**TIFFANY & BOSCO, P.A.**
Richard G. Himelrick, State Bar No. 004738
Seventh Floor Camelback Esplanade II
2525 E. Camelback Road
Phoenix, AZ 85016
Telephone: (602) 255-6000
Email: rgh@tblaw.com
*Liaison Counsel for Plaintiff*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com
         lrosen@rosenlegal.com
*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| David G. Lowthorp, Individually And On Behalf Of All Others Similarly Situated, | No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| V. | <u>CLASS ACTION</u> |
| Mesa Air Group, Inc.; Jonathan G. Ornstein; Michael J. Lotz; Daniel J. Altobello; Ellen N. Artist; Mitchell Gordon; Dana J. Lockhart; G. Grant Lyon; Giacomo Picco; Harvey Schiller; Don Skiados; Raymond James & Associates, Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Cowen and Company, LLC; Stifel, Nicolaus & Company, Incorporated; and Imperial Capital, LLC, | (DEMAND FOR JURY TRIAL) |
| Defendants. | |

Plaintiff David G. Lowthorp ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Mesa Air Group, Inc. ("Mesa Air Group," "Mesa" or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF THE ACTION

1.     Plaintiff brings this securities class action on behalf of persons who purchased or otherwise acquired Mesa Air Group's securities pursuant and/or traceable to the registration statement and related prospectus (collectively, the "Registration Statement") issued in connection with Mesa Air Group's August 2018 initial public offering (the "IPO" or "Offering") compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act").

2.     In August 2018, Defendants held the IPO, offering approximately 11 million shares of common stock to the investing public at $12.00 per share.

3.     By the commencement of this action, Mesa Air Group's shares trade significantly below its IPO price. As a result, investors were damaged.

## JURISDICTION AND VENUE

4.     The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of the Defendants' actions, and the subsequent damages took place within this District. The Company is also

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

headquartered in this District.

7.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of Mesa Air Group securities in this District.

## PARTIES

8.     Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities pursuant and/or traceable to the IPO and was damaged thereby.

9.     Defendant Mesa Air Group purports to operate as the holding company for Mesa Airlines, Inc., which provides regional air carrier services under capacity purchase agreements ("CPA") with American Airlines ("American") and United Airlines. Defendant Mesa Air Group is incorporated in Nevada and maintains its principal executive offices at 410 North 44th Street, Suite 700, Phoenix, Arizona. The Company's shares are listed on NASDAQ under the ticker symbol "MESA."

10.    Defendant Jonathan G. Ornstein ("Ornstein") was at all pertinent times Chairman of Mesa Air Group's Board of Directors (the "Board") and the Company's Chief Executive Officer ("CEO"). Defendant Ornstein reviewed, contributed to, and signed the Registration Statement.

11.    Defendant Michael J. Lotz ("Lotz") was at all pertinent times the Company's President and Chief Financial Officer ("CFO"). Defendant Lotz reviewed, contributed to, and signed the Registration Statement.

12.    Defendant Daniel J. Altobello ("Altobello") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

13.    Defendant Ellen N. Artist ("Artist") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the

2

signing and issuance of the Registration Statement.

14.     Defendant Mitchell Gordon ("Gordon") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

15.     Defendant Dana J. Lockhart ("Lockhart") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

16.     Defendant G. Grant Lyon ("Lyon") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

17.     Defendant Giacomo Picco ("Picco") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

18.     Defendant Harvey Schiller ("Schiller") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

19.     Defendant Don Skiados ("Skiados") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

20.     Defendants Ornstein, Lotz, Altobello, Artist, Gordon, Lockhart, Lyon, Picco, Schiller, and Skiados are collectively referred to herein as the "Individual Defendants."

21.     Each of the Individual Defendants signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential Mesa Air Group investors, all motivated by their own and the Company's financial interests.

3

22.     Defendant Raymond James & Associates, Inc. ("Raymond James") is an investment banking firm that acted as an underwriter of Mesa Air Group's IPO, helping to draft and disseminate the IPO documents. Raymond James' address is 880 Carillon Parkway, St. Petersburg, FL 33716.

23.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is an investment banking firm that acted as an underwriter of Mesa Air Group's IPO, helping to draft and disseminate the IPO documents. Merrill Lynch's address is 1 Bryant Park New York, NY 10036.

24.     Defendant Cowen and Company, LLC ("Cowen") is an investment banking firm that acted as an underwriter of Mesa Air Group's IPO, helping to draft and disseminate the IPO documents. Cowen's address is 1221 6th Ave, New York, NY 10020.

25.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") is an investment banking firm that acted as an underwriter of Mesa Air Group's IPO, helping to draft and disseminate the IPO documents. Mesa Air Group's address is 501 North Broadway, St. Louis, MO 63102.

26.     Defendant Imperial Capital, LLC ("Imperial") is an investment banking firm that acted as an underwriter of Mesa Air Group's IPO, helping to draft and disseminate the IPO documents. Imperial's address is 277 Park Ave, 48th Floor, New York, NY 10172.

27.     Defendants Raymond James, Merrill Lynch, Cowen, Stifel, and Imperial are referred to herein as the "Underwriter Defendants."

28.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared millions of dollars in fees collectively. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from Mesa Air Group, met with potential investors and presented

highly favorable information about the Company, its operations and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained an agreement from Mesa Air Group and the Individual Defendants that Mesa Air Group would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

(c)     Representatives of the Underwriter Defendants also assisted Mesa Air Group and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of the Company, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning the Company's most up-to-date operational and financial results and prospects.

(d)     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Mesa Air Group's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Mesa Air Group securities would be sold; (iii) the language to be used in the Registration Statement; what disclosures about the Company would be made in the Registration Statement; and (iv) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, Mesa Air Group's existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities

5

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

registered thereby, including those to Plaintiff and the other members of the Class.

29.     Mesa Air Group, the Individual Defendants, and the Underwriter Defendants are referred to collectively as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

30.     On or about July 13, 2018, Mesa Air Group filed with the SEC a Registration Statement on Form S-1, which in combination with subsequent amendments of Forms S-1/A and filed pursuant to Rule 424(b)(2), would be used for the IPO.

31.     On August 10, 2018, Mesa Air Group filed with the SEC its final prospectus for the IPO on Form 424B4 (the "Prospectus"), which forms part of the Registration Statement.

32.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

33.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

34.     In the Registration Statement, Mesa Air Group touted its "competitive cost structure" and "track record of reliable performance" stating the following, in pertinent part:

> As of March 31, 2018, we operated a fleet of 145 aircraft with approximately 610 daily departures. ***We operate 64 CRJ-900 aircraft under our capacity purchase agreement with American*** . . . and 20 CRJ-700 and 60 E-175 aircraft under our capacity purchase agreement with United . . . ***Over the last five calendar years, our share of the total regional airline fleet of American and United has increased from 7% to 11 % and from 4% to 15%, respectively. Driven by this fleet growth, our total operating revenues have grown by 55% from $415.2 million in fiscal 2013 to $643.6 million in fiscal 2017, respectively. We believe we have expanded our share with our major***

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

***airline partners because of our competitive cost structure, access to pilots under our labor agreements and track record of reliable performance***. . .

(Emphasis added.)

35.     In the Registration Statement, Mesa Air Group touted its ability to focus its efforts on safety and reliability, stating, in pertinent part:

> ***Our long-term capacity purchase agreements provide us guaranteed monthly revenue for each aircraft under contract***, a fixed fee for each block hour and flight flown, and reimbursement of certain direct operating expenses, in exchange for providing regional flying on behalf of our major airline partners. ***Our capacity purchase agreements shelter us from many of the elements that cause volatility in airline financial performance, including fuel prices, variations in ticket prices, and fluctuations in number of passengers.*** In providing regional flying under our capacity purchase agreements, we use the logos, service marks, flight crew uniforms and aircraft paint schemes of our major airline partners. Our major airline partners control route selection, pricing, seat inventories, marketing and scheduling, and provide us with ground support services, airport landing slots and gate access, ***allowing us to focus all of our eff orts on delivering safe, reliable and cost-competitive regional flying.***

(Emphasis added.)

36.     In the Registration Statement, Mesa Air Group touted itself as a low-cost operator with key efficiencies, including maintenance, such as its "responsible outsourcing of certain aircraft maintenance and other operating functions[,]" while also having its own maintenance team. The Company cited its 411 mechanics and employees generally as a key to its success. The Registration Statement further touted its low-cost and maintenance efficiencies, stating the following, in pertinent part:

> ***Low-Cost Operator.*** We believe that we are among the lowest cost operators of regional jet service in the United States. There are several key elements that contribute to our cost efficiencies:
> - ***Efficient Fleet Composition.*** We exclusively operate large regional aircraft with 70+ passenger seats on a single FAA certificate. Operating large regional aircraft allows us to enjoy unit cost advantages over smaller regional aircraft. ***Larger regional aircraft***

7

*require less fuel and crew resources per passenger carried, and may also have maintenance cost efficiencies.*

\* \* \*

- *Competitive Procurement of Certain Operating Functions.* We have long-term maintenance agreements with expirations extending from December 2020 to December 2027 with AAR Aircraft Services, Inc. ("AAR"), GE Engine Services, LLC ("GE"), StandardAero Limited ("StandardAero"), Aviall Services, Inc. ("Aviall") and Bombardier Aerospace ("Bombardier"), respectively, to provide parts procurement, inventory and engine, airframe and component overhaul services. We expect that our long-term agreements with these and other strategic vendors will provide predictable high-quality and cost-effective solutions for most maintenance categories over the next several years. *In prior periods, we also invested in long-term engine overhauls on certain aircraft, which we believe will reduce related maintenance obligations in future periods.*

\* \* \*

*Fleet Exclusively Comprised of Large, Efficient Regional Jets.* We exclusively operate large regional aircraft with 70+ passenger seats. These aircraft are the highest in demand across the regional airline industry and provide us with best in-class operating efficiencies, providing our major airline partners greater flexibility in route structuring and increased passenger revenues.

\* \* \*

*Maintain Low-Cost Structure.* We have established ourselves as a low-cost, efficient and reliable provider of regional airline services. *We intend to continue our disciplined cost control approach through responsible outsourcing of certain operating functions, by flying large regional aircraft with associated lower maintenance costs* and common flight crews across fleet types, and through the diligent control of corporate and administrative costs. Additionally, we expect our long-term collective bargaining agreements to protect us from significant labor cost increases over the next five years. These efficiencies, coupled with the low average seniority of our pilots, has enabled us to compete aggressively on price in our capacity purchase agreement negotiations.

8

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*      *      *

***A key element of our business and low-cost strategy is the responsible outsourcing of certain aircraft maintenance and other operating functions.*** We use competitive bidding among qualified vendors to procure these services on the best possible terms. In March 2014, August 2015 and January 2017, we entered into long-term maintenance contracts with AAR to provide fixed-rate parts procurement and component overhaul services for our aircraft fleet. Under these agreements, AAR provides maintenance and engineering services on any aircraft that we designate during the term of the agreement, along with access to spare parts inventory pool in exchange for a fixed monthly fee. Our agreements with AAR expire in 2026, unless earlier terminated for cause. ***We have not experienced difficulty obtaining spare parts on a timely basis for our aircraft fleet. As of September 30, 2017, $50.8 million of parts inventory was consigned to us by AAR under long-term contracts that is not reflected on our balance sheet.***

In July 2012, we entered into a heavy check maintenance contract with Bombardier, to perform heavy check maintenance on our CRJ-700 and CRJ-900 aircraft, which extends through November 2020.

In July 2013, we entered into an engine maintenance contract with GE to perform heavy maintenance on certain CRJ-700 and CRJ-900 engines based on a fixed pricing schedule. The pricing may escalate annually in accordance with GE's spare parts catalog for engines. The engine maintenance contract extends through 2024.

In 2014, we entered into a ten-year contract with Aviall to provide maintenance and repair services on the wheels, brakes and tires of our CRJ-700 and CRJ-900 aircraft. Under the agreement, we pay Aviall a fixed "cost per landing" fee for all landings of our aircraft during the term of the agreement, which fee is subject to annual adjustment based on increases in the cost of labor and component parts. As of September 30, 2017, $7.0 million of parts inventory was consigned to us by Aviall under long-term contracts that is not reflected on our balance sheet. We entered into an engine maintenance contract with StandardAero, which became effective on June 1, 2015, to perform heavy maintenance on certain CRJ-700 and CRJ-900 engines based on a fixed pricing schedule. The pricing may escalate annually in accordance with GE's spare parts catalog for engines. The engine maintenance contract extends through 2020.

***Apart from our outsourcing of certain maintenance functions, we have a FAA mandated and approved maintenance program. Our maintenance***

9

*technicians undergo extensive initial and recurrent training. Aircraft maintenance and repair consists of routine and non-routine maintenance, and work performed is divided into three general categories: line maintenance, heavy maintenance and component service.*

(Emphasis added.)

37.     In the Registration Statement, Mesa Air Group touted its operational performance and maintenance, stating that the Company's "cost discipline, strong operational performance and financial resources will provide additional opportunities to expand" and further stating, in pertinent part:

> *Strong Recent Record of Operational Performance.* We were ranked the number one regional airline for on-time performance by [the U.S. Department of Transportation ("DOT")] Air Travel Consumer Report for three of the first *four* months of 2018. In addition, we believe that we were the number one regional airline for on-time performance in 2016 and 2017 based on a comparison of our internal data to publicly available DOT data for reporting airlines. Under our capacity purchase agreements, we may receive financial incentives or incur penalties based upon our operational performance, including controllable on-time departures and controllable completion percentages.

38.     In the Registration Statement, Mesa Air Group provided the following "potential" risks, in pertinent part:

> *Increases in our labor costs, which constitute a substantial portion of our total operating costs, may adversely affect our business, results of operations and financial condition.*
>
> Our business is labor intensive, with labor costs representing approximately 28%, 30% and 34% of our total operating costs for the fiscal years ended September 30, 2016 and 2017 and the six months ended March 31, 2018, respectively. We are responsible for our labor costs above certain predetermined reimbursement levels, and we may not be entitled to receive increased payments under our capacity purchase agreements if our labor costs increase above the reimbursement levels. As a result, a significant increase in our labor costs above the reimbursement levels could result in a material reduction in our earnings.

*     *     *

10

The amounts we receive under our capacity purchase agreements may be less than the corresponding costs we incur.

\*        \*        \*

If our operating costs for labor, aircraft maintenance and overhead costs exceed the compensation earned from our pre-determined rates under our revenue-guarantee arrangements, our financial position and operating results will be negatively affected.

\*        \*        \*

**We rely on third-party suppliers as the sole manufacturers of our aircraft and aircraft engines.**

We depend upon Bombardier and Embraer S.A. ("Embraer") as the sole manufacturers of our aircraft and GE as the sole manufacturer of our aircraft engines. Our operations could be materially and adversely affected by the failure or inability of Bombardier, Embraer or GE to provide sufficient parts or related maintenance and support services to us in a timely manner, or the interruption of our flight operations as a result of unscheduled or unanticipated maintenance requirements/or our aircrafts or engines.

\*        \*        \*

**Maintenance costs will likely increase as the age of our regional jet fleet increases.**

The average age of our E-175, CRJ-900 and CRJ-700 type aircraft is approximately 2.4, 11.5 and 14.2 years, respectively. We have incurred relatively low maintenance expenses on our E-175 aircraft because most of the parts are under multi-year warranties and a limited number of heavy airframe checks and engine overhauls have occurred. Our maintenance costs will increase significantly, both on an absolute basis and as a percentage of our operating expenses, as our fleet ages and the E-175 warranties expire. In addition, because our current aircraft were acquired over a relatively short period of time, significant maintenance events scheduled for these aircraft will occur at roughly the same intervals, meaning we will incur our most expensive scheduled maintenance obligations across our present fleet at approximately the same time. These more significant maintenance activities result in out-of-service periods during which aircraft are dedicated to maintenance activities and unavailable for flying under our capacity purchase agreements. Any unexpected increase in our maintenance costs as our fleet ages or decreased revenues resulting from out-of-service periods could have an adverse effect on our cash flows, operating results and financial condition.

11

* * *

***If we /ace problems with any of our third-party service providers, our operations could be adversely affected.***

Our reliance upon others to provide essential services on behalf of our operations may limit our ability to control the efficiency and timeliness of contract services. We have entered into agreements with contractors to provide various facilities and services required/or our operations, including aircraft maintenance, ground facilities and IT services, and expect to enter into additional similar agreements in the future. In particular, we rely on AAR and Aviall to provide fixed-rate parts procurement and component overhaul services for our aircraft fleet and GE to provide engine support. Our agreement with AAR, and other service providers, are subject to termination after notice. If our third-party service providers terminate their contracts with us, or do not provide timely or consistently high-quality service, we may not be able to replace them in a cost-efficient manner or in a manner timely enough to support our operational needs, which could have a material adverse effect on our business, financial condition and results of operations. In addition, our operations could be materially and adversely affected by the failure or inability of AAR, Aviall or GE to provide sufficient parts or related maintenance and support services to us in a timely manner.

39.    The statements referenced in ¶¶30-38 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Mesa Air Group's operational performance was poor and below industry standards; (2) Mesa Air Group had a shortage of qualified mechanics and maintenance personnel; (3) Mesa Air Group had an inadequate number of spare aircraft and parts; (4) Mesa Air Group did not have a strong track record of reliable performance; (5) then-existing "risks" had already materialized; (6) Mesa Air Group knew of undisclosed adverse trends and uncertainties at the time of the IPO; and (7) as a result, Defendants' public statements were materially false and misleading at all relevant times.

40.    Then, on January 31, 2019, Mesa Air Group announced that its Board

12

ratified Mesa Airlines' entry into a term sheet with American which set forth amendments to the American CPA, effective February 1, 2019. These amendments to the American CPA included the following: (1) the conversion of two aircraft under the CPA to operational spares, resulting in a decrease in the number of guaranteed revenue-generating aircraft operated by Mesa Air Group for American from 64 to 62, effective April 1, 2019; (2) new and revised operational performance criteria imposed by American, which if not met could result in up to six additional aircraft being removed from the American CPA; (3) if Mesa failed to comply with the new and revised operational performance criteria, American would have the unilateral right to permanently withdraw one aircraft from the CPA, up to two aircraft from the CPA in any calendar month, and up to six aircraft in total; (4) if Mesa Air Group failed to comply with the new and revised operational performance criteria on two or more occasions, then upon the second occurrence and each subsequent failure, American would have the unilateral right to permanently withdraw six aircraft from the CPA.

41.     On February 5, 2019, during an earnings call with investors for Mesa Air Group's first quarter fiscal year 2019 ending December 31, 2018, Defendant Ornstein stated the following, in pertinent part:

> I'd also like to take a moment to talk about the 8-K we filed with American just to walk through that. **About a year ago, American talked [to] us about raising our performance levels.** As many of you know, that contract was negotiated initially almost 17 years ago. It's been through some modifications, but **the performance levels were certainly far below that which the industry is currently operating. All the levels, as I said, significantly below that** . . .

> We know we can operate with the best carriers, but we do need some issues addressed that were important to us, and they were willing to do that in return for the ability for us to operate at a higher level.

> For example, **some of those issues that were addressed were the number of spares we operate in. We increased that by 2** . . . [W]e will use those airplanes strategically going forward to maximize performance throughout our system.

> We traded that increased performance requirements . . .

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

In return to that, we did give them the right to pull down a few aircraft, fix aircraft over time. That first one that could come out would be in September.

(Emphasis added.)

42.     On May 9, 2019, the Company reported its Q2 2019 financial and operating results. In its earnings release, Mesa reported adjusted net income of $16 million and adjusted EPS of $0.46, below analysts' consensus of $0.55. Mesa also reported total operating revenues of $177 million, below analysts' consensus of $178.5 million.

43.     On May 10, 2019, during the Q2 2019 earnings call, the Raymond James analyst on the call asked Defendants about the American CPA amendments. Defendant Ornstein stated the following, in pertinent part:

> ***We knew that in the last year, 18 months, I mean, we were hamstrung by the fact that we had expanded a lot, we needed more pilots, we got hung up a little but in pilot training, maintenance became more difficult in terms of qualified maintenance people.*** And we're just sort of finally putting all that together.

(Emphasis added.)

44.     On August 8, 2019, Mesa reported its Q3 2019 financial and operating results. In its earnings release, Mesa Air Group reported adjusted net income of $10.4 million and adjusted EPS of just $0.30, well below analysts' consensus of $0.55. Mesa Air Group also reported total operating revenues of $180 million, below analysts' consensus of $183 million. The Company further reported increased maintenance expenses of $54 million, more than analyst estimates of $47 million, and total operating expenses of $163 million, more than analyst estimates of $149 million.

45.     On August 9, 2019, during the Q3 2019 earnings call, Defendant Ornstein explained, Mesa "did not meet the performance criteria" required under the American CPA, "and American elected to remove 2 aircraft effective November 2, 2019." American had elected to remove four aircraft from its CPA with Mesa Air Group, resulting in a decrease in the number of guaranteed revenue-generating aircraft operated by Mesa Air

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Group for American from 64 to 60. Defendant Ornstein also stated:

> [D]uring the initial 60-day performance period that began May 1, [a term under the American CPA], we had an aircraft unavailable due to ground damage in Dallas by a ground handler, and 2 additional aircraft were unavailable due to extended C-check tum times caused by labor shortages at our heavy maintenance provider, Bombardier.

46.     Defendant Ornstein added that Mesa still did not have an adequate number of operational spare aircraft, and as a result, it would be "very difficult to meet the performance criteria" required under the American CPA, which "could result in the removal of additional aircraft by the end of the calendar year."

47.     Mesa Air Group's Chief Operating Officer added the following about spare aircraft on the same earnings call: "once we're properly spared, we'd add the mechanics to deal with some of the more intensive maintenance issues, and we should be able to operate the fleet very reliably and meet their expectations."

48.     Since the IPO, and as a result of the disclosure of material adverse facts omitted from the Company's Registration Statement, Mesa Air Group's stock price has significantly fallen below its IPO price, damaging Plaintiff and Class members. On March 30, 2020, the Company's stock closed at $3.11 per share, or 74% less than its IPO price.

49.     Additionally, due to the materially deficient Registration Statement, Defendants have also violated their independent, affirmative duty to provide adequate disclosures about adverse conditions, risk and uncertainties. Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii) requires that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations.

50.     SEC Regulation S-K, 17 C.F.R. § 229.503, required the "Risk Factor" section of the Registration Statement to discuss the most significant factors that made the Offering risky or speculative and that each risk factor adequately described the risk. Defendants' failure to disclose the already occurring significant problems underlying its base business, as well as the likely material effects it would have on the Company's share

price, rendered the Registration Statement's many references to known risks that "if" occurring "may" or "could" adversely affect the Company as false and misleading.

51.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

52.    Plaintiff brings this action as a class action on behalf of all those who purchased Mesa Air Group securities pursuant and/or traceable to the Registration Statement (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

53.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Mesa Air Group or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

54.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

55.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

56.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)      whether Defendants violated the federal securities laws;

b)      whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and

c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

57.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of Section 11 of the Securities Act

### Against All Defendants

58.     Plaintiff incorporates all the foregoing by reference.

59.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

60.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

61.     Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

62.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

63.     By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

17

64. Plaintiff acquired Mesa Air Group securities pursuant to the Registration Statement.

65. At the time of their purchases of Mesa Air Group securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

66. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

**COUNT II**

**Violations of Section 12(a)(2) of the Securities Act**

**Against All Defendants**

67. Plaintiff incorporates all the foregoing by reference.

68. By means of the defective Prospectus, Defendants promoted, solicited, and sold the Company's securities to Plaintiff and other members of the Class.

69. The Prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased Mesa Air Group securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

70. Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired Mesa Air Group securities.

71.     By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Mesa Air Group securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

72.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## COUNT III

### Violations of Section 15 of the Securities Act

### Against the Company and the Individual Defendants

73.     Plaintiff incorporates all the foregoing by reference.

74.     This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against all Defendants except the Underwriter Defendants.

75.     The Individual Defendants were controlling persons of Mesa Air Group by virtue of their positions as directors or senior officers of Mesa Air Group. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of Mesa Air Group. The Company controlled the Individual Defendants and all of Mesa Air Group's employees.

76.     Mesa Air Group and the Individual Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

77.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 1, 2020

**TIFFANY & BOSCO, P.A.**

By: */s/ Richard G. Himelrick*
        Richard G. Himelrick
        Seventh Floor Camelback Esplanade II
        2525 E. Camelback Road
        Phoenix, AZ 85016
        *Liaison Counsel for Plaintiff*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
275 Madison Avenue, 40th Floor
New York, NY 10016
*Counsel for Plaintiff*

20

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2020, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*/s/Shelley Boettge*
Shelley Boettge

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Mesa Air Group, Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Mesa Air Group, Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

| | |
|---|---|
| **First name:** | David |
| **Middle initial:** | G |
| **Last name:** | Lowthorp |
| **Address:** | |
| **City:** | |
| **State:** | |
| **Zip:** | |
| **Country:** | |
| **Facsimile:** | |
| **Phone:** | |
| **Email:** | |



Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 12/31/2018 | 28 | 7.30 |
| Common Stock | 03/16/2020 | 28 | 3.85 |
| Common Stock | 03/18/2020 | 28 | 2.81 |

7. I have not served as a representative party on behalf of a class under the federal securities laws during the last three years, except if detailed below. [ ]

**Certification for David Lowthorp (cont.)**

I declare under penalty of perjury, under the laws of the
United States, that the information entered is accurate:          **YES**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.         **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform
Electronic Transactions Act as adopted by the various states and territories of the
United States.

Date of signing: 03/30/2020