1

Gary F. Urman (AZ 11748)
gurman@dmyl.com

2

**DECONCINI MCDONALD YETWIN & LACY, P.C.**
2525 East Broadway, Suite 500

3

Tucson, Arizona 85716
Telephone:520-322-5000

4

Facsimile: 520-322-5585

5

*Attorneys for Lead Plaintiff DeKalb County*
*Pension Fund and Liaison Counsel for the Class*

6

Lubna Faruqi (*Admitted pro hac vice*)

7

Robert W. Killorin (*Admitted pro hac vice*)
James M. Wilson, Jr. (*Admitted pro hac vice*)

8

**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor

9

New York, NY 10017
Telephone: 212-983-9330

10

Facsimile: 212-983-9331
Email: lfaruqi@faruqilaw.com

11

        rkillorin@faruqilaw.com
        jwilson@faruqilaw.com

12

*Attorneys for Lead Plaintiff DeKalb County*
*Pension Fund and Lead Counsel for the Class*

13

**UNITED STATES DISTRICT COURT**

14

**DISTRICT OF ARIZONA**

15

16

David G. Lowthorp, Individually And On
Behalf Of All Others Similarly Situated,

17

                    Plaintiff,

18

        V.

19

Mesa Air Group, Inc.; Jonathan G. Ornstein;

20

Michael J. Lotz; Daniel J. Altobello; Ellen N.
Artist; Mitchell Gordon; Dana J. Lockhart;

21

G. Grant Lyon; Giacomo Picco; Harvey

22

Schiller; Don Skiados; Raymond James &
Associates, Inc.; Merrill Lynch, Pierce,

23

Fenner & Smith Incorporated; Cowen and
Company, LLC; Stifel, Nicolaus &

24

Company, Incorporated; and Imperial

25

Capital, LLC,

26

                    Defendants.

27

28

Case No. 2:20-cv-00648-MTL

**AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

CLASS ACTION

(DEMAND FOR JURY TRIAL)

Lead Plaintiff DeKalb County Pension Fund ("Lead Plaintiff"),[1] individually and on behalf of all other persons similarly situated, by Lead Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things: (i) a review of U.S. Securities and Exchange Commission ("SEC") filings by Mesa Air Group, Inc. ("Mesa Air Group," "Mesa" or the "Company"); (ii) a review and analysis of those press releases, analyst reports, public statements, news articles, and other publications referenced herein that were disseminated by or concern Mesa and/or the other Defendants named herein; (iii) a review and analysis of those Company conference calls, press conferences, and related statements and materials referenced herein; and (iv) review and analysis of those other documents referenced herein. Many additional facts supporting the allegations are known only to Defendants and/or are within their exclusive custody or control. Lead Plaintiff believes that substantial additional evidentiary support will emerge for the allegations set forth herein after a reasonable opportunity to conduct discovery.

## NATURE OF THE ACTION

1.      Lead Plaintiff brings this securities class action on behalf of persons who purchased or otherwise acquired Mesa Air Group's securities pursuant and/or traceable to the Company's initial public offering (the "IPO" or "Offering") that was commenced on or around August 9, 2018. Lead Plaintiff alleges that the registration statement and related prospectus (collectively, the "Registration Statement")[2] issued in connection with the IPO violated Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") and that Mesa, certain officers and directors of Mesa, and the underwriters involved in the

---

[1]      Attached as Exhibit A is Lead Plaintiff's PSLRA Certification.

[2]      As used herein, the term "Registration Statement" refers to, collectively, the Registration Statement that was filed by the Company on July 13, 2018, all amendments thereto, and the Prospectus filed on Form 424B4 on August 10, 2018, as well as all Preliminary Prospectuses and updates and supplements thereto, which were incorporated into and formed a part of the Registration Statement that became effective on August 9, 2018.

creation and dissemination of the Registration Statement are strictly liable for damages sustained by Lead Plaintiff and the Class for the Securities Act violations.

2.      Defendant Mesa Air Group is headquartered in Phoenix, Arizona, and operates Mesa Airlines, Inc. ("Mesa Airlines").  Mesa Airlines is a regional air carrier that at the time of the Offering provided commercial passenger service to 110 cities in 38 states, the District of Columbia, Canada, Mexico, Cuba, and the Bahamas. All of Mesa's flights are operated as either American Eagle or United Express flights pursuant to the terms of capacity purchase agreements ("CPAs") Mesa Airlines has entered into with American Airlines, Inc. ("American") and United Airlines, Inc. ("United") (each, a "Major Airline Partner").  As of March 31, 2018, the American CPA accounted for 54% of Mesa's total revenue and the United CPA accounted for the remaining 46% of Mesa's total revenue.

3.      Mesa derives all of its operating revenues from Mesa Airlines' CPAs with its Major Airline Partners. In exchange for Mesa providing regional commercial flights on behalf of American and United, the CPAs provide the Company with guaranteed revenue for each aircraft under contract, fixed fees for block hours—computed as of the time aircraft engines are turned on for departure and turned off after landing—and flights flown, and reimbursement of certain operating expenses. At the time of the Offering, Mesa kept an operational spare aircraft as a backup for when aircraft assigned under the CPAs are out of service due to maintenance, repairs, or other issues.

4.      In 2010, Mesa filed for bankruptcy largely due to poor operational performance. Since emerging from bankruptcy, the Company has sought to portray itself as a new company, with such issues far in its past, that now operates efficiently with strong operational performance.

5.      On August 9, 2018, Mesa initiated its IPO by offering approximately 11 million shares of common stock to the investing public at $12.00 per share raising over $115 million. Company insiders sold shares in the Offering and obtained over $6.9 million from investors, while banks that underwrote the Offering collected over $8 million in fees.

2

6.      In connection with its IPO, Mesa Air Group described itself as the fastest growing regional airline in the United States, with several primary competitive strengths including a strong recent record of operational performance. However, soon after the IPO, Mesa disclosed materially adverse and previously existing but undisclosed conditions, trends, uncertainties, and risks at the Company, including a shortage of qualified mechanics and maintenance personnel to properly and timely service its aircraft, an inadequate number of operational spare aircraft to meet its needs, and operational performance levels far below industry standards, which led to increased maintenance expenses, decreased revenues, and weak earnings. These issues pre-dated the IPO, as Mesa's CEO stated during post-IPO quarterly earnings calls with investors.

7.      On May 10, 2019, for example, during an earnings call with investors for Mesa's second quarter fiscal year 2019 ending March 31, 2019 ("Q2 2019"),[3] Defendant Jonathan G. Ornstein ("Ornstein")—Mesa's Chairman and Chief Executive Officer ("CEO")—disclosed for the first time that Mesa had been "hamstrung" by a shortage of "qualified maintenance people" over the last 18 months-*i.e.*, for at least **nine months preceding the Offering**. On August 9, 2019, during an earnings call with investors for Mesa's third quarter fiscal **year 2019** ending June 30, 2019 ("Q3 2019"), Defendant Ornstein disclosed for the first time that there were "literally years of discussions"—*i.e.*, **at least one year preceding the Offering**—regarding the inadequacy of Mesa's number of operational spare aircraft. Defendant Ornstein further revealed for the first time that the Company had been "disadvantaged because [Mesa] did not have the adequate spare count."

8.      As a result and as further alleged below, the Registration Statement contained materially false and misleading statements of fact or omitted material facts required to be disclosed in order to make the statements in the Registration Statement not misleading, and were not prepared in accordance with the rules and regulations governing

---

[3]      Mesa reports its results of operations and financial condition on a fiscal year basis rather than a calendar year basis, with its first quarter ending December 31, its second quarter ending March 31, its third quarter ending June 30, and its fourth quarter and fiscal year ending September 30.

their preparation.

9.      In particular, the Registration Statement touted Mesa's "strong recent record of operational performance" and "low-cost structure" as primary competitive strengths. For example, the Registration Statement touted how Mesa had expanded its share of its Major Airline Partners' total regional airline fleet due to the Company's "competitive cost structure" and "track record of reliable performance." The Registration Statement also touted that Mesa was the number one regional airline for on-time performance and that its fleet of large regional aircraft—including a spare aircraft—allowed for maintenance cost efficiencies. In addition, the Registration Statement assured investors that the Company had long-term maintenance agreements and hundreds of in-house maintenance staff that were key to Mesa's success. However, prior to and at the time of the Offering, Mesa was significantly understaffed with respect to qualified mechanics and maintenance personnel to fully service its fleet, did not have an adequate number of operational spare aircraft to service and support its aging fleet of commercial passenger aircraft, and maintained operational performance levels "significantly below" industry standards.

10.      The Registration Statement also included false, misleading, and incomplete risk factors related to Mesa's operational performance because they did not warn investors about then-existing conditions described herein. In particular, the Registration Statement purported to warn of potential risks that "may" adversely affect the Company while failing to disclose that these very "risks" had already materialized prior to and at the time of the Offering. For example, the Registration Statement misled investors by stating: (1) "[i]ncreases in [Mesa's] labor costs . . . **may** adversely affect [its] business, results of operations and financial condition"; (2) "**[i]f** [Mesa's] operating costs for labor, aircraft maintenance and overhead cost exceed . . . compensation . . . [Mesa's] financial position and operating results will be negatively affected"; and (3) Mesa's "operations **could** be materially and adversely affected by the failure or inability of [third-parties] to provide sufficient parts or related maintenance and support services[.]" In fact, these risks had

4

already materialized prior to and at the time of the IPO.

11.     Within months of Mesa's IPO, the Company and its own executives disclosed additional information concerning the Company's operational performance that pre-dated the Offering. On May 9, 2019, Mesa reported its Q2 2019 financial and operating results, reporting adjusted earnings per share ("EPS") of $0.46, below analysts' consensus of $0.55, and total operating revenues of $177 million, below analysts' consensus of $178.5 million. During the related earnings call with investors held on May 10 2019, Defendant Ornstein stated for the first time that Mesa had been experiencing maintenance and other issues for months preceding the IPO: "**We knew that in the last year, 18 months**, . . . we were hamstrung by the fact that we had expanded a lot, [and] . . . **maintenance became more difficult in terms of qualified maintenance people**." (Emphasis added.)

12.     Then, on August 8, 2019, Mesa reported its Q3 2019 financial and operating results, reporting adjusted EPS of just $0.30, well below analysts' consensus of $0.55, and total operating revenues of $180 million, below analysts' consensus of $183 million. Mesa also reported increased maintenance expenses of $54 million, more than analyst estimates of $47 million, and total operating expenses of $163 million, more than analyst estimates of $149 million. The related press release issued that same day described how Mesa "experienced significant operational challenges in [its] American operation, . . . . result[ing] in [Mesa] operating with an insufficient number of spare aircraft" and "[Mesa] failing to meet . . . new performance criteria, and American elect[ing] to remove two aircraft from the [CPA] effective November 2, 2019." During the related earnings call with investors held on August 9, 2019, Defendant Ornstein informed the market for the first time that, in fact, Mesa had failed to maintain an adequate number of operational spare aircraft for years: "[W]e had 3 spares, historically, with American. There was [sic] literally years of discussions in regard to what was the adequate spare count versus . . . other operators, okay? I was a very strong advocate that **Mesa was being . . . disadvantaged**

**because we did not have the adequate spare count**.” (Emphasis added.)

13.     In the Registration Statement, Mesa touted the long-term security it had with American, the carrier that accounted for most of its revenue.  Mesa stated “Our long-term capacity purchase agreements provide us guaranteed monthly revenue for each aircraft under contract . . . .”  The Registration Statement described the CPAs with American and United as “Stable, Long-Term Revenue-Guarantee Capacity Purchase Agreements” that extend beyond 2020 for 94 of Mesa’s 144 aircraft in scheduled service. In fact, before the IPO, American had expressed dissatisfaction with the terms of the antiquated CPA, originally entered in February 2001, and was seeking to revise them before 2020, which is what happened. On February 5, 2019 Defendant Ornstein revealed for the first time that American had expressed a desire to revise the terms of the CPA approximately six months before the IPO during a conference call: “About a year ago, American talked [to] us about raising our performance levels.” After the IPO, American revised its CPA with Mesa, increasing Mesa’s performance requirements to levels that Mesa could not meet. Mesa’s inability to meet the new performance standards caused it to have a disastrous third quarter in 2019, with its stock price crashing from $10.77 per share on July 24, 2019 to $5.84 on August 12, 2019.

14.     As a result of Defendants’ securities law violations, Lead Plaintiff and the Class have suffered significant losses and damages. Due to the undisclosed adverse conditions, risks, trends, and uncertainties concerning Mesa’s operational performance—all of which the Company’s own executives have now disclosed existed prior to the IPO— *Mesa’s common stock price has plummeted and lost 75% of its value from its Offering price*, closing at $3.03 per share on April 1, 2020, as shown by the chart below.[4]

---

[4]     Attached as Exhibit B is a chart of Mesa’s historical stock price performance.



## JURISDICTION AND VENUE

15. This action arises under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act (15 U.S.C. § 77v).

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and § 22(a) of the Securities Act (15 U.S.C. § 77v(a)). Mesa is headquartered in this District and a significant portion of Defendants' actions occurred within this District.

18. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of Mesa Air Group securities in this District.

## PARTIES

19. Lead Plaintiff, as set forth in the accompanying Certification, purchased the

Company's securities pursuant and/or traceable to the IPO and was damaged thereby.

20.     Defendant Mesa Air Group is the holding company for Mesa Airlines, which provides regional air carrier services under capacity purchase agreements, or CPAs, with American Airlines and United Airlines. Defendant Mesa Air Group is incorporated in Nevada and maintains its principal executive offices at 410 North 44th Street, Suite 700, Phoenix, Arizona. The Company's shares are listed on NASDAQ under the ticker symbol "MESA."

21.     Defendant Ornstein was at all pertinent times Chairman of Mesa Air Group's Board of Directors (the "Board") and the Company's Chief Executive Officer ("CEO"). Defendant Ornstein reviewed, contributed to, and signed the Registration Statement.

22.     Defendant Michael J. Lotz ("Lotz") was at all pertinent times the Company's President and Chief Financial Officer ("CFO"). Defendant Lotz reviewed, contributed to, and signed the Registration Statement.

23.     Defendant Daniel J. Altobello ("Altobello") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

24.     Defendant Ellen N. Artist ("Artist") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

25.     Defendant Mitchell Gordon ("Gordon") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

26.     Defendant Dana J. Lockhart ("Lockhart") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

27.     Defendant G. Grant Lyon ("Lyon") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the

signing and issuance of the Registration Statement.

28.     Defendant Giacomo Picco ("Picco") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

29.     Defendant Harvey Schiller ("Schiller") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

30.     Defendant Don Skiados ("Skiados") was at all pertinent times a member of the Board of the Company and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

31.     Defendants Ornstein, Lotz, Altobello, Artist, Gordon, Lockhart, Lyon, Picco, Schiller, and Skiados are collectively referred to herein as the "Individual Defendants."

32.     Each of the above Individual Defendants signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential Mesa Air Group investors, all motivated by their own and the Company's financial interests.

33.     Defendant Raymond James & Associates, Inc. ("Raymond James") is an investment banking firm that acted as an underwriter of Mesa Air Group's IPO, helping to draft and disseminate the Registration Statement. Defendant Raymond James acted as a representative of all of the underwriters. Defendant Raymond James also participated in conducting and promoting the roadshow for the IPO. Raymond James' address is 880 Carillon Parkway, St. Petersburg, FL 33716.

34.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is an investment banking firm that acted as an underwriter of Mesa Air Group's IPO, helping to draft and disseminate the Registration Statement. Defendant Merrill Lynch

acted as a representative of all of the underwriters. Defendant Merrill Lynch also participated in conducting and promoting the roadshow for the IPO. Merrill Lynch's address is 1 Bryant Park, New York, NY 10036.

35.     Defendant Cowen and Company, LLC ("Cowen") is an investment banking firm that acted as an underwriter of Mesa Air Group's IPO, helping to draft and disseminate the Registration Statement. Defendant Cowen also participated in conducting and promoting the roadshow for the IPO. Cowen's address is 1221 6th Ave., New York, NY 10020.

36.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") is an investment banking firm that acted as an underwriter of Mesa Air Group's IPO, helping to draft and disseminate the Registration Statement. Defendant Stifel also participated in conducting and promoting the roadshow for the IPO. Mesa Air Group's address is 501 North Broadway, St. Louis, MO 63102.

37.     Defendant Imperial Capital, LLC ("Imperial") is an investment banking firm that acted as an underwriter of Mesa Air Group's IPO, helping to draft and disseminate the IPO documents. Defendant Imperial also participated in conducting and promoting the roadshow for the IPO. Imperial's address is 277 Park Ave., 48th Floor, New York, NY 10172.

38.     Defendants Raymond James, Merrill Lynch, Cowen, Stifel, and Imperial are referred to herein as the "Underwriter Defendants."

39.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a) The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared millions of dollars in fees collectively. The Underwriter Defendants arranged a multi city roadshow prior to the IPO during which they, and

representatives from Mesa Air Group, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b) The Underwriter Defendants also demanded and obtained an agreement from Mesa Air Group and the Individual Defendants that Mesa Air Group would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

(c) Representatives of the Underwriter Defendants also assisted Mesa Air Group and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of the Company, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning the Company's most up-to-date operational and financial results and prospects.

(d) In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Mesa Air Group's lawyers, management and top executives and on information and belief engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Mesa Air Group securities would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, Mesa Air Group's existing problems as detailed herein.

(e) The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Lead Plaintiff and the other members of the Class.

40.     Mesa Air Group, the Individual Defendants, and the Underwriter Defendants are referred to collectively as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

41.     Mesa was founded in 1982 and through its wholly-owned subsidiary, Mesa Airlines, is the fifth largest regional air carrier in the United States ranked by number of passenger enplanements, and one of two publicly traded regional air carriers in the United States. The Company also wholly owns Mesa Air Group-Airline Inventory Management, LLC ("MAG-AIM")—an Arizona limited liability company—which was established to purchase, distribute, and manage Mesa Airlines' inventory of spare rotable (capable of being rebuilt or overhauled) and expendable (throw-away) parts.

42.     By 2009, the Company had grown its fleet to 130 commercial passenger aircraft, flying under the U.S. Airways Group and Delta Air Lines banners, but about 52 of these aircraft were not in use at the time.  Earlier in 2008, Delta Air Lines had cancelled a contract with Mesa, arguing that the Company failed to deliver on-time performance and had poor completion rates. The Company had developed a poor reputation among major air carriers for not running on-time and having dirty aircraft. In January 2010, Mesa Air Group filed for bankruptcy protection.

43.     Since it emerged from bankruptcy in 2011, Mesa has portrayed itself as a stalwart paradigm of consistent, reliable operational performance.

44.     The Registration Statement repeatedly describes and touts Mesa's "operational performance," a term of art that refers to completion of flights, on-time performance, and other operating metrics. Under the CPAs with its Major Airline Partners, Mesa may receive certain financial incentives or incur penalties based on the Company's

operational performance, including controllable on-time departures and controllable completion percentages.

45.     According to the Registration Statement, Mesa provides commercial passenger flights to 110 cities in 37 states, the District of Columbia, Canada, Mexico, Cuba, and the Bahamas. All of Mesa's flights are operated as either American Eagle or United Express flights pursuant to the terms of CPAs the Company has negotiated and entered into with its Major Airline Partners, American and United.

46.     Mesa derives all of its operating revenues from the CPAs. The CPAs provide Mesa with: (i) guaranteed monthly revenue for each aircraft assigned under contract; (ii) a fixed fee for each block hour and flight flown; and (iii) reimbursement of certain direct operating expenses, *i.e.*, "pass-through" costs such as passenger and hull insurance, aircraft property taxes, landing fees, and catering. In exchange, Mesa provides regional commercial passenger flights under the American Eagle and United Express banners. Mesa adopts its Major Airline Partners' logos, service marks, flight crew uniforms, and aircraft paint schemes under the CPAs.

47.     Mesa's Major Airline Partners control route selection, pricing, seat inventories, marketing, and scheduling, and they also provide ground support services, airport landing slots, and gate access. Mesa maintains that its CPAs with American and United shield the Company from many costs and financial volatility inherent to the airline industry, such as fuel prices and fluctuations in ticket prices and number of passengers. According to the Company, this allows Mesa "to focus all of [its] efforts on delivering safe, reliable and cost-competitive regional flying."

48.     On the other hand, Mesa incurs and is responsible for significant operating expenses, including maintenance—*e.g.*, maintenance and repairs related to engine overhauls, airframe, landing gear, recurring maintenance, and lease return obligations on leased aircraft—and flight operations—*e.g.*, costs related to salaries, bonuses, and benefits for the Company's pilots, flight attendants, and dispatch personnel - as well as aircraft rent,

depreciation and amortization ("D&A"), general and administrative costs, aircraft and traffic servicing, and fuel.

49.     Since Mesa's fiscal year ("FY") ended September 30, 2013, maintenance has consistently been Mesa's largest annual operating expense, ranging from 27% to 42% of the Company's total operating expenses for FY 2013 through FY 2017. Mesa's maintenance expenses are also significant compared to its total operating revenues, with a maintenance expense-to-operating revenue ratio ranging from 25% to 38% for the same period. Thus, maintenance cost is a critical measure of Mesa's financial condition.

50.     Nevertheless, the Registration Statement touted to investors that the Company had 411 mechanics, as well as contracts with third parties to cover maintenance and, importantly, that maintenance expenses had been decreasing. For example, for the six months ended March 31, 2018 compared to the prior year period, aircraft maintenance cost decreased by nearly $11.7 million, or 9.9%, to nearly $105.8 million. The following chart from the Registration Statement illustrates this decrease:

| | Six Months Ended March 31, | | | |
| | 2017 | 2018 | Change | |
| | (in thousands) | | | |
| Engine overhaul | $      45,111 | $      27,939 | $ (17,172) | (38.1)% |
| Pass-through engine overhaul | 0 | 5,201 | 5,201 | 0.0% |
| C-check | 9,710 | 7,804 | (1,906) | (19.6)% |
| Pass-through C-check | 483 | 5,711 | 5,228 | 1082.4% |
| Component contracts | 16,473 | 15,275 | (1,198) | (7.3)% |
| Rotable and expendable parts | 14,704 | 11,690 | (3,014) | (20.5)% |
| Other pass-through | 2,120 | 3,765 | 1,645 | 77.6% |
| Labor and other | 28,821 | 28,371 | (450) | (1.6)% |
| Total | $    117,422 | $    105,756 | $ (11,666) | (9.9)% |

51.     Likewise, aircraft maintenance costs decreased by $14.4 million, or 6.4%, from Mesa's FY 2016 to FY 2017.  The following chart from the Offering Documents illustrates this decrease:

| (in thousands) | Year Ended September 30, | | Change | |
|---|---|---|---|---|
| | 2016 | 2017 | | |
| Engine overhaul | $ 90,890 | $ 63,719 | $ (27,171) | (29.9)% |
| Pass-through engine overhaul | — | 270 | 270 | 0.0% |
| C-check | 13,185 | 17,755 | 4,570 | 34.7% |
| Pass-through C-check | — | 4,889 | 4,889 | 0.0% |
| Component contracts | 31,702 | 31,671 | (32) | (0.1)% |
| Rotable and expendable parts | 27,160 | 26,098 | (1,062) | (3.9)% |
| Other pass-through | 3,728 | 6,003 | 2,275 | 61.0% |
| Labor and other | 58,464 | 60,324 | 1,860 | 3.2% |
| Total | $ 225,130 | $ 210,729 | $ (14,401) | (6.4)% |

52.     To be clear, maintenance and repairs are a key element of Mesa's business and are critical to achieving high levels of operational performance, as the Company must consistently deliver operational aircraft.

53.     According to the Registration Statement, Mesa operates a fleet of 145 large regional commercial aircraft, with approximately 610 daily departures.  The Company operates 64 Bombardier Aerospace ("Bombardier") CRJ-900 aircraft assigned under the American CPA, as well as 20 Bombardier CRJ-700 aircraft and 60 Embraer S.A. ("Embraer") E-175 aircraft assigned under the United CPA, each with 70 or more passenger seats.

54.     Mesa also maintained, at the time of the IPO, a single, 50-seat Bombardier CRJ-200 aircraft as an operational spare not assigned for service under either of its CPAs with American or United. Like other airlines, Mesa depends on its operational spare aircraft to operate reliably, substituting in a spare when assigned aircraft are unavailable due to unscheduled maintenance, delayed repairs, schedule recovery efforts because of air traffic control ("ATC") delays, or other issues.

55.     From 2013 to the time of the IPO, Mesa's share of the total regional airline fleet of American and United has increased from 7% to 11% and from 4% to 15% respectively.  Along with this fleet growth, the Company's total operating revenues grew by 55% from $415.2 million in FY 2013 to nearly $643.6 million in FY 2017. Mesa claims that this growth resulted from its "competitive cost structure, access to pilots under [its] labor agreements and track record of reliable performance."

56.     The following data from the Registration Statement further portrayed to investors how far the Company had come since its 2010 bankruptcy:

**Operating Revenues, Expenses, and Income**

| | 2013[1] | 2014[1] | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| | | (in thousands, except per share data) | | | |
| **Operating revenues:** | | | | | |
| Contract revenue | $ 382,125 | $ 407,408 | $ 481,168 | $ 569,373 | $ 618,698 |
| Pass-through and other | 33,131 | 28,617 | 24,931 | 18,463 | 24,878 |
| Total operating revenues | 415,256 | 436,025 | 506,099 | 587,836 | 643,576 |
| **Operating expenses:** | | | | | |
| Flight operations | 78,685 | 93,092 | 118,600 | 141,422 | 155,516 |
| Fuel | 13,531 | 6,092 | 1,017 | 753 | 766 |
| Maintenance | 102,473 | 123,506 | 142,643 | 225,130 | 210,729 |
| Aircraft rent | 77,243 | 80,942 | 69,083 | 71,635 | 72,551 |
| Aircraft and traffic servicing | 28,363 | 20,817 | 13,274 | 3,936 | 3,676 |
| Promotions and sales[2] | 5,406 | 2,795 | 11 | — | — |
| General and administrative | 31,598 | 34,501 | 39,940 | 42,182 | 38,996 |
| Depreciation and amortization | 32,945 | 33,425 | 42,296 | 46,020 | 61,048 |
| Asset impairment | 7,942 | — | — | — | — |
| Total operating expenses | 378,186 | 395,170 | 426,864 | 531,078 | 543,282 |
| Operating income | 37,070 | 40,855 | 79,235 | 56,758 | 100,294 |

**Operating Data**

| | 2013[1] | 2014[1] | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **Operating Data** | | | | | |
| Block hours | 206,431 | 225,720 | 308,681 | 368,468 | 395,083 |
| Departures | 134,805 | 140,165 | 172,033 | 208,399 | 221,990 |
| Passengers | 7,872,574 | 8,520,917 | 10,632,903 | 12,497,424 | 13,005,844 |
| Available seat miles—ASMs (thousands) | 4,283,272 | 4,932,516 | 7,356,450 | 8,823,595 | 9,471,911 |
| Revenue passenger miles—RPMs (thousands) | 3,703,837 | 4,103,834 | 6,019,316 | 7,019,586 | 7,392,688 |
| Contract revenue per available seat mile—CRASM (in cents) | c  8.92 | c  8.26 | c  6.54 | c  6.45 | c  6.53 |
| Operating cost per available seat mile—CASM (in cents) | c  8.83 | c  8.01 | c  5.80 | c  6.02 | c  5.74 |

(1) Our operations data for our fiscal years ended September 30, 2013 and 2014 include results from our historical *go!* operations. We operated *go!* as an inter-island air carrier in Hawaii from 2006 to 2014.

## **Mesa's IPO**

57.     On or about July 13, 2018, Mesa Air Group filed with the SEC a Registration Statement on Form S-1, which in combination with subsequent amendments of Forms S-

1/A and filed pursuant to Rule 424(b)(2), would be used for the IPO.

58.     On August 10, 2018, Mesa Air Group filed with the SEC its final prospectus for the IPO on Form 424B4 (the "Prospectus"), which forms part of the Registration Statement.

59.     Pursuant to the IPO, Mesa sold 10,974,500 shares of its common stock to the investing public, 1,344,500 of those shares representing the Underwriter Defendants' partial exercise of their overallotment option as announced on September 11, 2018.  The proceeds from 723,985 shares in the overallotment went to the Company while the proceeds from 620,515 shares in the overallotment went to the selling shareholders, including the Individual Defendants and other Company insiders.

60.     The Registration Statement stated that Defendants were "offering to sell, and seeking offers to buy, shares of our common stock."  The Registration Statement also informed investors that the Defendants did not "authorize[] anyone to provide [investors] with additional information or information different from that contained in" the Offering Documents.

**The Registration Statement for the IPO Contained Materially False and Misleading Statements of Fact and Omitted Material Facts in Violation of the Securities Laws**

61.     Sections 11 and 12(a)(2) of the Securities Act create strict liability for any untrue statements of material facts or any omission of material fact required to be stated in a registration statement or prospectus, respectively.[5]

62.     Pursuant to Sections 11 and 12(a)(2) of the Securities Act and SEC Regulation C, Defendants were also required to disclose material information necessary to ensure that representations therein were not misleading. Specifically, Rule 408, 17 C.F.R. § 230.408(a), states that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as

---

[5]     With respect to statements flagged as false and/or misleading in this Complaint, the statements being challenged as false and/or misleading are those statements that are bolded and italicized for emphasis in this section of the Complaint.

1    may be necessary to make the required statements, in light of the circumstances under

2    which they are made, not misleading."

3        63.    Under the instructions to Form S-1, Defendants were required to furnish the

4    information called for under Item 303 of Regulation S-K, 17 C.F.R. § 229.303.

5    Specifically, Item 303, and the SEC's related interpretive releases thereto, requires issuers

6    to disclose events or uncertainties, including, but not limited to "any known trends or

7    uncertainties that have had or that the registrant reasonable expects will have a material

8    favorable or unfavorable impact on net sales or revenues or income from continuing

9    operations" or "material events and uncertainties known to management that would cause

10   reported financial information not to be necessarily indicative of future operating results or

11   of future financial condition."

12       64.    Under the instructions to Form S-1, Defendants were also required to furnish

13   the information called for under Item 503 of Regulation S-K, 17 C.F.R. § 229.503.[6]

14   Specifically, Item 503, and the SEC's related interpretive releases thereto, requires issuers

15   to "provide under the caption 'Risk Factors' a discussion of the most significant factors

16   that make . . . [the] offering speculative or risky" and "[e]xplain how the risk affects the

17   registrant or the securities being offered."

18       65.    In violation of these statutes and rules, the Registration Statement contained

19   materially misleading statements and omissions concerning Mesa's operational

20   performance, including the fact that the Company was operating below industry standard

21   operating levels, the Company's shortage of qualified mechanics and qualified

22   maintenance personnel to service its fleet, and the Company's inadequate number of

23   operational spare aircraft to meet its needs. Specifically, the Registration Statement failed

24   to disclose the truth about: (i) Mesa's operational performance, including adverse trends

25   and uncertainties occurring at the Company; and (ii) then-existing risks that had already

26

27   _____
     [6]     On April 2, 2019, the SEC relocated Item 503(c) to Item 105 of Regulation S-K. *See*
28   FAST Act Modernization and Simplification of Regulation S-K, 84 Fed Reg. 12674,
     12688–89 (Apr. 2, 2019); 17 CFR § 229.105.

materialized.  As a result, the Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained in the Registration Statement not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

**The Registration Statement Contained Material Untrue Statements and Omissions and Failed to Disclose and Misrepresented Certain Material Adverse Trends and Uncertainties That Existed at the Time of the IPO**

66.     In the Registration Statement, Mesa Air Group touted its "competitive cost structure" and "track record of reliable performance" as the basis for the Company having "expanded [its] share" with it Major Airline Partners, stating the following, in pertinent part:

> As of March 31, 2018, we operated a fleet of 145 aircraft with approximately 610 daily departures. ***We operate 64 CRJ-900 aircraft under our capacity purchase agreement with American*** . . . and 20 CRJ-700 and 60 E-175 aircraft under our capacity purchase agreement with United . . . . ***Over the last five calendar years, our share of the total regional airline fleet of American and United has increased from 7% to 11% and from 4% to 15%, respectively. Driven by this fleet growth, our total operating revenues have grown by 55% from $415.2 million in fiscal 2013 to $643.6 million in fiscal 2017, respectively. We believe we have expanded our share with our major airline partners because of our competitive cost structure, access to pilots under our labor agreements and track record of reliable performance***.

(Emphasis added.)

67.     The Registration Statement describes how the CPAs provide Mesa Air Group with "guaranteed monthly revenue for each aircraft under contract" and also touted the Company's ability to focus its efforts on safety and reliability because its Major Airline Partners assume responsibility for many facets of the airline business, stating, in pertinent part:

> ***Our long-term capacity purchase agreements provide us guaranteed monthly revenue for each aircraft under contract***, a fixed fee for each block hour and flight flown, and reimbursement of certain direct operating expenses, in exchange for providing regional flying on behalf of our major airline partners. ***Our capacity purchase agreements shelter us from many of the elements that cause volatility in airline financial performance, including fuel prices, variations in ticket prices, and fluctuations in number of passengers.*** In providing regional flying under our capacity purchase agreements, we use the logos, service marks, flight crew uniforms and aircraft paint schemes of our major airline partners. Our major airline

partners control route selection, pricing, seat inventories, marketing and scheduling, and provide us with ground support services, airport landing slots and gate access, ***allowing us to focus all of our efforts on delivering safe, reliable and cost-competitive regional flying.***

(Emphasis added.)

68.   In the Registration Statement, Mesa Air Group touted itself as a low-cost operator with key efficiencies, including maintenance, such as its "responsible outsourcing of certain aircraft maintenance and other operating functions[,]" while also having its own maintenance team. The Company cited its 411 mechanics and employees generally as a key to its success. The Registration Statement further touted its low-cost and maintenance efficiencies, stating the following, in pertinent part:

***Low-Cost Operator.*** We believe that we are among the lowest cost operators of regional jet service in the United States. There are several key elements that contribute to our cost efficiencies:

- ***Efficient Fleet Composition.*** We exclusively operate large regional aircraft with 70+ passenger seats on a single FAA certificate. Operating large regional aircraft allows us to enjoy unit cost advantages over smaller regional aircraft. ***Larger regional aircraft require less fuel and crew resources per passenger carried, and may also have maintenance cost efficiencies.***

\*   \*   \*

- ***Competitive Procurement of Certain Operating Functions.*** We have long-term maintenance agreements with expirations extending from December 2020 to December 2027 with AAR Aircraft Services, Inc. ("AAR"), GE Engine Services, LLC ("GE"), StandardAero Limited ("StandardAero"), Aviall Services, Inc. ("Aviall") and Bombardier Aerospace ("Bombardier"), respectively, ***to provide parts procurement, inventory and engine, airframe and component overhaul services. We expect that our long-term agreements with these and other strategic vendors will provide predictable high-quality and cost-effective solutions for most maintenance categories over the next several years. In prior periods, we also invested in long-term engine overhauls on certain aircraft, which we believe will reduce related maintenance obligations in future periods.***

(Emphasis added.)

69.   In the Registration Statement, Mesa told investors that the Company operated a fleet of exclusively large, regional jets "with best-in-class operating efficiencies[.]"  The Registration Statement also stated that the Company had an "operational spare not assigned for service under" Mesa's CPAs with its Major Airline Partners.  The Offering Documents

stated, in pertinent part, as follows:

> ***Fleet Exclusively Comprised of Large, Efficient Regional Jets.*** We
> exclusively operate large regional aircraft with 70+ passenger seats. These
> aircraft are the highest in demand across the regional airline industry and
> ***provide us with best- in-class operating efficiencies***, providing our major
> airline partners greater flexibility in route structuring and increased
> passenger revenues. ***As of March 31, 2018, we had 145 aircraft (owned and
> leased) consisting of the following:***

| | Embraer Regional Jet-175 (76 seats)[1] | Canadair Regional Jet-700 (70 seats) | Canadair Regional Jet-900 (76-79 seats) | Canadair Regional Jet-200 (50 seats)[2] | Total |
|---|---|---|---|---|---|
| American Eagle | — | — | 64 | — | 64 |
| United Express | 60 | 20 | — | — | 80 |
| Subtotal | 60 | 20 | 64 | — | 144 |
| Unassigned | — | — | — | 1 | 1 |
| Total | 60 | 20 | 64 | 1 | 145 |

> (1) In February 2018, we mutually agreed with United to temporarily remove two
>     aircraft from service under our United Capacity Purchase Agreement.  These
>     aircraft were placed back in service in July 2018 and are reflected here.
> (2) ***CRJ-200 is an operational spare not assigned for service under our capacity
>     purchase agreements.***

(Emphasis added.)

70.     The Registration Statement touted that Mesa has a "strong recent record of
operational performance."  The Offering Documents stated, in pertinent part, as follows:

> ***Strong Recent Record of Operational Performance.***  We were ranked the
> number one regional airline for on-time performance by [the U.S. Department of
> Transportation ("DOT")] Air Travel Consumer Report for three of the first four
> months of 2018.  In addition, we believe that we were the number one regional
> airline for on-time performance in 2016 and 2017 based on a comparison of our
> internal data to publicly available DOT data for reporting airlines.  Under our
> capacity purchase agreements, we may receive financial incentives or incur
> penalties based upon our operational performance, including controllable on-time
> departures and controllable completion percentages.

(Emphasis added.)

71.     The Registration Statement told investors that Mesa's business strategy
includes maintaining a "low-cost structure" and that the Company has established itself as

a "low-cost, efficient and reliable provider of regional airline services" through a

"disciplined cost control approach" that would continue to "outsource[e] . . . certain

operating functions" and rely on "flying large regional aircraft with associated lower

maintenance costs[.]"  The Offering Documents stated, in pertinent part, as follows:

> ***Maintain Low-Cost Structure.*** We have established ourselves as a low-cost, efficient and reliable provider of regional airline services. ***We intend to continue our disciplined cost control approach through responsible outsourcing of certain operating functions, by flying large regional aircraft with associated lower maintenance costs*** and common flight crews across fleet types, and through the diligent control of corporate and administrative costs. Additionally, we expect our long-term collective bargaining agreements to protect us from significant labor cost increases over the next five years. **These efficiencies, coupled with the low average seniority of our pilots, has enabled us to compete aggressively on price in our capacity purchase agreement negotiations.**

(Emphasis added.)

72.     The Registration Statement discussed the Company's growth opportunities

and noted that the Company's "***cost discipline, strong operational performance*** and

financial resources will provide additional opportunities to expand [its] operations[.]"

(Emphasis added.)

73.     The Registration Statement told investors that a "key element" of Mesa's

business and "low-cost strategy" is the "responsible outsourcing of certain aircraft

maintenance and other operating functions[,]" while also having its own internal

maintenance team.  The Offering Documents stated, in pertinent part, as follows:

> ***A key element of our business and low-cost strategy is the responsible outsourcing of certain aircraft maintenance and other operating functions.*** We use competitive bidding among qualified vendors to procure these services on the best possible terms. In March 2014, August 2015 and January 2017, we entered into long-term maintenance contracts with AAR to provide fixed-rate parts procurement and component overhaul services for our aircraft fleet. Under these agreements, AAR provides maintenance and engineering services on any aircraft that we designate during the term of the agreement, along with access to spare parts inventory pool in exchange for a fixed monthly fee. Our agreements with AAR expire in 2026, unless earlier terminated for cause. ***We have not experienced difficulty obtaining spare parts on a timely basis for our aircraft fleet. As of September 30, 2017, $50.8 million of parts inventory was consigned to us by AAR under long-term contracts that is not reflected on our balance sheet.***

In July 2012, we entered into a heavy check maintenance contract with Bombardier, to perform heavy check maintenance on our CRJ-700 and CRJ-900 aircraft, which extends through November 2020.

In July 2013, we entered into an engine maintenance contract with GE to perform heavy maintenance on certain CRJ-700 and CRJ-900 engines based on a fixed pricing schedule. The pricing may escalate annually in accordance with GE's spare parts catalog for engines. The engine maintenance contract extends through 2024.

In 2014, we entered into a ten-year contract with Aviall to provide maintenance and repair services on the wheels, brakes and tires of our CRJ-700 and CRJ-900 aircraft. Under the agreement, we pay Aviall a fixed "cost per landing" fee for all landings of our aircraft during the term of the agreement, which fee is subject to annual adjustment based on increases in the cost of labor and component parts. As of September 30, 2017, $7.0 million of parts inventory was consigned to us by Aviall under long-term contracts that is not reflected on our balance sheet.

We entered into an engine maintenance contract with StandardAero, which became effective on June 1, 2015, to perform heavy maintenance on certain CRJ-700 and CRJ-900 engines based on a fixed pricing schedule. The pricing may escalate annually in accordance with GE's spare parts catalog for engines. The engine maintenance contract extends through 2020.

***Apart from our outsourcing of certain maintenance functions, we have a FAA mandated and approved maintenance program. Our maintenance technicians undergo extensive initial and recurrent training. Aircraft maintenance and repair consists of routine and non-routine maintenance, and work performed is divided into three general categories: line maintenance, heavy maintenance and component service.***

(Emphasis added.)

74.     The Registration Statement told investors that its employees "***have been, and will continue to be, a key to our success***." In particular, the Offering Documents stated that Mesa employs 3,229 employees, including 411 mechanics, that the Company's "continued success is partly dependent on [its] ability to attract and retain qualified personnel[,]" and that the "airline industry has from time to time experienced a shortage of qualified personnel, particularly with respect to pilots and maintenance technicians." The Registration Statement stated, in pertinent part, as follows:

As of March 31, 2018, we employed approximately 3,229 employees, consisting of 1,317 pilots or pilot recruits, 1,159 flight attendants, 53 flight dispatchers, ***411 mechanics*** and 289 employees in administrative roles. ***Our continued success is partly dependent on our ability to continue to attract and retain qualified personnel.*** We have never been the subject of

a labor strike or labor action that materially impacted our operations . . .

***The airline industry has from time to time experienced a shortage of qualified personnel, particularly with respect to pilots and maintenance technicians.*** In addition, as is common with most of our competitors, we have faced considerable turnover of our employees. Regional airline pilots, flight attendants and maintenance technicians often leave to work for larger airlines, which generally offer higher salaries and better benefit programs than regional airlines are financially able to offer. During fiscal 2017, we experienced higher than average turnover as a result of pilot wage increases at certain other regional air carriers and expanded hiring by major carriers. Should the turnover of employees, particularly pilots, sharply increase, the result will be significantly higher training costs than otherwise would be necessary and we may need to request a reduced flight schedule with our major airline partners, which may result in operational performance penalties under our capacity purchase agreements. ***We cannot assure you that we will be able to recruit, train and retain the qualified employees that we need to carry out our expansion plans or replace departing employees.***

(Emphasis added).

75.     The statements referenced in ¶¶ 66 - 74 concerning Mesa's operational performance – including, among other things, the Company's competitive cost structure, track record of reliable performance, efficient fleet composition including the Company's operational spare aircraft, and long-term maintenance agreements and in-hour maintenance team – were each false and misleading statements of material fact when made because they failed to disclose, misrepresented, and omitted material adverse facts, material adverse trends, material uncertainties, or significant risks that existed prior to and at the time of the IPO, including:

(a.)     By about February 5, 2018 – *i.e.,* ***six months before the Offering*** – American talked to Mesa about raising the operational performance levels required under the American CPA, and Defendant Ornstein revealed that "all" of Mesa's performance levels were "significantly below" industry standards, or "far below [the levels at] which the industry is currently operating."

(b.)     By about November 10, 2017 – *i.e.,* ***nine months before the Offering*** – Defendant Ornstein revealed that Mesa was "hamstrung by the fact that [it] had expanded a lot" and "maintenance became more difficult in terms of qualified maintenance people." In other words, as a result of the Company's growth and expansion prior to the IPO,

24

Mesa's qualified mechanics and qualified maintenance personnel were significantly understaffed.

(c.)     By about August 9, 2017 – *i.e.,* ***one year before the Offering*** – Mesa had discussions regarding its inadequate count of operational spare aircraft compared to other operators in the airline industry, and Defendant Ornstein was a "very strong advocate that Mesa was being . . . disadvantaged" because, as he revealed, the Company "did not have the adequate spare count."  In other words, because of the Company's pre-IPO growth and expansion, Mesa did not have an adequate number of operational spare aircraft to substitute in when aircraft assigned under the CPAs with its Major Airline Partners were unavailable due to maintenance, repairs or other issues.

76.     The omissions described in paragraph 75(a.)-(c.) also rendered the statements in paragraphs 66-74 in violation of Item 303 of SEC Regulation S-K (17 C.F.R. § 229.303(a)(3)(ii)).  Item 303 requires that materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations. The Registration Statements identified in paragraphs 66-74 failed to disclose the adverse conditions, risks and uncertainties identified in paragraph 75(a.)-(c.).

**The Registration Statement Failed to Disclose and
Misrepresented Material Facts Regarding Mesa's CPA With American**

77.     In the Registration Statement, Mesa touted the long-term security it had with American, the carrier that accounted for most of its revenue.  Mesa stated "Our long-term capacity purchase agreements provide us guaranteed monthly revenue for each aircraft under contract . . . ."  The Registration Statement described the contracts with American and United, known as Capacity Purchase Agreements, or CPAs, as "Stable, Long-Term Revenue-Guarantee Capacity Purchase Agreements" that extend beyond 2020 for 94 of Mesa's 144 aircraft in scheduled service.

78.     The statements referenced in ¶ 77 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts

25

pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them:

(a)     American, Mesa's prime contracting airline, was dissatisfied with Mesa's performance as shown by the statements of the two confidential witnesses below in paragraphs 112 through 120.

(b)     On February 5, 2019 in a conference call, Defendant Ornstein revealed for the first time that approximately six months before the IPO, American expressed a desire to revise the terms of the CPA, which had been represented in the IPO as "stable" and "long-term." In that conference call he revealed for the first time: "About a year ago, American talked [to] us about raising our performance levels."

(c)     On February 5, 2019 Defendant Ornstein revealed for the first time that the CPA with American in place at the time of the IPO was almost 17 years old and out of step with the industry, which would explain why American was dissatisfied and could have been expected to take steps to change it in a way that would be less favorable to Mesa:

> I'd also like to take a moment to talk about the 8-K we filed with American just to walk through that. About a year ago, American talked about -- us about raising our performance levels. As many of you know, that contract was negotiated initially almost 17 years ago. It's been through some modifications, but the performance levels were certainly far below that which the industry is currently operating. All the levels were, as I said, significantly below that.

(d)     On January 31, 2019, Mesa filed a Form 8-K announcing that American had changed the terms of the CPA without disclosing the details. That Form 8-K promised to publish the actual revised term sheet to the CPA, as opposed to a general description of its terms, in the next quarterly report, stating (emphasis added):

> The foregoing descriptions of the Term Sheet and the transactions contemplated thereby do not purport to be complete and are qualified in their entirety by reference to the full text of the Term Sheet or related definitive amendment to the American CPA, as the case may be, **which we expect to file as an exhibit to our Quarterly Report for the fiscal quarter ended December 31, 2018**, subject to any applicable request for confidential treatment with respect to certain portions of such document.

(e)     Mesa failed to keep its promise to publish the new Term Sheet to the CPA in the next Quarterly report, filed on February 13, 2019.  This left investors to discover the disastrous consequences of it through the reality of Mesa's dismal financial performance through the rest of 2019.

(f)     Mesa's stock price crashed from $10.77 per share on July 24, 2019 to $5.84 on August 12, 2019, after which crash Mesa finally disclosed the actual Term Sheet which led to Mesa's disastrous third quarter. It was an exhibit to Mesa's Form 10-K, filed on December 17, 2019.

(g)     The substantially revised American Term Sheet included the following: (1) the conversion of two aircraft under the CPA to operational spares, resulting in a decrease in the number of guaranteed revenue-generating aircraft operated by Mesa Air Group for American from 64 to 62, effective April 1, 2019; (2) new and revised operational performance criteria imposed by American, which if not met could result in up to six additional aircraft being removed from the American CPA; (3) if Mesa failed to comply with the new and revised operational performance criteria, American would have the unilateral right to permanently withdraw one aircraft from the CPA, up to two aircraft from the CPA in any calendar month, and up to six aircraft in total; (4) if Mesa Air Group failed to comply with the new and revised operational performance criteria on two or more occasions, then upon the second occurrence and each subsequent failure, American would have the unilateral right to permanently withdraw six aircraft from the CPA.

(h)     During 2019, Mesa had a one month maintenance delay involving two aircraft, and one aircraft was damaged in a ground collision with a fuel truck. Because of the austere terms of the revised Term Sheet, these two incidents caused Mesa to have to pull three aircraft from its CPA with American in addition to the initial two it had to pull under the terms of the new Term Sheet.

(i)     In a conference call on December 11, 2019, Defendant Ornstein assessed the damage to Mesa's operations which foreseeably flowed from the fact that Mesa's contract

with American was not in fact "stable" and "long term" as represented without

qualification in the IPO:

> On American, as you know, there have been a lot of moving pieces on the American fleet spares, damaged aircraft, removed aircraft, et cetera. So first, I'd like to recap exactly where we are on the American fleet. We began with 64 aircraft in our CPA. On April 1, 2019, we voluntarily agreed to remove two aircraft, splitting the costs with American. On November 2, 2019, two additional aircraft were removed under the terms of our amended CPA. On January 2020, one additional aircraft will be removed under the terms of the amended CPA. So in January 2020, we will have 59 aircraft under our CPA, of which three are operational spares, and we will have five unassigned aircraft.

**The Registration Statement Failed to Disclose and Misrepresented Significant Facts That Made the Offering More Speculative and Risky**

79.     The Registration Statement contained materially false, misleading, and incomplete risk factors that failed to advise investors about significant, then-existing (as opposed to potential) factors that made the Offering more speculative and risky than the Offering Documents disclosed. The Registration Statement purported to warn of potential risks that "may" or "could" adversely affect the Company while failing to disclose that these very "risks" had already materialized prior to and at the time of the IPO. The Registration Statement also failed to disclose warnings of specific, material risks that had already materialized prior to and at the time of the IPO.

80.     Specifically, the Registration Statement inaccurately described as ***potential*** certain risks associated with increases in Mesa's labor costs, which "may" adversely affect the Company's business, results of operations, and financial condition, rather than material adverse events, trends, and uncertainties that had already manifested.  The Offering Documents stated, in pertinent part, as follows:

> ***Increases in our labor costs,*** which constitute a substantial portion of our total operating costs, ***may adversely affect our business, results of operations and financial condition***.
>
> Our business is labor intensive, with labor costs representing approximately 28%, 30% and 34% of our total operating costs for the fiscal years ended September 30, 2016 and 2017 and the six months ended March 31, 2018,

respectively.  We are responsible for our labor costs above certain pre-determined reimbursement levels, and we may not be entitled to receive increased payments under our capacity purchase agreements if our labor costs increase above the reimbursement levels.  As a result, a significant increase in our labor costs above the reimbursement levels could result in a material reduction in our earnings.

(Emphasis added.)

81.     The Registration Statement also inaccurately described as ***potential*** certain risks associated with increases in labor and aircraft maintenance costs, which "may" have an adverse effect on Mesa's financial position and operating results, rather than material adverse events, trends, and uncertainties that had already manifested.  The Offering Documents stated, in pertinent part, as follows:

> ***The amounts we receive under our capacity purchase agreements may be less than the corresponding costs we incur.***
>
> \*       \*       \*
>
> ***If our operating costs for labor, aircraft maintenance and overhead costs exceed the compensation earned from our pre-determined rates under our revenue-guarantee arrangements, our financial position and operating results will be negatively affected.***

(Emphasis added.)

82.     The Registration Statement also inaccurately described as potential certain risks associated with Bombardier, Embraer, and GE Engine Services, LLC ("GE") being able to "provide sufficient parts or related maintenance and support services" to the Company "in a timely manner[,]" which "could" have an adverse effect on Mesa's operations, rather than material adverse events, trends, and uncertainties that had already manifested.  The Offering Documents stated, in pertinent part, as follows:

> ***We rely on third-party suppliers as the sole manufacturers of our aircraft and aircraft engines.***
>
> We depend upon Bombardier and Embraer S.A. ("Embraer") as the sole manufacturers of our aircraft and GE as the sole manufacturer of our aircraft engines.  ***Our operations could be materially and adversely affected by the failure or inability of Bombardier, Embraer or GE to provide sufficient parts or related maintenance and support services to us in a timely manner, or the interruption of our flight operations as a result***

29

> *of unscheduled or unanticipated maintenance requirements for our aircrafts or engines.*

83.     The Registration Statement inaccurately described as "potential" certain risks associated with increasing maintenance costs, which "could" have an adverse effect on Mesa's cash flows, operating results, and financial condition, rather than material adverse events, trends, and uncertainties that had already manifested. The Offering Documents stated, in pertinent part, as follows:

> *Maintenance costs will likely increase as the age of our regional jet fleet increases.*
>
> The average age of our E-175, CRJ-900 and CRJ-700 type aircraft is approximately 2.4, 11.5 and 14.2 years, respectively.  We have incurred relatively low maintenance expenses on our E-175 aircraft because most of the parts are under multi-year warranties and a limited number of heavy airframe checks and engine overhauls have occurred.  Our maintenance costs will increase significantly, both on an absolute basis and as a percentage of our operating expenses, as our fleet ages and the E-175 warranties expire.  In addition, because our current aircraft were acquired over a relatively short period of time, significant maintenance events scheduled for these aircraft will occur at roughly the same intervals, meaning we will incur our most expensive scheduled maintenance obligations across our present fleet at approximately the same time.  These more significant maintenance activities result in out-of-service periods during which aircraft are dedicated to maintenance activities and unavailable for flying under our capacity purchase agreements.  *Any unexpected increase in our maintenance costs as our fleet ages or decreased revenues resulting from out-of-service periods could have an adverse effect on our cash flows, operating results and financial condition.*

(Emphasis added.)

84.     The Registration Statement also inaccurately described as "potential" certain risks associated with procuring services, including maintenance services from third-party service providers, which "could" have an adverse effect on Mesa's business, financial condition, and results of operations, rather than material adverse events, trends, and uncertainties that had already manifested. The Registration Statement stated, in pertinent

part, as follows:

> ***If we face problems with any of our third-party service providers, our operations could be adversely affected.***
>
> ***Our reliance upon others to provide essential services on behalf of our operations may limit our ability to control the efficiency and timeliness of contract services. We have entered into agreements with contractors to provide various facilities and services required for our operations, including aircraft maintenance, ground facilities and IT services, and expect to enter into additional similar agreements in the future.*** In particular, we rely on AAR and Aviall to provide fixed-rate parts procurement and component overhaul services for our aircraft fleet and GE to provide engine support. Our agreement with AAR, and other service providers, are subject to termination after notice. ***If our third-party service providers terminate their contracts with us, or do not provide timely or consistently high-quality service, we may not be able to replace them in a cost-efficient manner or in a manner timely enough to support our operational needs, which could have a material adverse effect on our business, financial condition and results of operations.*** In addition, our operations could be materially and adversely affected by the failure or inability of AAR, Aviall or GE to provide sufficient parts or related maintenance and support services to us in a timely manner.

(Emphasis added.)

85.     The statements referenced above in ¶¶ 79-84 were each inaccurate statements of material fact because while noting only the potential negative impacts on Mesa's business, financial condition, and results of operations, the Registration Statement failed to disclose and misrepresented the specific, then-existing material adverse events, trends, and uncertainties that Mesa had already been facing at the time of the Offering including:

(a.)     By about February 5, 2018 – *i.e., **six months before the Offering*** – American talked to Mesa about raising the operational performance levels required under the American CPA, and Defendant Ornstein revealed that "all" of Mesa's performance levels were "significantly below" industry standards, or "far below [the levels at] which the industry is currently operating."

(b.)     By about November 10, 2017 – *i.e., **nine months before the Offering*** – Defendant Ornstein revealed that Mesa was "hamstrung by the fact that [it] had expanded

a lot" and "maintenance became more difficult in terms of qualified maintenance people." In other words, as a result of the Company's growth and expansion prior to the IP, Mesa's qualified mechanics and qualified maintenance personnel were significantly understaffed.

(c.)     By about August 9, 2017 – *i.e., one year before the Offering* – Mesa had discussions regarding its inadequate count of operational spare aircraft compared to other operators in the airline industry, and Defendant Ornstein was a "very strong advocate that Mesa was being . . . disadvantaged" because, as he stated, the Company "did not have the adequate spare count."  In other words, because of the Company's pre-IPO growth and expansion, Mesa did not have an adequate number of operational spare aircraft to substitute in when aircraft assigned under the CPAs with its Major Airline Partners were unavailable due to maintenance, repairs, or other issues.

86.     The omissions described in paragraph 85(a.)-(c.) also rendered the statements in paragraphs 79-84 in violation of Item 503 of SEC Regulation S-K (17 C.F.R. § 229.503) because they failed to disclose the already significant occurring problems underlying its base business, as well as the likely material effects it would have on the Company's share price.

**Additional Facts Demonstrating That the Registration Statement Was
False and Misleading at the Time of the IPO**

87.     Unbeknownst to investors, Mesa was experiencing a slew of adverse operational performance issues prior to and at the time of the IPO, including a shortage of qualified mechanics to service its fleet and an inadequate number of operational spare aircraft to meet its needs.  These operational performance issues, which pre-dated the Offering, led to increased maintenance expenses, decreased revenues, and weak earnings.

88.     Shortly after Mesa's IPO, several market analysts initiated coverage of the Company.  These first analyst reports underscored investors' understanding of Mesa's financial and operating condition at the time of the Offering.  On September 4, 2018, for example, less than a month after the IPO, Cowen analysts published an equity research report titled "Initiation: Revitalized and Back in the Public Eye."  The analysts explained

that Cowen was "initiating coverage on Mesa Air Group with an Outperform rating" because "Mesa faced a significant amount of maintenance and engine expenses on owned aircraft in the past few years[,]" the "*maintenance cost bubble is now behind them, which should lead to a stable maintenance outlook for the next few years*." (Emphasis added.)

89.     Also, on September 4, 2018, Raymond James analysts published an equity research report titled "The comeback Kid; Initiating Coverage at Strong Buy, $20 Target Price.  The analysts explained that "*Mesa's EPS is set to grow sharply in FY19/FY20 due to [,]*" among other things, a "*fall-off in heavy maintenance cost, to admittedly below normalized levels*."  The analysts stressed that Mesa is a "low-cost independent regional airline," with "several key elements that contribute to its cost efficiencies, including. . . competitive procurement of maintenance functions.  *Importantly, its lost-cost culture does not come at the sacrifice of either operational reliability or product offering*." (Emphasis added.)

90.     Commentary from analysts, such as Cowen and Raymond James, at the outset of their coverage of Mesa highlights how the Registration Statement misrepresented material facts concerning Mesa's operational performance, specifically with respect to the Company's critical maintenance personnel and mechanics being understaffed and inadequate number of operational spare aircraft.

91.     On December 6, 2018, less than four months after the Offering, Mesa announced it had hired a new Vice President of Maintenance, Douglas Shockey ("Shockey").  Mesa did not announce or issue a corresponding press release disclosing that the Company's former Vice President of Maintenance and Engineering, Jeffrey Domrese ("Domrese") would no longer be working for the Company.  However, Domrese's LinkedIn profile indicates his tenure at the Company ended contemporaneously in November 2018.

92.     On January 31, 2019, Mesa announced that its Board ratified Mesa Airlines' entry into a term sheet with American that sets forth four amendments to the CPA with

American, effective February 1, 2019. The amendments to the American CPA – a direct result of Mesa's poor operational performance – provided for the following: (i) the conversion of two aircraft under the CPA to operational spares, resulting in a decrease in the number of guaranteed revenue-generating aircraft operated by Mesa for American from 64 to 62, effective April 1, 2019; (ii) new and revised operational performance criteria imposed by American, which if not met could result in up to six additional aircraft being removed from the CPA; (iii) if Mesa failed to comply with the new and revised operational performance criteria, American would have the unilateral right to permanently withdraw one aircraft from the CPA, up to two aircraft from the CPA in any calendar month, and up to six aircraft in total; and (iv) if Mesa failed to comply with the new and revised operational performance criteria on two or more occasions, then upon the second occurrence and each subsequent failure, American would have the unilateral right to permanently withdraw six aircraft from the CPA.

93.     Analysts quickly noted the detrimental impact and consequences of the American CPA amendments.  On February 1, 2019, for example, Raymond James analysts published an equity research report titled "American Contract Amendment Hurts Optics." The analysts stressed that the American CPA amendments were "***likely to increase investor concerns about Mesa's earnings durability***." (Emphasis added.) The analysts neatly summarized the amendments: "Revised operational thresholds, sweeter carrots, and ***harsher sticks***."  In particular, the analysts noted that the amendments also "***replace[d] current penalty payments with the permanent removal of up to six CRJs***." (Emphasis added.) The analysts also explained that "***[i]f Mesa falls short and looses [sic] all six aircraft . . ., we estimate it would result in a loss of ~$5M in annual pretax income***." (Emphasis added.)

94.     A few days later, Mesa provided more detail concerning the American CPA amendments and how, ***months before the Offering***, the Company's operating performance levels were already "far below" industry standards. On February 5, 2019, during an

34

earnings call with investors for Mesa's first quarter fiscal year 2019 ending December 31, 2018 ("Q1 2019"), Defendant Ornstein explained:

> I'd also like to take a moment to talk about the 8-K we filed with American just to walk through that. ***About a year ago, American talked [to] us about raising our performance levels.*** As many of you know, that contract was negotiated initially almost 17 years ago. It's been through some modifications, but ***the performance levels were certainly far below that [sic] which the industry is currently operating. All the levels were, as I said, significantly below that*** . . . .

> We know we can operate with the best carriers, but we do need some issues addressed that were important to us, and they were willing to do that in return for the ability for us to operate at a higher level.

> For example, ***some of those issues that were addressed were the number of spares we're operating. We increased that by 2*** . . . . [W]e will use those airplanes strategically going forward to maximize performance throughout our system.

> We traded that increased performance requirements . . . . We actually got some nice incentives if we're able to perform at the levels that we believe . . .

> In return to that, ***we did give them the right to pull down a few aircraft, fixed aircraft over time***. That first one that could come out would be in September.

(Emphasis added.)

95. On March 6, 2019, Mesa announced it had hired a new Executive Vice President and Chief Operating Officer, Bradford R. Rich ("COO Rich"). The related press release issued that same day quoted Defendant Ornstein, who stated COO Rich would "play a critical part in the company's focus on operational performance and growth." At the same time, the press release noted that Mike Ferverda ("Ferverda") would be stepping down as COO.

96. On May 9, 2019, the Company reported its Q2 2019 financial and operating results. In its earnings release, Mesa reported adjusted net income of $16 million and adjusted EPS of $0.46, below analysts' consensus of $0.55. Mesa also reported total operating revenues of $177 million below analysts' consensus of $178.5 million

97.     During the related Q2 2019 earnings call held on May 10, 2019, a Raymond James analyst asked about the American CPA amendments during the questions and answers ("Q&A") segment: "Just wondering about the American contracts that was kind of revised with new performance metrics?  And I think part of the contract allowed you to have a couple of more spares as well as kind of made some changes to help kind of improve operations.  I was wondering how you're executing kind of to the new targets?"

98.     COO Rich explained that the American CPA amendments were "certainly in the best interest of American[,]" and added that "there are other things that we're doing, . . . some strategic investments that we are willing to and need to make in the operation to just create this really high sustainable reliability that our partners expect."

99.     Defendant Ornstein elaborated further: "***We knew that in the last year, 18 months, I mean we were hamstrung by the fact that we had expanded a lot, we needed more pilots, we got hung up a little bit in pilot training, maintenance became more difficult in terms of qualified maintenance people.  And we're just sort of finally putting all that together***." (Emphasis added.)

100.    After a follow-up question from the Raymond James analyst, Defendant Ornstein added: "American has been very helpful, too.  They have given us some focus.  Some of their real high quality people have been involved with us that we enjoy interacting with, particularly some of the people on the maintenance side have been incredibly helpful.  And so I think that we have seen some very significant improvement there."

101.    On August 8, 2019, Mesa reported its Q3 2019 financial and operating results. In its earnings release, Mesa reported adjusted net income of $10.4 million and adjusted EPS of just $0.30, well below analysts' consensus of $0.55. Mesa also reported total operating revenues of $180 million, below analysts' consensus of $183 million. The Company further reported increased maintenance expenses of $54 million, more than analyst estimates of $47 million, and total operating expenses of $163 million, more than the analysts' estimates of $149 million.

102.    During the related Q3 2019 earnings call held on August 9, 2019, COO Rich stated, "[D]uring the initial 60-day performance period that began May 1, [(a term under the American CPA amendments)], we had an aircraft unavailable due to ground damage in Dallas by a ground handler, and 2 additional aircraft were unavailable due to extended C-check turn times caused by labor shortages at our heavy maintenance provider, Bombardier."

103.    As a result, COO Rich explained, Mesa "did not meet the performance criteria" required under the American CPA amendments, "and American elected to remove 2 aircraft effective November 2, 2019."  Within months, American had elected to remove four aircraft from the CPA with Mesa, resulting in a decrease in the number of guaranteed revenue-generating aircraft operated by Mesa for American from 64 to 60.

104.    In other words, due to Mesa's failure to maintain sufficient maintenance personnel and an adequate number of operational spare aircraft – two issues that existed nine months and one year prior to the Offering, respectively – the Company had also failed to meet its operational performance requirements under the American CPA.

105.    COO Rich added that Mesa still did not have an adequate number of operational spare aircraft, and as a result, it would be "very difficult to meet the performance criteria" required under the American CPA amendments, which "could result in the removal of additional aircraft by the end of the calendar year."  COO Rich also commented that Mesa "remained very focus[ed] on the hiring of flight crews and maintenance technicians[.]"

106.    Also during the same earnings call, COO Rich explained that Mesa had "hired 54 new mechanics since the third quarter of last year and [had] added additional spares with the expectation that they would really be spares to deal with some of those issues.  Unfortunately, we just haven't had spares."

107.    COO Rich also explained that "once we're properly spared, we'd add the mechanics to deal with some of the more intensive maintenance issues, and we should be

able to operate the fleet very reliably and meet their expectations."

108.    In other words, COO Rich confirmed that one year after the Offering, Mesa still did not have an adequate number of operational spare aircraft, and the Company was working to become "properly spared" sometime in the future.  COO Rich conceded that, without an adequate number of operational spare aircraft or a sufficient number of mechanics to maintain Mesa's aircraft, the Company was not able to operate its fleet reliably or meet American's expectations.

109.    During the earnings call, a Raymond James analyst inquired further about whether Mesa had enough operational spare aircraft in its overall fleet, beyond the four removed from the American CPA: "[M]aybe I don't understand this, but if the spares are being funded by the American fleet and American still takes the kind of the [sic] baseline utilization and keep[s] pushing it up, do you not need to kind of find spares outside of the fleet to try and meet the increase utilization?"  Defendant Ornstein replied:

> Well, no, I mean the fact is that the 5 – we had 3 spares, historically, with American.  ***There were literally years of discussions in regard to what was the adequate spare count***, versus, for example, other operators, okay?  I was a very strong advocate that ***Mesa was being – what's the right word, disadvantaged because we did not have the adequate spare count.  We put the 2 spares in*** . . . .
>
> ***So we've had some headwinds, and clearly, this quarter, we've seen a sort of confluence of issues that have really put us in a difficult position.***

(Emphasis added.)

110.    Considered together with COO Rich's statement, Defendant Ornstein's answers demonstrate that Mesa still did not have an adequate number of operational spare aircraft, even though it's operational spare count had increased from one to five since the Company's IPO.

111.    As a result of the misrepresented and undisclosed adverse conditions, risks, trends, and uncertainties concerning Mesa's lack of qualified mechanics and maintenance personnel and inadequate number of operational spare aircraft – that the Company's own executives admit existed prior to the IPO – as of the market date of this action being filed,

Mesa's common stock closed at $3.03 per share, or **75% less than the $12.00 per share Offering price.**

### FORMER INSIDE EMPLOYEES AT MESA WERE AWARE OF THE PROBLEMS THAT WERE NOT DISCLOSED IN THE IPO

112.   Lead Plaintiff's first Confidential Witness ("CW 1") began working at Mesa in September 2015 and left in October 2019. The witness's first job at Mesa was an Airframe and Powerplant ("A&P") Mechanic, which lasted for two or two-and-a-half years. The witness was then promoted to Line Maintenance Technician for approximately twelve months before being promoted again to Maintenance Controller beginning in July 2018. The witness was intimately involved in repair and maintenance of Mesa aircraft and had supervisory responsibilities.

113.   CW1 stated that American Airlines had been upset with Mesa not meeting its on-time departures or number of flights. CW1 stated that Mesa suffered from recurring maintenance problems that caused flight delays and lack of on time performance. CW1 stated that the training for mechanics was inadequate, and there was also constant pressure "to get airplanes out" as quickly as possible. CW1 stated that instead of staying on top of maintenance and maintaining adequate inventories of spare parts, Mesa's approach to getting airplanes out was typically to "throw parts at it", by cannibalizing working aircraft to attempt a timely push-out/departure. The witness stated that this approach was faulty and lead to late departures because the cannibalized parts themselves would fail to work and the plane would have to return to the gate for more extensive repair.

114.   CW1 also stated that mechanics avoided volunteering for extra work needed by Mesa because of poor treatment. CW1 stated that in Dallas in particular, there had been shortages of qualified mechanics and additionally the mechanics there were worked "like dogs." For instance, not only did the mechanics often have to stay longer than their designated shifts, but they would be tasked to go on "road-trips" in which they'd fly to other airports where there was a Mesa aircraft needing repair. While Mesa would fly out mechanics as quickly as they could in such situations, CW1 stated that when it came time

to get the mechanics home again Mesa wasn't nearly as assiduous and mechanics often found it difficult to get back home. Accordingly, the Dallas mechanics learned to avoid volunteering for extra work if they could avoid it.

115. CW2 began working for Mesa in August 2016 as an Aircraft Mechanic doing overnight and line maintenance. He worked his way up to the position of maintenance lead for Mesa's American Airlines aircraft in Phoenix which position he held until he left the company in June 2018, shortly before the IPO in August 2018

116. CW2 was aware that poor maintenance practices and lack of inventory were causing growing problems within Mesa. CW2 stated that there were typically one or two spare parts available on any given day, which wasn't enough given the volume of flight activity occurring at Sky Harbor Airport in Phoenix. CW2 stated that Mesa often pushed off maintenance that was not absolutely critical until some other time. CW2 believed that this kind of deferred maintenance could have been "piling up" and subsequently created issues for the company. CW2 said the deferred maintenance often pertained to MEL or Minimum Equipment List items. Individually, such items might not be critical, however, combined with other items, there was the potential for the matters to become more serious.

117. After leaving Mesa, CW2 continued to work in the aviation industry. He stated that he now knows that other airlines would not let certain poor maintenance practices tolerated at Mesa "get by." CW2 added that "safety was not a factor in a lot" of went on at Mesa and, instead, there was "a lot of seat of the pants" maintenance which consisted of "throwing parts" at an aircraft having problems to "see if it works" with "a new part." CW2 also stated that the in-house training Mesa provided was "absolutely not adequate."

118. CW2 confirmed the statements of CW1 that Mesa's system of cannibalizing parts from one plane to quickly get another in the air, instead of maintaining adequate inventory, led to problems. CW2 said that cannibalizing parts would not address larger underlying problems that were causing the parts to fail and that while it would work for a

little while, the problems often recurred. CW2 said that Mesa's operational approach was to throw parts at a problem to "get it out" – *i.e.*, get an aircraft off the ground – and repeated the adage "[i]f it flew in, it will fly out." As he put it, at Mesa that was "the mantra".

119.   CW2 said that operating "on a shoestring budget" and deferring maintenance was probably why the Company "got in over their heads later." He reiterated that during his tenure before the IPO, Mesa was employing "band-aid" solutions for problems that would ultimately have to be dealt with later.

120.   CW2 said that although Mesa's aircraft haven't resulted in anyone being killed, that's not a reflection of and has "nothing to do with" the Company's maintenance efforts but instead the sheer robustness of the aircraft which are so well-engineered they can virtually "fly forever" despite Mesa's poor maintenance.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

121.   Lead Plaintiff brings this action as a class action on behalf of all those who purchased Mesa Air Group securities pursuant and/or traceable to the Registration Statement (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

122.   As a result of the misrepresented and undisclosed adverse conditions, risks, trends, and uncertainties concerning Mesa's lack of qualified mechanics and maintenance personnel and inadequate number of operational spare aircraft – that the Company's own executives admit existed prior to the IPO – as of the market date of this action being filed, Mesa's common stock closed at $3.03 per share, or ***75% less than the $12.00 per share Offering price***.

123.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at

this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Mesa Air Group or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

124.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

125.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

126.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the federal securities laws;

b) whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and

c) to what extent the members of the Class have sustained damages and the proper measure of damages.

127.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of Section 11 of the Securities Act

### Against All Defendants

128.    Lead Plaintiff incorporates all the foregoing by reference.

129.    This Count is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

130.    This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded. For purposes of asserting this and other claims under the Securities Act, Lead Plaintiff does not allege that Defendants acted with intentional, reckless, or otherwise fraudulent intent.

131.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

132.    Defendants are strictly liable to Lead Plaintiff and the Class for the misstatements and omissions.

133.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

134.    By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated § 11 of the Securities Act.

135.    Lead Plaintiff acquired Mesa Air Group securities pursuant to the Registration Statement.

136.    At the time of their purchases of Mesa Air Group securities, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

137.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act

### Against All Defendants

138.     Lead Plaintiff incorporates all the foregoing by reference.

139.     By means of the defective Prospectus, Defendants promoted, solicited, and sold the Company's securities to Lead Plaintiff and other members of the Class.

140.     This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded. For purposes of asserting this and other claims under the Securities Act, Lead Plaintiff does not allege that Defendants acted with intentional, reckless, or otherwise fraudulent intent.

141.     The Prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Lead Plaintiff and the other members of the Class who purchased Mesa Air Group securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

142.     Lead Plaintiff did not know, nor in the exercise of reasonable diligence could Lead Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Lead Plaintiff acquired Mesa Air Group securities.

143.     By reason of the conduct alleged herein, Defendants violated § 12(a)(2) of

the Securities Act, 15 U.S.C. § 77l(a)(2). As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class who purchased Mesa Air Group securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the shares. Accordingly, Lead Plaintiff and the other members of the Class who hold the securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and thereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

144.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## COUNT III

### Violations of Section 15 of the Securities Act

### Against the Individual Defendants

145.    Lead Plaintiff incorporates all the foregoing by reference.

146.    This cause of action is brought pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o against all Defendants except the Underwriter Defendants.

147.    This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded. For purposes of asserting this and other claims under the Securities Act, Lead Plaintiff does not allege that Defendants acted with intentional, reckless, or otherwise fraudulent intent.

148.    The Individual Defendants were controlling persons of Mesa Air Group by virtue of their positions as directors or senior officers of Mesa Air Group. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of Mesa Air Group. The Company controlled the Individual Defendants and all of Mesa Air Group's employees.

45

149.    Mesa Air Group and the Individual Defendants were culpable participants in the violation of §§ 11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

150.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiff, on behalf of itself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Lead Plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding rescissory damages in favor of Lead Plaintiff and the other relevant Class members where appropriate against all of the Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including  pre-judgment and post-judgment interest, as allowed by law;

(d) awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission;

(e) awarding Lead Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(f) awarding Lead Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

46

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated: August 17, 2020

By: */s/ Gary F. Urman*
Gary F. Urman

**DECONCINI MCDONALD YETWIN & LACY, P.C.**
2525 East Broadway, Suite 500
Tucson, Arizona 85716
Telephone: 520-322-5000
Facsimile: 520-322-5585
Email: gurman@dmyl.com

*Attorneys for Lead Plaintiff DeKalb County Pension Fund and Liaison Counsel for the Class*

Lubna Faruqi (*Admitted pro hac vice*)
Robert W. Killorin (*Admitted pro hac vice*)
James M. Wilson, Jr. (*Admitted pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: lfaruqi@faruqilaw.com
       rkillorin@faruqilaw.com
       jwilson@faruqilaw.com

*Attorneys for Lead Plaintiff DeKalb County Pension Fund and Lead Counsel for the Class*