Gary F. Urman (AZ 11748)
gurman@dmyl.com
**DECONCINI MCDONALD YETWIN & LACY, P.C.**
2525 East Broadway, Suite 500
Tucson, Arizona 85716
Telephone:520-322-5000
Facsimile: 520-322-5585

*Attorneys for Lead Plaintiff DeKalb County*
*Pension Fund and Liaison Counsel for the Class*

Lubna Faruqi (*Admitted pro hac vice*)
Robert W. Killorin (*Admitted pro hac vice*)
James M. Wilson, Jr. (*Admitted pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: lfaruqi@faruqilaw.com
        rkillorin@faruqilaw.com
        jwilson@faruqilaw.com

*Attorneys for Lead Plaintiff DeKalb County*
*Pension Fund and Lead Counsel for the Class*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| David G. Lowthorp, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>V.<br><br>Mesa Air Group, Inc.; Jonathan G. Ornstein; Michael J. Lotz; Daniel J. Altobello; Ellen N. Artist; Mitchell Gordon; Dana J. Lockhart; G. Grant Lyon; Giacomo Picco; Harvey Schiller; Don Skiados; Raymond James & Associates, Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Cowen and Company, LLC; Stifel, Nicolaus & Company, Incorporated; and Imperial Capital, LLC,<br><br>Defendants. | Case No. 2:20-cv-00648-MTL<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MESA DEFENDANTS' MOTION TO DISMISS**<br><br><u>CLASS ACTION</u> |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

I.      RELEVANT FACTUAL BACKGROUND ................................................... 3

II.     LEGAL STANDARDS .................................................................................. 5

        A.     Applicable Pleading Standards ........................................................... 5

III.    ARGUMENT ................................................................................................. 6

        A.     Mesa's Statements About the American CPA Were False and
               Misleading and Are Not Time Barred .............................................. 6

               1.     Claims Relating to Mesa's Statements About the Stability or
                      Long-Term Nature of the American CPA Are Timely ........... 6

               2.     Mesa's Discussions With American Were Material
                      Information That Was Required To Be Disclosed ................. 9

               3.     Mesa's Claims the American CPA Were "Stable" and
                      "Long-Term" Were Neither Accurate Or Puffery ............... 10

               4.     Mesa's Claims Concerning the American CPA Were Not
                      Protected by the Bespoke Caution Doctrine ....................... 12

        B.     Mesa's Statements About Its "Strong" Operational Performance
               Were Misleading, Actionable, and Are Not Time Barred .............. 13

               1.     Mesa Misled Investors about Insufficient Spare Planes ....... 15

               2.     Mesa's Statements Concerning Its Maintenance Personnel
                      and Contracts Are Misleading, Not Forward-Looking Nor
                      Couched in Caution ............................................................. 16

        C.     The Registration Statement Failed To Disclose Known Trends
               Required by Item 303 ...................................................................... 20

        D.     The Registration Statement Failed To Disclose Risks Required
               By Item 503 ..................................................................................... 22

        E.     Lead Plaintiff Has Sufficiently Alleged Standing And That
               Defendants Were Statutory Sellers Under Section 12(a)(2) ........... 23

        F.     Lead Plaintiff Has Adequately Alleged A Violation of
               Section 15 ........................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*In re 21st Century Holding Co. Sec. Litig.*,
  No. 07-61057-CIV, 2008 WL 5749572 (S.D. Fla. Nov. 7, 2008) .................... 19

*Abdo v. Fitzsimmons*,
  No. 17-cv-00851, 2018 WL 11220494 (N.D. Cal. May 22, 2018) ................... 9

*In re Alliance Pharm. Corp. Sec. Litig.*,
  279 F. Supp. 2d 171 (S.D.N.Y. 2003) ................................................................ 9

*In re Amylin Pharm., Inc. Sec. Litig.*,
  No. 01CV1455 BTM (NLS),
  2003 WL 21500525 (S.D. Cal. May 1, 2003) .................................................... 19

*In re Apple Inc. Sec. Litig.*,
  No. 19-cv-02033-YGR,
  2020 WL 2857397 (N.D. Cal. June 2, 2020) ..................................................... 11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................ 6

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) .............................................................................. 13

*Baker v. Seaworld Entm't*,
  No. 14cv2129-MMA (KSC),
  2016 WL 2993481 (S.D. Cal. Mar. 31, 2016) ................................................... 24

*In re Bare Escentuals, Inc. Sec. Litig.*,
  745 F. Supp. 2d 1052 (N.D. Cal. 2010) ............................................................. 8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................ 6

*Belodoff v. Netlist, Inc.*,
  No. SACV 07-00677 DOC (MLGx),
  2009 WL 2777320 (C.D. Cal. Sept. 1, 2009) ..................................................... 21

*Booth v. Strategic Realty Tr.*,
  No. 13-cv-04921-JST,
  2014 WL 3749759 (N.D. Cal. July 29, 2014) ..................................................... 7

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
No. 19-cv-06361-RS,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ........................................ 9, 10, 11

*Cai v. Switch, Inc.*,
No. 2:18-cv-01471-JCM-VCF,
2019 WL 3065591 (D. Nev. July 12, 2019) ..................................................... 23

*Capri v. Murphy*,
856 F.2d 473 (2d Cir. 1988) .......................................................................... 24

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align
Tech.*,
856 F.3d 605 (9th Cir. 2017) ..................................................................... 14, 17

*City of Roseville Empls.' Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011) ............................................................ 23

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) .......................................................... 17

*In re Daou Sys., Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) ................................................................. 15, 17

*Dorchester Inv'rs v. Peak Trends Tr.*,
No. 99 CIV. 4696(LMM)(F ........................................................................... 25

*In re DOT Hill Sys. Corp. Sec. Litig.*,
594 F. Supp. 2d 1150 (S.D. Cal. 2008).......................................................... 14

*In re Eventbrite, Inc. Sec. Litig.*,
No. 5:18-CV-02019-EJD,
2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ................................................ 15

*In re Facebook, Inc., IPO Sec. and Derivative Litig.*,
986 F. Supp. 2d 428 (S.D.N.Y. 2013) ............................................................ 14

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ................................................................ 6, 12, 13

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)......................................................................................... 6

*Hertzberg v. Dignity Partners*,
191 F.3d 1076 (9th Cir. 1999) ....................................................................... 23

iii

*Ill. State Bd. of Inv. v. Authentidate Holding Corp.*,
   369 F. App'x 260 (2d Cir. 2010) ....................................................................... 18

*In re InfoSonics Corp. Sec. Litig.*,
   No. 06CV1231 BTM,
   2007 WL 2301757 (S.D. Cal. Aug. 7, 2007) ..................................................... 19

*Karinski v. Stamps.com, Inc.*,
   No. CV 19-1828-MWF,
   2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ...................................................... 10

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) .......................................................................20, 21

*Kronfeld v. Trans World Airlines, Inc.*,
   832 F.2d 726 (2nd Cir. 1987) ........................................................................... 10

*Lee v. City of L.A.*,
   250 F.3d 668 (9th Cir. 2001) ............................................................................ 15

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) ............................................................................ 12

*Maine State Retirement System v. Countrywide Financial Corp.*,
   No. 2:10-CV-0302 MRP,
   2011 WL 4389689 (C.D. Cal. May 5, 2011) ..................................................... 24

*Mallen v. Alphatec Holdings, Inc.*,
   No. 10-cv-1673-BEN (MDD),
   2013 WL 1294640 (S.D. Cal. Mar. 28, 2013) ................................................... 21

*In re Metro. Sec. Litig.*,
   532 F. Supp. 2d 1260 (E.D. Wash. 2007) ......................................................... 12

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ...........................................................14, 18

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension
   Fund*,
   575 U.S. 175 (2015)............................................................................ 16, 19, 20

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ............................................................................ 10

*Pirani v. Slack Techs., Inc.*,
   445 F. Supp. 3d 367 (N.D. Cal. 2020)............................................................... 22

iv

*In re Quality Sys. Inc. Sec. Litig.*,
    865 F.3d. 1130 (9th Cir. 2017) .......................................................................... 10

*Rafton v. Rydex Series Funds*,
    No. 10-CV-01171-LHK,
    2011 WL 31114 (N.D. Cal. Jan. 5, 2011)...................................................... 7, 8

*In re Rexplore, Inc. Sec. Litig.*,
    685 F. Supp. 1132 (N.D. Cal. 1988)................................................................. 7

*Rieckborn v. Jefferies LLC*,
    81 F. Supp. 3d 902 (N.D. Cal. 2015) ................................................................ 8

*S.E.C. v. Todd*,
    642 F.3d 1207 (9th Cir. 2011) ......................................................................... 6

*Schueneman v. Arena Pharm.*,
    840 F.3d 698 (9th Cir. 2016) ......................................................................... 14

*SEC v. Das*,
    No. 8:10CV102, 2010 WL 4615336 (D. Neb. Nov. 4, 2010) .......................... 6

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) .......................................................... 18

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ....................................................................... 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................... 6

*U.S. S.E.C. v. Fehn*,
    97 F.3d 1276 (9th Cir. 1996) ........................................................................... 9

*In re Violin Memory Sec. Litig.*,
    No. 13-CV-5486 YGR,
    2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ................................................. 24

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ...................................................... 24, 25

*Welgus v. TriNet Grp., Inc.*,
    No. 15-cv-03625-BLF,
    2017 WL 6466264 (N.D. Cal. Dec. 18, 2017)................................................. 21

*In re Wells Fargo Mortgage-Backed Certificates Litig.*,
    712 F. Supp. 2d 958 (N.D. Cal 2010)............................................................. 25

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
No. 09-12830, 2010 WL 4184465 (E.D. Mich. Oct. 21, 2010).......................19

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ...................................................................12, 13

*Yanek v. Staar Surgical Co.*,
388 F. Supp. 2d 1110 (C.D. Cal. 2005) ..........................................................19

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ..........................................................................17

**Statutes**

15 U.S.C. § 77k(a)...........................................................................................6, 15

**Other Authorities**

17 C.F.R. § 229.503(c) ....................................................................................22, 23

Fed. R. Civ. P. 8(a)..............................................................................................5

Fed. R. Civ. P. 12(d)...........................................................................................15

H.R. Rep. No. 85, 73d Cong., 1st Sess., 2 (1933) ...............................................6

**INTRODUCTION**

The Registration Statement[1] issued in connection with Mesa's August 10, 2018 IPO was false and misleading in violation of Sections 11, 12(a)(2), and 15 of the Securities Act, because it failed to disclose materially adverse trends, uncertainties, and risks that the Company faced at the time of the IPO. Defendants repeatedly mischaracterize these statements as "puffery" or the result of "optimism." They were nothing of the sort and they misled Lead Plaintiff and other investors into purchasing millions of shares of Mesa stock at $12 per share that lost 75% of its value over the next twenty months. ¶ 14.[2]

In the Registration Statement, Mesa boasted its belief that its "cost discipline, strong operational performance and financial resources will provide additional opportunities to expand our operations . . . ." and touted the intent to "pursue opportunities to provide regional flying to other major airlines . . . ." *See* Declaration of James M. Wilson, Jr. in Opposition to Motion to Dismiss ("Wilson Decl."), Ex. 1, Registration Statement at 5-6.  Of course, none of that ever materialized as the stock marched downward with its first precipitous failure coming in the second quarter of 2019 (well before the outbreak of Covid-19).

In a glib moment of after-the-fact candor on May 10, 2019, nine months after the IPO, Mesa CEO Jonathan G. Ornstein ("Ornstein") blurted out the truth as the stock was beginning to crash:

> We knew that in the last year, 18 months, I mean **we were hamstrung** by the fact that we had expanded a lot, **we needed more pilots**, **we got hung** up a little but in pilot training, maintenance became more difficult in terms of qualified maintenance people. **And we're just sort of finally** putting all that together.

¶¶ 7, 11, 99.

This statement was in shocking contrast to claims made and the euphoric speculation of growth and success contained in the Registration Statement. It

---

[1]    All capitalized terms shall have the same meaning as in the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF No. 52).
[2]    Citations to ¶ __ are to the Complaint.

1

explained why the stock was failing, and demonstrated beyond doubt that the rosy Registration Statement, which had withheld this information, was false and misleading.

The Complaint contains detailed allegations specifically identifying the material misstatements and omissions that were confirmed to be false and/or misleading by Mesa's CEO after the IPO as well as by confidential former Mesa employees.

Defendants move to dismiss the Complaint arguing that Lead Plaintiff's claims are based "entirely on mischaracterizations of statements Mesa made well after the IPO" and that many of the challenged statements are vague expressions of corporate optimism, immunized forward-looking statements, and statements of opinion. Mesa Defendants' Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof (ECF No. 56) ("Opening Br.") at 8. This is not correct.

The Complaint pleads sufficient facts to support allegations that at the time of the IPO in August 2018:

(i)     The 17-year old American CPA, the main source of revenue for Mesa, was not the "stable, long-term, revenue guarantee" agreement touted in the Registration Statement, but rather was the subject of discussions by American to be amended to substantially raise performance standards to a level that Mesa was unlikely to fully meet;

(ii)    Mesa's operational performance was below industry standards, including because it lacked an adequate number of spare aircraft, which led to increased maintenance expenses, decreased revenues, and weak earnings; and

(iii)   Mesa lacked effective maintenance solutions because it failed to disclose that the Company was experiencing a shortage of qualified mechanics and maintenance personnel to properly and timely service its aircraft.

2

Defendants argue that Mesa suffered from some "unfortunate . . . events." Opening Br. at 5. That is true. However, the fact that such things do happen to companies heightens the importance of accurate disclosure of a company's true posture to investors in an IPO so that they may fairly gauge the company's vulnerability to such events. Mesa investors learned the hard way that Mesa was extremely vulnerable. Defendants' other arguments similarly fail. Lead Plaintiff's claims regarding the American CPA are not time barred because Defendants did not disclose sufficient information for a shareholder to bring a securities claim until December 17, 2019 and the first complaint was filed well within the limitations period. Further, Lead Plaintiff has sufficiently alleged its standing to bring claims under Sections 11 and 12(a)(2).

In sum, the Complaint's allegations are more than sufficient under Rule 12(b)(6), and Defendants' motion to dismiss should be denied.

## I.     RELEVANT FACTUAL BACKGROUND

Mesa is a regional aircraft carrier for American Airlines and United Airlines and provides commercial passenger service throughout the United States, and to Canada, Mexico, Cuba and the Bahamas. ¶ 2. Mesa operates pursuant to the terms of capacity purchase agreements ("CPA") with American and United. ¶ 45. The CPAs provide Mesa with: (i) guaranteed monthly revenue for each aircraft assigned under contract; (ii) a fixed fee for each block hour and flight flown; and (iii) reimbursement of certain direct operating expenses, *i.e.*, "pass-through" costs such as passenger and hull insurance, aircraft property taxes, landing fees, and catering. ¶ 46.

In the Registration Statement for Mesa's IPO, Mesa touted that it had 411 mechanics, contracts with third parties to cover maintenance, and that maintenance expenses had been steadily decreasing. ¶ 50. At the time of the IPO, Mesa operated a fleet of 145 large regional commercial aircraft. ¶ 53. Mesa also maintained one 50-seat Bombardier CRJ-200 aircraft as an operational spare not assigned for service

3

under either of its CPAs with American or United.[3] ¶ 54. In the event an assigned aircraft was unavailable, Mesa would substitute the assigned aircraft with its operational spare in order to maintain its operational performance. *Id.*

Throughout the Registration Statement, Mesa made multiple statements describing its "competitive cost structure" and substantial operating efficiencies. ¶¶ 66-69. The Company touted its "strong recent record of operational performance" and maintained that its strong operational performance, along with its business plan as a "low-cost, efficient and reliable" service provider were the keys to its financial success. ¶¶ 70-73. Furthermore, the Registration Statement praised its ability to "attract and retain qualified personnel" even when the airline industry had a shortage of qualified pilots and maintenance technicians. ¶ 74. The Registration Statement also touted the long-term revenue security it had under the American CPA. ¶ 77.

Unknown to investors at the time, Mesa had been experiencing operational issues that would threaten its continued operational performance and ability to maintain its strategy as a low-cost service provider. ¶ 75. Approximately nine months prior to the Offering, Mesa's growth and expansion had reduced its ability to find and maintain qualified maintenance personnel. ¶ 75(b). Additionally, since as early as one year before the IPO, Mesa had discussions relating to the inadequacy of its operational spare aircraft count compared to other operators in the airline industry. ¶ 75(c).

As much as six months prior to the Offering, the American CPA was not as secure as it had been historically. ¶ 75(a). American and Mesa began discussing raising Mesa's performance levels required under the American CPA that were "significantly below" industry standards. *Id.* American was dissatisfied with Mesa's performance and expressed its desire to change the terms of the American CPA. ¶¶

---

[3]    Defendants claim Mesa actually had three operational spare aircrafts. Opening Br. at 16-17. Regardless of Ornstein's statements during earnings calls, the Registration Statement states that Mesa only had one unassigned aircraft, not three. ¶¶ 54, 69. *See* Exhibit 1 at 97.

4

78(a)-78(b), 112-20. On January 31, 2019, Mesa announced that the Company and American had agreed to changes to the American CPA, and promised shareholders that the Term Sheet reflecting the revised terms would be disclosed in the next quarterly report, but Mesa did not file the Term Sheet until December 17, 2019. ¶¶ 78(d), (e). The Term Sheet disclosed drastic changes to the relationship between Mesa and American. Mesa would be required to substantially increase its operational performance or American would have the unilateral right to remove aircrafts from the American CPA. ¶ 78(g). Additionally, the revised terms required Mesa to remove two planes from the American CPA and keep them as operational spares. *Id.*

During 2019, American pulled three aircrafts due to Mesa's failure to maintain its new operational performance standards. ¶ 78(h). By the end of 2019, including the two planes Mesa was required to pull to keep as operational spares, American had exercised its right to remove 5 planes from the American CPA bringing the total from 64 planes to 59. *Id.*

Mesa's undisclosed performance issues that pre-dated the IPO would go on to blindsided analysts that were covering Mesa and have a material impact on the Company's financial reports.[4] ¶¶ 87-111.

## II.    LEGAL STANDARDS

### A.    Applicable Pleading Standards

As acknowledged by Defendants (Opening Brief at 6), where no fraud is alleged, the sufficiency of the complaint is measured only by Fed. R. Civ. P. 8.  Lead Plaintiff's complaint must give a short and plain statement of the claim showing that it is entitled to relief. Fed. R. Civ. P. 8(a).

All factual allegations in the complaint must be presumed to be true and reasonable inferences must be made in favor of the non-moving party. The claim must

---

[4]    Defendants falsely claim regarding mechanics that "Mesa warned, for example, that past shortages of pilots and mechanics could recur . . . ."  Opening Br. at 3. There is no support for this statement in the Registration Statement that Lead Plaintiff can find.  The word "mechanic" appears only three times, and never in the context of such a warning.

be "plausible on its face."[5] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Bell Atl.*, 550 U.S. at 556 (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)); *see also SEC v. Das*, No. 8:10CV102, 2010 WL 4615336, at *5 (D. Neb. Nov. 4, 2010). And, importantly, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 326 (2007).

Congress adopted Section 11 to ensure that issuers "tell[] the whole truth" to investors. H.R. Rep. No. 85, 73d Cong., 1st Sess., 2 (1933).  As such, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

A purchaser of securities may sue an issuer if the registration statement either "contain[s] an untrue statement of a material fact" or "omit[s] to state a material fact . . . necessary to make the statements therein not misleading . . . ." 15 U.S.C. § 77k(a). Further, "whether a [] statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1080-81 (9th Cir. 1995). Resolving an issue as a matter of law is only appropriate when the adequacy of the disclosure is "so obvious that reasonable minds [could] not differ." *S.E.C. v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011).

## III.   ARGUMENT

### A. Mesa's Statements About the American CPA Were False and Misleading and Are Not Time Barred

#### 1.   Claims Relating to Mesa's Statements About the Stability or Long-Term Nature of the American CPA Are Timely

Defendants' argument that Lead Plaintiff's CPA allegations are time-barred should be rejected. The Complaint clearly alleges that Defendants withheld until December 17, 2019, sufficient information to establish that statements in the

---

[5]     Unless otherwise noted, all citations, internal quotation marks and footnotes are omitted and all emphasis is added.

6

Registration Statement that the American CPA was a "Stable, Long-Term Revenue Guarantee…" were false and misleading. ¶¶ 77-78.

As an initial matter, Defendants' statute of limitations argument is premature. Defendants argue that the Complaint acknowledges that shareholders were on notice of the amended American CPA as early as January 31, 2019, when it was announced that Mesa and American had amended the CPA, or at the latest on February 5, 2019, when Orenstein revealed in an earnings conference call that American sought to revise the prior 17-year old CPA six months prior to the IPO. Opening Br. at 9. This argument ignores the Complaint's additional allegations that these disclosures themselves were insufficient to put shareholders on notice of the demanding new performance terms in the new American CPA that Mesa could not meet. ¶ 78(e)–(g). Neither the January nor the February disclosures revealed that Mesa's operating performance standards would be shifting radically.[6] Multiple courts have found that disclosures that only alert a plaintiff to the possibility of a securities fraud claim will not suffice to begin accruing the limitations period. *Booth v. Strategic Realty Tr.*, No. 13-cv-04921-JST, 2014 WL 3749759, at *5-6 (N.D. Cal. July 29, 2014) (finding that it was plausible that certain general disclosures, including a more specific disclosure acknowledging a significant deficiency in internal controls over financial reporting, were insufficient to supply a reasonably diligent plaintiff with the necessary information to plead a Section 11 claim with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss); *Rafton v. Rydex Series Funds*, No. 10-CV-01171-LHK, 2011 WL 31114, at *9-10 (N.D. Cal. Jan. 5, 2011) (finding defendants could not overcome the high bar for establishing inquiry notice as a matter of law even though the company disclosed graphs in its annual report demonstrating a

---

[6]    Furthermore, Defendants prevented the statutory clock from running when during a May 10, 2019 Q2 2019 earnings call, Defendant Ornstein stated American had been very helpful, and saw significant improvement in maintenance. ¶¶ 97-100. *In re Rexplore, Inc. Sec. Litig.*, 685 F. Supp. 1132, 1137-38 (N.D. Cal. 1988) (defendants' repeated assurances stopped a statute from running because they "lulled [investors] into thinking that the problems were being solved"), *superseded on other grounds by Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).

deviation, because it was not obvious from the disclosures in the registration statements and prospectus that the deviation was caused by compounding); *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 915-16 (N.D. Cal. 2015) (finding that a CFRA report and the company's subsequent switch to reporting "comprehensive DSO" was not sufficient to "ma[ke] plain the linkages between [defendant company]'s method of calculating its reported DSO and its alleged understatement of reserves and overstatement of revenues").

Whether a plaintiff is on inquiry notice is a fact-intensive process, and the "resolution of the limitations issue is not appropriate at the pleading stage, but must be determined once an evidentiary record has been developed." *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1080-81 (N.D. Cal. 2010) (collecting cases). A defendant seeking to establish that a Section 11 claim is time-barred on a motion to dismiss faces an "especially high hurdle . . . ." *Rafton*, 2011 WL 31114, at *10.

The information necessary to supply shareholders with the ability to bring a Section 11 claim that could withstand a motion to dismiss was not disclosed until the actual new American CPA Term Sheet was first filed on December 17, 2019. ¶ 78(f). The Term Sheet disclosed that Mesa would be required to perform under substantially stricter operational performance criteria and gave detailed information about how and why American would be able to withdraw aircrafts from the CPA. ¶ 78(g). Throughout 2019, Mesa failed to meet the updated operational performance criteria set out in the Term Sheet and American continued to pull aircrafts. ¶¶ 78(h). It was not until the Term Sheet was disclosed that investors could finally understand that the reality underlying Mesa's poor performance was due to its updated performance requirements. ¶ 78(i). The disclosure of the actual operational performance standards and detailed criteria for removing aircrafts from the CPA was material information that demonstrated to investors that the American CPA, at the time of the IPO, was not actually "stable" or long-term and the conclusion was solidified by Mesa's continued failure to meet the new standards. *Id.*

8

## 2. Mesa's Discussions With American Were Material Information That Was Required To Be Disclosed

Contracts and events do not need to be finalized in order for them to be material to potential shareholders. *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 196 (S.D.N.Y. 2003). Material facts include those that "'affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the company's securities.'" *Id.* (quoting *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968). When contingent or speculative events are at issue, the materiality of those events depends on "a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Abdo v. Fitzsimmons*, No. 17-cv-00851, 2018 WL 11220494, at *13 (N.D. Cal. May 22, 2018) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (quoting *Tex. Gulf Sulphur Co.*, 401 F.2d at 849)); *U.S. S.E.C. v. Fehn*, 97 F.3d 1276, 1291 (9th Cir. 1996) (same).

Lead Plaintiff has alleged that Mesa's single largest contract, which accounted for 54% of Mesa's total revenue as of March 31, 2018, was improperly characterized as "stable" and "long-term" in the Registration Statement, ¶¶ 13, 77, 78, evidenced by the fact that prior to the IPO American had already talked to Mesa about changing the American CPA in a way that was detrimental to the Company. ¶¶ 75(a), 78. In the event that American would alter the CPA to less favorable terms for Mesa, this would be an event of great magnitude negatively effecting Mesa due to Mesa's reliance on the American CPA for revenue. Indeed, after amending the American CPA, Mesa's quarterly earnings report was a massive disappointment. ¶¶ 78, 93-111. Furthermore, alterations to the American CPA were highly probable since the CPA had been in place for almost 17 years and the performance standards were substantially below industry standards. ¶ 78(c). Highly likely events with large potential consequences are exactly the type of information Companies are required to disclose. *Bos. Ret. Sys. v. Uber Techs., Inc.*, No. 19-cv-06361-RS, 2020 WL 4569846, at *7 (N.D. Cal. Aug. 7, 2020) (finding, among other reasons, defendants had a duty to disclose additional

9

information because the information defendants did disclose "create[d] an impression of a state of affairs that differ[ed] in a material way from one that actually exist[ed]" (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)); *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 735-37 (2nd Cir. 1987) (finding the omission of preliminary merger discussions in a prospectus to not be immaterial as a matter of law under summary judgment standards because the relationship between the two parties was critical to knowledgeable investors' understanding of the company and there was, at a minimum, a substantial possibility of its occurrence).

### 3. Mesa's Claims the American CPA Were "Stable" and "Long-Term" Were Neither Accurate Or Puffery

Defendants' attempt to characterize the claims about the American CPA as puffery or too vague to be actionable likewise fall away on further scrutiny. Opening Br. at 11-12.

First, the statements relating to the "stable" and "long-term" nature of the American CPA are not puffery because they were capable of being objectively verified and would have been highly material to investors. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). Moreover, general statements of optimism, when taken in context, can still be misleading "when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys. Inc. Sec. Litig.*, 865 F.3d. 1130, 1143 (9th Cir. 2017). At the time Mesa claimed the American CPA was "stable" and "long-term", it knew that American was dissatisfied with the substantially below market sweetheart deal and intended to change it and had initiated negotiations to raise the performance levels to current industry standards ¶ 78. These are exactly the type of misleading statements Ninth Circuit courts find to be actionable. *Karinski v. Stamps.com, Inc.*, No. CV 19-1828-MWF (SKx), 2020 WL 281716, at *10-11 (C.D. Cal. Jan. 17, 2020) (holding Stamps.com's statements that USPS was "very happy" with Stamps and their business model and that Stamps had a "great partnership with USPS" were misleading

because USPS repeatedly expressed its displeasure with Stamps' business practices and was investigating them); *In re Apple Inc. Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 2857397, at *14-15 (N.D. Cal. June 2, 2020) (finding that a positive statement relating to the sales of the iPhone XS and XS Max actionable because it was made days before production was cut, thereby affirmatively creating a positive impression in an area Apple knew was doing poorly); *Bos. Ret. Sys.*, 2020 WL 4569846, at *7 (finding general statements of optimism to be actionable, when taken in context, because the speaker was aware undisclosed facts that called into question the state of affairs affirmatively created by the general optimism).

Defendants have contrived an argument that the Complaint may be alleging that the terms "stable" and "long-term" meant that the American CPA was not subject to change. Opening Br. at 11-12. This argument is patently false. Lead Plaintiff is not alleging that the American CPA was not subject to change, but rather that at the time of the IPO, one of the most critical components of the American CPA, indeed the basis for much of Mesa's prior to success – the outdated and low performance thresholds – were already being renegotiated by American and investors were not properly put on notice.

Defendants also mischaracterize Lead Plaintiff's use of the word "guarantee" by failing to provide the context surrounding the word. Nowhere does Lead Plaintiff suggest that the amount of revenue Mesa would generate from the American CPA was guaranteed and not subject to penalties. Lead Plaintiff claims that the CPA guarantees a number of revenue generating aircrafts, subject to American's unilateral right to withdraw aircrafts. ¶¶ 46, 78(g), 92, 103. To the extent that the Complaint describes "guaranteed monthly income", it is in the context of direct quotes from the Registration Statement. ¶¶ 13, 67, 77. Ignoring Defendants' attempts to distract from the substance of the allegations with semantics, the "guaranteed" revenue per aircraft was not anywhere near as guaranteed as Mesa represented it was since the increased performance standards, which Mesa was apparently incapable of meeting, would

11

drastically increase the likelihood penalties would be applied and reduce the "guaranteed" fixed revenue per plane. Moreover, the revised CPA would also clearly threaten the number of revenue generating aircrafts in the CPA, as evidenced by American unilaterally pulling three aircrafts from the CPA in addition to the two planes removed as operational spares. ¶ 78.

### 4. Mesa's Claims Concerning the American CPA Were Not Protected by the Bespoke Caution Doctrine

Defendants claim that the "bespeaks caution doctrine" immunizes Mesa's description of the CPA as "stable" or "long-term" because certain warnings were placed in the Registration Statement. Opening Br. at 12-14. However, these warnings are nothing more than boilerplate risk factors and are not the targeted type of "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1291 (E.D. Wash. 2007). Defendants must demonstrate that "[t]here [was] sufficient cautionary language or risk disclosure such that reasonable minds could not disagree that the challenged statements were not misleading." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005); *Fecht*, 70 F.3d at 1082 ("we have also recognized that the 'bespeaks caution' doctrine reflects nothing more than 'the unremarkable proposition that statements must be analyzed in context'. . . . the doctrine is merely a new name for a venerable precept that does not alter the standard for deciding questions as a matter of law").

Lead Plaintiff has adequately alleged that Mesa's description of the American CPA as "stable" and "long-term" was false and misleading because Mesa knew that American was unsatisfied with the terms of the agreement and would likely want to raise the performance standards to industry standards. ¶ 78. The risk factors cited by Defendants are not the type of warnings that "relate directly to that which plaintiffs claim to have been misled." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1415

(9th Cir. 1994). Multiple courts have found similar types of disclosures to be insufficient to establish, as a matter of law, that no reasonable person would not find the challenged statements misleading. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798-99 (9th Cir. 2017) (finding the company's Form 8-K giving notice of an FDA letter was misleading because the company failed to disclose that the FDA had concerns about the drug test being cleared, and that was exactly the type of information a reasonable investor would find relevant); *Fecht*, 70 F.3d at 1082 (holding that inclusion of some cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading because reasonable jurors could find the public statements and omissions to be materially misleading).

Accordingly, Defendants' motion to dismiss Lead Plaintiff's claims relating to Mesa's description of the American CPA as "stable" and "long-term" should be denied in its entirety.

### B.    Mesa's Statements About Its "Strong" Operational Performance Were Misleading, Actionable, and Are Not Time Barred

The Registration Statement's description of Mesa's "strong" operational performance was false and misleading as evidenced by Mesa's own post-IPO statements admitting that prior to the IPO, Mesa was only obligated to operate at *below industry standards*. ¶¶ 66, 69, 70, 72, 75(a). Furthermore, the claims were even more obviously false and misleading after Mesa's calendar year 2019 performance where it completely failed to meet more normal, industry standard performance targets mandated by American in the newly revised American CPA. ¶¶ 78(h)-(i), 93-110.

Furthermore, Mesa's characterizations of its pre-IPO operational performance as "strong," "reliable," and "cost-competitive" and statements that its regional jets had "best-in-class operating efficiencies" are not mere puffery because they were objectively verifiable. ¶¶ 67, 69, 71-74. To determine whether statements "amount[]

only to puffery, the court must analyze the context in which [they] were made." *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.*, 856 F.3d 605, 616 (9th Cir. 2017). Here, Defendants' statements were objectively shown to be false because Mesa admitted it was experiencing operational issues, based on its own internal objective standards for performance. ¶ 75(a)-(c). *In re Facebook, Inc., IPO Sec. and Derivative Litig.*, 986 F. Supp. 2d 428, 465 (S.D.N.Y. 2013) (finding defendants' "specific statements leading up to the [ ] IPO ensuring 'on-time, on-target, and ready-to-launch technology' . . . . were not vague, forward-looking statements of optimism, but . . . were readily capable of verification"); *In re DOT Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150 (S.D. Cal. 2008).

As the Ninth Circuit has explained, "'once defendants choose to tout' positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm.*, 840 F.3d 698, 705-06 (9th Cir. 2016).

On February 5, 2019, Ornstein revealed for the first time that "all of Mesa's performance levels were significantly below industry standards" ¶¶ 75(a), 85(a). Ornstein's full statement makes it clear that only the performance requirements set forth in the old American CPA were below industry standards. Mesa wouldn't "need to perform at that [significantly raised] level [] to be competitive" if it were already performing at that level. Opening Br. at 15. In fact, Mesa clearly couldn't perform at industry standard levels evidenced by the fact that shortly after the revised American CPA was agreed to, American exercised its right to unilaterally pull three aircrafts due to Mesa's poor operational performance. ¶ 78.

Ornstein's statements (¶ 94), read in full context, are admissions that at the time of the IPO, Mesa was operating below industry standards. ¶¶ 78(b), (c), 94. Plaintiff is not cherry-picking statements or removing their context, as Defendants suggest. Importantly, district courts generally do not consider material outside the

pleadings for their truth when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001); *In re Eventbrite, Inc. Sec. Litig.*, No. 5:18-CV-02019-EJD, 2020 WL 2042078, at *7 (N.D. Cal. Apr. 28, 2020). *See also* Fed. R. Civ. P. 12(d). Mesa's statements were undoubtedly false or misleading, and, because the claims are not time-barred, unactionable puffery, or mischaracterizations of post-IPO disclosures, Defendant's motion to dismiss must be denied.

### 1.  Mesa Misled Investors about Insufficient Spare Planes

The Registration Statement maintained that Mesa had ***one*** 50-seat Bombardier CRJ-200 aircraft as an operational spare not assigned for service under either of its CPAs with American or United. ¶ 54. This is an express affirmative statement in the Registration Statement that was later proved to be misleading. Unlike Section 10(b), Section 11 of the Securities Act creates a private remedy for any purchaser of a security if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." 15 U.S.C. § 77k(a); *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1027 (9th Cir. 2005).

In direct contrast to the plain text of the Registration Statement, Defendants claim that Ornstein's statements made during two earnings calls demonstrate that Mesa actually had three operational spare aircrafts at the time of the IPO or at the very least required three to be operationally efficient. ¶ 109; Opening Br. at 16-17. However, it is irrelevant if Defendant Ornstein's statements during the earnings calls were referencing the number of spares Mesa thought it needed or what the actual agreement in place at the time of the IPO stated (¶ 94), because the Registration Statement clearly stated that Mesa only had one operational spare aircraft, not the three that Defendants claim. ¶¶ 54, 69. *See* Exhibit 1 at 97.

The Registration Statement states that Mesa only had one operational spare, so

either the Registration Statement contained a false statement or Defendant Ornstein misrepresented that Mesa had three operational spares in the earnings calls.

### 2. Mesa's Statements Concerning Its Maintenance Personnel and Contracts Are Misleading, Not Forward-Looking Nor Couched in Caution

Lead Plaintiff has alleged that Mesa's statements regarding its ability to maintain high quality and cost-effective maintenance solutions were misleading because, at the time of the IPO, the Company lacked an adequate number of mechanics and reliable outsourced contracts for heavy maintenance. ¶¶ 68, 75(b). The challenged statements are both (1) actionable under the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015); and (2) are not accompanied by meaningful risk disclosures, which are not immunized from liability under the caution doctrine.

Mesa's statements that they expected cost efficiencies, long-term agreements with strategic vendors to be high quality, and maintenance obligations would be reduced in the future (¶ 68), are actionable under *Omnicare* because (1) they contain an embedded statement of untrue fact since Mesa was not "operationally efficient" when the statements were made; and (2) they were misleading in context because Mesa omitted the fact that they did not conduct a reasonable inquiry into the facts underlying their statements that they had effective maintenance personal or cost-effective contracts at the time the statements were made. *See Omnicare*, 575 U.S. at 183-95.

*First*, Mesa's statements about its ability to maintain quality and cost-effective maintenance solutions were objectively false because Mesa admitted it was not "operationally efficient" when the statements were made. ¶ 78(b)-(c).

*Second*, the factual statements were further shown to be false when, in February 2019, Defendant Orenstein revealed for the first time after the IPO that the American CPA was out of step with the industry. Disclosures made approximately nine months prior to the Offering prove Mesa was unable to source qualified

16

maintenance personnel. ¶ 75(b).

*Third*, Plaintiff alleged with particularity the material facts giving rise to the misleading statements. Plaintiff provides detailed statements by two confidential witnesses that American was dissatisfied with Mesa's performance. ¶¶ 112-20. Plaintiff has alleged "particular [and material] facts" "about the inquiry the issuer did or did not conduct or the knowledge it did or did not have" that rendered the opinion "misleading to a reasonable person reading the statement fairly and in context." *Align*, 856 F.3d at 615 (N.D. Cal. 2014) (citing *Omnicare*, 575 U.S. at 186).

CW1 stated Mesa's system of cannibalizing parts from one plane to quickly get another in the air, instead of maintaining adequate inventory, led to problems, and was later confirmed by CW2. ¶ 118. CW2 also stated there wasn't enough spare parts available on any given day. ¶ 116. These two confidential witnesses show that there were widespread problems that materially affected Mesa's operations at the time of the IPO. *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1081–82 (C.D. Cal. 2008) (finding credible the Complaint's confidential witness accounts, suggesting a widespread Company culture).

The fact that the confidential witness left the company before the challenged disclosures were made does not reduce the probative value of the things they saw while at the company. The confidential witness test analyzes whether a complaint has provided sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). Where securities fraud plaintiffs rely on both confidential witnesses and other facts, they need not name their sources in the complaint as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. *Daou*, 411 F.3d at 1015. Plaintiffs have met this burden.

In May of 2019, Defendant Ornstein indicated that, in "the last year, 18 months, . . . we were hamstrung by the fact that we had expanded a lot" and

17

"maintenance became more difficult in terms of qualified maintenance people." ¶¶ 75(b), 85(b), 99; Ex. 12 to Decl. of Andrew C. Stanley in Supp. or Mesa Defs' Mot. to Dismiss (ECF No. 57-12) at 9. This is an admission that Mesa's qualified mechanics and qualified maintenance personnel were significantly understaffed at the time of the IPO. ¶¶ 75(b), 85(b), 90.

The fact that Defendant Ornstein acknowledged the pilot shortage hamstrung Mesa (¶¶ 75(b), 85(b) and 99) strengthens Lead Plaintiff's argument that Mesa was not equipped with proper maintenance personnel at the time of the IPO. Mesa should have disclosed they were facing mechanic issues or that the industry was facing a shortage of mechanics. ¶ 74. Defendants claim that Lead Plaintiff only alleges failure to meet operational requirements before the IPO, but efficient maintenance personnel and cost-effective contracts are necessarily required for operational efficiency.

"It is well settled [] that a duty to disclose does arise where [a statement or] an omission is misleading because it 'affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists.'" *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1135 (N.D. Cal. 2017); *Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 263 n.2 (2d Cir. 2010) (finding a duty to update forward-looking statements).

Finally, Mesa's statement about its maintenance (¶ 68) is not forward looking, but instead concerns present facts or mixed statements of present fact and future prediction. *See Mulligan*, 36 F. Supp. 3d at 964-65. Defendants' statement that there are several key elements that contribute to their cost efficiencies was fundamentally a representation of present fact regarding the status of Mesa's maintenance personnel and contracts and therefore fell outside of forward-looking protections. ¶ 68.

Defendants' statements regarding the status of cost efficiencies (¶ 68) were not forward-looking because Mesa disclosed risks associated with increases in labor and aircraft maintenance costs that had materialized prior to the IPO. ¶ 81.

Defendants' statements were also not accompanied by meaningful cautionary

18

language. "[c]autionary language can never be 'meaningful' if it warns of risks that have already materialized," *Wilkof v. Caraco Pharm. Labs., Ltd.*, No. 09-12830, 2010 WL 4184465, at *8 (E.D. Mich. Oct. 21, 2010); *see In re 21st Century Holding Co. Sec. Litig.*, No. 07-61057-CIV, 2008 WL 5749572, at *13 (S.D. Fla. Nov. 7, 2008). Further, Defendants' warnings were not meaningful because at the time the disclosures were made, Mesa knew that cost efficiencies did not exist. *In re InfoSonics Corp. Sec. Litig.*, No. 06CV1231 BTM (WMc), 2007 WL 2301757, at *11 (S.D. Cal. Aug. 7, 2007).

In addition, Defendants reference mere boilerplate instead of meaningful statements that reasonably describe specific risks. ¶ 82; *see also* ¶ 84; Ex. 1 at 33-34. "[C]autionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge." *In re Amylin Pharm., Inc. Sec. Litig.*, No. 01CV1455 BTM (NLS), 2003 WL 21500525, at *7 (S.D. Cal. May 1, 2003) ("Vague or boilerplate disclaimers are insufficient to invoke safe harbor protection."). Defendants' generic warnings did nothing to warn investors of the actual extent of the maintenance personnel and contract risks facing Mesa. *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1123 (C.D. Cal. 2005) (finding statements actionable where "the factors enumerated do not adequately disclose the actual risks involved . . . .").

Finally, even if one to assume that any of Defendants' statements (¶ 68) were just opinions, though they were not, those statements of opinion would still be actionable under *Omnicare*. A statement of opinion is false if it contains an embedded statement of untrue fact or if the speaker does not hold the stated belief. *Omnicare*, 575 U.S. at 176. A statement of opinion is rendered misleading by an omission if the basis for the speaker's opinion is omitted and the "omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id*. at 194. The statement's context includes its "surrounding text, including hedges, disclaimers, [ ] apparently conflicting information," and "the

customs and practices of the relevant industry." *Id*. at 190.

As such, there exists a question of material fact that the statements concerning Mesa's maintenance solutions are actionable non-forward-looking statements, which were not couched in caution.

**C.     The Registration Statement Failed To Disclose Known Trends Required by Item 303**

"[A] disclosure duty exists" under Item 303 of Regulation S-K "where a trend, demand, commitment, event or uncertainty is ***both*** [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).

At the time of the IPO, it is now known beyond question and has been admitted that trends that were reasonably likely to materially impact Mesa included: (1) that the Company's operational performance levels were "substantially below" industry standard operating levels; (2) that Mesa had a shortage of qualified mechanics and qualified maintenance personnel to service its fleet; and (3) that Mesa had an inadequate number of operational spare aircraft to meet its needs. *See* ¶ 76. Each of these adverse trends was omitted from the Registration Statement and increased the risk that Mesa would face higher maintenance expenses, decreased revenues, and weak earnings such that their omission left investors in the dark about the true state of Mesa's financial and operating conditions. *See* ¶¶ 76, 87-111. Each of these adverse trends would have been highly material to investors.

Defendants' present claims that at the time of the IPO, Mesa's operational performance was "industry leading" and unaffected by mechanic shortages does nothing to alleviate its duty to disclose known trends. Opening Br. at 22. Further, to the extent these current claims are at odds with the well-pled allegations of the complaint, they are an improper attempt to prematurely argue the merits, which is improper on a Rule 12(b)(6) motion. *See Knevelbaard Dairies v. Kraft Foods, Inc.*,

232 F.3d 979, 984 (9th Cir. 2000) (stating that on a Rule 12(b)(6) motion, a court must "presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party[]").

As alleged in the Complaint, Mesa's operational performance was far from "industry-leading." As Ornstein stated, Mesa's "performance levels" were in fact "significantly below" "that which the industry is currently operating" for at least six months **before** the IPO. *See* ¶¶ 86, 94. Mesa necessarily knew about this trend at the time of the IPO because: (1) American discussed raising the performance level with the Company about six months prior (*see* ¶ 94); (2) Mesa had been operating in this industry for years and it is reasonable to infer that it was aware of the industry standards for operational performance and whether it was meeting them (*see* ¶ 41); and (3) operational performance was of particular importance to Mesa because the Company derives all of its operating revenues from the CPAs with American and United, and may receive certain financial incentives or incur penalties based on its operational performance (*see* ¶¶ 44, 46).[7]

Mesa's shortage of qualified mechanics and maintenance personnel was also a known trend as Ornstein admitted "[w]e **knew** that in the last year, 18 months," (*i.e.*, about 9 months before the IPO) "we were hamstrung by the fact that we had expanded a lot" and "maintenance became more difficult in terms of qualified maintenance people." ¶ 99. CW1 corroborates this shortage and that recurring maintenance problems caused flight delays and lack of on time performance. *See* ¶¶ 112-14.

---

[7]     Defendants' authorities are inapposite. *Belodoff v. Netlist, Inc.*, No. SACV 07-00677 DOC (MLGx), 2009 WL 2777320, at *2, *9 (C.D. Cal. Sept. 1, 2009) (no adverse trend regarding customer demand where it was contradicted by company's sales figures and plaintiffs did not challenge the sales figures or explain why the figures did not accurately reflect demand); *Welgus v. TriNet Grp., Inc.*, No. 15-cv-03625-BLF, 2017 WL 6466264, at *24 (N.D. Cal. Dec. 18, 2017) ("one-off allegation" that TriNet's **competitor** failed to "reserve for workers' compensation claims" and "similarly failed" did not support inference that defendants knew about alleged "negative trends" related to **TriNet's** workers' compensation plans, loss reserve amounts, etc.); *Mallen v. Alphatec Holdings, Inc.*, No. 10-cv-1673-BEN (MDD), 2013 WL 1294640, at *12 (S.D. Cal. Mar. 28, 2013) (no indication that the defendants admitted that the inventory issues were known at the relevant time).

Mesa's inadequate number of operational spares was also a ***known*** trend as Ornstein disclosed that there were "literally years of discussions" (*i.e.*, at least one year before the IPO) regarding the adequacy of Mesa's spare aircraft count and he believed the Company was "disadvantaged because we did not have the adequate spare count." ¶¶ 109-10. This trend continued through the date of the Offering, as COO Rich confirmed that one year after the Offering, Mesa still did not have an adequate number of spares. ¶¶ 105-08, 110.

The shortage of qualified mechanics and maintenance personnel, as well as the inadequate spare count, contributed to Mesa's operational performance issues and made it reasonably likely that the Company would be forced to spend more on maintenance to fill gaps, resulting in increased maintenance costs. These shortages were also reasonably likely to negatively impact earnings and revenue by causing the Company to incur penalties under the CPAs for delayed flights, or to lose fees for hours flown due to fewer planes being able to fly. *See* ¶¶ 46, 54, 87-111. Mesa's subpar operational performance also made it reasonably likely that American would seek to raise Mesa's performance levels by amending the CPA, particularly considering that American approached the Company about doing so just six months prior to the IPO. ¶ 94.

Thus, the Registration Statement's failure to disclose these trends violated Item 303. ¶¶ 63, 76. *See Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 386 (N.D. Cal. 2020) (finding Item 303 violation where Slack had frequent service outages and it was "plausibly pled that Slack was aware of these outages at the time of its disclosures, and that future outages would have an unfavorable impact . . . on revenues due to the" terms of its customer agreements).

### D.    The Registration Statement Failed To Disclose Risks Required By Item 503

Item 503 of Regulation S-K requires the issuer to provide "a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. §

229.503(c); ¶ 86. Accordingly, Defendants were obligated to disclose the following then-existing facts as *separate* risk factors: that Mesa was operating below industry standard operating levels, had a shortage of qualified mechanics and qualified maintenance personnel to service its fleet, and had an inadequate number of operational spare aircraft to meet its needs. *See* ¶ 86.

These facts existed at the time of the IPO, as explained in Section A, *supra*, and are exactly what made Mesa's offering speculative or risky as they led to the increased maintenance expenses, decreased revenues, and weak earnings that ultimately sent Mesa's stock plummeting to $5.84 per share on August 12, 2019 (over half of its $12 IPO price).  *See* ¶¶ 11-13, 85, 87, 101; *Cai v. Switch, Inc.*, No. 2:18-cv-01471-JCM-VCF, 2019 WL 3065591, at *6 (D. Nev. July 12, 2019) (finding that defendants violated Item 503 where they omitted the specific risks arising from Switch's new sales strategy, and Switch's stock price dropped 22.3% upon the revelation of the new strategy and its potential effects on revenue); *City of Roseville Empls.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 427 (S.D.N.Y. 2011) (finding defendant violated Item 503 by failing to disclose the risk flowing from the fact that similar proposals had already been rejected, and that the risk factor warning that the failure of the proposal to be adopted *could* have an adverse impact on the company was insufficient in light of the other rejections).

### E.   Lead Plaintiff Has Sufficiently Alleged Standing And That Defendants Were Statutory Sellers Under Section 12(a)(2)

Lead Plaintiff has alleged that it "purchased the Company's securities pursuant and/or traceable to the IPO."  ¶¶ 1, 19.  In *Hertzberg v. Dignity Partners*, 191 F.3d 1076 (9th Cir. 1999), the Ninth Circuit held that a Section 11 plaintiff may properly allege standing if he can "show that he purchased his stock in the initial offering . . . ." *Id*. at 1080 n.4. Lead Plaintiff has done precisely that. As shown in DeKalb's PSLRA certification, along with other traceable purchases during the IPO window, it purchased 30,047 shares of Mesa stock on the launch

23

day of the IPO, August 10, 2018, at the offering price of $12.00. Complaint, Ex. A (ECF No. 52-1) at 3. That is sufficient. Under the permissive notice pleading standards of Rule 8(a) a plaintiff need only "'provide a short and plain statement of the claim showing that [he] is entitled to relief . . . . Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests.'" *In re Violin Memory Sec. Litig.*, No. 13-CV-5486 YGR, 2014 WL 5525946, at *8 (N.D. Cal. Oct. 31, 2014).

Defendants make a wholly misplaced argument that DeKalb should have provided additional "confirmation slips" in response to what amounted to a wholly improper request for discovery made by Defendants during the LRCiv 12.1 conference. Opening Br. at 23 n.9. Such discovery is prohibited by the PSLRA and rightly refused by DeKalb. Defendants argue in a footnote that DeKalb's refusal of their improper request casts "doubt" on DeKalb's allegations. This is rank unfounded conjecture and is false. DeKalb stands on its well-pled complaint, its PSLRA certification and the fact that they clearly show that DeKalb has standing to pursue this lawsuit against Defendants. Defendants' reliance on *Baker v. Seaworld Entm't*, No. 14cv2129-MMA (KSC), 2016 WL 2993481 (S.D. Cal. Mar. 31, 2016) (Opening Br. at 19, 23), is misplaced because in *Baker*, the named plaintiff purchased in the aftermarket versus directly in the offering. *Id.* at *18. Here, Plaintiff purchased in the Company's IPO, the only offering.

Defendants also argue that the complaint fails because it did not make more specific allegations of solicitation by Defendants, including "direct communication" with Lead Plaintiff. Defendants cite for that proposition the single outlying authority of *Maine State Retirement System v. Countrywide Financial Corp.*, No. 2:10-CV-0302 MRP (MANx), 2011 WL 4389689, at *10 (C.D. Cal. May 5, 2011), Opening Br. at 23.  However better-reasoned courts reject "personal[] or direct[]" solicitation requirements. *See Capri v. Murphy*, 856 F.2d 473, 479 (2d Cir. 1988); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F.

24

Supp. 2d 158, 186 (S.D.N.Y. 2003) ("Since *Capri*, it has become well settled. . . that the seller need not have 'personal' contact with the purchaser . . . to be held liable under § 12(a)(2).") (collecting cases); *see also Dorchester Inv'rs v. Peak Trends Tr.*, No. 99 CIV. 4696(LMM)(F.), 2003 WL 223466, at *2 (S.D.N.Y. Feb. 3, 2003) (collecting cases).  Indeed, "direct communications" between Lead Plaintiff and Defendants before the IPO that communicated anything other than publicly available information could potentially subject Lead Plaintiff to unique defenses.

Lead Plaintiff has alleged that "[E]ach of the above Individual Defendants signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential Mesa Air Group investors, all motivated by their own and the Company's financial interests." ¶ 32. At this stage, no more is required. DeKalb has adequately alleged that it has standing to pursue this case.

**F.     Lead Plaintiff Has Adequately Alleged A Violation of Section 15**

As Lead Plaintiff has adequately plead primary violations of Sections 11 and 12, Lead Plaintiff has also adequately plead a violation of Section 15. *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 973-74 (N.D. Cal 2010)

Dated: November 16, 2020          By: */s/ James M. Wilson, Jr.*
                                       James M. Wilson, Jr.

Lubna Faruqi (*Admitted pro hac vice*)
Robert W. Killorin (*Admitted pro hac vice*)
James M. Wilson, Jr. (*Admitted pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331

Email: lfaruqi@faruqilaw.com
rkillorin@faruqilaw.com
jwilson@faruqilaw.com

*Attorneys for Lead Plaintiff DeKalb County Pension Fund and Lead Counsel for the Class*

**DECONCINI MCDONALD YETWIN & LACY, P.C.**
2525 East Broadway, Suite 500
Tucson, Arizona 85716
Telephone:520-322-5000
Facsimile: 520-322-5585
Email: gurman@dmyl.com

*Attorneys for Lead Plaintiff DeKalb County Pension Fund and Liaison Counsel for the Class*

26