Fed. Sec. L. Rep. P 100,954

2020 WL 6947521
United States District Court, S.D. New York.

IN RE DYNAGAS LNG PARTNERS
LP SECURITIES LITIGATION

This Document Relates to: All Actions

Master File: 19-CV-4512 (AJN)
|
Signed 11/25/2020

**Synopsis**
**Background:** Investors brought securities class action against foreign shipping company, its officers, its parent company, and underwriters, alleging violations of § 10(b) and Rule 10b-5, as well as Securities Exchange Act's control-person liability and violation of provisions of Securities Act governing misleading registration statements and prospectuses, arising from alleged misleading statements regarding new long term charter rates and the sustainability of distributions. Defendants moved to dismiss.

**Holdings:** The District Court, Alison J. Nathan, J., held that:

[1] investors adequately alleged that company's officers misled investors by discussing that new contract had been secured while omitting fact terms were significantly less favorable;

[2] investors did not plausibly allege that statements of opinion by officers regarding future sustainability of distributions were not held beliefs officers professed in order to constitute misstatement or omission for securities fraud liability;

[3] investors did not plausibly allege that officers' statements of opinion regarding company's future sustainability of distributions were untrue at the time they were made in order to constitute misstatement or omission for securities fraud liability;

[4] investors failed to allege strong inference of scienter based on allegations company acted as conduit for parent company to siphon money from investors;

[5] investors failed to adequately plea scienter through circumstantial evidence for company and officers' allegedly misleading statements regarding future continued sustainability of distributions;

[6] investors failed to adequately plea scienter under recklessness theory for company and officers' allegedly misleading statements regarding future continued sustainability of distributions; and

[7] investors adequately alleged company and officers violated provision of Securities Act governing misleading registration statements and prospectuses.

Motion granted in part and denied in part.

West Headnotes (67)

**[1]** **Federal Civil Procedure** ⚷

On a motion to dismiss for failure to state a claim, the court should not accept legal conclusions as true. threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Fed. R. Civ. P. 12(b)(6).

**[2]** **Federal Civil Procedure** ⚷

To survive a motion to dismiss for failure to state a claim, plausibility depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable. Fed. R. Civ. P. 12(b)(6).

**[3]** **Federal Civil Procedure** ⚷

Along with the facts pleaded in the complaint, which the court assumes as true for the purposes of motion to dismiss for failure to state a claim in a securities fraud action, the court may consider: (1) documents attached to or incorporated by reference in the complaint; (2)

Case 2:20-cv-00648-MTL    Document 67-1    Filed 03/22/21    Page 2 of 30

documents integral to and relied upon in the complaint, even if not attached or incorporated by reference; (3) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission (SEC); and (4) facts of which judicial notice properly may be taken. Fed. R. Civ. P. 12(b)(6).

**[4]     Securities Regulation** 

To state a claim under § 10(b) of the Securities Exchange Act, a plaintiff must allege that each defendant: (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b).

**[5]     Securities Regulation** 

Section 10(b) securities fraud claims require that plaintiffs plausibly allege a material misrepresentation or omission by the defendants. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b).

**[6]     Securities Regulation** 

There are two kinds of omissions that can be actionable for a § 10(b) securities fraud claim: first a material omission in contravention of an affirmative legal disclosure obligation, and second a material omission of information that is necessary to prevent existing disclosures from being misleading. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b).

**[7]     Securities Regulation** 

To determine whether an omission can be actionable for a § 10(b) securities fraud claim, the court should consider whether the defendants' representations, taken together and in context, would have misled a reasonable investor. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b).

**[8]     Securities Regulation** 

A securities fraud claim for misrepresentations or omissions under § 10(b) does not lie when the company disclosed the very risks about which a plaintiff claims to have been misled. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b).

**[9]     Securities Regulation** 

When evaluating whether a company provided sufficient disclosures in a securities fraud claim under § 10(b), the court should consider not only the disclosures the company makes, but also information already in the public domain and facts known or reasonably available to the shareholders. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b).

**[10]     Securities Regulation** 

Overarching inquiry in evaluating whether a company provided sufficient disclosure in a securities fraud claim under § 10(b) is whether the total mix of information made available to investors sufficiently disclosed the purported risk. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b).

**[11]     Securities Regulation** 

To state a claim under § 10(b) of the Securities Exchange Act plaintiffs must plead facts to establish scienter. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b).

**[12]     Securities Regulation** 

Standard to plead scienter under § 10(b) of the Securities Exchange Act is higher than the familiar plausibility standard. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b).

**[13]    Securities Regulation** 🔑

To adequately plead scienter under § 10(b) and Rule 10b-5 for a securities fraud claim, a plaintiff must plead the factual basis which gives rise to a strong inference of fraudulent intent. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[14]    Securities Regulation** 🔑

Strong inference of fraudulent intent in order to plead scienter under § 10(b) and Rule 10b-5 for a securities fraud claim can be established by alleging with sufficient particularity: (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[15]    Securities Regulation** 🔑

Determining whether § 10(b) and Rule 10b-5 securities fraud complaint gives rise to strong inference of fraudulent intent to establish scienter requires a comparative evaluation, in which a court must consider not only inferences urged by the plaintiff but also competing inferences rationally drawn from the facts alleged. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[16]    Securities Regulation** 🔑

Inference of scienter for a securities fraud claim under § 10(b) and Rule 10b-5 must be more than merely plausible or reasonable, it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[17]    Securities Regulation** 🔑

Inquiry to determine strong inference of scienter for a securities fraud claim under § 10(b) and

Rule 10b-5 is to be conducted holistically, looking at all the facts alleged, taken collectively. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[18]    Securities Regulation** 🔑

A duty to disclose under Rule 10b-5 may arise either (1) expressly pursuant to an independent statute or regulation, or (2) as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[19]    Securities Regulation** 🔑

Securities regulation requiring disclosure by securities issuer of any known trends or uncertainties that it reasonably expects will have a material favorable or unfavorable impact on net sales or revenue did not apply to foreign shipping company, and thus, company was not liable for securities fraud based on alleged violation of regulation. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 229.303(a)(3)(ii).

**[20]    Securities Regulation** 🔑

Foreign shipping company complied with securities regulation requiring disclosure of any known trends or uncertainties that securities issuer reasonably expects will have a material favorable or unfavorable impact on net sales or revenue, and thus, was not liable to investors for securities fraud based on alleged violation of the regulation by allegedly failing to disclose the terms of the new charter contracts; company disclosed in its Form 20-F that there had been downward trend in long term charter rates for the last four years. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 229.303(a)(3)(ii).

**[21]    Securities Regulation** 🔑

Section 10(b) and Rule 10b-5(b) of the Securities Exchange Act do not create an affirmative duty to disclose any and all material information. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[22]**    **Securities Regulation** 🗝

Disclosure of any and all material information is required under § 10(b) and Rule 10b-5 only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[23]**    **Securities Regulation** 🗝

Disclosure of an item of information is not required under § 10(b) and Rule 10b-5 simply because it may be relevant or of interest to a reasonable investor. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[24]**    **Securities Regulation** 🗝

Companies may remain silent even with respect to information that a reasonable investor might consider material so long as they do not have an underlying duty to disclose that information under § 10(b) and Rule 10b-5. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[25]**    **Securities Regulation** 🗝

Even when there is no existing independent duty to disclose information under § 10(b) and Rule 10b-5, once a company speaks on an issue or topic, there is a duty to tell the whole truth. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[26]**    **Securities Regulation** 🗝

Inquiry into whether a duty to disclose exists under § 10(b) and Rule 10b-5 once a company speaks on an issue or topic requires an examination of defendants' representations, taken together and in context, keeping in mind that when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[27]**    **Securities Regulation** 🗝

Investors adequately alleged that foreign shipping company's officers misled investors by discussing the fact that a new contract had been secured for tanker ship while omitting the fact that the terms were significantly less favorable to company, as required to state a securities fraud claim under § 10(b) and Rule 10b-5; mere fact that officer made a single statement prior to the class period disclosing the rate, while making contemporaneous and more publicly disseminated statements that omitted the rate, was not by itself enough to establish that the subsequent omissions of the new rate were not misleading. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[28]**    **Securities Regulation** 🗝

Overarching inquiry in a securities fraud claim for misrepresentations or omissions under § 10(b) and Rule 10b-5 is whether the total mix of information made available to investors sufficiently disclosed the purported risk. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[29]**    **Securities Regulation** 🗝

Even at the pleading stage in a securities fraud claim for misrepresentation or omissions under § 10(b) and Rule 10b-5, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed. Securities Exchange Act of

Fed. Sec. L. Rep. P 100,954

1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[30]    Securities Regulation**

Investors adequately alleged that foreign shipping company's officer misled investors by asserting that long-term charter rates in the industry generally were improving while omitting the fact that company had agreed to accept substantially lower rates for charter tanker ships that year, as required to state a securities fraud claim under § 10(b) and Rule 10b-5; investors claimed the proposed calculations to determine new charter's rate were complex and intricate and thus the disclosed information did not make new charter rates reasonably available, and investors alleged company made three affirmatively misleading statements in describing the new charter contract as a direct continuation of the previous charter or the description of the new contract as an extended charter. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[31]    Securities Regulation**

Statements that express expectations about the future rather than presently existing, objective facts are statements of opinion, for purposes of securities fraud claims under § 10(b) and Rule 10b-5. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[32]    Securities Regulation**

Like objective statements of material fact, subjective statements of opinion can be actionable as fraud under § 10(b) and Rule 10b-5. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[33]    Securities Regulation**

Under § 10(b) and Rule 10b-5, statements of opinion may give rise to liability if the speaker did not hold the belief she professed or if the supporting facts she supplied were untrue.

Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[34]    Securities Regulation**

For statements of opinion to give rise to liability under § 10(b) and Rule 10b-5, it is not sufficient to allege that an opinion was unreasonable, irrational, excessively optimistic, or not borne out by subsequent events. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[35]    Securities Regulation**

Investors did not plausibly allege that subjective statements of opinion by officers of foreign shipping company regarding the future continued sustainability of distributions, despite company's drop in cash flow due to lower charter rates, were not held beliefs officers professed in order for statements of opinion to constitute a misstatement or omission to give rise to securities fraud liability under § 10(b) and Rule 10b-5; investors' claims were conclusory and relied in part on a claim officers must have known that their expectations were unachievable at the time they were made but did not provide any facts to support such a statement. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[36]    Securities Regulation**

Investors did not plausibly alleged that officers' subjective statements of opinion regarding foreign shipping company's future continued sustainability of distributions and its ability to maintain the distributions, despite company's drop in cash flow due to lower charter rates, were untrue at the time the statements were made in order for statements of opinion to constitute a misstatement or omission to give rise to securities fraud liability under § 10(b) and Rule 10b-5; statements of opinion related to whether company would be able to maintain the distribution rates, and investors did not plead facts to support claim new distribution rates

Case 2:20-cv-00648-MTL    Document 67-1    Filed 03/22/21    Page 6 of 30

were unachievable when made and instead relied on the claim that the revenue derived from the new charter contracts would not support the distribution rates. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[37]   Securities Regulation** 

Investors did not plausibly allege that officers' subjective statements of opinion as to the claim that the cash flow profile of foreign shipping company supported the distributions, despite company's drop in cash flow due to lower charter rates, were untrue at the time the statements were made in order for statements of opinion to constitute a misstatement or omission to give rise to securities fraud liability under § 10(b) and Rule 10b-5; investors asserted that cash flow could not be understood to include proceeds of new debt or equity which was inconsistent with common usage and analysts' understanding but investors provided no authority to support the assertion that company's interpretation of cash flow was inconsistent with common usage and complaint pleaded no facts to support such a reading. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[38]   Securities Regulation** 

Statements of opinion can also be actionable for securities fraud under § 10(b) and Rule 10b-5 if the speaker omits information whose omission makes the statement misleading to a reasonable investor, even if the opinions are sincerely held and otherwise true as a matter of fact. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[39]   Securities Regulation** 

To prevail on securities fraud claim under § 10(b) and Rule 10b-5 for statements of opinion when the speaker omits information whose omission makes the statement misleading, the investor must identify particular and material facts going to the basis for the issuer's opinion, facts about

the inquiry the issuer did or did not conduct or the knowledge it did or did not have, whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[40]   Securities Regulation** 

Investors did not adequately allege that officers' and foreign shipping company's subjective statements of opinion regarding cash flow and future continued sustainability of distribution expectations, despite drop in cash flow due to lower charter rates, would have misled a reasonable investor into thinking statements meant that the revenue from tankers ships' charter contracts would remain constant, as required for opinion statements to be actionable as misstatement or omission for securities fraud liability under § 10(b) and Rule 10b-5; company disclosed in Securities and Exchange Commission filings the effect of the new charter contracts on its contracted revenue backlog, and total mix of information available to investors included information that directly addressed the revenue stream. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[41]   Securities Regulation** 

Under the Private Securities Litigation Reform Act (PSLRA) safe harbor, a forward-looking statement is not actionable for securities fraud under § 10(b) and Rule 10b-5 if it is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u; 17 C.F.R. § 240.10b-5.

**[42]   Securities Regulation** 

Foreign shipping company and officers' conference calls regarding company's cash

flow and future continued sustainability of distribution expectation, despite drop in cash flow due to lower charter rates, were accompanied by meaningful cautionary language about the nature of the forward-looking statements, and thus, fell within Private Securities Litigation Reform Act (PSLRA) safe harbor protection for securities fraud liability under § 10(b) and Rule 10b-5; cautionary language was expressly made on the conference call and on the contemporaneously filed press releases which were incorporated by reference in the conference calls, and form filed with Securities and Exchange Commission (SEC) included cautionary language that specifically referenced the availability of financing distributions. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u; 17 C.F.R. § 240.10b-5.

**[43]  Securities Regulation**

When bringing a claim under § 10(b) of the Securities Exchange Act, plaintiffs must plead facts to support a finding of scienter. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b).

**[44]  Securities Regulation**

When assessing whether scienter has been adequately pled in a securities fraud claim under § 10(b), courts must, as with any motion to dismiss for failure to plead a claim on which relief may be granted, accept all factual allegations in the complaint as true. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); Fed. R. Civ. P. 12(b)(6).

**[45]  Securities Regulation**

On motion to dismiss securities fraud claim under § 10(b) for failure to state a claim on which relief may be granted, the inquiry is whether all the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. Securities Exchange Act of

1934 § 10, 15 U.S.C.A. § 78j(b); Fed. R. Civ. P. 12(b)(6).

**[46]  Securities Regulation**

Requisite inference to establish scienter in securities fraud claim under § 10(b) need not be the most plausible of competing inferences, but it must be at least as compelling as any opposing inference one could draw from the facts alleged. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b).

**[47]  Securities Regulation**

To establish scienter for a securities fraud claim under § 10(b), a plaintiff must allege either facts: (1) showing the defendants had both motive and opportunity to commit the fraud, or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b).

**[48]  Securities Regulation**

Investors failed to allege strong inference of scienter based on allegations that foreign shipping company acted as conduit for parent company to siphon money from investors and that shipping company and officers sought to avoid diluting company's stock and parent company's stake in a contemplated acquisition of assets, as required to state securities fraud claim under § 10(b) and Rule 10b-5; preventing dilution of stock was benefit that would extend to all shareholders, investors did not explain why parent company's interest in preventing their dilution was any different than those of any shareholders, and desire to maintain share prices high in order to avoid dilution of stock, when company planned to issue equity in order to pursue goals such as acquisition of new vessels, was expected motive of corporate actors. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[49]    Securities Regulation** 🔑

Need to attract investors in order to pay down debt accruing is insufficient to demonstrate scienter for a securities fraud claim under § 10(b) because it is common to most for-profit companies. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b).

**[50]    Securities Regulation** 🔑

Investors failed to allege strong inference of scienter based on allegations that officer of foreign shipping company had personal, financial, and familial reasons to perpetuate perceived success of company because parent company was owned by father-in-law and officer allegedly served as general manager and would receive the proceeds of the drop-down transactions through which company intended to acquire new vessels, as required to state securities fraud claim under § 10(b) and Rule 10b-5; claim required a series of assumptions that parent company stood to gain certain concrete personal benefits from the alleged misrepresentations regarding lower charter rates and that officer had personal stake in ensuring parent company's ability to do so, and investors relied on speculation and conclusory allegations. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[51]    Securities Regulation** 🔑

Where motive is not apparent, it is still possible to plead scienter in securities fraud claim under § 10(b) and Rule 10b-5 by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[52]    Securities Regulation** 🔑

Plaintiffs attempting to demonstrate scienter in securities fraud claim under § 10(b) and

Rule 10b-5 by arguing circumstantial evidence indicated conscious behavior must at the very least allege "reckless conduct" which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[53]    Securities Regulation** 🔑

Investors failed to plead any facts to support allegation that foreign shipping company, through its officers, committed conscious or reckless misbehavior in failing to disclose the terms of the new long-term charter shipping rates that were substantially lower than before, as would establish scienter requirement through circumstantial evidence for securities fraud claim for misstatements and omissions under § 10(b) and Rule 10b-5; none of the facts alleged in complaint supported notion that any of the statements were even highly unreasonable, let alone an extreme departure from standards of ordinary care, and company's Securities and Exchange Commission (SEC) filings did not hide the terms of the new charter contracts. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[54]    Securities Regulation** 🔑

Investors failed to adequately plead scienter through circumstantial evidence for foreign shipping company and officers' allegedly misleading statements regarding the future continued sustainability of distributions, despite company's drop in cash flow due to lower charter rates, as required for securities fraud claim under § 10(b) and Rule 10b-5; investors failed to establish that company and officers knew at the time they made the statements that the distributions were unachievable, company and officers never asserted that company would rely exclusively on the revenue from the charter contracts to finance the distributions, and

investors' claim relies on notion that company and officers knowingly misled investors by using "cash flow" to include all strategies directed at financing the distributions. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[55]    Securities Regulation** 🔑

Investors failed to adequately plead scienter under recklessness theory for foreign shipping company and officers' allegedly misleading statements regarding the future continued sustainability of distributions, despite company's drop in cash flow due to lower charter rates, as required for securities fraud claim under § 10(b) and Rule 10b-5; company and officers revealed sufficient facts form which investors could plausibly have calculated the terms of the new charter contract, and it did not follow that company and officers would, on the one hand, disclose financial information regarding the impact of the new charter contract, on the one hand, while knowingly or recklessly lying to the public about the financial state of company, on the other. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[56]    Securities Regulation** 🔑

In some cases, recklessness can be inferred from an egregious refusal to see the obvious, or to investigate the doubtful, for purposes of satisfying scienter requirement for securities fraud claim under § 10(b) and Rule 10b-5. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[57]    Securities Regulation** 🔑

Investors failed to adequately allege claim for insider trading under the Securities Exchange Act against officers of foreign shipping company for committing securities fraud under § 10(b) and Rule 10b-5 for allegedly omitting the fact the terms of new charter rates were significantly less favorable and allegedly making misleading statements regarding the future

continued sustainability of distributions despite the drop in cash flow due to lower charter rates; insider trading claim was contingent upon an underlying Securities Exchange Act violation and investors failed to adequately allege a securities fraud violation. Securities Exchange Act of 1934 §§ 10, 20A, 15 U.S.C.A. §§ 78j(b), 78t-1(a); 17 C.F.R. § 240.10b-5.

**[58]    Securities Regulation** 🔑

Investors failed to adequately allege claim for control-person liability under the Securities Exchange Act against officers of foreign shipping company for committing securities fraud under § 10(b) and Rule 10b-5 for allegedly omitting the fact the terms of new charter rates were significantly less favorable and allegedly making misleading statements regarding the future continued sustainability of distributions despite the drop in cash flow due to lower charter rates; investors failed to allege a primary violation of the Securities Exchange Act for securities fraud. Securities Exchange Act of 1934 §§ 10, 20A, 15 U.S.C.A. §§ 78j(b), 78t; 17 C.F.R. § 240.10b-5.

**[59]    Securities Regulation** 🔑

In order to establish a prima facie case of control-person liability under the Securities Exchange Act, a plaintiff must show a primary violation of the Securities Exchange Act. Securities Exchange Act of 1934 § 20A, 15 U.S.C.A. § 78t.

**[60]    Securities Regulation** 🔑

Provision of Securities Act governing false registration statements creates a right of action for any person acquiring a security offered pursuant to a misleading registration statement. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a).

**[61]    Securities Regulation** 🔑

To allege a claim under Securities Act provision governing false registration statements, a

plaintiff need show that a registration statement: (1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statement therein not misleading. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a).

**[62]    Securities Regulation** 🔑

Provision of Securities Act governing misleading prospectuses imposes liability on issuers or sellers of securities by means of a prospectus. Securities Act of 1933 § 12(a)(2), 15 U.S.C.A. § 77*l*(a).

**[63]    Securities Regulation** 🔑

Neither provision of Securities Act governing misleading registration statements and prospectuses requires that plaintiffs allege the scienter or reliance elements of a fraud cause of action. Securities Act of 1933 §§ 11, 12(a)(2), 15 U.S.C.A. §§ 77k(a), 77*l*(a).

**[64]    Securities Regulation** 🔑

Only a material misstatement or omission in a registration statement need be shown to establish a prima facie case under provisions of Securities Act governing misleading registration statements and prospectuses. Securities Act of 1933 §§ 11, 12(a)(2), 15 U.S.C.A. §§ 77k(a), 77*l*(a).

**[65]    Securities Regulation** 🔑

While a plaintiff need allege no more than negligence to proceed under either provision of Securities Act governing misleading registration statements and prospectuses, claims that do rely upon averments of fraud are subject to the heightened pleading test. Securities Act of 1933 §§ 11, 12(a)(2), 15 U.S.C.A. §§ 77k(a), 77*l*(a); Fed. R. Civ. P. 9(b).

**[66]    Securities Regulation** 🔑

Investors adequately alleged foreign shipping company and officers violated provisions of Securities Act governing misleading registration statements and prospectuses when they allegedly erroneously referred to new shipping charter contract as a "direct continuation of the vessel's current charter" and omitted that the new charter was at a substantially reduced rate, despite speaking to the possible future escalation of the rate; references to tanker's new charter contract as a "direct continuation" were materially misleading before company disclosed sufficient information about which analysts and investors reasonably could have known the terms of the new contract. Securities Act of 1933 §§ 11, 12(a)(2), 15 U.S.C.A. §§ 77k(a), 77*l*(a).

**[67]    Securities Regulation** 🔑

To state a claim for control-person liability under the Securities Act, a plaintiff must allege both an underlying violation of provision governing misleading registration statements and prospectuses and that the defendant exercised the requisite control. Securities Act of 1933 §§ 11, 12(a)(2), 15, 15 U.S.C.A. §§ 77k(a), 77*l*(a), 77*o*.

MEMORANDUM OPINION & ORDER

ALISON J. NATHAN, District Judge:

**\*1** Plaintiffs bring this federal securities class action pursuant to Sections 10(b), 20A and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of themselves and all others who purchased Dynagas LNG Partners LP ("Dynagas") securities during the period from December 21, 2017 through March 21, 2019. Plaintiffs also bring suit against a number of Dynagas officers, controlling entities, as well as several financial institutions that underwrote the SPO. Defendants Dynagas LNG Partners LP ("Dynagas"), Dynagas GP, LLC,

and Dynagas Holding Ltd. (collectively, the "Dynagas Entity Defendants"), and UBS Securities LLC, Stifel, Nicolaus & Company, Incorporated, Morgan Stanley & Co. LLC and B. Riley FBR, Inc. (collectively, the "Underwriter Defendants") have now moved to dismiss all of Plaintiffs' claims.[1] For the reasons given below, Defendants' motion is GRANTED in part and DENIED in part.

### I. BACKGROUND

The following facts are taken from the Amended Complaint and assumed to be true for the purposes of this motion. *See Hogan v. Fischer*, 738 F.3d 509, 513 (2d Cir. 2013).

#### A. Origins of Dynagas

On May 30, 2013, Defendant George Prokopiou founded Defendant Dynagas, a Marshall Islands limited partnership, as a wholly owned subsidiary of Dynagas Holding, a privately held company. Dkt. No. 50 ("Am. Compl.") ¶ 54–55. Dynagas "was created to own, operate and acquire LNG tanker ships then owned by Dynagas Holding and employed on multi-year charters." *Id.* ¶ 54. Dynagas GP, which is wholly owned by Dynagas Holding, was formed to serve as Dynagas's general partner. *Id.* ¶ 55. At all relevant times, Prokopiou, through Dynagas Holding and Dynagas GP, controlled Dynagas and the assets (that is, the LNG tanker ships) that Dynagas had purchased from Dynagas Holding. *Id.* ¶ 59. Prokopiou and Dynagas Holding formed Dynagas at least in part to access the financial and equity markets in the United States. *Id.* ¶ 57. They structured Dynagas "to enable the continued growth and profitability of Dynagas Holding though a series of 'drop down' transactions, in which vessels owned by Dynagas Holding would be sold to Dynagas for cash, funded by debt and equity issued by Dynagas," which would in turn shift the risks associated with the industry to Dynagas's shareholders. *Id.* ¶ 57–59.

Shortly after being created, Dynagas purchased three LNG tanker ships from Dynagas Holding, financed both by private debt and equity issued back to Dynagas Holding. *Id.* ¶ 60. One of those ships, *Ob River*, is central to the present dispute. The LNG tanker ships purchased by Dynagas were employed in long-term charter contracts, "which provided Dynagas with steady, predictable revenue for years to come." *Id.*

Dynagas completed its Initial Public Offering on November 13, 2013. *Id.* ¶ 61. It sold 12,500,000 shares to the public at $18 per share, raising $225 million in the process. *Id.* Dynagas Holding retained a 52% interest in Dynagas. *Id.*

Dynagas's common stock was listed on the NASDAQ Global Select Market around November 13, 2013, though Dynagas transferred its listing to the New York Stock Exchange effective December 2014. *Id.* Prokopiou was appointed chairman of Dynagas's board, a position that he continues to hold. *Id.* ¶ 62. Dynagas's initial and subsequent filings with the SEC made clear that Dynagas was controlled by Prokopiou and Dynagas Holding, and that its ownership structure created a conflict of interest that could result in actions being taken to the benefit of Prokopiou or Dynagas Holding and to the detriment of its shareholders. *Id.* In order to assure public shareholders that they would participate in the company's earnings, the IPO Prospectus stated that Dynagas's partnership agreement required the company to distribute all of its available cash to its stockholders on a quarterly basis. *Id.* ¶ 63. The Prospectus also stated that "the Company intended to make quarterly distributions to holders of its common stock of at least $0.365 per share (36.5 cents)." *Id.*

**\*2** Until 2017, Dynagas's quarterly distributions manifested that intent. On February 20, 2014, the Company's distribution of $0.1746 per share roughly equaled $0.365 per share, once pro-rated to account for the fact that Dynagas had only been public for around half of the prior quarter. *Id.* ¶ 64. Throughout 2014, Dynagas's distribution to holders of its common stock was at least $0.365 per share. *Id.* In 2015, 2016, and 2017, the distribution was of $0.4225 per share. *Id.* During this time, Dynagas assured investors that its fixed charters provided steady and predictable cash flows, stemming from the fact that it derives most of its revenue from steady long-term charter contracts with reliable counterparties. *Id.* ¶ 65. The cash flow was thus predictable to Dynagas and its leadership. *Id.* The net result was a substantial, consistent quarterly distribution that attracted institutional and individual investors. *Id.* As noted in a May 14, 2016 article in *The Motley Fool*, this structure provided investors with a "high-yield dividend stock" that offered "sustainable, generous dividend income." *Id.*

By the end of 2015, Dynagas owned six LNG tanker ships, all acquired from Dynagas Holding; at the time that these ships were "dropped down," all were employed in long-term charter contracts. *Id.* ¶ 67. Two of those ships—the *Ob River* and the *Arctic Aurora*—were operating under charter contracts that were set to expire in late 2017 and August 2018, respectively. *Id.* ¶ 69. On March 31, 2016, Dynagas announced that the then-current charter for the *Ob River* had been extended until May 1, 2018, and that Dynagas "had entered into a new long-term contract for the Ob River with its then-current charterer,

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Fed. Sec. L. Rep. P 100,954

to commence immediately upon the expiration of the prior charter (on or about May 1, 2018)." *Id.* ¶ 70. As would later become clear, the new contract provided a significantly lower rate that would be paid to Dynagas than it had received in the prior arrangement. *Id.* On December 20, 2017, meanwhile, Dynagas entered into a new long-term charter contract for the *Arctic Aurora* with the same entity to which it was then chartered. *Id.* ¶ 72. Like with the new *Ob River* contract, the new *Arctic Aurora* charter contract "provided that a lower rate would be paid to Dynagas than what Dynagas was receiving at the time." *Id.* As Dynagas's earnings declined in 2017, the company adjusted its distribution to $0.25 per share. *Id.* ¶ 73. As the company's CFO, Defendant Michael Gregos, subsequently admitted, Dynagas intended to sustain the $0.25/share distribution by issuing and selling new equity. *Id.* ¶ 74.

### B. Class Period

The Class Period for this litigation begins on December 21, 2017, when Dynagas filed a shelf registration statement that permitted it to issue up to $750 million in new securities. *Id.* ¶ 75. The prospectus attached to, and incorporated into, the shelf registration statement omitted the terms of the new long-term charter contracts that the company had entered into with respect to the *Ob River* and the *Arctic Aurora.Id.*

The December 21, 2017 prospectus, which was signed by both the Director and the Officer Defendants, stated that "[i]n December 2017, we entered into a time charter contract with Statoil for the employment of the Arctic Aurora. This charter will be in direct continuation of the vessel's current charter with Statoil (interrupted only by the vessel's mandatory statutory class five-year special survey and dry-docking) and will have a firm period of three years +/- 30 days. Statoil will have the option to extend the charter term by two consecutive 12-month periods at escalated rates." *Id.* ¶ 76.

That prospectus also incorporated by reference the risk factors enumerated in Dynagas's 2016 Annual Report, which stated that "[i]f any of our charters is terminated, we may be unable to re-deploy the related vessel on terms as favorable to us as our current charters, or at all. If we are unable to re-deploy a vessel for which the charter has been terminated, we will not receive any revenues from that vessel, and we may be required to pay ongoing expenses necessary to maintain the vessel in proper operating condition. Any of these factors may decrease our revenue and cash flows. Further, the loss of any of our charterers, charters or vessels, or a decline in charter hire under any of our charters, could have a material adverse effect

on our business, results of operations, financial condition and ability to make minimum quarterly distributions and other distributions to our unitholders." *Id.* ¶ 79.

**\*3** On December 21, 2017, Dynagas also issued a press release that stated that "[t]he Partnership has entered into a new three year charter agreement with Statoil ASA ("Statoil") for the employment of the Arctic Aurora, [ ] (the "Extended Charter").... The Extended Charter is expected to commence in the third quarter of 2018 in direct continuation of the Current Charter.... Statoil will have the option to extend the Extended Charter by two consecutive 12-month periods at escalated rates." *Id.* ¶ 81.

On February 15, 2018, Dynagas issued a press release which stated that "[o]n December 20, 2017, the Partnership entered into a new three-year charter agreement with Statoil for the employment of the *Arctic Aurora....* This new charter for the *Arctic Aurora* is expected to commence in the third quarter of 2018, in direct continuation of the current charter with Statoil." *Id.* ¶ 84.

The following day, on a conference call, officers of Dynagas were asked, "[t]here has been some talk around the spot charter rates[,] but have the 3, 5 and 7-year time charter rates responded in recent months as well?" In response, Defendant Lauritzen answered, "Yes, I think we've seen along with a substantial improvement in the spot markets. We've seen everything from multi-months to multi-year charter is being discussed. So yes, we can answer affirmative to that." *Id.* ¶ 85.

In that same conference call, Lauritzen was also asked "if we can get some additional color around the distribution; in particular, how low of a cash balance and coverage ratio would you be comfortable with until the new contract start in 2019? And are you committed to the current distribution level or is there a possibility that that might be reduced in the coming quarters?" *Id.* Lauritzen replied that "[w]e're not looking at the near-term as we have to look at the long-term as far as the distribution is concerned because once our Yamal contract start [sic] we have a very good visibility of what our cash flows will look like. What I can say is, it's an ongoing analysis, we would like to end up with a distribution coverage of above one-times which is sustainable for the longer term. And we're very fortunate because we can use the word long-term because we held it long time, the long-term contracts which is a necessary ingredient for having sustainable distribution, so that's what I can say at this point." *Id.*

On April 18, 2018, Dynagas issued a press release that announced that the quarterly distribution would be reduced from its previous level of $0.4225 per share of common stock to the new level of $0.25 per share. *Id.* ¶ 89. The press release included several quotations from Lauritzen, who stated that "[t]his decision by our Board of Directors to reduce the level of the Partnership's quarterly common unit distribution is necessary to align the Partnership's distribution level with its capacity to generate cash flow in the long term." *Id.* The press release also quoted him as asserting that "[t]he Partnership's Board of Directors believes that the new distribution level is in the best interest of the Partnership's common unitholders as it aligns the Partnership's cash flows with our cash payment obligations. The new distribution level is expected to provide the Partnership with approximately $24.5 million in annual cash savings in order to enhance our liquidity, strengthen our balance sheet and improve our distribution coverage ratio. Although our pro-forma 2018 distribution coverage ratio is expected to be below 1x, we believe the new distribution level is viable on an actual cash basis since it reduces the Partnership's current need to utilize existing cash reserves to fund distributions to unitholders."*Id.*

 **\*4** On May 16, 2018, Dynagas issued another press release addressing its financial results for the first quarter of 2018. The press release asserted that "the revised distribution level is expected to align the partnership's [Dynagas's] cash distributions with its capacity to generate cash flow in the long term," and quoted Lauritzen making a substantially similar comment: "This decision by our Board of Directors to reduce the level of the Partnership's quarterly common unit distribution was necessary to align the Partnership's distribution level with its capacity to generate cash flow in the long term." *Id.* ¶ 91.

On May 17, 2018, in Dynagas's first quarter earnings call, Lauritzen stated that the reduction of the distribution "was necessary to align [Dynagas's] distribution level with [its] capacity to generate cash flow in the long term." *Id.* ¶ 92. Gregos, meanwhile, said in his prepared remarks that "[w]e do find it noteworthy that certain analysts commented that a higher distribution reduction was necessary. The board and the management felt it would be unwarranted for the new distribution to be based on overly pessimistic scenarios. Management does not believe in for the limited moving parts that can affect our financial performance. Ultimately, distribution policy reflects the boards and management expectations and is not based on scenarios which are unlikely

to materialize. The moving parts ... are: how long and at what rate [t]he *Yenesei River* and the *Lena River* will be trading in the short term market, pending the delivery into their 15-year contracts, once their [current, long-term] contracts expire in Q3 of this year." *Id.* ¶ 93.

During the question-and-answer section of the call, the officers were asked, "So now that the distribution is more aligned with the suitable cash flow, do you feel like this current level is pretty easily sustainable in the coming quarters and years?" *Id.* ¶ 96. Gregos responded: "Yeah, definitely. What we want to achieve was this alignment. And as for the foreseeable future this distribution, as I mentioned before is sustainable. Basically, the expectations that we have on the market, there are some moving parts as I mentioned, which are the *Lena River* and *Yenesei River.* Again, how long they're going to be in [the spot] market and what they'll make [therein]. But under a reasonable scenarios [sic]; yes, definitely this distribution is sustainable." *Id.*

At another point, Lauritzen was asked, "Is [there] a way that you can tell us what could be an extreme event that would force you to reduce this distribution based on the development of the spot charter rate Yamal for these vessels?" *Id.* ¶ 98. He responded in part: "[ ] All I can say is that, we experience let's say extreme scenarios, which we're not, we don't believe it's going to happen. Then that's something to be discussed, but that's more of a longer term discussion. It's not a near term discussion." *Id.*

The presentation that accompanied the conference call, meanwhile, stated that "On April 12, 2018, following a strategic review of its financial profile and distribution policy, the Partnership's Board of Directors unanimously approved a plan to reduce the quarterly distribution on the Partnership's common units to $0.25 per common unit from $0.4225 per common unit, or from $1.69 per common unit to $1.00 per common unit on an annualized basis. The revised distribution level is expected to align the Partnership's cash distributions with its capacity to generate cash flow in the long term, strengthen its balance sheet and improve its distribution coverage ratio."*Id.* ¶ 101. That presentation also "included a slide showing continuous employment of the *Ob River* and the *Arctic Aurora*, each with a single charterer, through the end of 2021, and which stated: 'Long Term Contracts Provide Stable, Visible Cash Flows.' " *Id.* ¶ 103.

 **\*5** On July 17, 2018, Dynagas issued a press release discussing its financial results for the second quarter of 2018.

*Id.* ¶ 106. There, it disclosed that its earnings were lower than the previous quarter's, than the second quarter of 2017's, and than analysts' expectations. *Id.* In that press release, the company explained that "the completion of the multiyear charter contract with Gazprom for the *Ob River* in April 2018 and the subsequent employment of the vessel with the same company at a lower rate of hire reflecting a longer charter term of ten years." *Id.* ¶ 107. The press release did not disclose, though, that the new contract for the *Arctic Aurora* would also provide a lower rate of hire. *Id.* ¶ 108.

That same day, in the Second Quarter 2018 earnings call, Gregos assured investors that the $0.25 per share dividend payout was sustainable, asserting that "I think the maintaining this [distribution] we've already achieved that with our previous distribution realignment, I mean, if you look at our cash flows, they're supported, the distribution is supported by our current cash flow profile for quite a long time." *Id.* ¶ 109.

In October 2018, Dynagas sold 2.2 million Series B Preferred Units in an Offering. *Id.* ¶ 112. The October 18, 2018 final prospectus supplement twice described the new charter contract for the *Arctic Aurora* as a "direct continuation" of the prior charter. *Id.* ¶ 113. It stated in relevant part that "[t]his charter is in direct continuation of the vessel's previous charter with Statoil. Statoil will have the option to extend the charter term by two consecutive 12-month periods at escalated rates," and that "[o]n December 20, 2017, we entered into a new three-year charter agreement with Statoil for the employment of the Arctic Aurora. The new Statoil charter is expected to commence in the third quarter of 2018 in direct continuation of the vessel's current charter with Statoil (interrupted only by the vessel's mandatory statutory class five-year special survey and dry-docking) and will have a firm period of about 3 years +/- 30 days. Statoil will have the option to extend the charter term by two consecutive 12-month periods at escalated rates." *Id.* The prospectus supplement did not disclose, however, that the new charter for the *Arctic Aurora* would provide significantly less revenue than the previous charter. *Id.* ¶ 114.

The October 18, 2018 final prospectus supplement incorporated by reference the "Risk Factors" stated in the Company's Form 20-F for the Fiscal Year ended December 31, 2017, which asserted that "[i]f any of our charters is terminated, we may be unable to re-deploy the related vessel on terms as favorable to us as our current charters, or at all. If we are unable to re-deploy a vessel for which the charter has been terminated, we will not receive any revenues from that vessel, and we may be required to pay ongoing expenses necessary to maintain the vessel in proper operating condition. Any of these factors may decrease our revenue and cash flows. Further, the loss of any of our charterers, charters or vessels, or a decline in charter hire under any of our charters, could have a material adverse effect on our business, results of operations, financial condition and ability to make distributions to our unitholders."*Id.* ¶ 120.

On November 15, 2018, Dynagas issued a press release discussing its third quarter 2018 financial results. *Id.* ¶ 123. The press release noted that its earnings were again lower than those of the second quarter of 2018, the third quarter of 2017, and lower than analysts' expectations. *Id.* The press release quoted Lauritzen as explaining that "two of our vessels, the *Arctic Aurora* and the *Ob River*, commenced employment under extended charter contracts with their respective charterers at lower rates compared with the previous charter contracts." *Id.* ¶ 124.

 **\*6**  In the conference call that took place on November 16, 2018, Gregos was asked, "[I]s there any – with the whole 250 million kind of still outstanding for refinancing that, but obviously all of your vessels, like you said, fully contracted for many years. Is there any concerns, fears, questions about the current level of the distribution?" He responded, "Well, listen, I mean, I can only give you a general answer here. I mean, we are reviewing how to maximize value going forward. As I said, the refinancing of our notes is a high priority, but we also are concerned that we're getting a little to no credit for the current distribution. And our current equity yield has kind of hinted our ability to grow. So we will be looking at how distribution can be used to improve the equity value overtime." *Id.* ¶ 125. Following these disclosures, the price of Dynagas's common stock declined from $7.76 per share on November 16, 2018 to $4.08 per share on November 28, 2018. *Id.* ¶¶ 127–129.

On January 25, 2019, Dynagas announced that it would cut its quarterly distribution from $0.25 per share to $0.0625 per share. *Id.* ¶ 130. The price of Dynagas's common stock fell from $4.02 per share on January 25, 2019 to $2.88 per share on January 28, 2019. *Id.* ¶ 132.

On March 21, 2019, Dynagas issued a press release announcing the earnings results for the fourth quarter of 2018 —the first quarter in which the *Arctic Aurora* and the *Ob River* were both operating under the new charter contracts for the entire quarter. *Id.* ¶ 133. The press release quoted Lauritzen as stating that "[o]ur reported earnings for the fourth quarter

ended December 31, 2018 were in line with our expectations," and attributing the decrease in revenues in part to "the *Arctic Aurora* and the *Ob River* commencing employment under extended charter contracts with their respective charterers at lower rates compared with the previous charter contracts." *Id.* ¶ 134.

On March 22, 2019, Dynagas held a conference call with investors. *Id.* ¶ 135–136. One caller said, "And then just one more on the level of the distribution cut. You mentioned a disconnect between the equity price and what's going on with the company's underlying operations. So I was curious, maybe what's changed in the rationale for the degree of the cut this time around versus the earlier cut back in April 2018?" *Id.* ¶ 137. Gregos answered, "So when we did our previous cut, we have assumed that the MLP market broadly would improve going forward and enable us and other MLPs to issue cheap equity. Whereas, that didn't happen, and that is the reason why we had to make a second cut and a more severe cut that goes hand-in-hand and enables us to discuss a wide range of refinancing options." *Id.* ¶ 138.

After that, Dynagas did not pay any distributions in the second quarter of 2019. *Id.* ¶ 140. On September 19, 2019, the Company announced that it had entered into a five-year loan agreement that, among other things, prohibits it "from paying a distribution to shareholders during the term of the agreement, notwithstanding that its partnership agreement requires such distributions as stated in the IPO Prospectus." *Id.* ¶ 141.

## C. Procedural Background

This class action lawsuit was initiated on May 16, 2019. Dkt. No. 1. On August 12, 2019, the Court appointed the First New York Group to serve as Lead Plaintiff in this action and all related actions. Dkt. No. 41. On September 26, 2019, the Plaintiffs filed an Amended Complaint. Dkt. No. 50. Plaintiffs have not filed proof of service on the Individual Defendants, and those Defendants have never appeared in this litigation.

On December 5, 2019, the properly served Defendants moved to dismiss the Amended Complaint. Dkt. No. 73. Plaintiffs filed their opposition on February 10, 2020, Dkt. No. 92, and Defendants filed their reply on March 18, 2020, Dkt. No. 97.

## II. LEGAL STANDARD

**[1]  [2]**  On a motion to dismiss under Rule 12(b)(6), a court must "accept[ ] all factual allegations in the complaint as true,

and draw[ ] all reasonable inferences in the plaintiff's favor." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). Nonetheless, the court should not accept legal conclusions as true; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim achieves "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. While plausibility is "not akin to a 'probability requirement,' [ ] it asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, and if plaintiffs cannot "nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed," *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. "Plausibility ... depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

**\*7**  Plaintiffs' claims under Section 10(b), meanwhile, must satisfy the requirements of Federal Rule of Civil Procedure 9(b), which requires a party alleging fraud to "state with particularity the circumstances constituting fraud." In addition, "the Private Securities Litigation Reform Act ('PSLRA') requires a complaint to 'specify each statement [or omission] alleged to have been misleading, the reason or reasons why the statement [or omission] is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... state with particularity all facts on which that belief is formed.' " *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 725 (S.D.N.Y. 2015) (alterations in original) (quoting 15 U.S.C. § 78u-4(b)(1)).

**[3]**  Along with the facts pleaded in the Amended Complaint, which the Court assumes as true for the purposes of this motion, the Court may consider "(1) documents attached to or incorporated by reference in the complaint, (2) documents integral to and relied upon in the complaint, even if not attached or incorporated by reference, (3) public disclosure documents required by law to be, and that have been, filed

with the SEC, and (4) facts of which judicial notice properly may be taken." *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 831 (S.D.N.Y. 2019) (citing *Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 865 (S.D.N.Y. 2011)).

### III. DISCUSSION

Plaintiffs assert six claims.[2] First, they assert a claim against Defendant Dynagas under Section 10(b) of the Exchange Act and Rule 10b-5 (Count I). Am. Compl. ¶¶ 175–77. They also assert a claim against Dynagas under Section 20A of the Exchange Act (Count II). *Id.* ¶¶ 184–91. Furthermore, they assert claims under Section 20(a) of the Exchange Act against Defendants Dynagas GP and Dynagas Holding (Count III). *Id.* ¶¶ 192–97. They also assert claims under the Securities Act. Specifically, they assert claims under Sections 11 and 12(a)(2) of the Securities Act against Dynagas and the Underwriter Defendants (Counts IV and V). *Id.* ¶¶ 198–210, 211–225. Finally, they assert claims under Section 15 of the Securities Act against the Controlling Entity Defendants and the Director and Officer Defendants. *Id.* ¶¶ 226–33.

The Dynagas Defendants and the Underwriter Defendants move to dismiss all of Plaintiffs' claims against them. They allege, in relevant part, that the Amended Complaint fails to state a claim under Sections 10(b) of the Exchange Act and Rule 10b-5, arguing that the Amended Complaint does not adequately allege a false or misleading statement regarding either the new charter agreements or the sustainability of the distributions. *See* Dkt. No. 74 at 14–28. They also argue that the Amended Complaint does not adequately plead any facts giving rise to an inference of scienter. *Id.* at 28–35. They further argue that the Amended Complaint fails to state a claim under Section 20A and Section 20(a) of the Exchange Act. *Id.* at 35–36. And they argue that the Amended Complaint fails to state a claim under Sections 11, 12(a)(2), and 15 of the Securities Act. *Id.* at 37–40.

### A. 10(b) Claims

[4]  To state a claim under Section 10(b) of the Exchange Act, "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Indiana Pub. Ret. Sys. v. SAIC,* Inc., 818 F.3d 85, 93 (2d Cir. 2016). Defendants move to dismiss on the basis that Plaintiffs have

failed to adequately allege the first two of these elements. Specifically, they argue that Plaintiffs have failed to establish that the Defendants made misstatements or omissions of material fact as to both the charter agreements and the sustainability of the distributions. *See* Dkt. No. 74 at 15–26. And they argue that, even if Plaintiffs had done so, the 10(b) claims must still be dismissed on the basis that Plaintiffs failed to adequately plead scienter. *See id.* at 28–35.

**\*8**  "Section 10(b) makes it unlawful '[t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors,' " *Novak v. Kasaks,* 216 F.3d 300, 305 (2d Cir. 2000) (alterations in original) (quoting 15 U.S.C. § 78j(b)), and Rule 10b-5 specifies that this statute proscribes "mak[ing] any untrue statement of a material fact or ... omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," *id.* (quoting 17 C.F.R. § 240.10b-5).

[5]  [6]  [7]  [8]  [9]  [10]  "[Section 10(b) ] claims require that Plaintiff[s] plausibly allege 'a material misrepresentation or omission by the defendant[s].' " *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, No. 16-CV-3068 (AJN), 2017 WL 4082482, at \*4 (S.D.N.Y. Aug. 24, 2017), *aff'd sub nom.Police & Fire Ret. Sys. of City of Detroit v. La Quinta Holdings, Inc.*, 735 F. App'x 11 (2d Cir. 2018) (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014)). As is relevant here, two kinds of omissions can be actionable under this standard: first "a material omission in contravention of an affirmative legal disclosure obligation," and second "a material omission of information that is necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., LP*, 634 F.3d 706, 715–16 (2d Cir. 2011). To determine whether such an omission has occurred, the Court should consider "whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Rombach v. Chang,* 355 F.3d 164, 172 n.7 (2d Cir. 2004) (quoting *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 761 (2d Cir. 1991)). *See alsoHawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 836 (S.D.N.Y. 2019). Furthermore, a securities fraud claim for misrepresentations or omissions does not lie when the company "disclosed the very ... risks about which [a plaintiff]

claim[s] to have been misled." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011); *see also Olkey v. Hyperion 1999 Term Tr., Inc.,* 98 F.3d 2, 4-5 (2d Cir. 1996) (affirming dismissal of federal securities claims when "[t]he prospectuses warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed"); *Dujardin v. Liberty Media Corp.,* 359 F. Supp. 2d 337, 350 (S.D.N.Y. 2005) (concluding that a plaintiff "failed to allege material misrepresentations or omissions sufficient to state a securities fraud claim" because the claim was "premised on facts that were adequately disclosed"). When evaluating whether a company provided sufficient disclosures, the Court should consider not only the disclosures the company makes, but also "information already in the public domain and facts known or reasonably available to the shareholders." *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009) (quoting *United Paperworkers Int'l Union v. Int'l Paper Co.,* 985 F.2d 1190, 1199 (2d Cir. 1993)). The overarching inquiry is whether "the 'total mix' of information made available" to investors sufficiently disclosed the purported risk." *Id.* (citation omitted).

**[11] [12] [13] [14] [15] [16] [17]** To state a claim under Section 10(b), furthermore, plaintiffs must plead facts to establish scienter. The standard to plead scienter under Section 10(b) is higher than the familiar plausibility standard. "To adequately plead scienter under § 10(b) and Rule 10b-5, a plaintiff must 'plead the factual basis which gives rise to a strong inference of fraudulent intent.' " *In re BioScrip,* 95 F. Supp. 3d at 732 (quoting *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 Fed. Appx. 26, 27 (2d Cir. 2014)). This strong inference of fraudulent intent can be established by alleging with sufficient particularity (i) "that defendants had the motive and opportunity to commit fraud" or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir. 2009). This requires a "comparative evaluation," in which a court "must consider not only inferences urged by the plaintiff ... but also competing inferences rationally drawn from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Accordingly, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* This inquiry is to be conducted holistically, looking at "all the facts alleged, taken collectively." *Id.* at 323, 127 S.Ct. 2499.

### 1. The New Charter Agreements

**\*9 [18]** Defendants first argue that Plaintiffs have failed to establish that the Defendants made misstatements or omissions of material fact as to the new charter agreements for the *Ob River* and the *Arctic Aurora.* "A duty to disclose under Rule 10b-5 may arise either '(1) expressly pursuant to an independent statute or regulation; or (2) as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts.' " *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (quoting *In re Lululemon Sec. Litig.,* 14 F.Supp.3d 553 (S.D.N.Y. 2014)).

**[19] [20]** With respect to some of the alleged misstatements, Plaintiffs argue that Item 303 of SEC Regulation S-K imposed a separate legal duty to disclose the terms of the new charter contracts. *See* Dkt. No. 92 at 27 & n.29; *see also* Am. Compl. ¶ 117. They argue that Dynagas had a duty to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" in its annual report on March 9, 2018 and when it sold $55 million in securities in the October 2018 Offering. *See* Dkt. No. 92 at 27 (citing 17 C.F.R. § 229.303(a)(3)(ii)). But Dynagas is a foreign private issuer, and, as multiple courts in this Circuit have found, "foreign private issuers are not subject to SEC Regulation S–K." *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 416 (S.D.N.Y. 2007). *See also Brady v. Top Ships Inc.*, 2019 WL 3553999, at *12 (E.D.N.Y., Aug. 5, 2019); *Pearlstein v. BlackBerry Ltd.,* 93 F. Supp. 3d 233, 244–45 (S.D.N.Y. 2015). In any event, even if Item 303 applied, Defendants correctly note that, to the extent that the same disclosure requirements would apply to Dynagas's disclosure requirements under Form 20-F, "that argument fails because Dynagas disclosed in its fiscal year 2017 Form 20-F that there had been a downward trend in long term charter rates since 2013." Dkt. No. 97 at 5 n.8. *See also* Dkt. No. 75, Ex. 28 (Mar. 9, 2018 Form 20-F) at 88 ("Charter rates for LNG vessels started declining from 2013 as the supply increased more than the increase in demand .... Long-term rates (in excess of eight years) for [Dual Fuel Diesel Electric] vessels in 2017 were $70,000 per day unchanged from 2016 but lower than the $ 82,000 per day in 2014."). Thus, even if the same disclosure requirements established by Item 303 applied, *see* Dkt. No. 92 at 27 n.29, the Court would still conclude based on the pleadings that Dynagas complied, in form and substance, with the requisite disclosure

obligations to identify known trends that materially impacted, or would materially impact, net sales or revenues or income from continuing operations.

Plaintiffs separately argue that Defendants' affirmative statements and investor presentations were misleading insofar as they suggested erroneously that the new charter agreements were on the same terms as the previous agreements. *See* Dkt. No. 92 at 23–31. Plaintiffs' claims rest in part on the observation that "Dynagas frequently spoke to investors about their long-term charter contracts, which constituted the Company's sole source of revenue," and they argue that this created "a duty to disclose significant changes to the contracts' essential terms." Dkt. No. 92 at 23. Thus, they assert that Dynagas's omissions contravened "an affirmative legal disclosure obligation" that stemmed from the company's selective proclamations on the issue, and that the omissions were material insofar as the information was "necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., LP,* 634 F.3d 706, 715–16 (2d Cir. 2011). Defendants counter that Dynagas had no duty to disclose the new charter rates. *See* Dkt. No. 74 at 19–20. They argue in relevant part that "[h]ere, a duty to disclose could arise only if the challenged statements implied something about contract rates such that it was misleading to omit them." *Id.* at 19. And they claim that "Dynagas' announcement of the signing of a new contract did not imply anything about the rate of hire and therefore the Company had no duty to disclose the new rate." *Id.*

**\*10** **[21]** **[22]** **[23]** **[24]** "[I]t bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.' " *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 44, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011) (quoting 17 C.F.R. § 240.10b–5(b)). *See also Kleinman v. Elan Corp., plc,* 706 F.3d 145, 152–53 (2d Cir. 2013). Thus, "[d]isclosure of an item of information is not required ... simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz,* 303 F.3d 147, 154 (2d Cir. 2002). Because of this, "companies may remain silent even with respect to information that a reasonable investor might consider material so long as they do not have an underlying duty to disclose that information." *In re Rockwell Med., Inc. Sec. Litig.,* No. 16-CV-1691 (RJS), 2018 WL 1725553, at \*6 (S.D.N.Y. Mar. 30, 2018) (citation, alterations, and internal quotation marks omitted).

**[25]** **[26]** Nevertheless, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.,* 761 F.3d 245, 250 (2d Cir. 2014). The resulting inquiry into whether a duty to disclose exists in this context "requires an examination of defendants' representations, taken together and in context," keeping in mind that "when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate." *Id.* at 250–51 (quoting *In re Morgan Stanley Info. Fund Sec. Litig.,* 592 F.3d 347, 366 (2d Cir. 2010)).

As the Second Circuit has explained, "[b]ecause a 'pure omission' theory is relatively uncommon in securities litigation, and also not strictly within the letter of Rule 10b–5, courts often, to some confusion, use the term 'omission' when referring to statements that fall under the second prong of Rule 10b–5." *In re Vivendi, S.A. Sec. Litig.* ("*Vivendi I*"), 838 F.3d 223, 240 n.9 (2d Cir. 2016). But " '[p]ure omissions' ... must be distinguished from 'half-truths'— statements that are misleading under the second prong of Rule 10b–5 by virtue of what they omit to disclose." *Id.* at 239–40. *See also Universal Health Servs., Inc. v. United States,* ––– U.S. ––––, 136 S.Ct. 1989, 2000 & n.3, 195 L.Ed.2d 348 (2016) (explaining that "half-truths— representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations" applies in the "securities law" context). That proves relevant here because Plaintiffs' claims in the present case turn on their theory that Dynagas's statements were rendered misleading because certain information was omitted. In that regard, whether there was a standalone duty to disclose the omitted information as an initial matter does not fully resolve the question before the Court. Instead, the relevant inquiry is whether Plaintiffs have adequately pleaded facts to support their argument that Defendants' statements, taken as a whole, were rendered misleading by virtue of what was omitted. To clarify, however, the relevant inquiry is not whether more information would have been desired by or beneficial to investors—a question that would almost always be answered in the affirmative—but rather whether the affirmative statements made were in themselves misleading by virtue of what was omitted.

### 2. Statements Regarding the New Charter Contracts

With respect to the new charter contract for the *Ob River*, Plaintiffs rely especially on the argument that Dynagas's officers misled investors by discussing the fact that a new contract had been secured while failing to disclose that the terms were significantly less favorable to the company. Of special note are two statements. First, Lauritzen touted Dynagas's "success[ ] in securing a ten year contract for [the *Ob River*]," which Plaintiffs allege "suggest[ed] to investors that the contract continuations were a positive development." Dkt. No. 92 at 26 (citing Am. Compl. ¶ 9). In addition, on a February 16, 2018 call, Plaintiffs describe Lauritzen as asserting "that long-term charter rates in the industry, generally, were improving, without mentioning that Dynagas had agreed to accept substantially lower rates for *Arctic Aurora* and *Ob River* that year." Dkt. No. 92 at 26–27 (citing Am. Compl. ¶ 85).

**\*11 [27]** Defendants argue that the terms of the new *Ob River* charter contract had already been disclosed, or were reasonably available, and that as a result subsequent statements that failed to reiterate the terms of the contract were not misleading. *See* Dkt. No. 74 at 16–20. First, they point to a statement that Lauritzen made in the December 6, 2017 investor conference call, which disclosed that "[i]n Q2 2018, the Ob River will enter its new 10-year contract with Gazprom at a rate which will be about 35% lower than the current contract rate." Dkt. No. 74 at 16; Dkt. No. 75, Ex. 5 at 5.[3] From there, they argue that, at that point, the information had been disclosed and that, because the information remained in the market, it "need not be repeated." Dkt. No. 74 at 17. *See* *Abuhamdan v. Blyth, Inc., 9 F. Supp. 3d 175, 195 (D. Conn. 2014)* (defendant "had no duty to disclose the allegedly omitted information in light of information it had already disclosed."); *In re Progress Energy, Inc. Sec. Litig., 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005)* (finding that there was "no omission where the allegedly omitted facts [were] disclosed" before the class period). And they argue that, even if the information had not been disclosed expressly, "investors could readily determine the *Ob River*'s charter rate based on the figures Dynagas regularly disclosed in its quarterly SEC filings," insofar as the investors could use the reported numbers to calculate the daily charter rate from its prior charter and compare it to the numbers that addressed the new charter rate. Dkt. No. 74 at 17. *See* *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc., 412 F.3d 103, 111 (2d Cir. 2005)* (finding that "requiring

a stockholder to perform the two-minute multiplication to ascertain the fee is not an omission for which the law gives redress" (alterations incorporated) (citation omitted)); *Kahn v. Wien, 842 F. Supp. 667, 675 (E.D.N.Y. 1994)* (no material omission when information was disclosed "from which the reasonable investor could perform the simple mathematical calculations necessary to determine the [facts at issue].").

Plaintiffs dispute both of these points. They note that Lauritzen's December 6, 2017 statement was insufficient because the transcript was not made available on Dynagas's website nor filed with the SEC, while other public statements —including a contemporaneous press release that was filed with the SEC and mentioned on the website—did not mention the new rate. *See* Dkt. No. 92 at 30. And they point out that the rate reduction Lauritzen stated did not match the "approximate rate that Defendants now suggest investors could have derived from the 2013 IPO prospectus and other public statements." *Id.* They also argue that the calculations that Defendants suggest investors could have used to determine the new rate were "complex and intricate," requiring that investors "locat[e] inputs scattered through five years of SEC filings and a stale presentation" and then perform several calculations to reach the results. *See* Dkt. No. 92 at 29 (citing *In re Am. Realty Capital Props., Inc. Litig., 2019 WL 2082508, at \*2 (S.D.N.Y. May 10, 2019)*, for the proposition that "even if a careful and sophisticated analysis of ARCP's tables and statements conceivably could have revealed the possible falsity of ARCP's representations, the question is whether the disclosures made information regarding the new methodology 'reasonably available' to shareholders.").

**[28] [29]** "The overarching inquiry is whether the total mix of information made available to investors sufficiently disclosed the purported risk." *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc., No. 16-CV-3068 (AJN), 2017 WL 4082482, at \*5 (S.D.N.Y. Aug. 24, 2017)*, aff'd sub nom. *Police & Fire Ret. Sys. of City of Detroit v. La Quinta Holdings, Inc., 735 F. App'x 11 (2d Cir. 2018)* (citation omitted). "Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed." *In re Bank of Am. AIG Disclosure Sec. Litig., 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013)*, aff'd, *566 F. App'x 93 (2d Cir. 2014)* (citation omitted). *See also* *Dujardin v. Liberty Media Corp., 359 F. Supp. 2d 337, 350 (S.D.N.Y. 2005)* (concluding that a plaintiff "failed to allege material misrepresentations or omissions sufficient to state a securities fraud claim" on

the basis that the claim was "premised on facts that were adequately disclosed").

**\*12** At least at this stage, where the Court must resolve all reasonable inferences in the Plaintiffs' favor, the Court concludes that the mere fact that Lauritzen made a single statement prior to the class period disclosing the rate, while making contemporaneous (and more publicly disseminated) statements that omitted the rate, is not by itself enough to establish that the subsequent omissions of the new rate were not misleading. Similarly, the Court acknowledges that the Defendants' argument that an investor could estimate the terms of the new *Ob River*'s charter contract by comparing the numbers disclosed in the 2013 IPO Prospectus and the Form 6-K filed on March 31, 2016 would reveal a significant decrease in the daily rate. *See* Dkt. No. 75, Ex. 2 at 102; Dkt. No. 75, Ex. 4 at 4. At least at this stage, whether that sufficed to *adequately* disclose the information is a fact-specific inquiry. While the Court recognizes Defendants' assertion that theirs is not a truth-on-the-market defense, *see* Dkt. No. 97 at 3–4, the circumstances are sufficiently similar to apply the observation that whether the information was adequately disclosed "is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000).

**[30]** With respect to the *Arctic Aurora*, Defendants concede that the new rate was not expressly disclosed. But they reiterate their argument that the new charter rate was reasonably available to investors; specifically, they claim that investors could determine the new rate of the charter by comparing old SEC filings with disclosures in subsequent filings and investor presentations and performing the requisite calculations. *See* Dkt. No. 74 at 20–21. They also argue that multiple analysts in fact *did* estimate the new charter rate and determined that it was lower than the prior rate. Here, too, Plaintiffs rebut that the proposed calculations are "complex and intricate," and that as a result, the disclosed information did not make the new charter rates "reasonably available" to shareholders. *See* Dkt. No. 92 at 29; *In re Am. Realty Capital Props., Inc. Litig.*, 2019 WL 2082508, at \*2 (S.D.N.Y. May 10, 2019). And here, too, the Court draws all reasonable inferences in Plaintiffs' favor to conclude that the inquiry of whether these numbers were *adequately* disclosed is too fact-specific to resolve at this juncture.[4]

In addition, Plaintiffs plead that prior to February 15, 2018, Defendants made three affirmatively misleading statements in

describing the new charter contract for the *Arctic Aurora* as a "direct continuation" of the previous charter or the description of the new contract as an "extended charter." *See* Dkt. No. 92 at 23–26; Am. Compl. ¶¶ 76, 81, 83; Dkt. No. 93, Ex. D, Ex. E. In line with this, Plaintiffs thus claim that such statements were "half-truth[s]," insofar as, even if "literally accurate," they constituted "[a] device[ ] which misl[e]d investors." Dkt. No. 92 at 27 (quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)). Defendants, meanwhile, argue that "direct continuation" was merely a reference to the "absence of any gap in time between the contracts" and "not the monetary rate of hire." Dkt. No. 74 at 21.

Resolving all reasonable inferences in Plaintiffs' favor, the Court credits Plaintiffs' argument that such descriptions created the impression that the new charter contract was substantially the same as the previous one. And the Court agrees with Plaintiffs that, at this stage in the litigation, they have adequately pleaded sufficient facts to establish the plausible claim that the Defendants' statements regarding the new charter contract as a "direct continuation" of the previous contract were, in context and analyzed as a whole, materially misleading.

**\*13** As a result, having drawn all reasonable inferences in Plaintiffs' favor, the Court concludes that they have adequately pleaded that the statements regarding the terms of the new charter contracts for the *Ob River* and the *Arctic Aurora* were misleading.

### 3. Statements Regarding the Sustainability of the Distribution

Defendants next argue that Plaintiffs have failed to establish that the Defendants made misstatements or omissions of material fact as to the sustainability of the distribution. They argue that "the statements at issue are all non-actionable statements of opinion, forward-looking statements, or some combination of these," that "Plaintiffs have failed to plead facts suggesting that the Company's projections were unachievable at the time Dynagas made them or that the opinion statements did not reflect truly held opinions (as would be required to make them actionable)[,]" and that "Dynagas accompanied these forward-looking statements with meaningful cautionary language that brings them within the PSLRA safe harbor." Dkt. No. 74 at 22–23. Plaintiffs, meanwhile, argue that the statements at issue were not

opinions but rather "statements of mathematical fact." Dkt. No. 92 at 12. They also assert that the Defendants' arguments regarding the applicability of the PSLRA's safe harbor are unconvincing insofar as the alleged misstatements were "about the Company's current condition," that "any forward-looking element of the misstatements is severable," and that "even if the statements were considered forward looking, they would still be actionable." Dkt. No. 92 at 12. The specific statements that Defendants describe as opinions regarding the sustainability of the distribution include the statements made in the February 15, 2018 conference call, Am. Compl. ¶ 87; the April 18, 2018 press release, *id.* ¶ 89; the May 16, 2018 press release, *id.* ¶ 91; the May 17, 2018 conference call, *id.* ¶¶ 10, 92–93, 96, 98; the presentation accompanying the May 17, 2018 conference call, *id.* ¶ 101; and the July 27, 2018 conference call, *id.* ¶ 11, 109. *See also* Dkt. No. 92, Ex. A.

As an initial matter, Plaintiffs first allege that these statements are not opinions but rather false or misleading statements of facts, and that "[w]hether Dynagas's cash flow profile could support a distribution of a certain level was a question of arithmetic fact derived from existing contracts—a fact Dynagas touted repeatedly as transparent, predictable, and stable." Dkt. No. 92 at 12–16. In line with this, they argue that the challenged statements were "demonstrably false," *id.* at 12, that they were "formulated and reasonably understood as statements of facts," *id.* at 13, and that investors "reasonably construed 'cash flow' to exclude proceeds of contemplated investment," *id.* at 15.

Many of the statements contain phrases such as "I think" or "we expect," both of which can be indicative that the statements in question are statements of opinion. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183–84, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015) (expounding on the differences between statements of opinion and statements of fact and indicating, in part, that phrases such as "I think" or "I believe" can often serve as indicators that the statement in question is one of opinion and not of fact). Of course, the inclusion or exclusion of such language is never dispositive; the statements must be analyzed in context. So, while helpful in guiding the Court's analysis, ultimately the lodestar of this analysis is whether the statements in question are subjective statements that reflect beliefs or expectations.

**\*14** **[31]** "Statements that 'express expectations about the future rather than presently existing, objective facts' are [ ] statements of opinion." *In re Supercom Inc. Sec. Litig.*, No.

15-CV-9650 (PGG), 2018 WL 4926442, at \*22 (S.D.N.Y. Oct. 10, 2018) (quoting *In re Aratana Therapeutics Inc. Sec. Litis.*, 315 F.Supp.3d 737, 758 (S.D.N.Y. 2018)). *See also Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018) (noting that "subjective statements that reflect ... expectations for the future rather than presently existing, objective facts" are statements of opinion (citation omitted)). The text of many of the challenged statements makes clear that what is being expressed is an expectation about the future. *See* Am. Compl. ¶¶ 89, 91 ("This decision by our Board of Directors to reduce the level of the Partnership's quarterly common unit distribution is necessary to align the Partnership's distribution level with its capacity to generate cash flow in the long term.... *[W]e believe* the new distribution level is viable on an actual cash basis since it reduces the Partnership's current need to utilize existing cash reserves to fund distributions to unitholders."); *id.* ¶ 87 ("We're not looking at the near-term as we have to look at the long-term as far as the distribution is concerned because once our *Yamal* contract start [sic] we have a very good visibility of what our cash flows will look like. What I can say is, *it's an ongoing analysis, we would like to end up with* a distribution coverage of above one-times which is sustainable for the longer term. And we're very fortunate because we can use the word long-term because we held it long time, the longterm contracts which is a necessary ingredient for having sustainable distribution, so that's what I can say at this point." (emphasis added)).

Four of the statements made in the May 17, 2018 conference call and the accompanying presentation express expectations about the future, as well. *See* Am. Compl. ¶ 93 ("We do find it noteworthy that certain analysts commented that a higher distribution reduction was necessary. The board and the management felt it would be unwarranted for the new distribution to be based on overly pessimistic scenarios.... *Management does not believe* in for (sic) the limited moving parts that can affect our financial performance. Ultimately, distribution policy *reflects the boards and management expectations* and is not based on scenarios which are unlikely to materialize. The moving parts ... are: how long and at what rate [t]he *Yenesei River* and the *Lena River* will be trading in the short term market, pending the delivery into their 15-year contracts, once their [current, long-term] contracts expire in Q3 of this year." (emphasis added)); *id.* ¶¶ 10, 96 ("[Analyst:] "So now that the distribution is more aligned with the suitable cash flow, *do you feel like this current level* is pretty easily sustainable *in the coming quarters and years*?" [Gregos:] "Yeah, definitely. What we want to achieve

was this alignment. And *as for the foreseeable future* this distribution, as I mentioned before is sustainable. Basically*, the expectations that we have on the market, there are some moving parts as I mentioned*, which are the *Lena River* and *Yenesei River.* Again, how long they're going to be in [the spot] market and what they'll make [therein]. But under *a reasonable scenarios* [sic]; yes, definitely this distribution is sustainable." (emphases added)); *id.* ¶ 98 ("All I can say is that, we experience let's say extreme scenarios, which we're not, *we don't believe it's going to happen.* Then that's something to be discussed, but that's more of a longer term discussion. It's not a near term discussion." (emphasis added)); *id.* ¶ 101 ("The revised distribution level *is expected to align* the Partnership's cash distributions with its capacity to generate cash flow in the long term, strengthen its balance sheet and improve its distribution coverage ratio."). All of these statements contain indicators that reflect that the assertions were beliefs or expectations rather than proffers of fact. And the inclusion of this language buttresses the more general conclusion that these statements were subjective perspectives, rather than objective representations of fact.

Others of the challenged statements do not include the kind of language that traditionally distinguishes statements of opinion from statements of fact; the context of these statements, however, makes clear that these, too, are statements of expectation and opinion. For instance, Lauritzen is quoted as saying in the May 17, 2018 conference call that "[The April 2018 reduction of the distribution] was necessary to align the [Dynagas's] distribution level with [its] capacity to generate cash flow in the long term." Am. Compl. ¶ 92. Plaintiffs aver that this is a statement of present fact, insofar as it allegedly indicates that the distribution is aligned with the present cash flow. *See* Dkt. No. 92, Ex. A at 3. But the context makes clear that Lauritzen's statement was an opinion about a future expectation—that is, that the moves the company had made in the present would result, *in the long term*, with a distribution level that was aligned with the company's ability to generate cash flow. The same goes for one of the statements made in the July 27, 2018 conference call. There, Plaintiffs quote Gregos as responding to a question by saying, "Of course, you ask how do you envision maintaining the distribution. I think the maintaining this [distribution] we've already achieved that with our previous distribution realignment, I mean, if you look at our cash flows, they're supported, the distribution is supported by our current cash flow profile *for quite a long time.*" *See* Am. Compl. ¶¶ 11; 109 (emphasis added). Plaintiffs again try to parse the language to suggest that this is not a statement

about expectations of the future but rather an assertion of present fact. But the context makes clear that Gregos's answer references what Defendants expected to transpire in the *future*: The continued alignment of the distribution to the cash flow profile. Indeed, the question to which he was responding referenced the company's expectation about whether it would be able to *maintain* the distribution—a framing that clearly looks to the future. That Gregos was ultimately wrong does not change the nature of the statement.

**\*15 [32] [33] [34]** But that does not end the inquiry. "Like objective statements of material fact, subjective statements of opinion can be actionable as fraud." *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 577 (S.D.N.Y. 2016). Statements of opinion may give rise to liability if "the speaker did not hold the belief she professed" or if "the supporting fact[s] she supplied were untrue." *Id.* (quoting *Tongue v. Sanofi* ("*Sanofi II*"), 816 F.3d 199, 210 (2d Cir. 2016)). But "[i]t is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *Id.* (quoting *In re Salomon Analyst Level 3 Litig.*, 350 F.Supp.2d 477, 489 (S.D.N.Y. 2004)). While Plaintiffs claim that Defendants' statements of opinion are actionable under either of these prongs, their arguments prove unconvincing.

**[35]** As to the first prong, Plaintiffs plead no facts to support that any of the speakers did not hold the beliefs they professed. Plaintiffs' claims are conclusory, relying in part on a claim the speakers must have known that their expectations were unachievable at the time they were made; but, without any facts to support such a statement, this proves insufficient. "The Second Circuit has firmly rejected this 'fraud by hindsight' approach." *Podany v. Robertson Stephens, Inc.*, 318 F.Supp.2d 146, 156 (S.D.N.Y. 2004) (citing *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)).

**[36]** As to the second prong, Plaintiffs rely heavily on *Omnicare* to make their point. *See* Dkt. No. 92 at 13–15. The common thread in Plaintiffs' challenges to these statements is their assertion that any statements regarding cash flow were untrue because the new charter contracts had decreased the revenue being generated from the *Ob River* and the *Arctic Aurora.* But Plaintiffs fail to plausibly allege that statements regarding the company's cash flow and its relationship to the sustainability of the distribution were *untrue* at the time the statements were made. Here, the statements of opinion relate to whether Dynagas would be able to maintain the distribution rates. Plaintiffs have not pleaded facts to support their claim

that the new distribution rates were unachievable when made, and instead rely on the claim that the revenue derived from the new charter contracts could not support the distribution rates. As Defendants point out, however, "[t]he relevant question is whether *all* expected revenues and any other sources of funds available to pay the distribution could have been sufficient to maintain the distribution when Dynagas made the challenged statements." Dkt. No. 97 at 6. Plaintiffs have not pleaded facts to support the idea that it was *untrue*, at the time the statements were made, that Dynagas would be able to maintain the distributions.

 **[37]**   Nor have Plaintiffs plausibly alleged that the statements were untrue as to the claim that the cash flow profile supported the distributions. Plaintiffs rely heavily on their assertion that "cash flow" cannot be understood to "include proceeds of new debt or equity, which is inconsistent with common usage and analysts' understanding and, in any event, is not appropriately decided on a motion to dismiss." Dkt. No. 92 at 15. But Plaintiffs provide no authority to support the assertion that Defendants' interpretation of "cash flow" is "inconsistent with common usage and analysts' understanding." *Id.* And, crucially, the Amended Complaint pleads no facts to support such a reading. Moreover, Plaintiffs' reading is strained in part because Dynagas at multiple points made clear that future distributions would not be funded exclusively from charter revenues. *See* Dkt. No. 97 at 6–7. As Defendants note, "Dynagas stated in its April 18, 2018 Form 6-K ... that it 'believe[d] the new distribution level [was] viable on an actual cash basis since it *reduce[d]* the [Company's] *current need to utilize existing cash reserves to fund distributions to unitholders.*' " Dkt. No. 97 at 7 (citing Dkt. No. 93, Ex. P at 2) (emphasis in original). Similarly, during Dynagas's Q1 2018 earnings call, the company explained that its decision to reduce the distribution was "necessary to align [its] distribution level with its *capacity* to generate cash flow in the long term," and that the company "had adequate liquidity to cover any short fall and fund the current distribution." *Id.* at 7 (citing Dkt. No. 75, Ex. 25 at 4, 6). Plaintiffs' argument that, as a matter of fact, Defendants' broader use of the term "cash flow" was *untrue* is thus unsupported by any evidence or relevant facts actually pleaded in the amended complaint. As a result, the claim is too conclusory to credit, even after the Court draws all inferences in favor of Plaintiffs.

 **\*16  [38]    [39]**    Statements of opinion can also be actionable "if the speaker omits information whose omission makes the statement misleading to a reasonable investor," even if the

opinions are sincerely held and otherwise true as a matter of fact. *Gillis*, 197 F. Supp. 3d at 578 (quoting *Sanofi II, 816 F.3d at 210*). To prevail on such a claim, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Sanofi II, 816 F.3d at 209*. But "[t]he Supreme Court has instructed that its ruling that material omissions of facts may render a statement of opinion actionable should not be given 'an overly expansive reading,' and that establishing liability on such a theory 'is no small task for an investor' to meet." *Gillis*, 197 F. Supp. 3d at 578 (quoting *Sanofi II, 816 F.3d at 209*).

 **[40]**   Even under this theory, Plaintiffs' claim that the statements of opinion are actionable fails. Specifically, Plaintiffs have not adequately pleaded facts to support the claim that a reasonable investor would have been misled into thinking that the company's statements regarding cash flow and future distribution expectations necessarily meant that the revenues from the *Ob River* and *Arctic Aurora* charter contracts would remain constant. Furthermore, Plaintiffs' argument is undermined by the fact that Dynagas disclosed, in SEC filings, the effect of the new charter contracts on the company's contracted revenue backlog. *SeeGarber v. Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009) (noting that, when deciding whether there has been a material misrepresentation or omission, a court should consider "the 'total mix' of information made available," including "information already in the public domain and facts known or reasonably available to the shareholders" (citations omitted)). Given that the total mix of information available to investors included information that directly addressed the revenue stream, Plaintiffs' claim that the statements as to cash flow were misleading ultimately fails, even after drawing all reasonable inferences in their favor.

 **[41]**   In addition, many of these statements, even if construed as something other than a statement of opinion, would fall within the PSLRA "safe harbor" provision, which would accordingly render them inactionable. Under the PSLRA safe harbor, "a forward-looking statement is not actionable if it 'is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading.' " *In re Sanofi Sec. Litig.* ("*Sanofi I*"), 87 F. Supp. 3d 510, 529–30 (S.D.N.Y. 2015), *aff'd sub nom.Tongue v.*

*Sanofi*, 816 F.3d 199 (2d Cir. 2016) (citing *Slayton v. Am. Exp. Co.,* 604 F.3d 758, 766 (2d Cir. 2010)).

**[42]** To begin with, the May 17, 2018 and July 27, 2018 conference calls both contained meaningful cautionary language about the nature of the forward-looking statements, both expressly made on the call and on the contemporaneously filed press releases, which were incorporated by reference into the conference calls. *See* Dkt. No. 75, Ex. 3 at 10–11; Ex. 25 at 4; Ex. 26 at 4; Ex. 27 at 10–11; *see also* Am. Compl. ¶¶ 10, 11, 92, 93, 96, 98, 109. Specifically, the Form 6-Ks filed with the SEC, which are directly referenced at the beginning of the two conference calls, include cautionary language that specifically references the "availability of financing and refinancing ... [and] the amount of cash available for distributions," among other things that go directly to the harm that Plaintiffs claim was effected by the alleged omissions of facts. Ex. 3 at 10–11; Ex. 27 at 10–11. This cautionary language "relate[s] directly to that by which the plaintiffs claim to have been misled." *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.,* 159 F.3d 723, 729 (2d Cir. 1998); *see also P. Stolz Family P'ship L.P. v. Daum,* 355 F.3d 92, 97 (2d Cir. 2004). Plaintiffs rely on *In re Salix Pharm., Ltd.,* No. 14-CV-8925 (KMW), 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016), to argue that the cautionary language is too generic and that mere reference in SEC filings is insufficient. *See* Dkt. No. 92 at 21. The Court disagrees. Courts in this Circuit routinely find that references to SEC filings that expound more fully on the risks suffice to adequately convey the risks. *See, e.g., In re Fairway Grp. Holdings Corp. Sec. Litig.,* 2015 WL 4931357, at *17 (S.D.N.Y. Aug. 19, 2015); *City of Providence v. Aeropostale, Inc.,* 2013 WL 1197755, at *12 n.1 (S.D.N.Y. Mar. 25, 2013). And the cautionary language specifically referenced the uncertainty regarding the possibility that Dynagas would be unable to maintain the distribution if a number of things, including the availability of financing, transpired. As a result, the Court disagrees that the reasoning in *Salix* applies here.

**\*17** Plaintiffs also argue that the cautionary language is insufficient because the language "referred to a risk that had already transpired." Dkt. No. 92 at 22 (citing *In re BioScrip, Inc. Sec. Litig.,* 95 F. Supp. 3d 711, 736 (S.D.N.Y. 2015)). Again, however, Plaintiffs have not pleaded facts to support the notion that the risk that the company would be able to maintain the distribution had *already* transpired —only that Dynagas had committed the *Ob River* and *Arctic Aurora* to lower charter rates, which *could* impact the cash distribution in the future. This case is unlike *BioScrip*

because Plaintiffs have not established that the purported representations were unachievable when made. In that regard, even drawing all reasonable inferences in Plaintiffs' favor, the Amended Complaint does not establish facts that the overall risk had transpired, and, as such, the cases cited by Plaintiffs to overcome the safe-harbor provision of the PSLRA are distinguishable. *See In re Vivendi, S.A. Sec. Litig.,* 838 F.3d 223, 262 (2d Cir. 2016) ("Fraud depends on the state of events when a statement is made, not on what happens later." (citation omitted)); *In re Loral Space & Commc'ns Ltd. Sec. Litig.,* 2004 WL 376442, at *12 (S.D.N.Y. Feb. 27, 2004) (dismissing complaint after finding that Plaintiffs had not put forth "specific allegations" that made it "impossible" for the company to "eventually to meet [the] projections"). Finally, Plaintiffs' attempt to analogize this case to *In re General Electric Co. Sec. Litig.,* 857 F. Supp. 2d 367 (S.D.N.Y. 2012), is unavailing. *See* Dkt. No. 92 at 13–14. The statement in question in *General Electric* took the form of a guarantee, insofar as the speaker said that investors "can count on a great dividend." *See id.* at 380. The statements in question here, on the other hand, read in their proper context, do not express a similar kind of guarantee; furthermore, the statements must be read in the context of the cautionary language. As such, the Court concludes that none of the statements regarding the sustainability of the distribution were misleading for purposes of Plaintiffs' 10(b) claim.

### 4. Scienter

**[43]** **[44]** **[45]** **[46]** The Court now turns to scienter. When bringing a claim under Section 10(b), Plaintiffs must also plead facts to support a finding of scienter. *See* 15 U.S.C. § 78u-4(b)(2)(A); *see also In re Interpublic Sec. Litig.,* No. 02-CV-6527 (DLC), 2003 WL 21250682, at *11 (S.D.N.Y. May 29, 2003). When assessing whether scienter has been adequately pled, "courts must, as with any motion to dismiss for failure to plead a claim on which relief may be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Thus, "[t]he inquiry is whether all the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323, 127 S.Ct. 2499. The requisite inference need not be "the most plausible of competing inferences," but it must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324, 127 S.Ct. 2499.

**[47]** The Second Circuit has explained that to establish scienter, a plaintiff must allege either "facts (1) showing the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Plaintiffs advance both theories. Both theories fail.

There is no dispute that Lauritzen and Gregos, on behalf of Dynagas, "had an opportunity to commit the fraud, particularly because they were officers ... of the Company and controlled the Company's business." *In re Centerline Holdings Co. Sec. Litig.*, 613 F. Supp. 2d 394, 399 (S.D.N.Y. 2009), *aff'd sub nom.In re Centerline Holding Co. Sec. Litig.*, 380 F. App'x 91 (2d Cir. 2010). Defendants do not argue otherwise, but they challenge Plaintiffs' allegations as to motive.

**[48]** Plaintiffs advance two theories as to motive. They first argue that Dynagas operates as a conduit for Dynagas Holding "to siphon money from investors in the United States to itself," that the Defendants had "promised financial performance [Dynagas] could not deliver," that Dynagas thus "faced an imminent debt wall," that "the Ponzi scheme would soon unravel without further investment," and that "Dynagas was planning to acquire more vessels by selling new equity, as it had in the past." Dkt. No. 92 at 34. So they claim that "Defendants sought to avoid diluting Dynagas's stock (and it's (sic) private, family-owned parent's stake) in a contemplated acquisition of assets. That is, if the equity issued at a poor price, his own family's 43% stake in Dynagas would be diluted, offsetting the gains expected in the related-party transactions." *Id. See also* Am. Compl. ¶ 151. Furthermore, they argue that this establishes a "pattern and plan to use equity price to support acquisitions," which they note *can* "sufficiently allege scienter by motive." *Id.* at 34 (citing *In re Interpublic Sec. Litig.*, No. 02-CV-6527 (DLC), 2003 WL 21250682, at *10 (S.D.N.Y. May 29, 2003)). *See also* Am. Compl. ¶¶ 147–52.

**\*18** **[49]** To the extent Plaintiffs argue that Dynagas Holding had an interest in causing Lauritzen and Gregos to make certain assertions in order to prevent the "dilution of their share price," their claim fails because preventing the dilution of stock is a benefit that would extend to all shareholders. That is, Plaintiffs do not explain why Dynagas Holding's interest in preventing their dilution was any different than those of any shareholders. If the acquisitions led to greater dilution of Dynagas Holdings' ownership, so would it lead to the dilution of all other shareholders. The "need to attract investors in order to pay down debt accruing ... is insufficient to demonstrate scienter because it is common to most for-profit companies." *Janbay v. Canadian Solar, Inc.*, No. 10-CV-4430, 2013 WL 1287326, at *10 (S.D.N.Y. Mar. 28, 2013) (quoting *Bd. Of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO,* 811 F.Supp.2d 853, 867 (S.D.N.Y. 2011)). So too here. The desire to maintain share prices high in order to avoid the dilution of stock, when the company plans to issue equity in order to pursue certain corporate goals such as the acquisition of new vessels, is an expected motive of corporate actors. That alone does not establish actionable motive. *SeeSan Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris,* 75 F.3d 801, 813–14 (2d Cir. 1996) (finding that the desire to maintain a high bond or credit rating to maximize offering's marketability does not establish motive); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009) ("The alleged motivation of a corporation to raise money is far too generalized (and generalizable) to allege the proper 'concrete and personal' benefit required by the Second Circuit."). Plaintiffs have pleaded no facts to support the notion that Dynagas Holding sought a concrete benefit not otherwise shared by other shareholders. *SeeHawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 849 (S.D.N.Y. 2019); *Total Equity Capital, LLC v. Flurry, Inc.*, No. 15-CV-4168 (JMF), 2016 WL 3093993, at *5 (S.D.N.Y. June 1, 2016) ("[T]he only allegation with respect to motive is that Khalaf 'was motivated to artificially inflate the price of Flurry securities ... because ... Flurry had been funded primarily by issuing equity securities. Therefore, the higher the price of those securities, the greater the proceeds available to the Company to fund ongoing operations.' ... But '[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive.' ' " (citations omitted)).

**[50]** Plaintiffs also claim that Lauritzen also had personal, financial, and familial reasons to perpetuate the perceived success of Dynagas, at least in part because Dynagas Holding —his father-in-law's company, where, according to Plaintiffs, Lauritzen served as General Manager—would receive the proceeds of the drop-down transactions through which Dynagas intended to acquire the new vessels. *See* Dkt. No. 92 at 34–35. This claim is intertwined with the earlier claim: in essence, it requires a series of assumptions that Dynagas

Holding stood to gain certain concrete personal benefits from the alleged misrepresentations, and that Lauritzen had a personal stake in ensuring Dynagas Holding's ability to do so. In that regard, that Dynagas Holding had no concrete benefit that would be advanced by the alleged misrepresentations undercuts Plaintiffs' arguments regarding Lauritzen. Furthermore, the argument that the familial relationship between Lauritzen and Prokopiou created motive for the alleged fraud turns on the assumption that it would be sufficient to find that Lauritzen stood to personally benefit from the circumstances. But the Second Circuit has instructed that "[i]n looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest," *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994), and it stands to reason that that alone does not establish motive to defraud. And finally, to argue that Lauritzen had personal motive to effect the alleged fraud, Plaintiffs rely on "speculation and conclusory allegations," which "cannot [form the basis of] securities fraud claims." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). Even at this stage, that is not enough.

 **[51]**  **[52]** Plaintiffs also argue that "strong circumstantial evidence of conscious misbehavior or recklessness" establishes scienter in this case. *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also* Dkt. No. 92 at 32–34. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (citation omitted). Thus, to prevail, Plaintiffs must at the very least allege reckless conduct "which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Honeyman v. Hoyt (In Re Carter–Wallace, Inc. Secs. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted).

 **\*19** **[53]** With respect to the alleged misstatements and omissions about the charter rates for the *Arctic Aurora* and the *Ob River*, Plaintiffs assert that scienter can be established because the Amended Complaint "alleges that Dynagas, through its CEO and CFO, was aware of the essential terms of the Company's long-term charter contracts throughout the Class Period." Dkt. No. 92 at 33. They point to the following facts to establish scienter on these grounds: (1) "Lauritzen and Gregos frequently discussed their efforts to negotiate the terms of charter contracts on investor calls," and (2)

"Dynagas had just conducted a financial review, with which Lauritzen and Gregos, as CEO and CFO, were familiar." *Id.* (citing Am. Compl. ¶¶ 6, 75). Of course, it is not in dispute that Lauritzen and Gregos knew the terms of the new charter contract. But that alone cannot establish scienter. Under Plaintiffs' theory, any time that corporate officials did not disclose some information that was available to them, scienter would be established. Even at the motion to dismiss stage, the pleading standard for scienter is too high to accept such a claim. *See In Re Carter–Wallace, Inc. Secs. Litig.*, 220 F.3d at 39. The fact that the omitted information is known to the corporate officers does not establish that the corporate officers knowingly misled investors by failing to disclose it. Nor does it establish that corporate officers acted recklessly in omitting that information. The Second Circuit has explained that "reckless conduct is, at the least, conduct which is highly unreasonable and which represents an *extreme departure* from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (emphasis added) (internal quotation marks omitted). Plaintiffs do not plead any facts to support conscious, or even reckless, misbehavior in failing to disclose the terms of the new *Arctic Aurora* contract when it was announced, even when viewing the facts in the light most favorable to them. Indeed, none of the facts alleged in the amended complaint support the notion that any of the statements were even highly unreasonable, let alone an extreme departure from the standards of ordinary care. And Plaintiffs' argument is further undercut by the fact that Dynagas's SEC filings from February 26, 2018 on did not hide the terms of the new *Ob River* and the *Arctic Aurora* contracts. As discussed above more generally, Defendants disclosed information from which investors could roughly determine the terms of the new contract. The disclosure of that information is inconsistent with an intent to mislead investors. *See Lucas v. Icahn*, 616 F. App'x 448, 450 (summary order) (2d Cir. 2015) ("Lucas argues that it would have been very difficult for the average investor to actually perform such a valuation, even with the information provided. That is beside the point: such disclosure is flatly inconsistent with an intent to mislead investors ...., especially in the absence of an affirmative statement as to that value."). *See also Rombach v. Chang*, 355 F.3d 164, 176–77 (2d Cir. 2004); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 448 (S.D.N.Y. 2006).

 **[54]** While the Court has concluded that none of the statements regarding the sustainability of the distribution

were misleading under Section 10(b), even if it had ruled for the Plaintiffs on that point, it would also find that Plaintiffs failed to adequately plead scienter as to those statements, as well. To establish circumstantial evidence as to those claims, Plaintiffs point to "a post-Class-Period statement that is reasonably construed as an admission that Dynagas knew at the time of the statements that the distribution could not be sustained by the cash flow profile and could only be sustained by the sale of new equity to new investors." Dkt. No. 92 at 33 (citing Am. Compl. ¶ 138). They argue that the post-Class Period statement reveals "that Defendants knew facts contradicting their Class-Period statements that: (i) the distribution was supported by the Company's cash flow profile, (ii) that no further action on their part was required to maintain it, and (iii) that only 'extreme scenarios' would threaten the distribution," and they argue that these claims establish "actual knowledge" that the statements were misleading. Dkt. No. 92 at 32–33. But the post-Class Period statement does not establish that Defendants knew, at the time they made the Class Period statements, that the distributions were unachievable. *See* Dkt. No. 93, Ex. H. Plaintiffs' claim turns on the notion that Defendants knowingly used the term "cash flow profile" exclusively to refer to the revenues derived from the charter contract. As already discussed, however, Defendants never asserted that Dynagas would rely exclusively on the revenue from the charter contracts to finance the distributions. In addition, Plaintiffs' claim on this point relies on the notion that Defendants knowingly misled investors by using "cash flow" to include all strategies directed at financing the distributions—including, potentially, incurring debt and issuing equity. This claim is again undermined by the fact that, at multiple points, Dynagas indicated that its strategy for funding the distributions would not rely exclusively on revenue derived from the charter contracts. *See* Dkt. No. 75, Ex. 25 at 4, 6; Dkt. No. 93, Ex. P at 2; *see also* Dkt. No. 97 at 6–7. Indeed, if anything, the post-Class Period statement more strongly supports the inference that at the time Defendants made the statements in question, they believed that Dynagas *would* be able to maintain the distribution, and that their efforts were subsequently thwarted by the difficulties Dynagas experienced in attempting to refinance its debt. *See* Dkt. No. 93, Ex. H at 4.

 [55]   [56]  Plaintiffs fare no better under a recklessness theory. As already noted, "reckless conduct is, at the least, conduct which is highly unreasonable and which represents an *extreme departure* from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been

aware of it." *Chill,* 101 F.3d at 269; *see also* *Kalnit,* 264 F.3d at 142. In some cases, recklessness can be inferred from "[a]n egregious refusal to see the obvious, or to investigate the doubtful." *Chill,* 101 F.3d at 269 (citation and internal quotation marks omitted). *See also* *City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 419 (S.D.N.Y. 2011). Plaintiffs do not plead any facts that meaningfully support the notion that the challenged statements, which addressed expectations about the sustainability of the distribution, were an extreme departure from the standards of ordinary care. And as above, it is relevant that Defendants revealed sufficient facts from which investors could plausibly calculate the terms of the new charter contract. *See* *Lucas*, 616 F. App'x at 450 ("[S]uch disclosure is flatly inconsistent with an intent to mislead investors ...."). Insofar as the core of Plaintiffs' theory is that the new charter contracts undermined Dynagas's ability to maintain the distribution, it does not follow that Defendants would, on the one hand, disclose financial information regarding the impact of the new charter contract, on the one hand, while knowingly or recklessly lying to the public about the financial state of the company, on the other. At a minimum, such a claim advances no strong inference of scienter. Considering the above, even after drawing all reasonable inferences in Plaintiffs' favor, the Court still concludes that their proposed inference as to Defendants' actual knowledge or recklessness is not "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499. Rather, the inference that the Defendants—perhaps irrationally—expected to maintain the distribution when they made the challenged statements, only to be subsequently proven wrong, is more compelling, and Plaintiffs have failed to allege facts to support inferences of scienter as to both categories of statements.

### B. Section 20A Claims

 **\*20** **[57]**  Plaintiffs also claim that Defendants violated Section 20A of the Exchange Act, which makes individuals who violate § 10(b) and Rule 10b-5 liable to contemporaneous purchasers when they "purchas[e] or sell[ ] a security while in possession of material, nonpublic information." 15 U.S.C. § 78t–1(a). Because this claim is contingent upon an underlying Exchange Act violation, Plaintiffs' Section 20A claim must also be dismissed. *See* *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 704 (2d Cir. 1994) ("We therefore hold that [plaintiff] cannot base its § 20A claim on a violation of §§ 11 or 12(2) of the '33 Act, and, in order to state a claim under § 20A, must

plead as a predicate an independent violation of the '34 Act. As it has not done so, the district court properly dismissed this count of the complaint."); *accordGruber v. Gilbertson,* No. 16-CV-9727, 2019 WL 4458956, at *3 (S.D.N.Y. Sept. 17, 2019) ("[Section] 20A merely requires that an underlying violation of § 10(b) occurred."); *Kaplan v. S.A.C. Capital Advisors, L.P.*, 40 F. Supp. 3d 332, 343 (S.D.N.Y. 2014) ("[I]n order to state a claim under Section 20A, a plaintiff must allege a predicate violation of the Securities Exchange Act of 1934."). *See alsoCity of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 429 (S.D.N.Y. 2020). As a result, Plaintiffs' Section 20A claim is dismissed.

### C. Section 20(a) Claims

 **[58]**   **[59]**  Plaintiffs' allegations for control-person liability under § 20(a) of the Exchange Act also fail. In order to establish a *prima facie* case of liability under § 20(a), a plaintiff must show a primary violation of the Exchange Act. *SeeIn re Alstom SA*, 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005) (citing *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)). As discussed above, Plaintiffs have failed to allege a primary violation of the Exchange Act—namely, § 10(b). Plaintiffs' Section 20(a) claim is therefore also dismissed.

### D. Securities Act Claims

Defendants also move to dismiss Plaintiffs' claims under Section 11, 12, at 15 of the Securities Act.

 **[60]**   **[61]**   **[62]**  "Section 11 creates a right of action for 'any person' acquiring a security offered pursuant to a misleading registration statement." *In re Initial Pub. Offering Sec. Litig.,* 241 F. Supp. 2d 281, 344 (S.D.N.Y. 2003) (citing 15 U.S.C. § 77k(a)). "To allege a claim under Section 11 of the Securities Act, a plaintiff need show that a registration statement: (1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statement therein not misleading." *Arfa v. Mecox Lane Ltd.,* 10-CV-9053, 2012 WL 697155, at *4 (S.D.N.Y. Mar. 5, 2012)*aff'd,*504 F. Appx. 14 (2d Cir. 2012) (citing *Caiafa v. Sea Containers Ltd.,* 525 F.Supp.2d 398, 408 (S.D.N.Y. 2007)). Section 12(a)(2) "imposes liability under similar circumstances on issuers or sellers of securities by means of a prospectus." *Litwin v. Blackstone Grp., LP,* 634 F.3d 706, 715 (2d Cir. 2011).

 **[63]**   **[64]**   **[65]**  "Neither Section 11 nor Section 12(a)(2) requires that plaintiffs allege the scienter or reliance elements of a fraud cause of action."*Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004) (citing *Herman & MacLean,* 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)). Thus, "only a material misstatement or omission [in a registration statement] need be shown to establish a prima facie case[.]" *In re Initial Public Offering Sec. Litig.,* 241 F. Supp. 2d at 343 (citation and internal quotation marks omitted). *See alsoIn re CINAR Corp. Sec. Litig.,* 186 F. Supp. 2d 279, 306–07 (E.D.N.Y. 2002) ("[A] plaintiff does not need to allege the manner in which a material misstatement on a securities filing was made—innocently, negligently, fraudulently or otherwise —because § 11 provides for strict liability.") (citation omitted). The Second Circuit has explained, though, that "the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud." *Rombach,* 355 F.3d at 171. Thus, "while a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b)." *Id. See alsoCity of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,* 752 F.3d 173, 183 (2d Cir. 2014) (citing *Rombach,* 355 F.3d at 171).

 **\*21**  **[66]**  In the Amended Complaint, Plaintiffs make clear that they do not intend to predicate their Securities Act claims on averments of fraud, and expressly state that the Section 11 and Section 12(a)(2) claims "[do] not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme, motive, scienter or intentional conduct as part of this claim, which does not have scienter or fraudulent intent as required elements. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scheme, motive, scienter or intentional conduct to defraud Plaintiffs or other Class members." Am. Compl. ¶¶ 198, 211; *see alsoid.* ¶ 199. Defendants do not challenge this assertion in their Motion to Dismiss. As such, the Court construes Plaintiffs' Securities Act claims as not proceeding under a fraud theory.

Plaintiffs argue that the December 21, 2017 Prospectus and the October 18, 2018 Final Prospectus Supplement, both of which are incorporated into the December 21, 2017 registration statement, erroneously referred to the new *Arctic Aurora* charter contract as a "direct continuation of the vessel's current charter with Statoil," and that in doing so the Prospectus "omitted that the new charter was at a substantially

reduced rate, despite speaking to the possible future escalation of the rate." Dkt. No. 92 at 39–40 & n.50. *See also* Am. Compl. ¶ 200 ("[T]he Registration Statement falsely stated that the *Arctic Aurora*'s current long-term charter contract was in direct continuation of the vessel's previous charter with Statoil and omitted the material fact that the new charter contained less favorable terms, such that the Company would no longer be able to sustain its quarterly distribution based on its revenue.").

As discussed earlier, Plaintiffs have plausibly alleged that references to the *Arctic Aurora*'s new charter contract as a "direct continuation" were materially misleading before the company disclosed sufficient information from which analysts and investors reasonably could know the terms of the new contract. The same analysis applies here. Defendants' claim to the contrary relies on their assertion that the description of the new charter contract as a "direct continuation" only referred to the "absence of any gap in time between the contracts." Dkt. No. 74 at 38.

Because Sections 11 and 12(a)(2) do not have a scienter requirement, and because the Court has already found that Plaintiffs adequately pleaded that the statements regarding the new *Arctic Aurora* were misleading by what they failed to disclose, the Court DENIES Defendants' motion to dismiss Plaintiffs' claims under Section 11 and Section 12(a)(2).

 **[67]** Finally, the Court turns to Plaintiffs' claim under Section 15. In their memorandum of law in support of their motion to dismiss, Defendants correctly note that to state a claim under Section 15 of the Securities Act, "a plaintiff must allege both an underlying violation of Section 11 or 12 and that the defendant exercised the requisite control." *See* Dkt. No. 74 at 40 (citing 15 U.S.C. § 77*o*; *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185–86 (2d Cir. 2011)). But their sole argument in favor of dismissal is that "[b]ecause Plaintiffs do not adequately allege an underlying violation of Section 11 or 12(a)(2), their Section 15 claim also fails." Dkt. No. 74 at 40. As the Court finds that Plaintiffs have plausibly stated a claim under Sections 11 and 12(a)(2), and as Defendants do not argue that Plaintiffs have failed to state a claim that Defendants exercise the requisite control, the Court DENIES Defendants' motion as to the Section 15 claim.

## IV. CONCLUSION

The motion to dismiss is GRANTED as to Plaintiffs' Exchange Act claims and DENIED as to Plaintiffs' Securities Act claims. Defendants' letter motion requesting that the Court hear oral argument is DENIED as moot. This decision resolves docket numbers 73 and 76.

 **\*22** An initial pretrial conference is hereby scheduled for January 8, 2021 at 3:00 p.m. The materials described in Dkt. No. 8 are due at least seven days before the conference.

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2020 WL 6947521, Fed. Sec. L. Rep. P 100,954

---

Footnotes

1    The Individual Defendants named in the Amended Complaint have not been served in this matter, and they have not yet appeared. *See* Dkt. No. 47 at 2.

2    While Plaintiffs also assert certain of these claims against Individual Defendants, as noted above the record does not reflect that the Individual Defendants have ever been served. *See* Dkt. No. 74 at 14 n.15.

3    The Court takes judicial notice of the fact of disclosure, but does not consider this transcript for the truth of its contents. *See* *Staehr v. Hartford Financial Serv*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice as well as other matters."). *See also* *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation but rather to establish the fact of such litigation and related filings." (citation omitted)).

4    The two claims as to the *Arctic Aurora* that were made prior to the February 15, 2018 presentation made the new rates available present a different challenge. Simply put, even assuming Defendants were correct regarding the adequacy of the information available in the marketplace with respect to subsequent statements, prior to February 2018 it appears that there was no information available for investors to calculate the new rates.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Fed. Sec. L. Rep. P 100,954

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.