UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

——————————————

David G. Lowthorp, et al.,      )
                                )  CV 20-00648-PHX-MTL
            Plaintiff,          )
                                )  Phoenix, Arizona
         vs.                    )  July 15, 2021
                                )  10:03 A.M.
Mesa Air Group, Inc. et al,     )
                                )
            Defendants.         )
——————————————————————————      )


BEFORE:   THE HONORABLE MICHAEL T. LIBURDI, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING


Official Court Reporter:
Barbara H. Stockford, CRR, RMR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 39
Phoenix, Arizona  85003-2151
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription


UNITED STATES DISTRICT COURT

A P P E A R A N C E S

For the Plaintiff:

Faruqi & Faruqi LLP
By: ROBERT W. KILLORIN, ESQ.
3975 Roswell Road, Suite A
Atlanta, GA  30342

Faruqi & Faruqi LLP
By: JAMES M. WILSON, JR., ESQ.
685 Third Avenue, 26th Floor
New York, NY  10017

DeConcini McDonald Yetwin & Lacy, P.C.
By: GARY F. URMAN, ESQ.
2525 East Broadway Boulevard, Suite 200
Tucson, AZ  85716

For the Defendants:

Wilson Sonsini Goodrich & Rosati, PC
By: NINA F. LOCKER, ESQ.
    DOUGLAS W. McMANAWAY, ESQ.
650 Page Mill Road
Palo Alto, CA  94304

Sacks Ricketts & Case, LLP
By: CYNTHIA A. RICKETTS, ESQ.
2800 North Central Avenue, Suite 1910
Phoenix, AZ  85004

Lewis Roca Rothgerber Christie LLP
By: JOHN C. GRAY, ESQ.
201 East Washington Street, Suite 1200
Phoenix, AZ  8585004

Shearman & Sterling LLP  (Teleponically)
By: AGNÈS DUNOGUÉ, ESQ.
    ROBERT LEWIS, ESQ.
599 Lexington Avenue
New York, NY  10022

UNITED  STATES  DISTRICT  COURT

THE COURTROOM DEPUTY:  This is Case No. CV20-648. Lowthorp versus Mesa Air Group, Incorporated, et al.  Before the Court for a motion hearing.

Counsel in the courtroom, please announce your presence for the record.

MR. KILLORIN:  Robert Killorin for lead plaintiff, with the law firm of Faruqi & Faruqi, with my partner James Wilson and my local counsel Gary Urman.  Good morning.

THE COURT:  Good morning.

MS. LOCKER:  Good morning, Your Honor.  Nina Locker from Wilson Sonsini Goodrich & Rosati on behalf of the Mesa defendants.  And with me is my colleague Doug McManaway on the phone also on behalf of the Mesa defendants and...

MS. RICKETTS:  Cindy Ricketts with Sacks Ricketts & Case.

THE COURT:  Thank you.

MR. GRAY:  Good morning, Your Honor.  John Gray with Lewis Roca on behalf of the underwriter defendants.  Also with me on the phone, we have Agnès Dunogué from the law firm of Shearman & Sterling and Robert Lewis, also with Shearman & Sterling, who has not made an appearance in this case.  He is listening in today.

THE COURT:  Okay.  Thank you, Counsel.  Nice to see all of you and welcome to all of you who are on the phone.

What I'd like to do is invite you to take off -- for

the lawyers who are presenting, if you want to come up to the -- when you come up to the podium, that is, you're welcome to take off your mask if you want, and the reason is -- is because it will be easier for me to hear you and understand you and I'm sure it would be easier for you to make your presentation.

I do want to begin by talking about the defendant's request for judicial notice.  So, Ms. Locker, when you come up, if you want to talk about that a little bit first and then you could get into the merits of your motion.

And also, both of you, just be aware I have an 11:00 hearing; so we have a hard stop around that time.  So please use your time judiciously.

MS. LOCKER:  Okay.  Thank you, Your Honor.  And I was going to have Mr. McManaway address judicial notice if that's okay with the Court --

THE COURT:  Okay, that's fine.

MS. LOCKER:  -- in an effort to have younger attorneys have a chance to appear in court.

THE COURT:  That sounds good to me.  All right.

So, Mr. McManaway, do you want to give me a little bit of information about the -- I guess I would call it the judicial notice and incorporation by reference requests?

MR. MC MANAWAY:  Yes.  Thank you, Your Honor.

The securities class actions focus on whether the

UNITED STATES DISTRICT COURT

statement is misleading. And the Supreme Court and Ninth Circuit have both said this requires that challenged statements be reviewed in their full context. The Supreme Court decision of *Omnicare* and the Ninth Circuit decision in *Khoja v. Orexigen* make this plain.

So, consistent with these principles, the Ninth Circuit requires the Court to consider the entire contents of documents and statements that plaintiff relies on in its complaint, not just the portion it selectively quoted. And *Orexigen* also permits the Court to take judicial notice of information not subject to reasonable dispute.

So we're asking for the Court to take judicial notice and incorporate by reference Mesa's SEC filings all of which are judicially noticeable under *Orexigen* and are ostensibly quoted by plaintiff and are, therefore, incorporated by reference.

We're also asking for judicial notice of the earnings call transcripts which the Ninth Circuit held in *Orexigen* that courts can take judicial notice of these transcripts because an investor-called transcript generally qualifies as a source whose accuracy cannot be reasonably questioned. And these transcripts are also extensively quoted by plaintiff and are incorporated by reference. We're providing them to show their full and accurate context.

Mesa defendants also request judicial notice of

Department of Transportation bulletins documenting the collapse of the airline industry due to the pandemic.  Just last year, a California district court took judicial notice of the Department of Transportation public records related to the impact of COVID on the airline industry.  These facts are not and cannot be disputed by plaintiff.  It's specious to suggest otherwise.

And, lastly, we're requesting judicial notice of a news article describing the FAA's report of an industry-wide GPS malfunction in 2019, and the Ninth Circuit has taken judicial notice of facts in a newspaper article holding that such facts would be capable of a sufficiently accurate and ready determination.

THE COURT:  Okay.  What do you make of the plaintiffs' response that they don't oppose this request, but they don't want the Court to accept the material in the documents as true.

MR. MC MANAWAY:  We're asking the Court to consider all the contents of the documents.  So I don't think there's a big gap here between plaintiffs and defendants on this point. We -- *Orexigen* --

THE COURT:  Are you there?

MR. MC MANAWAY:  I'm here.  Sorry.  I stumbled a bit on my words, Your Honor.

*Orexigen* is -- requires us to prevent plaintiffs from engaging in artful pleadings, not selecting only portions of

documents that support their claims while omitting portions of documents that weaken or doom their claims. That's what we're asking the Court to do here.

As for the Department of Transportation bulletin and the news article, we would say that the Court take judicial notice of the truth of these mostly because they cannot be reasonably disputed, particularly the Department of Transportation bulletin.

The plaintiffs rely on the case *McGhee v. City of Flagstaff* which is completely distinguishable. First, *McGhee* actually acknowledged that courts can take judicial notice of statistics compiled and released by government agencies. And *McGhee* declined to take judicial notice of certain COVID-19 statistics at the early stages of the pandemic because, in April 2020, the testing capabilities of assessing how infectious and lethal the virus was were constantly changing. Here, the bulletin is discussing air traffic downturn at the outset of the pandemic which can't be reasonably questioned. People stopped flying.

THE COURT: Okay, okay. Thank you.

MS. LOCKER: Your Honor, if I might just add one thing to the judicial notice before I start the argument. It is a delicate balance. And there's no question, Your Honor, that, with respect to matters that are subject to judicial notice -- for example, the bulletin regarding the impact of COVID on the

airline industry, that can be taken for the truth of the matter asserted.  With respect to other materials such as transcripts, it is a delicate balance and I think the best way to discuss it is a concrete example.  Take the example that the allegation that Mesa had one spare airplane at the time of the IPO.  That comes from the registration statement.  The defendants refer the Court to an earnings transcript to say that Mr. Ornstein, Mesa's CEO, said on a call that Mesa had, in fact, three spare aircraft under the American CPA.  The Court doesn't need to take that for the truth of the matter asserted.  But it raises a question and then is confirmed by looking at another disclosure, Exhibit 4, Page 6, which is the actual American CPA which talks about spares assigned under the CPA as opposed to unassigned, one unassigned airplane.  And when you put all that together, it makes the allegation that the company only had one spare plane at the time of its IPO speculative, not credible.

And so, yes, you're looking at -- the question is whether plaintiffs are, in fact, basing an allegation only on a portion of the company's disclosures and misreading -- right? -- misreading, saying I'm going to ignore spare airplanes assigned under the CPA, which is discussed in an exhibit that was an exhibit to the prospectus, the registration statement on which I, plaintiff, am bringing my claim, and I'm only going to talk about one line in the prospectus.  And so it is a delicate balance as to whether or not you are looking at the materials

incorporated by reference into the complaint for determining whether plaintiffs are mischaracterizing the disclosures on which they are basing their claim, if that makes sense.

THE COURT:  It does.  Thank you.

MS. LOCKER:  Thank you, Your Honor.

THE COURT:  So why don't you go ahead and proceed with your merits.

And then, Mr. Killorin -- did I pronounce that right?

MR. KILLORIN:  That's correct, Your Honor.

THE COURT:  Okay.  Then you can go ahead and address your response to both the judicial notice, incorporation by reference, and then the merits when it's your turn, okay.

MR. KILLORIN:  Thank you, Your Honor.

THE COURT:  Go ahead, please.

MS. LOCKER:  Thank you, Your Honor.

Plaintiffs' claim that Mesa's prospectus contained false and misleading statements, the challenged statements, relate to the following topics:  Mesa's historical operational performance leading up to the IPO; Mesa's CPA particularly with American; and Mesa's maintenance personnel and outsourced heavy maintenance contracts.  Plaintiffs also claim that the prospectus should have disclosed that Mesa didn't have an adequate number of spare planes which I just talked about.

As set forth in our papers, the claim fails for many reasons.  First, many of the statements that plaintiffs

challenge are vague, statements of general optimism that are, therefore, immaterial as a matter of law.  Many of the challenged statements are also forward-looking that are immunized under the bespeaks caution doctrine.  Third, none of plaintiffs' claims are plausible on their face.  When the Court disregards the allegations that are based on unreasonable inferences or that are contradicted by matters deemed part of the complaint, they are devoid of well-pled allegations and, therefore, fall under *Twombly* and *Iqbal* which I know the Court is very familiar with from prior orders.  And then, finally, vast majorities of the claims are barred by the statute of limitations.

And I'd like to address the last two points, the plausibility standard and statute of limitations standard.

THE COURT:  Just so we're on the same page, Ms. Locker, I understand these arguments to be independent arguments; is that correct?

MS. LOCKER:  That is correct, Your Honor.

THE COURT:  So that means, for example, if you win on statute of limitations, then there's -- then it doesn't matter if you don't win on something else.  Do you agree with that?

MS. LOCKER:  Yes, Your Honor.

THE COURT:  All right.  Go ahead.

MS. LOCKER:  So, with respect to Mesa's statement in its prospectus that it believed that its record of operational

performance was strong, I refer the Court to Paragraph 44 of the complaint.  In Paragraph 44 of the complaint, plaintiff acknowledges that the term "operational performance" is a term of art in the airline industry and refers to specific metrics such as on-time performance and completion of flights.

And plaintiff -- what's interesting is plaintiff doesn't dispute any of the facts that Mesa put in the prospectus to support its statement that its operational performance -- its track record of operational performance was strong.  In particular -- and that's on Page 4 of the prospectus which is Exhibit 1.  On -- in particular, plaintiffs don't dispute that Mesa was ranked number one regional airline for on-time performance by the Department of Transportation in three of the first four months of 2018.  Again, the time period that's important here in testing the accuracy -- the accuracy of the challenged statements is at the time of the IPO which is August of 2018.

Plaintiff also doesn't dispute the other disclosure that supported this statement which is that Mesa was the number one regional airline for on-time performance in both 2016 and 2017.  So that takes care of the time period leading up to the IPO.

Plaintiff doesn't even dispute the facts in Mesa's other disclosures regarding its strong operational performance with respect to these metrics following the IPO up until that

May/June time period in 2019 when things started to fall apart. And that's at Exhibit 12 at Page 5 that relates to the quarter ending March 31, 2019, and Exhibit 7 at Page 5 which relates to the month of April, under the new CPA amendment.

THE COURT:  You're referring to complaint exhibits or exhibits to your motion to dismiss?

MS. LOCKER:  I apologize, Your Honor.  It's exhibits to Mr. Stanley's declaration.

THE COURT:  I see.  Thank you.

MS. LOCKER:  Yes, thank you very much.

So that takes care of the time period after the IPO.

And plaintiff doesn't even dispute that, in that May/June 2009 time period, Mesa experienced a confluence of unseen and quite unfortunate events:  one plane damaged on the ground; two planes stuck at Bombardier because of a labor shortage, that heavy maintenance provider --

THE COURT:  I've always wondered how you pronounce that.  So thank you --

MS. LOCKER:  I was corrected, Your Honor.

THE COURT:  Oh, you were?

MS. LOCKER:  I mispronounced it the first time and my client said "You need to pronounce that correctly."

THE COURT:  Okay, you solved the 20-year riddle for me.  Go ahead.

MS. LOCKER:  -- unusual weather; severe weather; and

then the GPS glitch.  In plaintiffs' own words -- and this is on Page 3 of their opposition -- quote, "Defendants argue that Mesa suffered from some unfortunate events.  That is true."  Unquote.

It doesn't even seem that plaintiffs really dispute that it was those events, those unfortunate events, that caused Mesa's operational performance to fall and, in fact, to fall below the new stricter performance criteria in the CPA amendment.

Nevertheless, plaintiff claims that the description in the prospectus of Mesa's operational performance being strong was false and they base this on a statement by Mr. Ornstein in the February 2019 earnings call.  And that is Exhibit 4, Your Honor.  And, in that call, Mr. Ornstein, according to plaintiffs, admitted that, prior to the IPO, Mesa's performance levels were, quote, "far below industry standards."  This is simply an implausible interpretation.  Indeed, it's a distortion of what Mr. Ornstein said.

The transcript of the hearing makes abundantly clear that, when Mr. Ornstein was referring to "well below industry standards" with respect to operational performance, he was referring to the criteria in the party's 17-year-old CPA.  He was not referring to Mesa's actual performance.  And this is exactly what incorporation by reference is supposed to take care of, to make sure that plaintiffs are not allowed to plead

a claim based on a mischaracterization of a disclosure.  And so I urge the Court to look at that February earnings call and really see what Mr. Ornstein said.

So, other than this distortion, there are no well-pled facts in the complaint that support plaintiffs' claim that Mesa's record of operational performance -- and we're talking about metrics such as completion of flights, on-time performance -- was not strong prior to the IPO.  So that's -- that's the *Twombly/Iqbal* argument.  This claim also is barred by the statute of limitations.

All of the information on which plaintiffs base their claim was disclosed in that February 2019 earnings transcript.

THE COURT:  Let me understand this.  I want to be precise on this.  So the prospectus was issued -- tell me when it was issued again.  Was it August of 2019?

MS. LOCKER:  August of 2018, I believe, is the 14th or the 18th.

THE COURT:  Okay.  So the conference call occurred on February -- in February of 2019?

MS. LOCKER:  Yes, Your Honor.

THE COURT:  So I don't think you dispute that the -- that the discovery rule applies such that the plaintiffs couldn't have known that -- if there was a material misrepresentation in the prospectus, they couldn't have known that until there was some other event that would lead them to

UNITED STATES DISTRICT COURT

believe that there was a misrepresentation; is that right?

MS. LOCKER:  The event is the February earnings call.

THE COURT:  Right, and so --

MS. LOCKER:  Right, yes, Your Honor.

THE COURT:  That's where I'm going.  So you would agree that that was the precipitating event?

MS. LOCKER:  Yes, Your Honor.

THE COURT:  Okay.  But then I think your argument is then they had to file their lawsuit by February of 2020; is that correct?

MS. LOCKER:  Yes, Your Honor.

THE COURT:  So, with that, go right ahead.

MS. LOCKER:  Okay.  So, according to plaintiffs, Mr. Ornstein admitted on the February call that, prior to the IPO, Mesa's performance was significantly below industry standards.  That's all the information they needed in order to claim that the statement and representation in the prospectus was false.  That is what their claim is based on.  It's all the information they needed to discover to bring their claim.  And it's a simple statute-of-limitations analysis for that claim -- for all the claims, but for that claim.

I'd like to now turn to Mesa's statement characterizing the American -- well, both CPAs, but we're focused on the American CPA -- as a stable, long term and revenue guaranteeing agreement.

THE COURT:  And just so you know, I think I could give you 10 more minutes and then we'll have to switch over --

MS. LOCKER:  Okay.

THE COURT:  -- to plaintiffs' counsel.  And my 11:00 is a Rule 16; so I might be able to push that a little bit without irritating those lawyers.

MS. LOCKER:  Okay.

THE COURT:  But I just wanted to give you that heads-up.

MS. LOCKER:  Okay, thank you, Your Honor.

So this claim also doesn't satisfy *Twombly* and *Iqbal* and is also barred by the statute of limitations.  Plaintiff has disavowed, at Page 11 of its opposition, that it's basing its claim on the argument that the description of the CPA as stable, long term and revenue guaranteed meant that the terms could not or would not change.  Their entire claim is based on their argument that, at the time of the IPO, the parties were actually negotiating and renegotiating the terms of the CPA for the amendment leading to the more strict performance criteria.

And I would refer the Court to Paragraph 10 of the complaint, the opposition at 2, the opposition at 10 and the opposition at 11.  I'll just make one quick quote.  Plaintiffs argue that the description of the American CPA was false because the performance criteria, quote, "were already being negotiated."  American had, quote, "initiated negotiations."

So putting aside the question of whether there's a duty to disclose ongoing negotiations before the outcome is known and there is not -- let's put that aside for the moment. The question is:  Are there any well-pled allegations that there were actual negotiations going on about that CPA amendment that ended up leading to the enhanced, significantly higher performance criteria?  And the answer is no.  Again, plaintiffs' allegation is based on a mischaracterization of Mr. Ornstein's statement in that February 2019 earnings call. What Mr. Ornstein said was:  American talked to us about raising our performance levels in the CPA.  And he was referring to about six months prior to the IPO.  That's it.

THE COURT:  Um-hmm.

MS. LOCKER:  That is not that negotiations were ongoing.  It simply is not.  And other than this distortion of Mr. Ornstein's statement saying that American had expressed its frustration with being bound to criteria, because you know there's incentives built into performance criteria, that it was frustrated six months prior to the IPO -- that's all he said. That is not ongoing negotiations at the time of the IPO.  So there's no well-pled allegations.  The claims should be dismissed.

And I would refer the Court to -- and I won't describe it because I might run out of time, but it's the case that's on all fours.  It's the *In re HEXO Securities Litigation* case out

of the Southern District of New York.  The case was decided after the motion to dismiss was fully briefed.

THE COURT:  You had provided me with supplemental authority.

MS. LOCKER:  Yes, Your Honor.

THE COURT:  I read all the cases that you -- and plaintiffs provided me with some as well.

MS. LOCKER:  Okay.  This claim is also time barred because, again, the information on which plaintiff bases his claim was disclosed in that conference call.  Now -- and it should be obvious from my description that the claim is based on a distortion, but, nevertheless, Mr. Ornstein's statement during that February call.

Plaintiff's only response is that the January 31 press release that Mesa issued, the 8-K that it issued which is Exhibit 4, in setting forth the terms of the term sheet in the amendment, was not sufficient to put plaintiffs on notice that the criteria, the performance criteria in the amendment, were going to be substantially higher and that they couldn't learn that until later in the year, December of 2019, when the company filed with the SEC the actual agreement.  That's their argument and their opposition.  But their own complaint refutes that.  And I would urge the Court to compare Paragraph 92 of the complaint and Paragraph 78(G) of the complaint.  92 of the complaint -- Paragraph 92 of the complaint is what plaintiff

says it learned regarding the key terms of that CPA amendment on January 31 from the 8-K.

Paragraph 78 of the complaint is what plaintiff alleges it learned about the key terms from the actual executed agreement that was made public later that year, attached to the company's 10-K in December of 2019. And, guess what, they're identical. So plaintiff didn't learn anything new in December of 2019. Those allegations are word-for-word identical. So it's not possible that their argument that they learned something new in December is credible.

Moreover, in that February 2019 earnings call, Mr. Ornstein himself, according to plaintiffs, put plaintiff on notice of exactly what they're saying was not disclosed until later that year. Mr. Ornstein said -- and this the Exhibit 6 at Page 6 and 12 again to Mr. Stanley's declaration. He said that the amendment was raising the -- was raising to current standards the performance criteria in the old 17-year-old CPA. And he characterized those criteria in the old CPA as, quote, "far" and, quote, "significantly below current standards."

This is -- I mean, this is the same thing as plaintiff's allegation that the new criteria was substantially stricter. There's no difference between "far below" and "substantially below" and, in plaintiff's words, "substantially stricter." So everything they base their claims on was disclosed more than a year before they filed suit.

UNITED STATES DISTRICT COURT

I have one last statement I was hoping to address.

THE COURT:  Go right ahead.

MS. LOCKER:  Okay.  Thank you, Your Honor.

I'd like to address plaintiffs' claim that the registration statement was misleading because it failed to disclose that the company lacked an adequate maintenance personnel, in-house maintenance personnel, and that it didn't have reliable outsourced contracts for heavy maintenance.

Let me start with the latter, Your Honor, because that's quite easy.

For some reason, my mouth is getting dry in here and I'm not even wearing a mask.

THE COURT:  Do you need some water?

MS. LOCKER:  I just did.  Thank you, Your Honor.

So, plaintiffs allege the registration statement with respect to outsourced contracts for heavy maintenance -- the prospectus said that Mesa believed that its long term agreements with third-party vendors for parts procurement and heavy maintenance would provide, quote, "predictable high quality and cost-effective solutions for most maintenance categories over the next several years."  The complaint doesn't contain a single allegation regarding Mesa's third-party maintenance contracts at the time of the IPO.  The only allegation in the complaint relating to Mesa's third-party maintenance contractors relates to Bombardier nine months after

the IPO and the labor shortage that Bombardier was experiencing which basically delayed the return of two of Mesa's spare planes.  It says nothing about what the state of these contracts was or why Mesa did not reasonably believe that they would provide reliable and cost-efficient maintenance going forward in August of 2018.

The other part of the statement in the registration statement that plaintiffs challenge -- the only statement is Mesa's statement in the prospectus that its future success depended on its ability to hire and retain qualified personnel including maintenance personnel.  And plaintiffs allege this was false because Mesa had a -- was significantly understaffed in maintenance personnel at the time of the IPO.  They don't dispute that Mesa -- Mesa's disclosure that it had 411 mechanics.  They don't dispute that the maintenance program -- in-house maintenance program was FDA approved.  All of this is in the prospectus.  But again, what is this claim based on?  Its another *Iqbal/Twombly* problem.  The claim is based on another distortion of Mr. Ornstein's statement made in earnings call, this one in the May 2019 earnings call which is Exhibit 12 to Mr. Stanley's declaration.

What Mr. Ornstein said was:  "Last year" -- so he's talking in May of 2019 -- "Last year, 18 months ago, I mean, we were hamstrung by the fact that we had expanded a lot.  We needed more pilots.  We got hung up a little bit in training."

Talking about training for pilots.  "Maintenance became more difficult in terms of qualified maintenance people."

So what Mr. Ornstein said was there's a pilot shortage.  We need more pilots.  That was disclosed throughout the registration statement -- 19 and 20, 41, 95, 99 to 100.  That pilot shortage was prominently disclosed in the registration statement.  But Mr. Ornstein did not say that there was a shortage of maintenance personnel and he most certainly did not say that Mesa's in-house maintenance program was significantly understaffed.  There's a difference between having difficulty with qualified maintenance people and saying that the program is significantly understaffed because little difficulties don't need to be disclosed.  Shortages and being significantly understaffed might -- if you can find a statement that's rendered in pleadings from it -- might need to be disclosed.

The only other fact that plaintiffs allege in the entire complaint about a supposed shortage of maintenance personnel is a conclusory allegation by CW1 -- this is in Paragraph 114 -- saying there had been shortages of qualified mechanics in Dallas.

The problem with CW1's allegations, however, Your Honor, is twofold.  One is Dallas is one location and there's -- and we've cited many cases indicating that CW's statements regarding one geographic location does not bear on

the status or state of affairs company-wide.  So the fact that there was, according to CW1, a shortage in Dallas doesn't tell you what is the company story company-wide, its entire maintenance program.

Two, and more important, is CW1 was -- began working at Mesa three years -- and this is Paragraph 112 -- three years before the IPO and left one year after.  And his allegation that there was a shortage of qualified mechanics in Dallas is wholly untethered in time.  We have no idea when it happened --

THE COURT:  That could have been in Year 1 or Year 3.

MS. LOCKER:  One day, one week, one month, five months.  You have no idea.  But it certainly is not sufficient to say that there was a company-wide shortage leading into the IPO.

THE COURT:  Okay.

MS. LOCKER:  And, with that, Your Honor, I'm happy to answer any questions or to sit.  I know I've taken up time.

THE COURT:  I might have a list of questions for you on rebuttal, but thank you, Ms. Locker.

MS. LOCKER:  Thank you, Your Honor.

THE COURT:  Mr. Killorin?

MR. KILLORIN:  Thank you, Your Honor.

THE COURT:  And make sure you bring up some water in case you need it.

MR. KILLORIN:  That's a good idea.  Thank you.

May it please the Court --

THE COURT:  If you feel comfortable, you can take off your mask.

MR. KILLORIN:  Thank you.  I would very much appreciate that.  Thank you.

Your Honor, just quickly if I may address the last point she made and get back to judicial notice.  She said, basically, that the statements about staffing didn't rise to the level that they should have been disclosed.  But, as she said, all of this has to be taken in context.  The shortages on maintenance and pilots was in the context of the CEO and chairman saying "We were hamstrung by that fact."  We're not just saying little snippets may have been inaccurate or should have been disclosed.  We're saying that the statement taken in context like "we were hamstrung by this problem" should have been disclosed to investors.

In these Section 11 cases, a single misstatement is actionable.  So, for example, in *Omnicare*, there were two alleged misstatements of opinion and that is all the Court addressed in the whole opinion.  And, as I understand the law, if either one of those statements of opinion was inaccurate, then a claim would survive a motion to dismiss.

In this case, there are not a lot, but there are a number of separate claims of misstatement we've alleged and only one of them is arguably subject to a statute of

UNITED STATES DISTRICT COURT

limitations.  So we couldn't disagree more that, if that one claim were to fall to a statute-of-limitations problem, which we believe it does not, if the other claims -- the other alleged false statements, which we will go into in detail, they would support independent Section 11 claims for misrepresentation.

The other thing I would like to say, generally, is this is not a motion for summary judgment.  This is one of the strongest Section 11 cases I've ever seen.  And so I believe their only option is to try to convert it into a motion for summary judgment because the statements that were revealed after the IPO are clearly statements that show the IPO was misleading and incomplete.  And that is -- that is the standard for Section 11.  It's that it has to be a complete and fair statement to put a reasonable investor on notice of what is being claimed without any misleading omissions.  And so this case is riddled -- well, not riddled, but there were several major misleading omissions that give each of these claims legs and we think clearly survive a motion to dismiss.

Now, going back to judicial notice, I agree with what Ms. Locker's partner said.  It's true we are not that far apart from them on the judicial notice issue.  We certainly believe -- understand the law says all of these statements have to be taken in context.  We at our firm are very careful to avoid that problem of puzzle pleading or taking snippets in a

misleading way.  We have quoted all of these quotes in their entirety in the full paragraph in which they occurred; so there's no issue of misconstruing what defendant Ornstein said. The full statements are quoted.

We have no objection to the Court putting the conference call transcripts into the record.  We have no objection to the Court taking judicial notice of SEC filings. That's all fine.  Context is just fine.  The context does nothing to weaken our claims.

If a person buys a horse or a truck or shares of a stock, there are million true statements about the fact of how the horse has been performing, how the truck has been running profitably and on time, none of which would spare the seller from a claim of misrepresentation by omission if the seller knew that there was some inherent problem with the truck or the horse or whatever is being sold that they did not disclose that they had a duty to disclose to make all the true statements not misleading.  That's what we're dealing with in this case.

THE COURT:  I think I understand both of your positions on that.

MR. KILLORIN:  Okay.  Thank you, Your Honor.

And so taking the allegations as true, once the statement -- the first statement that is absolutely not vulnerable to a statute-of-limitations attack was made on May 10th.  The complaint in this case was filed March 24, 2020.

On May 10, 2019, well within a year of the complaint, defendant Ornstein -- and I'm just going to quote the whole thing because they seem to be -- this whole context is an issue. So let me read the statement that he revealed to investors and you can ask -- and the question for you as a judge to decide, I believe, is would this have been material to a reasonable investor? Would this -- assuming this is true -- and we've alleged it is; so we believe it has to be taken as true. We think it's a good allegation. If this is true, would a reasonable investor have considered this material before deciding to purchase Mesa stock? Mesa stock which, by the way, lost over 50 percent of its value well before COVID ever came to be.

And, actually, going back to judicial notice, that is one reason we think that none of the facts in articles or in government filings that they are trying to use to treat this like a motion for summary judgment -- none of those facts should be taken as true because we don't have an opportunity to rebut those facts, and it changes the nature of the entire case. We think that the Court should look at the pleadings as pled, certainly take everything in context that needs to be taken in context. But additional facts to try to build their rebuttal case we don't think the Court should consider. And particularly on the COVID issue, it's not particularly germane because, before COVID -- months before COVID ever happened,

this company had lost over 50 percent of its value.  But be that -- they want you to take judicial notice on the effect of COVID on the airline industry.  Yes, you know, I'm sure those are things that could be argued and considered, but that's inappropriate on a motion-to-dismiss stage in our opinion.

So the statement -- the first statement that is immune to statute of limitations attacks by Ornstein is -- and to be considered by the Court, would a reasonable investor have considered this material and would they have considered the prospectus and registration statement misleading because of the omission of this statement:  "We knew that, in the last year, 18 months, I mean, we were hamstrung by the fact that we had expanded a lot.  We needed more pilots.  We got hung up a little bit in pilot training.  Maintenance became more difficult in terms of qualified maintenance people.  And we're just sort of finally putting all that together"?  There's no out of context.  That's simply a statement he made.  And to the fact that it has maybe bits of truth in it, that's not the point.  The point is the entire statement, the emphasis he puts on it, the extra truth revealed by his exact choice of words meaning whatever they mean in English to a reasonable investor, that's the question.  Would this statement -- "We knew that in the last year, 18 months, I mean, we were hamstrung." -- I think a reasonable investor would clearly have wanted to know that before putting their money down on Mesa stock.  They

didn't know that the CEO and chairman of the company considered the company to have problems that it considered being hamstrung.  That's like, well, we knew the horse was colicky for two years before we sold it to you, but it was pretty good on the day we sold it to you.  And everything we said about how fast the horse could run, that's true, that's fine.  You didn't reveal endemic health problems with the animal that only you would know.

And only the internal people at Mesa would know if they were being hamstrung by these problems and if that's a fair characterization.  Clearly, we allege that defendant Ornstein thought it was a fair characterization and that investors had a right to know it in his words, the way he put it or whatever it means in plain English as would be interpreted by a reasonable investor.  So that's one statement.

And, you know, in the case we cited, the *Kuhne* case, there was only one misstatement.  The company said it expects results for its interim analysis to be revealed.  And the Court -- let's see -- expected the results for this interim analysis to be available in the first half of 2020.  Well, that turned out to be a false statement.  The company had chosen to not reveal those results.  That, in itself, was an actionable Section 11 claim.

The point is investors are entitled to full and fair disclosure of what's going on.  And it was the same thing in

the *DynaGlas* case and this sort of bears on this case.  The company said that the new charter contract was a direct continuation of the old contract, but it didn't give the details of the contract.  Well, in this case, with the American Airlines contract, they didn't give the details.  They reduced to a single bullet point "We've got new operational requirements."  That bullet point actually represented 18 pages, which is in the record, of detailed, austere -- crushing, in our opinion -- performance requirements that, when things started to go a little bad, the company couldn't meet and led to a more precipitous stock drop than would have happened if the company had been in solid shape and if those contracts had not been radically redone.  The company actually offered -- it said it was going to produce the details of those new terms within a few months of the first announcement.

Let me get the dates.  So the company said, on February 5th, that we have a new contract with American.  And it said we are going to publish the terms to you in our next quarterly filing.  Guess what.  The company didn't publish them.  Once you see them published almost a year later, you would know why.  It's 18 pages of detailed, difficult, austere standards that was the huge explanation why the company was doing so bad, of why it faltered so severely when things started to go wrong.  Yes, the company had some difficulties.  The horse tripped on the racetrack, but the horse didn't need

an escort to fall and knock itself out but for the fact the horse had health problems.  And they didn't reveal the severity of the 18 pages of extra contract terms until just a few months before this complaint was filed.

So, in our opinion -- and the statute of limitations was not triggered until they actually revealed the terms of the contract.  And it's not the same point -- in the *DynaGlas* case, that was -- failure to reveal the full terms of the contract was its own Section 11 case.  In this case, the failure to reveal the terms of the contract is simply what makes the statements about it actionable and not barred by the statute of limitations.  So that's the second claim.

But the third statement I want to talk about is another one that is immune from statute of limitations challenges.  So, again, we couldn't disagree with her statement more there that the statute of limitations bars anything and the entire complaint fails.  In our opinion, it's very clear that this following statement -- again, I'll read in its entirety in context -- which was made within a year of the filing of the complaint, could not be barred by the statute of limitations and is a statement that shows a material omission from the prospectus.  Defendant Ornstein said, "We had three spares historically with American.  There was literally years of discussion in regard to what was the adequate spare count versus other operators, okay.  I was a very strong advocate

that Mesa was being disadvantaged because we did not have the adequate spare count."  That's the CEO of Mesa making this statement well after the IPO and something that was not disclosed to investors at the time they were asked to put their money down.  Just another -- the horse had hoof rot, whatever.  They didn't tell investors the full story of what was going on with that company.  Our CWs have indicated that behind the scenes --

THE COURT:  Before you get into that, could you flesh out the spare aircraft for me just a bit?

MR. KILLORIN:  Sure, I can, Your Honor, and --

THE COURT:  Let me ask my question --

MR. KILLORIN:  Sure.

THE COURT:  -- or just tell you what I'm thinking.  I can't really tell the difference if there was one operational spare or three operational spares or some -- or some other number.  So could you just help me through that?

MR. KILLORIN:  I can do -- I can go as far as I can go which is, in the prospectus, it said that there was one -- one plane that was not on the roster with American that was being kept as a spare.  And then the number of spares -- the way that the agreement with American went was -- and the number of spares changed, but if I could just step back and tell you my understanding of the operation, and I could be corrected, but, if the contract with American was a sweetheart deal -- again,

investors were not told it was 17 years out of date and that it did not require Mesa to perform anywhere near currently-accepted industry standards.  That is why talk of a new -- American wanting a new deal on performance would have been a huge deal to investors, but that was withheld from the investors in this IPO.  That got jump-started as soon as the IPO had finished and Mesa had raised $115 million at $12 a share and our client lost $360,000 by buying into that IPO.  By the way, that's -- while I'm on the subject, on the standing issue, they don't question our Section 11 standing for the Section 11 claim and we believe that our Section 12 which was purchasing on the day of the IPO over 30,000 shares of stock.

THE COURT:  I have a few questions about that as well because it's not clear to me the status of the defendants, if they qualify as sellers for the statute.

MR. KILLORIN:  Right.

THE COURT:  And then also your complaint alleges that the purchase of either all the shares or some of the shares are traceable --

MR. KILLORIN:  Right.

THE COURT:  -- to the underwriter defenses --

MR. KILLORIN:  Your Honor, I've got to apologize.  I'm sort of trying to speed things up here.

THE COURT:  Ten minutes.

MR. KILLORIN:  Great, great.

So on the shares issue first, Section 11 requires tracing.  You have to show that you are a purchaser of IPO shares that trace back to the IPO.  Defendants don't challenge that we meet that tracing requirement for our Section 11 claims, which is the bulk of this case is the Section 11 claims.

The Section 12 claims for which I think the primary remedy is rescissionary damages is also there, but that's the only claims where they challenge standing.  On those claims, the question is was Mesa -- did it qualify as an active seller?  Was it active enough in the solicitation of the sales of shares if we don't allege that we bought directly from Mesa?  And our complaint, despite their, what we consider, inaccurate characterization of it, goes through all -- lists all the items which -- which would make -- let's see.  I've got them right here.

Pardon me.  Let me turn to the list.

Our complaint fully alleges that the defendant signed the registration statements, solicited the investing public, hired and assisted the underwriters, planned and contributed to the IPO and registration statement, attended road shows and promotions to meet with present favorable -- to present favorable information to potential investors, all motivated by their company's financial interest.  Section -- Paragraph 30 -- and that's all -- Paragraph 32 of the complaint.

Paragraph 30 alleges each individual defendant reviewed, contributed to and signed or authorized the signing and issuance of the registration statement.

And then, finally, Paragraph 139:  Defendants promoted, solicited and sold the company's securities to lead plaintiff and other members of the class.

So we believe that those pleadings, under the case law, are more than adequate to allege standing for Section 12 purposes.  And as I say, for Section 11, standing is not challenged.

THE COURT:  Okay, thank you.

MR. KILLORIN:  So, now, going on to the third -- the third claim that I just read, again -- let's see.  This was on August 12th.  And the spare count changed, I believe, during this operative period.  And the way it worked is, when the company performed poorly under the operating agreement, under the contract, when -- there was a very, very rigorous, complex set of analytics.  If planes sat too long on the tarmac, if planes' push-back time was off so many minutes, you would be docked -- you know, penalized this much.  You know, if flights were delayed, this kind of thing.  Very complex system of procedural accomplishments that Mesa had to meet and, when it didn't meet those, then the penalty was that planes that were under the contract with American got pulled, dropped from that contract.  So the less planes under contract Mesa had with

American, the less money it would make and the less money American would pay.  Although they still had a duty as an airline to meet all these different burdens, but they were going to have to meet them with more spare aircraft that they were paying for and less aircraft under contract that American was paying for.  And that number simply fluctuated during this period.  Like if a plane got damaged by being hit by a food truck, all of a sudden that plane was out from the contract and a spare would have to make up for it.  And then the number of spares in relation to the number of active planes would go up, but it was a moving target on spares.  That -- I don't have the details of, day by day, how many spares were in operation.

THE COURT:  Okay, thank you.

MR. KILLORIN:  But the point is, the spares -- the spare -- the number of aircraft Mesa reported as total number of aircraft, its total inventory and the profit centers were the planes that were under contract with American.  And the big thing they touted was, basically, we've got this wonderful deal with American, guaranteed income, stable, long-term contract that's been making lots of money.  The fact that that contract was at risk, the fact that that contract was -- the discussions had already started about changing that contract and the fact that Mesa knew that contract was far behind in outdated industry standards and that a big upgrade was coming is, again, all things that would have been critical to investors to know

instead of just hearing "Oh, we're making lots of profits and we have these wonderful long-term, stable contracts." That's all investors got to know at the time they put their money down.

So we believe those claims, which were fully revealed only near the time of the complaint when this 18 pages of detailed, rigorous requirements -- all they revealed at the beginning of the year was a bullet point that said -- hold a second. I hate to waste my time flipping pages, but I would like to give Your Honor the benefit of the one bullet point that represented 18 pages: "The parties agreed to new and revised operational performance criteria under the American CPA which, if exceeded, will result in the payment of additional incentive compensation to Mesa and, if not met, could result in up to six additional aircraft being removed from the American CPA."

So those would be profit center aircraft pulled from the CPA, no longer part of the profit center because of poor performance. And there's no way for an investor to know what the criteria was until within a few months of our complaint when 18 pages of detailed requirements were finally published even though Mesa had promised they would release that information two or three quarters earlier.

THE COURT: What's your specific response to Ms. Locker's argument that her client didn't have to negotiate

or didn't have to disclose the fact that they were renegotiating the CPA?

MR. KILLORIN:  Right.  Well, I think that, under general SEC law, there is no generic requirement to disclose it.  Again, to use their terms, it's all has to be disclosed in context.  And once you say "We have long-term, stable contracts with American generating all this money," that triggers a duty to disclose to avoid being misleading.  So, yeah, it's like, to me, that's a red herring argument.

THE COURT:  So your client's position then is, since Mesa made the statement that it had a stable, long-term contract, referring to the CPA, the law then required that it supplement that statement with something to the effect of "yet this agreement is in the process of being renegotiated"?

MR. KILLORIN:  No, that's not -- exactly what I'm saying is they had a duty, when the new contract was in place, to disclose that -- the terms of that contract and, yes, during the IPO, they had a duty to tell Mesa investors that discussions were underway and that contract was now -- was -- was -- first, was 17 years out of date and American had approached them to discuss changing that contract.

THE COURT:  Okay.  Is it your position that the two statements concerning the CPA that you've identified in Paragraph 78 of the complaint -- and if you have that, you can go ahead and flip to it -- are material misstatements and that

Mesa Air's failure to disclose that American expressed a desire to revise the terms of the CPA -- are they both material omissions or are you saying that that second statement that I identified just provides context or factual support?

MR. KILLORIN:  Let me try to turn to that paragraph.

THE COURT:  Yeah, go ahead, Paragraph 78.

MR. KILLORIN:  I'm sorry.  I don't have that in front of me.  If you want to give me a second, I can fetch it.

THE COURT:  I think maybe you could just -- I just want to make sure I understand what you're arguing the material misstatements are.  And there was a -- according to plaintiffs, a failure to disclose that American, I'm going to quote, "expressed a desire to revise the terms of the CPA."  So do you feel like that is a material omission or does that just provide context?

MR. KILLORIN:  I think that statement in particular is more of a context-type of statement.

Your Honor, the statements that we contend -- we consider are material -- materially false are any statement regarding their low cost structure, their competitive cost structure, their stable, long-term agreements.  In other words, it's all of what might otherwise be considered puffery in the complaint, but it's undercut by hard facts that they didn't disclose that would reveal the truth of these claims of profitability, success, the health of the horse.  So it's

stable operating performance, on-time performance, maintenance efficiencies and strong training program, and even they went so far as to say "We have the potential to become a regional carrier for other airlines."

The IPO was nothing but rainbows and roses, but there was this ugly underbelly going on in the company which they simply chose to omit which is -- the temptation is always there.  And they got a handsome price, $12 a share, and, within a year, it was under 6.  So we think they didn't make enough disclosures.  We think all the positive statements about how great the company was doing were materially misleading because they didn't disclose all of the negatives about the problems the company knew about.

THE COURT:  Tell me a little bit about your position on the bespeaks caution doctrine.  So what I'm looking for, really, is how do you -- does your client avoid all of the language in the documents that warn investors about how -- how, you know, some of these statements are forward-looking statements and the statements may not hold up to market performance?

MR. KILLORIN:  Right.  Your Honor -- Your Honor, the bespeaks caution doctrine, according to Hazen, is -- revolves around the notion of projections and prognostication.  And what we are alleging is that hard statements of the company's current performance and immediate prospects and current

situation of the company are simply misleading because they are incomplete.  Bespeaks caution does nothing to save a claim that is inaccurate to a reasonable investor when made.  It simply -- I think the SEC law that -- Section 11, and cited in *Omnicare*, that the prospectus and registration statement have to give a full and fair assessment of what is happening simply trumps the bespeaks caution doctrine, the judicial doctrine regarding those cautionary statements.  And it comes down to the particulars, but a generic warning is never enough to save a material -- a material omission.

THE COURT:  So what you're saying is that, if a corporate representative or an offering document makes a statement that is either objectively false or that the speaker subjectively knew as false or, for whatever reason, is false, a company can't avoid liability simply by sticking a disclaimer in there?

MR. KILLORIN:  Absolutely, Your Honor.

THE COURT:  And then does that mean that that's a fact question?

MR. KILLORIN:  Does that mean --

THE COURT:  I think your answer to my first question is "yes."

MR. KILLORIN:  Yeah.

THE COURT:  And then my next question to you would be:  All right, well, maybe that's not the case.  Maybe there is a

legitimate bespeaks caution defense.

MR. KILLORIN:  I believe that would be a question of fact for the jury.  I believe that would go to the jury charges, frankly.

THE COURT:  Okay.

MR. KILLORIN:  I would say a lot of these statements, just the law is very clear.  They may be true as far as they go.  What makes them false is they don't go far enough.  The horse ran a great race yesterday.

THE COURT:  Okay.  You're not from New York originally?

MR. KILLORIN:  No, sir.  I'm --

THE COURT:  There are some clues that give that away.

[Laughter]

THE COURT:  Where are you from?

MR. KILLORIN:  I'm from Atlanta, Georgia, Your Honor.  Born and raised.

THE COURT:  Okay, all right.  Thank you.

So one final -- you do work in New York, though according to --

MR. KILLORIN:  I spend time in New York every few months, but I'm the Atlanta office of Faruqi & Faruqi.

THE COURT:  Okay, all right.  I was just pulling that off of your -- maybe I didn't look closely enough.

Okay.  Last question, I do want you to address the

defendant's criticisms of the confidential witnesses.

MR. KILLORIN:  Yeah.

THE COURT:  They take a pretty strong position on the confidential witnesses for various reasons.  I just want to make sure you have the opportunity to be responsive.

MR. KILLORIN:  Your Honor, in all candor, we hired investigators and that's what we got.  Because, as far as it goes, it's -- it's not the perfect set of CW statements.  We think they're credible.  We think everything they said is true.  We think it adds color to the description of the huge, endemic problems being hidden by the company as they tried to make things look pretty for the IPO.  But that's as far as it goes, Your Honor.  I'm not going to say it's more than it is.

THE COURT:  All right, thank you.

Okay, Ms. Locker.  Don't forget your water in case you need that.  You could go right ahead and -- you know, I'd like to give you five to seven minutes or so.  Go right ahead.  Jump into it as you see fit.  I might have a few questions for you also.

MS. LOCKER:  Thank you, Your Honor.  I'm going to try to go very efficiently.

With respect to spares, I would simply urge the Court to look at the statement at Exhibit 715 because counsel actually stopped in the middle, and that's why context is so important.  What Mr. Ornstein said was that "Given the enhanced

performance requirements of the CPA amendment, I was a very strong advocate that Mesa was being -- what's the right word? -- disadvantaged because we did not have the adequate spare count.  We put the two additional spares in."  He is talking about the amendment.  He's not talking about back in August of 2018.  The whole discussion is about putting in more spares into the amendment so the company could meet the new heightened criteria -- performance criteria.  That's the entire context.

With respect to -- the other thing on spares I would like to say, Your Honor, is -- no, I think that's it.  Sorry.

With respect to the claim that the characterization of the CPA -- American CPA as being long term, stable, and revenue guaranteed, I'm not sure I got a clear -- a full understanding of what the exact claim is, but I thought I heard that it's based on, yes, the process -- the whole process was being renegotiated.  And there's no well-pled allegations that support that claim.  There just aren't.  And I -- again, with respect to, for example, *In re Synchrony* case, the case that we cited, that case is also right on point because, in that case, the Court held that generally optimistic -- and this is going into a slightly different argument, but it's related -- a generally optimistic view of the state of business partnerships and the synergies of Synchrony's business model cannot support claims of securities fraud.

So, in *Synchrony*, what the Court tells was offering

document had business benefits from longstanding and collaborative relationships with our partners.  And the Court held that was immaterial as a matter of law.  And, in that case, at the time of the offering, Walmart had expressed frustration with Synchrony and the way it was -- it was a private label credit card company -- and the way it was underwriting the credit.  They had expressed frustration.  The company knew that Walmart had sought a bid from a competitor.  And, ultimately, Walmart ended its relationship with Synchrony and sued them alleging that they had improperly done the underwriting risk.  And the Court still said no, that's immaterial as a matter of law, something that says "longstanding and collaborative."

And with your one other point, which is also very important, and it's the -- sorry -- I'm blanking right now.  This is a little embarrassing.  Okay, hold on.  I know I have the case.  Nope, I've got it.  It's the *HOAX* [verbatim] case.  Sorry.  It's the *HOAX* case that we brought to the Court's attention, also out of New York.  But what's very important is that, if -- all plaintiffs can allege is that, at the time of the IPO, Mesa would be inclined to accommodate a business partner who accounted for more than 50 percent of its revenue, but that's all they can allege.  What they can't -- what they haven't alleged is ongoing negotiations.  And even if they did, again, I think the cases are clear.  But that's all they can

allege.  There was absolutely no certainty that Mesa would get the concessions that it required in exchange for agreeing to these new criteria.  Extra spares, the extra incentives on the higher performance criteria, sharing of costs -- this is all in the -- it's all in the disclosures.  Sharing of the costs for the extra spares, more block time -- those were all concessions that were negotiated for in exchange.  There was no certainty that the company was going to get that based on one statement from American that it was, you know, frustrated that it was stuck with these high performance criteria.  So there's no basis for the claim based on stable, long term and revenue guarantee.

Then with respect to -- oh, the plaintiffs' claim that you could not -- it's their statute of limitations argument regarding and arguing that you could not determine that the performance criteria was much more austere or stricter until the December 2019 time period when the company disclosed the actual agreement with American.  I would urge the Court to not only look at the paragraphs I cited -- 78(G) and 92 or 94 -- but to also look at the actual agreement which is Exhibit -- Exhibit 5, Your Honor.  And those 18 pages are gobbledygook. No one would understand them unless you were a complete expert in the airline industry.  I read it very, very carefully and could not read it.  So the 18 pages tell you nothing.  But the fact that they were more austere and significantly higher was

disclosed by Mr. Ornstein right then and there in the earnings call in February of 2019.

And then, finally, with respect to maintenance, again, I would urge the Court to read the statement in context because I don't believe it was fair of counsel to read the statement which says -- the statement is "In the last year, 18 months, I mean, we were hamstrung by the fact that we had expanded a lot.  We needed more pilots.  We got hung up a little bit in pilot training.  Maintenance became more difficult in terms of qualified maintenance people."

And then counsel said, "Well, wouldn't the investors want know that at the time of the offering?"

And the answer is, "You could not have more disclosure regarding a pilot shortage if you wanted."  That prospectus was replete with discussions about the pilot shortage that was ongoing.  And, again, that's Page 19, 20, 41, 94 through -- 94, 98 through 99.  It's all over the prospectus.  So it's not fair to ask "Wouldn't the investors want to know all of that?"  They did know all of that.

And what counsel has not identified is a statement in the prospectus rendered misleading by this nondisclosure of "maintenance became a little more difficult in terms of qualified maintenance people."  There's no statement identified that's rendered false by that.  In addition, of course -- and this is -- a lot of the reading of the prospectus together is

that it doesn't preclude the -- doesn't preclude the possibility that Mesa turned to its third-party heavy maintenance providers and other maintenance providers to cover for any difficulty it was having in terms of qualified maintenance personnel.  And their reliance on third-party providers for maintenance is also all over the prospectus.

THE COURT:  Okay, thank you.  I want to compliment you all on the briefs -- they were very good, very well written on a complicated subject matter -- and on your oral arguments today.

Did you want to say one more thing?

MR. KILLORIN:  Only if I may, Your Honor.  May I?

THE COURT:  Well, just -- typically, no, but if you want really quickly because I'm already over time.

MR. KILLORIN:  Okay, very quickly, Your Honor. I simply wanted to say, in response to her argument, that she cannot point to anywhere in the prospectus where the company disclosed it was hamstrung.  And the characterizations, the details provided by the CEO would be relevant to an investor.

The other thing I'd like to say is, if the Court finds any of our pleadings deficient in any way -- this is -- DeKalb County is a newly-appointed lead plaintiff.  This is our first complaint.  We would request leave to amend if the Court finds any deficiencies.

THE COURT:  Okay, very good.  Thank you.

In addition to your written work product, your presentations today were excellent.  So thank you for coming out to Phoenix during probably the worst time of the year to come to Phoenix.  So I appreciate the sacrifice that you've both made.

The motions will be taken under advisement.  Court is adjourned.

MS. LOCKER:  Thank you, Your Honor.

MR. KILLORIN:  Thank you, Your Honor.

(Proceedings adjourned at 11:18 p.m.)

C E R T I F I C A T E

I, BARBARA H. STOCKFORD, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 19th day of July 2021.

/s/ Barbara H. Stockford
Barbara H. Stockford, RMR, CRR, CRC

UNITED STATES DISTRICT COURT