1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

David G. Lowthorp, et al.,        )
                                  )  CV 20-00648-PHX-MTL
              Plaintiff,          )
                                  )  Phoenix, Arizona
              vs.                 )  September 9, 2021
                                  )  11:00 A.M.
Mesa Air Group, Inc. et al.,      )
                                  )
              Defendants.         )
_____ )

BEFORE:   THE HONORABLE MICHAEL T. LIBURDI, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SCHEDULING CONFERENCE

Official Court Reporter:
Barbara H. Stockford, CRR, RMR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 39
Phoenix, Arizona  85003-2151
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

A P P E A R A N C E S

For the Plaintiff:

        Faruqi & Faruqi LLP
        By: ROBERT W. KILLORIN, ESQ.
            CHRISTINA PANEQUE, ESQ.
        3975 Roswell Road, Suite A
        Atlanta, GA  30342

        DeConcini McDonald Yetwin & Lacy, P.C.
        By: GARY F. URMAN, ESQ.
        2525 East Broadway Boulevard, Suite 200
        Tucson, AZ  85716


For the Defendants:

        Wilson Sonsini Goodrich & Rosati, PC
        BY:  LAURIE B. SMILAN, ESQ.      (Telephonically)
        1700 K Street, NW, Fifth Floor
        Washington, DC  20006

        Wilson Sonsini Goodrich & Rosati, PC
        By: NINA F. LOCKER, ESQ.           (Telephonically)
        650 Page Mill Road
        Palo Alto, CA  94304

        Sacks Ricketts & Case, LLP
        By:  ANDREW C. STANLEY, ESQ.
        2800 North Central Avenue, Suite 1910
        Phoenix, AZ  85004

        Lewis Roca Rothgerber Christie LLP
        By: JOHN C. GRAY, ESQ.
        201 East Washington Street, Suite 1200
        Phoenix, AZ  8585004

        Shearman & Sterling LLP              (Telephonically)
        By: AGNÈS DUNOGUÉ, ESQ.
        599 Lexington Avenue
        New York, NY  10022

UNITED STATES DISTRICT COURT

THE COURTROOM DEPUTY:  This is Case No. CV-20-0648. Lowthorp versus Mesa Air Group, Inc., and others.  This is the time set for a scheduling conference.

Will the parties please announce for the record.

MR. KILLORIN:  Robert Killorin and local counsel Gary Urman for the plaintiff and also our associate Cristina Paneque.

THE COURT:  Okay.  Thank you.

MR. STANLEY:  Good morning, Your Honor. Andrew Stanley, local counsel for the Mesa defendants.  I'm joined by my colleagues at Wilson Sonsini who will introduce themselves and present today.

THE COURT:  Okay.  Thank you.

MR. GRAY:  Good morning, Your Honor.  John Gray on behalf of the underwriter defendants.  I also have on the phone with me Agnès Dunogue from Shearman & Sterling in New York.

THE COURT:  Okay.

MS. SMILAN:  Good morning, Your Honor.  This is Laurie Smilan from Wilson Sonsini on behalf of the Mesa defendants.

THE COURT:  Anyone else?

MS. LOCKER:  Yes.  Good morning, Your Honor. Nina Locker from Wilson Sonsini on behalf of the Mesa defendants.

THE COURT:  Okay.  And is that it?  All right.

UNITED STATES DISTRICT COURT

Ms. Locker, are you going to speak on behalf of the defendants?

MS. LOCKER:  No, Your Honor.  Ms. Smilan will be speaking.

THE COURT:  Okay.  I just want to make sure I'm pronouncing everybody's names right.  So it will be Ms. Smilan; is that right?

MS. SMILAN:  That is correct.  Your Honor.  Thank you.

THE COURT:  Okay.  And, Counsel, tell me your name one -- for the purposes of my pronunciation.

MR. KILLORIN:  Yes, Your Honor.  It's "kill-LOR-in."

THE COURT:  Killorin.  Okay.  Is that right?

MR. KILLORIN:  Killorin.  Yes, sir.

THE COURT:  All right.  You could take your masks off. Everybody is very far apart from one another.  If you don't want to take your mask off, you don't have to.

All right.  I've read your 26(f) report and I understand that there's a dispute as to how we should proceed with the case.  So I just want to hear a little bit about it. I think you both did a nice job, "both" meaning both sides did a nice job briefing it and I don't think we need to have further briefing unless -- unless something comes up here where I change my mind.  But what I intend to do is just listen to what you have to say and then probably taking it under advisement.

And also to let you know, just for time purposes, I really only have 30 minutes. So let's try to be succinct.

All right. So, Mr. Killorin, why don't you go first.

MR. KILLORIN: All right, Your Honor. Shall I approach the podium?

THE COURT: Why don't you come on up. That would be helpful to me. Thank you.

MR. KILLORIN: Your Honor, we have conferred in good faith with defendants and reached agreement on as many items as we can, but there is a very fundamental difference on how discovery should proceed in this matter and, in our opinion, based on a very, very fundamental disagreement among what this case is about.

We believe that defendants have misinterpreted our complaint and your order to somehow read into it that the statement about being hamstrung because of bad maintenance was an alleged curative disclosure for purposes of damage calculation and then, from that false understanding, they launch off a few -- once you go with that premise, of course, the sky is the limit and they can say "Oh, we can easily defeat that," and just give us no discovery basically. "Just let us file some motions and maybe get one interrogatory answered and we can knock that one right out of the park." Well, maybe they can because we weren't pleading damages. We weren't pleading loss causation. There is a fundamental reason for that: We

didn't have to.  This is a Section 11 claim and, under Section 11, we just plead a case for falsity.  And that particular statement they've latched on to about Ornstein, which the judge cited in support of the three false statements it found in the registration statement, neither you nor us ever said that that was a curative disclosure for purposes of *Dura* loss causation and damages.  Indeed, it doesn't pass the test.

Typically, when someone makes a -- a plaintiff alleges a curative disclosure, you follow a certain mantra that we do all the time in 10(b) cases because you do have to plead loss causation and damages upfront in your complaint.

Section 11, as defense counsel acknowledges in the articles they write, has statutory damages.  It's strict liability and the damages are calculated by statute.  And, therefore, very often these cases the class gets certified with no damages -- discovery complete and no damages expert reports submitted.  Because it's worthy of a class action, the damages comes later.  The damages is always intertwined with merits discovery.

There are cases where courts have bifurcated discovery to address merits first.  Once merits are established one way or the other, then move on to damages.  But never in our knowledge or experience has a court ever said let's bifurcate and let defendants take a crack at some narrow damage theory without any discovery.  And if you go through the nuts and

bolts of what they are proposing, in our opinion, it's -- Your Honor, I just will be candid -- to us, it's outrageous.  We've never seen anything like it.

THE COURT:  Let me just ask you just a few questions here.  So it's my understanding that the plaintiffs want this to be on a standard track where there's a class certification phase and -- I use that term loosely -- a class certification phase where, at some point in the near future, you intend to file a Rule 23 class certification motion.

MR. KILLORIN:  Yes, Your Honor.  I think December 3rd or something like that.  Fairly quickly, but with a bare bones discovery and --

THE COURT:  That's where I was going with that.  So do you anticipate -- and I'm going to ask defendant's counsel these same questions.  Do you anticipate the need to take discovery -- I should say "class certification discovery" -- prior to filing your motion?  And discovery is both fact discovery and expert discovery.

MR. KILLORIN:  Yes, Your Honor.

THE COURT:  Okay.

MR. KILLORIN:  Absolutely.

THE COURT:  Do you have an expert witness that you intend to disclose?

MR. KILLORIN:  Yes, we do, Your Honor.

THE COURT:  Okay.

MR. KILLORIN:  And we -- actually, let me backtrack on that.  We are considering going -- going ahead and addressing damages in our class certification motion, but we're also -- but we may not.  We haven't made that final decision yet because very often in these cases damages is not addressed in the initial class certification motion because it's simply not a part of the case, you know, but if the Court wants us to go ahead and address that, we could -- we could, I suppose.

THE COURT:  No.  What I meant by -- maybe I said something that was a little misleading.  What I meant by "expert witnesses," I don't know if you need an expert witness to provide opinion on any of the Rule 23 factors.

MR. KILLORIN:  No, Your Honor, not that I know of at this point in time.

THE COURT:  Okay.

MR. KILLORIN:  However, there are a number of what we consider important topics that we want -- would need discovery on.  And -- and I guess I'll just lead off with an example from a case, a Section 11 case I had with learned opposing counsel, where they took the position that the plaintiff could not move forward on their Section 11 case because, prior to releasing the shares in the IPO, they had -- the shares were all in street name, as you know.  So there's no serial number for a share of stock.  They had intentionally put it into a fund with shares from -- that had been prior owned by company insiders

and then they did the distribution for the IPO from this common fund that had non-newly minted shares conceptually. Although there is no such thing as newly minted shares because the shares don't have serial numbers. But then their argument was no plaintiff could have standing because they could never prove that the shares they got were from the IPO because they came out of a basket that had older shares that had been owned by insiders. We did hire an expert on that, one of the nation's most prominent experts. He said, "That's outrageous, and in my next treatise I'm going to make sure that everybody knows I think that would be outrageous."

Defendants are constantly looking at mechanisms to basically repeal Section 11. So far, the courts haven't allowed it, but we would want discovery on that. We would want to know are they claiming that these shares have been commingled with other shares of insiders before they were ever issued in the IPO. We would want to know what their evidence is of negative causation. They have now raised that affirmative defense. That's what throws us into the game of corrective disclosures and stock drops.

But, under Section 11, our damages are statutory and calculated pursuant to the statute provided that, if the defendant proves -- if the defendant proves, not the plaintiff. The burden is on the defendant to shift the burden on causation. If the defendant proves -- and I'm reading from the

statute.   "...the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall" be -- "shall not be recoverable."

So, sure, they can now play the loss causation game if they want to in discovery and they can try to make proof of negative causation.  There is the big item -- the big corrective disclosure in this case happened a couple months later when they filed their financial report and it showed huge additional expenses for maintenance that the analysts had never projected and they were surprised by it and that, too, is evidence that the original statements regarding maintenance were false, and that was a 32 percent stock drop in one day of the company's value.  That is the kind of corrective disclosure that we will get into and use to fight any allegations they may care to assert on negative causation, but that's all premature. We're not at that point yet.

THE COURT:  Okay, and I understand.  We don't have to go into too much detail.  I just want to try to figure out what way to go on the scheduling order.

MR. KILLORIN:  They are trying to completely

misconstrue our allegations and your order to act as if this has all been teed up and can be decided with no discovery. And we were supposed to file our motion for damages for the entire class with no discovery one month from today or one month from tomorrow and we think that is untenable and, again, I have to use the word "outrageous." We don't understand how they could try to defend that position.

But other items that we would be interested in discovery on is we have to show that a class action is a superior mechanism and that there is no other similar mechanism out there that would be superior including other pending class actions, and there is one. There's a competing class action in the state court here.

THE COURT: Right, yeah, I saw that that's stayed.

MR. KILLORIN: That's been stayed.

THE COURT: Okay.

MR. KILLORIN: Yes, but we want know defendant's position on how that would affect class actions -- our motion for class being certified before we file our motion. So there are a number of fundamental -- fundamental things that we would want a little discovery on so that we can file a quality motion for class certification that we think fairly represents the interests of the class.

THE COURT: Okay, I understand. Anything else?

MR. KILLORIN: Your Honor, yeah, one thing. I think

one of the -- one of the best quotes on this entire issue was actually put forward by defendants on Page 27 of this proposed scheduling order.  This is their language:  "The Supreme Court has made plain that this requires plaintiff to put forth a damages model that bears on the propriety of class certification and for the Court to engage in a rigorous analysis of that model including any issues that may overlap with the merits."

So damage discovery is always merits discovery in my experience especially when we're dealing with loss causation and economists that have to disentangle the effect of one event on the stock drop with other events on that same day.  So it simply -- it requires discovery and facts.

THE COURT:  Okay, thank you.

MR. KILLORIN:  Thank you, Your Honor.

THE COURT:  Okay.  Ms. Smilan?

MS. SMILAN:  Good morning, Your Honor.  It's Laurie Smilan from Wilson Sonsini.

THE COURT:  We don't have a -- for some reason, I don't have a great connection with your line, but I want to make sure I pronounce your name correctly.

MS. SMILAN:  Oh, sure.

THE COURT:  Tell me one more time.

MS. SMILAN:  It's Smilan.

THE COURT:  Smilan.  I'm going to write it down

phonetically.  Go ahead.

MS. SMILAN:  Draw a smiley face.

Okay.  We think that the Court's order is pretty straightforward.  The Court ruled that the plaintiff had adequately pled that a single misrepresentation or omission in registration statement about the sufficiency of Mesa's in-house mechanics was misleading.  And, in the Court's order, you pointed to a single allegedly corrective disclosure on May 10th, 2019, that suggested that, prior to the IPO, Mesa was a bit hamstrung in hiring enough qualified mechanics.

In the scheduling report, we went through every allegation in the complaint about alleged curative disclosures and plaintiff said that the truth came out.  And all of those disclosures, including the one that counsel just referred to in August 2019, related to the claims that the Court dismissed, either about the American CPA or about operational performance or about spare aircrafts.

There's no suggestion in the complaint, which the defendants have now answered, that any of those subsequent curative disclosures related in any way to mechanics, and they don't because the issue here is whether or not Mesa had enough mechanics at the time of the IPO and whether or not it misrepresented that in some way at the time of the IPO.  And on May 10, 2019, Mr. Ornstein, the company's CEO, said, "Well, yes, we were a bit hamstrung, because we had been expanding, in

hiring enough qualified mechanics prior to the IPO."

So it seems to us that it is quite plain from reading the Court's order that that's the one issue that remains in the case:  whether or not the company made misrepresentations or omitted to disclose that it was hamstrung in hiring enough qualified mechanics and did not, in fact, have enough qualified mechanics at the time of the IPO, which was in October of 2018, more than a year prior to the curative disclosure in August 2019 that the plaintiffs are now referencing, but did not plead, and which, you know, involve a very different set of circumstances.  It was after the company had amended these CPA with American Airlines and was held to much higher operating performance standards, all of which is reflected in the order.

In any event, as narrowed by the order, we think that a single issue is now dispositive and it is -- even if one were to accept, arguendo only, that the registration statement was misleading in that regard in suggesting that Mesa had an adequate number of in-house mechanics at the time of the IPO, the question is:  Did plaintiffs imputed as class suffer any cognizable losses that are attributable to any such misrepresentation or omission?

We -- our economic experts will conclusively show that they won't.  There was no statistically significant price decline following that alleged curative disclosure when Mr. Ornstein said, "Yeah, we were a bit hamstrung hiring

qualified mechanics" in the 18 months prior to his statement in May 2019.  In other words, the plaintiff and the class suffered no losses that were attributable to information about Mesa's pre-IPO mechanic staff.

And resolution of that issue, which does go to the issue of negative causation, which defendants have never argued that we do not have the burden on and which is an affirmative defense -- that resolution of that issue is -- is necessary in order for the Court to determine whether or not the plaintiffs had suffered an injury in fact and, therefore, has Article III standing and whether or not the Court has continuing jurisdiction which is dependent on whether or not the plaintiff has Article III standing.  And also that resolution of that issue will determine whether or not a class will be certified and whether defendants are entitled to summary judgment, period, across the board because of negative causation.

And we refer you to Justice Kavanaugh's decision in *TransUnion* and also to the Second Circuit, Southern District of New York's decision in a Section 11 case granting summary judgment on negative causation in the *Barclays* case.

And because this resolution of this issue implicates standing and continuing jurisdiction, it needs to be decided at the outset of the case whether at class certification or by means of a dispositive motion.  And we cited the Ninth

Circuit's decision in Bates and also the *Nguyen* case in the Northern District of California for those propositions.

And resolution of this issue does not require any merits discovery. Both when we were negotiating with the plaintiff in the report and now to this Court, the plaintiff keeps stating that they need merits discovery, but although we repeatedly asked them what merits discovery you need, we need to have experts look at what the publicly available information was to the market about the adequacy of the in-house mechanic staffing at Mesa before the IPO and how the market reacted to that revelation by Mr. Ornstein in May 2019 that they've been a bit hamstring hiring qualified mechanics and whether or not there was any other disclosure that directly related to the issue of whether or not there were adequate number of mechanics at the time of the IPO, because the plaintiffs say, well, maybe some of that information leaked or maybe there were some consequences of it in terms of increased expenses without having pled that or demonstrating that that wasn't instead due to the fact that there were higher requirements under the amended CPA. And they cannot, have not, still refuse to tell us what merits discovery that we -- they need.

In our section of the report, we noted that, you know, on a Rule 56(f) motion, in response to our motion for summary judgment, plaintiffs would have the opportunity to demonstrate what merits discovery that they thought was necessary in order

for them to adequately respond to our motion for summary judgment on negative loss causation which has implications for standing and jurisdiction, and we agreed that we would expedite resolution of that Rule 56(f) motion, but we still have yet to hear from them what discovery it is that they claim that they need.

We also think that class certification should be determined, as Rule 23 requires, at the earliest practical date and ask the Court to, you know, heed the Manual for Complex Litigation that suggests where, as in this sort of case, there is an affirmative defense or an issue that's a death knell for the rest of the case, that it doesn't make sense to proceed with costly, expensive, wasteful and probably unnecessary merits discovery because that will ultimately preclude certification or successful prosecution of the case, and that's the case here.

We think *TransUnion* is a cautionary tale.  That case came to the Supreme Court in 10 years almost after the case was first filed, a judgment was entered, and a class was improvidently certified.  The Supreme Court pointed out the class appeared to lack standing and that the Ninth Circuit and the District Court below had not gone through the necessary analysis as to whether or not the plaintiff had proved that class certification was appropriate.  So it threw the case back to the Ninth Circuit and said, in the first instance, the Court

should consider whether or not a class can be certified on the basis of the standing analysis which determined that Article III standing was lacking for significant portions of the class.

So we submit that, rather than go through the course of lengthy discovery and lengthy litigation, that, as the Ninth Circuit dictates in the Bates case, that the Court should adjudicate these threshold issues and determine whether or not the defendants can meet and the plaintiffs can rebut our showing of negative causation, which can be demonstrated on the basis of expert testimony alone based on market movements and information that is available publicly to the market, before reaching the merits in the case.

I'm happy to answer any other questions the Court may have.

THE COURT:  Okay.  I guess I just have a few questions.  The first is:  Why would it be improvident for me to entertain a class certification motion and make the determination of numerosity, commonality, typicality and adequacy and then, at some later time, resolve standing on summary judgment?

MS. SMILAN:  Well, that's exactly what happened in the court below in the *TransUnion* case --

THE COURT:  Okay.

MS. SMILAN:  -- is the Court made those Rule 23

determinations and Justice Kavanaugh said, well, you know, there was this threshold issue here concerning standing that went to whether or not these -- this class is properly certified.  It's not in the Rule 23 requirements what is constitutional, and the Court doesn't have continuing jurisdiction and the plaintiffs are entitled to have a class certified unless the members of the class and the plaintiffs have standing.

THE COURT:  Is that the case in all class action cases --

MS. SMILAN:  It's not.  Well, I mean, I would think that it would be provident for the Court to analyze whether or not standing was an issue, but it would not be in every case that the defendants will be challenging whether or not the plaintiff has standing.

THE COURT:  What about --

MS. SMILAN:  In many cases, we -- we will stipulate to conditional certification of the class where there's no apparent issue.

THE COURT:  What about in a nonclass case where it's just a single plaintiff or a group of plaintiffs and there is this standing issue lurking, but discovery is needed to determine whether standing does or does not exist; would that be a case where the Court would have to put all discovery on hold in order to determine the Article III standing issue?

UNITED STATES DISTRICT COURT

MS. SMILAN:  Well, two responses to that, Your Honor. One is, first, it would be incumbent on one of the parties to raise the standing issue which we propose to do by bringing a motion for partial summary judgment.  And then once that issue is presented to the Court, then we believe that that's when *Bates* and *TransUnion* and the other cases that we've cited suggest that, you know, the Court needs to resolve that issue at the outset.  And so we are seeking the Court's agreement that we would file that early motion for summary judgment.

As we've stated in our report, we do not believe that there is any merits discovery that is necessary in order for the Court to determine whether or not there was any loss attributable to the one remaining statement or omission in this case relating to in-house mechanics.  It all is based on expert discovery which is de rigueur in every securities case.  And Justice Barrett just said so in the *Goldman* case.

And *Barclays* talks about the very many cases where these expert event studies of the information that's available in the market and how the market responded and moved, aided by looking at, you know, stock price movements, stock price movements for the market as a whole, within the industry, within specific indices.  It's a quite established methodology that's been accepted up and down the judicial system in securities cases.  That's all we need.  And we would ask the plaintiffs tell us what else you think you need in order to

demonstrate that the market could not have cared less, it did not react in any statistically significant market-deviated way when Mr. Ornstein said, "Yeah, we were hung up a bit about mechanics."  And they can't tell us.  They haven't told us.

We told them and we put in our report that, if they filed a 56(f) motion in response to our motion for summary judgment and detailed what merits discovery they thought they needed on that issue, we would expedite it.  I mean I'll represent to the Court that, if we agree with them, we'll work on expediting getting that discovery to them as promptly as possible.  Truly, we cannot fathom what that would be.

THE COURT:  Okay.  Thank you.

All right.  Mr. Killorin, five minutes --

MR. KILLORIN:  Yes, Your Honor.

THE COURT:  -- in rebuttal.

MR. KILLORIN:  I'll be brief, Your Honor.

Your Honor, their arguments about shortcutting a case based on standing are -- that's a good principle and that's why we have to do things like show that we purchased this stock at the right time in the right amount on the right day, which we have done.  We have to file our PSL recertification.

Certainly, standing has -- threshold issues of standing always have to be shown.  However, never, almost never, on a case that has meritorious allegations of Dura loss causation and damages, in a securities case which will involve

event studies and complex expert reports and the need for discovery and merits discovery to ever prepare the damage reports, do you ever try to put blinders on a horse and just go down this narrow trail for a single issue to see are they going to get money at the end of this complex Dura loss causation trail.  That's not how it works.  I mean you could say, in every med-mal case -- medical malpractice case -- let's just see if the -- let's do limited discovery on was the plaintiff really injured and do they really have damages and, if not, there's no standing; so we can get rid of the case like that. But that's wrong.  To try to go into a complex damages analysis to the exclusion of all other discovery would be incredibly wasteful and then, at the end, when you find out, oh, yes, this plaintiff really was hurt, either through securities misstatements or through a car wreck, say, okay, now let's go back and redo all that discovery on the rest of the merits and the rest of the issues in the case -- it's never done that way. Defendants have cited no case.  They say it's a normal protocol.  This is not a normal protocol.

THE COURT:  What's your response to their citation of the *TransUnion* case?

MR. KILLORIN:  Oh, my gosh.  It's exactly what I'm talking about.  *TransUnion* had nothing to say about trying to deal with standing upfront.  It was just a standing case.  They simply analyzed the position of the parties and found that some

of them did have standing, and they went forward with their case, and some of them who had never been hurt by the disclosure by the credit union did not have standing.  Never a suggestion that that should have all been addressed at the beginning of the case to determine which of the group of plaintiffs had standing to move forward with the case and, indeed, some of them did have standing in *TransUnion* to move forward with the case.  That case, in my opinion, is completely irrelevant to this discussion.  It's just a new Supreme Court case on standing.  Does nothing to change the tried-and-true principles that you don't engage in complex damage -- myopic complex damage discovery with the hope of retroactively looking back and saying, gee, it turns out there wasn't standing.  That would be horribly inefficient and that's not the way American jurisprudence works in our experience and our understanding of the law.

THE COURT:  Okay, thank you.

MS. SMILAN:  Your Honor, if I could respond just super-briefly.

One, plaintiff's counsel keeps talking about damages. We're not talking about damages.  We are talking about whether we can prove and they can rebut an affirmative defense which is a statutory affirmative defense of negative causation that is a death knell to their case.  It's not a question of damages.

And the second thing is plaintiff keeps talking about

standing in terms of traceability to the offering.  That's not what we're talking about here.  We're talking about Article III constitutional standing, whether or not they suffered an injury in fact, not a question of damages.  And I just wanted to make those two points.

THE COURT:  I'm going to let Mr. Killorin have the last word.

MR. KILLORIN:  Okay, thanks.

We're talking about Article III standing, Your Honor, as well.  And, on August 8th, Mesa reported its third quarter 2019 financial operating results.  Mesa also reported increased maintenance expenses of $54 million, more than analysts' estimates of 47 million, and on that news and the other news of the day, which would be confounding information for an expert to disentangle, but on that news, just on the maintenance, the stock dropped 32 percent.

We've got plenty of damages.  We've got lots of damages.  We think this is a good case.  And it would be -- it's just crazy for defendants to just to try to get away from these damages that they are going to owe on this word game that we have already alleged and lost the right to prove damages because they are twisting and misconstruing the Ornstein statement as the only curative disclosure in our complaint.

What I just read to you was from Paragraph 12 of the complaint, what the witness -- confidential witnesses had to do

about maintenance.  Everything in our complaint was simply evidence that those statements were false.  They were not our evidence for damages.  That comes after discovery in a Section 11 case assuming defendants can ever meet their affirmative defenses and start proving their position on damages.

This is just -- I'm sorry, it makes my head spin.

THE COURT:  Okay.  Thank you very much.  We'll end it with that.  Okay.

I'm going to take this matter under advisement.  I'll issue an order shortly.  What I would expect to happen is, depending on however I decide to go on the -- what I'm just going to call the discovery sequence, whether it be bifurcated or if it's a standard track, I'll ask you all to confer once again and come up with dates consistent with my decision. I think that would be better for you all than rather me just randomly picking dates from what you've submitted.

How does that sound?

MR. KILLORIN:  That sounds fine, Your Honor.

THE COURT:  Okay.  Ms. Smilan?

MS. SMILAN:  Yes, that's fine, Your Honor.

THE COURT:  Okay.  Is there anything else you want me to address at this time?

MR. KILLORIN:  Not from the plaintiffs, Your Honor.

MS. SMILAN:  Nor the defendants.

THE COURT:  Okay, thanks.  I should say also I think what I'd like to do then is once -- I'll ask you to submit some proposed dates.  We'll have a continued Rule 16 scheduling conference and I'll go over the standard items that I normally do at a Rule 16.

All right.  Thank you.  We're adjourned.

MR. KILLORIN:  Thank you, Your Honor.

(Proceedings adjourned at 11:36 a.m.)

UNITED STATES DISTRICT COURT

C E R T I F I C A T E

I, BARBARA H. STOCKFORD, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 14th day of September 2021.

/s/ Barbara H. Stockford
Barbara H. Stockford, RMR, CRR, CRC

UNITED STATES DISTRICT COURT