# EXHIBIT A

**WILSON SONSINI GOODRICH & ROSATI**
**Professional Corporation**
NINA F. LOCKER (*pro hac vice*)
nlocker@wsgr.com
LAURIE B. SMILAN (*pro hac vice*)
lsmilan@wsgr.com
CHARLES A. TALPAS (*pro hac vice*)
ctalpas@wsgr.com
DOUGLAS W. MCMANAWAY (*pro hac vice*)
dmcmanaway@wsgr.com
650 Page Mill Road
Palo Alto, California 94304-1050
Telephone: (650) 493-9300

**SACKS, RICKETTS & CASE LLP**
CYNTHIA A. RICKETTS (AZ 012668)
cricketts@srclaw.com
2800 N. Central Avenue, Suite 1920
Phoenix, Arizona 85004
Telephone: (602) 385-3370

*Attorneys for Defendants Mesa Air Group, Inc.,*
*Jonathan G. Ornstein, Michael J. Lotz, Daniel*
*J. Altobello, Ellen N. Artist, Mitchell Gordon,*
*Dana J. Lockhart, G. Grant Lyon, Giacomo*
*Picco, Harvey Schiller and Don Skiados*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David G. Lowthorp, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Mesa Air Group, Incorporated, *et al.*,<br><br>Defendants. | Case No. 2:20-cv-00648-MTL<br><br>**MESA DEFENDANTS' [PROPOSED] MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................1

II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY ..............................2

      A.    Procedural History..................................................................2

      B.    The Maintenance Claims.........................................................3

      C.    Mesa's Disappointing 3Q 2019 Results Under the Amended CPA..............7

      D.    The Post-3Q 2019 Disclosure Stock Price Decline.......................................8

III.  ARGUMENT........................................................................................9

      A.    Summary Judgment  Standard.........................................................9

      B.    Section 11 and the "Negative Causation" Defense ...................................11

      C.    Plaintiff and the Class May Not Recover Stock Price Declines Prior to the May 10, 2019 Corrective Disclosure.......................................................14

      D.    The May 10, 2019 Corrective Disclosure Did Not "Cause" Any "Losses".......................................................................................15

      E.    The August 9, 2019 Disclosures Are Not Causally-Linked to the Now-Corrected Maintenance Statements in the Registration Statement ....20

IV.   CONCLUSION .................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Akerman* v. *Oryx Commc'ns, Inc.*,
810 F.2d 336 (2d Cir. 1987) ........................................................... 10, 14, 15, 16, 20

*Alpha Capital Anstalt v. Intellipharmaceutics Int'l Inc.*,
2021 U.S. Dist. LEXIS 128773 (S.D.N.Y July 9, 2021) ........................... 10, 11, 16,
17, 19, 20

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................... 11

*Boluka Garment Co. v. Canaan Inc.*,
2021 U.S. Dist. LEXIS 127490 (S.D.N.Y. July 8, 2021) ....................................... 10

*Brown v. Ambow Educ. Holding Ltd.*,
2014 U.S. Dist. LEXIS 18809 (C.D. Cal. Feb. 6, 2014) ....................... 10, 13, 15, 22

*C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*,
213 F.3d 474 (9th Cir. 2000) .................................................................... 10

*Cai v. Switch, Inc.*,
2020 U.S. Dist. LEXIS 122593 (D. Nev. July 10, 2020) ................................. 10, 14

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................ 10, 11

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.,
Inc.*,
856 F.3d 605 (9th Cir. 2017) ......................................................................... 5

*Dam v. Gen'l Elec. Co.*,
265 F.2d 612 (9th Cir. 1958) ........................................................................ 10

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ..................................................................................... 12

*Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund (Local 66)*,
579 F.3d 401 (5th Cir. 2009) ....................................................................... 19

*Goldkrantz v. Griffin*,
1999 U.S. Dist. LEXIS 4445 (S.D.N.Y. Apr. 6), *aff'd mem.*,
201 F.3d 431 (2d Cir. 1999) ................................................................... 19, 20

*Grigsby v. BofI Holding, Inc.*,
979 F.3d 1198 (9th Cir. 2020) ..................................................................... 22

*In re Allstate Life Ins. Co. Litig.*,
2013 U.S. Dist. LEXIS 132141 (D. Ariz. Sept. 13, 2013) ................................. 15

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ................................................................... 9

*In re Barclays Bank PLC Sec. Litig. (Barclays I)*,
2017 U.S. Dist. LEXIS 148695 (S.D.N.Y. Sept. 13, 2017), *aff'd*, 756
F. App'x 41 (2d Cir. 2018) ............................................................... *Passim*

*In re Barclays Bank PLC Sec. Litig. (Barclays II)*,
756 F. App'x 41 (2d Cir. 2018) ................................................... 11, 16, 18,
19, 20, 21

*In re BP P.L.C. Sec. Litig.*,
2016 U.S. Dist. LEXIS 73721 (S.D. Tex. May 31, 2016) ...................................... 23

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ................................................................. 11

*In re Fortune Sys. Sec. Litig.*,
680 F. Supp. 1360 (N.D. Cal. 1987) .......................................... 10, 11, 14, 15

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
252 F. Supp. 2d 1005 (C.D. Cal. 2003), *aff'd sub nom.*
*Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005) ....................................... 17

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
524 F. Supp. 3d 1007 (S.D. Cal.), *appeal docketed*,
No. 21-55342 (9th Cir. 2021) ............................................................. 9, 10

*In re Maxim Integrated Prods., Inc. Sec. Litig.*,
639 F. Supp. 2d 1038 (N.D. Cal. 2009) ......................................................... 24

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ......................................................... 15

*In re Shoretel, Inc. Sec. Litig.*,
2009 U.S. Dist. LEXIS 11151 (N.D. Cal. Feb. 2, 2009) ........................... 10, 12, 22

*In re Synergy Pharm., Inc. Sec. Litig.*,
2021 U.S. Dist. LEXIS 191322 (E.D.N.Y. Sept. 30),
*appeal docketed*, No. 21-2724 (2d Cir. 2021) ........................................... 24

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) ................................................................. 17

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005) ......................................................... 13

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ................................................................. 23

*McKowan Lowe & Co. v. Jasmine, Ltd.*,
2005 U.S. Dist. LEXIS 32164 (D.N.J. June 30, 2005),
*aff'd*, 231 F. App'x 216 (3d Cir. 2007) ................................................ 11, 14

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ................................................................. 22

*Miller v. Thane Int'l, Inc.*,
   615 F.3d 1095 (9th Cir. 2010) ........................................................ 12, 13, 15, 20, 21

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,*,
   575 U.S. 175 (2015) ......................................................................................................... 5

*Rubke v. Capitol Bancorp, Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) .............................................................................. 11, 12

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
   499 F. Supp. 3d 49 (D. Del. 2020), *appeal docketed*,
   No. 20-3427 (3d Cir. 2020) ........................................................................................ 21

*Smilovits v. First Solar, Inc.*,
   2019 U.S. Dist. LEXIS 221424 (D. Ariz. Dec. 27, 2019) ...................................... 17

*Weiss v. Amkor Tech., Inc.*,
   527 F. Supp. 2d 938 (D. Ariz. 2007) ........................................................................ 15

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ...................................................... 13, 15, 16, 19

**STATUTES**

15 U.S.C. § 77k........................................................................................................... 12

15 U.S.C. § 77k(e) ..................................................................................................... 12

**RULES**

Fed. R. Civ. P. 56(a) ................................................................................................... 9

**MISCELLANEOUS**

4 T. Hazen, *Law of Securities Regulation* § 12.93 (2020 update) ..................................... 16

Tabak et al., *Materiality and Magnitude: Event Studies in the Courtroom*,
   NERA Working Paper, April 1999 ........................................................................ 17

*The Role of Financial Economics in Securities Fraud Cases: Applications at
   the Securities and Exchange Commission*, 49 Bus. Law. 545 (1994)..................... 17

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| "American" | American Airlines, Inc. |
| "Complaint" or "¶" | Amended Class Action Complaint for Violations of the Federal Securities Laws, filed August 17, 2020, ECF No. 52 |
| "CPA" | Capacity Purchase Agreement |
| "Ex." | Exhibits attached to the Index of Exhibits |
| "Individual Mesa Defendants" | Jonathan G. Ornstein, Michael J. Lotz, Daniel J. Altobello, Ellen N. Artist, Mitchell Gordon, Dana J. Lockhart, G. Grant Lyon, Giacomo Picco, Harvey Schiller, and Don Skiados |
| "IPO" | Initial Public Offering |
| "Mesa" or "Company" | Mesa Air Group, Inc. |
| "Defendants" | Mesa Air Group, Inc. Jonathan G. Ornstein, Michael J. Lotz, Daniel J. Altobello, Ellen N. Artist, Mitchell Gordon, Dana J. Lockhart, G. Grant Lyon, Giacomo Picco, Harvey Schiller, and Don Skiados |
| "Offering Documents" | Registration Statement and Prospectus |
| "Order" | Order Granting in Part and Denying in Part the Mesa Defendants' Motion to Dismiss, filed July 22, 2021, ECF No. 81, attached as Ex. 1 to the Index of Exhibits |
| "Prospectus" | Mesa's Form 424B4, filed with the Securities and Exchange Commission ("SEC") on August 10, 2018, attached as Ex. 4 to the Index of Exhibits |
| "Tabak Rep." | Expert Report of David I. Tabak, dated January 3, 2022, attached as Ex. 7 to the Index of Exhibits |
| "United" | United Airlines, Inc. |

## I. INTRODUCTION

This Court's Motion to Dismiss Order significantly narrowed Plaintiff's claims: it dismissed the majority of statements in Mesa's August 2018 IPO Registration Statement that Plaintiff challenged in its Complaint. Plaintiff's entire case is now limited to statements relating to Mesa's maintenance solutions at the time of the IPO and is predicated *on a single alleged omission*: the failure to disclose an alleged shortage of qualified mechanics at the time of the IPO. In its Complaint, Plaintiff alleges that Mesa's May 2019 revelation that it had experienced "difficulties" in terms of qualified maintenance personnel during a period that spanned times both before and after the IPO rendered the risk warning in the Registration Statement—that Mesa's success depended on its "ability to continue to attract and retain qualified personnel"—misleading. Given the favorable inferences afforded plaintiffs at the pleading stage, the Court deemed it "plausible" that the Registration Statement's warning could be interpreted as suggesting that there were no existing staffing issues relating to mechanics at the time of the IPO.

However, even if Plaintiff were able to show that mechanic staffing issues existed at the time of the time of the IPO (as opposed to at *some* point before or after the IPO), and thus that the risk Mesa candidly warned about was instead a reality, Defendants have an absolute "negative causation" defense entitling them to summary judgment. This is so for several reasons.

*First,* none of the decline in Mesa's stock price occurring *before* the May 2019 revelation that Mesa had experienced past difficulties in terms of qualified maintenance personnel—which Plaintiff's complaint alleges is the first and only corrective disclosure regarding Mesa's in-house mechanics—could possibly have been caused by a market reaction to the revelation of the "truth" and is therefore not recoverable.

*Second,* when Mesa did reveal past staffing difficulties in May 2019, the market did *not* react—there was no statistically significant stock price decline following the revelation. As the Ninth Circuit has repeatedly confirmed, a significant decline in stock price after the "truth" is revealed is a requisite for establishing loss causation. The absence of such a

decline conclusively demonstrates "negative causation"—entitling defendants to summary judgment.

*Finally,* Plaintiff's recent attempt to evade this conclusion by claiming that statements made in August 2019 about increased maintenance expenses, including staffing costs, incurred in the third quarter of 2019 (ending June 30, 2019), were a consequence of the pre-IPO staffing problems also fails. Plaintiff *did not even allege* that the August 2019 statements were corrective of any statements about maintenance personnel in the Registration Statement for obvious reasons: Mesa's May 2019 revelation corrected any misrepresentation or omission about maintenance staffing at the time of the IPO and the August 2019 statements said *nothing* about maintenance staffing at the time of the IPO. Instead, the August 2019 statements (which are not challenged as false) attributed 3Q 2019's increased maintenance expenses to Mesa's then-current circumstances: Mesa's *post-IPO* decisions (1) to *overstaff* by hiring temporary mechanics and (2) to *accelerate* heavy maintenance originally due to be performed in future periods, all in *anticipation* of the *newly* operative elevated performance requirements of the *post-IPO* American Amended CPA and the upcoming peak summer travel season. The Court already dismissed the claims Plaintiff actually alleged were corrected by the August 2019 statements—those relating to Mesa's spare aircraft count—finding that the August 2019 disclosures related to post-IPO circumstances, not events or circumstances at the time of the IPO.

In sum, Defendants have an absolute negative causation defense with respect to Plaintiff's only remaining claim, because none of Plaintiff's alleged losses was attributable to any uncorrected misrepresentation or omission in the Registration Statement related to maintenance staffing or indeed any maintenance issue existing at the time of the IPO. Thus, Defendants are entitled to summary judgment as a matter of law.

## II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    Procedural History

The Court dismissed much of Plaintiff's Complaint, which purported to assert claims under Sections 11, 12 and 15 of the Securities Act of 1933, challenging statements

in Mesa's Registration Statement (the "Registration Statement") issued in connection with its August 9, 2018 initial public offering (the "IPO"). *See* Order. The Court dismissed the Section 12 claim outright and dismissed the Sections 11 and 15 claims challenging statements other than those related to Mesa's maintenance solutions (the "Maintenance Statements") (the "Maintenance Claims"). *See* Order at 13, 16, 19, 24-25. Among the challenged statements the Court dismissed were statements concerning Mesa's relationship with American Airlines, which was governed by a capacity purchase agreement. The nineteenth amendment to that agreement, which significantly elevated Mesa's operational performance standards, was executed more than five months after the IPO and became effective in April 2019 (the "Amended CPA"). *Id.* at 3. The Court also dismissed claims related to Mesa's operational performance and spare aircraft count, finding these claims concerned events arising well after the IPO—*i.e.*, operations under the post-IPO Amended CPA—which did not relate to nor render any statement in the Registration Statement false or misleading when made. *Id.* at 16, 19. Plaintiff chose not to seek leave to amend, and all Defendants answered. *See* Exs. 2-3.

The Mesa Defendants denied that any of the Maintenance Statements were false or misleading and asserted numerous affirmative defenses, including the defense of "negative causation." Ex. 2 at 37-38. That defense is premised on the fact that the post-IPO declines in Mesa's stock price are not recoverable because, as shown below, they are not attributable to any actionable misstatement or omission in the Registration Statement. Defendants now move for summary judgment on their negative causation defense.

**B.    The Maintenance Claims**

The Maintenance Claims, the only remaining claims in this action, challenge several statements in the Registration Statement, primarily relating to Mesa's belief that it could achieve "maintenance cost efficiencies" as a result of its (1) "efficient fleet composition," (2) long-term agreements outsourcing heavy maintenance, and (3) prior engine overhauls. ¶¶ 68, 74; Order at 19-21. Only one of the challenged Maintenance Statements touched upon Mesa's staffing, warning investors that "[o]ur continued success is partly dependent

on our ability to continue to attract and retain qualified personnel," *i.e.*, flight crews (pilots and flight attendants) and mechanics (the "Staffing Statement"). ¶ 74; Order at 20-21.

Plaintiff alleged that the Maintenance Statements were revealed to be false and misleading when "[o] n May 10, 2019 . . . during an earnings call with investors for Mesa's second quarter fiscal year 2019 ending March 31, 2019 ('Q2 2019'), Defendant Ornstein *disclosed for the first time* that Mesa had been 'hamstrung' by a shortage of 'qualified maintenance people' over the last 18 months—*i.e.*, for at least **nine months preceding the Offering**." ¶¶ 7, 9, 11, 87 (first emphasis added).  Mr. Ornstein's full statement reveals Plaintiff's selective edits to suit its theory, deleting Mr. Ornstein's emphasis on well-known and frequently disclosed long-term *pilot* shortages to make it appear that he was describing, and only describing, a similar shortage with respect to mechanics:

> In the last year, 18 months I mean, we were hamstrung by the fact that we had expanded a lot, we needed more pilots, we got hung up a little bit in pilot training, maintenance became more difficult in terms of qualified maintenance people. And we're just sort of finally putting all that together.

Order at 3; ¶ 99.

Although Mr. Ornstein's statement was primarily focused on pilots and does not state that any "difficult[ies] in terms of qualified maintenance people" existed or persisted over the entire prior 18-month period, *i.e.*, both before and after the IPO, Plaintiff alleged that this disclosure revealed that "prior to and at the time of the Offering, Mesa was significantly understaffed with respect to qualified mechanics and maintenance personnel to fully service its fleet[.]" ¶ 9; *see* ¶¶ 75(b), 85(b); *see also* ¶¶ 79, 86.  No other "corrective" disclosures concerning the Staffing Statement are alleged. There are *no* alleged corrective disclosures revealing that *at the time of the IPO* Mesa's other Maintenance Statements, *i.e.*, its belief that its fleet composition, outsourced maintenance contracts, and past engine overhauls would result in maintenance cost efficiencies, were misleading or false.[1]  As the Court specifically identified in its Order, the other purported

---

[1] Nor is there any support for Plaintiff's broad allegation that the disclosed risks of increases in labor and aircraft maintenance costs in the future were misleading because
(continued...)

-4-

corrective disclosures alleged in the Complaint, made in January, February, August and December 2019, related to the now-dismissed American CPA, Operational Performance and/or Operational Spares Claims. Order at 12-13, 15-18; ¶¶ 75(a) and (c), 78, 85(a) and (c), 105-111.

In its Order, the Court held that the Staffing Statement was plausibly alleged to be misleading in light of the May 10, 2019 Corrective Disclosure:

> Construing Mr. Ornstein's [May 10, 2019 Corrective Disclosure] statements in the Pension Fund's favor, as is required at this stage of the litigation, the Court finds the Pension Fund's characterization of Mr. Ornstein's remarks plausible. . . . That is, *a reasonable person could interpret Mr. Ornstein's statements to mean that, from May 2018 to May 2019, Mesa Air faced a shortage of qualified mechanics*, and that shortage was one of four factors [and the only maintenance-related factor] that "hamstrung" the company. Accordingly, the Court finds the Pension Fund has plausibly alleged that *Mr. Ornstein's assertion rendered Mesa Air's statement that its success depended on its "ability to continue to attract and retain qualified personnel" misleading to a reasonable person*. *See Align Tech., Inc.*, 856 F.3d at 616 (quoting *Omnicare*, 575 U.S. at 194).

Order at 21-22 (emphasis added).

In other words, the Maintenance Claims were sustained on the basis of *a single alleged omission*: the alleged failure to disclose an alleged shortage of qualified mechanics during some portion of a 12- to 18-month time period that encompassed the time of the IPO. *Id.* at 21-22. While the Order subsequently referred to the Maintenance Statements collectively, the Staffing Statement (1) is the only challenged statement that specifically addresses in-house personnel, the subject of the May 10, 2019 Corrective Disclosure, and (2) is the only statement specifically addressed by the Court as plausibly misleading—and only because of the May 10, 2019 Corrective Disclosure. *Id.* at 21-23. The same singular focus on the Staffing Statement is apparent in the Court's discussion of Item 303- and 503-

---

they had purportedly materialized prior to the IPO (¶¶ 10, 81). Instead, the Registration Statement reported that "aircraft maintenance costs *decreased* by $14.4 million, or 6.4%, from Mesa's FY2016 to FY2017." ¶¶ 50, 51 (emphasis added); Ex. 4 at 64. Significantly, Plaintiff does not challenge the accuracy of this financial data. Moreover, the only issue identified in the Complaint relating to outsourced maintenance contractors failing to provide timely services did not occur until spring 2019 (more than nine months *after* the IPO), when two aircraft were delayed at Bombardier. ¶ 102; Ex. 5 at 6.

based liability, despite the use of the plural term "statements concerning Mesa Air's maintenance solutions." *Id.* at 23-24.

It also bears noting that the May 10, 2019 Corrective Disclosure addressing past pilot shortages and "difficult[ies] in terms of qualified maintenance personnel," was an isolated comment made in the context of Mesa's announcement of disappointing financial performance in 2Q 2019, which Mesa and market analysts attributed to issues unrelated to maintenance staffing shortages or to any other maintenance issues pre-dating the IPO. Ex. 6 at 5-7, 10. Rather, as the more detailed discussion during the 2Q earnings call makes plain, the maintenance events and expenses experienced in that quarter related to the *acceleration* of heavy maintenance including engine overhauls and "C-checks" so its planes would be in service for peak summer schedules.[2] Ex. 6 at 5; *see, e.g.*, Ex. 10 at 3 (C-checks "typically fall under 'heavy maintenance,'" and require "a deep inspection of a majority of the aircraft's parts," which "can often take the aircraft out of service for 1–2 weeks" and require up to "6,000 maintenance hours"). Significantly, Plaintiff does not contend that these 2Q 2019 statements were false.

Moreover, in making the May 10, 2019 Corrective Disclosure, Mr. Ornstein also assured the market that he believed the Company had turned the corner on the past pilot shortages and mechanics "difficult[ies]": "we're just sort of finally putting all that together." Ex. 6 at 10; Order at 3; ¶ 99. In other words, when "correcting" any misimpression allegedly created by the Registration Statement about Mesa's staffing levels at the time of the IPO, Mr. Ornstein made a *new* representation, *i.e.*, that then-*current and*

---

[2] Thus, during the 2Q 2019 call Mesa stated: "we had a big maintenance quarter [in] Q2 and Q3 will also be ["big" as we are] . . . doing a lot of maintenance *ahead of time* to free up the aircraft for the July, August peak summer schedules." Ex. 6 at 11 (emphasis added); *see also id.* at 7 ("As we have said, our engine expense, although predictable, can vary significantly quarter-to-quarter and year-over-year. We did provide guidance for Q3 [the *upcoming* quarter] with engine expense projected [to increase] . . . . Also, as we talked about on our last call, we have retimed some of our C-check events based on revised C-check time limits and also to accommodate our partner's request for having maximum number of aircrafts available during the summer. As a result, the C-check expense for Q2 was $3 million higher than in Q1. We expect this to continue for Q2—for Q3 rather, and then drop off in Q4, which is actually our summer quarter. Again, like engines, this is more of a timing issue and not a structural cost issue.").

*future* staffing levels would be adequate as the Company entered 3Q 2019, its first full quarter operating under elevated performance standards of the new Amended CPA.

### C.     Mesa's Disappointing 3Q 2019 Results Under the Amended CPA

In August 2019, Mesa reported disappointing results for its third quarter of 2019, its first full quarter operating under the Amended CPA.  Order at 3 (citing ¶ 101).  During the 3Q 2019 earnings call, Mesa explained the reasons, *i.e.*, that "sometime after May 1, 2019, the company had one aircraft rendered unavailable due to ground damage and two additional aircraft pulled due to 'labor shortages at our heavy maintenance provider'" and that "[g]iven this reduction in [spare] aircraft, Mesa Air failed to meet the revised performance metrics under the [Amended] American CPA[.]"  Order at 4 (citing ¶¶ 102-103).  This temporary reduction in spares, in turn, made Mesa unable to compensate for unusually bad weather and an industry-wide GPS glitch during the third quarter.  Ex. 5 at 6.  As a result of this confluence of unfortunate events, particularly, the "reduction in aircraft, Mesa Air failed to meet the revised performance metrics under the American CPA, and American exercised its right [under the Amended CPA] to remove two aircraft" thereby reducing future revenues.  Order at 4 (citing ¶ 103).

During the 3Q 2019 conference call which, not surprisingly, focused on that quarter's disappointing events and the consequent reduction of future revenue under the Amended CPA, Mesa disclosed that, "ironically," it had spent an additional $1.2 million in 3Q 2019 to hire "temporary third-party contractors to supplement [Mesa's] in-house maintenance capabilities," bringing its mechanics staffing levels "*significantly above* what our targeted maintenance number is, just to be on the safe side" (Ex. 5 at 7, 10), in an effort to assure that it *would* meet the Amended CPA's heightened performance criteria in the first full quarter it was in effect.  *Id.* at 7, 17 (noting the extra expense of employing temporary mechanics was meant "*to try to preempt challenges that could have presented this quarter*," *i.e.*, the first full quarter operating under the Amended CPA) (emphasis added).  Mesa also announced increased Q3 2019 heavy engine maintenance expense, which Mesa "had anticipated and had provided guidance for [in the prior] quarter" (Ex. 5

at 7) when it noted that it would accelerate some heavy maintenance to Q2 and Q3 so its fleet would be fully available for the peak summer season.[3]  Unfortunately, that accelerated maintenance included the two aircraft that ended up being delayed at Bombardier.

Ignoring Mesa's explanation that its Q3 2019 in-house mechanics expenses increased in order to bring staffing levels "*significantly above* the targeted maintenance number" in anticipation of the elevated Amended CPA performance standards, Plaintiff vaguely speculated in the Complaint that this expense instead reflected ongoing, unabated issues existing at the time of the IPO.  Plaintiff alleges that "due to Mesa's failure to maintain sufficient maintenance personnel and an adequate number of operational spare aircraft—two issues that existed nine months and one year prior to the Offering, respectively—the Company … failed to meet its operational performance requirements under the [Amended] American CPA [in 3Q 2019]."  ¶ 104; *see also* ¶ 108 (the 3Q 2019 results "confirmed that one year after the Offering[] Mesa … did not have an adequate number of operational spare aircraft … or a sufficient number of mechanics to maintain Mesa's aircraft [and that] the Company was not able to operate its fleet reliably or meet American's expectations.").  However, while the Complaint included this atmospheric speculation, it specifically alleged that the maintenance statements were corrected by the May 2019 Corrective Disclosures (¶¶ 7, 75(b), 85(b)) and that the August 2019 disclosures only corrected statements related to spares.  ¶¶ 7, 75(c), 85(c).

**D.    The Post-3Q 2019 Disclosure Stock Price Decline**

After Mesa announced its disappointing 3Q 2019 financial and operational results,

---

[3] *See also* n.2, *supra*; Ex. 6 at 7 (providing guidance in Q2 that Q3 maintenance expenses would be elevated due to the acceleration of C-checks and engine maintenance in advance of the summer season). Investors and the market were well aware that maintenance expense "timing" and expenses could vary materially.  In the Registration Statement, Mesa warned that "[o]ur financial results can vary materially from quarter to quarter due to the timing of engine overhaul" and that "the actual timing and costs of major engine maintenance expense are subject to variables such as estimated usage, government regulations and the level of unscheduled maintenance events and their actual costs. Accordingly, we cannot reliably quantify the costs or timing of future maintenance-related expenses for any significant period of time." Ex. 4 at 56, 66, 78. Similar warnings were repeated when Mesa provided its guidance for Q3.  Ex. 6 at 7.

which, as was also disclosed, resulted in American removing two revenue-generating aircraft from the CPA with the threat of further reductions, analysts cut their 4Q 2019 and 2020 estimates and Mesa's stock price, not surprisingly, declined. Tabak Rep. ¶ 34; *see, e.g.*, n.22 (*Stifel,* August 9, 2019: "We lower our 2020 contract revenue estimate by ~$30m to reflect our expectation for the impact from American removing aircraft from scheduled service with Mesa …, assum[ing] that American removes two aircraft in November, … and another two in Mesa's F2Q20 … result[ing] in a y/y decline in aircraft in scheduled service with American of ~7% for FY20 … and a similar decline in revenue-generating block hours[.]"). Analysts were also concerned with wholly-unrelated uncertainties concerning protracted contract negotiations with United, which they viewed as a significant "overhang." Tabak Rep. ¶ 36.

However, not a single market analyst attributed Mesa's disappointing performance in 3Q 2019 or the future impact of that quarter's events to any shortage of mechanics, much less a shortage of mechanics that had existed at, and persisted since, the time of the IPO. Tabak Rep. ¶¶ 34-37. Indeed, not a single market analyst attributed Mesa's disappointing performance in 3Q 2019 to *any* maintenance issues existing at the time of IPO. *Id.* Instead, analysts focused on the future financial consequences of Mesa's failure in 3Q 2019 to meet the "post-IPO CPA amendment [performance criteria], not the adequacy of [mechanics staffing (or any of Mesa's maintenance solutions)] at the time of the IPO." *Cf.* Order at 16, 18 (discussing spare count); Tabak Rep. ¶¶ 34-37.

## III.    ARGUMENT

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that a party may move for summary judgment with respect to any "claim or *defense,*" and that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added)*; see In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1112 (9th Cir. 1989); *In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1015, 1051 (S.D. Cal.),

*appeal docketed*, No. 21-55342 (9th Cir. 2021) (granting defendant's motion for summary judgment on an affirmative defense) (citing *Dam v. Gen'l Elec. Co.*, 265 F.2d 612, 614 (9th Cir. 1958)). As the moving party asserting an affirmative defense, Defendants bear the initial burden to show an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480-81 (9th Cir. 2000) (granting summary judgment where defendant carried this burden on its affirmative defense).

In a Section 11 case, where defendants assert a "negative causation" defense, this burden is "not insurmountable." *In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1364-65 (N.D. Cal. 1987) (quoting *Akerman* v. *Oryx Commc'ns, Inc.*, 810 F.2d 336, 340 (2d Cir. 1987)). Indeed, courts in this Circuit and elsewhere readily grant motions to dismiss and for judgment on the pleadings where defendants' "negative causation" affirmative defense is apparent from the face of the pleadings and documents incorporated by reference or subject to judicial notice. *Cai v. Switch, Inc.*, 2020 U.S. Dist. LEXIS 122593, at *10-11 (D. Nev. July 10, 2020) (judgment on the pleadings); *In re Shoretel, Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 11151, at *12-15 (N.D. Cal. Feb. 2, 2009) (dismissing Section 11 claims); *Brown v. Ambow Educ. Holding Ltd.*, 2014 U.S. Dist. LEXIS 18809, at *40-45 (C.D. Cal. Feb. 6, 2014) (same); *Boluka Garment Co. v. Canaan Inc.*, 2021 U.S. Dist. LEXIS 127490, at *12-13 (S.D.N.Y. July 8, 2021) (Section 11 claims subject to Rule 12(b)(6) dismissal where the alleged corrective disclosure did "not speak at all" to the alleged misrepresentations or omissions). Summary judgment may also be granted on this basis. *Fortune Sys.*, 680 F. Supp. at 1363, 1366-68; *Akerman*, 810 F.2d at 342-43. Moreover, where the defendant demonstrates "negative causation" on the basis of expert testimony which relies solely on publicly available information without, for purposes of the motion, controverting the alleged facts, such expert evidence may also be used to satisfy the defendant's burden. *Fortune Sys.*, 680 F. Supp. at 1367-68; *In re Barclays Bank PLC Sec. Litig. (Barclays I)*, 2017 U.S. Dist. LEXIS 148695, at *40-41 (S.D.N.Y. Sept. 13, 2017), *aff'd*, 756 F. App'x 41 (2d Cir. 2018); *Akerman*, 810 F.2d at 343; *Alpha Capital*

-10-

*Anstalt v. Intellipharmaceutics Int'l Inc.,* 2021 U.S. Dist. LEXIS 128773, at *9-12, *17 (S.D.N.Y July 9, 2021).

To prevail on their "negative causation" defense at summary judgment, a defendant must show "'that the allegedly misleading representations did not cause the depreciation in the stock's value.'" *Barclays I*, 2017 U.S. Dist. LEXIS 148695, at *40-41; *In re Barclays Bank PLC Sec. Litig. (Barclays II)*, 756 F. App'x 41, 45 (2d Cir. 2018). A Section 11 defendant is not required to prove "what other factors caused a decline; once a defendant shows that the alleged misrepresentation was *not* the cause of plaintiffs' losses, its burden is met." *McKowan Lowe & Co. v. Jasmine, Ltd.*, 2005 U.S. Dist. LEXIS 32164, at *37 n.12 (D.N.J. June 30, 2005), *aff'd*, 231 F. App'x 216, 218 (3d Cir. 2007) (emphasis added). Where a defendant meets this burden, the burden shifts and plaintiff must then "adduc[e]" specific evidence suggesting that the price decline actually resulted from the alleged misstatement. *Id.* at *35-38; *see Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where a defendant presents expert testimony demonstrating "negative causation," a plaintiff may no longer rely on speculative allegations, but must discredit the defendant's expert analysis, by presenting competent and more compelling expert evidence of their own. *Intellipharmaceutics*, 2021 U.S. Dist. LEXIS 128773, at *13-15; *see also Fortune Sys.*, 680 F. Supp. at 1368 ("The Court refuses to allow speculation … to create a genuine issue of material fact for trial on the issue of loss causation," where plaintiffs "failed to rebut defendants' evidence concerning the decline").

**B.    Section 11 and the "Negative Causation" Defense**

"Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, provides a cause of action to any person who buys a security issued under a materially false or misleading registration statement." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013). Because a plaintiff must show that the statements it challenges were misleading at the time of the IPO, where a plaintiff asserts "[a] claim under section 11 based on the omission of information [it] must demonstrate that *the omitted information existed at the time the registration statement became effective.*" *Rubke v. Capitol Bancorp, Ltd.*, 551

-11-

F.3d 1156, 1164 (9th Cir. 2009) (emphasis added).

Section 11 damages are calculated as "the difference between the amount paid for the security … and … the value thereof as of the time such suit was brought [or the shares were sold][.]"   15 U.S.C. 77k(e).   Section 11's statutory damages calculation thus "envisions material misrepresentations [or omissions] in the registration statement inflating the market price of the security at the time of the [offering]" and that "[w]hen the … misrepresentation [or omission] is revealed," the "market corrects the price of the security to the value it would have had absent the misrepresentation [or omission]."  *Barclays I,* 2017 U.S. Dist. LEXIS 148695, at *66-67 (citation omitted).  Thus, "the statute [calculates] damages [as] the difference between the two prices—the purchase price reflecting the inflation associated with the material misstatement [or omission] and the latter reflecting the market correction after disclosure to approximate the value of the loss caused by the material misstatement [or omission]."  *Id.* at 67 (citation omitted).

However, because "a [Securities Act] defendant is liable only for depreciation that results directly from the misrepresentation at issue" a plaintiff cannot recover declines in market prices that were caused by circumstances other than the alleged misrepresentations or omissions in the offering documents it challenges.  *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1100 (9th Cir. 2010) (discussing the identical provision to Section 11(e) under Section 12 of the Securities Act) (emphasis added; citation omitted).  Thus, Section 11(e) provides defendant with a "negative causation" defense: "if the defendant proves that any portion or all of [the claimed] damages represents other than the depreciation in value of such security resulting from [a misrepresentation or omission in] … the registration statement, … such portion of or all such damages shall not be recoverable."  15 U.S.C. § 77k.  This provision is consistent with the general principle that the federal securities laws were "not [designed] to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations *actually cause*." *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 344-45 (2005) (quoted in *Shoretel*, 2009 U.S. Dist. LEXIS 11151, at *12-19 (dismissing Section 11 claims where losses were not

"caused" by misrepresentations in the registration statement)); *Ambow*, 2014 U.S. Dist. LEXIS 18809, at *40-45 (same).

In explaining loss causation under Section 10(b)—the "mirror image" of Section 11's negative causation defense (*Ambow,* 2014 U.S. Dist. LEXIS 18809, at *40 (citing *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 346 n.39 (S.D.N.Y. 2005))—the Ninth Circuit has repeatedly emphasized that "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197 (9th Cir. 2021) (emphasis added) (citations omitted). Loss causation—and negative loss causation—thus focuses on whether a loss can be attributed to "*the very facts about which the defendant lied*." *Id.* (citation omitted; emphasis added); *see also Miller*, 615 F.3d at 1100, 1105 (Section 12).

As the Ninth Circuit has further explained, "[b]ecause the nature of [a securities claim] is that [defendants] conceal[ed or misrepresented] 'underlying facts that affect the stock price,'" loss causation requires a showing that "the 'share price *fell significantly* after the truth became known.'" *Tesla*, 985 F.3d at 1197-98 (affirming dismissal where stock price quickly rebounded after corrective disclosure); *Miller*, 615 F.3d at 1100, 1105 (affirming judgment where there was no significant stock price decline) (Section 12).

Consistent with these principles, for a Section 11 claim to succeed it is "crucial" that (1) there be "a revelation of the concealed [or misrepresented fact]" *in the registration statement* and (2) "that the revelation cause a [significant] depreciation in the value of the security." *Barclays I*, 2017 U.S. Dist. LEXIS 148695, at *66-67 (citations omitted); *Ambow*, 2014 U.S. Dist. LEXIS 18809, at *42-45; *accord Miller*, 615 F.3d at 1100. Defendants will prevail on their Section 11 negative causation defense if they disprove either or both of these predicates.

Here, as discussed more fully below, Defendants have an absolute "negative causation" defense entitling them to summary judgment—for several reasons. *First,* none of the decline in Mesa's stock price occurring *before* the allegedly corrective disclosure in May 2019 could possibly have been caused by a market reaction to the revelation of the

-13-

"truth" and is therefore not recoverable.  *Second,* when Mesa did reveal past staffing difficulties in May 2019, the market did *not* react—there was no statistically significant stock price decline.  *Finally,* statements made about increased maintenance expenses, including staffing costs, in 3Q 2019, which were announced in August 2019—a year after the IPO—were not "corrective" both because (1) there was no omission remaining to be corrected and (2) the August statements did not reveal *any* information concerning the adequacy of Mesa's maintenance solutions *at the time of the IPO*, and, thus, did not reveal any misrepresentation or omission *in the Registration Statement*, the gravamen of a Section 11 claim.

Accordingly, none of the decline in value of Mesa's stock subsequent to Mesa's IPO can be attributed to the only remaining alleged omission in the Registration Statement— the alleged shortage of qualified mechanics at the time of the IPO.  Defendants are entitled to summary judgment on their "negative causation" defense as a matter of law.

**C.    Plaintiff and the Class May Not Recover Stock Price Declines Prior to the May 10, 2019 Corrective Disclosure**

As a matter of logic and law, "[t]he price decline before [any allegedly corrective] disclosure may not be charged to defendants" in a Section 11 case.  *Akerman*, 810 F.2d at 342-43 (affirming summary judgment on negative loss causation grounds);  *Fortune Sys.*, 680 F. Supp. at 1363, 1366-68 (same; granting summary judgment); *accord Cai*, 2020 U.S. Dist. LEXIS 122593, at *10 (Section 11's negative causation "defense prevents a devaluation of stock prior to the disclosure of the truth at issue from being attributed to defendants") (granting judgment on the pleadings).

This principle is just a matter of common sense, recognizing that "the market *could not* react to the [alleged] omissions until they were actually learned of," and, thus, any decline prior to the corrective disclosure must be attributable to something else. *Fortune Sys.,* 680 F. Supp. at 1363, 1365-68 (granting summary judgment); *McKowan*, 2005 U.S. Dist. LEXIS 32164, at *36-40 (same).  Accordingly, where there is no evidence that the market learned of the omissions or misrepresentations prior to the alleged corrective

-14-

disclosure, Defendants are entitled to summary judgment on their negative causation defense for any pre-disclosure stock price decline. *Fortune Sys.*, 680 F. Supp. at 1363, 1366-67; *Akerman*, 810 F.2d at 342-43.

Here, Plaintiff alleges that on May 10, 2019, Defendants "*disclosed for the first time that Mesa had been 'hamstrung' by a shortage of 'qualified maintenance people' over the last 18 months—i.e.*, for at least nine months preceding the Offering." ¶ 7 (emphasis added); *see also* ¶¶ 9, 11, 85(b), 87, 99. Because "[t]here is no allegation in the [amended] complaint that any corrective disclosures [regarding a shortage of qualified maintenance personnel] reached the market prior to [May 10, 2019]," "defendants have an absolute 'negative causation' defense pursuant to Section 11(e)" with respect to any losses suffered prior to that date. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1262 (N.D. Cal. 2000) (granting motion to dismiss Section 11 claims with respect to losses prior to the allegedly corrective disclosure); *see also, e.g.*, *Fortune Sys.*, 680 F. Supp. at 1363, 1366-68 (same; granting summary judgment); *Akerman*, 810 F.2d at 342-43 (same; affirming summary judgment). Accordingly, the decline in Mesa's stock price prior to the May 10, 2019 Corrective Disclosure is not recoverable under Section 11(e).

**D.** **The May 10, 2019 Corrective Disclosure Did Not "Cause" Any "Losses"**

As discussed above, for a securities claim to succeed, the revelation of the concealed or misrepresented fact must cause a significant decline in the value of the security. *Barclays I*, 2017 U.S. Dist. LEXIS 148695, at *66-68 (granting summary judgment) (Section 11); *Ambow*, 2014 U.S. Dist. LEXIS 18809, at *42-45 (granting dismissal where disclosure did not cause a stock price decline) (Section 11); *Miller*, 615 F.3d at 1103 (affirming judgment on negative causation defense) (Section 12); *accord Tesla*, 985 F.3d at 1198 (affirming dismissal of Section 10(b) claims where "'the share price [did not] *f[a]ll significantly* after the truth became known'"); *In re Allstate Life Ins. Co. Litig.*, 2013 U.S. Dist. LEXIS 132141, at *26-27 (D. Ariz. Sept. 13, 2013) (granting summary judgment where there was "[no] evidence of market revelation or economic loss, which the Ninth Circuit required even in its most relaxed version of the loss causation requirement")

-15-

(Section 10(b)); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 946-47 (D. Ariz. 2007) (dismissing Section 10(b) claims where plaintiffs "failed to link their losses to the alleged misrepresentations by showing" that the "stock price dropped upon revelation of the true state of the facts"). As the Ninth Circuit recently put it in *Tesla,* where "the price movement of the stock in question is not in sync with the plaintiff's theory of recovery, loss causation will be extremely difficult, if not impossible, to prove." 985 F.3d at 1198 (affirming dismissal) (quoting 4 T. Hazen, *Law of Securities Regulation* § 12.93 (2020 update)).

Consistent with this principle, courts grant summary judgment in Section 11 cases on negative causation grounds where expert analysis demonstrates that there is no statistically significant stock price decline after the revelation of the allegedly concealed or misstated information in a registration statement. *Akerman*, 810 F.2d at 343 (affirming summary judgment on negative loss causation grounds where defendants' expert's analysis "establish[ed] that the misstatement was barely material and … the public failed to react adversely to its disclosure"); *see also Barclays II*, 756 F. App'x at 48 (affirming summary judgment where expert established there was "no statistically significant market reaction" to the alleged corrective disclosure). As one district court recently put it, citing the Second Circuit's decision in *Barclays,* expert analysis demonstrating the lack of a statistically significant stock price decline constitutes "compelling evidence … establish[ing] that, *even if* the Registration Statement contained material omissions, those omissions were 'not the cause of the actual loss[.]'" *Intellipharmaceutics*, 2021 U.S. Dist. LEXIS 128773, at *12 (granting summary judgment); *see also id.* at *9-11, *17.

Here, the analysis of Mesa's economic expert, Dr. David Tabak, establishes that after the May 10, 2019 Corrective Disclosure, *Mesa's stock price fluctuated but did not experience a statistically significant decline*. Tabak Rep. ¶¶ 15, 19, 24. Mesa's share price decreased only marginally, falling from a close of $9.34 on May 9, 2019 to a close of $9.20 on May 10, 2019, marking a decline of $0.14 per share. If one measures from the time when the earnings call began at 1 p.m. on May 10, 2019, the share price declined only $0.17 over the remainder of that trading day. On May 13, 2019, the price dropped another

$0.39 to $8.81 at the same time as market and relevant industry indices decline.  Tabak Rep., Ex. 4b.

In reaching his conclusion that none of these declines were statistically significant, Mesa's expert, Dr. Tabak, like the experts in *Barclays* and *Intellipharmaceutics,* performed a statistical analysis known as an "event study."  As Judge Campbell explained:

> An event study is a statistical analysis used to "'disentangle the effects of two types of information on stock prices—information that is specific to the firm under question and information that is likely to affect stock prices marketwide.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016) (quoting Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 Bus. Law. 545, 556-57 (1994)). The study includes a regression analysis of daily stock returns to determine the typical level of stock price volatility and the relationship between a company's stock price movements and market and sector index movements. It allows an expert "to make inferences about the degree to which the company's stock price may have been artificially inflated on the basis of the market's misconception as to the truth prior to the release of that information." *Id.* at 253-54.

*Smilovits v. First Solar, Inc.*, 2019 U.S. Dist. LEXIS 221424, at *19 (D. Ariz. Dec. 27, 2019).  As Judge Campbell confirmed, "[e]vent studies are widely accepted and have been characterized as 'standard operating procedure in federal securities litigation.'"  *Id.* (citation omitted)*; see also, e.g.*, *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005) (same; also citing Tabak et al., *Materiality and Magnitude: Event Studies in the Courtroom*, NERA Working Paper, April 1999).

As Dr. Tabak further explains, once an event study:

> remov[es] the influence of general market and/or industry effects … [t]he remaining movement is then compared to a "control period" of similar market- and/or industry-adjusted price movements to see if it is unusual (i.e., statistically significant). If so, then one may be able to make the inference that the news was the cause of the unusual stock price movement.

Tabak Rep. ¶ 9.

Here, Dr. Tabak began his negative loss causation analysis by confirming, based on publicly available electronic databases, the allegation that Mesa's in-house mechanics staffing challenges during a period before and after the IPO were first revealed to the

market on May 10, 2019 during an earnings call that began at 1 p.m., *i.e.*, while the market was still open.  Tabak Rep. ¶ 12.  He then used various market models that compared the decreases in Mesa's stock price on May 10, 2019 and May 13, 2019 (the next trading day after the disclosure) to other daily and intraday fluctuations in Mesa's stock price and fluctuations in the United States stock market as a whole, using various indices, including those of publicly traded industrial and transportation stocks.  *Id.* ¶ 13.  Dr. Tabak conducted alternative analyses of these stock price movements using 22 different models utilizing 14 different comparative stock indices in order to assure that no idiosyncratic effects in any particular model or index affected his results.  *Id.* Ex. 3a, Ex. 3b.  He considered the price movements using different measuring dates, *i.e.*, beginning from the close on May 9, 2019 and, alternatively, after the 2Q earnings call began mid-day on May 10, 2019, and compared those prices to the prices on the close on May 10, 2019 after the May 10, 2019 Corrective Disclosure was made (which he considers the appropriate measuring date) and, alternatively, after the close on the next trading day, May 13, 2019.  *Id.* ¶¶ 14–17.

***Based on each and every one of these models, Dr. Tabak found that none of Mesa's stock price movements were statistically significant at the standard 95% significance interval***.  Tabak Rep. ¶ 18.  Instead, Dr. Tabak found that all of these fluctuations were within the normal range of volatility for Mesa's excess returns.  *Id.* ¶ 19.  This result held regardless of the event window; every model showed that Mesa's stock price did not experience a statistically significant change on any day between May 9 and May 13, 2019 (the next trading day after the May 10 disclosure) nor did it experience a statistically significant change over the period from May 9 to 13 as a whole.  *Id.* ¶¶ 22–24.

In sum, Dr. Tabak's report demonstrates that the minor fluctuations in Mesa's stock price that followed the May 10, 2019 Corrective Disclosure were statistically indistinguishable from normal daily fluctuations in the value of Mesa's stock that occurred because of broader market developments.  Tabak Rep. ¶¶ 19, 24.  This conclusion alone warrants entry of summary judgment.  *See, e.g.*, *Barclays II*, 756 F. App'x at 48 (affirming summary judgment on negative causation grounds where expert event study demonstrated

that there was no statistically significant stock price decline); *Intellipharmaceutics*, 2021 U.S. Dist. LEXIS 128773, at *9-12 (same; granting summary judgment).

Dr. Tabak also observed that his conclusion that the market did not react to the May 10, 2019 Corrective Disclosure is further supported by the fact that not a single market analyst reporting on Mesa's disappointing 2Q 2019 results commented on Mesa's then-current or past in-house mechanic staffing levels. Tabak Rep. ¶¶ 25–27. *Not one mentioned Mr. Ornstein's statements about a prior shortage of mechanics, i.e.*, the May 10, 2019 Corrective Disclosure. Tabak Rep. ¶ 26. Indeed, the only mention of mechanics at all was a single bullet point from a single analyst (Cowen) who noted a general, industry-related risk of shortages experienced by "some airlines"—a bullet point that was not specific to Mesa and instead appears to have been included in Cowen's overall industry reports over at least a two-year period. *Id.* ¶ 27. The lack of analyst commentary about Mesa's pre-IPO staffing issues supports the conclusion that none of the "changes [in stock prices] are explainable by the release of information related to [the alleged omission or misrepresentation]," here, the pre-IPO mechanics shortages. *Goldkrantz v. Griffin*, 1999 U.S. Dist. LEXIS 4445, at *13-14 (S.D.N.Y. Apr. 6), *aff'd mem.*, 201 F.3d 431 (2d Cir. 1999); *Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund (Local 66)*, 579 F.3d 401, 408-10 (5th Cir. 2009) (finding no loss causation based on a review of analyst reports which showed that stock price decline was primarily driven by concerns other than disclosure of alleged fraudulent practices).

Finally, the lack of causality is further demonstrated by the fact that in the weeks and months after the May 10, 2019 Corrective Disclosure, Mesa's stock price generally remained at a level similar to its closing price of $9.34 on the day before the May 10, 2019 Corrective Disclosure, closing at $9.77 on August 8, 2019, immediately preceding the August 9, 2019 disclosure. Tabak Rep., Exs. 7a, 7b. *See Barclays II*, 756 F. App'x at 48 (noting that "a layperson's review" of share prices further supported summary judgment on defendants' negative loss causation defense); *accord Tesla*, 985 F.3d at 1198 (affirming dismissal on loss causation grounds even in the absence of expert testimony where public

records showed stock price declined but quickly recovered after the allegedly corrective disclosure).

In sum, where, as here, "the evidence shows virtually no market reaction—and certainly no statistically significant market reaction—to the revelation of [the allegedly omitted or misstated facts]," negative loss causation is established because there are no "losses" that were "caused" by the alleged revelation of the supposed "truth." *Barclays II*, 756 F. App'x at 48-50 (affirming summary judgment); *Akerman*, 810 F.2d at 342-43 (same); *Intellipharmaceutics*, 2021 U.S. Dist. LEXIS 128773, at *9-11, *17 (same; granting summary judgment); *Goldkrantz*, 1999 U.S. Dist. LEXIS 4445, at *12-15 (same).

**E.    The August 9, 2019 Disclosures Are Not Causally-Linked to the Now-Corrected Maintenance Statements in the Registration Statement**

Belatedly recognizing that the only maintenance-related corrective disclosure—the May 10, 2019 Corrective Disclosure—did not cause any recoverable losses, Plaintiff here, like the unsuccessful plaintiff in *Barclays,* "begins to grasp at straws" and "quibbles" that "[this] disclosure . . . did not constitute the *'full truth* about Defendants' misrepresentations and omissions'" in the Registration Statement. *Barclays I*, 2017 U.S. Dist. LEXIS 148695, at *70; Ex. 8 at 6; Ex. 9 at 6-7. As in *Barclays* and *Miller*, Plaintiff now speculates that although it alleged that Mr. Ornstein disclosed the challenges concerning staffing at the time of the IPO in May 2019 (when he also made a *new* forward-looking representation that past staffing challenges had been overcome), Mesa's staffing challenges continued, further speculating that these continuing issues led to increased maintenance personnel expenses, which adversely impacted Mesa's 3Q 2019 financial and operational results announced August 9, 2019, which in turn led to a stock price decline. Ex. 8 at 6; Ex. 9 at 6-7. Based on this chain of speculation, Plaintiff concludes that the increased maintenance personnel expense in 3Q 2019 relates to the alleged shortage of mechanics existing at the time of the IPO and the decline in Mesa's stock price a year later is therefore recoverable under Section 11. *Id.*

As the *Barclays* court put it, such an "argument is not to be taken seriously."

*Barclays I*, 2017 U.S. Dist. LEXIS 148695, at \*70. Once a disclosure is made correcting a misrepresentation in the registration statement, such "[corrective] disclosure br[ea]k[s] any chain of causation that might have existed connecting any failure to report" staffing issues existing prior to the IPO, "and any losses [Plaintiff] may have suffered after [those facts were revealed]." *Barclays II*, 756 F. App'x 49-51. In other words, after a fully corrective disclosure concerning facts existing at the time of the IPO, "Plaintiff cannot recover for [subsequent] declines resulting from materialization of risk 'somehow connected with the [now-corrected] misstatement' [or omission]" where "the potentially corrective additional disclosures" do not "reveal 'some then-undisclosed fact' "reflect[ing] information that was misstated or concealed before the Offering." *Barclays I*, 2017 U.S. Dist. LEXIS 148695, at \*71-75 (emphasis added; citation omitted); *see also Barclays II*, 756 F. App'x at 49-50 (after a fully corrective disclosure of omissions in the registration statement, it is no longer relevant that additional details "may have emerged at any later date."); *see also SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 70 (D. Del. 2020) (where there was a full disclosure of the allegedly omitted facts *as they existed at the time of the challenged statements*, plaintiffs cannot recover for declines resulting from materialization of a risk arising from those disclosed facts), *appeal docketed*, No. 20-3427 (3d Cir. 2020).

The Ninth Circuit is in accord. Thus, in *Miller*, the Court of Appeals held that once a misstatement in an offering prospectus was fully corrected, subsequent stock price declines coinciding with the release of poor financial results were not recoverable under the Securities Act, even though the company disclosed *additional* details about the now-corrected facts. *Miller*, 615 F.3d at 1105. In so holding, the Ninth Circuit declined to credit "hypothetical" allegations that later losses were the "expected consequences" of the previously-corrected misstatement in the offering prospectus. *Id.*

The allegations here are even more attenuated. In *Miller,* the additional purportedly corrective disclosures specifically referenced and provided more detail about the now-disclosed "truth" about pre-IPO events and circumstances. Here, by contrast, Plaintiff's

-21-

"hypothetical" speculation that the increased maintenance expenses disclosed in August 2019 were the "expected consequences" of the now-disclosed staffing difficulties Plaintiff alleges existed at the time of the IPO is based on a disclosure that does not contain a single *reference to any maintenance- related issues at the time of the IPO.*

Where, as here, a post-IPO disappointing earnings announcement "reveals *nothing* [not just nothing *new*] about what was allegedly misrepresented in or omitted from the Registration Statement" it "cannot rationally be inferred as disclosing the alleged misstatements or misleading omissions in the Registration Statement." *Shoretel*, 2009 U.S. Dist. LEXIS 11151, at *15-19 (dismissing Section 11); *Ambow,* 2014 U.S. Dist. LEXIS 18809, at *42-45. (same, citing *Shoretel*); *accord*, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063-65 (9th Cir. 2008) (affirming dismissal where the allegedly corrective disclosures did not reveal that the *specific* alleged misrepresentation or omissions plaintiff challenges were false when made); *Grigsby v. BofI Holding, Inc.,* 979 F.3d 1198, 1207-08 (9th Cir. 2020) ("To be corrective, the disclosure … must at least relate back to the misrepresentation and not to some other [more current] negative information about the company.") (citation omitted).

While the August 9, 2019 disclosures did announce increased expense for temporary mechanics and heavy maintenance during 3Q 2019, unlike the May 10, 2019 Corrective Disclosure statements about past staffing shortages, the August statements made no reference whatsoever to any *past* maintenance-related deficiencies much less any such issues that existed at the time of the IPO.  Instead, in statements not challenged as false, Mesa disclosed that in 3Q 2019 it spent $1.2 million to hire "temporary third-party contractors to supplement [Mesa's] in-house maintenance capabilities," achieving levels "significantly above what our targeted maintenance number," in an effort to assure that the Company would meet the Amended CPA's heightened performance criteria in the first full quarter it was in effect.  Ex. 6 at 7, 10, 17.  *See* pp. 7–8, *supra.*  The increased 3Q 2019 heavy maintenance expense was described as "a timing issue" *which* Mesa "*had anticipated and had provided guidance for [in the prior] quarter*," (Ex. 5 at 7, 17)

-22-

(emphasis added), when it announced it was accelerating heavy maintenance so that its fleet would be fully available during the peak summer season when the Amended CPA would go fully into effect. *See* pp. 6–7, *supra*. Again, Plaintiff does not claim this explanation was false.

Moreover, Plaintiff cannot "provide proof[] that the market recognized a relationship between the event disclosed and the [alleged misrepresentation or omission]," as required where there is no direct or obvious connection between the two. *In re BP P.L.C. Sec. Litig.*, 2016 U.S. Dist. LEXIS 73721, at *140 (S.D. Tex. May 31, 2016) (collecting cases) (citation omitted); *cf. Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210-11 (9th Cir. 2016) (loss causation demonstrated where "the market and various analysts perceived [a] subpoena to be related to" misstatements about defendant's financial situation, a perception that was later confirmed). As discussed, not a single market analyst attributed Mesa's disappointing performance in 3Q 2019 to any shortage of mechanics, much less a shortage of mechanics that had existed at, and persisted since, the time of the IPO. Tabak Rep. ¶¶ 34-37. Indeed, not a single market analyst attributed Mesa's disappointing performance in 3Q 2019 to *any* maintenance issues existing at the time of IPO. *Id.* ¶¶ 34–37. Nor, unlike *Lloyd*, can Plaintiff point to any disclosure later confirming any such connection.

After reviewing the August 2019 statements—which Plaintiff only alleged were "corrective" of statements concerning Mesa's spare aircraft (¶¶ 75(c), 85(c))—the Court concluded that the August statements "concern[ed] … post-IPO CPA amendment [spare counts], *not* the adequacy of the spare count at the time of the IPO." Order at 16, 18 (emphasis added). The Court's conclusion with respect to the August 2019 statements concerning spare counts applies equally to the statements concerning maintenance expense in 3Q 2019: The context shows that Mesa's 3Q 2019 statements, which made no reference to pre-IPO periods, concerned post-IPO Amended CPA maintenance expenses, *not* the adequacy of Mesa's maintenance solutions, including staffing, at the time of the IPO. *Cf.* Order at 16, 18. As another district court recently held in words equally applicable here: "'Rather than relate back to Defendants' alleged misrepresentations, the events and dates

-23-

Plaintiff identifies relate to other negative information about the company, thereby insufficiently establishing loss causation.'" *In re Synergy Pharm., Inc. Sec. Litig.*, 2021 U.S. Dist. LEXIS 191322, at *25-26 (E.D.N.Y. Sept. 30) (granting motion to dismiss because "[t]he number of dots the Court must connect to produce an adequate theory of loss causation are too numerous and attenuated to succeed."), *appeal docketed*, No. 21-2724 (2d Cir. 2021) (Section 10(b) (citations omitted)); *see also In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1048 (N.D. Cal. 2009) (granting motion to dismiss where "[t]he allegations do not provide a plausible connection between the revelation of [the alleged] fraud . . . and the eventual price drop eight months later").

In sum, after a fully corrective disclosure and/or where losses in post-IPO periods are not revealed to have resulted from circumstances existing at the time of the IPO, stock price declines are not attributable to any misstatement or omission in the offering documents and, thus, are not recoverable under the Securities Act. Plaintiff's belated speculation that the August disclosure was "corrective" of the Maintenance Statements in the Registration Statement is, therefore, unavailing and must be rejected.

## IV.    CONCLUSION

In sum, Defendants have an absolute negative causation defense.  Losses prior to the allegedly corrective disclosure are not recoverable.  The corrective disclosure did not result in a statistically significant stock price decline.  Subsequent stock price declines are not attributable to the now-corrected alleged omissions in the Registration Statement. Accordingly, Defendants are entitled to summary judgment, disposing of the case.

Dated:  January 5, 2022                    WILSON SONSINI GOODRICH & ROSATI
                                           Professional Corporation

                                           By:  _____
                                                   NINA F. LOCKER

                                           *Attorneys for the Mesa Defendants*

*Lowthorp v. Mesa Air Group, Inc.*
Case No. 2:20-cv-00648-MTL

INDEX OF EXHIBITS TO MESA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| Exhibit No. | Exhibit Description |
| --- | --- |
| 1 | The Court's July 22, 2021 Order granting in part and denying in part the Mesa Defendants' Motion to Dismiss (ECF No. 81) |
| 2 | Mesa Defendants' September 3, 2021 Answer to the Amended Complaint (ECF No. 91) |
| 3 | Underwriter Defendants' September 15, 2021 Answer to the Amended Complaint (ECF No. 95) |
| 4 | Relevant Excerpts from Mesa's Form 424B4 (Prospectus), filed with the Securities and Exchange Commission ("SEC") on August 10, 2018 |
| 5 | S&P Global Inc. of Mesa's August 9, 2019 Q3 2019 Earnings Conference Call Transcript, attached as Exhibit 7 to the Declaration of Andrew C. Stanley in Support of Mesa Defendants' Motion to Dismiss (ECF No. 57-7) |
| 6 | S&P Global Inc. of Mesa's May 10, 2019 Q2 2019 Earnings Conference Call Transcript, attached as Exhibit 12 to the Declaration of Andrew C. Stanley in Support of Mesa Defendants' Motion to Dismiss (ECF No. 57-12) |
| 7 | Expert Report of David I. Tabak, dated January 3, 2022 |
| 8 | Joint Proposed Case Management Report filed with the Court on August 30, 2021 (ECF No. 90) |
| 9 | Supplemental Rule 26(f) Report filed with the Court on September 24, 2021 (ECF No. 96) |
| 10 | "Types of Maintenance Checks," National Aviation Academy (July 10, 2020), https://www.naa.edu/types-of-aviation-maintenance-checks/ (date accessed Jan. 5, 2022). |

# EXHIBIT 1

**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

David G Lowthorp,

        Plaintiff,

v.

Mesa Air Group Incorporated, et al.,

        Defendants.

No. CV-20-00648-PHX-MTL

**ORDER**

Plaintiffs bring this federal securities class action pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77a *et seq.*, on behalf of themselves and all others who purchased Mesa Air Group, Inc. ("Mesa Air") securities "pursuant and/or traceable to" the company's initial public offering ("IPO"). (Doc. 52 at ¶ 1.) Plaintiffs also assert claims against several Mesa Air officers and board members, as well as the financial institutions that underwrote the IPO. (*Id.*) Defendants Mesa Air, Jonathan G. Ornstein, Michael J. Lotz, Daniel J. Altobello, Ellen N. Artist, Mitchell Gordon, Dana J. Lockhart, G. Grant Lyon, Giacomo Picco, Harvey Schiller, and Don Skiados's (collectively, the "Mesa Defendants") have moved to dismiss all of Plaintiffs' claims. (Doc. 56.) Defendants Raymond James & Associates, Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Cowen and Company, LLC, Stifel, Nicolaus & Company, Inc., and Imperial Capital, LLC (collectively, the "Underwriter Defendants") have joined the Mesa Defendants' motion. (Doc. 59.) The motion is fully briefed. (Docs. 60, 63.) For the reasons given below, the Court will grant the motion in part.

## I.   BACKGROUND

This case arises out of offering documents that Mesa Air filed with the Securities and Exchange Commission ("SEC") in connection with the company's IPO. The First Amended Class Action Complaint (the "Amended Complaint") (Doc. 52) alleges the following facts, which the Court takes as true for purposes of resolving the pending motion. *See Everest & Jennings, Inc. v. Am. Motorists Ins. Co.*, 23 F.3d 226, 228 (9th Cir. 1994).

Mesa Air is a regional air carrier. (Doc. 52 ¶ 2.) It operates flights for American Airlines, Inc. ("American") and United Airlines, Inc. ("United") pursuant to terms detailed in respective capacity purchase agreements ("CPA"). (*Id.*) Mesa Air derives all its operating revenue from the CPAs. (*Id.*) As of March 2018, the American CPA accounted for 54% of Mesa Air's total revenue; the United CPA supplied the remaining 46%. (*Id.*)

In August 2018, Mesa Air conducted its IPO, selling nearly 11 million shares of common stock to the investing public at $12 per share. (*Id.* ¶ 59.) The Securities Act generally requires companies to file registration statements with the SEC before selling securities in interstate commerce. *See* 15 U.S.C. §§ 77d, 77e; *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 178 (2015). Thus, ahead of the IPO, Mesa Air filed a registration statement and prospectus with the SEC. (Doc. 52 ¶¶ 57–58.) Of significance here, the registration statement touted Mesa Air's relationship with American and the company's operational performance.[1] (*Id.* ¶¶ 66–74, 77.) It indicated that Mesa Air possessed 145 aircraft, including one unassigned operational spare. (*Id.* ¶ 69.) And the offering documents cautioned investors about risks that may adversely affect Mesa Air's prosperity. (*Id.* ¶¶ 79–84.)

Soon after the IPO, market analysts initiated coverage of Mesa Air's financial condition. (*Id.* ¶ 88.) In an equity research report published by Cowen in September 2018, analysts stated that "Mesa faced a significant amount of maintenance and engine expenses on owned aircraft in the past few years," but the "maintenance cost bubble is now behind them, which should lead to a stable maintenance outlook for the next few years." (*Id.*) In a

---

[1] The specific statements challenged by the Pension Fund are discussed in addressing the parties' arguments.

separate report published by Raymond James, analysts explained that Mesa Air's earnings per share ("EPS") was "set to grow sharply in FY19/FY20 due to," inter alia, a "fall-off in heavy maintenance cost." (*Id.* ¶ 89.)

On January 31, 2019, Mesa Air filed a Form 8-K with the SEC, announcing that its board of directors had ratified the company's entry into a term sheet with American, which amended the American CPA. (*Id.* ¶¶ 77, 92.) The Form 8-K described the CPA amendments as follows: (1) "the conversion of two aircraft under the CPA to operational spares, resulting in a decrease in the number of guaranteed revenue-generating aircraft operated by Mesa for American from 64 to 62, effective April 1, 2019;" (2) new and revised operational performance criteria; and (3) if Mesa Air "failed to comply with the new and revised operational performance criteria, American would have the unilateral right to permanently withdraw one aircraft from the CPA, up to two aircraft from the CPA in any calendar month, and up to six aircraft in total."[2] (*Id.* ¶ 92.) Mesa Air's chief executive officer, Jonathan Ornstein, discussed the American CPA amendment with investors during a quarterly earnings call in February 2019. (*Id.* ¶ 94.) He explained: "About a year ago, American talked [to] us about raising our performance levels" because the pre-amendment criteria "were certainly far below" the industry standard. (*Id.*)

In May 2019, Mesa Air reported disappointing quarter two financial and operating results. (*Id.* ¶ 96.) The company reported adjusted net income of $16 million and adjusted EPS of $0.46, which fell below analysts' estimates of $0.55 per share. (*Id.*) As to total operating revenue, Mesa Air reported $177 million, $1.5 million less than analysts' estimates. (*Id.*) During a corresponding earnings call, Mr. Ornstein stated: "We knew that in the last year, 18 months, I mean, we were hamstrung by the fact that we had expanded a lot, we needed more pilots, we got hung up a little bit in pilot training, maintenance became more difficult in terms of qualified maintenance people. And we're just sort of finally putting all that together." (*Id.* ¶ 99.)

The company's financial woes continued through quarter three. (*Id.* ¶ 101.) It

---

[2] The actual Term Sheet was disclosed on December 17, 2019, when Mesa Air filed it with the SEC as an attachment to the company's Form 10-K. (Doc. 52 ¶ 78.)

reported an adjusted EPS of only $0.30, and the company's total operating revenue was $3 million less than analysts' estimates. (*Id.*) Mesa Air also reported "increased maintenance expenses of $54 million, more than analyst estimates of $47 million," and "total operating expenses of $163 million," nearly $14 million more than analysts projected. (*Id.*) During a third quarter earnings call, Mesa Air's chief operating officer, Bradford Rich, explained that, sometime after May 1, 2019, the company had one aircraft rendered unavailable due to ground damage and two additional aircraft pulled due to "labor shortages at our heavy maintenance provider." (*Id.* ¶ 102.) Given this reduction in aircraft, Mesa Air failed to meet the revised performance metrics under the American CPA, and American exercised its right to remove two aircraft. (*Id.* ¶ 103.) Mr. Rich stated that, once Mesa Air was "properly spared," it would "add the mechanics to deal with some of the more intensive maintenance issues, and [the company] should be able to operate the fleet very reliably and meet [American's] expectations." (*Id.* ¶ 107.) Mr. Ornstein, in response to an analyst question, added that "[t]here were literally years of discussions in regard to what was the adequate spare count." (*Id.* ¶ 109.) He further noted that "clearly, this quarter, we've seen a sort of confluence of issues that have really put us in a difficult position." (*Id.*) In the days following the earnings call, Mesa Air's stock price dropped to $5.84 per share. (*Id.* ¶ 78.)

By April 1, 2020, Mesa Air's stock plummeted to $3.03 per share. (*Id.* ¶ 14.) The same day, Plaintiff David G. Lowthorp initiated this action. (Doc. 1.) After reviewing three lead plaintiff motions as required under the Private Securities Litigation Reform Act ("PSLRA"), the Court appointed DeKalb County Pension Fund (the "Pension Fund") as lead plaintiff and Faruqi & Faruqi, LLC as lead counsel. (Doc. 33.) The Pension Fund purchased just over 30,000 shares of Mesa Air common stock "pursuant and/or traceable to the IPO." (Doc. 52 ¶ 19, Ex. A at 2.)

On August 17, 2020, the Pension Fund filed the Amended Complaint, asserting claims for relief under Sections 11, 12(a)(2), and 15 of the Securities Act. (Doc. 52 at 44–47.) The Mesa Defendants, joined by the Underwriter Defendants, have moved to dismiss

the Pension Fund's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docs. 56, 59.) They also move the Court to either incorporate by reference or take judicial notice of 13 documents. (Doc. 58.) Both motions are ripe for ruling. (Docs. 56, 58, 60, 62, 63, 64.) The Court first resolves the motion pertaining to the doctrine of incorporation by reference and judicial notice.

## II.    INCORPORATION BY REFERENCE AND JUDICIAL NOTICE

### A.    Legal Standard

Generally, when assessing the sufficiency of a complaint under Rule 12(b)(6), the Court may not consider material outside the pleadings. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001); *see also* Fed. R. Civ. P. 12(d). "There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

Recently, the Ninth Circuit acknowledged "a concerning pattern in securities cases," whereby defendants improperly "exploit[]" the incorporation-by-reference doctrine and judicial notice to "defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja*, 899 F.3d at 998. Mindful that "[t]he overuse and improper application of [these procedures] . . . can lead to unintended and harmful results," the Ninth Circuit "clarif[ied] when it is proper to take judicial notice of facts in documents, or to incorporate by reference documents into a complaint, and when it is not." *Id.* at 998–99. Because the two procedures "permit district courts to consider materials outside a complaint, but each does so for different reasons and in different ways," the Court will address them in turn. *Id.* at 998.

Rule 201 of the Federal Rules of Evidence permits courts to take judicial notice of

"adjudicative fact[s]" that are "not subject to reasonable dispute," meaning the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(a)–(b). Courts, however, cannot take judicial notice of disputed facts contained in documents susceptible to judicial notice. *See Khoja*, 899 F.3d at 999. Thus, courts must "clearly specify" the fact or facts being judicially noticed. *Id.*

"Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Id.* at 1002. The doctrine is designed to prevent plaintiffs "from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* A document may be incorporated by reference into a complaint if it either "forms the basis of [a] plaintiff's claim" or is referred to "extensively" by the plaintiff. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). For a reference to be sufficiently "extensive," a document should be referred to "more than once." *Khoja*, 899 F.3d at 1003. But "a single reference" could, in theory, satisfy the standard if the reference is "relatively lengthy." *Id.*

Generally, and unlike judicial notice, district courts "may assume [an incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (quoting *Ritchie*, 342 F.3d at 908). It is improper, however, for courts "to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003. Thus, courts must be cautious when drawing inferences from incorporated documents. *Id.*

### B.    Discussion

To support their motion to dismiss, the Mesa Defendants ask the Court to incorporate by reference or take judicial notice of 13 documents, labelled as exhibits for ease of reference. (Doc. 58.) The Pension Fund "does not object to the court recognizing the existence of [the] offered documents and the statements made within." (Doc. 62 at 1.) The Pension Fund does, however, "object[] to the Court accepting as true any of the

- 6 -

statements or information contained in" the at-issue documents. (*Id.* at 1–2.) The Court will address the procedures seriatim.

### 1.   Incorporation by Reference

Defendants seek to have Exhibits 1, 2, 3, 4, 5, 6, 7, 9, and 12 incorporated into the Amended Complaint. (Doc. 58 at 4–5.) Exhibit 1 contains excerpts from Mesa Air's prospectus, as filed with the SEC on Form 424B4 on August 10, 2018. (Doc. 57-1.) Exhibit 2 is an index of exhibits identified in Mesa Air's Form S-1/A, as filed with the SEC on July 30, 2018. (Doc. 57-2.) Both exhibits are part of Mesa Air's registration statement, which forms the basis of the Pension Fund's claims, and the registration statement is referenced extensively in the Amended Complaint. (*See* Doc. 52 ¶¶ 1, 8–10, 13, 44, 45, 50, 51, 53, 56–58, 60, 65–74, 77, 79–84, 131, 133.) Accordingly, the Court will incorporate Exhibits 1 and 2 into the Amended Complaint. *See Ritchie*, 342 F.3d at 908 (noting the doctrine is applicable if "a plaintiff's claim about stock fraud is based on the contents of SEC filings").

Exhibits 3, 4, and 5 are related to the American CPA. Exhibit 3 is the CPA itself, which was attached as an exhibit to Mesa Air's Form S-1/A. (Doc. 57-3.) The Amended Complaint references the American CPA extensively, and thus the Court will incorporate the document. (*See* Doc. 52 at ¶¶ 2, 3, 12, 13, 20, 45–47, 53, 54, 67, 69, 75, 77, 78, 85, 92–94, 97, 98, 102–05, 109.) Exhibit 4 is Mesa Air's Form 8-K, as filed with the SEC on January 31, 2019. (Doc. 57-4.) The Form 8-K is referenced in two paragraphs in the Amended Complaint. (Doc. 52 ¶¶ 78, 92.) In paragraph 78(d), the Pension Fund quotes one of three paragraphs in the Form 8-K pertaining to the CPA amendment. (*Compare* Doc. 52 ¶ 78(d), *with* Doc. 57-4 at 4.) Though this may be a closer question than Exhibit 3, the Court finds the references to Exhibit 4 sufficiently extensive to incorporate the document into the Amended Complaint. Exhibit 5 is the "Nineteenth Amendment to Code Share and Revenue Sharing Agreement," which was filed with the SEC as an exhibit to Mesa Air's Form 10-K on December 17, 2019. (Doc. 57-5.) This document, which is referred to by the parties as the "American Term Sheet" or "American CPA amendment," is referenced extensively in the Amended Complaint. (Doc. 52 ¶¶ 78, 92–94, 97, 98, 102, 103, 105.) The

Court will thus incorporate the document.

Exhibits 6, 7, 9, and 12 are transcripts of Mesa Air's quarterly earnings conference calls. Exhibit 6 is S&P Global's Transcript of Mesa Air's FQ1 2019 Earnings Call, dated February 5, 2019. (Doc. 57-6 at 2.) The Court will incorporate this transcript into the Amended Complaint because it is referenced extensively therein. (Doc. 52 ¶¶ 13, 75, 78, 85, 94.) Exhibit 7 is S&P Global's Transcript of Mesa Air's FQ3 2019 Earnings Call, dated August 9, 2019. (Doc. 57-7.) The Amended Complaint refers to Exhibit 7 extensively, and the Court will incorporate the document. (Doc. 52 ¶¶ 7, 12, 102–10.) Exhibit 9 is S&P Global's Transcript of Mesa Air's FQ4 2019 Earnings Call, dated December 11, 2019. (Doc. 57-9.) Although this document is referenced only once in the Amended Complaint (Doc. 52 ¶ 78), the reference is "relatively lengthy" and the Pension Fund does not oppose Mesa Air's request. (Doc. 62 at 4.) *Khoja*, 899 F.3d at 1003 ("In theory, a reference may be sufficiently 'extensive' if a single reference is relatively lengthy."). Accordingly, the Court finds the reference sufficiently extensive under *Khoja* and *Ritchie*. Exhibit 12 is S&P Global's Transcript of Mesa Air's FQ2 2019 Earnings Call, dated May 10, 2019. (Doc. 57-12.) This transcript is extensively referenced in the Amended Complaint. (Doc. 52 ¶¶ 7, 11, 97–100.) The Court will therefore incorporate the transcript. Accordingly, the Court will grant the Mesa Defendants' request to incorporate Exhibits 1, 2, 3, 4, 5, 6, 7, 9, and 12 into the Amended Complaint in its entirety.

**2.    Judicial Notice**

Defendants ask the Court to take judicial notice of Exhibits 8, 10, 11, and 13. (Doc. 58 at 6–9.) Exhibit 8 is a February 10, 2020 press release, which was filed with the SEC as an exhibit to Mesa Air's Form 8-K. (Doc. 57-8.) An SEC filing generally qualifies as a "source[] whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (citing *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (SEC filings subject to judicial notice)). Accuracy, however, "is only one part of the inquiry under Rule 201(b)." *Khoja*, 899 F.3d at 999. Thus, this Court must "consider—and

identify—which fact or facts it is noticing" from the SEC filing. *Id.* For purposes of resolving the motion to dismiss, the Court will judicially notice that Mesa Air filed a press release with the SEC on February 10, 2020 and that Mesa Air made the statements contained therein.

Exhibit 10 is S&P Global's Transcript of Mesa Air's FQ1 2020 Earnings Call, dated February 10, 2020. (Doc. 57-10.) "An investor call transcript submitted to the SEC generally qualifies as a 'source[] whose accuracy cannot reasonably be questioned.'" *Khoja*, 899 F.3d at 999 (quoting Fed. R. Evid. 201(b), and *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 495 (W.D. Wash. 2009), and then *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1100 (N.D. Cal. 2006)). The Court will judicially notice that there was an investor call on February 10, 2020. The Court will also take judicial notice that the speakers made the statements included in the transcript. The Court will not take judicial notice of the substance of the statements because those facts may be subject to reasonable dispute.

Exhibit 11 is a Department of Transportation bulletin titled "Preliminary Air Traffic Data, April 2020: 96% Reduction in U.S. Airline Passengers from 2019." (Doc. 57-11.) Courts have taken judicial notice of Department of Transportation publications. *See Veliz v. Cintas Corp.*, No. C 03-1180 RS, 2009 WL 1107702, at *3 n.2 (N.D. Cal. Apr. 23, 2009) (taking judicial notice of various Department of Transportation publications and notices). The Court finds the Department of Transportation bulletin is appropriately subject to judicial notice. Thus, the Court will take judicial notice that on June 10, 2020, the Department of Transportation issued the bulletin.

Exhibit 13 is a news article published by the Consumer News and Business Channel ("CNBC") on June 9, 2019. (Doc. 57-13.) The Court will take judicial notice of the CNBC article "only to 'indicate what was in the public realm at the time, not whether the contents of [the] article[] [was] in fact true.'" *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1029 (C.D. Cal. 2015) (quoting *Van Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010)). Having resolved the Mesa Defendants'

requests under the doctrine of incorporation by reference and Rule 201 of the Federal Rules of Evidence (Doc. 58), the Court now turns to the pending motion to dismiss (Doc. 56).

### III.   MOTION TO DISMISS

#### A.   Legal Standard

A complaint must allege a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). A complaint should only be dismissed if it fails to state a cognizable legal theory or fails to provide sufficient facts to support a claim. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In deciding a Rule 12(b)(6) motion, the Court must construe all allegations of material fact in the light most favorable to the nonmoving party. *Marcus v. Holder*, 574 F.3d 1182, 1184 (9th Cir. 2009). The Court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotations omitted).

#### B.   Discussion

The Pension Fund alleges that Mesa Air's registration statement contained material misstatements and omissions, giving rise to liability under Sections 11, 12(a)(2), and 15 of the Securities Act. (Doc. 52 at 43–46.) The Mesa Defendants move to dismiss each claim. (Doc. 56.) The Court first determines whether the Pension Fund has sufficiently pleaded the elements of a Section 11 claim.

##### 1.   Section 11

Section 11 promotes compliance with the Securities Act "by giving purchasers a right of action against an issuer or designated individuals (directors, partners, underwriters, and so forth) for material misstatements or omissions in registration statements."

*Omnicare, Inc.*, 575 U.S. at 179. In relevant part, the text of the statute provides:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may . . . sue.

15 U.S.C. § 77k(a). Section 11 therefore "creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out." *Omnicare, Inc.*, 575 U.S. at 179.

To prevail on a Section 11 claim, a plaintiff must demonstrate that (1) "the registration statement contained an omission or misrepresentation," and (2) "the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (quoting *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403–04 (9th Cir. 1996) (hereinafter "*Stac Elecs.*")). Scienter is not required for liability under Section 11. *Id.* A defendant "will be liable for innocent or negligent material misstatements or omissions." *Id.* Thus, where, as here, fraudulent conduct is not alleged, the plaintiff "need satisfy only the ordinary notice pleading standard of Rule 8(a)." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003). (Doc. 52 ¶ 130.)

In this case, the Pension Fund challenges several statements in Mesa Air's offering documents concerning the American CPA, as well as Mesa Air's operational performance, spare count, and maintenance solutions. The Court will address the factual predicates in turn, starting with the American CPA.

### a.      American CPA

The Pension Fund takes issue with two statements relating to the American CPA. First, the registration statement indicates that Mesa Air's "long-term capacity purchase agreements provide [the company] with guaranteed monthly revenue for each aircraft under contract." (*Id.* ¶ 77.) Second, it describes the American CPA as a "[s]table, [l]ong-

[t]erm [r]evenue-[g]uarantee." (*Id.*) The Mesa Defendants move the Court to dismiss the claims relating to the American CPA on several grounds. (Doc. 56 at 8–14.) As detailed below, the Court will dismiss the Section 11 claim insofar as it arises from the American CPA statements because the claim is barred by the statute of limitations and the statements at issue are non-actionable puffery.

### i. Statute of Limitations

Section 11 claims are subject to a one-year statute of limitations. 15 U.S.C. § 77m. The limitations period begins to run when an untrue statement or omission is either discovered or should have been discovered by exercise of reasonable diligence.[3] *Id.*; *see Stac Elecs.*, 89 F.3d at 1411 ("The statute of limitations governing Section 11 requires filing a complaint within . . . one year of actual notice or inquiry notice of an untrue or misleading statement."). "The determination of inquiry notice is fact-intensive." *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1080 (N.D. Cal. 2010). A fact is "'discovered' when 'a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint . . . with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 915 (N.D. Cal. 2015) (quoting *City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)). Thus, a defendant who argues that Section 11 claims are time-barred at the pleading stage faces an "especially high hurdle." *Id.* (citation omitted).

Here, the Mesa Defendants argue that claims concerning the American CPA are time barred based on two disclosures. (Doc. 56 at 8.) First, the Mesa Defendants contend that a Form 8-K, filed on January 31, 2019, disclosed the CPA amendment, including its allegedly key terms. (*Id.* at 9) In relevant part, the Form 8-K indicated that the CPA amendment (1) converted two aircrafts into operational spares, (2) imposed new operational performance criteria, and (3) gave American the right to permanently withdraw up to six aircraft if Mesa Air failed to comply with the new operational performance

---

[3] In no event, however, may a Section 11 claim be brought "more than three years after the security was bona fide offered to the public." 15 U.S.C. § 77m. Unlike the one-year statute of limitations at issue in this Order, the three-year bar is a statue of repose. *See Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017).

metrics. (*Id.*; Doc. 57-4 at 4.) Second, during a February 5, 2019 earnings call, Mr. Ornstein revealed that six months before the IPO, American expressed a desire to review the CPA's terms. (Doc. 56 at 9.) Thus, according to the Mesa Defendants, Plaintiffs knew all the information on which its claims relating to the CPA amendment are based. (Doc. 63 at 4.) The Pension Fund does not dispute whether such disclosures occurred. Instead, it argues that those disclosures "were insufficient to put shareholders on notice of the demanding new performance terms in the new American CPA." (Doc. 60 at 7.) Thus, in the Pension Fund's view, the claim related to the American CPA did not accrue until December 2019, when Mesa Air filed the Term Sheet with the SEC. (*Id.* at 8.)

As presently plead, the Court finds that the Pension Fund's claims concerning the American CPA are time barred. The Pension Fund has not identified any provisions in the Term Sheet that were not previously disclosed by Mesa Air in the Form 8-K. (*See* Doc. 52 ¶ 78(g).) Indeed, the Amended Complaint only identifies the terms stated in the Form 8-K as the pertinent provisions of the amendment. (*Compare id.*, *with* Doc. 57-4 at 4.) The Court therefore disagrees with the Pension Fund's assertion that shareholders did not obtained the information needed to allege a Section 11 claim until Mesa Air filed the American Term Sheet. Thus, the Court will dismiss the claims related to the American CPA because, as presently alleged, the claims are barred by the statute of limitations.

### ii.      Non-Actionable Puffery

Even if the Section 11 claim concerning the American CPA was timely, the Pension Fund fails to allege a plausible claim for the independent reason that the challenged statements are non-actionable puffery. "In the Ninth Circuit, vague, generalized assertions of corporate optimism or statements of mere puffing are not actionable material misrepresentations under federal securities laws because no reasonable investor would rely on such statements." *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1255 (N.D. Cal. 2019) (internal quotations and citations omitted). "When valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th

Cir. 2010) (hereinafter "*Cutera*"); *see also In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992) ("Professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the company."). That said, "general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (internal quotations omitted); *see also Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) ("Statements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations.").

The Pension Fund here challenges statements that characterize the American CPA as "long-term" and "stable." (Doc. 52 ¶ 77.) These generic statements amount to nothing more than non-actionable puffery. *See In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1159–60 (S.D. Cal. 2008) (finding statements such as "excellent relationship" and "highly positive and mutually beneficial" to be non-actionable corporate puffery). The Pension Fund does not dispute that, at the time of the IPO, the American CPA had been in place for nearly 17 years. (Doc. 52 ¶¶ 78, 94.) Instead, the Pension Fund argues that, "[a]t the time Mesa claimed the American CPA was 'stable' and 'long-term,' it knew that American was dissatisfied with the [CPA] . . . and had initiated negotiations to raise the performance levels to current industry standards." (Doc. 60 at 10.) The Amended Complaint, however, is devoid of allegations suggesting that Mesa Air and American were "renegotiating" the terms of the CPA at the time of the IPO. Rather, the lone allegation is that American "expressed a desire to revise the terms of the CPA" in February 2018. (Doc. 52 ¶ 78.) This allegation, without more, is not enough to transform generic descriptions, like "long-term" or "stable," into actionable statements. *See Stac Elecs.*, 89 F.3d at 1407 (finding "a company is not required to forecast future events" because "another company's plans cannot be known to a certainty"). Accordingly, the Court finds the complained-of statements to be non-actionable puffery. The Court will therefore

dismiss the Pension Fund's Section 11 claim arising from statements that the American CPA was "stable" and "long-term" on this separate and independent ground.

### b.     Operational Performance

The Pension Fund's Section 11 claim also derives from statements concerning Mesa Air's operational performance. (Doc. 52 ¶¶ 70, 72.) As the Amended Complaint notes, "operational performance" is a term of art in the airline industry, referring to "completion of flights, on-time performance, and other operating metrics." (*Id.* ¶ 44.) The Pension Fund takes issue with statements describing the company's operational performance as "strong," "reliable," "cost competitive," and "best-in-class." (*Id.* ¶¶ 66, 69, 70, 72.) The Mesa Defendants move to dismiss this claim because, in their view, the claim "is time-barred, the challenged statements are immaterial puffery, and [the Pension Fund] relies on blatant mischaracterizations of post-IPO statements." (Doc. 56 at 16.)

### i.     Statute of Limitations

As noted, the limitations period "governing Section 11 requires filing a complaint within . . . one year of actual notice or inquiry notice of an untrue or misleading statement." *Stac Elecs.*, 89 F.3d at 1411. The Amended Complaint alleges that the statements concerning Mesa Air's operational performance were false and misleading because, during a February 2019 earnings call, Mr. Ornstein "revealed that 'all' of Mesa's performance levels were 'significantly below' industry standards, or 'far below [the levels at] which the industry is currently operating." (Doc. 52 ¶ 75(a).) The Mesa Defendants argue that any Section 11 claim arising from the statements at issue is barred by the statute of limitations because Mr. Ornstein's disclosure occurred more than one year before this lawsuit was filed. (Doc. 56 at 14.) The Court agrees.

To start, the Court provides a more complete depiction of Mr. Ornstein's remarks. During the February 2019 earnings call, Mr. Ornstein stated: "As many of you know, [the American CPA] was negotiated initially almost 17 years ago. It's been through some modifications, but the performance levels were certainly far below that which the industry is currently operating." (*Id.* ¶ 78(c); Doc. 57-6 at 7.) The Court now considers the Pension

Fund's rebuttal. The Pension Fund contends that Mr. Ornstein "admitt[ed] that prior to the IPO, Mesa was only obligated to operate at below industry standards." (Doc. 60 at 13 (emphasis omitted).) Regardless of whether that is true, Mr. Lowthorp waited until April 2020—almost 14 months after the alleged admission—to bring this action. (Doc. 1.) To avoid the statute of limitations, the Pension Fund claims that the challenged statements "were even more obviously false and misleading after Mesa's calendar year 2019 performance." (Doc. 60 at 13.) But the limitations period "does not reset simply because additional information is revealed that could make for a stronger claim." *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1054 (N.D. Cal. 2016); *see also Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1137 (C.D. Cal. 2011) ("A statute which does not begin to run until every possible phrasing or permutation of the defendant's wrongdoing has been publicly reported would never run.").

Thus, based on the Amended Complaint's allegations, the Court finds Plaintiffs had actual knowledge of potential Securities Act claims related to Mesa Air's operational performance. The limitations period expired one year later, in February 2020. *See* 15 U.S.C. § 77m. Because Mr. Lowthorp waited to file this lawsuit until two months after the statute of limitations expired, the Court will dismiss the Section 11 claim insofar as it is premised on statements concerning Mesa Air's operational performance.

### ii.    Non-Actionable Puffery

In addition to being time barred, statements describing Mesa Air's operational performance as "strong," "reliable," "cost-competitive," and "best-in-class" are non-actionable puffery, which cannot give rise to liability under Section 11. *See Cutera*, 610 F.3d at 1111; *In re Pivotal Sec. Litig.*, No. 3:19-CV-03589-CRB, 2020 WL 4193384 (N.D. Cal. July 21, 2020) ("Statements classifying [a company's] products and business as 'uniquely position[ed],' 'strong across sectors,' 'best-in-class,' and 'industry-leading' are not actionable because they represent the feel good speak that characterizes 'non-actionable puffing.'"). The Pension Fund argues that the at-issue statements are not mere puffery. (Doc. 60 at 13.) But, because the Pension Fund admits that Mr. Ornstein's "full statement"

pertains to "only the performance requirements set forth in the old American CPA," the crux of its argument focuses on post-IPO events. (*Id.* at 14.) The Pension Fund "cannot use post-IPO developments to claim statements in [Mesa Air's registration statement] were untrue at the time they were made." *See Bos. Ret. Sys. v. Uber Techs., Inc.*, No. 19-CV-063610-RS, 2020 WL 4569846, at *8 (N.D. Cal. Aug. 7, 2020). The Court therefore rejects the Pension Fund's argument and dismisses the Section 11 claims arising from the at-issue statements because they amount to no more than corporate puffery.

### c.     Spare Aircrafts

The Pension Fund challenges one statement in the offering documents pertaining to the quantity of Mesa Air's spare aircrafts. (Doc. 52 ¶ 69.) That statement reads: "CRJ-200 is an operational spare not assigned for service under our capacity purchase agreements." (*Id.*) In the Amended Complaint, the Pension Fund alleges that Mesa Air misled investors because the company lacked an adequate number of operational spare aircraft. (*Id.* ¶¶ 6, 54.) To support its claim, the Pension Fund contends Mr. Ornstein revealed, during an August 2019 earnings call, that Mesa Air was "'disadvantaged' because . . . the Company 'did not have the adequate spare count.'" (*Id.* ¶ 75(c).)

The Mesa Defendants give two reasons why, in their view, a claim related to operational spares must dismissed. They first argue the Pension Fund does "not point to any statement in the offering documents characterizing the adequacy of Mesa's spares." (Doc. 56 at 16 (emphasis omitted).) Second, the Pension Fund contends that Mr. Ornstein's statement addressed "the number of spares Mesa thought it needed to meet the elevated performance requirements under the CPA's nineteenth [a]mendment, not the agreement in place at the time of the IPO." (*Id.* (emphasis omitted).) The Court finds both arguments persuasive.

To the extent the claim is premised on an omission, the Pension Fund "must allege how the omitted fact negates the truth of or renders misleading the statements actually made" to state a plausible claim. *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1289 (E.D. Wash. 2007) (hereinafter "*Metro.*"). The statement identified by the Pension Fund does not

address the adequacy of Mesa Air's operational spares at the time of the IPO. (Doc. 52 ¶ 69.) Nor does the Amended Complaint otherwise identify any affirmative statement regarding the spare count's adequacy. Thus, because the Pension Fund has not identified an affirmative misstatement in the registration statement, the Pension Fund has failed to state a claim upon which relief can be granted. *See Metro.*, 532 F. Supp. at 1289 (dismissing a Section 11 claim because the plaintiff failed to "identify any affirmative statement in the [r]egistration [s]tatements that was rendered misleading by the alleged omissions.").

Equally problematic, the Pension Fund selected only the portion of the August 2019 earnings call that supported its claim while omitting the portions that weakened it. *Khoja*, 899 F.3d at 1002. The transcript reveals that Mr. Ornstein's statements were made in response to a question concerning whether the company needed more spare aircraft to meet the increased utilization in the amended American CPA. (Doc. 52 ¶ 109; Doc. 57-7 at 16.) As relevant here, Mr. Ornstein stated: "I was a very strong advocate that Mesa was being -- what's the right word, disadvantaged because we did not have the adequate spare count. We put the 2 spares in." (*Id.*) Those spares are what Mesa Air "traded" for "increased performance requirements" in the amended CPA. (Doc. 57-6 at 7.) Mr. Ornstein's statements thus concern negotiations of the post-IPO CPA amendment, not the adequacy of the spare count at the time of the IPO.

Perhaps realizing these deficiencies, the Pension Fund asserts, for the first time in its response, that Mesa Air misrepresented the number of operational spares it possessed at the time of the IPO. (Doc. 60 at 15.) It argues Mesa Air "actually had three operational spares at the time of the IPO," not one. (*Id.*) Thus, in the Pension Fund's view, the "plain text" of the registration statement misrepresents the number of Mesa Air's operational spares. (*Id.*) The Court rejects the Pension Fund's attempt to reframe the claim presented in its Amended Complaint on two grounds. First, the legal theory is not alleged in the Pension Fund's pleading. *See Dovenberg v. U.S. ex rel. U.S. Forest Serv.*, No. CV 08–0889–MO, 2009 WL 3756370, at *3 (D. Or. Nov. 5, 2009). Second, the argument ignores statements in the offering documents that undermine its efficacy. As the Mesa Defendants

point out, the offering documents distinguish between "operational spares 'assigned' under the American or United CPAs and operational spares 'not assigned' under the CPAs." (Doc. 63 at 10.) For example, the registration statement indicates that 64 aircraft were assigned under the American CPA, 80 aircraft were assigned under the United CPA, and 1 aircraft was not assigned for service under the CPAs. (Doc. 52 ¶ 69.) While the registration statement indicates that the unassigned aircraft was an operational spare, other portions of the offering documents indicate that three additional spare aircraft were assigned under the American CPA. (Doc. 57-3 at 9.) The Pension Fund's reframed claim ignores this distinction. Accordingly, the Court will dismiss the Pension Fund's Section 11 claim to the extent it arises from Mesa Air's operational spares.

### d.   Aircraft Maintenance

As to aircraft maintenance, the Amended Complaint alleges that three statements are materially false or misleading:

> (1)   Low-Cost Operator. We believe that we are among the lowest cost operators of regional jet service in the United States. There are several key elements that contribute to our cost efficiencies:
>
> • Efficient Fleet Composition. . . . Larger regional aircraft require less fuel and crew resources per passenger carried, and may also have maintenance cost efficiencies.
>
> * * *
>
> • Competitive Procurement of Certain Operating Functions. We have long-term maintenance agreements . . . to provide parts procurement, inventory and engine, airframe and component overhaul services. We expect that our long-term agreements with these and other strategic vendors will provide predictable high-quality and cost-effective solutions for most maintenance categories over the next several years. In prior periods, we also invested in long-term engine overhauls on certain aircraft, which we believe will reduce related

maintenance obligations in future periods.

(2) Maintain Low-Cost Structure. . . . We intend to continue our disciplined cost control approach through responsible outsourcing of certain operating functions, by flying large regional aircraft with associated lower maintenance costs . . . . These efficiencies, coupled with the low average seniority of our pilots, has enabled us to compete aggressively on price in our capacity purchase agreement negotiations.

(3) As of March 31, 2018, we employed approximately . . . 411 mechanics . . . . Our continued success is partly dependent on our ability to continue to attract and retain qualified personnel.

(Doc. 52 ¶¶ 68, 71, 74.) The Mesa Defendants argue the Pension Fund has not plausibly alleged a Section 11 claim because these statements are non-actionable opinions and immunized from liability under the bespeaks caution doctrine. (Doc. 56 at 18.)

### i.     Opinion Statements

Section 11 gives purchasers a right of action against an issuer or designated individuals for misstatements or omissions of "material *fact*." 15 U.S.C. § 77k (emphasis added). Thus, statements of opinion generally do not give rise to liability under Section 11. *See Omnicare, Inc.*, 575 U.S. at 183–85. But there are three exceptions to this rule, which the Ninth Circuit summarized in *City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.*, 856 F.3d 605 (9th Cir. 2017). That opinion reads:

> . . . *Omnicare* establishes three different standards for pleading falsity of opinion statements. First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that "the speaker did not hold the belief she professed" and that the belief is objectively untrue. Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that "the supporting fact [the speaker] supplied [is] untrue." Third, when a plaintiff relies on a theory of omission, the plaintiff must allege "facts going to the basis

> for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

*Id.* at 615–16 (internal citations omitted) (quoting *Omnicare*, 575 U.S. at 186, 194).

Here, the Mesa Defendants contend that the challenged statements "are quintessential opinions" because they begin with "we believe" or "we expect."[4] (Doc. 56 at 18.) The Pension Fund disagrees, arguing the statements are actionable because they contain an embedded statement of untrue fact and were misleading in context. (Doc. 60 at 16.) Thus, in the Pension Fund's view, the statements are actionable under *Omnicare*. (*Id.*) For support, the Pension Fund proffers a portion of an earnings call from May 2019. (*Id.* at 17–18.) During that call, Mr. Ornstein said: "We knew that in the last year, 18 months, I mean, we were hamstrung by the fact that we had expanded a lot, we needed more pilots, we got hung up a little bit in pilot training, maintenance became more difficult in terms of qualified maintenance people." (Doc. 52 ¶ 99; Doc. 57-12 at 10.)

The parties dispute the import of Mr. Ornstein's words. The Pension Fund argues his statement "is an admission that Mesa's qualified mechanics and qualified maintenance personnel were significantly understaffed at the time of the IPO." (Doc. 60 at 18.) The Mesa Defendants contend that Mr. Ornstein's statement concerned a mechanic shortage "prior to, but not continuing through, the IPO." (Doc. 63 at 11 n.5.) They further allege that "pilot shortages," not mechanic shortages, was "the primary challenge Mesa faced prior to the IPO." (Doc. 56 at 26.) Construing Mr. Ornstein's statements in the Pension Fund's favor, as is required at this stage of the litigation, the Court finds the Pension Fund's characterization of Mr. Ornstein's remarks plausible. *Marcus*, 574 F.3d at 1184. That is, a reasonable person could interpret Mr. Ornstein's statements to mean that, from May 2018 to May 2019, Mesa Air faced a shortage of qualified mechanics, and that shortage was one

---

[4] The Court notes that not all of the challenged statements include this language. For example, one statement reads: "Our continued success is partly dependent on our ability to continue to attract and retain qualified personnel." (Doc. 52 ¶ 74.) The Pension Fund does not contest whether that statement is a statement of opinion. (*See* Doc. 60 at 18.) Thus, and only for purposes of resolving this motion, the Court assumes, without deciding, that the each of challenged statements pertaining to maintenance are opinion statements.

of four factors that "hamstrung" the company. Accordingly, the Court finds the Pension Fund has plausibly alleged that Mr. Ornstein's assertion rendered Mesa Air's statement that its success depended on its "ability to *continue* to attract and retain qualified personnel" misleading to a reasonable person. *See Align Tech., Inc.*, 856 F.3d at 616 (quoting *Omnicare*, 575 U.S. at 194.) The Court therefore rejects Defendants' argument that the statements at issue are non-actionable opinions.[5]

### ii.    Bespeaks Caution Doctrine

To the extent the maintenance-related statements are forward looking, the bespeaks caution doctrine does not aid the Mesa Defendants at this stage of the case. "The bespeaks caution doctrine protects affirmative, forward-looking statements from becoming the basis for a securities fraud claim when they are accompanied by cautionary language or risk disclosure." *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1088 (C.D. Cal. 2003) (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994)). "[I]nclusion of some cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading." *Stac Elecs.*, 89 F.3d at 1408 (internal quotations omitted). Rather, "[d]ismissal on the pleadings under the bespeaks caution doctrine . . . requires a stringent showing: There must be sufficient cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) (internal quotations omitted). As noted above, reasonable minds could differ as to whether the challenged statements were misleading in this case. *See supra* Part III.B.1.d.i. Accordingly, the Mesa Defendants have not made the "stringent showing" needed for the Court to find, as a matter of law, that the bespeaks caution doctrine bars the Pension Fund's claim at the pleading stage. Therefore, the Court will deny the Mesa Defendants' motion to dismiss insofar as it relates to the

---

[5] In support of its claims, the Pension Fund offers information from two former Mesa Air employees, identified as confidential witnesses. (Doc. 52 ¶¶ 112–20.) The Mesa Defendants argue the Court should disregard the allegations attributed to the confidential witnesses because the allegations lack credibility. (Doc. 56 at 19.) Because the Court did not rely on the confidential witnesses' allegations, the Court need not address the Mesa Defendants' argument at this stage.

statements concerning Mesa Air's maintenance solutions.

**2.    Item 303 and Item 503**

Under Item 303 of Regulation S-K, a company is obligated to "[d]escribe any known trends or uncertainties that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). An Item 303 violation thus has three elements: (1) a defendant knew of an adverse trend, (2) the trend would have a material impact, and (3) the material impact is reasonably likely to occur. *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296–97 (9th Cir. 1998). Although the Pension Fund has not alleged a separate claim under Item 303, "[a]llegations which state a claim under Item 303(a) . . . sufficiently state a claim under Sections 11 and 12(a)(2)." *Id.* at 1296.

Only two paragraphs in the Amended Complaint expressly reference Item 303. (Doc. 52 ¶¶ 63, 76.) The alleged violations mirror the Section 11 claims already discussed. (*Id.*) They relate to Mesa Air's operational performance, the adequacy of operational spares, and Mesa Air's maintenance solutions. (*Id.*) The Amended Complaint is devoid of allegations that the Pension Fund knew of adverse trend regarding Mesa Air's operational performance or spare aircraft count at the time of the IPO. *See supra* Part III.B.1.b–c. Accordingly, the allegations under Item 303 are dismissed insofar as the alleged violation stems from Mesa Air's operational performance or spare aircraft.

The Court, however, finds that the Pension Fund has plausibly alleged a violation of Item 303 with respect to Mesa Air's maintenance operations. The Amended Complaint alleges the company "knew that in the last year, 18 months, . . . maintenance became more difficult in terms of qualified maintenance people." (Doc. 52 ¶ 99 (emphasis omitted).) As to materiality, the Amended Complaint includes Mesa Air's statement that the company's "continued success [] partly depend[ed] on [its] ability to continue to attract and retain qualified personnel." (*Id.* ¶ 74.) And, the Pension Fund alleges "a shortage of qualified mechanics" would lead to "increased maintenance expenses, decreased revenues, and weak earnings." (*Id.* ¶ 87.) Accordingly, the Pension Fund's alleged Item 303 violation survives

the motion to dismiss to the extent it arises from Mesa Air's maintenance operations.

Similarly, Item 503 of Regulation S-K requires disclosure of "the most significant factors that make [an] offering speculative or risky." *Mingbo Cai v. Switch, Inc.*, No. 2:18-CV-01471-JCM-VCF, 2019 WL 3065591, at *6 (D. Nev. July 12, 2019) (quoting 17 C.F.R. § 229.503(c)). "The registration statement must include an explanation of 'how the risk affects the issuer or the securities being offered.'" *Id.* (quoting 17 C.F.R. § 229.503(c)). The Pension Fund's allegations concerning Item 503 relate to Mesa Air's operational performance, spare aircraft, and maintenance solutions. (Doc. 52 ¶ 86.) As already noted, the Pension Fund has not adequately alleged that significant risks involving Mesa Air's operational performance or spare aircraft existed at the time of the IPO. But the alleged Item 503 violation will survive the motion to dismiss insofar as it stems from Mesa Air's maintenance solutions.

### 3.    Section 12(a)(2)

The Mesa Defendants contend that the Pension Fund lacks standing to bring claims under Section 12(a)(2). (Doc. 56 at 22–23.) The Court agrees. Although "Section 11 and Section 12 are indeed parallel statutes, their wording is significantly different as to who can bring a suit." *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir. 1999). Section 12 "permits suit against a seller of a security by prospectus only by 'the person purchasing such security *from him*,' thus specifying that a plaintiff must have purchased the security directly from the issuer of the prospectus." *Id.* (quoting 15 U.S.C. § 77*l*(a)(2)) (emphasis in original).

The Amended Complaint alleges that the Pension Fund purchased securities "pursuant and/or traceable to the IPO." (Doc. 52 ¶ 19.) This "conclusory allegation[] [is] insufficient to establish standing under Section 12(a)(2)." *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 977 (N.D. Cal. 2010); *see also In re Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 966 (N.D. Cal. 2010) ("Unlike Section 11, which permits an action by a plaintiff who has purchased a security that is merely 'traceable to' the challenged misstatement or omission, Section 12(a)(2) requires a plaintiff to plead

and prove that it purchased a security directly from the issuer as part of the initial offering . . . .") (hereinafter "*Wells Fargo*"). If the Pension Fund did in fact purchase stock directly from the IPO, it should have said so. "An evasive circumlocution does not suffice as a substitute." *Wells Fargo*, 712 F. Supp. 2d at 966 (citation omitted). Thus, the Pension Fund's Section 12(a)(2) claim is dismissed for failing to allege facts giving rise to standing.[6]

### 4.   Section 15

A claim under Section 15 is a derivative claim: it "require[s] [an] underlying primary violation[] of the securities laws." *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012); *see also* 15 U.S.C. § 77o. The Mesa Defendants argue that the Pension Fund's Section 15 claim must be dismissed because it failed to state plausible claims under Sections 11 and 12. (Doc. 56 at 23.) Because the Court finds that the Pension Fund has plausibly stated a claim under Section 11, the Court will deny the motion to dismiss as to the Pension Fund's Section 15 claim.

## IV.   CONCLUSION

In sum, the Court will grant the Mesa Defendants' motion to dismiss in part. The Court will dismiss the Pension Fund's Section 11 claim to the extent it arises from statements concerning the American CPA, Mesa Air's operational performance, and Mesa Air's operational spares. The Court will dismiss the Pension Fund's Section 12(a)(2) claim because the Pension Fund has not alleged facts giving rise to standing. The Pension Fund's Section 11 claim survives Defendants' motion to dismiss insofar as it is premised on statements concerning Mesa Air's maintenance solutions. The alleged Item 303 and Item 503 violations survive the motion to dismiss to the extent they relate to Mesa Air's maintenance solutions. The Section 15 claim also survives the motion to dismiss.

At oral argument the Pension Fund requested leave to amend if the Court found any of the allegations in the Amended Complaint deficient. This request was not made in the moving papers, and the Court finds the Pension Fund's request inadequate to meet the

[6] Because the Pension Fund has not yet established standing under Section 12, the Court need not address whether Defendants were statutory "sellers."

requirements of a motion to amend under Rule 15 of the Federal Rules of Civil Procedure and Rule 15.1 of the Local Rules of Civil Procedure. Thus, the Pension Fund's request is denied without prejudice to the Pension Fund filing a written motion to amend if it believes it can cure the deficiencies identified in this Order. The Court is mindful that the Pension Fund is a newly appointed lead plaintiff, who has filed only one complaint to date. And, in considering any motion to amend, the Court will be guided by Rule 15's directive that it "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Any motion to amend must be filed within the deadline set at the upcoming scheduling conference.

Accordingly,

**IT IS ORDERED granting in part** and **denying in part** the Mesa Defendants' Motion to Dismiss (Doc. 56) as described herein.

**IT IS FURTHER ORDERED granting** the Mesa Defendants' request for incorporation by reference and judicial notice (Doc. 58) to the extent described herein.

**IT IS FINALLY ORDERED** that, by separate order, the Court will set a Rule 16 Scheduling Conference in this matter.

Dated this 22nd day of July, 2021.

*Michael T. Liburdi*

Michael T. Liburdi
United States District Judge

- 26 -

# EXHIBIT 2

**WILSON SONSINI GOODRICH & ROSATI**
**Professional Corporation**
Nina F. Locker (*pro hac vice*)
nlocker@wsgr.com
Laurie B. Smilan (*pro hac vice*)
lsmilan@wsgr.com
Douglas W. McManaway (*pro hac vice*)
dmcmanaway@wsgr.com
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100

**SACKS, RICKETTS & CASE LLP**
Cynthia A. Ricketts, SBN 012668
cricketts@srclaw.com
Andrew C. Stanley, SBN 029789
astanley@srclaw.com
2800 North Central Avenue, Suite 1910
Phoenix, AZ 85004
Telephone: (602) 385-3370
Facsimile: (602) 385-3371

*Attorneys for Defendants Mesa Air Group, Inc.,*
*Jonathan G. Ornstein, Michael J. Lotz, Daniel J. Altobello,*
*Ellen N. Artist, Mitchell Gordon, Dana J. Lockhart,*
*G. Grant Lyon, Giacomo Picco, Harvey Schiller, and Don Skiados*

# UNITED STATES DISCTRICT COURT

## DISTRICT OF ARIZONA

|  |  |
|---|---|
| David G. Lowthorp, Individually and On Behalf of All Others Similarly Situated, | CASE NO.:  2:20-cv-00648-DLR |
| Plaintiff, | **MESA DEFENDANTS' ANSWER TO AMENDED CLASS ACTION COMPLAINT** |
| v. | Hon. Michael T. Liburdi |
| Mesa Air Group, Inc., et al., | |
| Defendants. | |

Defendants Mesa Air Group, Inc. ("Mesa" or the "Company"), Jonathan G. Ornstein, Michael J. Lotz, Daniel J. Altobello, Ellen N. Artist, Mitchell Gordon, Dana J. Lockhart, G. Grant Lyon, Giacomo Picco, Harvey Schiller, and Don Skiados (collectively, the "Individual Defendants" and together with Mesa, the "Mesa Defendants"), hereby answer DeKalb County Pension Fund's ("Lead Plaintiff") Amended Class Action Complaint (the "Complaint").  Except as to allegations specific to each of them or as otherwise indicated, the Individual Defendants lack information and belief sufficient to answer allegations relating to the other Individual Defendants, and, on that basis, deny such allegations.  Defendants Altobello and Picco retired from Mesa's Board of Directors on April 9, 2019 and lack knowledge and information sufficient to form a belief as to the to the truth of the allegations regarding events and conduct after their  retirement and, on that basis, are unable to respond to such allegations. All claims under Section 12 of the Securities Act of 1933 (the "Section 12 Claims") and all claims relating to the Mesa Defendants' statements regarding Mesa's operational performance (the "Operational Performance Claims"), its Capacity Purchase Agreement ("CPA") with American Airlines, Inc. (the "American CPA" and the "American CPA Claims"), its operational spare aircraft (the "Spares Claims"), and third-party maintenance agreements (the "Outsourced Maintenance Claims") have been dismissed pursuant to the Court's July 22, 2021 Order (Doc. 81) (the "Order") and no answer to allegations concerning the dismissed claims is required.[1]  Mesa Defendants respond only as to the remaining Section 11 and Section 15 claims relating to statements concerning Mesa's maintenance personnel (the "In-House Maintenance Claims").  Mesa Defendants lack knowledge or information sufficient to form a belief as to the truth of allegations concerning Lead Plaintiff's alleged investigation, review and analysis and its PSLRA Certification, which

---

[1] Collectively, the Section 12 Claims, the Operational Performance Claims, the CPA Claims, and the Outsourced Maintenance Claims are sometimes referred to as the "Dismissed Claims."

1

is cited in footnote 1 and is attached as Exhibit A to the Complaint, and, on that basis, deny such allegations.  To the extent the paragraphs of the Complaint are grouped under headings and subheadings, Mesa Defendants respond generally that such headings and subheadings state legal conclusions and characterizations to which no response is required.  To the extent not specifically admitted and except as averred, each and every allegation of the Complaint is denied.   The paragraph number for each answer corresponds with the analogous paragraph of the Complaint.

1.      Mesa Defendants admit that Lead Plaintiff purports to bring the action on its own behalf and on behalf of a class who purchased certain securities pursuant to Mesa's initial public offering ("IPO") that commenced on August 9, 2018.  Mesa Defendants admit that the Company filed its Form S-1 on July 13, 2018, that its Registration Statement became effective on August 9, 2018 (the "Registration Statement"), and that its Form 424B4 Prospectus was filed on August 10, 2018.  Mesa Defendants deny any violations of the Securities Act of 1933 (the "Securities Act") and deny that class certification is appropriate for Lead Plaintiff's claims.  Mesa Defendants aver that Lead Plaintiff's claims under Section 12 of the Securities Act and all other claims under Sections 11 and 15 of the Securities Act except the In-House Maintenance Claims have been dismissed.  Mesa Defendants lack knowledge and information sufficient to form a belief as to the truth of allegations that Lead Plaintiff or any purported class member acquired shares that were issued pursuant to and/or traceable to the IPO.  Such allegations are therefore denied.  The remaining allegations in paragraph 1 are assertions or legal conclusions to which no response is required.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 1.

2.      Mesa Defendants admit the allegations as of the date of Mesa's IPO. Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 2.

3.     Mesa Defendants admit the allegations as of the date of Mesa's IPO and aver that Mesa had one unassigned operational spare aircraft in addition to spare aircraft assigned under each of the CPAs.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 3.

4.     Mesa Defendants admit that Mesa filed for bankruptcy in 2010 and emerged from bankruptcy in 2011 but deny Lead Plaintiff's characterization of the causes therefor.  Mesa Defendants admit that the Registration Statement opined that Mesa had demonstrated recent strong operational performance, and deny any characterization of statements therein that are inconsistent the Registration Statement, which speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 4.

5.     Mesa Defendants admit the allegations of the first sentence of paragraph 5. and deny the remaining allegations to the extent inconsistent with the information set forth  in the Registration Statement, which speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 5.

6.     Mesa Defendants admit that Mesa discussed its growth, competition, and recent record of operational performance in the Registration Statement, which speaks for itself.  Mesa Defendants deny that the Registration Statement failed to disclose any existing conditions, trends, uncertainties, and risks required to be disclosed, specifically denying that Mesa did not have sufficient qualified mechanics and maintenance personnel to properly and timely service its aircraft at the time of its IPO.  Defendants Mesa, Ornstein, and Lotz admit, and the remaining Mesa Defendants other than Defendants  Altobello and Picco are informed and believe, that Defendant Ornstein participated in an earnings call on May 10, 2019, where the issue of maintenance personnel was discussed, but deny Lead Plaintiff's characterization of Defendant Ornstein's statements which are reflected in the transcript of the earnings call prepared by S&P Global Market Intelligence which the Mesa Defendants other than Defendants Altobello and Picco are informed and believe is accurate and speaks for itself. The

remaining allegations in this paragraph relate to claims concerning Mesa's statements regarding the dismissed Spares Claims and the Operational Performance Claims, as to which no response is required.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 6.

7.    Mesa Defendants admit that Defendant Ornstein was Chairman and Chief Executive Officer ("CEO"), and Defendants Mesa, Ornstein and Lotz admit, and the remaining Mesa Defendants other than Defendants Altobello and Picco are informed and believe that Ornstein spoke during the May 10, 2019 earnings call, but deny the allegations in paragraph 7 to the extent they mischaracterize, inaccurately or selectively quote, and reference out of context the statements made during the earnings call, which statements are reflected in the May 10, 2019 earnings call transcript, prepared by S&P Global Market Intelligence, which the Mesa Defendants other than Defendants Altobello and Picco are informed and believe is accurate and speaks for itself.  Mesa Defendants admit that the allegations in footnote 3.  The remaining allegations in this paragraph relate to the dismissed Spares Claims as to which no response is required.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 7.

8.    Mesa Defendants deny each and every allegation in paragraph 8.

9.    Mesa Defendants admit that language quoted in paragraph 9 appears in the Registration Statement but deny the allegations in paragraph 9 to the extent they mischaracterize, inaccurately or selectively quote, reference out of context, and/or are inconsistent with the Registration Statement, which speaks for itself.  Mesa Defendants deny the allegation that prior to and at the time of the offering Mesa was significantly understaffed with respect to qualified mechanics and maintenance personnel to fully service its fleet.  The remaining allegations in this paragraph relate to claims concerning Mesa's statements regarding the dismissed Spares Claims and Operational Performance Claims as to which no response is required.  To the extent a response is required, and

except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in Paragraph 9.

10. Mesa Defendants deny that the risk factors in the Registration Statement were false, misleading, or incomplete, and deny that any of the identified risks had materialized at the time of the IPO. Mesa Defendants admit that the language quoted in paragraph 10 appears in the Registration Statement, but deny that the quotations are complete or presented with context, and deny the allegations in Paragraph 10 to the extent they are inconsistent with the Registration Statement, which speaks for itself. The remaining allegations in this paragraph relate to the Operational Performance Claims as to which no response is required. To the extent a response is required and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 10.

11. The allegation in the first sentence of paragraph 11 consists of vague assertions and appears to relate to the dismissed Operational Performance Claims, and, for both such reasons, no response is required. Mesa Defendants other than Defendants Altobello and Picco admit that Mesa issued a press release on May 9, 2019, which speaks for itself, and are informed and believe that the transcript for the May 10, 2019 earnings call prepared by S&P Global Market Intelligence, which also purports to set forth the analysts' consensus for the fiscal quarter ended March 31, 2019, is accurate and speaks for itself. Mesa Defendants deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, reference out of context, or add emphasis to the statements reflected in the May 9, 2019 press release or May 10, 2019 earnings call transcript. Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 11.

12. Mesa Defendants other than Defendants Altobello and Picco admit that Mesa issued a press release on August 8, 2019, which speaks for itself, and are informed and believe that the transcript for the August 8, 2019 earnings call prepared by S&P Global Market Intelligence, which also purports to set forth the analysts' consensus for

the fiscal quarter ended June 30, 2019, is accurate and speaks for itself, and deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, reference out of context, or add emphasis to the statements in the August 8, 2019 press release or the August 8, 2019 earnings call transcript. The remaining allegations in this paragraph relate to the dismissed Spares Claims as to which no response is required.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 12.

13.    The allegations in paragraph 13 relate to the dismissed American CPA Claims as to which no response is required.  To the extent a response is required, Mesa Defendants aver that the Registration Statement and statements made by Mr. Ornstein on February 5, 2019 as well as Mesa's closing stock prices speak for themselves and otherwise deny the allegations in paragraph 13.

14.    Mesa Defendants deny the allegations of paragraph 14, except to admit that Exhibit B of the Complaint, cited in footnote 4, provides the price of Mesa's stock at closing on the dates listed therein.

**JURISDICTION AND VENUE**

15.    Mesa Defendants admit that Lead Plaintiff purports to assert claims under Sections 11, 12 and 15 of the Securities Act but deny that any such claims have merit. Mesa Defendants aver that Lead Plaintiff's claims under Section 12 and all Section 11 and 15 claims other than the In-House Maintenance Claims have been dismissed.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 15.

16.    Mesa Defendants deny that this Court continues to have jurisdiction over the subject matter of this action to the extent Lead Plaintiff lacks standing to assert claims on its own behalf or on behalf of the putative class.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 16.

17.     Mesa Defendants admit that venue is proper in this district but deny that any wrongful acts occurred in this district.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 17.

18.     Mesa Defendants admit that at times they have used instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges and markets. Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 18.

### PARTIES

19.     Mesa Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations regarding Lead Plaintiff's securities transactions and therefore deny such allegations.  Mesa Defendants deny that Lead Plaintiff or any putative class member suffered any damages as a result of Mesa Defendants' conduct, specifically denying that they suffered any damages relating to the In-House Maintenance Claims, the sole remaining claim in this case.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 19.

20.     Mesa Defendants admit the allegations in paragraph 20.

21.     Mesa Defendants admit that Jonathan G. Ornstein has served as Mesa's CEO since May 1, 1998, and as Chairman of Mesa's Board of Directors (the "Board") since 1999.  Mesa Defendants admit that Ornstein signed or authorized the signing and issuance of the Registration Statement.  Defendants Mesa and Ornstein admit that Ornstein reviewed the Registration Statement and provided certain information contained therein.  Mesa Defendants aver that the term "contributed" is vague and, on that basis, aver that they are unable to respond to the allegation.  The Mesa Defendants other than Defendants Mesa and Ornstein aver that they lack information and belief sufficient to answer allegations relating to Defendant Ornstein which they have not otherwise admitted herein.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 21.

22.    Mesa Defendants admit that Michael J. Lotz served as Chief Financial Officer ("CFO") from August 1999 to January 2000 and from June 2008 until present, as Chief Operating Officer ("COO") from January 2000 until June 2008, and as President since June 22, 2000, and signed or authorized the signing and issuance of the Registration Statement. Defendants Mesa and Lotz admit that Lotz reviewed the Registration Statement and provided certain information contained therein. Mesa Defendants aver that the term "contributed" is vague and, on that basis, aver that they are unable to respond to the allegation. The Mesa Defendants other than Mesa and Lotz lack information and belief sufficient to answer allegations relating to Defendant Lotz which they have not otherwise admitted herein. Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 22.

23.    Mesa Defendants admit that Daniel J. Altobello served as a member of the Board at the time of the IPO and signed or authorized the signing and issuance of the Registration Statement. Mesa Defendants aver that Altobello retired from the Board on April 9, 2019. Defendants Mesa and Altobello admit the allegation that Altobello reviewed the Registration Statement. Mesa Defendants aver that the term "contributed" is vague and, on that basis, aver that they are unable to respond to the allegation. The Mesa Defendants other than Mesa and Altobello lack information and belief sufficient to answer allegations relating to Defendant Altobello which they have not otherwise admitted herein. Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 23.

24.    Mesa Defendants admit that Ellen N. Artist served as a member of the Board at the time of the IPO and signed or authorized the signing and issuance of the Registration Statement. Defendants Mesa and Artist admit that Artist reviewed the Registration Statement. The remaining Mesa Defendants lack information and belief sufficient to answer allegations relating to Defendant Artist. Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 24.

25.   Mesa Defendants admit that Mitchell Gordon served as a member of the Board at the time of the IPO and signed or authorized the signing and issuance of the Registration Statement.  Defendants Mesa and Gordon admit that Gordon reviewed the Registration Statement.  Mesa Defendants aver that the term "contributed" is vague and, on that basis, aver that they are unable to respond to the allegation.  The Mesa Defendants other than Mesa and Gordon lack information and belief sufficient to answer allegations relating to Defendant Gordon which they have not otherwise admitted herein.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 25.

26.   Mesa Defendants admit that Dana J. Lockhart served as a member of the Board at the time of the IPO and signed or authorized the signing and issuance of the Registration Statement.  Defendants Mesa and Lockhart admit that Lockhart reviewed the Registration Statement.  Mesa Defendants aver that the term "contributed" is vague and, on that basis, aver that they are unable to respond to the allegation.  The Mesa Defendants other than Mesa and Lockhart lack information and belief sufficient to answer allegations relating to Defendant Lockhart which they have not otherwise admitted herein.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 26.

27.   Mesa Defendants admit that G. Grant Lyon served as a member of the Board at the time of the IPO and signed or authorized the signing and issuance of the Registration Statement.  Mesa Defendants aver that Lyon stepped down from Mesa's Board on February 4, 2020.  Defendants Mesa and Lyon admit that Lyon reviewed the Registration Statement.  Mesa Defendants aver that the term "contributed" is vague and, on that basis, aver that they are unable to respond to the allegation.  The Mesa Defendants other than Mesa and Lyon lack information and belief sufficient to answer allegations relating to Defendant Lyon which they have not otherwise admitted herein.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 27.

28.     Mesa Defendants admit that Giacomo Picco served as a member of the Board at the time of the IPO and signed or authorized the signing and issuance of the Registration Statement.  Mesa Defendants aver that Defendant Picco stepped down from Mesa's Board on April 9, 2019.  Defendants Mesa and Picco admit the allegation that Picco reviewed the Registration Statement.  Mesa Defendants aver that the term "contributed" is vague and, on that basis, aver that they are unable to respond to the allegation.  The Mesa Defendants other than Mesa and Picco lack information and belief sufficient to answer allegations relating to Defendant Picco which they have not otherwise admitted herein.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 28.

29.     Mesa Defendants admit that Harvey Schiller served as a member of the Board at the time of the IPO and signed or authorized the signing and issuance of the Registration Statement.  Defendants Mesa and Schiller admit that Schiller reviewed or the Registration Statement.  Mesa Defendants aver that the term "contributed" is vague and, on that basis, aver that they are unable to respond to the allegation.  The Mesa Defendants other than Mesa and Schiller lack information and belief sufficient to answer allegations relating to Defendant Schiller which they have not otherwise admitted herein. Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 29.

30.     Mesa Defendants admit that Spyridon "Don" Skiados served as a member of the Board at the time of the IPO and signed or authorized the signing and issuance of the Registration Statement.  Defendants Mesa and Skiados admit that Skiados reviewed the Registration Statement.  Mesa Defendants aver that the term "contributed" is vague and, on that basis, aver that they are unable to respond to the allegation.  The Mesa Defendants other than Mesa and Skiados lack information and belief sufficient to answer allegations relating to Defendant Skiados which they have not otherwise admitted herein. Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 30.

31.    The allegations in this paragraph contain assertions as to which no response is required.

32.    Mesa Defendants admit that the Individual Defendants signed or authorized the signing and issuance of the Registration Statement and that Mesa hired the underwriters.  Mesa Defendants aver that the allegation that the Individual Defendants assisted the underwriters consists of vague assertions and, on that basis, deny the allegation.  Except as expressly admitted herein, Mesa Defendants deny the remaining allegations in paragraph 32.

33.    Mesa Defendants admit that Defendant Raymond James & Associates, Inc. ("Raymond James") acted as an underwriter with respect to Mesa's IPO.  Defendants Mesa, Ornstein, and Lotz admit that certain of the Underwriter Defendants participated in the roadshow for the IPO.  Except as expressly admitted, Mesa Defendants lack knowledge and information sufficient to form a belief as to allegations relating to Raymond James and, on that basis, deny the remaining allegations in paragraph 33.

34.    Mesa Defendants admit that Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") acted as an underwriter with respect to Mesa's IPO.  Defendants Mesa, Ornstein, and Lotz admit that certain of the Underwriter Defendants participated in the roadshow for the IPO.  Except as expressly admitted, Mesa Defendants lack knowledge and information sufficient to form a belief as to allegations relating to Merrill Lynch and, on that basis, deny the remaining allegations in paragraph 34.

35.    Mesa Defendants admit that Defendant Cowen and Company, LLC ("Cowen") acted as an underwriter with respect to Mesa's IPO.  Defendants Mesa, Ornstein, and Lotz admit that certain of the Underwriter Defendants participated in the roadshow for the IPO.  Except as expressly admitted, Mesa Defendants lack knowledge and information sufficient to form a belief as to allegations relating to Cowen and, on that basis, deny the remaining allegations in paragraph 35.

36.     Mesa Defendants admit that Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") acted as an underwriter with respect to Mesa's IPO.  Defendants Mesa, Ornstein, and Lotz admit that certain of the Underwriter Defendants participated in the roadshow for the IPO.  Except as expressly admitted, Mesa Defendants lack knowledge and information sufficient to form a belief as to allegations relating to Stifel and, on that basis, deny the remaining allegations in paragraph 36.

37.     Mesa Defendants admit that Imperial Capital, LLC ("Imperial") acted as an underwriter with respect to Mesa's IPO.  Defendants Mesa, Ornstein, and Lotz admit that certain of the Underwriter Defendants participated in the roadshow for the IPO.  Except as expressly admitted, Mesa Defendants lack knowledge and information sufficient to form a belief as to allegations relating to Imperial and, on that basis, deny the remaining allegations in paragraph 37.

38.     The allegations in this paragraph contain assertions as to which no response is required.

39.     Mesa Defendants deny that the Registration Statement contained false and misleading statements.  No response is required with respect to legal conclusions concerning the Underwriter Defendants.

a. Mesa Defendants are informed and believe that the Underwriter Defendants are investment banking houses that specialize in public offerings of securities and acted as underwriters with respect to Mesa's IPO.  Mesa Defendants admit that Mesa issued the Registration Statement, which disclosed the discounts and commissions received by the Underwriter Defendants and which speaks for itself.  Defendants Mesa, Ornstein, and Lotz admit and the remaining Mesa Defendants are informed and believe that certain of the Underwriter Defendants arranged a multi-city roadshow prior to Mesa's IPO during which they met with potential investors and presented information about the Company, its operations, and its financial

prospects.  Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 39(a).

b.  Mesa Defendants admit that Mesa disclosed in its Registration Statement that it agreed to indemnify the Underwriter Defendants against certain liabilities, including liabilities under the Securities Act, and refer to the Registration Statement, which speaks for itself.  Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 39(b).

c.  Mesa Defendants admit that certain of the Underwriter Defendants assisted Mesa in planning the IPO.  Mesa Defendants are informed and believe that the Underwriter Defendants collectively conducted a reasonable and adequate due diligence investigation and aver that they relied on representations by the Underwriter Defendants to that effect and admit that the Underwriter Defendants collectively had access to internal, confidential, and current corporate information concerning Mesa's operational and financial results and prospects at the time of the IPO.  Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 39(c).

d.  Defendants Mesa, Ornstein, and Lotz admit, and the remaining Mesa Defendants are informed and believe, that certain of the Underwriter Defendants met and conferred with representatives of Mesa regarding the IPO and Mesa's Registration Statement.  Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 39(d).

e.  The allegations in paragraph 39(e) contain legal conclusions as to which no response is required.  To the extent a response is required, Mesa Defendants deny each and every allegation in paragraph 39(e).

40.    The allegations in paragraph 40 contain assertions as to which no response is required.

### **SUBSTANTIVE ALLEGATIONS**

41.    Mesa Defendants admit that the information in paragraph 41 was true as of the date of the IPO.   Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 41.

42.    Mesa Defendants admit that on January 5, 2010, Mesa filed a petition to reorganize under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.  Mesa Defendants aver that the other allegations in paragraph 42 relate to alleged matters that occurred a decade prior to the Initial Public Offering and are irrelevant, that Lead Plaintiff's references to events occurring in 2008 and 2009 without specific dates renders such allegations vague and ambiguous, deny the Plaintiff's characterization of such matters, and refer to Mesa's SEC filings in 2008, 2009, and 2010 relating to some of these matters, which speak for themselves.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 42.

43.    Mesa Defendants admit that Mesa emerged from bankruptcy in 2011 and that it discussed its operational performance in the Registration Statement, which speaks for itself, and aver that the Operational Performance Claims have been dismissed and therefore no response to such allegations is required.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 43.

44.    Mesa Defendants admit that it discussed its operational performance in the Registration Statement, which speaks for itself, and aver that the Operational Performance Claims have been dismissed.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 44.

45.    Mesa Defendants admit the allegations in ¶ 45 as of the date of the IPO.

46.    Mesa Defendants admit the allegations in ¶ 46 as of the date of the IPO.

47.     Mesa Defendants admit the allegations in ¶ 47 as of the date of the IPO.

48.     Mesa Defendants admit the allegations in ¶ 48 as of the date of the IPO.

49.     Mesa Defendants admit that maintenance was Mesa's largest annual operating expense from fiscal years 2013 through 2017, and the ratio of maintenance expenses to operating revenues ranged from 25% to 38% during that same period. Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 49.

50.     Mesa Defendants admit the allegations of paragraph 50 other than Plaintiff's characterizations, except and to the extent the allegations are inconsistent with the Registration Statement which speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 50.

51.     Mesa Defendants admit the allegations of paragraph 51 other than Plaintiff's characterizations, except and to the extent the allegations are inconsistent with the Registration Statement, which speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 51.

52.     Mesa Defendants admit that the Company provides maintenance and repairs for its aircraft as part of its business.  The remaining allegations state conclusions and characterizations as to which no response is required.   To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 52.

53.     Mesa Defendants admit allegations in paragraph 53 as of the time of the IPO.  Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 53.

54.     The allegations in paragraph 54 relate to the dismissed Spares Claims as to which no response is required.  To the extent a response is required, Mesa Defendants aver that at the time of the IPO Mesa had one  unassigned operational spare in addition to multiple spare aircraft assigned under each of the CPAs and that the assigned spares were

-15-

able to be utilized when an assigned aircraft was unavailable.  Except as expressly admitted or averred, Mesa Defendants deny each and every allegation in paragraph 54.

55.    Mesa Defendants admit that the information in paragraph 55 appears in the Registration Statement, but deny that it is complete or presented with context, and deny the allegations in paragraph 55 to the extent they are inconsistent with the Registration Statement, which speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 55.

56.    Mesa Defendants admit that the charts in paragraph 56 appear in the Registration Statement, which speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 56.

57.    Mesa Defendants admit the allegations in paragraph 57.

58.    Mesa Defendants admit the allegations in paragraph 58.

59.    Mesa Defendants admit the allegations of paragraph 59, except as to Defendant Picco, who was not a selling shareholder in connection with the IPO.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 59.

60.    Mesa Defendants admit that paragraph 60 purports to quote and characterize statements in the Registration Statement, but deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, or reference out of context, and refer to the Registration Statement, which speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 60.

61.    The allegations in paragraph 61 contain legal conclusions and/or relate to the dismissed Section 12 Claims and for each of these reasons no response is required. As to the allegations in footnote 5, cited in paragraph 61, Mesa Defendants deny that any statements described in the Complaint were false or misleading.  The remaining allegations in footnote 5 contain assertions to which no response is required.  To the

extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 61.

62.    The allegations in paragraph 62 contain legal conclusions and/or relate to the dismissed Section 12 Claims and for each of these reasons no response is required.

63.    The allegations in paragraph 63 contain legal conclusions to which no response is required.

64.    The allegations in paragraph 64 contain legal conclusions to which no response is required.

65.    Mesa Defendants deny each and every allegation in paragraph 65 and also aver that to the extent the allegations relate to the Dismissed Claims, no response is required.

66.    Mesa Defendants admit that the quoted portions of paragraph 66 are set forth in the Registration Statement, but deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, reference out of context, and/or are inconsistent with the Registration Statement, which speaks for itself and also aver that to the extent the allegations relate to the Dismissed Claims, no response is required. To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 66.

67.    Mesa Defendants admit that the quoted portions of paragraph 67 are set forth the Registration Statement but deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, reference out of context, and/or are inconsistent with the Registration Statement, which speaks for itself.  To the extent the allegations in paragraph 67 relate to the dismissed American CPA Claims, the dismissed Section 12 Claims or other of the Dismissed Claims, no response is required.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 67.

68.    Mesa Defendants admit that the quoted portions of paragraph 68 are set forth in the Registration Statement, but denies the allegations to the extent they

mischaracterize, inaccurately or selectively quote, reference out of context, and/or are inconsistent with the Registration Statement, which speaks for itself.  To the extent the allegations in paragraph 68 relate to the dismissed Outsourced Maintenance Claims, the dismissed Section 12 Claims, or other of the Dismissed Claims, no response is required. Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 68.

69.     Mesa Defendants admit that the quoted portions of paragraph 69 are set forth in the Registration Statement but deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, reference out of context, and/or are inconsistent with the Registration Statement, which speaks for itself.  To the extent the allegations in paragraph 69 relate to the dismissed Spares Claims, the dismissed Section 12 Claims, or other of the Dismissed Claims, no response to such allegations is required. To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 69.

70.     Mesa Defendants admit that the quoted portions of paragraph 70 are set forth in the Registration Statement but deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, reference out of context, and/or are inconsistent with the Registration Statement, which speaks for itself.  To the extent the allegations in paragraph 70 relate to the dismissed Operational Performance Claims, the dismissed Section 12 Claims, or other of the Dismissed Claims, no response to such allegations is required.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 70.

71.     Mesa Defendants admit that the quoted portions of paragraph 71 are set forth in the Registration Statement but deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, reference out of context, and/or are inconsistent with the Registration Statement, which speaks for itself.  To the extent the allegations in paragraph 71 relate to the dismissed Outsourced Maintenance Claims, the

dismissed Section 12 Claims, or other of the Dismissed Claims, no response to such allegations is required.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 71.

72.    Mesa Defendants admit that the quoted portions of paragraph 72 are set forth in the Registration Statement but deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, reference out of context, and/or are inconsistent with the Registration Statement, which speaks for itself.  To the extent the allegations in paragraph 72 relate to the dismissed Operational Performance Claims, the dismissed Section 12 Claims, or other of the Dismissed Claims, no response to such allegations is required.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 72.

73.    Mesa Defendants admit that the quoted portions of paragraph 73 are set forth in the Registration Statement but deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, reference out of context, and/or are inconsistent with the Registration Statement, which speaks for itself.  To the extent the allegations in paragraph 73 relate to the dismissed Outsourced Maintenance Claims, the dismissed Section 12 Claims, or other of the Dismissed Claims, no response to such allegations is required.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 73.

74.    Mesa Defendants admit that the quoted portions of paragraph 74 are set forth in the Registration Statement but deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, reference out of context, and/or are inconsistent with the Registration Statement, which speaks for itself. To the extent the allegations in paragraph 74 relate to the dismissed Section 12 Claims, or other of the Dismissed Claims, no response is required.  To the extent a response is required, and

except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 74.

75.     In response to Paragraph 75, Mesa Defendants incorporate by reference their responses to Paragraphs 66-74, and deny that any statements in the Registration Statement were false and misleading, or that Mesa omitted material adverse facts, trends, uncertainties, or risks that purportedly existed prior to or at the time of the IPO. Defendants Mesa, Ornstein and Lotz admit, and the remaining Mesa Defendants other than Defendants Altobello and Picco are informed and believe that paragraph 75(b) purports to quote Defendant Ornstein's statement about in-house maintenance personnel from the May 10, 2019 earnings call but deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, reference out of context, or add emphasis to the statements, and refer to the May 10, 2019 earnings call transcript, prepared by S&P Global Market Intelligence, which the Mesa Defendants other than Defendants Altobello and Picco are informed and believe is accurate and which speaks for itself.  Mesa Defendants deny the allegation that at the time of the IPO, as a result of the Company's growth and expansion prior to the IPO, Mesa's qualified mechanics and qualified maintenance personnel were significantly understaffed.  The remaining allegations in this paragraph relate to the Dismissed Claims, as to which no response is required.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 75.

76.     In response to Paragraph 76, Mesa Defendants incorporate by reference their responses to Paragraphs 66-75, and aver that to the extent the allegations in paragraph 76 relate to the Dismissed Claims, and state legal conclusions, no response is required.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 76.

77.     The allegations in paragraph 77 relate to the dismissed American CPA Claims, as to which no response is required.  To the extent a response is required, other

-20-

than statements that are accurately quoted, Mesa Defendants deny the allegations in paragraph 77.

78.     In response to Paragraph 78, Mesa Defendants incorporate by reference their responses to Paragraph 77, and aver that the allegations in paragraph 78 relate to the dismissed American CPA Claims, as to which no response is required.  To the extent a response is required, other than statements that are accurately quoted, Mesa Defendants deny the allegations in paragraph 78.

79.     Mesa Defendants deny each and every allegation in paragraph 79.

80.     Mesa Defendants admit that the quoted portions of paragraph 80 are set forth in the Registration Statement but deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, reference out of context, or add emphasis to the statements, and refer to the Registration Statement, which speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 80.

81.     Mesa Defendants admit that the quoted portions of paragraph 81 are set forth in the Registration Statement but deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, reference out of context, and/or are inconsistent with the Registration Statement, which speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 81.

82.     The allegations in paragraph 82 relate to the dismissed Outsourced Maintenance Claims, as to which no response is required.  To the extent a response is required, Mesa Defendants admit that the quoted portions of paragraph 82 are set forth in the Registration Statement which speaks for itself and, except as expressly admitted or averred, deny the allegations in paragraph 82.

83.     The allegations in paragraph 83 relate to the dismissed Outsourced Maintenance Claims, as to which no response is required.  To the extent a response is required, Mesa Defendants admit that the quoted portions of paragraph 83 are set forth in

the Registration Statement which speaks for itself and, except as expressly admitted or averred, deny the allegations in paragraph 83.

84. The allegations in paragraph 84 relate to the dismissed Outsourced Maintenance Claims, to which no response is required. To the extent a response is required, Mesa Defendants admit that the quoted portions of paragraph 84 are set forth in the Registration Statement which speaks for itself and, except as expressly admitted or averred, deny the allegations in paragraph 84.

85. In response to Paragraph 85, Mesa Defendants incorporate by reference their responses to Paragraphs 79-84. Mesa Defendants deny that the Registration Statement failed to disclose, misrepresented, or omitted material adverse facts, material adverse trends, material uncertainties, or significant risks related to its in-house maintenance team or otherwise, that purportedly existed at the time of the IPO. Defendants Mesa, Ornstein and Lotz admit, and the remaining Mesa Defendants other than Defendants Altobello and Picco are informed and believe that paragraph 85(b) purports to quote and characterize Defendant Ornstein's statement from the May 10, 2019 earnings call concerning Mesa's maintenance personnel, but deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, reference out of context, or add emphasis to the statements, and refer to the May 10, 2019 earnings call transcript, prepared by S&P Global Market Intelligence, which the Mesa Defendants other than Defendants Altobello and Picco are informed and believe is accurate and which speaks for itself. Mesa Defendants deny the allegation that at the time of IPO, its qualified mechanics and qualified maintenance personnel were significantly understaffed. The remaining allegations in this paragraph relate to the dismissed Spares and Operational Performance Claims, and/or Section 12 Claims or state legal conclusions and for each of these reasons, no response is required. To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 85.

86.     Mesa Defendants deny that the Registration Statement omitted any adverse conditions, risks, and uncertainties relating to in-house maintenance that were required to be disclosed.  To the extent the allegations in paragraph 86 relate to the dismissed Operational Performance Claims, Spares Claims, Section 12 Claims and/or state legal conclusions, no response is required.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 86.

87.     Mesa Defendants deny that Mesa had a shortage of qualified mechanics to service its fleet at the time of the IPO, or that this led to increased maintenance expenses, decreased revenues, or weak earnings.  To the extent the allegations in paragraph 87 relate to the Dismissed Claims, including the dismissed Spares Claims, Operational Performance Claims, and Section 12 Claims, no response is required.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 87.

88.     Mesa Defendants admit that several market analysts initiated coverage of the Company after the IPO and that paragraph 88 purports to quote a September 4, 2018 report where an analyst from Cowen expressed his opinion, which speaks for itself. Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 88.

89.     Mesa Defendants admit that paragraph 89 purports to quote a September 4, 2019 report where an analyst from Raymond James expressed his opinion, which speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 89.

90.     Mesa Defendants deny that the Company's maintenance personnel and mechanics were understaffed and that commentary from analysts highlight any misrepresentations in the Registration Statement.  Mesa Defendants admit that analysts published reports regarding Mesa, which speak for themselves.  The remaining allegations relate to the dismissed Spares Claims, as to which no response is required.  To

the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 90.

91.     Mesa Defendants admit the allegations in the first two sentences of paragraph 91, and lack knowledge and information sufficient to form a belief as to the remainder of the allegations.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 91.

92.     The allegations in paragraph 92 relate to the dismissed American CPA Claims, as to which no response is required.  To the extent a response is required, Mesa Defendants admit that Mesa issued a press release on January 31, 2019 announcing amendments to the American CPA, and both the press release and the amendments speak for themselves.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 92.

93.     The allegations in paragraph 93 relate to the dismissed American CPA Claims, as to which no response is required.  To the extent a response is required, Mesa Defendants admit that analysts published reports regarding Mesa, which speak for themselves.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 93.

94.     The allegations in paragraph 94 relate to the dismissed American CPA Claims, and other Dismissed Claims as to which no response is required.  To the extent a response is required, Defendants Mesa, Ornstein, and Lotz admit, and the remaining Mesa Defendants are informed and believe that Ornstein participated in a February 5, 2019 earnings call but deny the allegations in paragraph 94 to the extent they mischaracterize, inaccurately or selectively quote, and reference out of context the statements made during the earnings call, which statements are reflected in the February 5, 2019 earnings call transcript, prepared by S&P Global Market Intelligence, which the Mesa Defendants are informed and believe is accurate and which speaks for itself. Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 94.

95.     Mesa Defendants admit that Mesa issued a press release on March 6, 2019, which speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 95.

96.     Mesa Defendants other than Defendants Altobello and Picco admit that Mesa issued a press release on May 9, 2019, which speaks for itself, and are informed and believe that a May 10, 2019 earnings call transcript prepared by S&P Global Market Intelligence, sets forth the referenced analysts' consensus, is accurate, and speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 96.

97.     The allegations in paragraph 97 relate to the dismissed American CPA Claims and Spares Claims, as to which no response is required.  To the extent a response is required, Mesa Defendants deny each and every allegation in paragraph 97.

98.     The allegations in paragraph 98 relate to the dismissed American CPA claims, as to which no response is required.  To the extent a response is required, Mesa Defendants deny the allegations in paragraph 98.

99.     Defendants Mesa, Ornstein and Lotz admit and the remaining Mesa Defendants  other than Defendants Altobello and Picco are informed and believe that Defendant Ornstein spoke during the May 10, 2019 earnings call, but deny the allegations in paragraph 99 to the extent they mischaracterize, inaccurately or selectively quote, and reference out of context the statements made during the earnings call, which statements are reflected in the May 10, 2019 earnings call transcript, prepared by S&P Global Market Intelligence, which the Mesa Defendants other than Defendants Altobello and Picco are informed and believe is accurate and speaks for itself. .  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 99.

100.     Defendants Mesa, Ornstein and Lotz admit and the remaining Mesa Defendants other than Defendants Altobello and Picco are informed and believe that Defendant Ornstein spoke during the May 10, 2019 earnings call, but deny the allegations

in paragraph 100 to the extent they mischaracterize, inaccurately or selectively quote, and reference out of context the statements made during the earnings call, which statements are reflected in the May 10, 2019 earnings call transcript, prepared by S&P Global Market Intelligence, which the Mesa Defendants other than Defendants Altobello and Picco are informed and believe is accurate and speaks for itself.  Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 100.

101.   Mesa Defendants other than Defendants Altobello and Picco admit the allegations of Paragraph 101 with respect to information reported by Mesa.  Mesa Defendants other than Defendants Altobello and Picco are informed and believe that the transcript for the August 8, 2019 earnings call prepared by S&P Global Market Intelligence is accurate, sets forth the referenced analysts' consensus, and speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 101.

102.   The allegations in paragraph 102 relate to the dismissed American CPA and Outsourced Maintenance Claims or other Dismissed Claims, as to which no response is required.  To the extent a response is required, Defendants, Mesa, Ornstein, and Lotz admit, and the remaining Mesa Defendants other than Defendants Altobello and Picco are informed and believe that Bradford Rich spoke during the August 9, 2019 conference call, but deny the allegations in paragraph 102 to the extent they mischaracterize, inaccurately or selectively quote, and reference out of context the statements made during the earnings call, which statements are reflected in the August 9, 2019 earnings call transcript, prepared by S&P Global Market Intelligence which the Mesa Defendants other than Defendants Altobello and Picco are informed and believe is accurate and which speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 102.

103.   The allegations in paragraph 103 relate to the dismissed American CPA Claims or other Dismissed Claims, as to which no response is required.  To the extent a response is required, Defendants, Mesa, Ornstein, and Lotz admit, and the remaining

Mesa Defendants other than Defendants Altobello and Picco are informed and believe that Bradford Rich spoke during the August 9, 2019 conference call, but deny the allegations in paragraph 102 to the extent they mischaracterize, inaccurately or selectively quote, and reference out of context the statements made during the earnings call, which statements are reflected in the August 9, 2019 earnings call transcript prepared by S&P Global Market Intelligence which the Mesa Defendants other that Defendants Altobello and Picco are informed and believe is accurate and which speaks for itself. Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 103.

104. Mesa Defendants deny the Company failed to maintain sufficient maintenance personnel at the time of the Offering. The remaining allegations in paragraph 104 relate to the dismissed Spares and American CPA Claims or other Dismissed Claims as to which no response is required. To the extent a response is required, Mesa Defendants other than Defendants Altobello and Picco deny the remaining allegations in paragraph 104.

105. To the extent the allegations in paragraph 105 relate to the dismissed American CPA Claims and the Spares Claims or any other Dismissed Claims, no response is required. To the extent a response is required, Defendants, Mesa, Ornstein, and Lotz admit, and the remaining Mesa Defendants other than Defendants Altobello and Picco are informed and believe that Bradford Rich spoke during the August 9, 2019 conference call, but deny the allegations in paragraph 105 to the extent they mischaracterize, inaccurately or selectively quote, and reference out of context the statements made during the earnings call, which statements are reflected in the August 9, 2019 earnings call transcript, prepared by S&P Global Market Intelligence which the Mesa Defendants other than Defendants Altobello and Picco are informed and believe is accurate and which speaks for itself. Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 105.

106.    To the extent the allegations in paragraph 105 relate to the dismissed Spares Claims and American CPA Claims, or any other Dismissed Claims, no response is required.  Defendants, Mesa, Ornstein, and Lotz admit, and the remaining Mesa Defendants other than Defendants Altobello and Picco are informed and believe, that Bradford Rich spoke during the August 9, 2019 conference call, but deny the allegations in paragraph 106 to the extent they mischaracterize, inaccurately or selectively quote, and reference out of context the statements made during the earnings call, which statements are reflected in the August 9, 2019 earnings call transcript, prepared by S&P Global Market Intelligence which the Mesa Defendants other than Defendants Altobello and Picco are informed and believe is accurate and which speaks for itself.   Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 106.

107.    To the extent the allegations in paragraph 107 relate to the dismissed Spares Claims, the American CPA Claims or any other Dismissed Claims, no response is required.  Defendants, Mesa, Ornstein, and Lotz admit, and the remaining Mesa Defendants other than Defendants Altobello and Picco are informed and believe that Bradford Rich spoke during the August 9, 2019 conference call, but deny the allegations in paragraph 107 to the extent they mischaracterize, inaccurately or selectively quote, and reference out of context the statements made during the earnings call, which statements are reflected in the August 9, 2019 earnings call transcript, prepared by S&P Global Market Intelligence which the Mesa Defendants other than Defendants Altobello and Picco are informed and believe is accurate and which speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 107.

108.    Mesa Defendants deny that the Company lacked a sufficient number of mechanics to maintain Mesa's aircraft at the time of the IPO.  The remaining allegations in paragraph 108 relate to the dismissed Spares, American CPA, and Operational Performance Claims or other Dismissed Claims, as to which no response is required.  To

the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 108.

109.   The allegations in paragraph 109 relate to the dismissed Spares, American CPA, and Operational Performance Claims or other Dismissed Claims, as to which no response is required.  To the extent a response is required, Defendants, Mesa, Ornstein, and Lotz admit, and the remaining Mesa Defendants other than Defendants Altobello and Picco are informed and believe that Defendant Ornstein spoke during the August 9, 2019 conference call, but deny the allegations in paragraph 109 to the extent they mischaracterize, inaccurately or selectively quote, and reference out of context the statements made during the earnings call, which statements are reflected in the August 9, 2019 earnings call transcript, prepared by S&P Global Market Intelligence which the Mesa Defendants other than Defendants Altobello and Picco are informed and believe is accurate and which speaks for itself.  Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 109.

110.   The allegations in paragraph 110 relate to the dismissed Spares Claims, as to which no response is required.  To the extent a response is required, Mesa Defendants deny the allegations in paragraph 110.

111.   Mesa Defendants admit that the price of Mesa's stock at the time of the IPO was $12.00 per share and that Mesa's stock closed at $3.03 on April 1, 2020.  To the extent the allegations in paragraph 111 relate to the dismissed Spares Claims or other Dismissed Claims, no response is required.  To the extent a response is required, and except as expressly admitted or averred herein, Mesa Defendants deny the allegations in paragraph 111.

112.   The allegations in paragraph 112 are based on an anonymous "former employee" who may or may not exist, whose identity, personal knowledge, credibility, and accuracy have not been established, and whose allegations are unspecific as to time. Mesa Defendants lack knowledge and information sufficient to form a belief as to the

truth of his/her alleged statements, and on that basis deny the allegations based on these statements.

113. The allegations in paragraph 113 are based on an anonymous "former employee" who may or may not exist, whose identity, personal knowledge, credibility, and accuracy have not been established, and whose allegations are unspecific as to time. Mesa Defendants lack knowledge and information sufficient to form a belief as to the truth of his/her alleged statements, and on that basis deny the allegations based on these statements and deny his/her characterizations and opinions concerning the Company overall.

114. The allegations in paragraph 114 are based on an anonymous "former employee" who may or may not exist, whose identity, personal knowledge, credibility, and accuracy have not been established, and whose allegations are unspecific as to time. Mesa Defendants lack knowledge and information sufficient to form a belief as to the truth of his/her alleged statements, and on that basis deny the allegations based on these statements and deny his/her characterizations and opinions concerning the Company overall.

115. The allegations in paragraph 115 are based on an anonymous "former employee" who may or may not exist, whose identity, personal knowledge, credibility, and accuracy have not been established, and whose allegations are unspecific as to time but aver that he/she claims to have left the Company prior to the IPO. Mesa Defendants lack knowledge and information sufficient to form a belief as to the truth of his/her alleged statements, and on that basis deny the allegations based on these statements.

116. The allegations in paragraph 116 are based on an anonymous "former employee" who may or may not exist, whose identity, personal knowledge, credibility, and accuracy have not been established, and whose allegations are unspecific as to time but aver that he/she claims to have left the Company prior to the IPO. Mesa Defendants lack knowledge and information sufficient to form a belief as to the truth of his/her

alleged statements, and on that basis deny the allegations based on these statements and deny his/her characterizations and opinions concerning the Company overall.

117. The allegations in paragraph 117 are based on an anonymous "former employee" who may or may not exist, whose identity, personal knowledge, credibility, and accuracy have not been established, and whose allegations are unspecific as to time, but aver that he/she claims to have left the Company prior to the IPO and to report on his experience at other airlines. Mesa Defendants lack knowledge and information sufficient to form a belief as to the truth of his/her alleged statements, and on that basis deny the allegations based on these statements and deny his/her characterizations and opinions concerning the Company overall.

118. The allegations in paragraph 118 are based on an anonymous "former employee" who may or may not exist, whose identity, personal knowledge, credibility, and accuracy have not been established, and whose allegations are unspecific as to time, but aver that he/she claims to have left the Company prior to the IPO. Mesa Defendants lack knowledge and information sufficient to form a belief as to the truth of his/her alleged statements, and on that basis deny the allegations based on these statements and deny his/her characterizations and opinions concerning the Company overall.

119. The allegations in paragraph 119 are based on an anonymous "former employee" who may or may not exist, whose identity, personal knowledge, credibility, and accuracy have not been established, and whose allegations are unspecific as to time but aver that he/she claims to have left the Company prior to the IPO. Mesa Defendants lack knowledge and information sufficient to form a belief as to the truth of his/her alleged statements, and on that basis deny the allegations based on these statements and deny his/her characterizations and opinions concerning the Company overall.

120. The allegations in paragraph 120 are based on an anonymous "former employee" who may or may not exist, whose identity, personal knowledge, credibility, and accuracy have not been established, and whose allegations are unspecific as to time but aver that he/she claims to have left the Company prior to the IPO. Mesa Defendants

lack knowledge and information sufficient to form a belief as to the truth of his/her alleged statements, and on that basis deny the allegations based on these statements and deny his/her characterizations and opinions concerning the Company overall.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

121.    Mesa Defendants admit that Lead Plaintiff purports to bring this action on its own behalf and on behalf of a class who purchased Mesa's securities pursuant to and/or traceable to Mesa's IPO (the "Class").  Mesa Defendants aver that as a result of the Order dismissing many of the claims herein, the Class must be limited to those who acquired shares pursuant to or traceable to the IPO and held such shares as of May 10, 2019 and that any recovery is limited to any decline in the price of those shares attributable to the disclosures relating to in-house mechanics made on that date.  Mesa Defendants also aver that after the expiration of the IPO lock-up in February 2019, non-registered shares entered the market and persons purchasing thereafter cannot "trace" their shares to the Registration Statement.  Mesa Defendants deny that Lead Plaintiff can demonstrate the requisites for certification of any class.  Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 121.

122.    Mesa Defendants admit that the price of Mesa's stock at the time of the IPO was $12.00 per share and that Mesa's stock closed at $3.03 on April 1, 2020, but aver that any recovery is limited to any decline in the price of those shares attributable to disclosures relating to in-house mechanics, the only claim remaining in the case. Mesa Defendants deny that Mesa misrepresented or failed to disclose facts, adverse conditions, risks, trends, or uncertainties, concerning Mesa's mechanics and maintenance personnel in the Registration Statement or that it lacked qualified mechanics and maintenance personnel at the time of the IPO.   The remaining allegations in paragraph 122 relate to the dismissed Spares Claims or other of the Dismissed Claims, as to which no response is required.  To the extent a response is required, Mesa Defendants deny the allegations in paragraph 122.

123. The allegations in paragraph 123 are assertions or legal conclusions as to which no response is required. To the extent a response is required, Mesa Defendants deny each and every allegation in paragraph 123 and aver that no class may be properly certified in this action.

124. The allegations in paragraph 124 are assertions or legal conclusions as to which no response is required. To the extent that this paragraph purports to contain factual assertions requiring a response, Mesa Defendants deny that the Mesa Defendants engaged in any wrongful conduct and deny that Lead Plaintiff or the putative Class has any claim. Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 124.

125. The allegations in paragraph 125 are assertions or legal conclusions as to which no response is required. To the extent that this paragraph purports to contain factual assertions requiring a response, Mesa Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations concerning the purported adequacy of Lead Plaintiff or its counsel, and on that basis, deny such allegations. Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 125.

126. The allegations in paragraph 126 are assertions or legal conclusions as to which no response is required. To the extent that this paragraph purports to contain factual assertions requiring a response, Mesa Defendants deny there were any violations of federal securities laws, false or misleading statements or omissions in the Registration Statement, or any damages sustained by members of the putative class. Except as expressly admitted or averred herein, Mesa Defendants deny each and every allegation in paragraph 126.

127. The allegations in paragraph 127 are assertions or legal conclusions as to which no response is required. To the extent a response is required, Mesa Defendants deny each and every allegation in paragraph 127.

**Count I: Violations of Section 11 of the Securities Act Against All Defendants**

128.   Mesa Defendants repeat each and every response contained above.

129.   Mesa Defendants admit that Lead Plaintiff purports to assert Count I pursuant to Section 11 of the Securities Act against all Defendants, deny that such claims have merit, and aver that no such claims can be asserted with respect to the Dismissed Claims. Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 129.

130.   The allegations in paragraph 130 are assertions or legal conclusions as to which no response is required. To the extent that this paragraph purports to contain factual assertions requiring a response, Mesa Defendants admit that they did not act with intentional, reckless, or otherwise fraudulent intent. Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 130.

131.   Mesa Defendants deny each and every allegation in paragraph 131.

132.   Mesa Defendants deny each and every allegation in paragraph 132.

133.   Mesa Defendants deny each and every allegation in paragraph 133.

134.   Mesa Defendants deny each and every allegation in paragraph 134.

135.   Mesa Defendants lack knowledge and information sufficient to form a belief as to whether Lead Plaintiff acquired Mesa's stock pursuant to the Registration Statement, and on that basis, deny the allegation.

136.   Mesa Defendants lack knowledge and information sufficient to form a belief as to what facts Lead Plaintiff and other members of the putative class knew or could have reasonably discovered, and on that basis, deny such allegations. Mesa Defendants deny any wrongful conduct occurred. Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 136.

137.   Mesa Defendants aver that the Court dismissed the American CPA and Operational Performance Claims as untimely. Mesa Defendants deny that any statement in the Registration Statement was untrue or misleading by omission and deny each and every allegation in paragraph 137.

-34-

**Count II: Violations of Section 12(a)(2) of the Securities Act**

138.    Pursuant to the Court's Order, the Section 12 Claim was dismissed, and therefore no response is required.  To the extent a response is required, Mesa Defendants deny each and every allegation in paragraph 138.

139.    Pursuant to the Court's Order, the Section 12Claim was dismissed, and therefore no response is required.  To the extent a response is required, Mesa Defendants deny each and every allegation in paragraph 139.

140.    Pursuant to the Court's Order, the Section 12Claim was dismissed, and therefore no response is required.  To the extent a response is required, Mesa Defendants admit that they did not act with intentional, reckless, or otherwise fraudulent intent but otherwise deny each and every allegation in paragraph 140.

141.    Pursuant to the Court's Order, the Section 12 Claim was dismissed, and therefore no response is required.  The allegations in paragraph 141 are assertions or legal conclusions as to which no response is required.  To the extent a response is required, Mesa Defendants deny each and every allegation in paragraph 141.

142.    Pursuant to the Court's Order, the Section 12Claim was dismissed, and therefore no response is required.  To the extent a response is required, Mesa Defendants deny there were any untruths or omissions in the Prospectus or Registration Statement and lack knowledge and information sufficient to form a belief as to what facts Lead Plaintiff and members of the putative class knew or in the exercise of reasonable diligence could have reasonably known, and on that basis, deny such allegations.  Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 142.

143.    Pursuant to the Court's Order, the Section 12 Claim was dismissed, and therefore no response is required.  To the extent a response is required, Mesa Defendants deny each and every allegation in paragraph 143.

144.    Pursuant to the Court's Order, the Section 12 Claim was dismissed, and therefore no response is required.  To the extent a response is required, Mesa Defendants

aver that the Court dismissed the American CPA and Operational Performance Claims as untimely, and deny each and every allegation in paragraph 144.

**Count III: Violations of Section 15 of the Securities Act Against the Individual Defendants**

145. Mesa Defendants repeat each and every response contained above.

146. The Individual Defendants admit that Lead Plaintiff purports to assert Count III pursuant to Section 15 of the Securities Act against all Defendants except the Underwriter Defendants. Mesa Defendants aver that Mesa could not be a "control person" of Mesa. Except as expressly admitted and averred, Mesa Defendants deny each and every allegation in paragraph 146.

147. The allegations in paragraph 147 are assertions or legal conclusions as to which no response is required. To the extent that this paragraph purports to contain factual assertions requiring a response, the Mesa Defendants admit that they did not act with intentional, reckless, or otherwise fraudulent intent. Except as expressly admitted herein, Mesa Defendants deny each and every allegation in paragraph 147.

148. The allegations in paragraph 148 are assertions or legal conclusions as to which no response is required. To the extent that this paragraph purports to contain factual assertions requiring a response, Mesa Defendants deny each and every allegation in paragraph 148.

149. Mesa Defendants aver that Lead Plaintiff's Section 12(a)(2) claim was dismissed, and to the extent any Section 15 claims against the Individual Defendants were predicated on violations of Section 12, or any of the Dismissed Claims, such claims under Section 15 are also dismissed. As to the remaining Section 15 claims, Mesa Defendants deny each and every allegation in paragraph 149.

150. Mesa Defendants lack knowledge and information sufficient to form a belief as to what facts Lead Plaintiff and other members of the putative class knew or in the exercise of reasonable diligence could have reasonably known, and on that basis, deny such allegations. Mesa Defendants aver that the Court dismissed the American

CPA and Operational Performance Claims as untimely.  As to the surviving Section 15 claims, Mesa Defendants deny each and every allegation in paragraph 150.

### **Prayer for Relief**

To the extent any response is required to Lead Plaintiff's prayer for relief, Mesa Defendants deny each and every allegation therein.  Mesa Defendants specifically deny this action is a proper class action or that Lead Plaintiff or members of the putative class were damaged.  Mesa Defendants also aver that rescissory damages are only available pursuant to Section 12 claims or Section 15 claims predicated upon Section 12 claims, and that such claims have been dismissed by the Court.

### **AFFIRMATIVE DEFENSES**

Without assuming any burden of proof, persuasion or production not otherwise legally assigned to him, her, or it, each of the Mesa Defendants asserts the following defenses.  Each of the Mesa Defendants also reserves the right to amend this Answer to assert further defenses that become available and apparent during pretrial proceedings in this action.

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Lead Plaintiff's claims are barred, in whole or in part, by the lack of loss causation, because Lead Plaintiff has not suffered any injury as a result of the alleged misstatement or omission.

### Third Affirmative Defense

Lead Plaintiff was not damaged by any of the Mesa Defendants' conduct.

### Fourth Affirmative Defense

Lead Plaintiff cannot establish that the Registration Statement contained any misleading statement or omission, or failed to disclose any information that was required to be stated therein.

Fifth Affirmative Defense

Lead Plaintiff cannot establish that any alleged misrepresentation or omission in the Registration Statement was material.

Sixth Affirmative Defense

Lead Plaintiff's damages, if any, resulted from the intervening and superseding act of a third party.

Seventh Affirmative Defense

The claims asserted in the Complaint are barred by Lead Plaintiff's inequitable conduct and unclean hands.

Eighth Affirmative Defense

Lead Plaintiff is estopped, in whole or in part, from asserting the claims set forth in the Complaint.

Ninth Affirmative Defense

Lead Plaintiff and others alleged to be members of the putative class lack standing to maintain some or all of their claims.

Tenth Affirmative Defense

Lead Plaintiff's alleged losses were not caused by any alleged misrepresentation or omission upon which its claims are based.

Eleventh Affirmative Defense

Each of the Mesa Defendants acted in good faith reliance on rules, regulations, and informal guidance offered by the Securities & Exchange Commission, as well as applicable judicial precedent and common understanding among lawyers specializing in the securities field.

Twelfth Affirmative Defense

Based on a reasonable investigation, each of the Mesa Defendants had reasonable ground to believe and did believe that the Registration Statement was accurate, complete, and not misleading.

-38-

Thirteenth Affirmative Defense

Despite the exercise of reasonable care, Mesa Defendants did not know and could not have known about any alleged misstatement or omission in the Registration Statement.

Fourteenth Affirmative Defense

The Individual Defendants were not controlling persons of the Company.

Fifteenth Affirmative Defense

Each of the Individual Defendants did not have knowledge of or reasonable ground to believe in the existence of the facts by reason of which the Company's liability is alleged to exist, and, to the extent that lack of culpable participation is an element of any defense, did not culpably participate in any violation of the Securities Act.

Sixteenth Affirmative Defense

Lead Plaintiff's claims and/or the claims of members of the class that Lead Plaintiff purports to represent, are barred in whole or in part, to the extent that Lead Plaintiff and the purported class members held, have disposed of, or could have disposed of their securities at a price in excess of the offering price.

Seventeenth Affirmative Defense

Lead Plaintiff's claims and/or the claims of members of the class that Lead Plaintiff purports to represent, are barred in whole or in part, to the extent that they did not purchase shares traceable to the IPO.

Eighteenth Affirmative Defense

Lead Plaintiff's claims are barred, in whole or in part, because any alleged misstatements in the Registration Statement are non-actionable statements because the Registration Statement contained sufficient cautionary language and risk disclosures.

Nineteenth Affirmative Defense

Lead Plaintiff's claims are barred, in whole or in part, because the alleged misrepresentations are non-actionable statements of opinion that Lead Plaintiff has not alleged, and cannot prove, were not genuinely believed.

-39-

Twentieth Affirmative Defense

Without admitting that Lead Plaintiff suffered damages in any amount, or that any of the Mesa Defendants are or should be liable for any such damages, to the extent that Lead Plaintiff failed to mitigate, minimize or avoid any loss or damage referred to in its Complaint, any recovery against the Mesa Defendants must be reduced by that amount or eliminated.

Twenty-First Affirmative Defense

Lead Plaintiff's claims against Mesa Defendants are barred, in whole or in part, because Lead Plaintiff assumed the risks disclosed in the Registration Statement associated with the IPO and any losses Lead Plaintiff allegedly experienced were caused because those risks came to fruition.

Twenty-Second Affirmative Defense

Without admitting any wrongful or liability-creating conduct on the part of any Mesa Defendant, this action is barred, in whole or in part, by the doctrines of estoppel, waiver, consent, and ratification.

Twenty-Third Affirmative Defense

This action is barred, in whole or in part, because the alleged damages, if any, are speculative and impossible to ascertain.

Twenty-Fourth Affirmative Defense

Recovery in this action is barred, in whole or in part, to the extent recovery is had in another lawsuit, other proceeding, or otherwise.

Twenty-Fifth Affirmative Defense

Lead Plaintiff's claims are barred to the extent they rely on documents and statements not incorporated into the Registration Statement, or on statements that were modified or superseded by those documents.

Twenty-Sixth Affirmative Defense

Without admitting that Lead Plaintiff suffered damages in any amount, or that any of the Mesa Defendants are or should be liable for any such damages, any recovery for

-40-

damages allegedly incurred by Lead Plaintiff or members of the putative class is subject to offset in the amount of any tax benefits or other benefits received by Lead Plaintiff or members of the putative class through their investments.

Twenty-Seventh Affirmative Defense

Mesa Defendants adopt by reference any applicable defense pleaded or may be pleaded by any other defendant not expressly set forth herein.

Twenty-Eighth Affirmative Defense

Any liability of the outside director Individual Defendants is limited to each outside director's percentage of responsibility (if any), pursuant to the proportionate liability provisions of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(f).

Twenty-Ninth Affirmative Defense

Lead Plaintiff's claims are barred, in whole or in part, by applicable statutes of limitation.

Additional Affirmative Defenses

Mesa Defendants may have additional, as yet unidentified defenses available against the named Lead Plaintiff and/or putative class members and thus reserve the right to assert such defenses in a timely fashion after the facts to support such defenses become known to them.

Reservation of Rights

WHEREFORE, each of the Mesa Defendants denies any liability and requests judgment:

1.    Dismissing the Complaint as against each of the Mesa Defendants with prejudice;

2.    Awarding each of the Mesa Defendants costs, interest, attorneys' fees and disbursements in this action;

3.    Such other relief as this Court deems equitable and just.

-41-

## JURY DEMAND

Mesa Defendants demand a trial by jury of all issues so triable pursuant to Federal Rule of Civil Procedure 38.

Dated: September 3, 2021                    Respectfully submitted,


                                           */s/ Nina F. Locker*

                                           **WILSON SONSINI GOODRICH & ROSATI**
                                           **Professional Corporation**
                                           Nina F. Locker (*pro hac vice*)
                                           Laurie B. Smilan (*pro hac vice*)
                                           Douglas W. McManaway (*pro hac vice*)
                                           650 Page Mill Rd
                                           Palo Alto, CA 94304

                                           **SACKS, RICKETTS & CASE LLP**
                                           Cynthia A. Ricketts (Arizona Bar No. 012668)
                                           Andrew C. Stanley (Arizona Bar No. 029789)
                                           2800 N. Central Avenue, Suite 1910
                                           Phoenix, AZ 85004

                                           *Attorneys for Mesa Defendants*

# EXHIBIT 3

Edwin A. Barkel (Bar No. 021666)
John C. Gray (Bar No. 028454)
Michael C. Brown (Bar No. 030524)
LEWIS ROCA ROTHGERBER CHRISTIE LLP
201 East Washington Street, Suite 1200
Phoenix, AZ 85004
Telephone:   (602) 262-5311
Facsimile:   (602) 262-5747
Email:       ebarkel@lrrc.com
             jgray@lrrc.com
             mbrown@lrrc.com

Adam S. Hakki (*pro hac vice*)
Agnès Dunogué (*pro hac vice*)
SHEARMAN AND STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Telephone:   (212) 848-4000
Email:       adam.hakki@shearman.com
             agnes.dunogue@shearman.com

*Counsel for Defendants*
*Raymond James & Associates, Inc.; Merrill*
*Lynch, Pierce, Fenner & Smith*
*Incorporated; Cowen and Company, LLC;*
*Stifel, Nicolaus & Company, Incorporated;*
*and Imperial Capital, LLC*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| David G. Lowthorp, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Mesa Air Group, Inc., *et al.*,<br><br>Defendants. | Case No. 2:20-cv-00648-MTL<br><br>(Assigned to the Hon. Michael T. Liburdi)<br><br>**ANSWER AND AFFIRMATIVE DEFENSES OF THE UNDERWRITER DEFENDANTS TO THE AMENDED CLASS ACTION COMPLAINT** |

114845831.1

Defendants Raymond James & Associates, Inc. ("Raymond James"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Cowen and Company, LLC ("Cowen"), Stifel, Nicolaus & Company, Incorporated ("Stifel"), and Imperial Capital, LLC ("Imperial"), by their undersigned counsel, respond as follows to the allegations in the Amended Class Action Complaint, filed on August 17, 2020 (the "Complaint"), insofar as they are made against the Underwriter Defendants.

All claims under Section 12 of the Securities Act of 1933 (the "Section 12 Claims") and all claims relating to statements regarding Mesa Air Group, Inc.'s ("Mesa") operational performance (the "Operational Performance Claims"), its Capacity Purchase Agreement ("CPA") with American Airlines, Inc. (the "American CPA" and the "American CPA Claims"), its operational spare aircraft (the "Spares Claims"), and third-party maintenance agreements (the "Outsourced Maintenance Claims") (collectively the "Dismissed Claims") have been dismissed pursuant to the Court's July 22, 2021 Order (Dkt. 81) (the "Order") and no answer to allegations concerning these claims is required.

The Underwriter Defendants incorporate into each such response a denial of all allegations in the Complaint to the extent they (i) suggest that the Registration Statement[1] contains material misstatements or omissions for which the Underwriter Defendants may be held liable, (ii) assert any factual allegations that are inconsistent with or contrary to

---

[1] For the sake of clarity, and unless otherwise stated, the Underwriter Defendants herein use the defined terms and phrases set forth in the Complaint. In so doing, however, the Underwriter Defendants do not concede that any such definitions are proper. This includes the term "Registration Statement," which includes the Registration Statement that was filed by Mesa on July 13, 2018, all amendments thereto, and the Prospectus that was filed on Form 2424B4 on August 10, 2018, as well as all Preliminary Prospectuses and updates and supplements thereto, which were incorporated into a formed part of the Registration Statement that became effective on August 9, 2018.

-1-

the Registration Statement, to which reference is made for a complete and accurate statement of its contents, (iii) suggest that the Underwriter Defendants failed to conduct an adequate due diligence investigation, (iv) suggest that Lead Plaintiff or members of the putative class have suffered any damages as a consequence of any acts of the Underwriter Defendants alleged in the Complaint or any alleged misstatement or omission in connection with the IPO, (v) suggest that the Underwriter Defendants have any liability under the Complaint, and (vi) suggest that Lead Plaintiff has standing to sue, and/or to represent a putative class of similarly situated individuals and/or entities, for the claims against the Underwriter Defendants.   The Underwriter Defendants deny any averments in the headings and subheadings in the Complaint.   The Underwriter Defendants intend to respond only as to allegations directed at the Underwriter Defendants individually, and where the Underwriter Defendants respond to allegations that concern "Mesa Defendants"[2] and not the Underwriter Defendants individually, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations as to the other Defendants unless the Underwriter Defendants expressly state otherwise.

The Underwriter Defendants further respond to the specific allegations in the Complaint as follows:

To the extent the allegations of the introductory paragraph on page 1 of the Complaint consist of legal conclusions, no response is required or appropriate.   To the

---

[2] The "Mesa Defendants" include defendants Mesa Air Group, Inc.; Jonathan G. Ornstein; Michael J. Lotz; Daniel J. Altobello; Ellen N. Artist; Mitchell Gordon; Dana J. Lockhart; G. Grant Lyon; Giacomo Picco; Harvey Schiller; and Don Skiados.

extent a response is required, the Underwriter Defendants deny the allegations of the introductory paragraph on page 1 of the Complaint, except they admit that Lead Plaintiff purports to bring the claims described therein on the bases alleged.

**NATURE OF THE ACTION**

1.     To the extent the allegations contained in paragraph 1 consist of legal conclusions, no response is required or appropriate.  To the extent the allegations relate to the Dismissed Claims, the Underwriter Defendants are not required to answer such allegations.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the Registration Statement referenced therein for a complete and accurate statement of its contents.

2.     The Underwriter Defendants deny that the allegations contained in paragraph 2 constitute a complete and accurate description of Mesa and its business, except they admit as of the date of the IPO, (i) Mesa is headquartered in Phoenix, Arizona, (ii) it operates as Mesa Airlines, Inc., (iii) it provided commercial passenger service to 110 cities in 38 states, the District of Columbia, Canada, Mexico, Cuba, and the Bahamas, (iv) its flights operated as American Eagle or United Express flights pursuant to the terms of the CPAs Mesa entered into with American Airlines, Inc. and United Airlines, Inc. (iv) and as of March 31, 2018, the American CPA accounted for 54% of Mesa's total revenue and the United CPA accounted for the remaining 46% of Mesa's total revenue.

3.     The Underwriter Defendants deny that the allegations contained in paragraph 3 constitute a complete and accurate statement of Mesa's business, revenue

-3-

sources, and operations, except they respectfully refer the Court to the Registration Statement for a description of Mesa's business, revenue sources, and operations as of its effective date.

4. The Underwriter Defendants deny that the allegations contained in paragraph 4 constitute a complete and accurate statement of Mesa and its business, except they (i) admit that Mesa filed for bankruptcy in 2010, and (ii) respectfully refer the Court to the Registration Statement for a description of Mesa's business as of its effective date.

5. The Underwriter Defendants deny that the allegations contained in paragraph 5 constitute a complete and accurate description of the IPO, except they respectfully refer the Court to the Registration Statement and actual trading records for a complete and accurate statement of their contents.

6. To the extent the allegations contained in paragraph 6 relate to the dismissed Spares Claims and the dismissed Operational Performance Claims, no response is required.  To the extent a response is required, the Underwriter Defendants deny that the allegations contained in paragraph 6 constitute a complete and accurate statement of Mesa and its business, except they respectfully refer the Court to the Registration Statement for a description of Mesa's business as of its effective date.

7. To the extent the allegations contained in paragraph 7 relate to the dismissed Spares Claims, no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the transcript of the earnings conference calls referenced and quoted therein for a complete and accurate statement of their contents.

8.      To the extent the allegations contained in paragraph 8 consist of legal conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations contained in paragraph 8.

9.      To the extent the allegations contained in paragraph 9 relate to the dismissed Spares Claims and the dismissed Operational Performance Claims, no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents.

10.     To the extent the allegations contained in paragraph 10 consist of legal conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents.

11.     To the extent the allegations contained in paragraph 11 relate to the dismissed Operational Performance Claims, no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the public filing referenced therein and the transcript of the earnings conference call referenced and quoted therein for a complete and accurate statement of their contents.

12.     To the extent the allegations contained in paragraph 12 relate to the dismissed Spares Claims, no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court

to the public filings referenced therein and the transcript of the earnings conference call referenced and quoted therein for a complete and accurate statement of their contents.

13.     To the extent the allegations contained in paragraph 13 relate to the dismissed American CPA Claims, no response is required.  To the extent a response is required, the Underwriter Defendants respectfully refer the Court to the Registration Statement and the transcript of the earnings conference calls referenced and quoted therein for a complete and accurate statement of their contents and to publicly reported market services for the trading price of Mesa's stock, and deny any inconsistent allegations contained in paragraph 13.  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in the sixth sentence of paragraph 13.

14.     To the extent the allegations contained in paragraph 14 consist of legal conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to publicly reported market services for the trading price of Mesa's stock.

**JURISDICTION AND VENUE**

15.     To the extent the allegations contained in paragraph 15 relate to the Dismissed Claims or consist of legal conclusions, no response is required or appropriate. To the extent a response is required, the Underwriter Defendants deny the allegations, except they admit that Lead Plaintiff purports to bring this action pursuant to the statutes cited therein.

-6-

16.    To the extent the allegations contained in paragraph 16 consist of legal conclusions or relate to the Dismissed Claims, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they admit that Lead Plaintiff purports to base jurisdiction over this action on the statutes cited therein.

17.    To the extent the allegations contained in paragraph 17 consist of legal conclusions or relate to the Dismissed Claims, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they (i) admit that Lead Plaintiff purports to base venue on the statute cited therein, and (ii) admit and aver on information and belief that Mesa is headquartered within this District.

18.    To the extent the allegations contained in paragraph 18 consist of legal conclusions or relate to the Dismissed Claims, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they admit that the mails, interstate wire and telephonic communications, and/or the facilities of a national securities exchange were used in connection with the IPO.

**PARTIES**

19.    To the extent the allegations contained in paragraph 19 relate to the Dismissed Claims or are not directed to the Underwriter Defendants, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the

-7-

allegations contained therein, except they admit and aver that the Lead Plaintiff submitted a certificate in this action purporting to set forth its ownership of Mesa common stock.

20.    To the extent the allegations contained in paragraph 20 are not directed to the Underwriter Defendants, no response is required or appropriate. To the extent a response is required, the Underwriter Defendants deny that the allegations constitute a complete and accurate description of Mesa and its business, except they admit on information and belief that Mesa is incorporated in Nevada, maintains its principal executive offices at 410 North 44th Street, Suite 700, Phoenix, Arizona, and has its shares listed on the NASDAQ under the ticker symbol "MESA."

21.    To the extent the allegations contained in paragraph 21 relate to claims that are not directed to the Underwriter Defendants, no response is required or appropriate. To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations, except they respectfully refer the Court to the Registration Statement, Mesa's other public filings, and actual trading records for the identities of who signed the referenced Registration Statement and public filings and for a description of Johnathan G. Ornstein, his history, title, and role at Mesa.

22.    To the extent the allegations contained in paragraph 22 relate to claims that are not directed to the Underwriter Defendants, no response is required or appropriate. To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations, except they respectfully refer the Court to the Registration Statement, Mesa's

other public filings, and actual trading records for the identities of who signed the referenced Registration Statement and public filings and for a description of Michael J. Lotz, his history, title, and role at Mesa.

23.    To the extent the allegations contained in paragraph 23 relate to claims that are not directed to the Underwriter Defendants, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations, except they respectfully refer the Court to the Registration Statement, Mesa's other public filings, and actual trading records for the identities of who signed the referenced Registration Statement and public filings and for a description of Daniel J. Altobello, his history, title, and role at Mesa.

24.    To the extent the allegations contained in paragraph 24 relate to claims that are not directed to the Underwriter Defendants, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations, except they respectfully refer the Court to the Registration Statement, Mesa's other public filings, and actual trading records for the identities of who signed the referenced Registration Statement and public filings and for a description of Ellen N. Artist, her history, title, and role at Mesa.

25.    To the extent the allegations contained in paragraph 25 relate to claims that are not directed to the Underwriter Defendants, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny

knowledge or information sufficient to form a belief as to the truth or falsity of the allegations, except they respectfully refer the Court to the Registration Statement, Mesa's other public filings, and actual trading records for the identities of who signed the referenced Registration Statement and public filings and for a description of Mitchell Gordon, his history, title, and role at Mesa.

26.    To the extent the allegations contained in paragraph 26 relate to claims that are not directed to the Underwriter Defendants, no response is required or appropriate.   To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations, except they respectfully refer the Court to the Registration Statement, Mesa's other public filings, and actual trading records for the identities of who signed the referenced Registration Statement and public filings and for a description of Dana J. Lockhart, his history, title, and role at Mesa.

27.    To the extent the allegations contained in paragraph 27 relate to claims that are not directed to the Underwriter Defendants, no response is required or appropriate.   To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations, except they respectfully refer the Court to the Registration Statement, Mesa's other public filings, and actual trading records for the identities of who signed the referenced Registration Statement and public filings and for a description of G. Grant Lyon, his history, title, and role at Mesa.

28.   To the extent the allegations contained in paragraph 28 relate to claims that are not directed to the Underwriter Defendants, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations, except they respectfully refer the Court to the Registration Statement, Mesa's other public filings, and actual trading records for the identities of who signed the referenced Registration Statement and public filings and for a description of Giacomo Picco, his history, title, and role at Mesa.

29.   To the extent the allegations contained in paragraph 29 relate to claims that are not directed to the Underwriter Defendants, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations, except they respectfully refer the Court to the Registration Statement, Mesa's other public filings, and actual trading records for the identities of who signed the referenced Registration Statement and public filings and for a description of Harvey Schiller, his history, title, and role at Mesa.

30.   To the extent the allegations contained in paragraph 30 relate to claims that are not directed to the Underwriter Defendants, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations, except they respectfully refer the Court to the Registration Statement, Mesa's other public filings, and actual trading records for the identities of who signed the

referenced Registration Statement and public filings and for a description of Don Skiados, his history, title, and role at Mesa.

31. Paragraph 31 does not contain factual allegations and no response is required.

32. To the extent the allegations contained in paragraph 32 are not directed to the Underwriter Defendants, no response is required or appropriate. To the extent a response is required, the Underwriter Defendants deny the allegations to the extent they suggest a material misstatement in or omission from the Registration Statement, and otherwise deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained therein.

33. The Underwriter Defendants deny the allegations contained in paragraph 33 are a complete and accurate description of Raymond James' role in the IPO, except they (i) admit that its address is 880 Carillon Parkway, St. Petersburg, FL 33716, and (ii) respectfully refer the Court to the Registration Statement for a complete and accurate description of its role in the IPO.

34. The Underwriter Defendants deny the allegations contained in paragraph 34 are a complete and accurate description of Merrill Lynch's role in the IPO, except they (i) admit that its address is 1 Bryant Park, New York, NY 10036, and (ii) respectfully refer the Court to the Registration Statement for a complete and accurate description of its role in the IPO.

35. The Underwriter Defendants deny the allegations contained in paragraph 35 are a complete and accurate description of Cowen's role in the IPO, except

they respectfully refer the Court to the Registration Statement for a complete and accurate description of its role in the IPO. Cowen's address is 599 Lexington Ave., 20th Floor, New York, NY 10022.

36.    The Underwriter Defendants deny the allegations contained in paragraph 36 are a complete and accurate description of Stifel's role in the IPO, except they (i) admit that its address is 501 North Broadway, St. Louis, MO 63102, and (ii) respectfully refer the Court to the Registration Statement for a complete and accurate description of its role in the IPO.

37.    The Underwriter Defendants deny the allegations contained in paragraph 37 are a complete and accurate description Imperial's role in the IPO, except they respectfully refer the Court to the Registration Statement for a complete and accurate description of its role in the IPO. Imperial's address is 10100 Santa Monica Blvd., Suite 2400, Los Angeles, CA 90067.

38.    Paragraph 38 does not contain factual allegations and no response is required.

39.    To the extent the allegations contained in paragraph 39 consist of legal conclusions, no response is required or appropriate. To the extent a response is required, the Underwriter Defendants (i) deny that the Registration Statement was false or misleading, (ii) deny the allegations in subparagraph 39(e), and (iii) deny all other allegations in paragraph 39, except they (iv) admit that they participated in the IPO consistent with the role of an underwriter, (v) admit that certain Underwriter Defendants

-13-

participated in the roadshow, and (vi) respectfully refer the Court to the Registration Statement for a description of the underwriting arrangements relating to the IPO.

## SUBSTANTIVE ALLEGATIONS

### Background

40. Paragraph 40 does not contain factual allegations and no response is required.

41. The Underwriter Defendants deny that the allegations contained in paragraph 41 constitute a complete and accurate description of Mesa and its business, except they respectfully refer the Court to the Registration Statement and its public filings for a description of Mesa and its business as of their effective dates.

42. The Underwriter Defendants deny that the allegations contained in paragraph 42 constitute a complete and accurate description of Mesa and its business, except they (i) admit that Mesa filed bankruptcy in January 2010, and (ii) respectfully refer the Court to the Registration Statement and its public filings for a description of Mesa and its business as of their effective dates.

43. To the extent the allegations contained in paragraph 43 relate to the dismissed Operational Performance Claims, no response is required. To the extent a response is required, the Underwriter Defendants deny that the allegations contained in paragraph 43 constitute a complete and accurate description of Mesa and its business, except they (i) admit that Mesa emerged from bankruptcy in January 2011, and (ii) respectfully refer the Court to the Registration Statement and its public filings for a description of Mesa and its business as of their effective dates.

-14-

44.    To the extent the allegations contained in paragraph 44 relate to the dismissed Operational Performance Claims, no response is required.  To the extent a response is required, the Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 44.

45.    The Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 45.

46.    The Underwriter Defendants deny that the allegations contained in paragraph 46 constitute a complete and accurate description of Mesa and its business, except they respectfully refer the Court to the Registration Statement for a description of Mesa and its business as of its effective date.

47.    The Underwriter Defendants deny that the allegations contained in paragraph 47 constitute a complete and accurate description of Mesa and its business, except they respectfully refer the Court to the Registration Statement for a description of Mesa and its business as of its effective date and for a complete and accurate statement of its contents.

48.    The Underwriter Defendants deny that the allegations contained in paragraph 48 constitute a complete and accurate description of Mesa and its business, except they respectfully refer the Court to the Registration Statement for a description of Mesa and its business as of its effective date.

-15-

49.    The Underwriter Defendants deny that the allegations contained in paragraph 49 constitute a complete and accurate description of Mesa and its business, except they respectfully refer the Court to the Registration Statement for a description of Mesa and its business as of its effective date.

50.    The Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 50.

51.    The Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 51.

52.    The Underwriter Defendants deny that the allegations contained in paragraph 52 constitute a complete and accurate description of Mesa and its business, except they respectfully refer the Court to the Registration Statement for a description of Mesa and its business as of its effective date.

53.    The Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 53.

54.    To the extent the allegations in paragraph 54 relate to the dismissed Spares Claims, no response is required.   To the extent a response is required, the Underwriter Defendants deny that the allegations constitute a complete and accurate description of Mesa and its business, except they respectfully refer the Court to the Registration Statement for a description of Mesa and its business as of its effective date.

-16-

55. The Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 55.

56. The Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 56.

### Mesa's IPO

57. The Underwriter Defendants admit the allegations contained in paragraph 57 on information and belief and respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents.

58. The Underwriter Defendants admit the allegations contained in paragraph 58 on information and belief and respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents.

59. The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the destination of the proceeds of the overallotment. The Underwriter Defendants otherwise admit the allegations contained in paragraph 59 on information and belief and respectfully refer the Court to Mesa's public filings.

60. The Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 60.

**The Registration Statement for the IPO Contained Materially False and Misleading Statements of Fact and Omitted Material Facts in Violation of the Securities Laws**

61.     To the extent the allegations contained in paragraph 61 relate to the dismissed Section 12 Claims or consist of legal conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to Sections 11 and 12(a)(2) of the Securities Act.

62.     To the extent the allegations contained in paragraph 62 relate to the dismissed Section 12 claims or consist of legal conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to Rule 408, 17 C.F.R. § 230.408(a).

63.     To the extent the allegations contained in paragraph 63 consist of legal conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to Item 303 of Regulation S-K, 17 C.F.R. § 229.303 and the SEC's related interpretive releases thereto.

64.     To the extent the allegations contained in paragraph 64 consist of legal conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to Item 503 of Regulation S-K, 17 C.F.R. § 229.105 and the SEC's related interpretive releases thereto.

65.    To the extent the allegations contained in paragraph 65 relate to the Dismissed Claims or consist of legal conclusions, no response is required or appropriate. To the extent a response is required, the Underwriter Defendants deny the allegations to the extent they suggest a material misstatement in or omission from the Registration Statement.

**The Registration Statement Contained Material Untrue Statements and Omissions and Failed to Disclose and Misrepresented Certain Material Adverse Trends and Uncertainties That Existed at the Time of the IPO**

66.    To the extent the allegations contained in paragraph 66 relate to the Dismissed Claims, no response is required.  To the extent a response is required, the Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 66.

67.    To the extent the allegations in paragraph 67 relate to the dismissed American CPA claims, the dismissed Section 12 Claims, or any of the other Dismissed Claims, no response is required.  To the extent a response is required, the Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 67.

68.    To the extent the allegations contained in paragraph 68 relate to the dismissed Outsourced Maintenance Claims, the dismissed Section 12 Claims, or any of the other Dismissed Claims, no response is required.  To the extent a response is required, the Underwriter Defendants respectfully refer the Court to the Registration Statement for

-19-

a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 68.

69.    To the extent the allegations in paragraph 69 relate to the dismissed Spares Claims, the dismissed Section 12 Claims, or any of the other Dismissed Claims, no response is required.  To the extent a response is required, the Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 69.

70.    To the extent the allegations contained in paragraph 70 relate to the dismissed Operational Performance Claims, the dismissed Section 12 claims, or any of the other Dismissed Claims, no response is required.  To the extent a response is required, the Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 70.

71.    To the extent the allegations in contained in paragraph 71 relate to the dismissed Outsourced Maintenance Claims, the dismissed Section 12 Claims, or any of the other Dismissed Claims, no response is required.  To the extent a response is required, the Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 71.

72.    To the extent the allegations contained in paragraph 72 relate to the dismissed Operational Performance Claims, the dismissed Section 12 Claims, or any of the other Dismissed Claims, no response is required.  To the extent a response is required,

-20-

the Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 72.

73.    To the extent the allegations contained in paragraph 73 relate to the dismissed Outsourced Maintenance Claims, the dismissed Section 12 Claims, or any of the other Dismissed Claims, no response is required.  To the extent a response is required, the Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 73.

74.    To the extent the allegations contained in paragraph 74 relate to the dismissed Section 12 Claims or any of the other Dismissed Claims, no response is required.  To the extent a response is required, the Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 74.

75.    To the extent the allegations contained in paragraph 75 relate to the Dismissed Claims or consist of legal conclusions, no response is required or appropriate. To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the transcript of the earnings conference calls referenced and quoted therein for a complete and accurate statement of their contents.

76.    In response to the allegations contained in paragraph 76, the Underwriter Defendants incorporate by reference their responses to paragraphs 66-75. To the extent the allegations relate to the Dismissed Claims or consist of legal

-21-

conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to Item 303 of Regulation S-K, 17 C.F.R. § 229.303 referenced and quoted therein and to the Registration Statement referenced therein for a complete and accurate statement of their contents.

**The Registration Statement Failed to Disclose and Misrepresented Material Facts Regarding Mesa's CPA with American**

77.    To the extent the allegations contained in paragraph 77 relate to the dismissed American CPA Claims, no response is required.  To the extent a response is required, the Underwriter Defendants respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents and deny any inconsistent allegations contained in paragraph 77.

78.    In response to the allegations contained in paragraph 78, the Underwriter Defendants incorporate by reference their responses to paragraph 77.  To the extent the allegations contained in paragraph 78 relate to the dismissed American CPA claims or consist of legal conclusions, no response is required or appropriate.  To the extent a response is required, other than statements that are accurately quoted, Underwriter Defendants deny the allegations.

**The Registration Statement Failed to Disclose and Misrepresented Significant Facts That Made the Offering More Speculative and Risky**

79.    To the extent the allegations contained in paragraph 79 consist of legal conclusions, no response is required or appropriate.  To the extent a response is

-22-

required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the Registration Statement for a complete and accurate statement of its contents.

80.    The Underwriter Defendants deny the allegations contained in paragraph 80, except they respectfully refer the Court to the Registration Statement referenced therein for a complete and accurate statement of its contents.

81.    The Underwriter Defendants deny the allegations contained in paragraph 81, except they respectfully refer the Court to the Registration Statement referenced therein for a complete and accurate statement of its contents.

82.    To the extent the allegations contained in paragraph 82 relate to the dismissed Outsourced Maintenance Claims, no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the Registration Statement referenced therein for a complete and accurate statement of its contents.

83.    To the extent the allegations contained in paragraph 83 relate to the dismissed Outsourced Maintenance Claims, no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the Registration Statement referenced therein for a complete and accurate statement of its contents.

84.    To the extent the allegations contained in paragraph 84 relate to the dismissed Outsourced Maintenance Claims, no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they

respectfully refer the Court to the Registration Statement referenced therein for a complete and accurate statement of its contents.

85.    In response to paragraph 85, the Underwriter Defendants incorporate by reference their responses to paragraphs 79-84.  To the extent the allegations relate to the dismissed Spares Claims, the dismissed Operational Performance Claims, or the dismissed Section 12 Claims or contain legal conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the Registration Statement referenced therein and the transcript of the earnings conference calls referenced and quoted therein for a complete and accurate statement of their contents.

86.    To the extent the allegations contained in paragraph 86 relate to the dismissed Spares Claims, the dismissed Operational Performance Claims, or the dismissed Section 12 Claims or consist of legal conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations to the extent they suggest a material misstatement in or omission from the Registration Statement.

**Additional Facts Demonstrating that the Registration Statement Was False and Misleading at the Time of the IPO**

87.    To the extent the allegations contained in paragraph 87 relate to the dismissed Spares Claims, the dismissed Operational Performance Claims, the dismissed Section 12 Claims, or any other Dismissed Claims, no response is required.  To the extent

-24-

a response is required, the Underwriter Defendants deny the allegations to the extent the allegations suggest that the Registration Statement was false or misleading.

88. The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 88, except they respectfully refer the Court to the Cowen analyst report referenced and quoted therein for a complete and accurate statement of its contents.

89. The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 89, except they respectfully refer the Court to the Raymond James analyst report referenced and quoted therein for a complete and accurate statement of its contents.

90. To the extent the allegations contained in paragraph 90 relate to the dismissed Spares Claims, no response is required. To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations, except they respectfully refer the Court to the Cowen and Raymond James analyst reports referenced therein for a complete and accurate statement of their contents.

91. The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 91.

92. To the extent the allegations contained in paragraph 92 relate to the dismissed American CPA Claims, no response is required. To the extent a response is

required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 92.

93. To the extent the allegations in paragraph 93 relate to the dismissed American CPA Claims, no response is required. To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 93, except they respectfully refer the Court to the Raymond James analyst report referenced therein for a complete and accurate statement of its contents.

94. To the extent the allegations contained in paragraph 94 relate to the dismissed American CPA Claims or any of the other Dismissed Claims, no response is required. To the extent a response is required, the Underwriter Defendants deny the allegations to extent the allegations suggest that the Registration Statement was false or misleading and otherwise respectfully refer the Court to the transcript of the earnings conference call referenced and quoted therein.

95. The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 95, except they respectfully refer the Court to the public filings referenced and quoted therein.

96. To the extent the allegations contained in paragraph 96 relate to claims that are not directed to the Underwriter Defendants, the Underwriter Defendants are not required to answer such allegations. To the extent a response is required, the Underwriter Defendants respectfully refer the Court to the public filing referenced therein

for a complete and accurate statement of its contents and deny any inconsistent allegations contained therein.

97.    To the extent the allegations contained in paragraph 97 relate to claims that are not directed to the Underwriter Defendants or the dismissed American CPA Claims or the dismissed Spares Claims, no response is required.  To the extent a response is required, the Underwriter Defendants deny the allegations, expect they respectfully refer the Court to the transcript of the earnings conference call referenced therein for a complete and accurate statement of its contents.

98.    To the extent the allegations contained in paragraph 98 relate to claims that are not directed to the Underwriter Defendants or to the dismissed American CPA Claims, the Underwriter Defendants are not required to answer such allegations.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the transcript of the earnings conference call referenced therein for a complete and accurate statement of its contents.

99.    To the extent the allegations contained in paragraph 99 relate to claims that are not directed to the Underwriter Defendants, the Underwriter Defendants are not required to answer such allegations.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the transcript of the earnings conference call referenced therein for a complete and accurate statement of its contents.

100.    To the extent the allegations contained in paragraph 100 relate to claims that are not directed to the Underwriter Defendants, the Underwriter Defendants

are not required to answer such allegations. To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the transcript of the earnings conference call referenced therein for a complete and accurate statement of its contents.

101. To the extent the allegations contained in paragraph 101 relate to claims that are not directed to the Underwriter Defendants, the Underwriter Defendants are not required to answer such allegations. To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the public filing refenced therein for a complete and accurate statement of its contents.

102. To the extent the allegations contained in paragraph 102 relate to claims that are not directed to the Underwriter Defendants or relate to the dismissed American CPA Claims, the dismissed Outsourced Maintenance Claims, or any of the other Dismissed Claims, the Underwriter Defendants are not required to answer such allegations. To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the transcript of the earnings conference call referenced therein for a complete and accurate statement of its contents.

103. To the extent the allegations contained in paragraph 103 relate to claims that are not directed to the Underwriter Defendants or relate to the dismissed American CPA claims or any of the other Dismissed Claims, the Underwriter Defendants are not required to answer such allegations. To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to

the transcript of the earnings conference call referenced therein for a complete and accurate statement of its contents.

104.    To the extent the allegations contained in paragraph 104 relate to claims that are not directed to the Underwriter Defendants or relate to the dismissed Spares Claims, the dismissed American CPA Claims, or any of the other Dismissed Claims, the Underwriter Defendants are not required to answer such allegations.  To the extent a response is required, the Underwriter Defendants deny the allegations to the extent the allegations suggest that the Registration Statement was false or misleading.

105.    To the extent the allegations contained in paragraph 105 relate to claims that are not directed to the Underwriter Defendants or relate to the dismissed American CPA claims, the dismissed Spares Claims, or any of the other Dismissed Claims, the Underwriter Defendants are not required to answer such allegations.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the transcript of the earnings conference call referenced therein for a complete and accurate statement of its contents.

106.    To the extent the allegations contained in paragraph 106 relate to claims that are not directed to the Underwriter Defendants or relate to the Dismissed Spares Claims, the dismissed American CPA Claims, or any of the other Dismissed Claims, the Underwriter Defendants are not required to answer such allegations.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the transcript of the earnings conference call referenced therein for a complete and accurate statement of its contents.

107.    To the extent the allegations contained in paragraph 107 relate to claims that are not directed to the Underwriter Defendants or relate to the Dismissed Spares Claims, the dismissed American CPA Claims, or any of the other Dismissed Claims, the Underwriter Defendants are not required to answer such allegations.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the transcript of the earnings conference call referenced therein for a complete and accurate statement of its contents.

108.    To the extent the allegations contained in paragraph 108 relate to claims that are not directed to the Underwriter Defendants or relate to the dismissed Spares Claims, the dismissed American CPA Claims, the dismissed Operational Performance Claims, or any of the other Dismissed Claims, the Underwriter Defendants are not required to answer such allegations.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the transcript of the earnings conference call referenced therein for a complete and accurate statement of its contents.

109.    To the extent the allegations contained in paragraph 109 relate to claims that are not directed to the Underwriter Defendants or relate to the dismissed Spares Claims, the dismissed American CPA Claims, the dismissed Operational Performance Claims, or any of the other Dismissed Claims, the Underwriter Defendants are not required to answer such allegations.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to

the transcript of the earnings conference call referenced therein for a complete and accurate statement of its contents.

110.    To the extent the allegations contained in paragraph 110 relate to claims that are not directed to the Underwriter Defendants or relate to the dismissed Spares Claims, the Underwriter Defendants are not required to answer such allegations. To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to the transcript of the earnings conference call referenced therein for a complete and accurate statement of its contents.

111.    To the extent the allegations contained in paragraph 111 relate to the dismissed Spares Claims or any of the other Dismissed Claims or consist of legal conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations, except they respectfully refer the Court to publicly reported market services for the trading price of Mesa's stock.

**Former Inside Employees at Mesa Were Aware of the Problems That Were Not Disclosed in the IPO**

112.    The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 112 and, separately, insofar as these allegations are based on unnamed witnesses whose identity, credibility, reliability, and accuracy have not been established.

113.    The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in

paragraph 113 and, separately, insofar as these allegations are based on unnamed witnesses whose identity, credibility, reliability, and accuracy have not been established.

114. The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 114, and, separately, insofar as these allegations are based on unnamed witnesses whose identity, credibility, reliability, and accuracy have not been established.

115. The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 115 and, separately, insofar as these allegations are based on unnamed witnesses whose identity, credibility, reliability, and accuracy have not been established.

116. The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 116 and, separately, insofar as these allegations are based on unnamed witnesses whose identity, credibility, reliability, and accuracy have not been established.

117. The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 117 and, separately, insofar as these allegations are based on unnamed witnesses whose identity, credibility, reliability, and accuracy have not been established.

118. The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 118 and, and, separately, insofar as these allegations are based on unnamed witnesses whose identity, credibility, reliability, and accuracy have not been established.

119. The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 119 and, and, separately, insofar as these allegations are based on unnamed witnesses whose identity, credibility, reliability, and accuracy have not been established.

120. The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 120, and, separately, insofar as these allegations are based on unnamed witnesses whose identity, credibility, reliability, and accuracy have not been established.

## **LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS**

121. Paragraph 121 does not contain factual allegations and no response is required.

122. The Underwriter Defendants deny that this case is appropriate for class-action treatment. To the extent the allegations contained in paragraph 122 relate to the dismissed Spares Claims or any of the other Dismissed Claims, no response is required. To the extent a response is required, the Underwriter Defendants deny the allegations contained in paragraph 122.

123. The Underwriter Defendants deny that this case is appropriate for class-action treatment and otherwise deny the allegations contained in paragraph 123.

124. The Underwriter Defendants deny that this case is appropriate for class-action treatment and otherwise deny the allegations contained in paragraph 124.

125. The Underwriter Defendants deny that this case is appropriate for class-action treatment and otherwise deny the allegations contained in paragraph 125.

126. The Underwriter Defendants deny that this case is appropriate for class-action treatment and otherwise deny the allegations contained in paragraph 126.

127. The Underwriter Defendants deny that this case is appropriate for class-action treatment and otherwise deny the allegations contained in paragraph 127.

## COUNT I

### Violations of Section 11 of the Securities Act Against All Defendants

128. The Underwriter Defendants repeat and reallege each and every response set forth in paragraphs 1-127 as fully set forth herein.

129. The Underwriter Defendants aver that no such claims can be asserted with respect to the Dismissed Claims. To the extent the allegations contained in paragraph 129 consist of legal conclusions, no response is required or appropriate. To the extent a response is required, the Underwriter Defendants deny the allegations, except they admit that Lead Plaintiff purports to bring the claim described therein.

130. To the extent the allegations contained in paragraph 130 consist of legal conclusions, no response is required or appropriate. To the extent a response is required, the Underwriter Defendants deny the allegations, except they admit that Lead Plaintiff purports to bring the claim on the bases alleged.

131. To the extent the allegations contained in paragraph 131 consist of legal conclusions, no response is required or appropriate. To the extent a response is required, the Underwriter Defendants deny the allegations.

132. To the extent the allegations contained in paragraph 132 are not directed at the Underwriter Defendants or consist of legal conclusions, no response is

required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations.

133.  To the extent the allegations contained in paragraph 133 are not directed at the Underwriter Defendants or consist of legal conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations.

134.  To the extent the allegations contained in paragraph 134 are not directed at the Underwriter Defendants or consist of legal conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations.

135.  To the extent the allegations contained in paragraph 135 consist of legal conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 135.

136.  To the extent the allegations contained in paragraph 136 consist of legal conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations.

137.  The Underwriter Defendants aver that the Court dismissed the American CPA and Operational Performance Claims as untimely.  To the extent the allegations contained in paragraph 137 consist of legal conclusions, no response is required or appropriate.  To the extent a response is required, the Underwriter Defendants deny the allegations.

-35-

## COUNT II

**Violations of Section 12(a)(2) of the Securities Act Against All Defendants**

138-144.   To the extent the allegations contained in paragraph 138-144 relate to the Dismissed Claims, the Underwriter Defendants are not required to answer such allegations.  To the extent a response is required, the Underwriter Defendants deny the allegations.

## COUNT III

**Violations of Section 15 of the Securities Act Against All Individual Defendants**

145-150.   The allegations contained in paragraphs 145–150 are not directed at the Underwriter Defendants, and, therefore, the Underwriter Defendants are not required to answer such allegations.  To the extent a response is required, the Underwriter Defendants deny the allegations.

## PRAYER FOR RELIEF

The Underwriter Defendants deny that Lead Plaintiff or members of the putative class are entitled to the requested relief, or any relief, against the Underwriter Defendants and the Underwriter Defendants request that the Court dismiss all claims against them with prejudice, enter judgment in their favor and against Lead Plaintiff, award them attorneys' fees, costs and expenses, and order such further relief as the Court deems just and proper.  The Underwriter Defendants also aver that rescissory damages are only available pursuant to Section 12 claims or Section 15 claims predicated on Section 12 claims, and that such claims have been dismissed by the Court.

## JURY DEMAND

The Underwriter Defendants deny the allegations in the jury demand, except they admit that Lead Plaintiff purports to demand a jury trial.

## DEFENSES

The Underwriter Defendants state the following defenses and reserve their right to assert other and additional defenses, crossclaims and third-party claims not asserted herein of which they become aware through discovery or other investigation as may be appropriate at a later time.  In asserting these defenses, the Underwriter Defendants do not assume any burden of proof, persuasion or production with respect to any issue where the applicable law places the burden upon Lead Plaintiff and members of the putative class.

## FIRST DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

## SECOND DEFENSE

The Underwriter Defendants are not liable to Lead Plaintiff and members of the putative class because they did not make any material misstatements or material omissions, the Registration Statement bespoke caution about the risks of investing in Mesa and the Underwriter Defendants are not responsible in law or fact for any material misstatement or material omissions by others.

## THIRD DEFENSE

The Underwriter Defendants are not liable to Lead Plaintiff and members of the putative class because they had no duty to disclose any facts allegedly not disclosed.

## FOURTH DEFENSE

The Underwriter Defendants are not liable to Lead Plaintiff and members of the putative class because any alleged misrepresentations or omissions for which the Underwriter Defendants are allegedly responsible were not material.

## FIFTH DEFENSE

The Underwriter Defendants are not liable to Lead Plaintiff and members of the putative class because the substance of any information that was allegedly misrepresented in and/or omitted from the Registration Statement was, in fact, represented accurately and/or disclosed.

## SIXTH DEFENSE

The Underwriter Defendants are not liable to Lead Plaintiff and members of the putative class because:  (i) the Registration Statement did not fail to state any trend, event or uncertainty under Item 303 of Regulation S-K; (ii) even if there was a trend, event or uncertainty, it was not known to the Mesa Defendants at the time of the IPO; and (iii) even if there was a trend, event or uncertainty that was known to the Mesa Defendants at the time of the IPO, the Mesa Defendants could not reasonably expect that such known trend, event or uncertainty would have a material impact on Mesa's net sales or revenues or income from continuing operations.

## SEVENTH DEFENSE

Any allegedly material information allegedly omitted from the Registration Statement was already disclosed and/or publicly known.

**EIGHTH DEFENSE**

Lead Plaintiff and members of the putative class lack standing to maintain some or all of their claims under Section 11 of the Securities Act, to the extent Lead Plaintiff and members of the putative class did not purchase stock in or traceable to the IPO, and (as already held by the Court) under Section 12 of the Securities Act.

**NINTH DEFENSE**

The Underwriter Defendants acted at all times in good faith and had no knowledge, and were not reckless in not knowing, that any alleged statement or omission was false or misleading.

**TENTH DEFENSE**

The Underwriter Defendants are not liable to Lead Plaintiff and members of the putative class because they had, after reasonable and diligent investigation, reasonable grounds to believe, and did believe, at the time the offering materials became effective, that the statements in the Registration Statement were true and that there were no misstatements of material fact or omissions of material fact that were necessary to make the statements therein not misleading.

**ELEVENTH DEFENSE**

The Underwriter Defendants are not liable to Lead Plaintiff and members of the putative class to the extent that the acts or omissions alleged in the Complaint relate to portions of the Registration Statement reviewed by experts retained to assist in preparing such documents, including, but not limited to, independent auditors, tax specialists and legal counsel, as to which the Underwriter Defendants had no reasonable grounds to

-39-

believe, and did not believe, that any statements contained therein were misleading, including, without limitation that the Underwriter Defendants were entitled to rely, and did rely reasonably and in good faith, upon the written opinion of issuer's counsel and other representations and opinions provided to the Underwriter Defendants in connection with the Registration Statement and Prospectus that, subject to the conditions stated therein, the Registration Statement did not violate Section 11 of the Securities Act.

### TWELFTH DEFENSE

The Underwriter Defendants are not liable to Lead Plaintiff and members of the putative class for any damages to the extent such damages, if any, resulted from the intervening and superseding act of a third party.

### THIRTEENTH DEFENSE

The Underwriter Defendants are not liable to Lead Plaintiff and members of the putative class for any damages to the extent Lead Plaintiff and members of the putative class have incurred no legally cognizable injury or damages.

### FOURTEENTH DEFENSE

Lead Plaintiff and members of the putative class' claims against the Underwriter Defendants are barred in whole, or in part, because the depreciation in the market price of the Mesa stock resulted from factors other than the purported misstatements or omissions alleged in the Complaint.

### FIFTEENTH DEFENSE

Lead Plaintiff and members of the putative class' claims against the Underwriter Defendants are barred in whole, or in part, to the extent the alleged damages or other

injuries were caused solely by the acts or omissions of the Lead Plaintiff and members of the putative class or others over which the Underwriter Defendants had no control.

**SIXTEENTH DEFENSE**

The Underwriter Defendants are not liable to Lead Plaintiff and members of the putative class for any damages to the extent such damages, if any, are due to the negligence, or other acts or omissions, of persons or entities other than the Underwriter Defendants; however, in the event that a finding is made that negligence exists on the part of the Underwriter Defendants, which proximately contributed to Lead Plaintiff and members of the putative class' damages alleged in the Complaint, the Underwriter Defendants' liability, if any, should be reduced, at least, by an amount proportionate to the amount by which the comparative negligence, or other acts or omissions, of such other person or entities contributed to the happening of the incident and alleged damages upon which Lead Plaintiff and members of the putative class seek recovery.

**SEVENTEENTH DEFENSE**

The Underwriter Defendants are not liable to Lead Plaintiff and members of the putative class to the extent their claims against the Underwriter Defendants are barred in whole, or in part, by laches, equitable estoppel, waiver or other related equitable doctrine.

**EIGHTEENTH DEFENSE**

The Underwriter Defendants are not liable to Lead Plaintiff and members of the putative class to the extent their claims against the Underwriter Defendants are barred in whole, or in part, because of Lead Plaintiff and members of the putative class' inequitable conduct and unclean hands.

**NINETEENTH DEFENSE**

The Underwriter Defendants are not liable to Lead Plaintiff and members of the putative class in connection with any purchase of securities offered in the IPO that (i) were not offered in the United States pursuant to the Registration Statement and Prospectus or (ii) were not sold or purchased in the United States.

**TWENTIETH DEFENSE**

Lead Plaintiff and members of the putative class' claims are not properly maintainable as a class action.

**TWENTY-FIRST DEFENSE**

To the extent Lead Plaintiff and members of the putative class purport to request injunctive relief, any such claim is barred because Lead Plaintiff and members of the putative class have an adequate remedy at law.

**TWENTY-SECOND DEFENSE**

If any false or misleading statement was made, or if any material fact required to be stated or necessary to make any statement made not misleading was omitted, and if the Lead Plaintiff or any members of the putative class were aware of that statement or omission, then such Lead Plaintiff and members of the putative class cannot prevail.

**TWENTY-THIRD DEFENSE**

Lead Plaintiff and members of the putative class are not entitled to recover attorneys' fees, experts' fees or other costs and disbursements.

**TWENTY-FOURTH DEFENSE**

Lead Plaintiff and members of the putative class' claims are barred in whole, or in part, against Underwriter Defendants as to which this Court lacks general or specific personal jurisdiction.

**TWENTY-FIFTH DEFENSE**

Lead Plaintiff and members of the putative class' claims against the Underwriter Defendants are barred by the one-year statute of limitations under Section 13 of the Securities Act.

**TWENTY-SIXTH DEFENSE**

Lead Plaintiff and members of the putative class are not entitled to any recovery under the Securities Act from the Underwriter Defendants because the Underwriter Defendants did not know, and in the exercise of reasonable care, could not have known, of the alleged misstatements or omissions of fact in the offering materials.

**TWENTY-SEVENTH DEFENSE**

The Underwriter Defendants are entitled to recover contribution from others for any liability they incur as a result of any of the alleged misrepresentations, omissions and conduct alleged in the Securities Act claims against the Underwriter Defendants.

**TWENTY-EIGHTH DEFENSE**

None of the Underwriter Defendants are liable under Section 11 of the Securities Act for damages in excess of the total price at which the specific offered securities underwritten and distributed by such underwriter to the public were offered to the public.

**TWENTY-NINTH DEFENSE**

Lead Plaintiff's and members of the putative class' claims are barred in whole, or in part, because certain of the challenged statements contain expressions of opinion that Lead Plaintiff has not alleged, and cannot prove, either were not honestly held or contained embedded statements of false, material facts.

**THIRTIETH DEFENSE**

Lead Plaintiff and members of the putative class' claims are barred in whole, or in part, because the Registration Statement complied with applicable statutes, rules and regulations of the SEC and any other statutes, rules or regulations in effect at the time of the conduct alleged in the Complaint.

**THIRTY-FIRST DEFENSE**

Lead Plaintiff and members of the putative class' claims are barred in whole, or in part, because Lead Plaintiff assumed the risks disclosed in the Registration Statement associated with the securities in question and any alleged losses were caused by those risks coming to fruition.

**THIRTY-SECOND DEFENSE**

Lead Plaintiff and members of the putative class' claims are barred in whole, or in part, to the extent they seek damages "which exceed the price at which the security was offered to the public."  15 U.S.C. § 77k(g).

**THIRTY-THIRD DEFENSE**

Lead Plaintiff and members of the putative class' claims are barred in whole, or in part, to the extent that they held, disposed of or could have disposed of the securities at a price in excess of the offering price.

**THIRTY-FOURTH DEFENSE**

Without admitting that Lead Plaintiff or members of the putative class suffered damages in any amount, or that any defendants are or should be liable for any such damages, to the extent that Lead Plaintiff failed to mitigate, minimize or avoid any loss or damage referred to in the Complaint, any recovery against the Underwriter Defendants must be reduced by that amount or eliminated.

**THIRTY-FIFTH DEFENSE**

The Underwriter Defendants reserve all separate or affirmative defenses or rights that they may have against the putative class and its members.  It is not necessary at this time for the Underwriter Defendants to delineate such defenses because no class has been certified and the putative class members are not parties to the litigation.

**THIRTY-SIXTH DEFENSE**

The Underwriter Defendants reserve the right to raise any additional defenses, crossclaims and third-party claims not asserted herein of which they may become aware through discovery or other investigation, as may be appropriate at a later time.  The Underwriter Defendants adopt and incorporate any and all separate defenses asserted by other defendants in this action, to the extent that such defenses are applicable to the Underwriter Defendants.

Dated: September 15, 2021

Respectfully submitted,

/s/ *John C. Gray*
John C. Gray
Edwin A. Barkel
Michael C. Brown
LEWIS ROCA ROTHGERBER
CHRISTIE LLP

Adam S. Hakki
Agnès Dunogué
SHEARMAN & STERLING LLP

*Counsel for Defendants*
*Raymond James & Associates, Inc.;*
*Merrill Lynch, Pierce, Fenner & Smith*
*Incorporated; Cowen and Company,*
*LLC; Stifel, Nicolaus & Company,*
*Incorporated; and Imperial Capital, LLC*

# EXHIBIT 4



| **Company:** | MESA AIR GROUP INC |
|---|---|
| **Document:** | 424B4 (Final Prospectus - Priced Offering (S-1)) · 08/10/2018 |
| | Entire Document |
| **File Number:** | 333-226173 |
| **Pages:** | 207 |

1/3/2022 7:37:25 PM

Intelligize, Inc.    info@intelligize.com    1-888-925-8627

Table of Contents

Filed pursuant to Rule 424(b)(4)
Registration No. 333-226173

**PROSPECTUS**

# 9,630,000 Shares



# Mesa Air Group, Inc.

## Common Stock

This is the initial public offering of our common stock. We are offering 9,630,000 shares.

The initial public offering price is $12.00 per share. Our common stock has been approved for listing on the Nasdaq Global Select Market under the symbol "MESA."

We are an "emerging growth company" as defined under the federal securities laws, and, as such, we are subject to reduced public company reporting requirements. See "*Prospectus Summary—Implications of Being an Emerging Growth Company*."

**Investing in our common stock involves risks. See "*Risk Factors*" beginning on page 19 to read about factors you should consider before buying shares of our common stock.**

| | Per Share | | Total |
|---|---|---|---|
| Initial public offering price | $ 12.00 | $ | 115,560,000 |
| Underwriting discounts and commissions(1) | $ 0.84 | $ | 8,089,200 |
| Proceeds to us (before expenses) | $ 11.16 | $ | 107,470,800 |

(1)   The underwriters will receive no underwriting discount or commission with respect to 900,000 shares sold to certain related parties. See the "*Underwriting*" section beginning on page 151 for additional information regarding underwriting compensation.

We and the selling shareholders identified in this prospectus have granted the underwriters the right to purchase up to an additional 1,444,500 shares of common stock at the initial public offering price, less underwriting discounts and commissions. The underwriters can exercise this option within 30 days from the date of this prospectus. If the overallotment option is exercised, an aggregate of up to 777,833 shares will be purchased directly from us, and an aggregate of up to 666,667 shares will be purchased directly from the selling shareholders. We will not receive any of the proceeds from the sale of any shares sold by the selling shareholders if the overallotment option is exercised.

**Neither the Securities and Exchange Commission, nor any state securities commission, nor any other regulatory body has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

The underwriters expect to deliver the shares to the purchasers on or about August 14, 2018.

**RAYMOND JAMES**                                                    **BofA Merrill Lynch**

**Cowen**                                    **Stifel**                                    **Imperial Capital**

**Prospectus dated August 9, 2018.**

Table of Contents

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion of our financial condition and results of operations in conjunction with the annual consolidated financial statements, condensed consolidated interim financial statements and the notes thereto included elsewhere in this prospectus. The following discussion contains forward-looking statements that reflect our plans, estimates and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to these differences include those discussed below and elsewhere in this prospectus, particularly in "Risk Factors."*

## Overview

We are a regional air carrier providing scheduled passenger service to 110 cities in 38 states, the District of Columbia, Canada, Mexico, Cuba and the Bahamas. All of our flights are operated as either American Eagle or United Express flights pursuant to the terms of capacity purchase agreements we entered into with American and United. We have a significant presence in several of our major airline partners' key domestic hubs and focus cities, including Dallas, Houston, Phoenix and Washington-Dulles.

As of March 31, 2018, we operated a fleet of 145 aircraft with approximately 610 daily departures. We operate 64 CRJ-900 aircraft under our American Capacity Purchase Agreement and 20 CRJ-700 and 60 E-175 aircraft under our United Capacity Purchase Agreement. For the six months ended March 31, 2018, approximately 55% of our aircraft in scheduled service were operated for United and approximately 45% were operated for American. All of our operating revenue in our 2017 fiscal year and the six months ended March 31, 2018 was derived from operations associated with our American and United Capacity Purchase Agreements.

Our long-term capacity purchase agreements provide us guaranteed monthly revenue for each aircraft under contract, a fixed fee for each block hour and flight actually flown, and reimbursement of certain direct operating expenses in exchange for providing regional flying on behalf of our major airline partners. Our capacity purchase agreements also shelter us from many of the elements that cause volatility in airline financial performance, including fuel prices, variations in ticket prices, and fluctuations in number of passengers. Our major airline partners control route selection, pricing, seat inventories, marketing and scheduling, and provide us with ground support services, airport landing slots and gate access.

## Trends and Uncertainties Affecting Our Business

We believe our operating and business performance is driven by various factors that typically affect regional airlines and their markets, including trends which affect the broader airline and travel industries, though our capacity purchase agreements reduce our exposure to fluctuations in certain trends. The following key factors may materially affect our future performance:

*Availability and Training of Qualified Pilots.* On July 8, 2013, as directed by the U.S. Congress, the FAA issued more stringent pilot qualification and crew member flight training standards, which, among other things, increased the required training time for new airline pilots from 250 hours to 1,500 hours of flight time. With these changes, the supply of qualified pilot candidates eligible for hiring by the airline industry has been dramatically reduced. To address the diminished supply of qualified pilot candidates, regional airlines implemented significant pilot wage and bonus increases.

In prior periods, these factors caused our pilot attrition rates to be higher than our ability to hire and retain replacement pilots and we have been unable to provide flight services at or exceeding the

54

Table of Contents

minimum flight operating levels expected by our major airline partners. See "*Business—Capacity Purchase Agreements*." However, on July 13, 2017, we reached a new four-year collective bargaining agreement with our pilots that provides increases in our pilots' wages, premium pay for flying on scheduled days off and competitive signing bonuses for prospective new pilots. See "*Business—Employees*." Following the ratification of our new collective bargaining agreement in July 2017, the average number of new pilot applications per month has increased by 45.3%.

We believe that our average number of new pilot applications per month will continue to exceed pilot attrition during our 2018 fiscal year. However, we face a significant training backlog for our new pilot candidates before we are able to resume flight services at or exceeding the minimum flight operating levels expected by our major airline partners. We are carefully optimizing pilot scheduling and providing premium pay to incentivize our pilots to fly on scheduled days off to maintain the flight schedules expected by our major airline partners. We have also negotiated increased access to flight simulators with our vendors and hired additional instructors to streamline our backlog of pilot training, but our results of operations may be negatively impacted if we are unable to hire and train our pilots in a timely manner.

*Pilot Attrition*. In recent years, we have experienced significant volatility in our attrition as a result of pilot wage and bonus increases at other regional air carriers, the growth of cargo, low-cost and ultra low-cost carriers and the number of pilots at major airlines reaching the statutory mandatory retirement age of 65 years. Following the ratification of our new collective bargaining agreement in July 2017, our average pilot attrition per month has decreased by 16.2%. If our actual pilot attrition rates are materially different than our projections, our operations and financial results could be materially and adversely affected.

*Labor*. The airline industry is heavily unionized. The wages, benefits and work rules of unionized airline industry employees are determined by collective bargaining agreements. As of March 31, 2018, approximately 76.7% of our workforce was represented by the ALPA and AFA. Our pilots and flight attendants ratified new four-year collective bargaining agreements during calendar 2017. The agreements include rate increases for three years and two years, respectively, after the amendable dates. The new agreements are amendable following their four-year term and include labor rate structures for two years (flight attendants) and three years (pilots), respectively, after the amendable dates. The terms and conditions of our future collective bargaining agreements may be affected by the results of collective bargaining negotiations at other airlines that may have a greater ability, due to larger scale, greater efficiency or other factors, to bear higher costs than we can. In addition, conflicts between airlines and their unions can lead to work slowdowns or stoppages. A strike or other significant labor dispute with our unionized employees may adversely affect our ability to conduct business.

*Competition*. The airline industry is highly competitive. We compete principally with other regional airlines. Major airlines typically award capacity purchase agreements to regional airlines based on the following criteria: ability to fly contracted schedules, availability of labor resources, including pilots, low operating cost, financial resources, geographical infrastructure, overall customer service levels relating to on-time arrival and flight completion percentages and the overall image of the regional airline. We expect that, over the next five years, capacity purchase agreements representing up to 300 aircraft currently flown by our competitors on behalf of our major airline partners will expire by their terms and be subject to rebidding. In addition, our United Capacity Purchase Agreement expires with respect to 50 aircraft between June 2019 and August 2020. Our ability to renew our existing agreements and earn additional flying opportunities in the future will depend, in significant part, on our ability to maintain a low-cost structure competitive with other regional air carriers. See "*Business—Competition*."

*Market Volatility*. The airline industry is volatile and affected by economic cycles and trends. Consumer confidence and discretionary spending, fear of terrorism or war, weakening economic conditions, fare

55

**Table of Contents**

initiatives, fluctuations in fuel prices, labor actions, changes in governmental regulations on taxes and fees, weather and other factors have contributed to a number of reorganizations, bankruptcies, liquidations and business combinations among major and regional airlines. The effect of economic cycles and trends may be somewhat mitigated by our reliance on capacity purchase agreements. If, however, any of our major airline partners experiences a prolonged decline in the number of passengers or is negatively affected by low ticket prices or high fuel prices, it may seek rate reductions in future capacity purchase agreements, or materially reduce our scheduled flights in order to reduce its costs. Our financial performance could be negatively impacted by any adverse changes to the rates, number of aircraft or utilization under our capacity purchase agreements.

*Maintenance Contracts, Costs and Timing*. Our employees perform routine airframe and engine maintenance along with periodic inspections of equipment at their respective maintenance facilities. We also use third-party vendors, such as AAR, Aviall, Bombardier, GE and StandardAero, for certain heavy airframe and engine maintenance work, along with parts procurement and component overhaul services for our aircraft fleet. As of March 31, 2018, $58.9 million of parts inventory was consigned to us by AAR and Aviall under long-term contracts that is not reflected on our balance sheet.

The average age of our E-175, CRJ-900 and CRJ-700 type aircraft is approximately 2.4, 11.5 and 14.2 years, respectively. Due to the relatively young age of our E-175 aircraft, they require less maintenance now than they will in the future. Over the past five years, we have incurred relatively low maintenance expenses on our E-175 aircraft because most of the parts are under multi-year warranties and a limited number of heavy airframe checks and engine overhauls have occurred. As our E-175 aircraft age and these warranties expire, we expect that maintenance costs will increase in absolute terms and as a percentage of revenue. In addition, because our current aircraft were acquired over a relatively short period of time, significant maintenance events scheduled for these aircraft will occur at roughly the same intervals, meaning we will incur our most expensive scheduled maintenance obligations across our present fleet at approximately the same time. These more significant maintenance activities result in out-of-service periods during which aircraft are dedicated to maintenance activities and unavailable for flying under our capacity purchase agreements.

We use the direct expense method of accounting for our maintenance of regional jet engine overhauls, airframe, landing gear, and normal recurring maintenance wherein we recognize the expense when the maintenance work is completed, or over the repair period, if materially different. While we keep a record of expected maintenance events, the actual timing and costs of major engine maintenance expense are subject to variables such as estimated usage, government regulations and the level of unscheduled maintenance events and their actual costs. Accordingly, we cannot reliably quantify the costs or timing of future maintenance-related expenses for any significant period of time. For more information, see "*Critical Accounting Policies—Maintenance*" elsewhere in this prospectus.

*Aircraft Leasing and Finance Determinations*. We have generally funded aircraft acquisitions through a combination of operating leases and debt financing. Our determination to lease or finance the acquisition of aircraft may be influenced by a variety of factors, including the preferences of our major airline partners, the strength of our balance sheet and credit profile and those of our major airline partners, the length and terms of the available lease or financing alternatives, the applicable interest rates, and any lease return conditions. When possible, we prefer to finance aircraft through debt rather than operating leases, due to lower operating costs, extended depreciation period, opportunity for aircraft equity, absence of lease return conditions and greater flexibility in renewing the aircraft under our capacity purchase agreements with our major airline partners after paying off the principal balance.

Subsequent to the initial acquisition of an aircraft, we may also refinance the aircraft or convert one form of financing to another (e.g., replacing an aircraft lease with debt financing). The purchase of leased aircraft allows us to lower our operating costs and avoid lease-related use restrictions and return conditions.

Table of Contents

As of March 31, 2018, we had 79 aircraft in our fleet under lease, including 42 E-175 aircraft owned by United and leased to us at nominal amounts. In order to determine the proper classification of our leased aircraft as either operating leases or capital leases, we must make certain estimates at the inception of the lease relating to the economic useful life and the fair value of an asset as well as select an appropriate discount rate to be used in discounting future lease payments. These estimates are utilized by management in making computations as required by existing accounting standards that determine whether the lease is classified as an operating lease or a capital lease. All of our aircraft leases have been classified as operating leases, which results in rental payments being charged to expense over the terms of the related leases.

We are also subject to lease return provisions that require a minimum portion of the "life" of an overhaul remain on the engine at the lease return date. We estimate the cost of maintenance lease return obligations and accrue such costs over the remaining lease term when the expense is probable and can be reasonably estimated. Additionally, operating leases are not reflected on our consolidated balance sheet and, accordingly, neither a lease asset nor an obligation for future lease payments is reflected in our consolidated balance sheets. See "*Recent Accounting Pronouncements*" below for a discussion of a new accounting standard that is likely to have an impact on our aircraft lease accounting beginning in our 2020 fiscal year.

*Seasonality*. Our results of operations for any interim period are not necessarily indicative of those for the entire year, since the airline industry is subject to seasonal fluctuations and general economic conditions. Our operations are somewhat favorably affected by increased utilization of our aircraft, historically occurring in the summer months, and are unfavorably affected by increased fleet maintenance during the months from November through January and by inclement weather which occasionally results in cancelled flights, principally during the winter months.

**Key Components of Consolidated Statements of Operations**

The following discussion summarizes the key components of our consolidated statements of operations and consolidates historical components.

**Operating Revenues**

Our consolidated operating revenues consist primarily of contract revenue flight services as well as pass-through and other revenues.

*Contract Revenue*. Contract revenue consists of the fixed monthly amounts per aircraft received pursuant to our capacity purchase agreements with our major airline partners, along with the additional amounts received based on the number of flights and block hours flown. Contract revenues we receive from our major airline partners are paid and recognized by us on a weekly basis.

*Pass-Through and Other*. Pass-through and other revenue consists of passenger and hull insurance, aircraft property taxes, landing fees, catering and certain maintenance costs related to our E-175 aircraft that we equally recognize as both a revenue and expense.

**Operating Expenses**

Our operating expenses consist of the following items:

*Flight Operations.* Flight operations expense includes costs related to salaries, bonuses and benefits earned by our pilots, flight attendants, and dispatch personnel, as well as costs related to technical publications, lodging of our flight crews and pilot training expenses.

57

Table of Contents

*Operating Revenues*

| Operating revenues ($ in thousands): | Year Ended September 30, | | Change | |
|---|---|---|---|---|
| | 2016 | 2017 | | |
| Contract | $ 569,373 | $ 618,698 | $ 49,325 | 8.7% |
| Pass-through and other | $ 18,463 | $ 24,878 | $ 6,415 | 34.7% |
| **Total operating revenues** | $ 587,836 | $ 643,576 | $ 55,740 | 9.5% |
| **Operating data:** | | | | |
| Available seat miles—ASMs (miles in thousands) | 8,823,595 | 9,471,911 | 648,316 | 7.3% |
| Block hours | 368,468 | 395,083 | 26,615 | 7.2% |
| Revenue passenger miles—RPMs (miles in thousands) | 7,019,586 | 7,392,688 | 373,102 | 5.3% |
| Average stage length (miles) | 557 | 561 | 4 | 0.7% |
| Contract revenue per available seat mile—CRASM (in cents) | ¢ 6.45 | ¢ 6.53 | ¢ 0.08 | 1.2% |
| Passengers | 12,497,424 | 13,005,844 | 508,420 | 4.1% |

Total operating revenue increased by $55.7 million, or 9.5%, from our 2016 fiscal year to our 2017 fiscal year. Contract revenue increased by $49.3 million, or 8.7%, primarily due to the addition of seven new E-175 aircraft to our fleet in 2017 and higher block hour compensation, primarily driven by the aircraft added to our fleet. In addition, we added 16 E-175 aircraft to our fleet between our second and fourth quarters of our 2016 fiscal year, which more directly impacted our contract revenue during our 2017 fiscal year. Our block hours flown during our fiscal 2017 increased 7.2% over our 2016 fiscal year, primarily due to the additional E-175 aircraft. Likewise, our pass-through and other revenue increased during our fiscal 2017 by $6.4 million, or 34.7%, primarily due to pass-through maintenance costs related to our E-175 fleet.

*Operating Expenses*

| Operating expenses ($ in thousands): | Year Ended September 30, | | Change | |
|---|---|---|---|---|
| | 2016 | 2017 | | |
| Flight operations | $ 141,422 | $ 155,516 | $ 14,094 | 10.0% |
| Fuel | 753 | 766 | 13 | 1.7% |
| Maintenance | 225,130 | 210,729 | (14,401) | (6.4)% |
| Aircraft rent | 71,635 | 72,551 | 916 | 1.3% |
| Aircraft and traffic servicing | 3,936 | 3,676 | (260) | (6.6)% |
| General and administrative | 42,182 | 38,996 | (3,186) | (7.6)% |
| Depreciation and amortization | 46,020 | 61,048 | 15,028 | 32.7% |
| **Total operating expenses** | $ 531,078 | $ 543,282 | $ 12,204 | 2.3% |
| **Operating data:** | | | | |
| Available seat miles—ASMs (miles in thousands) | 8,823,595 | 9,471,911 | 648,316 | 7.3% |
| Block hours | 368,468 | 395,083 | 26,615 | 7.2% |
| Average stage length (miles) | 557 | 561 | 4 | 0.7% |
| Departures | 208,399 | 221,990 | 13,591 | 6.5% |
| Operating cost per available seat mile—CASM (in cents) | ¢ 6.02 | ¢ 5.74 | ¢ (0.28) | (4.7)% |

*Flight Operations*. In our 2017 fiscal year, flight operations expense increased $14.1 million, or 10.0%, to $155.5 million from $141.4 million for our 2016 fiscal year. The increase is primarily driven by $11.5 million in additional wages, taxes, and benefits under our new collective bargaining agreements and an increase in our block hours flown.

Table of Contents

*Fuel.* Fuel expense remained relatively consistent from our 2016 fiscal year to our 2017 fiscal year. In our 2016 fiscal year and our 2017 fiscal year, all fuel costs related to flying under our capacity purchase agreements were directly paid to suppliers by our major airline partners.

*Maintenance.* Aircraft maintenance costs decreased by $14.4 million, or 6.4%, from our 2016 fiscal year to our 2017 fiscal year. This decrease was primarily driven by a $26.9 million decrease in engine overhaul expense, due to the timing of significant maintenance events, including engine overhauls, which occurred less frequently in our 2017 fiscal year than in our 2016 fiscal year. That decrease was partially offset by an increase of $9.5 million related to performing more "C" maintenance checks than in our 2016 fiscal year. Total pass-through maintenance expense reimbursed by our major airline partners increased by $7.4 million from our 2016 fiscal year to our 2017 fiscal year.

The following table presents information regarding our maintenance costs during our 2016 and 2017 fiscal years:

| (in thousands) | Year Ended September 30, | | Change | |
|---|---|---|---|---|
| | 2016 | 2017 | | |
| Engine overhaul | $ 90,890 | $ 63,719 | $(27,171) | (29.9)% |
| Pass-through engine overhaul | — | 270 | 270 | 0.0% |
| C-check | 13,185 | 17,755 | 4,570 | 34.7% |
| Pass-through C-check | — | 4,889 | 4,889 | 0.0% |
| Component contracts | 31,702 | 31,671 | (32) | (0.1)% |
| Rotable and expendable parts | 27,160 | 26,098 | (1,062) | (3.9)% |
| Other pass-through | 3,728 | 6,003 | 2,275 | 61.0% |
| Labor and other | 58,464 | 60,324 | 1,860 | 3.2% |
| **Total** | $ 225,130 | $ 210,729 | $(14,401) | (6.4)% |

*Aircraft Rent.* In our 2017 fiscal year, aircraft rent expense increased $0.9 million, or 1.3%, to $72.6 million from $71.6 million for our 2016 fiscal year. The increase is attributable to a $1.5 million manufacturer lease credit that expired in December 2015, which was partially offset by a $0.6 million increase in engine rent.

*Aircraft and Traffic Servicing.* In our 2017 fiscal year, aircraft and traffic servicing expense decreased by $0.3 million, or 6.6%, to $3.7 million from $3.9 million for our 2016 fiscal year. The decrease is primarily due to a reduction in interrupted trip expenses and international navigation fees as compared to our 2016 fiscal year. For our fiscal years ended September 30, 2016 and 2017, 42.6% and 46.5% respectively, of our aircraft and traffic servicing expense were reimbursed by our major airline partners.

*General and Administrative.* In our 2017 fiscal year, general and administrative expense decreased $3.2 million, or 7.6%, to $39.0 million from $42.2 million for our 2016 fiscal year. The decrease is primarily related to a decrease in insurance costs of $1.1 million and a decrease in wages and employee related expense of $2.1 million.

*Depreciation and Amortization.* Depreciation and amortization expense increased by $15.0 million, or 32.7%, from our 2016 fiscal year to our 2017 fiscal year. This increase was due to an increase of $9.8 million in aircraft depreciation due to placing 16 E-175 aircraft into service during 2016, which resulted in partial depreciation in 2016. The increase is also attributable to an increase of $4.4 million in spare engine depreciation due to purchasing additional spare engines during our 2017 fiscal year.

### Other Expense

Other expense increased by $14.7 million, or 46.1%, from $31.9 million in our 2016 fiscal year to $46.6 million in our 2017 fiscal year due to an increase in aircraft interest expense of $7.3 million

Table of Contents

related to the financing of 16 E-175 aircraft between the second and fourth quarter of 2016, along with an increase in interest expense of $5.5 million related to the financing of 20 spare engines. Expenses related to debt financing amortization was also higher, by $0.8 million, for legal and commitment fees incurred in connection with the financing of aircraft engines and acquisition of E-175 aircraft.

### *Income Taxes*

In our 2017 fiscal year, our effective tax rate was 38.9% compared to 40.0% in our 2016 fiscal year. Our tax rate can vary depending on the amount of income we earn in each state and the state tax rate applicable to such income, as well as any valuation allowance required on our state net operating losses.

We recorded an income tax provision of $20.9 million and an income tax provision of $9.9 million for the years ended September 30, 2017 and 2016, respectively.

This income tax provision for the year ended September 30, 2017 results in an effective tax rate of 38.9%, which differs from the U.S. federal statutory rate of 35% primarily due to state taxes, changes in the valuation allowance against state net operating losses, expired state attributes, and the benefit from changes in state apportionment and statutory rates.

This income tax provision for the year ended September 30, 2016 results in an effective tax rate of 40.0%, which differs from the U.S. federal statutory rate of 35% primarily due to state taxes, changes in the valuation allowance against state net operating losses, expired state attributes, and the benefit resulting from changes in state apportionment and statutory rates.

We continue to maintain a valuation allowance on a portion of our state net operating losses in jurisdictions with shortened carryforward periods or in jurisdictions where our operations have significantly decreased as compared to prior years in which the net operating losses were generated.

On December 22, 2017, the President signed into law the legislation colloquially known as the Tax Act. The Tax Act incorporates several new provisions that will have an impact on our financial statements going forward. Most notably, the Tax Act will decrease the federal statutory rate to 24.5% for the year ending September 30, 2018, and 21% for years ending September 30, 2019 and forward. This decrease in federal statutory rate will result in a net tax benefit due to the remeasurement of our net deferred tax liability. The change in our future effective tax rate is not anticipated to have an effect on our cash tax until all of our U.S. federal net operating losses and credits have been utilized.

Additional provisions of the Tax Act that may impact our financial statements include 100% expensing of qualified property placed in service after September 27, 2017 and before January 1, 2023, refundable minimum tax credits over a four year period, net interest expense deductions limited to 30% of earnings after interest, taxes, depreciation, and amortization through 2021 and of earnings before interest and taxes thereafter, and net operating losses incurred in tax years beginning after December 31, 2017 are only allowed to offset up to 80% of a taxpayer's taxable income. These net operating losses are allowed to be carried forward indefinitely.

See Note 12: "*Income Taxes*" in the notes to the audited consolidated financial statements included elsewhere in this prospectus.

### Quarterly Results of Operations and Operating Statistics

The following table sets forth our unaudited quarterly condensed consolidated statements of operations data for each of the 10 quarters ended March 31, 2018. In management's opinion, the data below have been prepared on the same basis as the audited consolidated financial statements included elsewhere

65

Table of Contents

in this prospectus, and reflect all necessary adjustments, consisting only of normal recurring adjustments, necessary for a fair statement of this data. The results of historical periods are not necessarily indicative of the results to be expected for a full year or any future period. The following quarterly financial data should be read in conjunction with our audited financial statements and related notes included elsewhere in this prospectus.

Our financial results can vary materially from quarter to quarter due to the timing of engine overhauls and major airframe inspections and maintenance events. Our quarterly results may also be favorably impacted by higher rates of flight activity and utilization in the June and September calendar quarters compared to the December and March calendar quarters. During our fiscal 2018, we expect that our June and September calendar quarters will benefit from relatively low levels of engine and airframe maintenance costs.

| | Year Ending September 30, 2018 | |
| --- | --- | --- |
| | First Quarter | Second Quarter |
| | (in thousands) | |
| **Operating revenues**: | | |
| Contract | $ 154,389 | $ 156,515 |
| Pass-through and other | 10,295 | 11,125 |
| **Total operating revenues** | 164,684 | 167,640 |
| **Operating expenses:** | | |
| Engine overhaul | 17,181 | 10,758 |
| Engine overhaul pass-through | 2,327 | 2,874 |
| All other | 130,151 | 137,659 |
| **Total operating expenses** | 149,661 | 151,291 |
| Total other (expense) income | (14,188) | (13,369) |
| Income tax (benefit) expense | (21,789) | 608 |
| **Net income** | $ 22,624 | $ 2,372 |
| **Net income per share attributable to common shareholders:** | | |
| Basic(1) | $ 2.00 | $ 0.20 |
| Diluted(1) | $ 0.96 | $ 0.10 |
| **Weighted-average common shares outstanding:** | | |
| Basic | 11,294 | 11,592 |
| Diluted | 23,559 | 23,563 |
| **Operating data:(2)** | | |
| Block hours | 97,705 | 97,853 |
| Departures | 55,364 | 51,679 |
| Passengers | 3,311,007 | 3,021,514 |
| Available seat miles—ASMs (thousands) | 2,308,312 | 2,313,068 |
| Revenue passenger miles—RPMs (thousands) | 1,833,459 | 1,806,633 |
| Contract revenue per available seat mile—CRASM (in cents) | ¢ 6.69 | ¢ 6.77 |
| Operating cost per available seat mile—CASM (in cents) | ¢ 6.48 | ¢ 6.54 |

(1) See Note 10 to our quarterly condensed consolidated statements of operations data included elsewhere in this prospectus for an explanation of the method used to calculate the basic and diluted earnings per share.

(2) The definitions of certain terms related to the airline industry used in the table can be found under "*Glossary of Airline Terms*" at the end of this prospectus.

Table of Contents

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| | | Year Ended September 30, 2017 | | |
| | | (in thousands) | | |
| **Operating revenues:** | | | | |
| Contract | $ 155,502 | $ 154,210 | $ 157,411 | $ 151,575 |
| Pass-through and other | 4,733 | 4,886 | 9,541 | 5,718 |
| **Total operating revenues** | 160,235 | 159,096 | 166,952 | 157,293 |
| **Operating expenses:** | | | | |
| Engine overhaul | 23,930 | 21,181 | 8,436 | 10,171 |
| Engine overhaul pass-through | — | — | — | 270 |
| All other | 115,467 | 117,510 | 122,156 | 124,161 |
| **Total operating expenses** | 139,397 | 138,691 | 130,592 | 134,602 |
| Total other (expense) income | (10,281) | (11,938) | (11,862) | (12,511) |
| Income tax (benefit) expense | 3,947 | 3,163 | 9,066 | 4,698 |
| **Net income** | $ 6,610 | $ 5,304 | $ 15,432 | $ 5,482 |
| **Net income per share attributable to common shareholders:** | | | | |
| Basic[1] | $ 0.62 | $ 0.48 | $ 1.40 | $ 0.49 |
| Diluted[1] | $ 0.28 | $ 0.23 | $ 0.66 | $ 0.23 |
| **Weighted-average common shares outstanding** | | | | |
| Basic | 10,593 | 10,973 | 10,993 | 11,117 |
| Diluted | 23,409 | 23,407 | 23,223 | 23,459 |
| **Operating data:[2]** | | | | |
| Block hours | 100,784 | 98,519 | 100,671 | 95,109 |
| Departures | 55,373 | 54,046 | 57,054 | 55,517 |
| Passengers | 3,273,813 | 3,119,838 | 3,364,121 | 3,248,072 |
| Available seat miles—ASMs (thousands) | 2,452,657 | 2,376,234 | 2,384,960 | 2,258,060 |
| Revenue passenger miles—RPMs (thousands) | 1,930,489 | 1,828,991 | 1,875,934 | 1,757,274 |
| Contract revenue per available seat mile—CRASM (in cents) | ¢ 6.34 | ¢ 6.49 | ¢ 6.60 | ¢ 6.71 |
| Operating cost per available seat mile—CASM (in cents) | ¢ 5.68 | ¢ 5.84 | ¢ 5.48 | ¢ 5.96 |

[1]    See Note 10 to our quarterly condensed consolidated statements of operations data included elsewhere in this prospectus for an explanation of the method used to calculate the basic and diluted earnings per share.

[2]    The definitions of certain terms related to the airline industry used in the table can be found under "*Glossary of Airline Terms*" at the end of this prospectus.

Table of Contents

- In fiscal year 2014, we permanently financed eight CRJ-900 aircraft with $114.5 million in debt. The debt bears interest at 5% and requires monthly principal and interest payments. As of September 30, 2017, we had $82.8 million outstanding under these notes.
- In fiscal year 2015, we financed seven CRJ-900 aircraft with $170.2 million in debt. The senior notes payable of $151 million bear interest at monthly LIBOR plus 2.71% (3.942% at September 30, 2017) and require monthly principal and interest payments. The subordinated notes payable are noninterest-bearing and become payable in full on the last day of the term of the notes. We have imputed an interest rate of 6.25% on the subordinated notes payable and recorded a related discount of $8.1 million, which is being accreted to interest expense over the term of the notes. As of September 30, 2017, we had $144.0 million outstanding under these notes.
- In fiscal year 2016, we financed 10 E-175 aircraft with $246 million in debt under an EETC financing arrangement. The debt bears interest ranging from 4.75% to 6.25% and requires semi-annual principal and interest payments. As of September 30, 2017, we had $226.4 million outstanding under these notes.
- In fiscal year 2016, we financed eight E-175 aircraft with $195.3 million in debt. The senior notes payable of $172 million bear interest at the three-month LIBOR plus a spread ranging from 2.20% to 2.32% (3.533% to 3.654% at September 30, 2017) and require quarterly principal and interest payments. The subordinated notes payable bear interest at 4.50% and require quarterly principal and interest payments. As of September 30, 2017, we had $181.1 million outstanding under these notes.

In December 2017, we refinanced $41.9 million of debt on nine CRJ-900 aircraft (due between 2019 and 2022) with $74.9 million of debt, resulting in net cash proceeds to us of $30.5 million after transaction related fees. The senior notes payable of $46.9 million bear interest at monthly LIBOR plus 3.5%. The subordinated notes payable bear interest at monthly LIBOR plus 4.5%. The refinanced debt requires quarterly payments of principal and interest through fiscal 2022.

On June 27, 2018, we refinanced $16.0 million of debt on six CRJ-900 aircraft (due in 2019), with $27.5 million of debt, resulting in net cash proceeds to us of $10.4 million after transaction related fees. The notes payable require quarterly payments of principal and interest through fiscal 2022 bearing interest at LIBOR plus 3.50%.

On June 28, 2018, we purchased nine CRJ-900 aircraft, which were previously leased under the GECAS Lease Facility, for $76.5 million. We financed the aircraft purchase with $69.6 million in new debt and proceeds from the June 2018 aircraft refinancing. The notes payable of $69.6 million require quarterly payments of principal and interest through fiscal 2022 bearing interest at LIBOR plus a spread ranging from 3.50% for the senior promissory notes to 7.50% for the Subordinated GECAS Notes. We recorded non-cash lease termination expense of $15.1 million in connection with the lease buyout. Also, as part of the transaction, we (i) received $4.5 million of future goods and services credits and $5.6 million of loan forgiveness for loans with a maturity date in 2027 from the aircraft manufacturer, and (ii) mutually agreed with GE Capital Aviation Services LLC to terminate the GE Warrant.

The Aircraft Notes are secured by the respective aircraft, which had a net book value of $1,023.8 million as of September 30, 2017. The weighted-average effective interest rate of the fixed and floating rate aircraft and equipment notes at September 30, 2017 and March 31, 2018, was 4.89% and 5.32%, respectively.

77

Table of Contents

*Maintenance Commitments*

In August 2005, we entered into a ten-year agreement with AAR, for the maintenance and repair of certain of our CRJ-200, CRJ-700 and CRJ-900 aircraft. The agreement has been amended since with a term through 2021, also to include certain E-175 aircraft rotable spare parts with a term through December 2027. Under the agreements, we pay AAR a monthly access fee per aircraft for certain consigned inventory as well as a fixed "cost per flight hour" fee on a monthly basis for repairs on certain repairable parts during the term of the agreement, which fees are subject to annual adjustment based on increases in the cost of labor and component parts.

In July 2012, we entered into a heavy check maintenance contract with Bombardier, to perform heavy check maintenance on all CRJ-700 and CRJ-900 aircraft, which has been extended through November 2020. We are charged on a time and materials basis by Bombardier for the heavy check maintenance work performed under this agreement.

In July 2013, we entered into an engine maintenance contract with GE to perform heavy maintenance on certain CRJ-700, CRJ-900 and E-175 engines based on a fixed pricing schedule. The pricing may escalate annually in accordance with GE's spare parts catalog for engines. The engine maintenance contract extends through 2024.

In 2014, we entered into a ten-year contract with Aviall to provide maintenance and repair services on the wheels, brakes and tires of our CRJ-700 and CRJ-900 aircraft. Under the agreement, we pay Aviall a fixed "cost per landing" fee for all landings of our aircraft during the term of the agreement, which fee is subject to annual adjustment based on increases in the cost of labor and component parts.

We entered into an engine maintenance contract with StandardAero, which became effective on June 1, 2015, to perform heavy maintenance on certain CRJ-700 and CRJ-900 engines based on a fixed pricing schedule. The pricing may escalate annually in accordance with the GE's spare parts catalog for engines. The engine maintenance contract extends through 2020.

Our employees perform routine airframe and engine maintenance along with periodic inspections of equipment at their respective maintenance facilities. We also use third-party vendors, such as AAR, Aviall and GE, for certain heavy airframe and engine maintenance work, along with parts procurement and component overhaul services for our aircraft fleet. As of September 30, 2017, $57.8 million of parts inventory was consigned to us by AAR and Aviall under long-term contracts that is not reflected on our balance sheet.

We use the direct expense method of accounting for our maintenance of regional jet engine overhauls, airframe, landing gear, and normal recurring maintenance wherein we recognize the expense when the maintenance work is completed, or over the repair period, if materially different. While we keep a record of expected maintenance events, the actual timing and costs of major engine maintenance expense are subject to variables such as estimated usage, government regulations and the level of unscheduled maintenance events and their actual costs. Accordingly, we cannot reliably quantify the costs or timing of future maintenance-related expenses for any significant period of time.

*Off-Balance Sheet Arrangements*

An off-balance sheet arrangement is any transaction, agreement or other contractual arrangement involving an unconsolidated entity under which a company has (i) made guarantees, (ii) a retained or a contingent interest in transferred assets, (iii) an obligation under derivative instruments classified as equity or (iv) any obligation arising out of a material variable interest in an unconsolidated entity that provides financing, liquidity, market risk or credit risk support to the company, or that engages in leasing, hedging or research and development arrangements with the company.

Table of Contents

We have no off-balance sheet arrangements of the types described in the four categories above that we believe may have material current or future effect on financial condition, liquidity or results of operations.

A majority of our leased aircraft are leased through trusts formed for the sole purpose of purchasing, financing and leasing aircraft to us. Because these are single-owner trusts in which we do not participate, we are not at risk for losses and we are not considered the primary beneficiary. We believe that our maximum exposure under the leases are the remaining lease payments.

**Quantitative and Qualitative Disclosure About Market Risk**

We are subject to market risks in the ordinary course of our business. These risks include interest rate risk and, on a limited basis, commodity price risk with respect to foreign exchange transactions. The adverse effects of changes in these markets could pose a potential loss as discussed below. The sensitivity analysis provided does not consider the effects that such adverse changes may have on overall economic activity, nor does it consider additional actions we may take to mitigate our exposure to such changes. Actual results may differ.

*Interest Rates*. We are subject to market risk associated with changing interest rates on our variable rate long-term debt; the variable interest rates are based on LIBOR. The interest rates applicable to variable rate notes may rise and increase the amount of interest expense on our variable rate long-term debt. We do not purchase or hold any derivative instruments to protect against the effects of changes in interest rates.

As of September 30, 2017, we had $613.0 million of variable rate debt including current maturities. A hypothetical 50 basis point change in interest rates would have affected interest expense by approximately $3.1 million in the year ended September 30, 2017. As of March 31, 2018, we had $603.5 million of variable-rate debt including current maturities. A hypothetical 50 basis point change in market interest rates would have affected interest expense by approximately $1.5 million in the six months ended March 31, 2018.

As of September 30, 2017, we had $343.9 million of fixed-rate debt, including current maturities. A hypothetical 50 basis point change in market interest rates would not impact interest expense or have a material effect on the fair value of our fixed-rate debt instruments as of September 30, 2017 or March 31, 2018.

*Foreign Exchange.* We have *de minimis* foreign currency risks related to our station operating expenses denominated in currencies other than the U.S. dollar, primarily the Canadian dollar. Our revenue is U.S. dollar denominated.

Unlike other airlines, our capacity purchase agreements largely shelter us from volatility related to fuel prices, which are directly paid and supplied by our major airline partners.

**Inflation**

We do not believe that inflation had a material effect on our business, financial condition, or results of operations in the last two fiscal years. If our costs were to become subject to significant inflationary pressures, we may not be able to fully offset such higher costs through price increases. Our inability or failure to do so could harm our business, financial condition, and results of operations.

**Critical Accounting Policies**

We prepare our consolidated financial statements in accordance with generally accepted accounting principles in U.S. GAAP. In doing so, we have to make estimates and assumptions that affect our

# EXHIBIT 5

# EXHIBIT 7

**S&P Global**
Market Intelligence

# Mesa Air Group, Inc. NasdaqGS:MESA
# FQ3 2019 Earnings Call Transcripts
## Friday, August 09, 2019 5:00 PM GMT
### S&P Global Market Intelligence Estimates

| | -FQ3 2019- | | | -FQ4 2019- | -FY 2019- | -FY 2020- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| **EPS Normalized** | 0.55 | 0.30 | ▼ (45.45 %) | 0.60 | 1.85 | 2.72 |
| **Revenue (mm)** | 182.91 | 180.22 | ▼ (1.47 %) | 181.40 | 719.78 | 799.66 |

Currency: USD
Consensus as of Aug-09-2019 1:15 AM GMT



| - EPS NORMALIZED - | | | |
|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE |
| **FQ4 2018** | 0.50 | 0.56 | ▲ 12.00 % |
| **FQ1 2019** | 0.47 | 0.55 | ▲ 17.02 % |
| **FQ2 2019** | 0.52 | 0.46 | ▼ (11.54 %) |
| **FQ3 2019** | 0.55 | 0.30 | ▼ (45.45 %) |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

Contents

_____

# Table of Contents

**Call Participants**          ...................................................................................          **3**

**Presentation**               ...................................................................................          **4**

**Question and Answer**        ...................................................................................          **9**

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

Case 2:20-cv-00648-MTL    Document 109-1    Filed 01/05/22    Page 171 of 335
Case 2:20-cv-00648-MTL   Document 57-7   Filed 10/01/20   Page 4 of 19
MESA AIR GROUP, INC. FQ3 2019 EARNINGS CALL |  AUG 09, 2019

# Call Participants

**EXECUTIVES**

**Bradford Roger Rich**
*Executive VP & COO*

**Darren L. Zapfe**
*Vice President of Finance*

**Jonathan G. Ornstein**
*Chairman & CEO*

**Michael J. Lotz**
*President & CFO*

**Michael L. Ferverda**
*Senior Vice President of Regulatory
& Special Projects*

**ANALYSTS**

**Conor T. Cunningham**
*Cowen and Company, LLC,
Research Division*

**Joseph William DeNardi**
*Stifel, Nicolaus & Company,
Incorporated, Research Division*

**Matthew Vernon Fallon**
*Deutsche Bank AG, Research
Division*

**Savanthi Nipunika Syth**
*Raymond James & Associates,
Inc., Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ3 2019 EARNINGS CALL |  AUG 09, 2019

# Presentation

**Operator**

Welcome, and thank you for standing by. [Operator Instructions] This call is being recorded. If you have any objections, you may disconnect at this time.

May I introduce your speaker for today, Jonathan Ornstein. Please, go ahead.

**Jonathan G. Ornstein**
*Chairman & CEO*

Thank you, operator. Thanks, everyone, for joining us on the call today. As operator indicated, this is Jonathan Ornstein, Chairman, Chief Executive Officer.

On the call with me today will be Mike Lotz, our President and Chief Financial Officer; Brian Gillman our Executive VP and General Counsel; Brad Rich, our Chief Operating Officer; and Darren Zapfe, our Vice President, Finance.

First, before we get started, I'd like to ask Darren to just please read the safe harbor statement.

**Darren L. Zapfe**
*Vice President of Finance*

Thanks, Jonathan. Before the presentation and comments begin, Mesa would like to remind you that some of the statements in response to your questions in this conference call may include forward-looking statements. As such, they are subject to future events and uncertainties that could also affect our actual results to differ materially from those statements.

Also please note the company undertakes no obligation to update or revise these forward-looking statements. Any forward-looking statements should be considered in conjunction with the cautionary statements in our press release and the risk factors included in our filings with the SEC, which Mesa encourages you to read. In addition, please refer to our press release in the Investor Section of Mesa's website to find additional disclosures and reconciliations of non-GAAP financial measures that will be used on today's call.

**Jonathan G. Ornstein**
*Chairman & CEO*

Okay. Thank you, Darren. Okay, let's get started. We obviously have a lot to cover. We had a very challenging quarter operationally, financially as is pretty evident. There are 3 main areas we'd like to cover: status of the United contract, operational performance and financial performance compared to prior quarters.

First, let's talk about the status of the United contract. We continue to have productive discussions with United related to the 20 CRJ700s, which begin to expire on August 31 through December 31. I know this has been an ongoing topic for far longer than any of us anticipated, but we still remain confident on a CPA extension on the 20 CRJ700s and the Embraer 175s.

There've been a lot of numbers -- excuse me, a lot -- a number of issues that have led to this delay, not the least of which has been the change in management in our Express program, United's interested in converting the CRJ700s to 550s, the 50-seat variant, and a potential backfill of the 70-seat aircraft, which was also complicated with what was going at Bombardier time. As many of you know, they have recently announced exiting the regional aircraft business.

While nothing is done until it is done in this industry, and obviously, things can change rapidly, we remain confident that the good-faith negotiations with United will lead to a new contract. It is important to note that all of our aircraft are currently scheduled in all future United schedules. We have hope -- again, we

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ3 2019 EARNINGS CALL |  AUG 09, 2019

hope to have something to announce in the next few weeks, and I can assure you that it has been one of our highest priorities.

On operational performance, we had a number of challenges in our operational performance in the third quarter, which were driven by very specific identifiable issues that I'm going to ask Brad Rich to now walk you through. Brad?

**Bradford Roger Rich**
*Executive VP & COO*

Thank you, Jonathan. As Jonathan's already mentioned, we've experienced several operational challenges in the third quarter. First, I want to express my appreciation to all of the people of Mesa who are working hard every day and committed to producing the reliability and experience that our customers expect and deserve. I've been here at Mesa now just over 4 months, and I think it's worth noting that, in my many years of regional airline experience and, most recently, having mainline experience, I do understand, I think, very clearly what our partners expect and require. And I do believe Mesa has the operational capability to meet those expectations.

During the third quarter of fiscal '19, we had a controllable completion factor of 99.4%, which compares to 99.4% for the same period in the prior year. Although the results are the same number, they were actually achieved very differently. The third quarter of fiscal '19's controllable completion factor was accomplished while increasing our block hours by 10.8% over the same period last year primarily due to higher utilization on our fleet.

At the same time, we experienced several significant challenges during this year's third quarter, including unprecedented weather. Our total completion factor, which includes weather and other uncontrollable cancellations, was 95.9% in the third quarter of '19 compared to 98.2% for the same period in the prior year. The 2.3 point difference is the impact of the weather primarily, which negatively impacts the flow and location of both our aircraft and our crews.

And as we previously reported, we removed 2 CRJ900 aircraft from the American CPA on April 2 to be used as additional spare aircraft to help support the American operation, which previously had only 3 operational spares. We also agreed to new performance criteria based on the additional spare aircraft supporting the operation.

During the month of April, our first month with the additional spares, we operated at 99.6% controllable completion, and we exceeded all of the new performance criteria in the American operation. Unfortunately, during the initial 60-day performance period that began May 1, we had an aircraft unavailable due to ground damage in Dallas by a ground handler, and 2 additional aircraft were unavailable due to extended C-check turn times caused by labor shortages at our heavy maintenance provider, Bombardier.

As a result, rather than benefiting from additional -- the additional 2 spares, our spare aircraft count was reduced from 3 to 2 throughout the majority of the measurement period. When combining the impact of the damaged aircraft, the extended C-checks, the unprecedented weather and widely reported GPS outage, we did not meet the performance criteria, and American elected to remove 2 aircraft effective November 2, 2019.

Today, we continue to operate with only 2 of the 5 dedicated spare aircraft during the second 60-day performance period that began on June 30. Further impacting -- negatively impacting the operation, on July 31, we had another aircraft incur significant ground damage in Dallas when it was struck by a fueling truck while parked at the gate. As a result, it's going to be very difficult to meet the performance criteria, and that could result in the removal of additional aircraft by the end of the calendar year.

Needless to say, we're disappointed to have lost the aircraft after our people have worked very hard to meet the new criteria only to be negatively impacted by events that were largely and primarily out of our control. Now that being said, we do remain very focused on our identified initiatives to improve our operational performance. And I would say by the end of August, we do believe that all 5 spare aircraft will be back and operational.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ3 2019 EARNINGS CALL |  AUG 09, 2019

At the -- on the United side of the operation, our controllable completion factor was also 99.4% for Q3, so I think it's important to note that we had 99.7% controllable completion factor on the E75 fleet, which we do consider to be the premier aircraft in the regional industry and where our potential growth could come from. It's also worth noting that, in July, 2019, Mesa did lead the United Express portfolio in on-time performance and overall customer satisfaction, very positive points and I think indicative of improvements.

In closing, I would again remind you that we remained very focus on the hiring of flight crews and maintenance technicians, and we had very positive net increases in both pilots and mechanics over the third quarter of last year. With that, I'll now turn the time over to Mike to walk through the financials.

**Michael L. Ferverda**
*Senior Vice President of Regulatory & Special Projects*

Thanks, Brad. So for the third quarter, we reported pretax income of $3.9 million. This compares to a pretax loss of $14.6 million for the same quarter of last year.

Additionally, for the quarter we reported $900,000 in income tax expense or net income of $3 million or $0.09 per share. Excluding special items, our adjusted net income was $10.4 million or $0.30 per share. And just a quick note on our income tax expense. Although we'll be reflecting income tax of $900,000, for accounting purposes, we will not pay any cash taxes as we still have an excess of $400 million in NOLs.

For pretax income, excluding the lease termination adjustment associated with the GECAS lease buyout, adjusted pretax income was $13.4 million for the quarter. This compares to adjusted pretax income of $11.6 million with the same quarter last year about a 15% improvement.

If we look at adjusted pretax income for the first 3 quarters of fiscal year, we're at $59.4 million on $535 million of revenue, about a 11% pretax margin. This compares to the first 3 quarters of last year, where we were at $16.4 million on about $504 million of revenue, about a 3% margin. So we made significant improvement year-over-year on both revenue as a result of increasing our block hour production on the existing fleet and on our margin as well.

Importantly though, when comparing this quarter to our previous quarter, we did have a decrease in adjusted pretax earnings of $7.6 million, down from $21 million in Q2 to $13.4 million this quarter. The $7.6 million decrease is comprised primarily of the following: $3.9 million was due to the timing of engine events, which we had anticipated and had provided guidance for last quarter. Again, Q2 engine expense was $5.6 million compared to this quarter of $9.5 million, which was slightly above our guidance.

$2.8 million of the increase was due to increased flight operation expense per block hour. Again, as we noted on prior calls, this was primarily due to an increase in pilot wages and pilot training costs as a result of hiring more pilots they needed based on our anticipation that we will add additional block hours or achieve some incremental flying going forward.

The pilot training footprint also has not been reduced as quickly as anticipated. We had pilot premium pay that was higher. And lastly, as a result of lower total completion factor due to significant weather and ATC, which Brad alluded to, this quarter versus prior quarters are true cost both flight attendant and pilots per block hour cost increase due to having to pay for flights that -- pay the crews for flights that we don't operate.

And lastly, $1.2 million is due to an increase in line maintenance expense, where we use temporary third-party contractors to supplement our in-house maintenance capabilities. On the revenue side, the reported contract or CPA revenue, excluding past year items of 174 -- $170.4 million, an increase of 6.5% over the same quarter last year of $159.9 million.

Our adjusted EBITDA was $45.9 million and adjusted EBITDAR was $58.8 million. This compares to the same quarter last year, where adjusted EBITDA and adjusted EBITDAR were $41.7 million and $59.7 million, respectively.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ3 2019 EARNINGS CALL |  AUG 09, 2019

Block hours were 114,042 for Q3, as Brad alluded to, a 10.8% increase from the same quarter last year and slightly below our guidance of 115,203. We're also providing guidance for Q4 to be 116,600, which is 3.7% increase from the same quarter last year and 2.2% higher than Q3.

On the engine expense, I'd like to recap where we are. Our engine expense was $9.5 million for Q3. We have provided guidance in our earnings release that, next quarter, we expect engine expense to come down about $800,000 to $8.7 million. Although engine expense is expected to go down by $800,000, we expect our flight operations expense per block hour and our line maintenance expense per block hour to temporarily remain at these elevated levels through the fourth quarter and into next year.

I'd also like to touch on the aircraft at American that are coming out. As Brad pointed out, we will be reducing 2 aircraft from our American flying in November. We are currently evaluating alternative uses of the aircraft. Some of those alternatives are to use the aircraft to support the American operation, to redeploy the aircraft at other operators, to lease the aircraft or to sell the aircraft as we do have significant equity in the 2 aircraft that were removed. We're still evaluating each of these alternatives as each will have a different short- and long-term financial impact.

On June 14, we finalized the purchase and financing of 10 CRJ-700s, previously leased from GECAS and operating at United. By purchasing these aircraft previously leased, we have reduced the number of leased aircraft with third parties down to 18 for the entire company.

We ended the quarter at $79.9 million in cash. Total debt on the balance sheet for Q3 was $881 million, down $41 million from the $915 million as of September 30, 2018. The change is essentially, $109 million of principal payments that were off by $70 million of additional debt for the aircraft that were purchased off lease and $3 million in engine financing.

For the fourth quarter and remainder of 2019, other CapEx we expect to be in the $2 million to $5 million range. We don't have any other major transactions planned for the fourth quarter. We also have our revolving credit facility at $35 million, which has been extended through mid-September, and we're finalizing a long-term extension.

I'd like to turn it back over to Jonathan.

**Jonathan G. Ornstein**
*Chairman & CEO*

Thank you, Mike. Few other items I'd like to just touch on briefly we talked about on previous calls.

On the cargo side, we continue to make good progress in our efforts to diversify into the cargo business. We expect to see this potentially come to fruition in the summer of 2020. One of the main benefits we see from the cargo operation, which is important, will be small but will be increased pilot recruiting and reduced attrition, which we believe is still the [ single-biggest ] challenge in the regional industry.

On that point, we continue to hire pilots above our current level of attrition, and that's being done purposely to position ourselves for both increased utilization of our existing fleet and the potential opportunity to grow a number of aircraft that we operate in our CPA agreements with either American or United.

Obviously, we're pretty disappointed with this quarter. We knew that we would have some challenges, unfortunately, those challenges were really exceptionally exacerbated over this summer. We had hoped -- and our thoughts had always been that we did not have spare aircraft to adequately operate the elevated levels of utilization. We worked very cooperatively with American to come up with a plan that we thought would be successful.

Clearly, as we entered April and saw how much the beat was, we did have a lot of confidence, and that followed through into the first week of May, where, again, the numbers all were very good. And then once these aircraft started to either get damaged or not come back out of C-check obviously it had a very severe impact on the operation.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ3 2019 EARNINGS CALL |  AUG 09, 2019

We're going to just continue to push hard and do the right thing. Brad has been a huge help to us here, and we continue to have a lot of confidence in his ability to help us get the operation to where it needs to be.

I'd like to mention that we are very cognizant in the fact that we have a extension to work out with American, and if that contract does come due within a couple years, we spent quite a bit of money over the last 5 or 6 months on basically an open checkbook to get some of these things fixed and to do it rapidly.

And I'm frankly still convinced that we have done that, and I think Brad has done a lot to help to make that happen. We have a new VP of maintenance, we -- who has done a marvelous job and has received kudos from both of our partners. We don't think that there is a systematic issue nearly as much as we just got caught in what was a confluence of issues that just hit us at precisely the wrong time.

We invested a lot of money. That is not a small part in why the numbers weren't where they were supposed to be. It would've been a lot easier for us maybe just to pull the planes out and maintain our old contractual requirements, which were far, far less onerous. But we felt in good faith that, by going forward with American and showing them that we could do this and agreeing to some of these newer terms, it would put us on much stronger footing for any discussions that we might have regarding the renewal.

I don't think any of us feel differently about that. And I think that, in spite of the fact that we failed and in spite of the fact that they elected to pull the 2 aircraft out, I think we still created a lot of good faith by doing what we did. And I think we're going to build on that good faith going forward, particularly as the schedules start to come down, we see a significant drop in block hours coming in September. And once these 5 spare aircraft are back, I don't think we're going to -- I think that the proof will be in the pudding obviously, but I feel very confident that, between all of us here, we're going to see these numbers improve very significantly going into the fall.

So with that -- oh, and one other point that I'd touch on, on the pilot side, it has always been difficult, but I just want to remind people that, unlike just about -- that I can think of any other regional in the industry, we've expanded very significantly over the last 5 years. We've been able to keep up that expansion. There are obviously pinch points, most notably in the summer, where things are tight. But again, we continue to hire a very significant number of pilots and have exceeded our attrition levels every month, and we have seen a significant decline in attrition, mostly we think in regard to the fact that we have this agreement with United on the flow-through of our pilots, which has helped us considerably.

So on the critical areas, we just continue to press forward. We stick to our business. I've always believed that, if you do the right things, the right things happen, and while we have had obviously what is not an insignificant setback, we're going to continue to press forward and do whatever it takes to get the ship righted and do the -- and move forward.
So with that, I'm happy to open it up to any questions that you might have.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ3 2019 EARNINGS CALL | AUG 09, 2019

# Question and Answer

**Operator**

[Operator Instructions] And our first question comes from Matt Fallon with Deutsche Bank.

**Matthew Vernon Fallon**
*Deutsche Bank AG, Research Division*

Two questions from me. Clearly, during the June Q, you were sweating the assets, running a tight operation. And then of course, you dealt with some operational disruptions out of left field. Do you think these -- as for these operational assumptions, the kind of utilization you're pushing is still sustainable?

**Jonathan G. Ornstein**
*Chairman & CEO*

Every month, our pilot count has gone up, which is the only issue of significance. Our maintenance numbers have gone up significantly as well in terms of hiring of mechanics to cover this. We are, in fact, significantly above what our targeted maintenance number is, just to be on the safe side.

So yes, I think it's absolutely sustainable. And in fact, in some of the conversations that we've had, particularly on the 175s, I think it's important to note that we've never turned back a 175 schedule in terms of hours, and that we feel that, at this point, we are well prepared to do that. And it just keeps getting better in terms of pilot count and maintenance count, but unfortunately, it has been expensive to go above and beyond to make that happen.

And hopefully, that will get normalized. But going forward -- but again, yes, I think that, on the hours side, it is sustainable, and our partners are working closely with us -- they -- look there's no doubt that they piled on a lot of hours this summer. Would we have preferred that maybe those numbers been backed off a little bit, particularly, in light of the fact that we did not have adequate spare coverage? Yes. That being said, I mean we still ran a 99.4% completion rate. I mean that's still not -- it's not like the operation's coming apart. It's just that -- it just wasn't at the level it needed to be.

**Matthew Vernon Fallon**
*Deutsche Bank AG, Research Division*

Got it. Just as a follow-up, I know you sort of talked about ways to monetize those extra airplanes. But just sort of absent that, what is the financial drag on an annual basis of carrying these extra airplanes with all the associated costs and crews? How should we think about that?

**Michael J. Lotz**
*President & CFO*

Well, look, we're still evaluating the alternative. So it could vary significantly. If we just don't use the aircraft for anything and support the American operation, that would be a much higher number than if we were to just sell the aircraft and take the cash in. So we're still evaluating what the potential impact would be based on what we do with the aircraft.

**Operator**

The next question is from Helane Becker with Cowen Inc.

**Conor T. Cunningham**
*Cowen and Company, LLC, Research Division*

It's actually Conor Cunningham on for Helane. I know that your negotiations between American and United are kept separate. But I have to ask, like have the operational issues that you've seen at American starting to creep into your discussions with United? And also can you just talk about the -- like how the tone of your conversations have changed with United since the new management started?

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ3 2019 EARNINGS CALL |  AUG 09, 2019

---

**Jonathan G. Ornstein**
*Chairman & CEO*

Well, first of all, we -- I guess for better or worse, I mean Scott Kirby is the President at United. He was the President at American. He's well aware of our operational capabilities at both carriers. So I don't think that that's an issue. And again, I think it's important to note that, while we did not make our goals as a result of what Brad had gone through, we still ran a 99.4% completion rate. I mean -- for the quarter. And so I think that has to be taken into context. And that at United, when you're running a 99.7% completion rate in the Embraer 175s, which is the aircraft obviously that they're looking to grow and we're the most on-time carrier with the highest customer satisfaction, I think that those numbers also speak to Mesa's operational capabilities.

So I don't think that what's happening at American has done that. And look, everyone in -- at both America and United are professionals, and they've been around the business a long time. And I think it's fair to say that they also do appreciate the fact that a worldwide GPS outage, the issue regarding damaged airplanes and the C-checks, they realize that. I do think though that American clearly felt that by pulling 2 airplanes down, it would potentially provide new additional spares into that system.

The new management at United are -- is someone that we just most recently met. We have had very fruitful and positive conversations. I don't think that, that is a issue -- is an issue, whatsoever. And remember, Brad worked at United and also had previous relationships with all these people as running the Express program.

And then Brad, you want to add anything to that?

**Bradford Roger Rich**
*Executive VP & COO*

I just agree what you just said. I don't think there's a negative impact and -- or any spillover as you just described.

**Jonathan G. Ornstein**
*Chairman & CEO*

Yes. Just a change.

**Bradford Roger Rich**
*Executive VP & COO*

Just a change.

**Jonathan G. Ornstein**
*Chairman & CEO*

Those -- that position, unfortunately, has seen a lot of turnover. Brad knows that. He used to be in that position. Right? But the fact of the matter is, Tracy came in, who's a good friend of ours from back in the Continental days. But we're very comfortable with Sarah that we'll develop a strong relationship as we've always had back since 1990 at United.

**Conor T. Cunningham**
*Cowen and Company, LLC, Research Division*

Okay. And just on American specifically. I mean can you just talk to the actual plan of how you think you're going to improve the underlying performance side? Does it really just come down to having more crew and spare aircraft? And then just secondly on top of that, can you actually provide the financial impact from the operational issues in the quarter? It just seems like, theoretically, that could be onetime in nature if you fix everything?

**Jonathan G. Ornstein**
*Chairman & CEO*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ3 2019 EARNINGS CALL |  AUG 09, 2019

Well -- okay, sure. I'm going to let Brad talk to the spares and aircraft issue because -- anyway, go ahead Brad.

**Bradford Roger Rich**
*Executive VP & COO*

Yes. Well, certainly from the highest level, yes, we're -- and that's why we've made a big focus here on the call about our commitment to continuing hiring crews. And we are. We're focused on it. We're doing everything we can. We've got some interesting and creative things that we're going to begin implementing to do that. So that's a big issue. And then fundamentally, even as we described what's happened with the damaged aircraft, extended C-checks to reduce the spare count, when you look at how the airline actually operates and functions every day, there have been days here where we essentially have had no spares. So yes, that's why I made a point to say, by August -- by the end of August, we expect the spare count to come up to its expected level. And those 2 things will continue to make a positive difference.

But on top of that, look, there are a lot of things that we're doing, initiatives that we're focusing on, everywhere from continued focusing on the pilot-hiring footprint in the training department to the quality of the training, right into the curriculum, to technology improvements that we need to make in the system. And we're focused on all of those things.

**Jonathan G. Ornstein**
*Chairman & CEO*

Yes. And I would also want to point out too that I think the issue with spares is in fact critical. It's been one of my real issues. We look at another carrier that's operated very -- had a very good operating track record, one of our partners. And they operated about the same number of Embraers that we operate. We've operated with 3 spares since we operated, and they operate with 5 spares. Maybe they negotiate a better contract. Maybe times have changed. Maybe we were more hungry to take those airplanes on, but I'm convinced and I truly am convinced that, for example, at American, with the 5 spares, the numbers would have been significantly different. And now if they give us 2 more and we're at 7 and we elect to keep them in, which he may well do in effort to show good faith and continue to try to show them that, as we've said, that money is not the issue right now, we really want to be able to demonstrate that we can do the job they want, if that's what it takes, then that's what we'll do. The fact is I don't see any operational difference between us and any other carrier that would not allow us to achieve those results. And I think, Brad, having come over from United and managing all their carriers, would agree with me on that.

**Bradford Roger Rich**
*Executive VP & COO*

Yes, I do. I do.

**Michael J. Lotz**
*President & CFO*

And going to add. It did have some financial impact on the quarter. But again, we did run 99.4% controllable completion factor, overall. We did spend additional money at American on supplementing our maintenance staff. We talked about spending slightly over $1 million for that. But we still ran at 99.4%, but the threshold at American was at such a level that we still didn't meet the criteria.

**Operator**

The next question is from Joseph DeNardi with Stifel.

**Joseph William DeNardi**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Brad, can you just walk us through the process that American looks at in terms of evaluating whether to pull additional aircraft and what the risk is that they continue to do that? I mean how many more could you potentially lose over the next several months?

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ3 2019 EARNINGS CALL |  AUG 09, 2019

**Bradford Roger Rich**
*Executive VP & COO*

Okay. Well, I'll first just talk about -- I'll just give my thoughts about -- look, whenever I'm doing this, it's hard because I'm not American, right? So we have a contract in place, and the contract has, I mean specific provisions. And look, they're adhering to their rights within the contract.

Now having said that, look, there's one angle you could look at on this and say right up until some of these issues started happening with damaged aircraft and extended C-checks and those type of things, and again, every time we say that, it almost appears we're just making excuses. I mean these are just facts that happened in the operation. I mean largely, the issues that negatively impacted us were uncontrollable, and we were certainly hoping that, as American looked at that, that, that would come into play. And I think we've been doing a lot of things to demonstrate our willingness to do the things that Jonathan has outlined. And Jonathan has given us the green light to do the types of things and make the investments we need to improve the operation, and we have been doing that, and I think American has seen that.

But look, at the end of the day, where we're hoping for some -- I guess I'll use the term leniency, given that a lot of this was uncontrollable. Yes. At the end of the day, they made a business decision. And look, honestly, I think, from their perspective, they thought, doing what they did, removing the airplanes, would give us some -- would actually be helpful to the operation to have additional spares. So look, it is what it is. I don't know what they're going to do going forward. Our objective is to do everything we can to run the operation in a way that meets their expectations and the expectations of the customers. And we've outlined a lot of things that we're doing and have identified that need to be done to create the reliability that's expected.

**Michael J. Lotz**
*President & CFO*

This is Mike. I'd just add to that, to the other part of your question, is they did notice us on these 2 aircraft, and the agreement that we have is on for a maximum of 6 aircraft. So the maximum number of aircraft they could take beyond these 2 was an additional 4, and that wouldn't happen until -- if it were [indiscernible], not until the end of 2019, into the first quarter of 2020.

**Joseph William DeNardi**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Okay. For any -- is it your expectation that, that what's they're going to do?

**Bradford Roger Rich**
*Executive VP & COO*

We do not -- we don't know, honestly.

**Joseph William DeNardi**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Okay. Okay. And then Mike, it seems like just from -- on the expense side, the biggest variance relative to what you guys maybe were expecting 12 months ago is on the flight ops side. And so should we continue to expect kind of through 2020 or through your FY '20 for that to remain at 30%, 31% of revenue and for that not to come down for the foreseeable future?

**Michael J. Lotz**
*President & CFO*

Yes. I think at least through the first half of 2020, maybe into the second half. And again, some of that will be dependent on if we get to asked to fly additional block hours or if we were to increase by any incremental aircraft because, once that occurred, then obviously you're going to either further buildup a backlog of pilots to prepare for that type of growth, and that generally accelerates your -- increases

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ3 2019 EARNINGS CALL | AUG 09, 2019

your flight app expense over a normal level until the block hours commence. So -- but certainly, at least through the first half of the year.

**Joseph William DeNardi**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Okay. And then Jonathan, I mean it sounds like you guys are staffing up to prepare for growth or for higher utilization, but at the same time, you're losing aircraft with American, and the extension with United is kind of dragging on. So can you talk about when the opportunity is to grow the fleet? Where they are? What's some of the key milestones you're looking at are?

**Jonathan G. Ornstein**
*Chairman & CEO*

Sure. So first of all, it's important to note, and again, Mike and Brad, we did fly with 2 fewer aircraft, but we flew more hours.

**Bradford Roger Rich**
*Executive VP & COO*

That's correct.

**Michael J. Lotz**
*President & CFO*

Right.

**Jonathan G. Ornstein**
*Chairman & CEO*

Right? So even though they -- American pulled the 2 airplanes out to help us -- and by the way, we've been talking about doing that for quite some time prior to that agreement, so it is not like that -- from our standpoint, we wanted the additional spares, okay? But they did fly more hours even with the fewer aircraft, and that will continue. And I would be surprised if that doesn't continue even now beyond the additional 2 airplanes coming up.

On the United inside, we had and continue to have some level of expectation that, a, the block hour numbers will go up. The difference at United is they have been constrained in terms of increasing block hours on the 175 fleet because we operate all out of 1 hub, so they have been talking to us about potentially moving aircraft and putting flow-through to another hub. And on the 700s, I mean we have a stage length of 380 miles, which is half of the stage length, basically, that we have on the 175s. So it's hard to really press that utilization up a whole lot because the trips are so short.

That being said, we still would like to add more CRJ crews in both the American and United just to give ourselves bigger buffers. I think in terms of growth, obviously the discussion has been around the CRJ700s. Those aircraft potentially being downgraded and then backfilling those airplanes with 70-seat aircraft. Those discussions have been ongoing for quite some time. I've been, as I mentioned, disappointed. I have some very longstanding relationships at United that I still have that level of confidence. But at this point in time, I think it's fair to say that the deal is not done until it's done, and we're going to just have to wait and let that continue to go through what has been a very long process. But we'll continue to hire crews. We continue to hire crews in anticipation of flying more block hours one way or the other.

**Joseph William DeNardi**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Is it your expectation that, in FY '20, that you can grow contract revenue, assuming you get an extension with United?

**Jonathan G. Ornstein**
*Chairman & CEO*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**MESA AIR GROUP, INC. FQ3 2019 EARNINGS CALL |  AUG 09, 2019**

In 2020? Particularly, I would think that every projection that we've seen includes more block hours going forward without any incremental aircraft. And I think it's fair to say that with any incremental aircraft, yes, the answer would be we would be flying more hours, for sure.

**Operator**

And the next question is from Savi Syth with Raymond James.

**Savanthi Nipunika Syth**
*Raymond James & Associates, Inc., Research Division*

I was just wondering if you can -- clearly, the E175 operation is doing well and the CRJ operation is not. Is it just a matter of aircraft age and [ stage month ]? Or I was hoping you can kind of walk me through what the differences there are and if there are any learnings that you can kind of bring over from the E175 side to the CRJ side.

**Jonathan G. Ornstein**
*Chairman & CEO*

Yes. I mean I'll let Brad also talk about this, but I would just tell you my feeling. Yes. The planes are older. There's no doubt about it, but they're still front-line good airplanes. They're not unreliable. I mean -- but when you're trying to run a fleet of 64 airplanes with 2 spares and, as Brad says, on many days, no spares, it's just very difficult.

Are the 175s more reliable? Yes. There's no doubt that the aircraft are more reliable. Our 175s fly average stage lengths in excess of 720 miles, which clearly helps us on the utilization side. And on the American side, our average stage length on the 900s is only 520 miles. So again, if you adjust for stage length, I mean we fly a lot. I mean our -- we actually have, on average, yearly, one more departure than most other large, regional jet operators on our CRJ fleet, one more departure per day than other operators because we have a shorter stage length.

So those are all things that come into play, but I don't think there's any fundamental difference on the CRJ other than the fact that it's an older aircraft. It's going to be a bit more maintenance intensive, but they still operate with the same engines. I mean no, I think that we just have to focus a little bit. And already -- I mean the idea was that we were going to operate at American with 5 spares as, whereas at United, we've achieved excellent results with only 3 spares. But do we think that those 2 spares will make the difference? I certainly do.

And I'll let Brad continue that. I mean it's [indiscernible] you.

**Bradford Roger Rich**
*Executive VP & COO*

Yes. No, right. I agree completely. I mean the question is a very valid question, but the issues that would -- that come into play on a CRJ and older CRJ we're addressing. We've hired 54 new mechanics since the third quarter of last year and we've added additional spares with the expectation that they would really be spares to deal with some of those issues. Unfortunately, we just haven't had spares.

So once we're properly spared, we'd add the mechanics to deal with some of the more intensive maintenance issues, and we should be able to operate the fleet very reliably and meet their expectations. And look, the one thing that we're trying to do to accommodate our partner is, on both sides, the aircraft utilization is going up and the schedules are being tweaked. Each major -- I mean across our system, we've got increased utilization. So all of this is happening at the same time the schedules have become -- I'll just say, as they tweaked the schedules, they become more difficult to fly. But we're addressing that by staffing up, by -- on both crews and mechanics, and we've added additional spares.

**Jonathan G. Ornstein**
*Chairman & CEO*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ3 2019 EARNINGS CALL |  AUG 09, 2019

Yes. And I think it is fair to note that our partners have their own pressures, too, and we're cognizant of those and sympathetic. You look at American, American has had the MAX problem. They want us to operate reliably. And so I think that -- and the MAX issue is certainly something out of their control. They were able to take 2 airplanes out, give us more spares, which we all thought was a good thing, us included. I think they expected better performance from us, as did we, but the spares were not available.

But as you can see, it's not as if they said, "Hey, let's fly the planes less." They flew the planes more -- 10% more with 2 fewer airplanes. So obviously, the planes are being pushed a lot harder than they were even last summer, and we achieved results that were, in our view, pretty good, but unfortunately, not at the level that we needed to be for that test period. We had a very good April. We felt very confident, and then unfortunately, May/June became tougher as these airplanes became unavailable to us.

**Savanthi Nipunika Syth**
*Raymond James & Associates, Inc., Research Division*

And maybe I don't understand this, but if the spares are being funded by the American fleet and American still takes the kind of the baseline utilization and keep pushing it up, do you not need to kind of find spares outside of the fleet to try and meet the increased utilization?

**Jonathan G. Ornstein**
*Chairman & CEO*

Well, no, I mean the fact is that the 5 -- we had 3 spares, historically, with American. There was literally years of discussions in regard to what was the adequate spare count versus, for example, other operators, okay? I was a very strong advocate that Mesa was being -- what's the right word, disadvantaged because we did not have the adequate spare count. We put the 2 spares in. We all anticipated that, that was going to solve the problem along with all the initiatives that Brad has discussed and the initiatives that we implemented along with American. The fact of the matter is now is, in fact, we now are looking at 7 spares going into the fall, the idea -- we had looked at getting additional spares and did not -- at this point, I don't think anyone would think it's necessary to go beyond the 7 spares having been operating for literally over a decade with 3 spares.

And the other point too is that, clearly, Mesa has been in an expansion mode for a long time, having gone from 58 aircraft to 143, whereas, some of the other big operators have actually shrunk their fleet and had a pool of pilots to call upon. The environment for pilots has been tough. We had a 7-month period before we got our pilot contract put in place where we actually would net done almost 150 pilots. But we've been crawling -- slowly crawling out of that hole at the same time while we've been expanding the fleet.

So we've had some headwinds, and clearly, this quarter, we've seen sort of a confluence of issues that have really put us in a difficult position. But I don't have any lack of confidence in the model and what we're doing and with the people who we have here, including Brad and our new VP of Maintenance, Doug Shockey. I mean these are all good quality people who I'm convinced we're going to get this thing to where it needs to be.

**Savanthi Nipunika Syth**
*Raymond James & Associates, Inc., Research Division*

I appreciate that. And just a couple of clarifications. Just first on the contract -- American contract. I thought they were only able to pull 2 aircraft every 6 months. I'm kind of curious why if one is coming in November -- coming out in November, why the other one would come out end of year and into 1Q?

**Michael J. Lotz**
*President & CFO*

Yes -- no, there's a -- there was not -- it was not 2 every 6 months. It was 6 total.

**Bradford Roger Rich**
*Executive VP & COO*

2 every...

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Michael J. Lotz**
*President & CFO*

Maximum of 2 in any given month.

**Savanthi Nipunika Syth**
*Raymond James & Associates, Inc., Research Division*

Okay. Got it. And then just on the -- a follow-up on Conor's -- your response to Conor on the financial impact. Mike, the -- in the last quarter, you guys made close to 40 -- about $0.46, and this quarter it was $0.30. I'm just kind of curious if the $0.30 versus the $0.46 is a function of these issues, and therefore, this is kind of -- I think that's what Conor was trying to get at, and that's what I'm trying to understand is what would have been kind of the earnings this quarter if you hadn't had some of these kind of extraneous circumstances?

**Michael J. Lotz**
*President & CFO*

Yes. I mean like I've pointed out, the 3 biggest drivers for the change in the earnings quarter-over-quarter were almost $4 million more in just heavy maintenance on the engines, which is a timing issue. That was going to hit this quarter irrespective of what happened with the American fleet. The other piece was $2.5 million to $3 million in additional flight operations cost. And again, that was, we already talked about this, better preparing ourselves for potential increased block hours or, even better, obviously, increased fleet growth as well as our training footprint is not as efficient as it needs to be, and there was some overtime that we paid for the quarter. But again, that wasn't necessarily related to the American completion factor issues.

And the third one was there was about $1 million, $1.5 million in additional maintenance expense where we brought in some outside maintenance contractors to, ironically, improve the fleet so that we would hit some of these targets. And that expense is not going to be ongoing. That will -- that was more related to the challenge -- to try to preempt challenges that could have presented this quarter, and that will be -- that will start going down as early as next quarter.

**Jonathan G. Ornstein**
*Chairman & CEO*

But I will say, Savi, this is Jonathan, I mean we threw money at this issue. There's no doubt. Like Mike said, the temporary maintenance people we wanted to ensure that we could fly the block hours in terms of the overtime for the pilots, which was running, I think, what, about $600,000, $700,000 a month. That's not a small expense. We did that specifically to do that. Our pilots have been super productive and, I will say, very cooperative and helpful in this whole process.

And I think that those things may have been different, and I think we'd be having a much different call if we hadn't missed the numbers with all these investments and in spite of the fact we might have missed our numbers if it hadn't been for the fact that we had some really tough luck in terms of the spare count going from what should have been 3 to 5 actually down to 1 or 2, and these investments sort of looked really smart. Right now, I mean obviously, I think there are people questioning that. I personally think that, in the long run, we're still best suited by doing everything we can to demonstrate that we can operate at these levels and that the money we spent was the right decision at the time and continue to be the right decision.

So -- and we're going to continue to do it. I mean I want it -- people should know that we are doing what we have to, to make sure that our partners are satisfied with our operational results. And I'm hopeful that, in spite of the fact that American did pull these 2 planes down, which I think they felt in the end would be helpful to us again, that we can look back and say these were the right decisions.

**Operator**

Speakers, we show no further questions in queue at this time.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ3 2019 EARNINGS CALL |  AUG 09, 2019

**Jonathan G. Ornstein**
*Chairman & CEO*

Okay. Well, Mike had wanted to add something.

**Michael J. Lotz**
*President & CFO*

Yes. I just want to just -- on the American operation, that we do have the 3 spares, and we did get these 2 additional aircraft, the -- we call them whitetails. They are not necessarily spares. Their intent is to use those aircraft when other aircraft are in maintenance or unavailable to us. For this time period, we had that need all the time, but just a nuance there I just wanted to clarify.

**Jonathan G. Ornstein**
*Chairman & CEO*

Yes. Okay. So all right, we appreciate everyone's time this morning. To say that we're disappointed would be an understatement. We had very strong hopes that our new agreement with American was going to strengthen our relationship and would allow us to continue to operate all the aircraft. Unfortunately, as we mentioned due to a lot of different events at least 2 aircraft are going to come out.

At United, we continue to have confidence that the extension, which is only days away, and I think it's important to point out that those aircraft are scheduled as far out as United schedules go. I don't think that there is a risk on the 700s, but I understand that people have grown concerned given the fact that it's taken this long.

All I can tell you is that we continue to press forward on all these fronts. We're going to do the best job possible. We continue to feel that the model works, and we just have to fine-tune that model and get us to where we need to be.

But with that, I want to thank everyone for taking their time. We're always available if you want to call us afterwards if you have any other additional questions. And I think that one of the things at Mesa we've always tried to do is align the interests of both the shareholders and management. I mean I still continue to be one of the largest individual shareholders and disappointed from that regard as well as I know most of you are. But we've been here for a long time. We intend to do everything we can to get everything fixed and move forward in a positive way.

So with that, I want to thank everyone for taking the time today. And we look forward to talking to you on our next call. Thank you very much.

**Operator**
And that concludes today's conference. Thank you for your participation. You may now disconnect.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ3 2019 EARNINGS CALL |  AUG 09, 2019

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.

# EXHIBIT 6

# EXHIBIT 12

**S&P Global**
Market Intelligence

# Mesa Air Group, Inc. NasdaqGS:MESA FQ2 2019 Earnings Call Transcripts

## Friday, May 10, 2019 5:00 PM GMT

### S&P Global Market Intelligence Estimates

|  | -FQ2 2019- | | | -FQ3 2019- | -FY 2019- | -FY 2020- |
|---|---|---|---|---|---|---|
|  | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| **EPS Normalized** | 0.52 | 0.46 | ▼ (11.54 %) | 0.57 | 2.12 | 2.76 |
| **Revenue (mm)** | 178.06 | 177.15 | ▼ (0.51 %) | 184.04 | 719.79 | 793.58 |

Currency: USD
Consensus as of  May-10-2019 5:06 PM GMT



| - EPS NORMALIZED - | | | |
|---|---|---|---|
|  | CONSENSUS | ACTUAL | SURPRISE |
| **FQ3 2018** | - | - | - |
| **FQ4 2018** | 0.50 | 0.56 | ▲ 12.00 % |
| **FQ1 2019** | 0.47 | 0.55 | ▲ 17.02 % |
| **FQ2 2019** | 0.52 | 0.46 | ▼ (11.54 %) |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

**Contents**

---

# Table of Contents

| | | |
|---|---|---|
| **Call Participants** | ................................................................................... | **3** |
| **Presentation** | ................................................................................... | **4** |
| **Question and Answer** | ................................................................................... | **7** |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

## EXECUTIVES

**Bradford Roger Rich**
*Executive VP & COO*

**Brian S. Gillman**
*Executive VP, General Counsel &
Secretary*

**Jonathan G. Ornstein**
*Chairman & CEO*

**Michael J. Lotz**
*President & CFO*

## ANALYSTS

**Helane R. Becker**
*Cowen and Company, LLC,
Research Division*

**Joseph William DeNardi**
*Stifel, Nicolaus & Company,
Incorporated, Research Division*

**Michael John Linenberg**
*Deutsche Bank AG, Research
Division*

**Savanthi Nipunika Syth**
*Raymond James & Associates,
Inc., Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ2 2019 EARNINGS CALL |  MAY 10, 2019

# Presentation

**Operator**

Welcome, and thank you all for standing by. [Operator Instructions] This call is being recorded. If you have any objections, you may disconnect at this point. And now I will turn the meeting over to your host, Jonathan Ornstein, You may begin.

**Jonathan G. Ornstein**
*Chairman & CEO*

Thank you, Kirby. Thanks, everyone, for joining us on the call today. As the operator indicated, this is Jonathan Ornstein. I'm the Chairman and Chief Executive Officer of Mesa Airlines. On the call with me today is Mike Lotz, President and Chief Financial Officer; Brian Gillman, Executive VP and General Counsel; a new addition to our call, Brad Rich, Chief Operating Officer; and Darren Zapfe, Vice President of Finance.

I would like to ask Brian to read the safe harbor statement please.

**Brian S. Gillman**
*Executive VP, General Counsel & Secretary*

Thanks, Jonathan. Before the presentation comments begin, Mesa would like to remind you that some of the statements and responses to your questions in the conference call today may include forward-looking statements. As such, they are subject to future events and uncertainties that could also affect our actual results to differ materially from those statements. Also, please note the company undertakes no obligation to update or revise these forward-looking statements. Any forward-looking statements should be considered in conjunction with the cautionary statements in our press release and the risk factors included in our filings with the SEC, which Mesa encourages you to read. In addition, please refer to our press release in the Investor section of Mesa's website to find additional disclosures and reconciliations of non-GAAP financial measures that will be used on today's call.

**Jonathan G. Ornstein**
*Chairman & CEO*

Okay. Thank you, Brian. Okay. We had a pretty nice quarter. We continue to execute our plan to increase block hour production on our existing fleet. As a result, block hours were 112,030 for Q2 fiscal '19, which represented a 14.5% increase from the same quarter last year. We're also providing guidance for third quarter. We believe the block hours will be about a 115,203, which is an 11.9% increase from the same quarter last year. Given our partner's desire of increased block hour production and to position ourselves for future growth opportunities, we have continued to overstaff, hiring more pilots than we are losing. We continue to see excellent results on our pilot recruiting front and attrition has been stable to slightly lower than anticipated.

Our quarter 2 fiscal '19 adjusted earnings before taxes, were $21 million, which compares to $3 million for the same quarter last year. However, earnings before taxes were $4 million lower than our previous quarter, primarily due to the timing of heavy maintenance events, engine, C-checks and landing gear. As you know, our earnings are very sensitive to the timing of these major heavy maintenance events since we expense these costs in the period they occur.

On March 6, we finalized our purchase agreement with GECAS for 10 CRJ-700 aircraft, current leased from them and operating at United. Upon completion of the transaction and financing closing, we will have reduced the number of leased aircraft with third parties to 18 out of our total fleet.

For United, we continue to have productive discussions in United related to the 20 CRJ-700 standard, which we just purchased. That agreement is scheduled to expire later this year. I know this has been an ongoing topic for longer than any of us anticipated, but we remain highly confident on a CPA extension on the 20 CRJ-700s. As noted above, the CRJ-700s that we are purchasing off lease from GECAS are currently flying at United. We hope to have something to announce in the next few weeks.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**MESA AIR GROUP, INC. FQ2 2019 EARNINGS CALL |  MAY 10, 2019**

Beyond our existing business, we continue to explore potential expansion that includes CPA flight increases and other opportunities as previously discussed, including new partnerships in cargo. On the cargo front, we believe we have made some progress towards that goal. All in all, we continue to focus on operational excellence and believe as the low-cost regional airline operator, we're well positioned to take advantage of these opportunities.

Brad Rich, who many of you will know from his days at SkyWest and later at United, will now walk through some of our operational performance.

**Bradford Roger Rich**
*Executive VP & COO*

Thank you, Jonathan. First of all, having been here less than 2 months, my comments will be very brief today. But let me start by saying, first of all, how impressed I am with the talent and the capabilities of the Mesa operational team. Having recently come from United, I'm familiar with the regional carriers, and I believe Mesa is very well positioned in the industry. I've been working very closely with both American and United. I may know many of their senior leaders personally from my time both at SkyWest and United. And I am confident that Mesa can and will do everything possible to meet and exceed their expectations.

As an example, during the second quarter of fiscal '19, we had a controllable completion factor of 99.6% compared to 98.8% for the same period in the prior year. That's a significant improvement. So far, for Q3 in fiscal '19 to date, we're at 99.6%. Our total completion factor, which includes weather and other uncontrollable cancellations was 97.4% in Q2 compared to 96.4% for the same period in the prior year. I mentioned just a few of those metrics has an indication of the improvements that were making. And again, I'm confident that we can be successful in the future.

Let me now turn the time over to Mike Lotz, who will now walk through some of the financial details.

**Michael J. Lotz**
*President & CFO*

Thanks, Brad. So for the second quarter, we reported pretax income of $17.3 million, excluding a onetime adjustment for the loss on the extinguishes -- extinguishment of debt, the adjusted pretax income was $21 million for the quarter. This is a significant increase over the same quarter last year where we reported pretax earnings of $3 million. Our earnings are down from our pretax income of $25 million from the first quarter, and as Jonathan had pointed out, this is primarily due to the timing of our heavy maintenance events.

Additionally, we reported $4.1 million of income tax expense for net income of $13.2 million or $0.38 per share. Excluding the onetime adjustment, our adjusted net income was $16 million or $0.46 per share. Also, from an income tax perspective, although we reflect the income tax expense of $4.1 million for accounting purposes, we do not pay any cash taxes, and we still have approximately $415 million in NOLs; this is up from last year's NOL of about $300 million. And we believe based on our current projections, that we will not be a cash taxpayer until 2024 or 2025.

Our adjusted EBITDA was $53.7 million and adjusted EBITDAR was $67.8 million. Again, these are significant increases from the same quarter last year when adjusted EBITDA and adjusted EBITDAR were $32 million and $50.3 million, respectively.

On the revenue side, we reported contract or CPA revenue excluding pass-through items of $169.8 million, which is an 8.5% increase over the same quarter last year of $156.5 million. Also included in revenue is pass-through revenue, which is reimbursement of certain expenses on a dollar-for-dollar basis, which have no P&L impacts. For quarter 2, we reported pass-through revenue of $7.4 million compared to $11.1 million for the same quarter last year.

On the expense side, as Jonathan pointed out to position Mesa better to take advantage of potential growth and our partner's desire for increased block hours, we continue to hire more pilots than the associated attrition levels would require. To put this into context, during the quarter, we averaged

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ2 2019 EARNINGS CALL |  MAY 10, 2019

approximately 188 pilots in training each month, which is down from the same quarter last year where we were at about 268. But still, we're about 100 pilots more than required if we were just to offset for attrition. As a result, we believe pilot training expense will decline over time, but we do not believe they will decline as rapidly as we had previously anticipated. That being said, we believe this is a strategic investment in our long-term future. The added expense of increased pilots and training is approximately $3.5 million to $5 million per quarter.

Our engine expense was $5.6 million for the quarter compared to $10.8 million for the same quarter last year. As we have said, our engine expense, although predictable, can vary significantly quarter-to-quarter and year-over-year. We did provide guidance for Q3 with engine expense projected at $8.7 million. Also, as we talked about on our last call, we have retimed some of our C-check events based on revised C-check time limits and also to accommodate our partner's request for having maximum number of aircrafts available during the summer. As a result, the C-check expense for Q2 was $3 million higher than in Q1. We expect this to continue for Q2 -- for Q3 rather, and then drop off in Q4, which is actually our summer quarter. Again, like engines, this is more of a timing issue and not a structural cost issue.

Also, Jonathan mentioned the purchase of 10 CRJ-700s from GECAS. This will have a positive impact on earnings as we transition from lease accounting to ownership accounting. And we expect about $3 million to $4 million per year over the next few years and increased earnings as a result of that transaction.

From cash and liquidity standpoint, we ended the quarter at $77.7 million in cash, which is down $45.5 million from $123.2 million that we reported at the end of September 2018. This reduction of cash was primarily driven by executing on 2 of the key IPO initiatives that totals $51 million. One of them was for $26 million that we paid down in connection with refinancing our spare engine facility at lower interest rates and $25 million to pay down our full line of credit.

Total debt on the balance sheets for the quarter was $844 million, down $71 million from the $915 million as of September 2018. As to other CapEx for the remainder of fiscal 2019, we will have the 10 purchased CRJ-700s, which will be $70 million. We have 1 additional engine that we're purchasing for roughly $5 million, and then we're looking at roughly about $10 million to $12 million in additional CapEx on maintenance-related items.

Lastly, on cash, we do still have our full revolver available to us of $35 million, and we anticipate extending and expanding that over the next few months.

I'd like to now turn it back over to Jonathan who can open it up for questions.

**Jonathan G. Ornstein**
*Chairman & CEO*

Thanks, Mike. That was a good review. Before we open up for questions, I would like to update you on the conferences that Mesa will be attending. We are going to be at the Bank of America Merrill Lynch 2019 Transportation and Industrials Conference, which is actually next week in Boston on May 14, and we will be -- I believe, we are presenting there. Is that correct, Mike?

**Michael J. Lotz**
*President & CFO*

Yes.

**Jonathan G. Ornstein**
*Chairman & CEO*
Okay. All right. So with that, we'd like to open up the floor to questions.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ2 2019 EARNINGS CALL |  MAY 10, 2019

# Question and Answer

**Operator**

[Operator Instructions]

The first question is from the line of Michael Linenberg of Deutsche Bank.

**Michael John Linenberg**
*Deutsche Bank AG, Research Division*

Brad, welcome aboard. Welcome back. Anyway, Jonathan, can you just give us your thoughts on how you think about -- I know you made without recently with this CRJ-550 concept. Thoughts on it? I think there's a view out there that taking a 70-seater and putting 50 seats on it that -- it undermines the economics of the aspect. And maybe we have to think a little bit harder about how it's being utilized, and maybe it's going to be in markets that are premium heavy -- premium -- revenue-premium heavy. Thoughts on it? And whether or not something like that would potentially make sense for you guys?

**Jonathan G. Ornstein**
*Chairman & CEO*

Sure. Thanks, Mike. Yes. I'm actually very excited about the concept. As these aircraft get older and they become depreciated, there are some cost benefits obviously that accrue to us as a result of that. From United's perspective, as you know, they are somewhat scope-restrained in the larger regional jets, which has put them at a strategic disadvantage in regard to total first class seats available. And the revenue impact is not insignificant. If you want to fly from Wichita to London and you're going to buy a ticket on business or first, you can't do it on United Airlines. I don't think Wichita is an example, but these other carriers would have more. Large regional jets can offer first class ticket, and it's that connecting long-haul traffic where United is being penalized.

I think that it obviously will take a special cost structure. I'm very pleased that I think Mesa is one of just a couple of carriers that could potentially do that. And I think it opens up the door for us for a significant amount of opportunity, not the least of which is why I've been as confident as I have been and we've been in regarding to our 700s to either be operated in the 70-seat configuration or in a 50-seat configuration. So I'm very excited about it. I think it will certainly be very well received from the passenger's standpoint. I've looked at the LOPA, the seat arrangements on the aircraft. It's going to be incredible airplane. I mean it's probably as close as you can fly to a private aircraft in the commercial world. And I think that Mesa's cost structure will allow us to operate that plane profitably for United as well as for ourselves.

**Michael John Linenberg**
*Deutsche Bank AG, Research Division*

Okay. Very good. And then just a second question on cargo. You mentioned, I think, it was a sentence or so on cargo, and you indicated that there was progress toward a goal but that you still had a few more steps. Can you elaborate on that? I mean the opportunity -- and is that a 2019 opportunity? Or is this putting in something structurally for an opportunity in 2020, 2021? Any detail on that would be great.

**Jonathan G. Ornstein**
*Chairman & CEO*

Sure. I mean, we've -- since I've served on the Board at southern, cargo is kind of interesting to us because it's so similar to our business. There are some nuances to it regarding how the contracts are structured, but there's advantages and disadvantages. We think it's very interesting. Again, given our cost structure, we think we are very well positioned. It's a simple operation in terms of -- you don't have this sort of complex networks and utilization that you have in the current major airline partner relationships. You just have to operate reliably. And I think that this is something that we'd be looking out. Clearly, it would be more of a 2020-type opportunity. It's not a game-changer by any stretch. We actually would start very small. We think it's helpful, not only from the standpoint that it diversifies our business and

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ2 2019 EARNINGS CALL | MAY 10, 2019

gives us a new revenue stream and opportunity on the net income side, but more importantly, probably is the fact that it helps us in terms of attraction and retention of pilots. You can come to Mesa and start by flying a regional jet and end up flying a narrowbody or bigger, I think that is a really big, big benefit, and I think that helps our partners as well. So we're excited about it. We think that there's some real opportunities. Most of you on this call certainly follow what's going on in the cargo world. And I think there's definitely room for a low-cost operator, like ourselves, to enter the cargo business in a way that is beneficial to all parties.

**Michael John Linenberg**
*Deutsche Bank AG, Research Division*

So Jonathan, just reading between the lines, if I heard you right, it would sound like that you would be flying, in the cargo business, bigger airplanes than regional jets. Is that the right interpretation?

**Jonathan G. Ornstein**
*Chairman & CEO*

Well, I think that we are looking at regional jets for sure. I mean everybody is trying to figure out what to do with these 50 seaters that are out there. And there's a lot that are out there parked, but we're looking across the whole spectrum. It's just that can you make the 50 seaters work, and if not, obviously, then we would be looking at larger aircraft.

**Operator**

The next question is from the line of Savi Syth of Raymond James.

**Savanthi Nipunika Syth**
*Raymond James & Associates, Inc., Research Division*

And actually, if I might -- Brad, it's nice to have you back. And just kind of wondering, leaving United, coming to Mesa, what attracted you? And what you see is kind of key important things to get done in the first 18 months?

**Bradford Roger Rich**
*Executive VP & COO*

Well, thank you, Savi. First of all, look, the positioning of Mesa is one of the primary reasons I'm here. I've known Mike and Jonathan, of course, for many years. In fact, Jonathan and I joke about the fact most of those years we've been competitors and then partners while I was at United. And so I've known the team for a long time. And look, I see a lot of opportunity, both in the positioning of the cost structure, which obviously can't be -- I don't think we could overemphasized how important that is as well as the operational capability when we consistently produce high reliability, which is my highest priority right now then, of course, we think there are a lot of opportunities with our major partners. And so that's the primary reason I'm here and my priority is consistent reliability.

**Savanthi Nipunika Syth**
*Raymond James & Associates, Inc., Research Division*

Got it. And if I might ask on the American contract, I think starting April, you're under the kind of the new performance metrics, and just wondering if you can provide an update on how that's progressing with kind of that extra spares now?

**Jonathan G. Ornstein**
*Chairman & CEO*

Brad, do you want to take a shot at that? Or would you like me to talk about it?

**Bradford Roger Rich**
*Executive VP & COO*

Well, I, first of all, ask you to repeat the question, please?

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ2 2019 EARNINGS CALL |  MAY 10, 2019

---

**Savanthi Nipunika Syth**
*Raymond James & Associates, Inc., Research Division*

Sure. Just wondering about the American contracts that was kind of revised with new performance metrics? And I think part of the contract allowed you to have a couple of more spares as well as kind of made some changes to help kind of improve operations. I was wondering how you're executing kind of to the new targets?

**Bradford Roger Rich**
*Executive VP & COO*

Okay. Well, so first of all, I think we should just say, I mean, the contract amendment is an interesting amendment. I mean it's one that certainly motivates us to produce at a higher level, and it's also certainly in the best interest of American. And -- but by the way, I'm perfectly fine with that because our relationship with American is going to do nothing but improve and get better and stronger as we adhere to and comply with the amendment. So -- and I'm confident that we can achieve the metrics. Yes, there are some things that we're looking at and restructuring and looking at different ways of doing some things everywhere from a schedule to just fundamental operating procedures. And I think all of that will be -- that's when things really work and strengthen relationships is when things work both for the regional partner and the major airline. And so look, I'm confident that we can be successful with the new amendment. And look, there are other things that we're doing, I mean, some strategic investments that we are willing to and need to make in the operation to just create this really high sustainable reliability that our partners expect. So I'm confident we can do that.

**Jonathan G. Ornstein**
*Chairman & CEO*

Yes, and if I could add, I mean, I think that the proof is in the pudding. We knew that in the last year, 18 months, I mean, we were hamstrung by the fact that we had expanded a lot, we needed more pilots, we got hung up a little bit in pilot training, maintenance became more difficult in terms of qualified maintenance people. And we're just sort of finally putting all that together. And as I mentioned, the proof is in the pudding. We ran a completion rate, almost a full point, higher than we did last year. That is not an insignificant number. So we think we've made the improvements necessary. We have more to go. But that being said, I think when you look at the standpoint of how we operate, where we operate and at the cost at which we operate, it's a pretty compelling product. And that's what we just continue to focus on providing the best product at the best cost.

**Savanthi Nipunika Syth**
*Raymond James & Associates, Inc., Research Division*

And Jonathan, just a follow-up on that. So I'm guessing then the increment came on the American side because I think that's where -- because United, you're already performing at a high level. Is that fair?

**Jonathan G. Ornstein**
*Chairman & CEO*

Yes. I would say, for sure, that the bulk of that came on the American side, and you know, American has been very helpful, too. They have given us some focus. Some of their real high quality people have been involved with us that we enjoy interacting with, particularly some of the people on the maintenance side have been incredibly helpful. And so I think that we have seen some very significant improvement there. And again, we continue to do things like our maintenance space in Dallas, which we're really pleased that we now have the maintenance capability, overnight capability in Dallas, for example. I think it will all make really big difference. And I think you're seeing it in those numbers because we're seeing improvement across the board in our operational performance at American, in particular.

**Operator**

The next question is from the line of Helane Becker of Cowen.

**Helane R. Becker**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**MESA AIR GROUP, INC. FQ2 2019 EARNINGS CALL |  MAY 10, 2019**

---

*Cowen and Company, LLC, Research Division*

And Brad, I'll add my welcome back comments to you as well, nice to hear you again. So here's my 2 questions. One is, we noticed that G&A was higher and I was wondering if you can talk about that or is that just spread salary? And the other question is your -- some thoughts on profitability for the rest of the year, given the higher pilots, more than you were thinking. So two questions with respect to that one. Greater number of pilots than you were thinking and then maintenance moving around a little bit. Obviously, you're heading into the peak, so you would normally want to have your maintenance done before the peak. So how should we think about that? And then finally, maybe I don't know, Jonathan or Mike, you can answer this question, with respect to -- if this -- I mean, I know Jonathan you mentioned this cargo potential operation in response to Mike's question about when it would start out, which would be next year, and possibly larger aircraft. What would you do for training these pilots? Like, I assume you would take existing Mesa pilots who are more senior and offer them that opportunity, especially if it's a bigger jet. How should we think about the potential for training costs? And where you would get sim time to do that? Sorry, I think that was more than 2, but it was all bundled in one.

**Jonathan G. Ornstein**
*Chairman & CEO*

No problem. It's fine Helane. Mike, why don't you go over the G&A issue first?

**Michael J. Lotz**
*President & CFO*

Yes, I can hit a couple of them, the G&A issues. Brad's employment agreement is confidential. So I can't discuss any of those details. However, I can assure you, it's not the variance in G&A.

**Helane R. Becker**
*Cowen and Company, LLC, Research Division*

Okay. Just joking.

**Michael J. Lotz**
*President & CFO*

So on the G&A, it's just one of the nuances of our SEC reporting and our capacity purchase agreement. So included in our G&A are property taxes on the aircraft and hull and liability insurance. And those 2 costs combined and it's primarily the property -- increase in property tax rates based on where we fly. That's what's driving the majority of the increase in G&A. And so it will be offset in the pass-through revenue as well. So there's not been a structural cost change on the G&A side. It's really related to those 2 items, the property taxes and the hull and liability -- passenger liability and hull insurance that's included in those items.

As for the -- having the additional pilots, we talked about that. That's just something we think is a good investment. Again, it's going to run $4 million to $5 million more per quarter than we had originally anticipated, where we did some of our earlier modeling. So it's going to be consistent going forward with what it was last quarter. I think this quarter was a little bit lower because we had lower block hours, but that's -- it's not going to come down until probably the fourth quarter. In terms of our maintenance, we will have a big maintenance quarter. We had a big maintenance quarter. Q2 and Q3 will also be for us because that's our June quarter, so April, May and June, but then we'd be doing a lot of maintenance ahead of time to free up the aircraft for the July, August peak summer schedules. As for cargo and training pilots, we're not close to that yet, but we would -- depending upon which aircraft flight it would be, if it was an aircraft that we don't not operate today, we would outsource that pilot training to FlightSafety or CAE-type company down the road. But it would likely be done by some of our pilots. Some of our senior pilots would upgrade into that aircraft if it was a bigger aircraft, and we would get new hire FOs off the street. And as Jonathan alluded to, that is part of the benefit we see of a cargo operation, whether it's the front end of cargo with turboprops using our existing regional jets, or on the other end, getting bigger jets. Across the board, we look at it as a way to attract pilots and retain them as well.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And I think that it should be -- we should note to that, we're talking about a very, very small number to start. I mean, you're talking about a very low utilization out and back trip. And that -- even the size operation that we're contemplating would require probably somewhere around, call it, 20 to 25 pilots. So not a big number. And that's why we continue -- because we think of this growth opportunity plus other growth opportunities that we feel are in hand that we have made this investment in hiring what is now -- we have literally over 100 pilots more than we need in training all the time to be able to accommodate the growth opportunities. As well as to give our partners the opportunity to fly the aircraft more. I mean, both of our partners want to fly aircraft more, and we just keep hiring pilots so that we can do that because not only do you want to be able to fly the planes more but you want to be able to fly them more and be able to react to irregular operations and all those kinds of situations where having a few pilots on the bench can be very helpful. And that's the goal that we're looking to when we spend this money to hire more pilots and what we would need to actually operate the schedule.

**Operator**

The last question is from the line of Joseph DeNardi of Stifel.

**Joseph William DeNardi**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Just to start, Mike, just to make sure on the same page in terms of your expectations around the flight ops expense line. I mean, it's been running 10% higher than maybe you guys had expected. Should we assume 2020 is kind of back in line with expectations? Or is it just higher but not as high as it's been?

**Michael J. Lotz**
*President & CFO*

Yes. No. I think, by 2020, we'll be back to our previous run rates, maybe a point or 2 higher. We did put a new pilot contract inquiry if you're looking back at fiscal year '17 or '18. But yes, by 2020 -- again, it's -- if we were to get some additional growth and had to start prehiring for that. Whenever we have growth, like we've had it over the last 5 years, is that buildup of expenses prior to the aircraft coming online and getting position for them, but if we were to get no growth and just keep the same fleet size by 2020, we would be back.

**Joseph William DeNardi**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Okay. And then Jonathan, you talked about the United aircraft, obviously. Can you just remind us how many aircrafts are on contract kind of coming up for expiration out of this year or next? And what your expectation would be in terms of, I guess, the contract?

**Jonathan G. Ornstein**
*Chairman & CEO*

Sure. I mean, the key is the 700s, so we have 20 700s that start coming out, I believe, in August according to the plan. I think most of you would probably be familiar with airline scheduling and know that at this close in, those are aircraft already scheduled. So again, we have confidence that those planes will remain in the fleet. And I think that those are the ones that -- obviously, I think people are -- have their concerns about. We do have some of our Embraer 175 contracts that technically come off just because they were 5-year deals and they get renewals. But again, I think that we've been assured by United that all those -- the Embraers are going to be renewed as well. So we feel very confident about that.

**Joseph William DeNardi**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Okay. That's helpful. And then, Mike, just in terms of free cash flow for the year, you walked us through the CapEx. It still seems like you guys will generate pretty, pretty strong free cash. What are your priorities in terms of deploying that. Is it kind of just deleveraging?

**Michael J. Lotz**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ2 2019 EARNINGS CALL |  MAY 10, 2019

*President & CFO*

Yes. I think our primary focus on our cash is to use it for growing the company. We really are out talking to various partners about increasing our business, and if we were to get just say 20 aircraft, you're talking about $50 million to $60 million in down payments that we would have to make and that probably would be the best use of our cash.

**Joseph William DeNardi**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Got it. And then Jonathan, just going through the proxy and kind of your compensation and what drives it, it seems like, based on the most recent one, it's a little bit subjective between you and the Board. As you mature as a public company, should we expect that the metrics that drive executive comp will be a little bit more formalized? And what metrics do you think are most relevant in determining kind of your incentive compensation?

**Jonathan G. Ornstein**
*Chairman & CEO*

Yes. I mean we do reviews all the time. And just -- I mean, it's sort of a joke in the company. I've never been to a compensation committee meeting in my history. I just -- I'm not one that lobbies for pay. And I think that when you look at the most recent one, I mean, a lot of that had to do with the stock that was granted and you know the IPO. Because I wondered, like, where did all my money go, and I realized that it's all paid. Half of it went out in taxes just because the stock is all vested, but we're going to continue...

**Michael J. Lotz**
*President & CFO*

Jonathan, I can add a little bit to it, also, that when we were private, it was less structured in terms of -- there was little bit more subjectivity to it. But since we've been public and since we've had our last compensation committee meeting with the Board, one of our objectives is to put a little bit more structure into what types of things we would measure and a little bit more structure into what those payouts would look like. And we're obviously looking at companies like SkyWest and how they would do it, and we plan on putting that in place if not during this year, certainly, for next year.

**Operator**

[Operator Instructions]

**Jonathan G. Ornstein**
*Chairman & CEO*

There's one other point that I forgot to make. I'd like to make that the reason why we are so excited about this concept of 50-seat 700s is, it really opens up the door for 700s at United to be downguaged into 50-seat aircraft, and what that creates is opportunities for more 70-seat aircrafts to replace those 70 seaters that are now going to 50 seats. And we believe that if it wasn't for the constraint of pilots, that literally every 700 could be downguaged into 50 seaters creating more backfill opportunities. And that Mesa is, by far, best position in terms of cost and operation capability to fulfill those requirements.

The other thing that it has done, it did sort of opened up the eyes. The whole industry has looked at what other opportunities exist, whether it's taking 76-seat aircraft and putting them into 70-seat configuration; or American, for example, has the opportunity to take a 70 or 76-seat aircraft and convert it into a 65-seat airplane, not a 50-seat, but a 65-seat airplane, which only gets counted as if it was a 50-seat airplane. So this whole downgauge movement has been, I think, for us, could open up a real big opportunity going forward. So we are going to do everything we can if we've given the opportunity to prove that, that thesis works in real life. It's a really big opportunity for Mesa.

**Operator**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**MESA AIR GROUP, INC. FQ2 2019 EARNINGS CALL |  MAY 10, 2019**

We don't have questions on queue. [Operator Instructions] No questions on queue. Speakers, you may continue.

**Jonathan G. Ornstein**
*Chairman & CEO*

Okay. Well, everyone, if there is no further questions, we'd like to thank you for taking time out of I know your busy day to talk to us and hear about Mesa and our earnings for this quarter. We continue to do everything we can to enhance shareholder value, work as hard as we can to provide the best performance for our partners, and again, do everything we can to provide best work environment for our people. So thank you very much. We look forward to talking to you for the next quarter.

**Operator**
Thank you. And that concludes today's conference. Thank you all for joining. You may now disconnect.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

MESA AIR GROUP, INC. FQ2 2019 EARNINGS CALL |  MAY 10, 2019

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.

# EXHIBIT 7

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| David G. Lowthorp,<br><br>    Plaintiff,<br><br>v.<br><br>Mesa Air Group Incorporated, et al.,<br><br>    Defendants. | No. CV-20-00648-PHX-MTL |

# EXPERT REPORT OF DAVID I. TABAK, PH.D.

## I.    SCOPE OF ANALYSIS AND SUMMARY OF FINDINGS

1.   "Plaintiffs bring this federal securities class action pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the 'Securities Act'), 15 U.S.C. § 77a *et seq.*, on behalf of themselves and all others who purchased Mesa Air Group, Inc. ('Mesa Air') securities 'pursuant and/or traceable to' the company's initial public offering ('IPO')."[1]  It is my understanding that the Order denied many of the bases for Plaintiffs' claims but held that "[t]he Pension Fund's Section 11 claim survives Defendants' motion to dismiss insofar as it is premised on statements concerning Mesa Air's maintenance solutions."[2]  In this report, I refer to these statements as "maintenance-related statements."  It is also my understanding that there are at most two sets of alleged

---

[1] Order, dated July 22, 2021 ("Order"), p. 1.

[2] Order, p. 25.

corrective disclosure events that Plaintiffs may attempt to allege revealed misstatements and/or omissions concerning Mesa Air's maintenance solutions in the registration statement associated with the company's IPO ("Registration Statement"): a set of disclosures on May 9 (after the market close) and 10 (during the trading day), 2019 and a set of disclosures on August 8 (after the market close) and 9 (during the trading day), 2019.

2.  I have been asked by counsel for Mesa Air to address four questions or sets of questions:

   a.  What was the market response, if any, to the May 9/10 news, and, specifically, was there a statistically significant price reaction following that news?

   b.  Assuming that maintenance-related statements in the Registration Statement contained actionable misstatements and/or omissions, were those misstatements and/or omissions fully corrected by the May 9/10 news?

   c.  If the answer to the second question is "yes," could any later price declines be attributed to actionable alleged misstatements and/or omissions contained in the maintenance-related statements in the Registration Statement?

   d.  What was the market response to the August 8/9 news, and, specifically was there a statistically significant price response following that news?  If so, did analysts identify any information about the number of qualified mechanics as of the time of the IPO as a negative disclosure in the August 8/9 news?

3.  As discussed in this report, I conclude the following:

   a.  There was no statistically significant price reaction following the May 9/10 news.  This is true under a variety of statistical analyses (known as "event studies") using different market and/or industry indices and looking

at (1) the full trading day of May 10, 2019 and (2) solely the period of that day following the May 10 portion of the news.  In addition, analysts did not comment on any lack of maintenance staff at Mesa Air, further indicating that that news was immaterial and did not cause any decline in Mesa Air's stock price.

b.  Any actionable misstatements and/or omissions in the maintenance-related statements in the Registration Statement would have been fully corrected by the May 9/10 news.

c.  Consequently, no later price declines could be attributed to actionable alleged misstatements and/or omissions in the maintenance-related statements in the Registration Statement.

d.  There was a statistically significant price decline following the August 8/9, 2019 news.  However, analysts did not suggest that any new information about the number of qualified mechanics as of the time of the IPO had been disclosed or could be a reason for a decline in Mesa Air's stock price.

## II.    QUALIFICATIONS AND REMUNERATION

4.  I received Bachelor's degrees in Physics and in Economics from the Massachusetts Institute of Technology and a Master's degree and a Ph.D. in Economics from Harvard University.  I have appeared as an expert in federal district courts; state trial courts; bankruptcy court; and in arbitration forums, including the National Association of Securities Dealers, the International Chamber of Commerce International Court of Arbitration, and the American Arbitration Association.  I have published in my fields of expertise on subjects such as market efficiency, loss causation, statistics, and the analysis of stock price movements.

5.  National Economic Research Associates ("NERA") was established in 1961 and now employs approximately 500 people in over twenty offices worldwide.  NERA provides consulting for economic matters to parties for their internal use, to parties in

litigation, and to governmental and regulatory authorities. I have worked at NERA for over twenty years and am a managing director in NERA's securities and finance practice. My work entails providing analyses for parties in litigation and consulting for parties in non-litigation settings. I have served as a speaker at events providing CLE credits for attorneys and at academic conferences on areas related to securities litigation. I have provided reports and/or testimony for plaintiffs and defendants in numerous securities class actions.

6. My curriculum vitae, which sets forth in further detail my publications and prior testimony experience, is attached to this report as Exhibit 1.

7. NERA is being compensated on a non-contingent basis for out-of-pocket costs and at our usual rates for time. My billing rate is $1,050 per hour. I have been assisted by a number of individuals at NERA working at my direction who are billing at their standard rates. My compensation and the compensation of NERA are in no way contingent on the conclusions I reach or the opinions I provide in this litigation.

### III.    MATERIALS CONSIDERED

8. Materials considered for the purposes of this report are listed in Exhibit 2.

### IV.    THERE WAS NO IDENTIFIABLE MARKET RESPONSE TO THE MAY 9/10 NEWS

#### A.    *Mesa Air's stock-price movement after the May 9/10 news was not statistically significant*

9. To determine whether Mesa Air's stock price responded to the news on May 9 and 10, 2019, I performed statistical analyses, based on tests known as "event studies," the standard means of quantifying stock price responses to news. An event study is a statistical test that first measures the movement in the price of a stock or other security by removing the influence of general market and/or industry effects. The remaining

-4-

movement is then compared to a "control period" of similar market- and/or industry-adjusted price movements to see if it is unusual (i.e., statistically significant).  If so, then one may be able to make the inference that the news was the cause of the unusual stock price movement.[3]

10. To determine the relationship between movements in Mesa Air's stock price and those of the market and/or industry, I employ what is known as a "market model," or a statistical analysis to control for the effect of general market and industry factors on Mesa Air stock.  In securities litigation, often the control period (known as the "estimation window") is placed before the start of the first alleged misstatement, so that prices are not affected by any alleged misstatements.  As the alleged misstatements at issue here occur with the issuance of the Registration Statement before Mesa Air's IPO, my estimation window will begin with the first returns (or price movements) after Mesa Air's stock began trading.

11. More specifically, I employ two time periods for my market models.  First, to analyze the full-day of price movement on May 10, 2019, or the movement from the close of trading on May 9 to the close on May 10, I conduct an apples-to-apples comparison by including full-day, or close-to-close, movements of indices or securities that account for market and/or industry factors.  For these market models, I employ an estimation window that begins with the returns on August 13, 2018 (the first close-to-close return, or price movement, following Mesa Air's August 10, 2018 IPO) through May 9, 2019 (the last return before the May 9/10 news).

12. Second, because Mesa Air's May 10, 2019 conference call began at 1 p.m. Eastern Time, I also want to examine how Mesa Air's stock moved with the indices and securities solely during the trading day without the effects of the "overnight" or close-to-open movements.  To do this, I examine price movements from the open of each trading

---

[3] The event studies I employ here are consistent with my own published work (David Tabak and Frederick Dunbar, in *Litigation Services Handbook, The Role of the Financial Expert* (3d ed. 2001)).

day to the close, or open-to-close movements, to measure how Mesa Air's stock price moves relative to each security during the trading day.[4]  For these market models, I employ an estimation window using open-to-close data from August 10, 2018 through May 9, 2019.

13. In many situations, an economist will employ just a single market index or security and/or a single industry index or security.  However, to be sure that my results are not dependent on what may be an outlier index or security, I ran market models using a variety of market and/or industry indices or securities.  Exhibit 3a lists the index or indices used for each of the close-to-close market models that employs an index as well as the results (i.e., the coefficients on the index or indices employed and summary statistics for each model).  Exhibit 3b shows close-to-close market models using exchange-traded funds ("ETF"s), which are meant to track an index but trade throughout the trading day.  The ETFs used in Exhibit 3b were designed to track the indices used in Exhibit 3a.

14. Exhibits 4a and 4b then show the results of the event studies, or the determinations of Mesa Air's stock-price movement adjusted for market and/or industry effects for each market model from Exhibits 3a and 3b, respectively, when examining the full May 10, 2019 trading day.  Statistical significance is determined by reference to the "t-statistic" for each event study.  When a t-statistic is greater than approximately 1.96 in absolute magnitude, then the result is said to be significant at the 5% significance level, which is the standard used in financial economics.[5]

---

[4] Because the indices do not have intraday pricing data, these analyses rely solely on the securities, which trade during the trading day and thus have intraday pricing data.

[5] See, for example, *Reference Guide on Statistics* in the *Reference Manual on Scientific Evidence*, 2010, ("*Reference Guide on Statistics*") published by the Federal Judicial Center, p. 251. ("In practice, statistical analysts typically use levels of 5% and 1%. The 5% level is the most common in social science, and an analyst who speaks of significant results without specifying the threshold probably is using this figure.")  Internal footnote omitted.

15. The t-statistics in Exhibit 4a for May 10, 2019 range from -0.32 to -0.47 while those in Exhibit 4b range from -0.30 to -0.50.  All of these are less than 1.96 in absolute magnitude and, thus, the price movement is not statistically significant under any of these models.  In fact, the largest t-statistic in absolute magnitude is only 0.50, which would not even qualify as statistically significant at the 5% level if one used a test that lowers the bar for statistical significance called a "one-tailed test."  A one-tailed test assumes that the price reaction would necessarily be negative.  Notably, "[o]ne-tailed tests at the 5% level are viewed as weak evidence—no weaker standard is commonly used in the technical literature."[6]  Again, the results for May 10, 2019 fail even to provide evidence of a statistically significant price decline using even this weak standard.

16. Next, I perform alternative analyses to examine the effects of the May 10, 2019 news, a Mesa Air conference call that began at 1 p.m. Eastern Time.  The results are shown in Exhibit 5 (market models) and Exhibit 6 (intraday price reactions).  For the market models, because there is no intraday pricing on indices, I am only able to employ versions of the market models that use ETFs.  As I will be examining an intraday price movement, to remove the effects of changes from the close to the open, I use the returns on Mesa Air and the ETFs from the open to the close each day.  To account for the fact that I am measuring Mesa Air's return from only 1 p.m. to 4 p.m. on May 10, 2019, I multiply the estimated constant of each market model by the fraction 3/6.5, where 3 represents the number of hours in the time period measured on May 10, 2019 and 6.5 is the number of hours (from 9:30 a.m. to 4 p.m.) in a normal trading day.

17. For the price reaction, I replace Mesa Air's full-day return and those of each ETF employed on May 10, 2019 with their respective return from their volume-weighted average price as of 12:59 p.m. Eastern Time to the closing price on May 10, 2019.  To account for the fact that I am measuring Mesa Air's return from only 1 p.m. to 4 p.m. on May 10, 2019, I multiply the "standard error" of each market model by the square root of

---

[6] *Reference Guide on Statistics*, p. 256.

the fraction 3/6.5, where 3 represents the time period measured and 6.5 is the number of hours (from 9:30 a.m. to 4 p.m.) in a normal trading day.[7]

18. As mentioned above, Exhibit 6 shows the event studies for the market models in Exhibit 5.  As can be seen in column (11) of Exhibit 6, the largest t-statistic has an absolute value of 1.22, below the level of 1.96 that would be required to reach statistical significance at the standard 5% level.  Moreover, none of those price movements is statistically significant even using a one-tailed test at the 5% significance level, which would require a t-statistic of 1.65 in absolute value and is the weakest standard used in the technical literature.

19. Thus, having examined both the full day of May 10, 2019 and the portion of that day beginning with the start of the conference call, and having tried a variety of market and industry indices and ETFs, under not one single analysis is the market- and/or industry-adjusted price return (over either time period) statistically significant.  This is true not only when using the standard 5% significance level (with a two-tailed test), but also when using the weakest standard used in the technical literature (a 5% significance level using a one-tailed test).  In summary, the conclusion that the May 9/10 news did not cause a statistically significant price reaction is robust to the time period examined and to the index or ETF used to control for market and/or industry effects.

20. I next turn to an error made by Lead Plaintiff in its analysis of Mesa Air's stock-price movement in May 2019.  On pages 5-6 of the Joint Proposed Case Management Report dated August 30, 2021 ("August Joint Proposed Case Management Report"), Lead Plaintiff states the following:

> Defendants argue that Lead Plaintiff's claims should be dismissed based on an affirmative defense they apparently intend to raise (they have not flied [sic] an answer and affirmative defenses as of

---

[7] Standard errors grow with the square root of time.  Thus, the proper adjustment is based on the square root of the fraction of the trading day after the start of the 1 p.m. conference call.  A t-statistic is calculated as the excess, or market- and/or industry-adjusted, return divided by the standard error.

this submission) that a curative disclosure regarding the false and misleading maintenance issues that was made on May 10, 2019 did not result in a statistically significant stock price decline in the Mesa stock price. Lead Plaintiff and its damages expert strongly disagree. The stock drop of May 10, 2019 was statistically significant, but that is a question of fact which involves expert testimony.

21. On pages 8-9 of the August Joint Proposed Case Management Report, Lead Plaintiffs goes on to say:

While Defendants argue that their expert will conclusively demonstrate that the May 10, 2019 stock price drop was not statistically significant, using well-established methodologies, Lead Plaintiff too can state with confidence that it will submit its own expert testimony that the 4.2% stock price drop on May 10, 2019 was statistically significant, also using well-established methodologies.

22. Lead Plaintiff's "confidence" regarding "the 4.2% stock price drop on May 10, 2019" is, in fact, misplaced, as Mesa Air's stock price dropped by only 1.5% on Friday May 10, 2019.  Lead Plaintiff may be mistakenly referring to Mesa Air's 4.2% price decline on Monday May 13, 2019, the following trading day.  However, as the allegedly relevant news events occurred on May 9 (after market hours) and May 10 (at 1 p.m. Eastern Time, during market hours), this would be the wrong day to examine because the effects of that news should have already been incorporated into Mesa Air's price before May 13, 2019.  Even if we suppose that, for some reason, the market did not react to the May 9 and 10 news until May 13, Mesa's stock price decline on May 13, 2019 was not statistically significant.  (See Column (11) of Exhibits 4a and 4b, showing that the price reactions on May 13, 2019 based on the market models in Exhibits 3a and 3b, respectively, were not statistically significant, as the t-statistics are all less than 1.96 in absolute magnitude.  Column (12) in these exhibits also shows that the two-day price reactions covering May 10 and 13, 2019 also have t-statistics less than 1.96 in absolute magnitude, and thus also are not statistically significant.  Although not shown, a cumulative price reaction including the period after 1 p.m. Eastern Time on May 10 along with the full-day movement on May 13, 2019 is also not statistically significant.)

23. Again, based on the analyses above, using a variety of indices and ETFs, and examining Mesa Air's price movement on both the full trading day of May 10, 2019 and the period after the start of the 1 p.m. conference call, it is clear that the price movement on that day is *not* statistically significant.

24. In fact, not only is the price movement not statistically significant at the standard 5% level, but it is also not statistically significant when using a one-tailed test at the 5% level, the weakest test commonly used in the technical literature.  Moreover, even if the largest May 10, 2019 full-day market- and/or industry-adjusted return were tripled, it would not be statistically significant, even using the one-tailed test at the 5% significance level.  Similarly, even if the May 13, 2019 market- and/or industry-adjusted return were tripled, it also would not be statistically significant at the 5% significance level, even using a one-tailed test.  The lack of statistical significance is also consistent with what one observes when reviewing Mesa Air's stock price either graphically (Exhibit 7a) or in tabular form (Exhibit 7b).  Mesa Air's price movements following the May 9/10, 2019 alleged corrective disclosure do not stand out in either exhibit, consistent with that news not representing material, new information to the market.

### B.  Analysts did not comment on the alleged disclosure of a shortage of qualified in-house mechanics

25. An additional means of assessing the market's response to news is to examine commentary of informed market participants, such as analysts.  While such a review may not tell us if there was an overall price response to news, if there was such a response, this type of review can help identify which news the market was responding to.  Thus, assuming, arguendo, that the May 9/10 stock-price response was, counter to what was demonstrated above, statistically significant, we would like to know whether news about a shortage of qualified in-house mechanics was the cause of that decline.  Examining commentary, such as analyst reports, following a news event is an established means of assessing which portion(s) of a large news event were responsible for a resulting stock-

price movement and, when appropriate, for parsing the stock-price movement between various portions of the news event.[8]

26. I obtained a list of publicly available analyst reports from Refinitiv Eikon, a vendor that collects and sells such reports.  This list had five analyst reports in the period from May 9 through May 30, 2019, though all were dated between May 10 and May 16. Counsel for Mesa Air also provided me with two additional reports by Raymond James. I reviewed all of those reports to find any mention of "maintenance" or "mechanics," including variations of those words.  I excluded any references that were not to airline maintenance, but to another issue such as an analyst "maintaining" a rating or a price target.  Notably, no analyst referred back to the statement by Mr. Ornstein during the May 10, 2019 earnings call that Plaintiffs allege revealed a shortage of qualified mechanics as of the IPO.

27. The single reference to a lack of maintenance personnel or mechanics was not even specific to Mesa Air, but rather was a general industry-related statement in a list of "Primary Airline Investment Risks" that stated, "Labor Risk[.] Some airlines are having issues attracting qualified pilots and mechanics which could limit their growth."[9]  The

---

[8] See, for example, *Bricklayers and Trowel Trades v Credit Suisse LLC*, 752 F.3d 82 (1st Cir. 2014).  (An expert "had tools at his disposal, such as intra-day trading analysis, to guide his analysis of confounding information."  Closing footnote: "[The expert] could also have used content analysis. …")  See also *Barrie v. Intervoice-Brite, Inc.*, Civil Action No. 3: 01-CV-1071-K (N.D. Tex. Oct. 26, 2009).  (Expert's "review of analyst reports and the public press also shows that those information sources did not link the June 6 disclosure to any prior earnings or revenues that were supposedly overstated.")

[9] "Pilot Hiring Suggests Growth But We Still Await the United Extension," *Cowen*, May 10, 2019.  The analyst at Cowen was also the only analyst who asked a question that referenced maintenance on the May 10, 2019 call, though the reference was not to any shortage of in-house mechanics, much less one dating back to the IPO, but rather, the acceleration of heavy maintenance, which is performed by third-party vendors, before the peak summer season.  ("And the other question is your -- some thoughts on profitability for the rest of the year, given the higher pilots, more than you were thinking. So two questions with respect to that one. Greater number of pilots than you were thinking and then maintenance moving around a little bit. Obviously, you're heading into the peak, so (continued)

fact that the only reference to a lack of mechanics or maintenance personnel in all the analyst reports from May 9 to May 30, 2019 covering Mesa Air was merely one bullet point out of eleven on a list of "Primary Airline Investment Risks" that dealt with the entire industry rather than Mesa Air specifically indicates that to the extent that there was a price movement in Mesa Air's stock price following the May 9/10 news, issues regarding maintenance or mechanics were not the cause of that price movement. Moreover, this bullet point was not new, appearing in the same analyst firm's February 5, 2019, December 5, 2018, and September 4, 2018 reports on Mesa Air, demonstrating that its inclusion in a May 10, 2019 analyst report could not be the result of the May 9/10, 2019 disclosure.[10]  Beyond that, this same statement was a long-time Cowen staple, appearing, for example in various Cowen reports on the airline industry (as opposed to on Mesa Air in particular).[11]

## V. THE MAY 9/10 NEWS FULLY CORRECTED ANY ALLEGED ACTIONABLE MISSTATEMENTS AND/OR OMISSIONS IN THE REGISTRATION STATEMENT

28. The alleged misstatements and/or omissions in the maintenance statements in the Registration Statement that the Order left in the case were alleged to have been shown to be false by an alleged "admission" on May 10, 2019 about difficulties retaining and

---

you would normally want to have your maintenance done before the peak. So how should we think about that? …")  Mesa Air Group FQ2 2019 Earnings Call Transcript, p. 10.

[10] See the following Cowen reports on Mesa Air: "Reiterating Outperform As Mesa's 1FQ Exceeds Estimates" dated February 5, 2019; "Blue Skies Ahead" dated December 5, 2018; and "Initiation: Revitalized and Back in the Public Eye" dated September 4, 2018.

[11] See, for example, "Pilot Retirements Accelerate Beginning In 2021 & Peak In 2025," *Cowen*, July 5, 2017.  See also, for example, Cowen's "Takeoffs & Landings: Next Week's Itinerary," weekly report from (1) May 3, 2019, (2) June 7, 2019, and (3) June 28, 2019.  I have not reviewed all Cowen reports, and a report not being included here should not be taken to suggest that this statement was not included in that report.

recruiting qualified maintenance personnel.[12]  The Order discusses this, in part, as follows:[13]

> For support, the Pension Fund proffers a portion of an earnings call from May 2019. (*Id.* at 17–18.) During that call, Mr. Ornstein said: "We knew that in the last year, 18 months, I mean, we were hamstrung by the fact that we had expanded a lot, we needed more pilots, we got hung up a little bit in pilot training, maintenance became more difficult in terms of qualified maintenance people." (Doc. 52 ¶ 99; Doc. 57-12 at 10.)
>
> The parties dispute the import of Mr. Ornstein's words. The Pension Fund argues his statement "is an admission that Mesa's qualified mechanics and qualified maintenance personnel were significantly understaffed at the time of the IPO." (Doc. 60 at 18.) … Construing Mr. Ornstein's statements in the Pension Fund's favor, as is required at this stage of the litigation, the Court finds the Pension Fund's characterization of Mr. Ornstein's remarks plausible. *Marcus*, 574 F.3d at 1184. That is, a reasonable person could interpret Mr. Ornstein's statements to mean that, from May 2018 to May 2019, Mesa Air faced a shortage of qualified mechanics …

29. Under Plaintiffs' interpretation of Mr. Ornstein's statement, which I understand allowed the case regarding maintenance-related statements to proceed, Mr. Ornstein's statement quoted above (the "May 2019 Ornstein Statement") caused the market to learn that there had been a shortage of qualified mechanics as of the time of the Registration Statement.  For the remainder of this report, I assume that Lead Plaintiff is correct that there was a shortage of qualified mechanics at the time of the IPO.[14]

30. Having learned of a shortage of qualified mechanics as of the time of the Registration Statement, the market would adjust its valuation of Mesa Air.  Had that adjustment been material, we would have expected to see a substantial decline in Mesa

---

[12] Order, pp. 20-22.

[13] Order, p. 21.

[14] I take no position on whether this allegation is in fact correct, but assume it to be correct for purposes of my analyses.

Air's stock price on May 10, 2019, though, as discussed above, the decline was not statistically significant.  Nevertheless, having learned of a prior shortage of qualified mechanics, the market would no longer be relying on any belief that there was no shortage of qualified mechanics as of the time of the IPO.  This means that the alleged misrepresentations and/or omissions in the maintenance-related statements in the Registration Statement were fully corrected.  In other words, under the interpretation that allowed this case to proceed, following the May 2019 Ornstein Statement, the market no longer believed any statements in the Registration Statement that were dependent on there not being a lack of qualified mechanics as of the time of the IPO.

**VI.    IF THE MAY 9/10 NEWS FULLY CORRECTED ANY ALLEGED ACTIONABLE MISSTATEMENTS AND/OR OMISSIONS IN THE REGISTRATION STATEMENT, THEN NO LATER PRICE DECLINES COULD BE ATTRIBUTED TO THOSE ALLEGED MISSTATEMENTS AND/OR OMISSIONS**

31. Paragraph 85 of the Amended Class Action Complaint for Violations of the Federal Securities Laws dated August 17, 2020 ("Amended Complaint") lists three reasons why Lead Plaintiff alleges that statements in the Registration Statement were false.  The first reason relates to the American CPA, and it is my understanding that the Order dismissed those claims.[15]  The third reason relates to operational spares, and it is my understanding that the Order also dismissed those claims.[16]  This leaves the second reason in ¶85 of the Amended Complaint, which reads in full as follows (with emphasis in the original):[17]

---

[15] Order, p. 13.

[16] Order, p. 19.

[17] Mr. Ornstein's complete sentence as written in ¶99 of the Amended Complaint was: "[I]n the last year, 18 months I mean, we were hamstrung by the fact that we had expanded a lot, we needed more pilots, we got hung up a little bit in pilot training,
(continued)

> By about November 10, 2017—*i.e.*, **nine months before the Offering**—Defendant Ornstein revealed that Mesa was "hamstrung by the fact that [it] had expanded a lot" and "maintenance became more difficult in terms of qualified maintenance people." In other words, as a result of the Company's growth and expansion prior to the IP[O], Mesa's qualified mechanics and qualified maintenance personnel were significantly understaffed.

32. Thus, Lead Plaintiff's argument for why any maintenance-related statements in the Registration Statement were false and/or misleading is that "Mesa's qualified mechanics and qualified maintenance personnel were significantly understaffed" as of the time of the IPO. The Amended Complaint further blames later adverse developments at Mesa Air on a lack of operational spares[18] (a claim that has been dismissed), a "failure to maintain sufficient maintenance personnel[,]"[19] or a lack of "a sufficient number of mechanics[.]"[20] Again, Lead Plaintiff's stated theory of the case in the Amended Complaint, after removing dismissed claims, is that a lack of qualified mechanics and/or maintenance staff as of the time of the IPO was the cause of later declines in Mesa Air's stock price.

33. As discussed above, Lead Plaintiff's theory of the case is that the market learned in May 2019 that there was a shortage of qualified mechanics as of the time of the IPO. Because the market would have accounted for a shortage of mechanics as of the time of the IPO on May 10, 2019, any later declines in Mesa Air's stock price would therefore be unrelated to learning of a shortage of qualified mechanics as of the time of the IPO. Instead, later movements in Mesa Air's stock price would be due to other new information about Mesa Air reaching the market. While this new information may even relate to maintenance or the sufficiency of qualified mechanics **after** the IPO, as the

---

maintenance became more difficult in terms of qualified maintenance people. And we're just sort of finally putting all that together."

[18] Amended Complaint, ¶¶104 and 108.

[19] Amended Complaint, ¶104.

[20] Amended Complaint, ¶108.

market had already been informed of the lack of qualified mechanics at the time of the IPO, it would not "learn" that information again, and thus after May 10, 2019 would not react to "learning" of the information allegedly misstated in the Registration Statement. Put differently, after May 10, 2019, the market's reactions to news would be no different than if the Registration Statement said that Mesa Air lacked a sufficient number of qualified mechanics as of the IPO. Thus, any later movements in Mesa Air's stock price cannot be attributed to the alleged failure to disclose this information in the Registration Statement.[21]

### VII.    ANALYSTS DID NOT SUGGEST THAT NEW INFORMATION REGARDING THE NUMBER OF QUALIFIED MECHANICS AS OF THE IPO COULD HAVE CAUSED ANY OF THE DECLINE FOLLOWING THE AUGUST 8/9 NEWS

34. Following the August 8/9, 2019 news, analysts discussed American Airlines' pulling of two aircraft as the primary reason for a decline in Mesa Air's stock price. For example, Stifel began its August 2019 report by stating, "With shares of Mesa down ~40% today, we view the selloff as well overdone despite the combination of weaker-than-expected 2Q [sic] operating performance, American's decision to remove two of its 64 aircraft on contract with Mesa, and the lack of a contract extension with United."[22] Stifel also changed its earnings estimates to account for American Airlines' removal of two planes from its CPA [capacity purchase agreement] with Mesa Air, stating, "We lower our 2020 contract revenue estimate by ~$30m to reflect our expectation for the

---

[21] It is my understanding that Lead Plaintiff has not alleged that any statements made after the Registration Statement are false. It is also my understanding that statements outside of the Registration Statement would not be part of a Section 11 case. Thus, it is my understanding that even if there were additional allegedly false statements made after the publication of the Registration Statement, the effects of those statements would not be a part of this case.

[22] "Selloff Overdone Despite Frustrating Results and Lack of United News; Main. Buy," *Stifel*, August 9, 2019, p. 1.

impact from American removing aircraft from scheduled service with Mesa."[23]  Stifel further noted that "additional downside could come from American removing more aircraft (up to six total) or the loss of United CRJs, [but] we do believe our estimates reflect some of the key headwinds facing Mesa."[24]  Nowhere, however, did Stifel tie any of its commentary or estimate changes to a lack of qualified mechanics as of the IPO.

35. Cowen led its analyst report following the August disclosure as follows: "Mesa shares came under pressure as a result of operational issues. As a result, American is pulling 2 additional aircraft in November."  Cowen also noted, "Management believes the issues at American are somewhat transitory as the spare count and crew [i.e., flight crew such as pilots and flight attendants] hiring should allow them to operate a reliable schedule going forward."[25]  Cowen further stated, "Another factor playing into the disappointing results was higher than expected engine maintenance expense ($9.5 MM vs guidance of $8.7 MM) and additional pilot training costs."[26]  Cowen did not tie any of these issues, or any of the other issues it discussed, to a lack of qualified mechanics as of the IPO.

36. Next, Deutsche Bank began its report with a header: "Challenging June Q; cost pressures transitory[.]"[27]  Deutsche Bank noted that revenues came in below expectations while costs exceeded expectations primarily due to three categories of expenses, one of which was maintenance expenses.  However, Deutsche Bank did not tie any of these

---

[23] "Selloff Overdone Despite Frustrating Results and Lack of United News; Main. Buy," *Stifel*, August 9, 2019, p. 1.

[24] "Selloff Overdone Despite Frustrating Results and Lack of United News; Main. Buy," *Stifel*, August 9, 2019, p. 1.

[25] "Operational Headwinds Impacting The Business; Clarity Needed On Contracts," *Cowen*, August 9, 2019, p. 1.

[26] "Operational Headwinds Impacting The Business; Clarity Needed On Contracts," *Cowen*, August 9, 2019, p. 3.

[27] "Challenging June Q; long-term growth story intact," *Deutsche Bank*, August 9, 2019, p. 1.

costs to issues as of the time of the IPO, much less a lack of qualified mechanics as of the time of the IPO.  In addition to discussing the 3Q19 results, Deutsche Bank also discussed American Airlines' removal of two planes from its CPA with Mesa Air and stated that the "absence of a contract extension [with United Airlines] has been an overhang on the stock."[28]  Nowhere, however, did Deutsche Bank tie any of its commentary to a lack of qualified mechanics as of the IPO.

37. Several days later, on August 12, 2019, Bank of America Merrill Lynch and Raymond James put out analyst reports discussing the 3Q19 results.[29]  Both of these analysts considered the 3Q19 results to be poor and discussed the negative development with the American Airlines CPA.  Neither analyst tied any issues to a lack of qualified mechanics as of the time of the IPO.

I reserve the right to modify or extend my opinion in light of any new information, including submissions by any experts for Plaintiffs, that becomes available to me.

David I. Tabak
January 3, 2022

---

[28] "Challenging June Q; long-term growth story intact," *Deutsche Bank*, August 9, 2019, p. 2.

[29] "FY3Q19 review: poor results, United resolution needs to come soon," *Bank of America Merrill Lynch*, August 12, 2019 and "Credibility Needs Mending, but Below Partial Draw-Down Value," *Raymond James*, August 12, 2019.

-18-



**David I. Tabak**
Managing Director

National Economic Research Associates, Inc.
1166 Avenue of the Americas
New York, New York 10036
+1 212 345 2176
david.tabak@nera.com
www.nera.com.

# EXHIBIT 1
# DAVID I. TABAK
## MANAGING DIRECTOR

Dr. Tabak earned his Ph.D. and M.A. degrees in Economics from Harvard University and his B.S. in Economics and B.S. in Physics from the Massachusetts Institute of Technology.  While at Harvard, Dr. Tabak participated in teaching courses in micro- and macroeconomics and American economic policy at the undergraduate and graduate levels and in the creation of an undergraduate textbook and accompanying software package.

Dr. Tabak has appeared as an expert in state, federal, Delaware Chancery, and bankruptcy courts, and before arbitration panels, including the National Association of Securities Dealers, the American Arbitration Association, the International Dispute Resolution Centre, and the International Chamber of Commerce International Court of Arbitration.  He has published in his areas of expertise in forums such as *St. John's Law Review* and *Shannon Pratt's Business Valuation Update*, and has published peer-reviewed articles in *Litigation Economics Review* and the *Journal of Forensic Economics*.  Dr. Tabak is also the author of book chapters and has served as a member of *BV Q&A Update's* expert author panel and as a referee for peer-reviewed journals.  His publications have covered topics such as commercial disputes, economic analysis of market efficiency, valuation discounts for lack of marketability, and the application of statistics in litigation analyses.  Dr. Tabak has been an invited presenter at the Securities and Exchange Commission and has spoken at forums that provide continuing legal education credits or continuing professional education credits for accountants and valuation professionals.

Dr. Tabak has been retained as an expert to address issues including allegations of valuations, contract disputes, commercial damages, and disputes between brokers and customers. His non-litigation work has included developing a risk-scoring model for a reinsurance company, assisting financial institutions in new product development, analysis of potential insider trading for a financial institution, and interpretation of statistical analyses of treatment effectiveness for a program for at-risk youth.

David I. Tabak

## Education

**Harvard University**
Ph.D., Economics, 1996
M.A., Economics, 1992

**Massachusetts Institute of Technology**
B.S., Economics, 1990
B.S., Physics, 1990

## Professional Experience

**NERA Economic Consulting**

2005-     *Managing Director (f/k/a Senior Vice President)*
Provide written and oral testimony. Conduct and supervise economic analyses, with a focus on securities litigation and valuation cases.

2001-2005     *Vice President*

1998-2001     *Senior Consultant*

1996-1998     *Senior Analyst*

**Harvard University**

1991-1996     *Teaching Fellow in Economics*
Participated in teaching various courses from introductory principles of economics to graduate macroeconomics. Ran coursewide tutorial program for the largest class at Harvard for two academic years, with a staff of over fifty part-time employees.

**Worth Publishers**

1991, 1993     *Research Assistant/Independent Contractor*
Worked on data collection, software analysis, and creation of a problem bank for an educational economics software package.

**National Bureau of Economic Research**

1991     *Research Assistant*
Performed data collection and econometric analysis for a project on comparisons of international growth rates.

## Honors and Professional Activities

Member, American Economic Association, 1993-present

Referee, *Journal of Forensic Economics*, 2005, 2006, 2008, 2009, 2011, 2012, 2015

David I. Tabak

Referee, *Litigation Economics Review*, 2002, 2003, 2004

William M. Mercer Securities Corporation, Registered Representative, Series 7 and 63, 2000 - 2002

Marsh & McLennan Securities Corporation, Registered Representative, Series 7 and 63, 1998 - 2000

Adjunct Member, Committee on International Trade, Association of the Bar of the City of New York, 1998 – 2001

Harvard University Scholarship, 1990-1992

Derek Bok Teaching Award, 1993, 1994, 1995, and 1996

Allyn Young Teaching Award, 1996

David I. Tabak

## Expert Reports and Testimony

Deposition before the United States District Court for the Northern District of California in *In re Oracle Securities Litigation*, November 23, 2021.

Deposition before the American Arbitration Association Commercial Panel in *Honeywell International, Inc. v. Rheem Sales Company, Inc.,* October 28, 2021.

Expert Report of David. I Tabak, Ph.D. before the American Arbitration Association Commercial Panel in *Honeywell International, Inc. v. Rheem Sales Company, Inc.,* October 15, 2021.

Expert Report of David. I Tabak, Ph.D. before the United States District Court for the Northern District of California in *In re Oracle Securities Litigation*, October 6, 2021.

Reply Report of David I. Tabak, Ph.D. (on damages) before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, September 20, 2021.

Rebuttal Report of David I. Tabak, Ph.D. (on negative causation) before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, September 20, 2021.

Deposition testimony before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, September 1, 2021.

Reply Expert Report of David I. Tabak, Ph.D. before the Southern District of New York in *Sjunde AP-Fonden v. General Electric Company*, August 16, 2021.

Rebuttal Report of David I. Tabak, Ph.D. before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, August 4, 2021.

Testimony before the Court of Chancery of the State of Delaware in *In re CVR Refining, LP Unitholder Litigation*, July 27, 2021.

Deposition testimony before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, June 22, 2021.

Deposition testimony before the Court of Chancery of the State of Delaware in *In re CVR Refining, LP Unitholder Litigation*, June 17, 2021.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, May 28, 2021.

Expert Reports of David I. Tabak, Ph.D. before the Southern District of New York in *Sjunde AP-Fonden v. General Electric Company*, May 21, 2021.  (Two reports submitted simultaneously.)

Expert Report of David I. Tabak , Ph.D. before the Court of Chancery of the State of Delaware in *In re CVR Refining, LP Unitholder Litigation*, March 16, 2021.

Deposition before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, December 14, 2020.

Rebuttal Expert Report before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, December 2, 2020.

Deposition before the United States District Court for the Eastern District of Virginia, Alexandria Division, in *In re Willis Towers Watson Proxy Litigation*, August 7, 2020.

Rebuttal Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia, Alexandria Division, in *In re Willis Towers Watson Proxy Litigation*, August 5, 2020.

Rebuttal Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Celgene Securities Litigation*, July 30, 2020.

Deposition testimony before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, July 28, 2020.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, June 18, 2020.

Deposition testimony before the United States District Court for the District of New Jersey in *In re Celgene Securities Litigation*, June 11, 2020.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia, Alexandria Division, in *In re Willis Towers Watson Proxy Litigation*, June 9, 2020.

Deposition testimony before the United States District Court for the Southern District of New York in *In re Grupo Televisa Securities Litigation*, May 13, 2020.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Celgene Securities Litigation*, April 30, 2020.

Deposition testimony before the United States Bankruptcy Court for the District of Delaware in *In re: Paragon Offshore PLC, Debtor* and *Paragon Litigation Trust v. Noble Corporation PLC, et al.*, April 28, 2020.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Grupo Televisa Securities Litigation*, April 25, 2020.

Deposition testimony before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., January 17, 2020.

Expert Report of David I. Tabak, Ph.D. in the United States Bankruptcy Court for the District of Delaware in *In re: Paragon Offshore PLC, Debtor* and *Paragon Litigation Trust v. Noble Corporation PLC, et al.*, January 15, 2020.

David I. Tabak

Affidavit of David I. Tabak before the United States District Court for the Northern District of Illinois, Eastern Division in *In re Akorn, Inc. Data Integrity Securities Litigation*, October 18, 2019.

Expert report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., September 23, 2019.

Supplemental Rebuttal Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Vale S.A. Securities Litigation*, August 21, 2019.

Deposition before the United States District Court for the Northern District of Georgia in *In re HD Supply Holdings, Inc. Securities Litigation*, July 11, 2019.

Expert Report of David I. Tabak before the United States District Court for the Northern District of Illinois, Eastern Division in *In re Akorn, Inc. Data Integrity Securities Litigation*, June 25, 2019.

Expert Report of David I. Tabak before the United States District Court for the Northern District of Georgia in *In re HD Supply Holdings, Inc. Securities Litigation*, June 17, 2019.

Expert Affidavit of David I. Tabak before the United States District Court for the Northern District of Illinois in *George Hedick Jr. v. The Kraft Heinz Company, et al.* and in *Iron Workers District Council (Philadelphia and vicinity) Retirement and Pension Plan v. The Kraft Heinz Company, et al.*, May 15, 2019.

Rebuttal Expert Report of David I. Tabak before the United States District Court for the Central District of California in *Trevor Mild v. PPG Industries et al.*, April 8, 2019.

Deposition before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, March 29, 2019.

Deposition before the United States District Court for the Central District of California in *Trevor Mild v. PPG Industries et al.*, March 27, 2019.

Deposition before the United States District Court for the District of Puerto Rico in *The Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico et al.*, March 20, 2019.

Expert Report of David I. Tabak before the United States District Court for the Central District of California in *Trevor Mild v. PPG Industries et al.*, March 8, 2019.

Rebuttal Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, March 7, 2019.

Expert Declaration of David I. Tabak before the United States District Court for the District of Puerto Rico in *The Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico et al.*, February 25, 2019.

David I. Tabak

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, February 11, 2019.

Testimony before JAMS Arbitration in *John Mariani, Jr.* et al. *v. James Mariani* et al., June 12, 2018.

Testimony before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., June 4-5, 2018.

Deposition testimony before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., May 14, 2018.

Deposition testimony before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, April 6, 2018.

Deposition testimony before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., March 23, 2018.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, March 9, 2018.

Expert Report of David I. Tabak, Ph.D. before JAMS Arbitration in *John Mariani, Jr.* et al. *v. James Mariani* et al., February 21, 2018.

Expert Report of David I. Tabak, Ph.D. before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., February 16, 2018.

Rebuttal Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Vale S.A. Securities Litigation*, November 17, 2017.

Deposition testimony before the United States District Court for the Southern District of New York in *In re Vale S.A. Securities Litigation*, October 26, 2017.

Report of David I. Tabak, PhD in *Babscay Pty Ltd v. Slater & Gordon Limited*, Federal Court Proceeding VID 659 / 2017, Australia, October 26, 2017.

Deposition testimony before the Supreme Court of the State of New York, County of Westchester, in *Paraco Gas Corporation v. Ferrellgas, L.P.*, September 28, 2017.

Rebuttal Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, County of Westchester, in *Paraco Gas Corporation v. Ferrellgas, L.P.*, September 20, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Vale S.A. Securities Litigation*, September 14, 2017.

Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, County of Westchester, in *Paraco Gas Corporation v. Ferrellgas, L.P.*, August 24, 2017.

David I. Tabak

Supplement to Reply Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., August 9, 2017.

Deposition Testimony before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., August 1, 2017.

Reply Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., June 15, 2017.

Sur-Reply Expert report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., May 31, 2017.

Reply Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., May 26, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of South Carolina in *Edna Selan Epstein* et al. *vs. World Acceptance Corporation* et al., May 8, 2017.

Deposition Testimony before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., April 21, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., April 13, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., March 23, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of South Carolina in *Edna Selan Epstein* et al. *vs. World Acceptance Corporation* et al., March 16, 2017.

Supplement to Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of California in *In re Rocket Fuel, Inc. Securities Litigation*, February 21, 2017.

Deposition Testimony before the United States District Court for the Middle District of Florida, Jackson Division in *In re Rayonier Inc. Securities Litigation*, February 8, 2017.

Expert Rebuttal Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Salix Pharmaceuticals*, January 17, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Middle District of Florida, Jackson Division in *In re Rayonier Inc. Securities Litigation*, December 12, 2016.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., December 9, 2016.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of California in *In re Rocket Fuel, Inc. Securities Litigation*, December 8, 2016.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Salix Pharmaceuticals*, November 3, 2016.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Salix Pharmaceuticals*, October 7, 2016.

Rebuttal Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, May 6, 2016.

Deposition Testimony before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, February 11, 2016.

Deposition Testimony before the United States District Court for the Eastern District of Virginia in *In re Genworth Securities Litigation*, February 9, 2016.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia in *In re Genworth Securities Litigation*, February 3, 2016.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, January 29, 2016.

Expert Report of David Tabak, Ph.D. before the Securities and Exchange Commission in *In the Matter of Arthur F. Jacob, CPA and Innovative Business Solutions, LLC,* January 29, 2016.

Deposition Testimony before the United States District Court for the Eastern District of New York in *In re Symbol Technologies, Inc. Securities Litigation*, January 28, 2016.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, December 23, 2015.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia in *In re Symbol Technologies, Inc. Securities Litigation*, December 11, 2015.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia in *In re Genworth Securities Litigation*, December 2, 2015.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, November 16, 2015.

Expert Report of David I. Tabak, Ph.D. in the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, November 12, 2015.

Deposition Testimony before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, September 2, 2015.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Bridgepoint Securities Litigation*, July 20, 2015.

Rebuttal Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Bridgepoint Securities Litigation*, June 15, 2015.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Bridgepoint Securities Litigation*, June 1, 2015.

Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, March 30, 2015.

Declaration of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *George Byrun et al. v. Salix Pharmaceuticals et al.*, 30 January 2015.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, January 13, 2015.

Expert Report of David Tabak before the Securities and Exchange Commission in the matter of *Airtouch Communications, Inc., Hideyuki Kanakubo, and Jerome Kaiser, CPA*, December 16, 2014.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Puda Coal Securities et al. Litigation*, November 13, 2014.

Deposition Testimony before the United States District Court for the Southern District of Ohio, Western Division (at Dayton) in *Antioch Litigation Trust, W. Timothy Miller, Trustee,* against *McDermott Will & Emery LLP*, July 2, 2014.

Testimony before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, June 16, 2014.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of Ohio, Western Division (at Dayton) in *Antioch Litigation Trust, W. Timothy Miller, Trustee,* against *McDermott Will & Emery LLP*, June 11, 2014.

Supplemental Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, June 3, 2014.

Deposition before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, March 31, 2014.

Cross Examination in the Matter of the Companies' Creditors Arrangement Act and in the Matter of a Plan of Compromise or arrangement of Nortel Networks Corporation et al. before the Ontario Superior Court of Justice (Commercial List), March 19, 2014.

Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. *against AriZona Beverages USA LLC et al.*, March 11, 2014.

Report of David I. Tabak in the Matter of the Companies' Creditors Arrangement Act and in the Matter of a Plan of Compromise or arrangement of Nortel Networks Corporation *et al.* before the Ontario Superior Court of Justice (Commercial List), February 28, 2014.

Deposition Testimony before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, November 8, 2013.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, September 4, 2013.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, July 12, 2013.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, June 27, 2013.

Deposition Testimony before the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, May 10, 2013.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, April 11, 2013.

Declaration of David I. Tabak, Ph.D. in the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, March 21, 2013.

Reply Declaration of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, November 8, 2012.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation*, November 6, 2012.

David I. Tabak

Deposition Testimony before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, July 12, 2012.

Testimony before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, May 3, 2012.

Written Direct Testimony of David Tabak, Ph.D. before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, April 17, 2012.

Declaration of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, April 10, 2012.

Rebuttal Report before the Supreme Court of Victoria at Melbourne in *Pathway Investments Pty Ltd and Doystoy Pty Ltd vs. National Australia Bank Limited*, January 30, 2012.

Expert Report before the Supreme Court of Victoria at Melbourne in *Pathway Investments Pty Ltd and Doystoy Pty Ltd vs. National Australia Bank Limited*, December 5, 2011.   (Affidavits testifying to the report executed on December 9, 2011 and December 20, 2011.)

Deposition Testimony before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, August 1, 2011.

Expert Report of David Tabak, Ph.D. before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, July 8, 2011.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, February 3, 2011.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, January 11, 2011.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Securities and Exchange Commission v. Alfred S. Teo, et al.*, November 4, 2010.

Declaration of David Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, October 29, 2010.

Deposition Testimony before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, October 7, 2010.

Expert Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, September 16, 2010.

David I. Tabak

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, August 30, 2010.

Rebuttal Declaration of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *Maureen Bakke,* et al. *vs. Novatel Wireless,* et al., April 25, 2010.

Declaration of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *Maureen Bakke,* et al. *vs. Novatel Wireless,* et al., March 12, 2010.

Testimony before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd*., November 6, 2009.

Expert Rebuttal Report of David Tabak, Ph.D., before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd*., October 19, 2009.

Expert Report of David Tabak, Ph.D., before the United States District Court for the Central District of California in *Donald Johnson v. James D. Aljian, Kirk Kerkorian, and Tracinda Corporation*, September 17, 2009.

Expert Report of David Tabak, Ph.D., before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd*., September 10, 2009.

Rebuttal Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, July 16, 2009.

Declaration of David Tabak before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, July 13, 2009.

Rebuttal Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, June 26, 2009.

Deposition Testimony before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, June 16, 2009.

Declaration and Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, May 29, 2009.

Deposition Testimony before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, May 6, 2009.

Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, April 15, 2009.

David I. Tabak

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *Herbert Feinberg against Jerome S. Boros; Robinson, Silverman, Pearce, Aronsohn & Berman and Bryan Cave*, February 17, 2009.

Declaration of David Tabak, Ph.D., before the United States District Court for the Central District of California in *Donald Johnson v. James D. Aljian, Kirk Kerkorian, and Tracinda Corporation*, January 5, 2009.

Expert Report of David Tabak, Ph.D., before the Supreme Court of the State of New York, County of New York, in *Herbert Feinberg against Jerome S. Boros; Robinson, Silverman, Pearce, Aronsohn & Berman and Bryan Cave*, December 15, 2008.

Declaration of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, November 7, 2008.

Deposition Testimony before the District Court for the Southern District of New York in *In Re American International Group Inc. Securities Litigation,* October 31, 2008.

Declaration of David Tabak, Ph.D., before the District Court for the Southern District of New York in *In Re American International Group Inc. Securities Litigation,* September 23, 2008.

Cross-Examination before the Superior Court of Justice, Ontario, in *Peter McCann v. CP Ships Limited, Raymond Miles, Frank Halliwell, and Ian Weber*, June 23, 2008.

Surrebuttal Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, January 11, 2008.

Affidavit of David I. Tabak before the Superior Court of Justice, Ontario, in *Peter McCann v. CP Ships Limited, Raymond Miles, Frank Halliwell, and Ian Weber*, December 19, 2007.

Rebuttal Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, December 19, 2007.

Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, December 3, 2007.

Deposition Testimony before the District Court for the Northern District of Georgia in *Carpenters Health & Welfare Fund, et al. vs. The Coca-Cola Company*, August 23, 2007.

Deposition Testimony before the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada in *Holmes Lundt et al. v. Fenwick & West, LLP and Robert A. Freedman*, June 13, 2007.

Expert Report of David Tabak before the District Court for the Northern District of Georgia in *Carpenters Health & Welfare Fund,* et al. *vs. The Coca-Cola Company*, May 30, 2007.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, April 27, 2007.

Expert Report of David Tabak before the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada in *Holmes Lundt et al. v. Fenwick & West, LLP and Robert A. Freedman*, April 4, 2007.  (Amended report, June 25, 2007.)

Rebuttal Report of David Tabak before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, January 18, 2007.

Expert Report of David Tabak before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, December 18, 2006.

Deposition Testimony before the United States District Court for the District of Colorado in *Genesis Insurance Company v. Daniel D. Crowley, Arlin M. Adams, National Union Fire Insurance Company of Pittsburgh PA*, November 9, 2006.

Deposition Testimony before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, October 13, 2006.

Affidavit of David I. Tabak before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, October 11, 2006.

Rebuttal Report before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, October 4, 2006.

Expert Report before the United States District Court for the District of Colorado in *Genesis Insurance Company v. Daniel D. Crowley, Arlin M. Adams, National Union Fire Insurance Company of Pittsburgh PA*, October 4, 2006.

Deposition Testimony before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, September 15, 2006.

Expert Report before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, August 25, 2006.

Deposition Testimony before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, July 20, 2006.

Deposition Testimony before the United States District Court for the Southern District of Texas in *In re Enron Corporation Securities Litigation*, May 25, 2006.

Affidavit before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, April 14, 2006.

Deposition Testimony before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, March 24, 2006.

Rebuttal Expert Report of David Tabak before the United States District Court for the Southern District of Texas in *In re Enron Corporation Securities Litigation*, March 17, 2006.

David I. Tabak

Rebuttal Expert Report of David Tabak before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, March 9, 2006.

Expert Report of David Tabak before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, February 13, 2006.

Expert Report of David Tabak before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, February 1, 2006.

Rebuttal Report of David Tabak, Ph.D. before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, November 30, 2005.

Deposition Testimony before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, November 9, 2005.

Expert Report of David Tabak, Ph.D. before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, October 3, 2005.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Eastern District of Pennsylvania in *Sean Fitzpatrick v. Michael Queen, Thomas McGreal, Joseph W. Luter, IV, Michael H. Cole, Smithfield Foods, Inc., Showcase Foods, Inc., and Pennexx Foods, Inc.*, March 25, 2005.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, February 24, 2005.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, February 18, 2005.

Affidavit of David Tabak, Ph.D. and Stephanie Plancich, Ph.D. before the United States District Court for the Northern District of Illinois, Eastern Division in *Doug Sutton and Prescott Nottingham v. Robert F. Bernard, Robert T. Clarkson, and Bert B. Young*, January 11, 2005.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, January 5, 2005.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of New York in *Phoenician Trading Partners, L.P. v. Blue Water Fund Ltd., et al.*, January 3, 2005.

Affidavit of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, December 14, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, December 10, 2004.

David I. Tabak

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, October 4, 2004.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, September 22, 2004.

Deposition Testimony before the United States District Court for the Northern District of Illinois, Eastern Division in *Richard C. Snyder, et al. v. Thomas and Betts Corporation*, September 9, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Illinois, Eastern Division in *Richard C. Snyder, et al. v. Thomas and Betts Corporation*, August 20, 2004.

Further Additional Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, July 30, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, June 30, 2004.

Testimony before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, April 7, 2004.

Deposition Testimony before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, April 2, 2004.

Expert Report of David Tabak before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, March 31, 2004.

Statement of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *United States of America v. Morris Weissman*, February 10, 2004.

Additional Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, December 17, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of Ohio Eastern District (at Columbus) in *Barry F. Bovee, et al. v. Coopers & Lybrand, et al.*, December 16, 2003.

Deposition Testimony before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Stockholders Litigation* and in *In Re Safety-Kleen Rollins Shareholders Litigation*, October 23, 2003.

Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, October 1, 2003.

David I. Tabak

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Stockholders Litigation*, August 28, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Rollins Shareholders Litigation*, August 28, 2003.

Testimony before the NASD in *Ralph Rubenstein, JANT Foundation, et al. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* June 19, 2003.

Affidavit of David Tabak, Ph.D. and Ramzi Zein, Ph.D. in Support of Norwegian Cruise Line's Opposition to Proposed Rule before the Federal Maritime Commission, May 30, 2003.

Testimony before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, March 11 and 12, 2003.

Declaration of David I. Tabak in Support of Defendant's Motion in Opposition to Appointment of Additional Lead Plaintiffs and Class Certification before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, June 21, 2002.

Affidavit before the United States District Court for the District of Rhode Island in *George Kinney et al. v. Metro Global Media, Inc., et al.* May 15, 2002.

Testimony before the American Arbitration Association in *Beth Kaplan v. Rite Aid Corporation; Rite Aid Corporation v. Beth Kaplan and Bruce Sholk*, May 2-3, 2002.

Expert Report of David I. Tabak before the United States District Court for the District of Idaho in *Pippin v. ICF Kaiser International, et. Al, Wood v. Edwards et al.*, February 11, 2002.

Deposition Testimony before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, February 7, 2002.

Deposition Testimony before the United States District Court for the Eastern District of Pennsylvania in *In Re Equimed Securities, Inc. Litigation*, January 17, 2002.

Affidavit before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, January 10, 2002.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of Pennsylvania in *In Re Equimed Inc. Securities Litigation*, December 28, 2001.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *Castle Creek Technology Partners LLC against Cellpoint Inc.*, December 13, 2001.

Deposition Testimony before the United States District Court for the Southern District of New York in *Morgens, Waterfall, Vintiadis & Co., Inc. et al. against Donaldson, Lufkin & Jenrette Securities Corporation et al.*, October 11, 2001.

David I. Tabak

Deposition Testimony before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, September 25, 2001.

Expert Report of David I. Tabak, Ph.D. before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, September 17, 2001.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *Morgens, Waterfall, Vintiadis & Co., Inc. et al. against Donaldson, Lufkin & Jenrette Securities Corporation et al.*, September 6, 2001.

Testimony before the United States District Court for the Eastern District of New York in *United States of America against Harry Shuster*, July 30, 2001.

Declaration before the United States District Court for the Eastern District of New York in *United States of America against Roy Ageloff, et al.*, July 23, 2001.

Testimony before the National Association of Securities Dealers in *In the Matter of the Arbitration Between Michael A. Brownlee, M.D. against Marc Keller, Schroder & Co., Inc. and Sanfrey Securities, Inc.*, May 29, 2001.

Opinion Letter before the United States District Court for the Eastern District of New York in *United States of America against Roy Ageloff, et al.*, May 24, 2001.

Testimony before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, May 22, 2001.

Testimony before the Supreme Court of the State of New York, County of New York in *Robert Klein against 5B Technologies Corporation f/k/a Paramount Financial Corporation and Deltaforce Personnel Services, Inc.*, May 17, 2001.

Expert Report of David I. Tabak, Ph.D. before the National Association of Securities Dealers in *In the Matter of the Arbitration Between Michael A. Brownlee, M.D. against Marc Keller, Schroder & Co., Inc. and Sanfrey Securities, Inc.*, April 25, 2001.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Central District of California in *In Re Imperial Credit Industries, Inc. Securities Litigation*, April 5, 2001.

Affidavit before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, February 8, 2001.

Deposition Testimony before the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida in *U.S. Diagnostic, Inc. and Diversified Therapy Corporation vs. Bachner, Tally, Polevoy & Misher, LLP and Michael Karsch*, January 19, 2001.

Expert Report of David I. Tabak before the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida in *U.S. Diagnostic, Inc. and Diversified Therapy Corporation vs. Bachner, Tally, Polevoy & Misher, LLP and Michael Karsch*, January 11, 2001.

David I. Tabak

Supplemental Expert Report of David I. Tabak before the State of Minnesota, County of Hennepin District Court, Fourth Judicial District in *Irving P. Knelman v. Investment Advisers, Inc.*, September 13, 2000.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of New York in *Martin R. Lautman v. The Loewen Group Inc., et al.*, September 6, 2000.

Supplemental Affidavit of David I. Tabak before the Circuit Court of Franklin County, Alabama in *James Taff, individually and on behalf of all others similarly situated, vs. CareMark Rx, Inc and PNC Bank, Kentucky Inc.,* May 25, 2000.

Affidavit of David I. Tabak and Christoph Muelbert before the Circuit Court of Franklin County, Alabama in *James Taff, individually and on behalf of all others similarly situated, vs. CareMark Rx, Inc and PNC Bank, Kentucky Inc.,* May 23, 2000.

Expert Report of David I. Tabak before the State of Minnesota, County of Hennepin District Court, Fourth Judicial District in *Irving P. Knelman v. Investment Advisers, Inc.*, April 28, 2000.

Testimony before the American Arbitration Association in *Roderick Covlin against C.S. Block New York, LLC, Dr. Sharaif Amanat, Omar Amanat*, March 30, 2000.

Expert Report of David I. Tabak before the National Association of Securities Dealers Office of Dispute Resolution in *Brooks, Houghton & Company, Inc. Private Corporate Advisors, Inc., and Brooks, Houghton Securities, Inc. against BIG Entertainment, Inc.*, March 17, 2000.

Declaration of David I. Tabak before the United States District Court for the Southern District of New York in *GST Telecommunications, Inc., GST USA, Inc., and GST Telecom Inc. v. Stephen Irwin, David Adler, and Olshan Grundman Frome & Rosenzweig LLP,* February 21, 2000.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *The Klass Report LLC and Christopher M. Klass against Telemation, Inc.*, December 15, 1999.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *GST Telecommunications, Inc., GST USA, Inc., and GST Telecom Inc. v. Stephen Irwin, David Adler, and Olshan Grundman Frome & Rosenzweig LLP,* November 26, 1999.

Expert Report of David I. Tabak, Ph.D. before the National Association of Securities Dealers in *A.R. DiGima, Inc. vs. A.G. Edwards & Sons, Inc. and Eugene Damico*, November 5, 1999.

Deposition Testimony before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, October 22, 1999.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, September 16, 1999.

David I. Tabak

Expert Report of Frederick C. Dunbar and David I. Tabak before the United States District Court for the Northern District of Alabama, Southern Division in *MedPartners, Inc. v. Dun & Bradstreet, Inc*, July 28, 1999.

Testimony before the International Chamber of Commerce International Court of Arbitration in *Hanbo Engineering and Construction Co., Ltd. and Hanbo Corporation v. CE Casecnan Water and Energy Company, Inc.*, April 13, 1998.

Expert Witness Statement of David I. Tabak before the International Chamber of Commerce, International Court of Arbitration in *Hanbo Engineering and Construction Co., Ltd. and Hanbo Corporation v. CE Casecnan Water and Energy Company, Inc.*, March 13, 1998.

David I. Tabak

## Publications

"How COVID-19 Impact Analysis May Shape MAE Disputes," (with Edward Flores), *Law360*, June 29, 2020.

COVID-19-related NERA webpages: (1) "S&P 500 Index: Daily Price Movements" (with Edward Flores), May 1, 2020 with updates; (2) "COVID-19, MAEs, and Preliminary Evidence of Disproportionate Impacts Within Industries" (with Edward Flores), June 9, 2020;  (3) "How COVID-19 Impact Analysis May Shape MAE Disputes") (with Edward Flores) reprint of article on Law360, June 29, 2020.

"Economic and Financial Analyses in Australian Securities Litigation in the Wake of *TPT Patrol Pty Limited as trustee for Amies Superannuation Fund v Myer Holdings Limited*," (with William S. Taylor), NERA Working Paper, January 2020.

"Testing Securities Market Efficiency With Cammer Factors," *Law360.com*, February 5, 2019.

"Securities Class Actions Appear to Be Largely 'Price-Maintenance' and Omissions Cases," *NERA Working Paper*, April 10, 2017.

"Further Insight into 'What Should We Expect When Testing for Price Response to News in Securities Litigation?'," *Oxford Business Law Blog*, September 27, 2016.

"Gauging Share-Price Response to News in Securities Litigation," *The CLS Blue Sky Blog, Columbia Law School's Blog on Corporations and the Capital Markets*, September 8, 2016.

"What Should We Expect When Testing for Price Response to News in Securities Litigation?" *NERA Working Paper*, August 11, 2016.

"Should Solvency Tests Give the Same Answer?"  *NERA Working Paper*, July 28, 2015

"Implications for Market Efficiency and Damages Analysis of Plaintiff Interpretations of *Halliburton II's* Statement that 'market efficiency is a matter of degree,'" *Loyola University Chicago Law Journal*, Spring 2015.

"The Solvency Two-Step," Guest Post on the Weil Bankruptcy Blog.  March 2013.

"Do Courts Count *Cammer* Factors?" NERA Working Paper, republished in the Harvard Law School Forum on Corporate Governance and Financial Regulation.  Also published in modified form as "Counting Cammer Factors – A Review of Case Law" at Law360.com, August 2012.

"Settlement reasonableness from negotiations to coverage disputes," *Litigation and Dispute Resolution 2012 Global Reference* Guide.  A prior version of this was published as a NERA Working Paper, February 2012.

"Guesstimating Loss for Sentencing," published in Law360.com, February 2012.  (Originally published with the title "Estimating Loss For Sentencing Purposes."  Retitled by Law360.com after initial publication on its website.)

"Economic Analysis of Loss in the United States Sentencing Commission's Proposed Methodologies," NERA Working Paper, February 2012.

"Guideline Companies in Valuation: A Careful View of the Market Approach," *Journal of Business Valuation*, 2011 Volume 1.  (A previous version appeared as a NERA working paper entitled "Guideline Companies in Valuation: The Economist's View of the Market Approach" in October 2008.)

"The Matrixx of Materiality and Statistical Significance in Securities Fraud Cases," (co-authored with Frederick Lee of Boies, Schiller & Flexner) NERA Working Paper, December 2010.

"Materiality and Statistical Significance Explained" (co-authored with Frederick Lee of Boies, Schiller & Flexner), published in Law360.com, December 2010.

"Satisfying Fiduciary Duty Under ERISA," *Employment Law Strategist*, June 2010.

"Use and Misuse of Event Studies to Examine Market Efficiency," NERA Working Paper, April 2010.  (A previous version appeared in September 2009, and a condensed version appeared as a Guest Column, "On the Misuse of Event Studies to Examine Market Efficiency," in May 2010 on www.securitiesdocket.com.)

 "Comment: 'A Closer Look at Correction for False Discovery Bias When Making Multiple Comparisons," *Journal of Forensic Economics*, December 2009.

Book Review of *Business Valuation: In Integrated Theory (Second Edition)* in *Valuation Strategies,* November/December 2008.

Guest Author/Respondent, *BVUpdate*, published by Business Valuation Resources, LLC, *Special Report:* What Will the Wall Street Meltdown Mean to the BV Profession? (with Raymund Wong), November 2008.

 "Inflation and Damages in a Post-*Dura* World," NERA Working Paper, September 2007.

"Multiple Comparisons and the Known or Potential Error Rate," *Journal of Forensic Economics,"* Volume XIX, Number 2, published March 2007.

"Making Assessments About Materiality Less Subjective Through The Use of Content Analysis," NERA Working Paper, March 2007.

"Risk Disclosures and Damages Measurement in Securities Fraud Cases," published in the *Securities Reform Act Litigation Reporter*, April 2006.  (Previously published as a NERA Working Paper.)

Guest Author/Respondent, *BV Q&A Update*, published by Business Valuation Resources, LLC., January, March, June, and July 2004; February, May, August, and September 2005.

"Loss Causation and Damages in Shareholder Class Actions: When it Takes Two Steps to Tango," in *Securities Litigation & Enforcement Institute 2004,* published by the Practising Law Institute.  (Previously published as a NERA Working Paper.)

David I. Tabak

"The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-On-The-Market Cases" (with Paul A. Ferrillo and Frederick C. Dunbar), *St. John's Law Review,* Winter 2004.  (Previously published as a working paper by NERA and Weil, Gotshal & Manges, LLP.)

"Determination of the Appropriate Event Window Length in Individual Stock Event Studies" (with Dmitry Krivin, Robert Patton, and Erica Rose), NERA Working Paper, November 4, 2003.

"Inflation Methodologies in Securities Fraud Cases: Theory and Practice" (with Chudozie Okongwu), published in *Securities Litigation & Enforcement Institute 2003,* by the Practising Law Institute.  (Previously published as a NERA Working Paper.)

"Hedging and the Estimation of Marketability Discounts," in *Shannon Pratt's Business Valuation Update*, published by Business Valuation Resources, LLC, August 2003.  (Also reprinted in *BVR's Guide to Discounts for Lack of Marketability*, 2007.)

 "Shareholders' Suit against Corporation," in *Litigation Support Report Writing: Accounting, Finance, and Economic Issues*, edited by Jack P. Friedman and Roman L. Weil, published by John Wiley & Sons, Inc., 2003.

"A CAPM-Based Approach to Calculating Illiquidity Discounts," NERA Working Paper, November 2002.

"A Proposed Methodology to Measure Damages for Option Traders Alleging Securities Fraud" (with Svetlana Starykh and Marc Shotland), *Litigation Economics Review*, Vol. 5, No. 2, Winter 2001 (printed July 2002).

"Intraday Trading Rates in Shareholder Class Actions," *NERA Securities and Finance Insights*, June 2002.

"Materiality and Magnitude: Event Studies in the Courtroom" (with Frederick C. Dunbar), *Litigation Services Handbook: The Role of the Financial Expert, Third Edition, 2001*, edited by Roman L. Weil, Michael J. Wagner and Peter B. Frank, published by John Wiley & Sons, Inc. (Previous versions appeared in the 2000 Supplement to the *Litigation Services Handbook* and as a NERA Working Paper.)

"Are Investors Signalling You About Your Y2K Risk?" (with Vinita M. Juneja and Denise N. Martin), *Y2K Marketwatch*, December 1999.

"What Does the Market Think About Your Y2K Exposure?" (with Vinita M. Juneja and Denise N. Martin), *Viewpoint*, Issue No. 2, November 1999.

"Economic Analysis and Identification of Class Conflicts in Securities Fraud Litigation," NERA Working Paper, June 1998.

November 2021

**Exhibit 2**
**Mesa Air Group, Inc.**
**Materials Considered**

*Academic Literature*

David Tabak and Frederick Dunbar, Chapter 19 of *Litigation Services Handbook, The Role of the Financial Expert* (3d ed. 2001).

*Analyst Reports*

"Blue Skies Ahead," *Cowen,* December 5, 2018.

"Challenging June Q; long-term growth story intact," *Deutsche Bank*, August 9, 2019.

"Credibility Needs Mending, but Below Partial Draw-Down Value," *Raymond James*, August 12, 2019.

"FY3Q19 review: poor results, United resolution needs to come soon," *Bank of America Merrill Lynch*, August 12, 2019.

"Initiation: Revitalized and Back in the Public Eye," *Cowen,* September 4, 2018.

"Operational Headwinds Impacting The Business; Clarity Needed On Contracts," *Cowen*, August 9, 2019.

"Pilot Hiring Suggests Growth But We Still Await the United Extension," *Cowen*, May 10, 2019.

"Pilot Retirements Accelerate Beginning In 2021 & Peak In 2025," *Cowen*, July 5, 2017.

"Reiterating Outperform As Mesa's 1FQ Exceeds Estimates," *Cowen,* February 5, 2019.

"Selloff Overdone Despite Frustrating Results and Lack of United News; Main. Buy," *Stifel*, August 9, 2019.

"Takeoffs & Landings: Next Week's Itinerary," *Cowen,* June 28, 2019.

"Takeoffs & Landings: Next Week's Itinerary," *Cowen,* June 7, 2019.

"Takeoffs & Landings: Next Week's Itinerary," *Cowen,* May 3, 2019.

*Case Law*

*Barrie v. Intervoice-Brite, Inc.*, Civil Action No. 3: 01-CV-1071-K (N.D. Tex. Oct. 26, 2009).

*Bricklayers and Trowel Trades v Credit Suisse LLC*, 752 F.3d 82 (1st Cir. 2014).

**Exhibit 2**
**Mesa Air Group, Inc.**
**Materials Considered**

### Data

Dow Jones Transportation Average Index price data obtained from Bloomberg L.P.

Mesa Air Group, Inc. volume data obtained from FactSet Research Systems Inc.

Mesa Air Group, Inc., S&P 500 Index, Nasdaq Composite Index, CRSP US Total Market Index, Dow Jones U.S. Industrials Index, MSCI US Investable Market Industrials 25/50 Index, S&P Industrials Select Sector Index, S&P Transportation Select Industry Index, SPDR S&P 500 ETF Trust, Fidelity Nasdaq Composite Index ETF, Vanguard Total Stock Market ETF, iShares U.S. Industrials ETF, Vanguard Industrials ETF, SPDR Industrials Select Sector ETF, iShares U.S. Transportation ETF and SPDR S&P Transportation ETF opening, and closing price data obtained from FactSet Research Systems Inc.

Mesa Air Group, Inc., SPDR S&P 500 ETF Trust, Fidelity Nasdaq Composite Index ETF, Vanguard Total Stock Market ETF, iShares U.S. Industrials ETF, Vanguard Industrials ETF, SPDR Industrials Select Sector ETF, iShares U.S. Transportation ETF and SPDR S&P Transportation ETF intraday price data obtained from Tick Data, LLC.

### News Stories

"Press Release: Mesa Air Group Announces Second Quarter Fiscal Year 2019 Results," *Dow Jones Newswire,* May 9, 2019.

### Pleadings in This Matter

Amended Class Action Complaint dated August 17, 2020.

Joint Proposed Case Management Report dated August 30, 2021.

Order dated July 22, 2021.

### SEC Filings

Mesa Air Group, Inc. Form 8-K, dated May 13, 2019.

### Other Materials

Mesa Air Group FQ2 2019 Earnings Call Transcript dated May 10, 2019.

*Reference Guide on Statistics*, part of the *Reference Manual on Scientific Evidence*, published by the Federal Judicial Center, 2011.

**Exhibit 3a**
**Mesa Air Group, Inc.**
**Statistical Model of Daily Logarithmic Returns of Mesa Air Common Stock**
**Estimation Period: August 13, 2018 through May 9, 2019[1]**
*Using Close-to-Close Returns of Mesa Air Common Stock and Various Indices [2]*

| | Model 1 (1) | Model 2 (2) | Model 3 (3) | Model 4 (4) | Model 5 (5) | Model 6 (6) | Model 7 (7) | Model 8 (8) | Model 9 (9) | Model 10 (10) | Model 11 (11) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dependent Variable[3] | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. |
| Constant[4] | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) |
| | *(0.48)* | *(0.47)* | *(0.47)* | *(0.51)* | *(0.46)* | *(0.48)* | *(0.38)* | *(0.33)* | *(0.29)* | *(0.34)* | *(0.30)* |
| **Market Indices** | | | | | | | | | | | |
| S&P 500 Index[5] | **0.93** | | | | | | | | (0.36) | | |
| | *3.56* | | | | | | | | *(0.82)* | | |
| Nasdaq Composite Index[5] | | **0.82** | | | | | | | | 0.08 | |
| | | *4.09* | | | | | | | | *0.26* | |
| CRSP US Total Market Index[5] | | | **0.97** | | | | | | | | (0.29) |
| | | | *3.76* | | | | | | | | *(0.64)* |
| **Industry Indices** | | | | | | | | | | | |
| Dow Jones U.S. Industrials Index[5] | | | | **0.91** | | | | | | | |
| | | | | *4.02* | | | | | | | |
| MSCI US Investable Market Industrials 25/50 Index[5] | | | | | **0.92** | | | | | | |
| | | | | | *4.05* | | | | | | |
| S&P Industrials Select Sector Index[5] | | | | | | **0.87** | | | | | |
| | | | | | | *3.84* | | | | | |
| Dow Jones Transportation Average Index[5] | | | | | | | **0.97** | | | | |
| | | | | | | | *4.81* | | | | |
| S&P Transportation Select Industry Index[5] | | | | | | | | **0.94** | **1.15** | **0.88** | **1.12** |
| | | | | | | | | *5.11* | *3.64* | *2.94* | *3.40* |
| R-Squared[6] | 6.44% | 8.35% | 7.13% | 8.07% | 8.19% | 7.42% | 11.16% | 12.44% | 12.76% | 12.47% | 12.64% |
| Adjusted R-Squared[7] | 5.93% | 7.85% | 6.63% | 7.57% | 7.69% | 6.92% | 10.67% | 11.96% | 11.81% | 11.51% | 11.68% |
| Standard Error[8] | 0.0371 | 0.0367 | 0.0370 | 0.0368 | 0.0367 | 0.0369 | 0.0361 | 0.0359 | 0.0359 | 0.0360 | 0.0359 |
| Number of Observations | 186 | 186 | 186 | 186 | 186 | 186 | 186 | 186 | 186 | 186 | 186 |
| Regression Start Date[1] | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 |
| Regression End Date[1] | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 |

**Notes and Sources:**

Data for the Dow Jones Transportation Average Index obtained from Bloomberg L.P. Data for Mesa Air and all other indices obtained from FactSet Research Systems Inc.

t-statistics are shown in *italics*. Statistically significant coefficients (at the 5% level) are shown in **bold**.

[1] This period refers to the period with available close-to-close returns data preceding the disclosures on May 9, 2019 and May 10, 2019. The disclosure on May 9, 2019 happened after market hours and the disclosure on May 10, 2019 happened during market hours. As such, the effective disclosure date is taken to be May 10, 2019. Mesa Air's common stock first traded on August 10, 2018 and its first close-to-close return is on August 13, 2018.

[2] Returns of Mesa Air common stock and the indices used in the regressions are their close-to-close logarithmic returns.

[3] In all of the regressions in this exhibit, the dependent variable is Mesa Air common stock price returns.

[4] The constant is the expected value of the dependent variable (Mesa Air common stock price returns) if the independent variables equal zero.

[5] The coefficient for each of the independent variables measures the change in the dependent variable (Mesa Air common stock price returns) associated with a one unit change in that independent variable, holding all else equal.

[6] R-squared is the percent of the variance in the dependent variable (Mesa Air common stock price returns) that is explained by the variance of the independent variables.

[7] Adjusted R-squared is the percent of the variance in the dependent variable (Mesa Air common stock price returns) that is explained by the variance of the independent variables, adjusted for the number of predictors in the market model.

[8] Denotes the standard error of the regression model, which is a statistical measure of the variability of predictions made with the regression model.

**Exhibit 3b**
**Mesa Air Group, Inc.**
**Statistical Model of Daily Logarithmic Returns of Mesa Air Common Stock**
**Estimation Period: August 13, 2018 through May 9, 2019[1]**
*Using Close-to-Close Returns of Mesa Air Common Stock and Various ETFs [2]*

| | Model 12 (1) | Model 13 (2) | Model 14 (3) | Model 15 (4) | Model 16 (5) | Model 17 (6) | Model 18 (7) | Model 19 (8) | Model 20 (9) | Model 21 (10) | Model 22 (11) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dependent Variable[3] | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. |
| Constant[4] | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) |
| | *(0.48)* | *(0.48)* | *(0.46)* | *(0.50)* | *(0.46)* | *(0.48)* | *(0.38)* | *(0.33)* | *(0.30)* | *(0.35)* | *(0.30)* |
| **ETFs Tracking the Market** | | | | | | | | | | | |
| SPDR S&P 500 ETF Trust[5] | **0.94** | | | | | | | | (0.24) | | |
| | *3.64* | | | | | | | | *(0.57)* | | |
| Fidelity Nasdaq Composite Index ETF[5] | | **0.86** | | | | | | | | 0.17 | |
| | | *4.23* | | | | | | | | *0.54* | |
| Vanguard Total Stock Market ETF[5] | | | **0.97** | | | | | | | | (0.22) |
| | | | *3.77* | | | | | | | | *(0.51)* |
| **ETFs Tracking the Industry** | | | | | | | | | | | |
| iShares U.S. Industrials ETF[5] | | | | **0.91** | | | | | | | |
| | | | | *4.00* | | | | | | | |
| Vanguard Industrials ETF[5] | | | | | **0.95** | | | | | | |
| | | | | | *4.24* | | | | | | |
| SPDR Industrials Select Sector ETF[5] | | | | | | **0.91** | | | | | |
| | | | | | | *4.05* | | | | | |
| iShares U.S. Transportation ETF[5] | | | | | | | **0.96** | | | | |
| | | | | | | | *4.79* | | | | |
| SPDR S&P Transportation ETF[5] | | | | | | | | **0.94** | **1.09** | **0.82** | **1.08** |
| | | | | | | | | *5.09* | *3.48* | *2.75* | *3.34* |
| R-Squared[6] | 6.72% | 8.87% | 7.16% | 7.99% | 8.90% | 8.18% | 11.08% | 12.35% | 12.51% | 12.49% | 12.48% |
| Adjusted R-Squared[7] | 6.21% | 8.38% | 6.65% | 7.49% | 8.40% | 7.68% | 10.60% | 11.88% | 11.55% | 11.54% | 11.52% |
| Standard Error[8] | 0.0370 | 0.0366 | 0.0369 | 0.0368 | 0.0366 | 0.0367 | 0.0362 | 0.0359 | 0.0360 | 0.0360 | 0.0360 |
| Number of Observations | 186 | 186 | 186 | 186 | 186 | 186 | 186 | 186 | 186 | 186 | 186 |
| Regression Start Date[1] | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 | 8/13/2018 |
| Regression End Date[1] | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 |

**Notes and Sources:**

Data for Mesa Air and all ETFs obtained from FactSet Research Systems Inc.

t-statistics are shown in *italics*. Statistically significant coefficients (at the 5% level) are shown in **bold**.

[1] This period refers to the period with available close-to-close returns data preceding the disclosures on May 9, 2019 and May 10, 2019. The disclosure on May 9, 2019 happened after market hours and the disclosure on May 10, 2019 happened during market hours. As such, the effective disclosure date is taken to be May 10, 2019. Mesa Air's common stock first traded on August 10, 2018 and its first close-to-close return is on August 13, 2018.

[2] Returns of Mesa Air common stock and the ETFs used in the regressions are their close-to-close logarithmic returns. The ETFs presented in this exhibit track the indices presented in Exhibit 3a.

[3] In all of the regressions in this exhibit, the dependent variable is Mesa Air common stock price returns.

[4] The constant is the expected value of the dependent variable (Mesa Air common stock price returns) if the independent variables equal zero.

[5] The coefficient for each of the independent variables measures the change in the dependent variable (Mesa Air common stock price returns) associated with a one unit change in that independent variable, holding all else equal.

[6] R-squared is the percent of the variance in the dependent variable (Mesa Air common stock price returns) that is explained by the variance of the independent variables.

[7] Adjusted R-squared is the percent of the variance in the dependent variable (Mesa Air common stock price returns) that is explained by the variance of the independent variables, adjusted for the number of predictors in the market model.

[8] Denotes the standard error of the regression model, which is a statistical measure of the variability of predictions made with the regression model.

**Exhibit 4a**
**Mesa Air Group, Inc.**
**Calculation of Abnormal Common Stock Price Reactions Following the Alleged Disclosures on May 9, 2019 and May 10, 2019**
*Based on Close-to-Close Returns of Mesa Air Common Stock and Various Indices[1]*

| Date | Mesa Air Closing Price | Actual Stock Price Return | | Market Index Return[1] | Industry Index Return[1] | Predicted Stock Price Return | | Abnormal Stock Price Return | | t-statistic for Abnormal Stock Price Return | | Cumulative Abnormal Stock Price Reaction[5] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Daily[1] | Cumulative | | | Daily[2] | Cumulative | Daily | Cumulative | Daily[3] | Cumulative[4] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) |
| | | $\ln[(2)/\text{prev}(2)]$ | (3) + prev(4) | | | | (7) + prev(8) | (3) - (7) | (4) - (8) | | | |

*May 9, 2019: After market hours, "Mesa reported its Q2 2019 financial and operating results, reporting adjusted earnings per share ('EPS') of $0.46, below analysts' consensus of $0.55, and total operating revenues of $177 million, below analysts' consensus of $178.5 million." ¶11[6]*

*May 10, 2019: During market hours, Mesa hosted its Q2 2019 earnings conference call, during which "Defendant Ornstein stated for the first time that Mesa had been experiencing maintenance and other issues for months preceding the IPO[.]" ¶11[7]*

*Model 1 - Using S&P 500 Index as the Independent Variable in the Market Model*

| Date | Price | Daily | Cumulative | Market | Industry | Pred Daily | Pred Cum | Abn Daily | Abn Cum | t Daily | t Cum | CAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | 0.00 | N/A | 0.00 | 0.00 | (0.02) | (0.02) | (0.46) | (0.46) | $ (0.15) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | (0.02) | N/A | (0.02) | (0.02) | (0.02) | (0.04) | (0.52) | (0.70) | (0.32) |

*Model 2 - Using Nasdaq Composite Index as the Independent Variable in the Market Model*

| Date | Price | Daily | Cumulative | Market | Industry | Pred Daily | Pred Cum | Abn Daily | Abn Cum | t Daily | t Cum | CAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | 0.00 | N/A | (0.00) | (0.00) | (0.01) | (0.01) | (0.39) | (0.39) | $ (0.13) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | (0.03) | N/A | (0.03) | (0.03) | (0.01) | (0.03) | (0.37) | (0.54) | (0.25) |

*Model 3 - Using CRSP US Total Market Index as the Independent Variable in the Market Model*

| Date | Price | Daily | Cumulative | Market | Industry | Pred Daily | Pred Cum | Abn Daily | Abn Cum | t Daily | t Cum | CAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | 0.00 | N/A | 0.00 | 0.00 | (0.02) | (0.02) | (0.47) | (0.47) | $ (0.15) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | (0.03) | N/A | (0.03) | (0.02) | (0.02) | (0.03) | (0.47) | (0.66) | (0.31) |

*Model 4 - Using Dow Jones U.S. Industrials Index as the Independent Variable in the Market Model*

| Date | Price | Daily | Cumulative | Market | Industry | Pred Daily | Pred Cum | Abn Daily | Abn Cum | t Daily | t Cum | CAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | N/A | 0.00 | 0.00 | 0.00 | (0.02) | (0.02) | (0.46) | (0.46) | $ (0.15) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | N/A | (0.03) | (0.03) | (0.03) | (0.02) | (0.03) | (0.44) | (0.64) | (0.29) |

*Model 5 - Using MSCI US Investable Market Industrials 25/50 Index as the Independent Variable in the Market Model*

| Date | Price | Daily | Cumulative | Market | Industry | Pred Daily | Pred Cum | Abn Daily | Abn Cum | t Daily | t Cum | CAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | N/A | 0.00 | 0.00 | 0.00 | (0.02) | (0.02) | (0.46) | (0.46) | $ (0.15) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | N/A | (0.03) | (0.03) | (0.03) | (0.02) | (0.03) | (0.42) | (0.62) | (0.29) |

*Model 6 - Using S&P Industrials Select Sector Index as the Independent Variable in the Market Model*

| Date | Price | Daily | Cumulative | Market | Industry | Pred Daily | Pred Cum | Abn Daily | Abn Cum | t Daily | t Cum | CAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | N/A | 0.00 | 0.00 | 0.00 | (0.02) | (0.02) | (0.46) | (0.46) | $ (0.15) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | N/A | (0.03) | (0.03) | (0.02) | (0.02) | (0.03) | (0.46) | (0.65) | (0.30) |

**Exhibit 4a**
**Mesa Air Group, Inc.**
**Calculation of Abnormal Common Stock Price Reactions Following the Alleged Disclosures on May 9, 2019 and May 10, 2019**
*Based on Close-to-Close Returns of Mesa Air Common Stock and Various Indices [1]*

| Date | Mesa Air Closing Price | Actual Stock Price Return | | Market Index Return [1] | Industry Index Return [1] | Predicted Stock Price Return | | Abnormal Stock Price Return | | t-statistic for Abnormal Stock Price Return | | Cumulative Abnormal Stock Price Reaction [5] |
| | | Daily [1] | Cumulative | | | Daily [2] | Cumulative | Daily | Cumulative | Daily [3] | Cumulative [4] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) |
| | | ln[(2) / prev(2)] | (3) + prev(4) | | | | (7) + prev(8) | (3) - (7) | (4) - (8) | | | |

**Model 7 - Using Dow Jones Transportation Average Index as the Independent Variable in the Market Model**

| Date | Price | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | N/A | (0.00) | (0.00) | (0.00) | (0.01) | (0.01) | (0.33) | (0.33) | $ (0.10) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | N/A | (0.03) | (0.03) | (0.03) | (0.01) | (0.03) | (0.41) | (0.52) | (0.23) |

**Model 8 - Using S&P Transportation Select Industry Index as the Independent Variable in the Market Model**

| Date | Price | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | N/A | (0.00) | (0.00) | (0.00) | (0.01) | (0.01) | (0.36) | (0.36) | $ (0.11) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | N/A | (0.03) | (0.03) | (0.03) | (0.01) | (0.03) | (0.35) | (0.50) | (0.22) |

**Model 9 - Using S&P 500 Index and S&P Transportation Select Industry Index as the Independent Variables in the Market Model**

| Date | Price | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | 0.00 | (0.00) | (0.00) | (0.00) | (0.01) | (0.01) | (0.32) | (0.32) | $ (0.10) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | (0.02) | (0.03) | (0.03) | (0.03) | (0.01) | (0.03) | (0.41) | (0.51) | (0.23) |

**Model 10 - Using Nasdaq Composite Index and S&P Transportation Select Industry Index as the Independent Variables in the Market Model**

| Date | Price | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | 0.00 | (0.00) | (0.00) | (0.00) | (0.01) | (0.01) | (0.36) | (0.36) | $ (0.12) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | (0.03) | (0.03) | (0.03) | (0.03) | (0.01) | (0.02) | (0.32) | (0.49) | (0.22) |

**Model 11 - Using CRSP US Total Market Index and S&P Transportation Select Industry Index as the Independent Variables in the Market Model**

| Date | Price | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | 0.00 | (0.00) | (0.00) | (0.00) | (0.01) | (0.01) | (0.33) | (0.33) | $ (0.10) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | (0.03) | (0.03) | (0.03) | (0.03) | (0.01) | (0.03) | (0.40) | (0.51) | (0.23) |

**Notes and Sources:**

Data for the Dow Jones Transportation Average Index obtained from Bloomberg L.P. Data for Mesa Air and all other indices obtained from FactSet Research Systems Inc.

Description of alleged disclosures taken from the Amended Class Action Complaint filed August 17, 2020 (the "Complaint").

[1] Returns presented in columns 3, 5, and 6 for Mesa Air and the indices as of a day are close-to-close returns from the previous day to the current day.

[2] Returns are predicted using a regression of the close-to-close returns of Mesa Air's common stock on the close-to-close returns of the index or indices listed in each model. In particular, Models 1, 2, and 3 each use only a market index; Models 4, 5, 6, 7, and 8 each use only a industry index; and Models 9, 10, and 11 each use both a market and a industry index. The regression is run over the period from August 13, 2018 to May 9, 2019, the period with available close-to-close returns data preceding the May 10, 2019 effective disclosure date. For more information, see Exhibit 3a.

[3] Abnormal return t-statistics are calculated as the daily abnormal return divided by the standard error of the regression model in each section over the estimation period. Two stars (**) represent significance at the 5% level, and one star (*) represents significance at the 10% level.

**Exhibit 4a**
**Mesa Air Group, Inc.**
**Calculation of Abnormal Common Stock Price Reactions Following the Alleged Disclosures on May 9, 2019 and May 10, 2019**
*Based on Close-to-Close Returns of Mesa Air Common Stock and Various Indices[1]*

| Date | Mesa Air Closing Price | Actual Stock Price Return | | Market Index Return[1] | Industry Index Return[1] | Predicted Stock Price Return | | Abnormal Stock Price Return | | t-statistic for Abnormal Stock Price Return | | Cumulative Abnormal Stock Price Reaction[5] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Daily[1] | Cumulative | | | Daily[2] | Cumulative | Daily | Cumulative | Daily[3] | Cumulative[4] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) |
| | | ln[(2) / prev(2)] | (3) + prev(4) | | | | (7) + prev(8) | (3) - (7) | (4) - (8) | | | |

[4] Cumulative abnormal return t-statistics are calculated as the cumulative abnormal return divided by [(the standard error of the regression model in each section over the estimation period) times (the square root of the number of days cumulated)]. Two stars (**) represent significance at the 5% level; one star (*) represents significance at the 10% level.

[5] Calculated using the following formula: -[1-exp(("Cumulative Abnormal Stock Price Return") + $s^2 \times N/2$)] × (closing price on May 9, 2019), where "s" represents the standard error of the regression model in each section and "N" is days cumulated.

[6] A *Dow Jones Newswires* news article, titled "Press Release: Mesa Air Group Announces Second Quarter Fiscal Year 2019 Results," was published at 8:00 PM ET on May 9, 2019.

[7] According to Mesa Air's Form 8-K dated May 13, 2019, Mesa Air hosted the conference call for its second quarter 2019 results at 1:00 PM ET on May 10, 2019.

**Exhibit 4b**
**Mesa Air Group, Inc.**
**Calculation of Abnormal Common Stock Price Reactions Following the Alleged Disclosures on May 9, 2019 and May 10, 2019**
*Based on Close-to-Close Returns of Mesa Air Common Stock and Various ETFs[1]*

| Date | Mesa Air Closing Price | Actual Stock Price Return | | Market ETF Return[1] | Industry ETF Return[1] | Predicted Stock Price Return | | Abnormal Stock Price Return | | t-statistic for Abnormal Stock Price Return | | Cumulative Abnormal Stock Price Reaction[5] |
| | | Daily[1] | Cumulative | | | Daily[2] | Cumulative | Daily | Cumulative | Daily[3] | Cumulative[4] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) |
| | | ln[(2) / prev(2)] | (3) + prev(4) | | | | (7) + prev(8) | (3) - (7) | (4) - (8) | | | |

*May 9, 2019: After market hours, "Mesa reported its Q2 2019 financial and operating results, reporting adjusted earnings per share ('EPS') of $0.46, below analysts' consensus of $0.55, and total operating revenues of $177 million, below analysts' consensus of $178.5 million." ¶11[6]*

*May 10, 2019: During market hours, Mesa hosted its Q2 2019 earnings conference call, during which "Defendant Ornstein stated for the first time that Mesa had been experiencing maintenance and other issues for months preceding the IPO[.]" ¶11[7]*

*Model 12 - Using SPDR S&P 500 ETF Trust as the Independent Variable in the Market Model*

| Date | Mesa Air Closing Price | Daily | Cumulative | Market ETF | Industry ETF | Daily | Cumulative | Daily | Cumulative | Daily | Cumulative | Reaction |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | 0.01 | N/A | 0.00 | 0.00 | (0.02) | (0.02) | (0.50) | (0.50) | $ (0.17) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | (0.03) | N/A | (0.03) | (0.02) | (0.02) | (0.04) | (0.49) | (0.70) | (0.32) |

*Model 13 - Using Fidelity Nasdaq Composite Index ETF as the Independent Variable in the Market Model*

| Date | Mesa Air Closing Price | Daily | Cumulative | Market ETF | Industry ETF | Daily | Cumulative | Daily | Cumulative | Daily | Cumulative | Reaction |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | 0.00 | N/A | (0.00) | (0.00) | (0.01) | (0.01) | (0.41) | (0.41) | $ (0.13) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | (0.03) | N/A | (0.03) | (0.03) | (0.01) | (0.03) | (0.34) | (0.53) | (0.24) |

*Model 14 - Using Vanguard Total Stock Market ETF as the Independent Variable in the Market Model*

| Date | Mesa Air Closing Price | Daily | Cumulative | Market ETF | Industry ETF | Daily | Cumulative | Daily | Cumulative | Daily | Cumulative | Reaction |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | 0.00 | N/A | 0.00 | 0.00 | (0.02) | (0.02) | (0.50) | (0.50) | $ (0.16) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | (0.03) | N/A | (0.03) | (0.02) | (0.02) | (0.04) | (0.47) | (0.68) | (0.31) |

*Model 15 - Using iShares U.S. Industrials ETF as the Independent Variable in the Market Model*

| Date | Mesa Air Closing Price | Daily | Cumulative | Market ETF | Industry ETF | Daily | Cumulative | Daily | Cumulative | Daily | Cumulative | Reaction |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | N/A | 0.00 | 0.00 | 0.00 | (0.02) | (0.02) | (0.47) | (0.47) | $ (0.15) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | N/A | (0.03) | (0.03) | (0.02) | (0.02) | (0.03) | (0.45) | (0.65) | (0.30) |

*Model 16 - Using Vanguard Industrials ETF as the Independent Variable in the Market Model*

| Date | Mesa Air Closing Price | Daily | Cumulative | Market ETF | Industry ETF | Daily | Cumulative | Daily | Cumulative | Daily | Cumulative | Reaction |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | N/A | 0.00 | 0.00 | 0.00 | (0.02) | (0.02) | (0.48) | (0.48) | $ (0.16) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | N/A | (0.03) | (0.03) | (0.03) | (0.01) | (0.03) | (0.39) | (0.61) | (0.28) |

*Model 17 - Using SPDR Industrials Select Sector ETF as the Independent Variable in the Market Model*

| Date | Mesa Air Closing Price | Daily | Cumulative | Market ETF | Industry ETF | Daily | Cumulative | Daily | Cumulative | Daily | Cumulative | Reaction |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | N/A | 0.00 | 0.00 | 0.00 | (0.02) | (0.02) | (0.47) | (0.47) | $ (0.15) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | N/A | (0.03) | (0.03) | (0.03) | (0.02) | (0.03) | (0.43) | (0.64) | (0.29) |

**Exhibit 4b**
**Mesa Air Group, Inc.**
**Calculation of Abnormal Common Stock Price Reactions Following the Alleged Disclosures on May 9, 2019 and May 10, 2019**
*Based on Close-to-Close Returns of Mesa Air Common Stock and Various ETFs [1]*

| Date | Mesa Air Closing Price | Actual Stock Price Return | | Market ETF Return[1] | Industry ETF Return[1] | Predicted Stock Price Return | | Abnormal Stock Price Return | | t-statistic for Abnormal Stock Price Return | | Cumulative Abnormal Stock Price Reaction[5] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Daily[1] | Cumulative | | | Daily[2] | Cumulative | Daily | Cumulative | Daily[3] | Cumulative[4] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) |
| | | ln[(2) / prev(2)] | (3) + prev(4) | | | | (7) + prev(8) | (3) - (7) | (4) - (8) | | | |

**Model 18 - Using iShares U.S. Transportation ETF as the Independent Variable in the Market Model**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | N/A | (0.00) | (0.00) | (0.00) | (0.01) | (0.01) | (0.32) | (0.32) | $ (0.10) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | N/A | (0.03) | (0.03) | (0.03) | (0.02) | (0.03) | (0.42) | (0.52) | (0.23) |

**Model 19 - Using SPDR S&P Transportation ETF as the Independent Variable in the Market Model**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | N/A | (0.00) | (0.00) | (0.00) | (0.01) | (0.01) | (0.34) | (0.34) | $ (0.11) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | N/A | (0.03) | (0.03) | (0.03) | (0.01) | (0.03) | (0.39) | (0.52) | (0.23) |

**Model 20 - Using SPDR S&P 500 ETF Trust and SPDR S&P Transportation ETF as the Independent Variables in the Market Model**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | 0.01 | (0.00) | (0.00) | (0.00) | (0.01) | (0.01) | (0.30) | (0.30) | $ (0.09) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | (0.03) | (0.03) | (0.03) | (0.03) | (0.02) | (0.03) | (0.44) | (0.52) | (0.23) |

**Model 21 - Using Fidelity Nasdaq Composite Index ETF and SPDR S&P Transportation ETF as the Independent Variables in the Market Model**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | 0.00 | (0.00) | (0.00) | (0.00) | (0.01) | (0.01) | (0.35) | (0.35) | $ (0.11) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | (0.03) | (0.03) | (0.03) | (0.03) | (0.01) | (0.02) | (0.33) | (0.48) | (0.21) |

**Model 22 - Using Vanguard Total Stock Market ETF and SPDR S&P Transportation ETF as the Independent Variables in the Market Model**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/9/2019 | $ 9.34 | | | | | | | | | | | |
| **5/10/2019** | 9.20 | (0.02) | (0.02) | 0.00 | (0.00) | (0.00) | (0.00) | (0.01) | (0.01) | (0.30) | (0.30) | $ (0.10) |
| 5/13/2019 | 8.81 | (0.04) | (0.06) | (0.03) | (0.03) | (0.03) | (0.03) | (0.02) | (0.03) | (0.44) | (0.52) | (0.23) |

**Notes and Sources:**

Data for Mesa Air and all ETFs obtained from FactSet Research Systems Inc. Description of alleged disclosures taken from the Amended Class Action Complaint filed August 17, 2020 (the "Complaint").

[1] Returns presented in columns 3, 5, and 6 for Mesa Air and the ETFs as of a day are close-to-close returns from the previous day to the current day.

[2] Returns are predicted using a regression of the close-to-close returns of Mesa Air's common stock on the close-to-close returns of the ETF or ETFs listed in each model. In particular, Models 12, 13, and 14 each use only an ETF tracking a market index; Models 15, 16, 17, 18, and 19 each use only an ETF tracking a industry index; and Models 20, 21, and 22 each use both an ETF tracking a market index and an ETF tracking a industry index. The regression is run over the period from August 13, 2018 to May 9, 2019, the period with available close-to-close returns data preceding the May 10, 2019 effective disclosure date. For more information, see Exhibit 3b.

[3] Abnormal return t-statistics are calculated as the daily abnormal return divided by the standard error of the regression model in each section over the estimation period. Two stars (**) represent significance at the 5% level, and one star (*) represents significance at the 10% level.

**Exhibit 4b**
**Mesa Air Group, Inc.**
**Calculation of Abnormal Common Stock Price Reactions Following the Alleged Disclosures on May 9, 2019 and May 10, 2019**
*Based on Close-to-Close Returns of Mesa Air Common Stock and Various ETFs [1]*

| Date | Mesa Air Closing Price | Actual Stock Price Return | | Market ETF Return[1] | Industry ETF Return[1] | Predicted Stock Price Return | | Abnormal Stock Price Return | | t-statistic for Abnormal Stock Price Return | | Cumulative Abnormal Stock Price Reaction[5] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Daily[1] | Cumulative | | | Daily[2] | Cumulative | Daily | Cumulative | Daily[3] | Cumulative[4] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) |
| | | ln[(2) / prev(2)] | (3) + prev(4) | | | | (7) + prev(8) | (3) - (7) | (4) - (8) | | | |

[4] Cumulative abnormal return t-statistics are calculated as the cumulative abnormal return divided by [(the standard error of the regression model in each section over the estimation period) times (the square root of the number of days cumulated)]. Two stars (**) represent significance at the 5% level; one star (*) represents significance at the 10% level.

[5] Calculated using the following formula: $-[1-\exp(("Cumulative Abnormal Stock Price Return") + s^2 \times N/2)] \times$ (closing price on May 9, 2019), where "s" represents the standard error of the regression model in each section and "N" is days cumulated.

[6] A *Dow Jones Newswires* news article, titled "Press Release: Mesa Air Group Announces Second Quarter Fiscal Year 2019 Results," was published at 8:00 PM ET on May 9, 2019.

[7] According to Mesa Air's Form 8-K dated May 13, 2019, Mesa Air hosted the conference call for its second quarter 2019 results at 1:00 PM ET on May 10, 2019.

**Exhibit 5**
**Mesa Air Group, Inc.**
**Statistical Model of Daily Logarithmic Returns of Mesa Common Stock**
**Estimation Period: August 10, 2018 through May 9, 2019[1]**
*Using Open-to-Close Returns of Mesa Air Common Stock and Various ETFs [2]*

| | Model 23 (1) | Model 24 (2) | Model 25 (3) | Model 26 (4) | Model 27 (5) | Model 28 (6) | Model 29 (7) | Model 30 (8) | Model 31 (9) | Model 32 (10) | Model 33 (11) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dependent Variable[3] | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. | Mesa Air Group, Inc. |
| Constant[4] | (0.00) *(0.50)* | (0.00) *(0.39)* | (0.00) *(0.46)* | (0.00) *(0.72)* | (0.00) *(0.52)* | (0.00) *(0.61)* | (0.00) *(0.57)* | (0.00) *(0.37)* | (0.00) *(0.37)* | (0.00) *(0.35)* | (0.00) *(0.37)* |
| **ETFs Tracking the Market** | | | | | | | | | | | |
| SPDR S&P 500 ETF Trust[5] | **1.29** *4.13* | | | | | | | | 0.17 *0.35* | | |
| Fidelity Nasdaq Composite Index ETF[5] | | **1.15** *4.73* | | | | | | | | 0.48 *1.33* | |
| Vanguard Total Stock Market ETF[5] | | | **1.32** *4.30* | | | | | | | | 0.22 *0.45* |
| **ETFs Tracking the Industry** | | | | | | | | | | | |
| iShares U.S. Industrials ETF[5] | | | | **1.16** *4.50* | | | | | | | |
| Vanguard Industrials ETF[5] | | | | | **1.20** *4.71* | | | | | | |
| SPDR Industrials Select Sector ETF[5] | | | | | | **1.23** *4.78* | | | | | |
| iShares U.S. Transportation ETF[5] | | | | | | | **1.14** *4.92* | | | | |
| SPDR S&P Transportation ETF[5] | | | | | | | | **1.10** *5.20* | **1.01** *3.03* | **0.78** *2.44* | **0.97** *2.81* |
| R-Squared[6] | 8.45% | 10.77% | 9.08% | 9.88% | 10.69% | 11.00% | 11.58% | 12.73% | 12.79% | 13.56% | 12.83% |
| Adjusted R-Squared[7] | 7.96% | 10.29% | 8.59% | 9.39% | 10.21% | 10.52% | 11.10% | 12.26% | 11.84% | 12.62% | 11.88% |
| Standard Error[8] | 0.0378 | 0.0373 | 0.0377 | 0.0375 | 0.0373 | 0.0373 | 0.0372 | 0.0369 | 0.0370 | 0.0368 | 0.0370 |
| Number of Observations | 187 | 187 | 187 | 187 | 187 | 187 | 187 | 187 | 187 | 187 | 187 |
| Regression Start Date[1] | 8/10/2018 | 8/10/2018 | 8/10/2018 | 8/10/2018 | 8/10/2018 | 8/10/2018 | 8/10/2018 | 8/10/2018 | 8/10/2018 | 8/10/2018 | 8/10/2018 |
| Regression End Date[1] | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 | 5/9/2019 |

**Notes and Sources:**
Data for Mesa Air and all ETFs obtained from FactSet Research Systems Inc.
t-statistics are shown in *italics*.  Statistically significant coefficients (at the 5% level) are shown in **bold**.

[1] This period refers to the period with available open-to-close returns data preceding the disclosures on May 9, 2019 and May 10, 2019. The disclosure on May 9, 2019 happened after market hours and the disclosure on May 10, 2019 happened during market hours. As such, the effective disclosure date is taken to be May 10, 2019. Mesa Air's common stock first traded on August 10, 2018 and its first open-to-close return is on August 10, 2018.

[2] Returns of Mesa Air common stock and the ETFs used in the regressions are their open-to-close logarithmic returns. The ETFs presented in this exhibit track the indices presented in Exhibit 3a.

[3] In all of the regressions in this exhibit, the dependent variable is Mesa Air common stock price returns.

[4] The constant is the expected value of the dependent variable (Mesa Air common stock price returns) if the independent variables equal zero.

[5] The coefficient for each of the independent variables measures the change in the dependent variable (Mesa Air common stock price returns) associated with a one unit change in that independent variable, holding all else equal.

[6] R-squared is the percent of the variance in the dependent variable (Mesa Air common stock price returns) that is explained by the variance of the independent variables.

[7] Adjusted R-squared is the percent of the variance in the dependent variable (Mesa Air common stock price returns) that is explained by the variance of the independent variables, adjusted for the number of predictors in the market model.

[8] Denotes the standard error of the regression model, which is a statistical measure of the variability of predictions made with the regression model.

**Exhibit 6**
**Mesa Air Group, Inc.**
**Calculation of Abnormal Common Stock Price Reactions Following the Alleged Disclosures on May 9, 2019 and May 10, 2019**
*Based on Intraday Returns of Mesa Air Common Stock and Various ETFs [1,2]*

| Date | Mesa Air VWAP and Closing Price[1] | Actual Stock Price Return | | Market ETF Return[2] | Industry ETF Return[2] | Predicted Stock Price Return | | Abnormal Stock Price Return | | t-statistic for Abnormal Stock Price Return | | Cumulative Abnormal Stock Price Reaction[6] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Daily[2] | Cumulative | | | Daily[3] | Cumulative | Daily | Cumulative | Daily[4] | Cumulative[5] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) |
| | | ln[(2) / prev(2)] | (3) + prev(4) | | | | (7) + prev(8) | (3) - (7) | (4) - (8) | | | |

*May 10, 2019:*  Beginning at 1:00 PM ET, Mesa hosted its Q2 2019 earnings conference call, during which "Defendant Ornstein stated for the first time that Mesa had been experiencing maintenance and other issues for months preceding the IPO[.]" ¶11 [8]

***Model 23 - Using SPDR S&P 500 ETF Trust as the Independent Variable in the Market Model***

| Date | Price | Daily | Cum | Mkt | Ind | Daily | Cum | Daily | Cum | t-Daily | t-Cum | CAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/10/2019 12:59 PM | $  9.37 | | | | | | | | | | | |
| 5/10/2019 4:00 PM | 9.20 | (0.02) | (0.02) | 0.01 | N/A | 0.01 | 0.01 | (0.03) | (0.03) | (1.14) | (1.14) | $  (0.27) |

***Model 24 - Using Fidelity Nasdaq Composite Index ETF as the Independent Variable in the Market Model***

| Date | Price | Daily | Cum | Mkt | Ind | Daily | Cum | Daily | Cum | t-Daily | t-Cum | CAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/10/2019 12:59 PM | $  9.37 | | | | | | | | | | | |
| 5/10/2019 4:00 PM | 9.20 | (0.02) | (0.02) | 0.01 | N/A | 0.01 | 0.01 | (0.03) | (0.03) | (1.10) | (1.10) | $  (0.25) |

***Model 25 - Using Vanguard Total Stock Market ETF as the Independent Variable in the Market Model***

| Date | Price | Daily | Cum | Mkt | Ind | Daily | Cum | Daily | Cum | t-Daily | t-Cum | CAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/10/2019 12:59 PM | $  9.37 | | | | | | | | | | | |
| 5/10/2019 4:00 PM | 9.20 | (0.02) | (0.02) | 0.01 | N/A | 0.01 | 0.01 | (0.03) | (0.03) | (1.13) | (1.13) | $  (0.26) |

***Model 26 - Using iShares U.S. Industrials ETF as the Independent Variable in the Market Model***

| Date | Price | Daily | Cum | Mkt | Ind | Daily | Cum | Daily | Cum | t-Daily | t-Cum | CAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/10/2019 12:59 PM | $  9.37 | | | | | | | | | | | |
| 5/10/2019 4:00 PM | 9.20 | (0.02) | (0.02) | N/A | 0.01 | 0.01 | 0.01 | (0.03) | (0.03) | (1.08) | (1.08) | $  (0.25) |

***Model 27 - Using Vanguard Industrials ETF as the Independent Variable in the Market Model***

| Date | Price | Daily | Cum | Mkt | Ind | Daily | Cum | Daily | Cum | t-Daily | t-Cum | CAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/10/2019 12:59 PM | $  9.37 | | | | | | | | | | | |
| 5/10/2019 4:00 PM | 9.20 | (0.02) | (0.02) | N/A | 0.01 | 0.01 | 0.01 | (0.03) | (0.03) | (1.14) | (1.14) | $  (0.26) |

***Model 28 - Using SPDR Industrials Select Sector ETF as the Independent Variable in the Market Model***

| Date | Price | Daily | Cum | Mkt | Ind | Daily | Cum | Daily | Cum | t-Daily | t-Cum | CAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/10/2019 12:59 PM | $  9.37 | | | | | | | | | | | |
| 5/10/2019 4:00 PM | 9.20 | (0.02) | (0.02) | N/A | 0.01 | 0.01 | 0.01 | (0.03) | (0.03) | (1.22) | (1.22) | $  (0.28) |

***Model 29 - Using iShares U.S. Transportation ETF as the Independent Variable in the Market Model***

| Date | Price | Daily | Cum | Mkt | Ind | Daily | Cum | Daily | Cum | t-Daily | t-Cum | CAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/10/2019 12:59 PM | $  9.37 | | | | | | | | | | | |
| 5/10/2019 4:00 PM | 9.20 | (0.02) | (0.02) | N/A | 0.01 | 0.01 | 0.01 | (0.03) | (0.03) | (1.09) | (1.09) | $  (0.25) |

***Model 30 - Using SPDR S&P Transportation ETF as the Independent Variable in the Market Model***

| Date | Price | Daily | Cum | Mkt | Ind | Daily | Cum | Daily | Cum | t-Daily | t-Cum | CAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/10/2019 12:59 PM | $  9.37 | | | | | | | | | | | |
| 5/10/2019 4:00 PM | 9.20 | (0.02) | (0.02) | N/A | 0.01 | 0.01 | 0.01 | (0.03) | (0.03) | (1.02) | (1.02) | $  (0.23) |

**Exhibit 6**
**Mesa Air Group, Inc.**
**Calculation of Abnormal Common Stock Price Reactions Following the Alleged Disclosures on May 9, 2019 and May 10, 2019**
*Based on Intraday Returns of Mesa Air Common Stock and Various ETFs [1,2]*

| Date | Mesa Air VWAP and Closing Price[1] | Actual Stock Price Return Daily[2] | Actual Stock Price Return Cumulative | Market ETF Return[2] | Industry ETF Return[2] | Predicted Stock Price Return Daily[3] | Predicted Stock Price Return Cumulative | Abnormal Stock Price Return Daily | Abnormal Stock Price Return Cumulative | t-statistic for Abnormal Stock Price Return Daily[4] | t-statistic for Abnormal Stock Price Return Cumulative[5] | Cumulative Abnormal Stock Price Reaction[6] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) |
| | | $\ln[(2)/\text{prev}(2)]$ | (3) + prev(4) | | | | (7) + prev(8) | (3) - (7) | (4) - (8) | | | |
| **Model 31 - Using SPDR S&P 500 ETF Trust and SPDR S&P Transportation ETF as the Independent Variables in the Market Model** | | | | | | | | | | | | |
| 5/10/2019 12:59 PM | $ 9.37 | | | | | | | | | | | |
| 5/10/2019 4:00 PM | 9.20 | (0.02) | (0.02) | 0.01 | 0.01 | 0.01 | 0.01 | (0.03) | (0.03) | (1.05) | (1.05) | $ (0.24) |
| **Model 32 - Using Fidelity Nasdaq Composite Index ETF and SPDR S&P Transportation ETF as the Independent Variables in the Market Model** | | | | | | | | | | | | |
| 5/10/2019 12:59 PM | $ 9.37 | | | | | | | | | | | |
| 5/10/2019 4:00 PM | 9.20 | (0.02) | (0.02) | 0.01 | 0.01 | 0.01 | 0.01 | (0.03) | (0.03) | (1.10) | (1.10) | $ (0.25) |
| **Model 33 - Using Vanguard Total Stock Market ETF and SPDR S&P Transportation ETF as the Independent Variables in the Market Model** | | | | | | | | | | | | |
| 5/10/2019 12:59 PM | $ 9.37 | | | | | | | | | | | |
| 5/10/2019 4:00 PM | 9.20 | (0.02) | (0.02) | 0.01 | 0.01 | 0.01 | 0.01 | (0.03) | (0.03) | (1.05) | (1.05) | $ (0.24) |

**Notes and Sources:**

Data for Mesa Air and all ETFs obtained from FactSet Research Systems Inc and Tick Data LLC. Description of alleged disclosures taken from the Amended Class Action Complaint filed August 17, 2020 (the "Complaint").

Volume-weighted average price is abbreviated as "VWAP."

Though the analysis presented in this exhibit covers only part of one day, cumulative figures are shown to keep the exhibit formatting consistent with that of Exhibits 4a and 4b for ease of comparison.

[1] Prices presented in column 2 are Mesa Air VWAP as of 12:59 PM ET on May 10, 2019 and its closing price on May 10, 2019. VWAP is calculated as the volume weighted average price [sum(price × volume)/total volume] for each one minute interval. Trades that Tick Data flagged to exclude (i.e., "if Tick Data recommends exclusion of trade from time series due to condition code(s)") are not used in the calculation of VWAP (US Equity Trade, Quote and One Minute Data File Format Document, Version 3.8). Additionally, when Tick Data provides a filtered price for a trade (i.e., "[i]f Tick Data would have adjusted the price of this trade during its filtering process due to scrubbing algorithm conditions being met"), the filtered price is used to calculate VWAP (US Equity Trade, Quote and One Minute Data File Format Document, Version 3.8).

[2] Returns presented in columns 3, 5, and 6 for Mesa Air and the ETFs are intraday returns from their VWAPs as of 12:59 PM ET on May 10, 2019 to their closing prices on May 10, 2019. For ETFs that were not traded during the one minute interval from 12:59:00 PM to 12:59:59 PM, their VWAPs as of the last minute with available data before 1:00 PM were used in the calculation of the intraday returns. Additionally, intraday returns for the ETFs are calculated using split-adjusted VWAPs and split-adjusted closing price data when applicable.

[3] Returns are predicted using a regression of the open-to-close returns of Mesa Air's common stock prices on the open-to-close returns of the ETF or ETFs listed in each model. In particular, Models 23, 24, and 25 each use only an ETF tracking a market index; Models 26, 27, 28, 29, 30 each use only an ETF tracking a industry index; and Models 31, 32, and 33 each use both an ETF tracking a market index and an ETF tracking an industry index. The regression is run over the period from August 10, 2018 to May 9, 2019, the period with available open-to-close returns data preceding the May 10, 2019 effective disclosure date. For more information, see Exhibit 5. Additionally, in column 7, when calculating the predicted Mesa Air return in ea section, the constant in the market model in that section is assumed to be 3/6.5 of the estimated constant presented in Exhibit 5, where 3 represents the time period measured from 1:00 PM to 4:00 PM and 6.5 is the number of normal hours (from 9:30 AM to 4:00 PM) in a trading day. For more information, see paragraph 16 of the Expert Report of David I. Tabak, Ph.D. dated January 3, 2022.

[4] Abnormal return t-statistics are calculated as the daily abnormal return divided by the adjusted standard error of the regression model in each section over the estimation period. The adjusted standard error is calculated by multiplying the original standard error of the regression model in each section by the square root of the fraction 3/6.5, where 3 represents the time period measured from 1:00 PM to 4:00 PM and 6.5 is the number of normal hours (from 9:30 AM to 4:00 PM) in a trading day. Two stars (**) represent significance at the 5% level, and one star (*) represents significance at the 10% level. For more information regarding the adjusted standard error, see paragraph 17 of the Expert Report of David I. Tabak, Ph.D. dated January 3, 2022.

[5] Cumulative abnormal return t-statistics in column 12 are the same as the daily abnormal return t-statistics in column 11 since the event window being considered covers only one period. Two stars (**) represent significance at the 5% level; one star (*) represents significance at the 10% level.

[6] Calculated using the following formula: $-[1-\exp((\text{"Cumulative Abnormal Stock Price Return"}) + s^2 \times 1/2)] \times (\text{VWAP as of 12:59 PM on May 10, 2019})$, where "s" represents the adjusted standard error of the regression model in each section. See footnote 4 for the calculation of the adjusted standard error.

[7] A *Dow Jones Newswires* news article, titled "Press Release: Mesa Air Group Announces Second Quarter Fiscal Year 2019 Results," was published at 8:00 PM ET on May 9, 2019.

[8] According to Mesa Air's Form 8-K dated May 13, 2019, Mesa Air hosted the conference call for its second quarter 2019 results at 1:00 PM ET on May 10, 2019.

**Exhibit 7a**
**Mesa Air Group, Inc.**
**Closing Price, Trading Volume, and News Dates**
**August 1, 2018 - March 31, 2020[1]**



**Notes and Sources:**

Price and volume data obtained from FactSet Research Systems, Inc. Descriptions of news obtained from the Amended Class Action Complaint dated August 17, 2020. Timing of news obtained from articles from Factiva Dow Jones.

[1] Mesa's initial public offering took place on August 9, 2018 and the common stock began trading on August 10, 2018.

**Exhibit 7b**
**Mesa Air Group, Inc.**
**Closing Price and Trading Volume**
**August 10, 2018 - March 31, 2020[1]**

| Date | Closing Price | Trading Volume |
|------|---------------|----------------|
| (1) | (2) | (3) |
| 8/10/2018 | $  11.75 | 2,520,237 |
| 8/13/2018 | 11.50 | 430,202 |
| 8/14/2018 | 11.65 | 400,693 |
| 8/15/2018 | 11.64 | 294,627 |
| 8/16/2018 | 11.70 | 266,448 |
| 8/17/2018 | 11.74 | 296,339 |
| 8/20/2018 | 12.17 | 341,970 |
| 8/21/2018 | 12.33 | 455,598 |
| 8/22/2018 | 12.44 | 343,573 |
| 8/23/2018 | 12.50 | 214,382 |
| 8/24/2018 | 12.56 | 327,353 |
| 8/27/2018 | 12.56 | 257,616 |
| 8/28/2018 | 12.97 | 396,659 |
| 8/29/2018 | 12.84 | 109,967 |
| 8/30/2018 | 13.69 | 321,419 |
| 8/31/2018 | 13.79 | 242,255 |
| 9/4/2018 | 15.82 | 777,452 |
| 9/5/2018 | 15.85 | 724,676 |
| 9/6/2018 | 15.65 | 401,182 |
| 9/7/2018 | 15.85 | 291,950 |
| 9/10/2018 | 15.65 | 222,072 |
| 9/11/2018 | 15.29 | 308,913 |
| 9/12/2018 | 14.65 | 326,684 |
| 9/13/2018 | 15.31 | 428,611 |
| 9/14/2018 | 15.60 | 334,931 |
| 9/17/2018 | 14.84 | 177,878 |
| 9/18/2018 | 14.89 | 227,940 |
| 9/19/2018 | 14.45 | 153,458 |
| 9/20/2018 | 13.56 | 369,792 |
| 9/21/2018 | 13.81 | 1,436,785 |
| 9/24/2018 | 13.40 | 246,511 |
| 9/25/2018 | 12.57 | 278,702 |
| 9/26/2018 | 13.61 | 390,427 |
| 9/27/2018 | 13.36 | 135,306 |
| 9/28/2018 | 13.86 | 127,742 |
| 10/1/2018 | 13.21 | 210,094 |
| 10/2/2018 | 13.66 | 158,243 |
| 10/3/2018 | 13.90 | 112,217 |
| 10/4/2018 | 13.33 | 78,404 |
| 10/5/2018 | 12.99 | 106,950 |
| 10/8/2018 | 13.21 | 267,470 |
| 10/9/2018 | 13.07 | 103,056 |
| 10/10/2018 | 13.25 | 133,984 |
| 10/11/2018 | 12.62 | 147,360 |

**Exhibit 7b**
**Mesa Air Group, Inc.**
**Closing Price and Trading Volume**
**August 10, 2018 - March 31, 2020[1]**

| Date | Closing Price | Trading Volume |
|------|---------------|----------------|
| (1) | (2) | (3) |
| 10/12/2018 | $ 13.39 | 113,390 |
| 10/15/2018 | 13.65 | 83,128 |
| 10/16/2018 | 14.08 | 94,182 |
| 10/17/2018 | 14.19 | 90,402 |
| 10/18/2018 | 13.60 | 101,312 |
| 10/19/2018 | 13.86 | 97,433 |
| 10/22/2018 | 14.06 | 175,803 |
| 10/23/2018 | 13.65 | 73,731 |
| 10/24/2018 | 13.63 | 78,426 |
| 10/25/2018 | 13.79 | 104,428 |
| 10/26/2018 | 13.47 | 91,746 |
| 10/29/2018 | 12.99 | 79,835 |
| 10/30/2018 | 13.59 | 123,162 |
| 10/31/2018 | 14.45 | 206,617 |
| 11/1/2018 | 14.12 | 99,761 |
| 11/2/2018 | 13.63 | 82,168 |
| 11/5/2018 | 13.90 | 144,443 |
| 11/6/2018 | 13.73 | 50,045 |
| 11/7/2018 | 14.11 | 65,136 |
| 11/8/2018 | 15.12 | 444,450 |
| 11/9/2018 | 14.46 | 148,857 |
| 11/12/2018 | 14.33 | 119,053 |
| 11/13/2018 | 14.55 | 138,429 |
| 11/14/2018 | 14.78 | 125,380 |
| 11/15/2018 | 15.14 | 121,454 |
| 11/16/2018 | 14.56 | 91,240 |
| 11/19/2018 | 13.01 | 565,906 |
| 11/20/2018 | 13.17 | 207,427 |
| 11/21/2018 | 13.65 | 78,203 |
| 11/23/2018 | 13.94 | 33,209 |
| 11/26/2018 | 13.41 | 125,859 |
| 11/27/2018 | 12.83 | 79,393 |
| 11/28/2018 | 12.46 | 153,437 |
| 11/29/2018 | 11.83 | 182,449 |
| 11/30/2018 | 12.08 | 240,281 |
| 12/3/2018 | 12.00 | 321,018 |
| 12/4/2018 | 10.63 | 483,774 |
| 12/6/2018 | 11.69 | 191,476 |
| 12/7/2018 | 11.89 | 151,736 |
| 12/10/2018 | 11.70 | 105,920 |
| 12/11/2018 | 11.51 | 52,092 |
| 12/12/2018 | 11.88 | 227,296 |
| 12/13/2018 | 10.23 | 251,036 |
| 12/14/2018 | 10.10 | 119,943 |

**Exhibit 7b**
**Mesa Air Group, Inc.**
**Closing Price and Trading Volume**
**August 10, 2018 - March 31, 2020[1]**

| Date | Closing Price | Trading Volume |
|------|---------------|----------------|
| (1) | (2) | (3) |
| 12/17/2018 | $   9.95 | 181,038 |
| 12/18/2018 | 9.14 | 467,221 |
| 12/19/2018 | 7.90 | 505,686 |
| 12/20/2018 | 7.32 | 506,910 |
| 12/21/2018 | 6.86 | 370,992 |
| 12/24/2018 | 6.80 | 176,198 |
| 12/26/2018 | 6.75 | 252,145 |
| 12/27/2018 | 6.56 | 262,232 |
| 12/28/2018 | 7.03 | 230,539 |
| 12/31/2018 | 7.71 | 239,408 |
| 1/2/2019 | 7.70 | 260,140 |
| 1/3/2019 | 7.22 | 317,969 |
| 1/4/2019 | 7.33 | 263,243 |
| 1/7/2019 | 7.77 | 299,694 |
| 1/8/2019 | 7.89 | 216,748 |
| 1/9/2019 | 7.93 | 208,470 |
| 1/10/2019 | 7.66 | 213,098 |
| 1/11/2019 | 7.75 | 250,140 |
| 1/14/2019 | 8.05 | 186,616 |
| 1/15/2019 | 8.19 | 142,493 |
| 1/16/2019 | 8.27 | 140,944 |
| 1/17/2019 | 8.55 | 141,921 |
| 1/18/2019 | 8.65 | 144,653 |
| 1/22/2019 | 8.72 | 249,776 |
| 1/23/2019 | 8.42 | 173,538 |
| 1/24/2019 | 8.48 | 185,783 |
| 1/25/2019 | 8.75 | 162,604 |
| 1/28/2019 | 9.04 | 144,144 |
| 1/29/2019 | 8.82 | 153,171 |
| 1/30/2019 | 9.25 | 105,891 |
| 1/31/2019 | 8.75 | 107,848 |
| 2/1/2019 | 8.73 | 208,221 |
| 2/4/2019 | 9.01 | 201,237 |
| 2/5/2019 | 8.58 | 720,034 |
| 2/6/2019 | 8.65 | 421,599 |
| 2/7/2019 | 8.73 | 299,889 |
| 2/8/2019 | 8.80 | 209,785 |
| 2/11/2019 | 8.80 | 184,515 |
| 2/12/2019 | 9.11 | 222,293 |
| 2/13/2019 | 8.96 | 155,093 |
| 2/14/2019 | 9.52 | 404,874 |
| 2/15/2019 | 9.39 | 309,008 |
| 2/19/2019 | 9.68 | 266,887 |
| 2/20/2019 | 9.33 | 179,722 |

**Exhibit 7b**
**Mesa Air Group, Inc.**
**Closing Price and Trading Volume**
**August 10, 2018 - March 31, 2020[1]**

| Date | Closing Price | Trading Volume |
|------|---------------|----------------|
| (1) | (2) | (3) |
| 2/21/2019 | $   9.80 | 268,592 |
| 2/22/2019 | 10.03 | 190,776 |
| 2/25/2019 | 9.71 | 318,812 |
| 2/26/2019 | 10.21 | 337,854 |
| 2/27/2019 | 10.05 | 94,336 |
| 2/28/2019 | 10.07 | 157,478 |
| 3/1/2019 | 9.85 | 162,315 |
| 3/4/2019 | 9.72 | 243,888 |
| 3/5/2019 | 9.53 | 155,909 |
| 3/6/2019 | 9.41 | 362,021 |
| 3/7/2019 | 9.59 | 206,947 |
| 3/8/2019 | 9.62 | 200,977 |
| 3/11/2019 | 9.41 | 174,150 |
| 3/12/2019 | 9.34 | 209,199 |
| 3/13/2019 | 9.46 | 255,146 |
| 3/14/2019 | 9.52 | 188,241 |
| 3/15/2019 | 9.41 | 353,352 |
| 3/18/2019 | 9.34 | 183,166 |
| 3/19/2019 | 9.36 | 189,045 |
| 3/20/2019 | 9.16 | 125,865 |
| 3/21/2019 | 8.74 | 280,617 |
| 3/22/2019 | 8.50 | 298,249 |
| 3/25/2019 | 8.28 | 178,811 |
| 3/26/2019 | 8.13 | 225,755 |
| 3/27/2019 | 8.39 | 202,931 |
| 3/28/2019 | 8.40 | 165,996 |
| 3/29/2019 | 8.34 | 176,464 |
| 4/1/2019 | 8.64 | 141,860 |
| 4/2/2019 | 8.59 | 90,054 |
| 4/3/2019 | 8.71 | 76,861 |
| 4/4/2019 | 8.57 | 101,183 |
| 4/5/2019 | 8.40 | 120,971 |
| 4/8/2019 | 8.27 | 226,318 |
| 4/9/2019 | 8.16 | 99,566 |
| 4/10/2019 | 8.34 | 153,941 |
| 4/11/2019 | 8.46 | 127,051 |
| 4/12/2019 | 8.48 | 238,459 |
| 4/15/2019 | 8.10 | 93,915 |
| 4/16/2019 | 8.05 | 86,016 |
| 4/17/2019 | 8.28 | 88,272 |
| 4/18/2019 | 8.47 | 116,027 |
| 4/22/2019 | 8.62 | 114,635 |
| 4/23/2019 | 8.67 | 135,742 |
| 4/24/2019 | 8.79 | 121,774 |

**Exhibit 7b**
**Mesa Air Group, Inc.**
**Closing Price and Trading Volume**
**August 10, 2018 - March 31, 2020[1]**

| Date | Closing Price | Trading Volume |
|------|---------------|----------------|
| (1) | (2) | (3) |
| 4/25/2019 | $  8.73 | 74,544 |
| 4/26/2019 | 8.75 | 108,645 |
| 4/29/2019 | 9.10 | 89,935 |
| 4/30/2019 | 9.14 | 135,421 |
| 5/1/2019 | 9.03 | 96,002 |
| 5/2/2019 | 9.14 | 95,661 |
| 5/3/2019 | 9.29 | 98,645 |
| 5/6/2019 | 9.30 | 79,044 |
| 5/7/2019 | 9.16 | 119,742 |
| 5/8/2019 | 9.17 | 111,922 |
| 5/9/2019 | 9.34 | 402,904 |
| 5/10/2019 | 9.20 | 828,507 |
| 5/13/2019 | 8.81 | 254,194 |
| 5/14/2019 | 8.97 | 177,962 |
| 5/15/2019 | 9.02 | 105,788 |
| 5/16/2019 | 8.90 | 106,831 |
| 5/17/2019 | 8.85 | 88,785 |
| 5/20/2019 | 8.82 | 74,168 |
| 5/21/2019 | 9.00 | 125,816 |
| 5/22/2019 | 8.88 | 131,038 |
| 5/23/2019 | 8.96 | 129,758 |
| 5/24/2019 | 9.08 | 150,418 |
| 5/28/2019 | 9.10 | 141,071 |
| 5/29/2019 | 9.11 | 186,688 |
| 5/30/2019 | 9.26 | 196,613 |
| 5/31/2019 | 9.12 | 213,813 |
| 6/3/2019 | 9.00 | 202,891 |
| 6/4/2019 | 8.87 | 165,261 |
| 6/5/2019 | 9.30 | 947,920 |
| 6/6/2019 | 9.54 | 347,724 |
| 6/7/2019 | 10.15 | 531,942 |
| 6/10/2019 | 10.45 | 320,072 |
| 6/11/2019 | 10.32 | 270,696 |
| 6/12/2019 | 10.36 | 286,286 |
| 6/13/2019 | 10.62 | 343,842 |
| 6/14/2019 | 10.85 | 642,395 |
| 6/17/2019 | 10.60 | 296,746 |
| 6/18/2019 | 10.59 | 264,674 |
| 6/19/2019 | 10.67 | 322,929 |
| 6/20/2019 | 10.87 | 247,294 |
| 6/21/2019 | 10.66 | 315,036 |
| 6/24/2019 | 10.14 | 199,944 |
| 6/25/2019 | 9.60 | 337,790 |
| 6/26/2019 | 9.33 | 467,614 |

**Exhibit 7b**
**Mesa Air Group, Inc.**
**Closing Price and Trading Volume**
**August 10, 2018 - March 31, 2020[1]**

| Date | Closing Price | Trading Volume |
|------|---------------|----------------|
| (1) | (2) | (3) |
| 6/27/2019 | $  9.19 | 328,151 |
| 6/28/2019 | 9.14 | 1,477,930 |
| 7/1/2019 | 9.52 | 444,598 |
| 7/2/2019 | 9.38 | 180,008 |
| 7/3/2019 | 9.47 | 87,157 |
| 7/5/2019 | 9.64 | 170,515 |
| 7/8/2019 | 9.53 | 230,306 |
| 7/9/2019 | 9.47 | 172,770 |
| 7/10/2019 | 9.53 | 199,237 |
| 7/11/2019 | 9.41 | 111,765 |
| 7/12/2019 | 9.88 | 311,513 |
| 7/15/2019 | 9.89 | 296,055 |
| 7/16/2019 | 10.16 | 302,962 |
| 7/17/2019 | 10.14 | 246,801 |
| 7/18/2019 | 10.23 | 157,877 |
| 7/19/2019 | 10.09 | 268,728 |
| 7/22/2019 | 10.14 | 265,180 |
| 7/23/2019 | 10.45 | 252,086 |
| 7/24/2019 | 10.77 | 331,571 |
| 7/25/2019 | 10.36 | 203,902 |
| 7/26/2019 | 10.14 | 193,124 |
| 7/29/2019 | 10.12 | 262,272 |
| 7/30/2019 | 10.32 | 257,920 |
| 7/31/2019 | 10.24 | 310,788 |
| 8/1/2019 | 9.81 | 177,577 |
| 8/2/2019 | 9.46 | 253,877 |
| 8/5/2019 | 9.13 | 267,574 |
| 8/6/2019 | 9.35 | 193,488 |
| 8/7/2019 | 9.60 | 170,277 |
| 8/8/2019 | 9.77 | 180,426 |
| 8/9/2019 | 6.62 | 3,117,672 |
| 8/12/2019 | 5.84 | 748,594 |
| 8/13/2019 | 6.14 | 609,036 |
| 8/14/2019 | 6.19 | 637,810 |
| 8/15/2019 | 5.83 | 369,569 |
| 8/16/2019 | 6.14 | 416,720 |
| 8/19/2019 | 6.48 | 377,501 |
| 8/20/2019 | 6.26 | 410,723 |
| 8/21/2019 | 6.25 | 251,581 |
| 8/22/2019 | 6.06 | 182,154 |
| 8/23/2019 | 6.01 | 379,043 |
| 8/26/2019 | 6.46 | 428,209 |
| 8/27/2019 | 6.33 | 445,697 |
| 8/28/2019 | 6.39 | 289,223 |

**Exhibit 7b**
**Mesa Air Group, Inc.**
**Closing Price and Trading Volume**
**August 10, 2018 - March 31, 2020[1]**

| Date | Closing Price | Trading Volume |
|---|---|---|
| (1) | (2) | (3) |
| 8/29/2019 | $    6.72 | 466,067 |
| 8/30/2019 | 6.46 | 1,077,084 |
| 9/3/2019 | 6.46 | 345,292 |
| 9/4/2019 | 6.56 | 294,148 |
| 9/5/2019 | 6.65 | 648,508 |
| 9/6/2019 | 6.49 | 418,668 |
| 9/9/2019 | 7.01 | 349,931 |
| 9/10/2019 | 7.27 | 406,679 |
| 9/11/2019 | 7.52 | 276,838 |
| 9/12/2019 | 7.53 | 315,269 |
| 9/13/2019 | 7.79 | 394,102 |
| 9/16/2019 | 7.55 | 216,271 |
| 9/17/2019 | 7.41 | 263,142 |
| 9/18/2019 | 7.29 | 187,046 |
| 9/19/2019 | 7.24 | 194,854 |
| 9/20/2019 | 7.47 | 399,965 |
| 9/23/2019 | 7.41 | 196,477 |
| 9/24/2019 | 7.17 | 262,892 |
| 9/25/2019 | 7.26 | 137,767 |
| 9/26/2019 | 6.88 | 190,773 |
| 9/27/2019 | 6.81 | 195,396 |
| 9/30/2019 | 6.75 | 272,560 |
| 10/1/2019 | 6.49 | 224,929 |
| 10/2/2019 | 6.31 | 356,355 |
| 10/3/2019 | 6.25 | 355,270 |
| 10/4/2019 | 6.35 | 245,397 |
| 10/7/2019 | 6.50 | 117,910 |
| 10/8/2019 | 6.50 | 176,793 |
| 10/9/2019 | 6.38 | 147,224 |
| 10/10/2019 | 6.34 | 139,298 |
| 10/11/2019 | 6.43 | 168,285 |
| 10/14/2019 | 7.03 | 224,071 |
| 10/15/2019 | 7.41 | 660,554 |
| 10/16/2019 | 7.23 | 338,333 |
| 10/17/2019 | 7.27 | 101,402 |
| 10/18/2019 | 7.05 | 124,985 |
| 10/21/2019 | 7.33 | 321,931 |
| 10/22/2019 | 7.71 | 419,300 |
| 10/23/2019 | 7.46 | 235,817 |
| 10/24/2019 | 7.46 | 366,688 |
| 10/25/2019 | 7.68 | 280,091 |
| 10/28/2019 | 7.74 | 193,673 |
| 10/29/2019 | 7.75 | 256,363 |
| 10/30/2019 | 7.77 | 151,162 |

**Exhibit 7b**
**Mesa Air Group, Inc.**
**Closing Price and Trading Volume**
**August 10, 2018 - March 31, 2020[1]**

| Date | Closing Price | Trading Volume |
|------|---------------|----------------|
| (1) | (2) | (3) |
| 10/31/2019 | $  7.62 | 150,398 |
| 11/1/2019 | 7.64 | 141,813 |
| 11/4/2019 | 7.55 | 275,128 |
| 11/5/2019 | 7.33 | 266,237 |
| 11/6/2019 | 7.35 | 228,954 |
| 11/7/2019 | 7.60 | 185,104 |
| 11/8/2019 | 7.43 | 222,045 |
| 11/11/2019 | 7.30 | 226,174 |
| 11/12/2019 | 7.11 | 110,720 |
| 11/13/2019 | 7.02 | 131,230 |
| 11/14/2019 | 7.06 | 126,358 |
| 11/15/2019 | 7.19 | 150,927 |
| 11/18/2019 | 7.10 | 189,760 |
| 11/19/2019 | 7.09 | 201,727 |
| 11/20/2019 | 7.09 | 217,789 |
| 11/21/2019 | 6.97 | 203,914 |
| 11/22/2019 | 7.06 | 182,924 |
| 11/25/2019 | 7.11 | 256,764 |
| 11/26/2019 | 7.16 | 171,885 |
| 11/27/2019 | 7.15 | 188,817 |
| 11/29/2019 | 7.27 | 116,528 |
| 12/2/2019 | 7.00 | 268,871 |
| 12/3/2019 | 8.09 | 1,524,954 |
| 12/4/2019 | 8.43 | 766,979 |
| 12/5/2019 | 8.73 | 501,064 |
| 12/6/2019 | 8.89 | 483,046 |
| 12/9/2019 | 9.11 | 603,981 |
| 12/10/2019 | 9.07 | 509,675 |
| 12/11/2019 | 9.26 | 682,508 |
| 12/12/2019 | 8.83 | 1,556,653 |
| 12/13/2019 | 8.86 | 488,988 |
| 12/16/2019 | 8.75 | 466,648 |
| 12/17/2019 | 8.81 | 1,285,071 |
| 12/18/2019 | 8.76 | 424,911 |
| 12/19/2019 | 8.98 | 548,305 |
| 12/20/2019 | 8.98 | 725,046 |
| 12/23/2019 | 9.40 | 696,664 |
| 12/24/2019 | 9.52 | 186,345 |
| 12/26/2019 | 9.41 | 216,825 |
| 12/27/2019 | 9.14 | 296,025 |
| 12/30/2019 | 8.95 | 272,258 |
| 12/31/2019 | 8.94 | 241,098 |
| 1/2/2020 | 8.84 | 248,146 |
| 1/3/2020 | 8.69 | 281,513 |

**Exhibit 7b**
**Mesa Air Group, Inc.**
**Closing Price and Trading Volume**
**August 10, 2018 - March 31, 2020[1]**

| Date | Closing Price | Trading Volume |
|------|---------------|----------------|
| (1) | (2) | (3) |
| 1/6/2020 | $ 8.56 | 233,074 |
| 1/7/2020 | 8.58 | 172,431 |
| 1/8/2020 | 8.69 | 276,529 |
| 1/9/2020 | 8.79 | 161,649 |
| 1/10/2020 | 8.64 | 161,550 |
| 1/13/2020 | 8.70 | 217,281 |
| 1/14/2020 | 8.87 | 303,320 |
| 1/15/2020 | 8.96 | 181,431 |
| 1/16/2020 | 9.36 | 247,338 |
| 1/17/2020 | 9.27 | 215,455 |
| 1/21/2020 | 9.07 | 200,857 |
| 1/22/2020 | 9.00 | 138,722 |
| 1/23/2020 | 9.37 | 187,947 |
| 1/24/2020 | 9.21 | 115,403 |
| 1/27/2020 | 8.71 | 356,321 |
| 1/28/2020 | 8.64 | 219,580 |
| 1/29/2020 | 8.60 | 134,340 |
| 1/30/2020 | 8.66 | 155,407 |
| 1/31/2020 | 8.54 | 416,880 |
| 2/3/2020 | 8.29 | 203,251 |
| 2/4/2020 | 8.24 | 203,916 |
| 2/5/2020 | 8.35 | 162,273 |
| 2/6/2020 | 8.25 | 154,311 |
| 2/7/2020 | 7.81 | 284,760 |
| 2/10/2020 | 7.91 | 261,242 |
| 2/11/2020 | 8.46 | 612,688 |
| 2/12/2020 | 8.35 | 172,013 |
| 2/13/2020 | 8.09 | 108,324 |
| 2/14/2020 | 7.94 | 190,837 |
| 2/18/2020 | 7.69 | 190,814 |
| 2/19/2020 | 7.61 | 142,204 |
| 2/20/2020 | 7.77 | 278,099 |
| 2/21/2020 | 7.68 | 293,258 |
| 2/24/2020 | 7.24 | 292,051 |
| 2/25/2020 | 6.70 | 430,813 |
| 2/26/2020 | 6.30 | 237,988 |
| 2/27/2020 | 5.90 | 519,249 |
| 2/28/2020 | 5.77 | 329,448 |
| 3/2/2020 | 5.95 | 399,171 |
| 3/3/2020 | 5.81 | 307,548 |
| 3/4/2020 | 6.06 | 369,225 |
| 3/5/2020 | 5.34 | 606,497 |
| 3/6/2020 | 5.76 | 533,871 |
| 3/9/2020 | 5.19 | 418,762 |

**Exhibit 7b**
**Mesa Air Group, Inc.**
**Closing Price and Trading Volume**
**August 10, 2018 - March 31, 2020[1]**

| Date | Closing Price | Trading Volume |
|------|---------------|----------------|
| (1) | (2) | (3) |
| 3/10/2020 | $  5.43 | 605,015 |
| 3/11/2020 | 4.53 | 379,760 |
| 3/12/2020 | 3.73 | 781,420 |
| 3/13/2020 | 4.72 | 1,491,108 |
| 3/16/2020 | 3.72 | 890,113 |
| 3/17/2020 | 3.40 | 955,284 |
| 3/18/2020 | 2.89 | 793,227 |
| 3/19/2020 | 2.70 | 1,023,780 |
| 3/20/2020 | 3.13 | 1,417,157 |
| 3/23/2020 | 3.02 | 846,937 |
| 3/24/2020 | 3.43 | 853,765 |
| 3/25/2020 | 3.24 | 1,692,121 |
| 3/26/2020 | 4.09 | 1,269,951 |
| 3/27/2020 | 3.94 | 831,950 |
| 3/30/2020 | 3.11 | 1,419,396 |
| 3/31/2020 | 3.29 | 847,769 |

**Notes and Sources:**

Price and volume data obtained from FactSet Research Systems, Inc.

[1] Mesa's initial public offering took place on August 9, 2018 and the common stock began trading on August 10, 2018.

# EXHIBIT 8

NINA F. LOCKER (*pro hac vice*)
LAURIE B. SMILAN (*pro hac vice*)
DOUGLAS M. MCMANAWAY (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:  (650) 565-5100
Email:  nlocker@wsgr.com

CYNTHIA A. RICKETTS, SBN 012668
cricketts@srclaw.com
ANDREW C. STANLEY, SBN 029789
astanley@srclaw.com
SACKS, RICKETTS & CASE LLP
2800 North Central Avenue, Suite 1910
Phoenix, AZ 85004
Telephone: (602) 385-3370
Facsimile: (602) 385-3371

Attorneys for Defendants
*Mesa Air Group, Inc.,*
*Jonathan G. Ornstein, Michael J. Lotz, Daniel J. Altobello,*
*Ellen N. Artist, Mitchell Gordon, Dana J. Lockhart,*
*G. Grant Lyon, Giacomo Picco, Harvey Schiller, and Don Skiados*

(Additional counsel on signature page)

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| David G. Lowthrorp, Individually and On Behalf of All Other Similarly Situated,<br><br>        Plaintiff,<br><br>      v.<br><br>Mesa Air Group, Inc., *et al.*,<br><br>        Defendants. | CASE NO.:  2:20-cv-00648<br><br>**JOINT PROPOSED CASE MANAGEMENT REPORT** |

Lead Plaintiff, DeKalb County Pension Fund ("DeKalb" or "Lead Plaintiff"), by and through its counsel and Defendants Mesa Air Group, Inc. ("Mesa"), Jonathan G. Ornstein, Michael J. Lotz, Daniel J. Altobello, Ellen N. Artist, Mitchell Gordon, Dana J. Lockhart, G. Grant Lyon, Giacomo Picco, Harvey Schiller, and Don Skiados (collectively, the "Mesa Defendants") and Raymond James & Associates, Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Cowen and Company, LLC; Stifel, Nicolaus & Company, Incorporated; and Imperial Capital, LLC (collectively, the "Underwriter Defendants"), by and through their counsel, hereby submit this Joint Proposed Case Management Plan.

**1.    COUNSEL WHO ATTENDED THE RULE 26(F) MEETING AND ASSISTED IN DEVELOPING THIS JOINT PROPOSED CASE MANAGEMENT REPORT:**

For Lead Plaintiff: Robert Killorin and James Wilson of Faruqi & Faruqi, LLP (Lead Counsel); Gary Urman of Deconcini McDonald Yetwin & Lacey, P.C. (liaison counsel for Lead Plaintiff).

For Defendants: Nina Locker and Laurie B. Smilan of Wilson Sonsini Goodrich & Rosati, P.C. (for the Mesa Defendants); Cynthia A. Ricketts of Ricketts & Case, LLP (local counsel for the Mesa Defendants); Agnès Dunogué and Robert Lewis of Shearman & Sterling LLP (for the Underwriter Defendants); John C. Gray of Lewis Roca Rothgerber Christie LLP (local counsel for the Underwriter Defendants).

**2.    LIST OF ALL PARTIES IN THE CASE, INCLUDING ANY PARENT CORPORATIONS OR ENTITIES:**

      a.      Lead Plaintiff – Dekalb County Pension Fund

      b.      Named Plaintiff – David G. Lowthorp

      c.      Defendant – Mesa Air Group Incorporated

      d.      Defendant – Jonathan G. Ornstein

      e.      Defendant – Michael J. Lotz

      f.      Defendant – Daniel J. Altobello

      g.      Defendant – Ellen N. Artist

h.    Defendant – Mitchell Gordon

i.    Defendant – Dana J. Lockhart

j.    Defendant – G. Grant Lyon

k.    Defendant – Giacomo Picco

l.    Defendant – Harvey Schiller

m.    Defendant – Don Skiados

n.    Defendant – Raymond James & Associates, Inc.

o.    Defendant – Merrill Lynch, Pierce, Fenner & Smith, Incorporated

p.    Defendant – Cowen and Company, LLC

q.    Defendant – Stifel Nicolaus & Company, Incorporated

r.    Defendant – Imperial Capital, LLC

3.    **SHORT STATEMENT OF THE NATURE OF THE CASE, INCLUDING A DESCRIPTION OF EACH CLAIM, DEFENSE, AND AFFIRMATIVE DEFENSE:**

Lead Plaintiff's Statement of the Case:

Lead Plaintiff asserts **claims** under Sections 11, 12(a)(2), and 15 of the Securities Act, and violations of Items 303 and 503 of SEC Regulation S-K on behalf of persons who acquired Mesa Air Group's securities pursuant and/or traceable to Defendant Mesa Air Group's ("Mesa" or the "Company") initial public offering ("IPO") commenced on or around August 9, 2018. Amended Class Action Complaint For Violations Of The Federal Securities Law ("Complaint"), Dkt. 52, ¶ 1. Lead Plaintiff asserts securities claims against Mesa, the Individual Defendants (Complaint ¶¶ 20-31) and the Underwriter Defendants. Complaint ¶¶ 33-37.

Lead Plaintiff's claims are based on its allegations that Mesa's registration statement contained material misstatements and omissions that violate Sections 11, 12(a)(2), and 15 of the Securities Act and Items 303 and 503 of Regulation S-K. The Court found in its Motion to Dismiss Order ("Order") that *two of the three claims were adequately plead (and that Lead Plaintiff also had adequately stated claims under Items 303 and 503 of*

***Regulation S-K, which separately are  sufficient to state a Section 11 claim).[1]*** The only claim that was dismissed by the Court was Lead Plaintiff's claim for a violation of Section 12(a)(2), and the Court noted that any motion to amend must be filed within the deadline set at the upcoming scheduling conference. *See* Order (Dkt. 81) at 21-22 (adding the emphasis).

The Court sustained Lead Plaintiff's claims based on its allegations that the Company's registration statement and prospectus issued for the IPO (Complaint ¶¶ 57-58) contained materially false and misleading statements in violation of Sections 11 and 15 of the Securities Act of 1933, Items 303 (17 C.F.R. § 229.303(b)(2)(ii)) and 503 (17 C.F.R. § 229.503(c))) of SEC Regulation S-K regarding Mesa's Aircraft Maintenance. Complaint ¶¶ 68, 71, 74.); *see also* Order at 19-24 (granting in part and denying in part Defendants' motion to dismiss). Dkt. 81. These materially false or misleading statements include the following:

(1) Low-Cost Operator. We believe that we are among the lowest cost operators of regional jet service in the United States. There are several key elements that contribute to our cost efficiencies: Efficient Fleet Composition. . . . Larger regional aircraft require less fuel and crew resources per passenger carried, and may also have maintenance cost efficiencies. . . . Competitive Procurement of Certain Operating Functions. We have long-term maintenance agreements . . . to provide parts procurement, inventory and engine, airframe and component overhaul services. We expect that our long-term agreements with these and other strategic vendors will provide predictable high-quality and cost effective solutions for most maintenance categories over the next several years. In prior periods, we also invested in long-term engine overhauls on certain aircraft, which we believe will reduce related maintenance obligations in future periods:

---

[1] The Court noted that the Lead Plaintiff did not bring separate claims under Items 303 and 503 in the Complaint, but that allegations which state a claim under Item 303 and 503 sufficiently state a claim under Section 11. Order at 22-23.

(2) Maintain Low-Cost Structure. . . . We intend to continue our disciplined cost control approach through responsible outsourcing of certain operating functions, by flying large regional aircraft with associated lower maintenance costs . . . These efficiencies, coupled with the low average seniority of our pilots, has enabled us to compete aggressively on price in our capacity purchase agreement negotiations: and

(3) As of March 312, 2018, we employed approximately . . . 411 mechanics … Our continued success is partly dependent on our ability to continue to attract and retain qualified personnel. *See* Order at 19-20.

Lead Plaintiff alleges that these statements were false and misleading and that soon after the IPO, Mesa disclosed materially adverse and previously existing but undisclosed conditions, trends, uncertainties, and risks at the Company, including a shortage of qualified mechanics and maintenance personnel to properly and timely service its aircraft. Complaint ¶¶ 6-7, 11; *see also* Order at 19-24. Due to the undisclosed shortage of qualified mechanics and maintenance personnel, adverse conditions, risks, trends, and uncertainties leading to increased maintenance expenses, decreased revenues, and weak earnings, risks which the Company's, Mesa's common stock price plummeted and lost 75% of its value from its Offering price, closing at $3.03 per share on April 1, 2020.

Lead Plaintiff purchased substantial amounts of Mesa stock in the IPO, including a single purchase of 30,047 at the offering price of $12.00 on August 10, 2018, the initial day of the offering. Lead Plaintiff held all but 138 of its shares until March 30, 2020. Under the statutory formula for damages under Section 11, Lead Plaintiff's damages are in the hundreds of thousands of dollars and it is an adequate lead plaintiff. Dkt. 52-1.

Defendants argue that Lead Plaintiff's claims should be dismissed based on an affirmative defense they apparently intend to raise (they have not flied an answer and affirmative defenses as of this submission) that a curative disclosure regarding the false and misleading maintenance issues that was made on May 10, 2019 did not result in a statistically significant stock price decline in the Mesa stock price. Lead Plaintiff and its

damages expert strongly disagree. The stock drop of May 10, 2019 was statistically significant, but that is a question of fact which involves expert testimony. Beyond that, Lead Plaintiff maintains that there were other disclosures that revealed to the market the unexpectedly high costs of Mesa's maintenance program after the IPO. However, based on the incorrect premise that the May 10, 2019 stock drop was the only one that tended to reveal Defendants' false IPO claims, and on the incorrect premise that that stock drop was not "statistically significant" Defendants propose the unheard of (to Lead Plaintiff's knowledge) procedure of receiving one-sided discovery from Lead Plaintiff in order to attempt to show that Lead Plaintiff cannot prove damages at trial. Lead Plaintiff believes that this approach would be grossly prejudicial and ultimately a great waste of judicial resources. In particular, Defendants ask the Court to break from traditional litigation practices and do the following: (i) extend the current discovery stay that was imposed on the Lead Plaintiff under the PSLRA during the pendency of their motion to dismiss, and (ii) allow the Defendants to obtain merits discovery from Lead Plaintiff  that Defendants can use in opposition to Lead Plaintiff's motion for class certification and in support of their negative loss causation affirmative defense that they will raise in their motion for partial summary judgement. Defendants claim this approach is supported by the Court's dismissal of a majority of the Lead Plaintiff 's claims and case law that approve a determination of standing for class certification purposes early in the litigation. This effort by Defendants to obtain discovery on their affirmative defense while precluding the Lead Plaintiff from litigating its claims should be rejected.

Bifurcation of proceedings is not the normal approach to litigating civil cases and a defendant seeking bifurcation has the burden to show that the following factors favor bifurcation: (1) separability of the issues; (2) simplification of discovery and conservation of resources; and (3) no prejudice to the parties. *Reed v. AutoNation, Inc.*, No. CV-16-08916-BRO (AGRx), 2017 WL 6940519, at *7 (C.D. Cal. Apr. 20, 2017). As discussed below, none of these factors favors bifurcation.

First, the Lead Plaintiff has demonstrated that it has standing to bring the Section 11 claims and Defendants' assertion that they seek to "bifurcate" discovery to examine the threshold issue of standing is completely disingenuous. Defendants made no challenge to Lead Plaintiff's standing as to its Section 11 claims in its Motion to Dismiss. The Lead Plaintiff has made a prima facie showing of standing by filing its sworn PSLRA certification with its lead plaintiff motion papers and the amended complaint demonstrating that it purchased its Mesa stock in the IPO, sold a small portion of its investment in June 2019, and then started to sell its position in March 30, 2020, just prior to the filing of the first complaint against Mesa, during the time when the Mesa stock was dramatically declining. Dkt. 52-1. Indeed, Defendants limited their standing arguments to only the Section 12(a) claims in their motion to dismiss.

Second, Defendants seek to bifurcate discovery so that they can develop a record to support the affirmative defense of negative loss causation[2] that they presumably will assert. Should Defendants assert the affirmative defense of negative causation, that will raise numerous issues as to which Lead Plaintiff would be entitled to receive discovery from Defendants, such as the true value of Mesa stock at the time of the IPO.

This Court ruled that as support for the Complaint's allegations that statements concerning Mesa's maintenance issues were false and misleading, the Lead Plaintiff

---

[2] Sections 11 of the Securities Act provide a statutory affirmative defense, which Defendants may assert in their answer that may limit damages to the extent defendants establish that the plaintiff's losses were caused by other factors (15 U.S.C. § 77k(e), 77l(b)). Generally, such affirmative defense cannot be addressed at the motion to dismiss stage and can only be decided after adequate discovery by all parties. *See Levine v. Atricure, Inc.,* 508 F. Supp. 2d 268, 272-73 (S.D.N.Y. 2007) (court noted that "As an affirmative defense, the burden of disproving loss causation falls on defendants, reflecting Congress's 'desire to allocate the risk of uncertainty to the defendants . . . Because an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial . . .On a summary judgment motion or at trial, of course, the plaintiff may come forward with evidence suggesting that the price decline, despite first appearances, did in fact result from the alleged nondisclosure." (citing *Akerman v. Oryx Commc'ns*, 810 F.2d 336, 343 (2d Cir. 1987); *Beecher v. Able*, 435 F. Supp. 397, 407 (S.D.N.Y.1975)).

proffered a portion of an earnings call from May 2019, during which the Defendant Mr. Orenstein acknowledged that the Company had been hamstrung because it needed more pilots, it was hung up on pilot training, maintenance became more difficult in terms of qualified maintenance people.  Order at 21. However, stock price drops that occurred on other dates when the Company reported negative earnings results due to higher maintenance costs would also be attributable to the registration statement's false and misleading maintenance statements even without a *mea culpa* similar to the one made by Mr. Orenstein on May 10, 2019. *See, e.g., In re Enron Corp. Sec. Derivative & ERISA Litig.,* No. CIV A. H013624, 2005 WL 3504860, at \*18 (S.D. Tex. Dec. 22, 2005) ("Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss"). Courts uniformly agree that a corrective disclosure need only reveal some aspect of the fraud and that the market does not always learn of a fraudulent scheme in one complete *mea culpa. See, e.g., U.S. v. Hatfield,* No. 06-CR-0550 JS AKT, 2014 WL 7271616, at \*8 (E.D.N.Y. Dec. 18, 2014).  Importantly, a corrective disclosure may occur even where the defendant continues to deny the existence of a fraud. *In re Elec. Data Sys. Sec. & ERISA Litig.,* 298 F. Supp. 2d 544, 560–61 (E.D. Tex. 2004). Requiring Lead Plaintiff to defend against the Defendants' negative causation affirmative defense based on their incorrect assertion that there was a single corrective disclosure on May 10, 2019 without any benefit of discovery would be highly prejudicial.

Third, Defendants face a heavy burden in raising the affirmative defense of negative causation and should not be permitted to try to meet this burden without also allowing the Lead Plaintiff the discovery needed to rebut it. *See, e.g., Hildes v. Arthur Andersen, LLP,* 734 F.3d 854, 860 (9th Cir. 2013) ("Defendants bear the 'heavy burden' of proving the 'depreciation in value of a plaintiff's stock resulted from factors other than the alleged material misstatement'"). While Defendants argue that their expert will conclusively demonstrate that the May 10, 2019 stock price drop was not statistically

significant, using well-established methodologies, Lead Plaintiff too can state with confidence that it will submit its own expert testimony that the 4.2% stock price drop on May 10, 2019 was statistically significant, also using well-established methodologies. Further, Lead Plaintiff expects that its damages expert will testify that a substantial portion of Lead Plaintiffs losses were due to the fact that Mesa stock was overvalued at the time of the IPO. Courts recognize as a valid damages theory, that an IPO's stated stock price may not reflect the true value of the security.  *See In re Snap Inc. Sec Litig.*, No. 2:17-CV-03679-SVW-AGR, 2018 WL 2972528, at *9 (C.D. Cal. June 7, 2018). This also calls for a fact-intensive analysis of the true value of Mesa stock at the time of the IPO.

Because causation is fact-intensive, it is normally resolved after the parties are allowed to develop a full record later at the summary judgement phase after allowance to develop a full evidentiary record by bother parties. *See Kuhne v. Gossamer Bio, Inc.*, No. 20-CV-649-DMS-DEB, 2021 WL 1529934, at *7 (S.D. Cal. Apr. 19, 2021) (citing *Hildes*, 734 F.3d at 860, and *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1131 (S.D. Cal. 2012) (quoting *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1171 (C.D. Cal. 2008)). Fourth, it is premature to examine the Lead Plaintiff's damages claim.  Defendant's completely speculative statements to the effect that they really hope to win the case do not constitute legitimate grounds to bifurcate discovery.

Defendants' Statement of the Case:

On July 22, 2021, the Court dismissed much of Lead Plaintiff's amended complaint, dismissing the Section 12 claim outright and dismissing the Section 11 and 15 claims related to statements other than a single statement in the Registration Statement concerning Mesa's "ability to *continue* to attract and retain qualified personnel" (the "In-House Maintenance Statement" or "In-House Maintenance Claim"). (Dkt. 81 (the "MTD Order")

at 21-22 (adding the emphasis).[3]   The Court held that, drawing all inferences in Lead Plaintiff's favor, the Complaint plausibly alleged the In-House Maintenance Statement was misleading because of a single purportedly curative disclosure on May 10, 2019 (the "May 10, 2019 Curative Disclosure"), which the Court held could be interpreted as disclosing a shortage of qualified mechanics at the time of the IPO.  *Id.*  Lead Plaintiff alleges—and the Court noted in its Order—that the May 10, 2019 Curative Disclosure is the *only* curative information regarding the In-House Maintenance Claim.[4]  (Dkt. 52 at ¶¶ 97-99; Dkt. 81 at 21).

Defendants deny and will ultimately show that the In-House Maintenance Statement was not false or misleading at the time of the IPO, nor shown to be so by the May 10, 2019 Curative Disclosure, as Lead Plaintiff contends. However, even if Lead Plaintiff could demonstrate that the In-House Maintenance Statement was misleading (which it cannot), neither Lead Plaintiff nor any member of the putative class suffered any injury-in-fact attributable to that statement.  That is because (1) Lead Plaintiff's cognizable losses under Sections 11 and 15 are limited to any decline in Mesa's stock price attributable to the May 10, 2019 Curative Disclosure, the *only* allegedly curative disclosure relevant to the In-House Maintenance Statement, and (2) the May 10, 2019 Curative Disclosure did not result in a statistically significant decline in Mesa's stock price, as expert testimony utilizing

[3] The Court dismissed Lead Plaintiff's claims based on  misstatements in the Registration Statement concerning: (i) Mesa's capacity purchase agreement ("CPA") with American Airlines (the "American CPA Claims"); (ii) Mesa's operational performance (the "Operational Performance Claims"); and (iii) Mesa's spare aircrafts (the "Operational Spares Claims") as well as all claims under Section 12 of the Securities Act (collectively,the "Dismissed Claims").  *See* MTD Order (Dkt. 81) at 13, 16, 19, 24-25.

[4] As the Court specifically identified, the other purported corrective disclosures alleged in the Complaint related to Dismissed Claims and not to the remaining In-House Maintenance Claim. The alleged corrective disclosures in January, February, August and December 2019, related to the now-dismissed American CPA, Operational Performance and/or Operational Spares Claims. (Dkt. 52 at ¶¶ 75, 78, 85, 105-111; Dkt. 81 at 12-13, 15-18.),

well-established methodologies will conclusively demonstrate. *In re Barclays Bank PLC Sec. Litig.*, 2017 U.S. Dist. LEXIS 148695, *75-76 (S.D.N.Y. Sept. 13, 2017) (granting summary judgment on Section 11 claims where experts established the lack of a statistically significant price reaction), *aff'd* 756 F. App'x 41, 47-50 (2d Cir. 2018).

The lack of any cognizable loss is fatal to Lead Plaintiff's proposed motion for class certification and its further prosecution of this case.[5] As the Supreme Court very recently confirmed, a class action plaintiff must demonstrate injury-in-fact in order to establish its standing under Article III of the U.S. Constitution and, thus, the court's continuing jurisdiction, threshold matters which must be assessed in determining whether a class properly may be certified and whether a case may proceed. *See TransUnion LLC v. Ramirez*, No. 20-297, ___ U.S. ___, 2021 WL 2599472, (June 25, 2021) (Kavanaugh, J.) (remanding to the Ninth Circuit *after judgment* suggesting that the Court of Appeals "consider in the first instance whether class certification is appropriate in light of our conclusion about standing."). When the issue of standing (i.e., injury in fact) is presented – either by means of a dispositive motion or at class certification -- the Court must "consider Plaintiffs' standing to pursue their proposed class-wide . . . relief *before anything else*." *Nguyen*, 2015 U.S. Dist. LEXIS 109125 at *12 (emphasis added) (denying class certification) (citing *Bates v. UPS*, 511 F.3d 974, 985 (9th Cir. 2007) (because "[s]tanding is a threshold matter central to subject matter jurisdiction," courts "must assure that the constitutional standing requirements are satisfied *before proceeding to the merits*.")).

Defendants submit that in order for these threshold issues to be considered "*before anything else,*" the Court should order motions for partial summary judgment on the issue of standing, in tandem with motions for class certification, to be briefed and decided at the outset of the case. *See* Defendants' Proposed Schedule below. Plaintiff's retort that

---

[5] "On a motion for class certification," a plaintiff "must show standing through evidentiary proof." *Nguyen v. Medora Holdings, LLC*, 2015 U.S. Dist. LEXIS 109125, *20 (N.D. Cal. Aug. 18. 2015).

these issues were not raised at the motion to dismiss stage is specious.  Plaintiff itself acknowledges that,  in Section 11 cases, negative loss causation is an affirmative defense not generally capable of resolution on a motion to dismiss because loss causation typically involves expert testimony and reports.  By contrast, such expert evidence is not only appropriate but, indeed, is almost universally required at class certification and also appropriately considered at summary judgment.

Plaintiff's cited cases concerning "negative causation" are not to the contrary.  All merely make the observation that in a Section 11 case, causation is not usually appropriately resolved *on a motion to dismiss*.   Moreover, the "factual" discovery to which those decisions refer as being relevant to causation is evidence about what information was known to the market and affected the stock price *after* the offering, i.e., publicly available market information analyzed by experts.  Those cases do not refer to factual merits discovery – for example, about what was or was not known within the Company at the time of the offering about the statements at issue – as being necessary to resolve the question of what effect the statements at issue, and other factors, had or did not have on the stock price. *See, e.g., Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 273-74 (S.D.N.Y.  2007)(discussing possible "leakage" of curative information into the market post-IPO) (cited in *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1171 (C.D. Cal. 2008)).

Plaintiff's repeated assertion that merits discovery is required to assess whether Plaintiff can meet its burden at class certification of demonstrating injury-in-fact or if Plaintiff can rebut Defendants' showing of negative loss causation on summary judgment is wholly unsupported.   Plaintiff does not provide a single example of what sort of "merits" discovery is required.  Instead, as in every securities case the expert testimony and reports will focus solely on whether (1) the stock price movements were statistically significant and (2) whether they are attributable to the challenged statement and related curative disclosure.   All of that expert evidence relies *solely* on publicly-available market

JOINT PROPOSED CASE MANAGEMENT REPORT                    -12-

information concerning Mesa's stock's performance relevant to its inherent fluctuations, general market movements, particularly for similar industry issuers, and commentary by market specialists. *See, e.g., Barclays*, 2017 U.S. Dist. LEXIS 148695, *75-76 (S.D.N.Y. Sept. 13, 2017) (granting summary judgment on Section 11 claims where experts established the lack of a statistically significant price reaction), *aff'd* 756 F. App'x 41, 47-50 (same). If Plaintiff can persuasively demonstrate that there is specific "merits" discovery that is required, it can file a Rule 56(f) motion in opposing Defendants' motion for partial summary judgment and/or seek such discovery as part of the class certification discovery Defendants propose to prioritize.

Plaintiff's vague reference that fact discovery is needed to assess whether Mesa's stock was "overvalued" at the time of the IPO is irrelevant to determining damages and, thus, negative loss causation. Plaintiff's misinterpretation of *Snap* does not alter the conclusion that no merits discovery is required to resolve Plaintiff's standing in this case. Consistent with the language of the statute, *Snap* notes that damages are limited to the difference between the *price* of the stock at the time of the IPO and the *value* of the stock when the shares were sold or suit was filed. *In re Snap Inc. Sec. Litig.*, No. 217CV03679SVWAGR, 2018 WL 2972528, at *9 (C.D. Cal. June 7, 2018) (citing 15 U.S.C. §77k(e)(3). Thus, any proffered testimony by Plaintiff's expert as whether Mesa's stock was "overvalued" at the time of the IPO is irrelevant to determining damages and thus negative loss causation.

At a minimum, an early resolution of whether and to what extent a class may be certified, as required by Rule 23, will assure that any class, if one can be certified at all, (and any subsequent merits discovery) is properly limited and defined in light of the Court's dismissal of Lead Plaintiff's claims concerning challenged statements and alleged curative disclosures other than those related to the In-House Maintenance Claims. *See nns.* 3-4, *supra. See, e.g., In re Merix Corp. Secs. Litig.*, 2009 U.S. Dist. LEXIS 149236, *17 (D. Or. Nov. 5, 2009) (eliminating shareholders who sold their shares before the date of

the first alleged corrective disclosure from the putative class). Defendants believe that discovery should also be prioritized to address the threshold issues of standing critical to the determination of class certification. Because "[d]iscovery relevant only to the merits delays the certification decision and may ultimately be unnecessary," "[c]ourts often bifurcate discovery between certification issues and those related to the merits of the allegations." Federal Judicial Center, Manual for Complex Litigation, Fourth, § 21.14 Precertification Discovery 256 (2004)).[6]   Accordingly, Defendants submit that prioritization of class and expert damages discovery  prior to merits discovery, and early resolution of threshold issues of standing and jurisdiction, serves the interests of judicial economy, the dictates of Rule 23, and the requirements of Article III.

**4.    THE PRINCIPAL FACTUAL AND LEGAL DISPUTES IN THIS CASE:**

The parties expect that the following legal and factual issues[7] will be the subject of discovery in this litigation and will be addressed in this case:

a.    Whether any of the Defendants violated § 11 of the Securities Act;

---

[6]*See, e.g., Young v. Mophie_ Inc._*2020 U.S. Dist. LEXIS 38658 at *8-9 (C.D. Cal. 2020)(noting that "[p]hased discovery [related to standing] may prevent the parties from engaging in broad and possibly wasteful efforts.")); *In re Tokai Pharmaceuticals, Inc. Sec. Litig.*, No. 1684CV03725-BLS2 slip op. (Mass. Superior Court Feb. 6 2019)(phasing class certification discovery re Securities Act claims); *In re OvaScience, Inc. Stockholder Litig.*, 34 Mass. L. Rep. 587 (2017)(same; standing issues); *Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*, No. 15 C 3187, ECF No. 96 slip op. (N.D. Ill. Apr. 28, 2017)(Securities Exchange Act claims); *In re Northfield Labs. Inc. Sec. Litig.*, 264 F.R.D. 407, 409 (N.D. Ill. 2009)(same); *Smith v. Dominion Bridge Corp.*, 2007 WL 1101272 at *4 (E.D. Pa. Apr. 11, 2007)(same; noting prior bifurcation of class and merits discovery); *In re Sonus Networks, Inc.*, 229 F.R.D. 339, 341 (D. Mass. 2005)(same*;* phasing discovery where there were "meaningful issues concerning the propriety of class certification"); *In re Stone Energy Corp. Sec. Litig.*, No. 6:05-cv-02088-TLM-PJH slip op.(W.D. Louisiana March 14, 2008)(same).

[7] The Parties' statements of issues reflect their current assessment of the primary issues to be litigated and are not intended to be an exhaustive list of issues, defenses or arguments that may be asserted or arise.

JOINT PROPOSED CASE MANAGEMENT REPORT                    -14-

b.    Whether any of the Individual Defendants violated § 15 of the Securities Act;

c.    Whether any of the alleged statements at issue omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.    Whether any of the statements alleged to be false and/or misleading were material;

e.    Whether the alleged false and misleading statements caused damages;

f.    The extent of alleged damages allegedly sustained by class members and the appropriate measure of such alleged damages;

g.    The extent to which any alleged damages are reduced or eliminated due to "negative causation" within the meaning of § 11;

h.    Whether the Individual Mesa Defendants had, after reasonable investigation, reasonable ground to believe and did believe that the statements in the Registration Statement were true and not misleading;

i.    Whether the Underwriter Defendants had, after reasonable investigation, reasonable ground to believe and did believe that the statements in the Registration Statement were true and not misleading;

j.    Whether a class may be certified in this case pursuant to FED. R. CIV. P. 23;

k.    Whether Plaintiff has standing; and

l.    Whether this Court continues to have Article III subject matter jurisdiction over this action.

5.    **JURISDICTIONAL BASIS FOR THE CASE:**

This action arises under and pursuant to §§ 11 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77o).  The parties agree that Mesa is headquartered in this District and a significant portion of the Mesa Defendants' alleged actions occurred within this District, but Defendants contend that no wrongful actions occurred in this District or elsewhere.

Lead Plaintiff's Position: Lead Plaintiff contends that this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act (15 U.S.C. § 77v). Lead Plaintiff contends that venue is proper in this District pursuant to 28 U.S.C. § 1391 and § 22(a) of the Securities Act (15 U.S.C. § 77v(a)).

Defendants' Position: Defendants contend that the Court lacks continuing jurisdiction because Lead Plaintiff lacks Article III standing to assert the sole claim remaining in the case after the Court's Order on Defendants' Motion to Dismiss. (Dkt. 81). *TransUnion LLC v. Ramirez*, No. 20-297, ___ U.S. ___, 2021 WL 2599472, * ___ (June 25, 2021) (Kavanaugh, J.).

**6.    ANY PARTIES THAT HAVE NOT BEEN SERVED:**

All Defendants through their counsel have accepted service of the summons and complaint in this Action (Dkt. 31).

**7.    STATEMENT WHETHER ANY PARTY EXPECTS TO ADD ADDITIONAL PARTIES TO THE CASE OR OTHERWISE TO AMEND THE PLEADINGS**

At this point, Lead Plaintiff does not expect to add additional parties. The Parties agree that the deadline to amend the pleadings shall be the last day of fact discovery.

**8.    LISTING OF CONTEMPLATED MOTIONS:**

a.    Motion for Class Certification

**Lead Plaintiff's Position Regarding Timing of Class Certification Motion:**

Lead Plaintiff's proposed deadline of December 3, 2012 to file its motion for class certification complies with Rule 23 for a Section 11 case. Defendants improperly seek to move up the briefing schedule for the motion for class certification and permit Defendants to obtain discovery from Lead Plaintiff regarding its standing, while staying Lead Plaintiff's discovery from Defendants until after a decision on the motion for class certification.

Contrary to Defendants' aspirational speculation, Lead Plaintiff expects that the evidence will show that Lead Plaintiff (1) does have standing, (2) did hold Mesa stock purchased in the IPO beyond the time that the first complaint was filed as the stock price plummeted, and (3) the stock drops in this case (which Defendants freely admit occurred) were statically significant.  As counsel for Defendants have recently stated in a publication:

"Section 11 packs quite a punch. Unlike fraud claims under the securities laws which require proof of reckless or intentional misconduct, Section 11 imposes *strict liability* against the issuer for innocent or merely negligent misstatements in a registration statement and permits recovery for any decline below the stock's initial offering price. [2] Individual defendants can escape liability only by proving their good faith—a factual inquiry rarely resolved at the pleading stage."

**https://www.wsgr.com/en/insights/courts-cut-shareholders-slack-on-section-11-claims.html**

It would be grossly unfair to allow Defendants' plan to have bifurcated discovery regarding class certification issues that only allows Defendants' to move forward while discovery for Lead Plaintiff is effectively stayed with Defendants producing no documents to Lead Plaintiff until after a ruling on class certification. Modern class certification calls for a "rigorous analysis", which has resulted in increased amount of discovery before class certification motions are filed. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

Defendants' invocation of the recent Supreme Court case of *TransUnion LLC v. Ramirez*, No. 20-297, ___ U.S. ___, 2021 WL 2599472, *___ (June 25, 2021) (Kavanaugh, J.) is inappropriate. That case provides no guidance as to what would constitute a reasonable schedule in this case. It has always been the case that plaintiffs must have standing to sue. *Transuinion* changes nothing as to the rules concerning standing in Section 11 cases. It merely holds that consumers that did not have harmful information published do not have standing for defamation-type claims under the Fair Credit Reporting Act, and those who's information was published did have standing. Certainly Defendants may be correct that by way of Monday-morning-quarterbacking every case that results in a defense verdict turns out to be a case where the plaintiff lacked standing. That esoteric exercise does not justify Defendants' proposal to attempt to leapfrog to a conclusion on damages while depriving Plaintiff of discovery on the matter.

The measure of damages in class action securities cases are particularly complex fact- based inquiries that uniformly require expert testimony to resolve. The factual support for claims of damages in securities cases involves a tremendous amounts of merits-based discovery. All of that discovery would need to be disentangled and repeated if defendants fail to show on motion for summary judgment that there is no genuine dispute as to any material fact regarding Plaintiff's claims for damages. Defendants' request for bifurcation and one-sided discovery regarding Plaintiff's damages claims should be denied.

**Defendants' Position:**

Defendants contend that Lead Plaintiff's proposed schedule for class certification *after* substantial completion of merits discovery (*infra* pp. __) is inconsistent with Rule 23, which requires courts to address class certification "[a]t an early practicable time." FED. R. CIV. P. 23(c)(1)(A).  Early consideration of class certification is particularly important where, as here, there are serious threshold issues regarding Lead Plaintiff's standing to assert claims based on the sole remaining statement  in this action, either on its own behalf or on behalf of  putative class.

 As discussed in Defendants' Statement of the Case,  *TransUnion* makes plain that a class action plaintiff  must  satisfy its burden of establishing standing by demonstrating injury-in-fact, threshold matters which the court must "consider in the first instance [when deciding] whether class certification is appropriate." *TransUnion'* principles are Constitutional and apply in every class action regardless of the nature of the statutory harm alleged; *see also Bates,* 511 F.3d at 985 (because "[s]tanding is a threshold matter central to [the court's] subject matter jurisdiction . . . [courts] must assure that the constitutional standing requirements are satisfied *before proceeding to the merits*.") (emphasis added). Again, as Plaintiff itself acknowledges, in Section 11 cases loss causation is an affirmative defense not generally capable of resolution on a motion to dismiss because it involves expert testimony and reports.  Such expert evidence is almost

universally required by the courts at class certification and at summary judgment.  Mesa's counsel's article concerning Section 11 cited by Plaintiff above relates to the limited defenses available "at the pleading stage."  Read in full, including with the omitted footnote about causation and damages, the article is in no way inconsistent with Defendants' argument here -- that such issues should be decided at the earliest possible juncture *after* the pleading stage, i.e., at class certification or on a motion for summary judgment. The omitted footnote states: "Defendants can attempt to establish "negative causation" and limit damages where extraneous market or other factors contributed to the decline, but this affirmative defense is not resolvable at early stages of the litigation," i.e., on a motion to dismiss. *See* "Courts Cut Shareholders Slack on Section 11 Claims," https://corpgov.law.harvard.edu/2020/05/17/courts-cut-shareholders-slack-on-section-11-claims/.

The Mesa Defendants also submit that, at a minimum, early resolution of whether and to what extent a class may be certified—as Rule 23 requires—will assure that any class (and any subsequent merits discovery) is properly limited and defined in light of the Court's Order dismissing the majority of Lead Plaintiff's claims.

b.    **Dispositive Motions**

The Parties contemplate that motions for summary judgment will be filed.

**Lead Plaintiff's Position:**

Defendants have not made a sufficient showing that Lead Plaintiff alone should be required to produce discovery to Defendants so that they can make an early merits-based motion for partial summary judgement on the grounds that there was no loss causation in tandem with the motion for class certification. While standing and jurisdiction should be resolved early as discussed in *Bates* and *TransUnion,* those case did not allow for early bifurcated merits based discovery on damages so that defendants in those cases could make an early motion for summary judgment.

The schedule proposed by Lead Plaintiff will allow for the early determination of Lead Plaintiff's standing and whether the Action should proceed as a class action.

**Defendants' Position:**

Defendants note that, as with its proposal for class certification, Lead Plaintiff proposes that dispositive motions await the completion of merits discovery. Defendants believe that the threshold issues of standing and continuing jurisdiction should be addressed through an early Partial Motion for Summary Judgment which can and should be resolved simultaneously with Lead Plaintiff's Motion for Class Certification. Allowing the motions for summary judgment and class certification to proceed in tandem will provide flexibility to the Court in determining how best to decide the threshold issues of standing and jurisdiction which, as noted, must be resolved before proceeding to the merits. *Bates*, 511 F.3d at 985. Although Plaintiff points out that these issues were not resolved at the outset in *TransUnion,* that failure resulted in the Supreme Court reversing the judgment entered almost ten years after the case was filed because of an improvidently certified class.

Contrary to Plaintiff's suggestions, resolution of the threshold issue of standing on each of these motions is not dependent on merits discovery and Defendants are not seeking such discovery in the first phase; rather resolution of these motions requires only class certification-related discovery including an affirmation concerning Lead Plaintiff's transactions and expert reports and testimony of the type typically used in securities cases concerning damages (including whether any decline in Mesa's stock price for which Lead Plaintiff seeks recovery is attributable to the sole remaining challenged statement).

Defendants agree that any motions for summary judgment solely related to the merits should await substantial completion of merits discovery.

c.      Discovery Motions

The Parties also contemplate that discovery motion(s) may be necessary.

**Lead Plaintiff's Position:** Lead Plaintiff's position is that routine discovery motions may be filed pursuant to the Federal Rules of Civil Procedure.

JOINT PROPOSED CASE MANAGEMENT REPORT         -20-

**Defendants' Position:** Defendants submit that the Court has complete discretion to order phasing discovery; however, Defendants are prepared to file an expedited motion to phase and prioritize discovery should the Court prefer briefing on this issue. The Mesa Defendants agree to expedited resolution of any 56(f) motion filed in connection with their proposed motion for partial summary judgment on standing and jurisdiction issues.

**9.    PROSPECT FOR SETTLEMENT AND POTENTIAL METHODS FOR CONDUCTING SETTLEMENT, INCLUDING (A) WHETHER THE CASE IS SUITABLE FOR REFERENCE TO A MAGISTRATE JUDGE FOR SETTLEMENT CONFERENCE AND (B) ANY OTHER REQUEST OF THE COURT FOR ASSISTANCE IN SETTLEMENT EFFORTS:**

The Parties discussed settlement during the Meet and Confer held on August 18, 2021. The Parties believe it is premature to have meaningful settlement negotiations, but do not foreclose the possibility of settlement at a later date.

**10.    WHETHER ANY ASPECT OF THE CASE IS SUITABLE FOR REFERENCE TO A SPECIAL MASTER OR TO A UNITED STATES MAGISTRATE JUDGE:**

The Parties do not object to the appointment of a Magistrate Judge to resolve any potential discovery disputes, should the need arise at a later date.

**11.    THE STATUS OF ANY RELATED CASES PENDING BEFORE THIS OR OTHER COURTS:**

There are no related pending cases in this Court. There is a case pending in Superior Court of the State of Arizona in and for the County of Maricopa captioned, *City of Pittsburgh Comprehensive Municipal Pension Trust Fund, et al. v. Mesa Air Group, Inc., et al.*, Civ. No. CV2020-003927 (filed March 24, 2020) (the "State Action") that asserts the same and/or similar claims and allegations against the same Defendants as those in this Action. On October 6, 2020, the Superior Court issued an order that stayed proceedings in the State Action in light of the pendency of this action until further order of that court.

JOINT PROPOSED CASE MANAGEMENT REPORT                -21-

**12.    DISCUSSION OF ANY ISSUES RELATING TO PRESERVATION, DISCLOSURE OR DISCOVERY OF ELECTRONICALLY STORED INFORMATION ("ESI"), INCLUDING THE PARTIES' PRESERVATION OF ESI AND THE FORM IN WHICH IT WILL BE PRODUCED:**

The Parties are in the process of meeting and conferring regarding an ESI protocol that will cover topics related to ESI, including but not limited to, the format in which the Parties agree to produce ESI.

**13.    A DISCUSSION OF ANY ISSUES RELATING TO CLAIMS OF PRIVILEGE OR WORK PRODUCT:**

The Parties are in the process of meeting and conferring regarding a protective order and ESI protocol, both of which will address privilege issues, which the parties will submit to the Court for approval.

**14.    A DISCUSSION OF NECESSARY DISCOVERY WITHIN THE SCOPE OF RULE 26(B)(1):**

**Plaintiff's Proposal:**

Plaintiff strongly opposes Defendants' contention that discovery should be bifurcated to allow them to conduct discovery from Lead Plaintiff in support of their opposition to the Lead Plaintiff's motion for class certification and partial summary judgment while Lead Plaintiff's discovery is stayed. Such bifurcation of discovery would be highly prejudicial. *See Cardenas v. Resort Sales by Spinnaker, Inc.,* No. 9:20-cv-00376-RMG, 2021 WL 733393 (D.S.C. Feb. 24, 2021); quoting *Ahmed v. HSBC Bank USA, Nat'l Assoc.*, No. ED CV 15-057 FMO SPX, 2018 WL 501413 (C.D. Cal. Jan. 5, 2018); *Obertman v. Electrolux Home Care Products, Inc.*, No. 2:19-cv-02487-KJM-AC, 2020 WL 8834885 (E.D. Cal. June 18, 2020). In light the "rigorous analysis" requirement for class certification (*see Dukes*, 564 U.S. 338), many courts "are reluctant to bifurcate class-related discovery from discovery on the merits." *Chen–Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 299–300 (S.D.N.Y. 2012) (collecting cases). This is because the distinction between class certification and merits discovery is murky at best and

JOINT PROPOSED CASE MANAGEMENT REPORT            -22-

impossible to determine at worst. *See Munoz v. PHH Corp.*, No. 1:08–cv–0759–DAD–BAM, 2016 WL 10077139, at *4 (E.D. Cal. Feb. 11, 2016) ("Courts have repeatedly acknowledged that there is no clear-cut division between discovery that relates to class certification and discovery that relates to the merits."); *In re: Riddell Concussion Reduction Litig.*, Civil No. 13-7585 (JBS/JS), 2016 WL 4119807, at *2 (D.N.J. July 7, 2016) (explaining that the court had previously declined to bifurcate discovery because "more often than not there is no 'bright line' between class certification and merits issues."); *Lakeland Reg'll Med.l Ctr., Inc. v. Astellas US, LLC*, No. 8:10–cv–2008–T–33TGW, 2011 WL 486123, at *2 (M.D. Fla. Feb. 7, 2011).

The Parties discussed discovery within the scope of Rule 26(b)(1), including the following: (a) the extent, nature, scope, and location of discovery anticipated by the parties and why it is proportional to the needs of the case; (b) suggested changes, in any, to the discovery limitations imposed by the Federal Rules of Civil Procedure; and (c) the number of hours permitted for each deposition, unless extended by agreement of the parties. The Parties have agreed to engage in good faith negotiations regarding the extent, nature, scope and location of discovery, including the impact of the Court's Order of July 22, 2021 (Dkt. 81) on the scope of discovery.

Lead Plaintiff does not have any suggested changes to discovery limitations imposed by the Federal Rule of Civil Procedure.  The recommended hour limitation for depositions is seven hours total, and not to exceed two business days.

**Defendants' Proposal:**

Defendants propose a prioritization  of discovery during the pendency of Lead Plaintiff's Motion for Class Certification and Defendants' Motion for Partial Summary Judgment Regarding Standing and Jurisdiction.  While class discovery and written merits discovery may proceed beginning on September 10, 2021, Defendants respectfully submit that the collection, review and production of documents and fact witness testimony on the

merits on both sides should await resolution of Lead Plaintiff's Motion for Class Certification and Defendants' contemporaneous Motion for Partial Summary Judgment.

Because "[d]iscovery relevant only to the merits delays the certification decision and may ultimately be unnecessary," "[c]ourts often bifurcate discovery between certification issues and those related to the merits of the allegations." Federal Judicial Center, Manual for Complex Litigation, Fourth, § 21.14 Precertification Discovery 256 (2004)).[8] Where, as here, "plaintiffs' prospects for obtaining class certification are dim, regardless of the scope of discovery, that is plainly a factor that supports bifurcation [of class and merits discovery]—it would be utterly inefficient and unjust to subject a defendant to months, if not years, of onerous and expensive discovery so that the plaintiffs may continue a quixotic undertaking destined to fail." *Christian v. Generation Mortg. Co.*, 2013 WL 2151681, at *4 (N.D. Ill. May 16, 2013). By contrast, "[p]roceeding with merits discovery, which may well involve the review of millions of documents not directly relevant to the issues of class certification, may delay [resolution of] the class certification issue." *Harris v. comScore, Inc.*, 2012 WL 686709, at *3 (N.D. Ill. Mar. 2, 2012).

Plaintiff's cases denying bifurcation involve class certification determinations in non-securities cases that turn on commonality, typicality, and predominance issues

---

[8] *See, e.g., Young v. Mophie_ Inc._* 2020 U.S. Dist. LEXIS 38658 at *8-9 (C.D. Cal. 2020) (standing issues, noting that "[p]hased discovery [related to standing] may prevent the parties from engaging in broad and possibly wasteful efforts.")); *In re Tokai Pharmaceuticals, Inc. Sec. Litig.*, No. 1684CV03725-BLS2 slip op. (Mass. Superior Court Feb. 6 2019)(phasing class certification discovery re Securities Act claims); *In re OvaScience, Inc. Stockholder Litig.*, 34 Mass. L. Rep. 587 (2017) (same; standing issues); *Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*, No. 15 C 3187, ECF No. 96 slip op. (N.D. Ill. Apr. 28, 2017) (Securities Exchange Act claims); *In re Northfield Labs. Inc. Sec. Litig.*, 264 F.R.D. 407, 409 (N.D. Ill. 2009) (same); *Smith v. Dominion Bridge Corp.*, 2007 WL 1101272 at *4 (E.D. Pa. Apr. 11, 2007) (same; noting prior bifurcation of class and merits discovery); *In re Sonus Networks, Inc.*, 229 F.R.D. 339, 341 (D. Mass. 2005) (same*;* phasing discovery where there were "meaningful issues concerning the propriety of class certification."); *In re Stone Energy Corp. Sec. Litig.*, No. 6:05-cv-02088-TLM-PJH slip op.(W.D. Louisiana March 14, 2008) (same).

relevant to the Rule 23 inquiry which may be solely within the defendants' knowledge, e.g., whether other employees or customers were subjected to the same or similar alleged wrongful conduct.  Here, the putative class all purportedly purchased shares issued in the offering and the question that Defendants seek to have this Court consider as a threshold matter is only whether the decline in Mesa's stock price after the relevant alleged curative disclosure was attributable to any misstatement in the offering documents.  All of the information required for that assessment is in the public domain and all that is required is the analysis of that information by experts utilizing well-established methodologies. Moreover,  one of Plaintiff's own authorities supports bifurcation of merits and class certification discovery.  *See Munoz v. PHH Corp.*, 2016 WL 10077139, at *3-4 (E.D. Cal. 2016) (noting that class and merits discovery was  bifurcated).

At a minimum, "it is axiomatic that defining the class will make it easier to determine the limits of discovery on the merits."  *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 932-33 (N.D. Ill. 2013).   Accordingly, the Mesa Defendants submit that prioritization of class and expert damages discovery prior to  merits discovery serves the interests of judicial economy.

**15.    PROPOSED DEADLINES FOR EACH OF THE FOLLOWING EVENTS:**

a.      *A deadline for amending the pleadings*

The Parties jointly propose the following deadline: **July 15, 2022.**

b.      *A deadline for lodging a proposed Joint Stipulated Protective Order with the Court, if desired*

The Parties jointly propose the following deadline: **October 15, 2021**

c.      *A deadline for completing fact discovery.  This will also be the deadline for pretrial disclosures pursuant to Rule 26(a)(3).  Discovery requests must be served and depositions noticed sufficiently in advance of this date to ensure reasonable completion by the deadline, including time to resolve discovery dispute.  Absent extraordinary circumstances, the Court will not entertain discovery disputes after this deadline*

The Parties have agreed that documents shall be produced on a rolling basis.  The Parties also jointly propose that pretrial disclosures pursuant to Rule 26(a)(3) be completed by February 10, 2023.  The Parties disagree regarding a proposed date for the substantial completion of document discovery.  The Parties' respective positions are set forth below.

**Plaintiff's Proposal re Substantial Completion Date.**    Plaintiff proposes that production of documents responsive to document requests relating to the merits served on or before September 9, 2021 shall be substantially completed by December 31, 2021 and completed by July 15, 2022. Lead Plaintiff's view is that all discovery should proceed and not be bifurcated to allow Defendants to obtain discovery that addresses class certification and certain merits issues.

**Defendants' Proposal re Substantial Completion Date.**  Defendants believe that Plaintiff's proposed "substantial completion" date is unrealistic and not achievable in any circumstances.  Moreover, as discussed above, Defendants propose that while class and written merits discovery may begin on September 10, 2021, production of documents relating to merits discovery should be deferred until 30 days after any ruling granting class certification or denying Defendants' proposed motion for partial summary judgment regarding standing and jurisdiction, and such written discovery and depositions should be substantially completed within 150 days of any such ruling and completed within 210 days of any such ruling(s).  Defendants are not seeking merits discovery during the first "phase," but seek to prioritize only damages-related discovery necessary to establish Plaintiff's standing the propriety of Class Certification, and only seek to defer production of documents and fact witnesses, not all merits discovery during that initial phase.

        d.     *Dates for full and complete expert disclosures and rebuttal expert disclosures, if any, and a date for expert discovery cut-off*

The Parties disagree regarding proposed dates for expert disclosure deadlines.  The Parties' respective positions are set forth below.

JOINT PROPOSED CASE MANAGEMENT REPORT                -26-

**Plaintiff's Proposal:**

Disclosure of damages-related expert reports at the class certification stage is not required for class certification and wholly inappropriate at this stage. Calculation of damages in a Section 11 case is determined by statute in contrast of other types of securities fraud cases. Lead Plaintiff's proposed schedule below therefore is appropriate and reasonable:

- Initial expert reports, if any, from either Party: **August 12, 2022**
- Rebuttal expert reports, if any, from either Party: **September 23, 2022**
- Reply expert reports, if any, from either Party: **October 14, 2022**
- Expert discovery (including expert witness depositions) completed: **November 11, 2022**

**Defendants' Proposal:**

Disclosure of damages-related expert reports should be made simultaneous with the Parties' submission of their respective initial briefs on class certification (Plaintiff) and partial summary judgment regarding standing and jurisdiction (Defendants). Disclosure of rebuttal and reply damages-related expert reports should be made simultaneously with each Party's respective submission of responsive briefing.

Plaintiff bears the burden of proof concerning standing and, when seeking certification of a class, must demonstrate "injury in fact." The Supreme Court has made plain that this requires Plaintiff to put forth "a damages model that bears on the propriety of class certification" and for the court to engage in a "rigorous analysis" of that model, including any issues that may overlap with the merits. *Comcast Corp. v. Behrend,* 569 U.S. 27, 34 (2013). Mere assertion of a statutory formula does not satisfy this "rigorous" standard. For that reason, expert reports concerning damages are de rigeur at the class certification stage in securities class actions.

Disclosure of other initial expert reports should be made 260 days following a ruling granting class certification and denying partial summary judgment; rebuttal expert reports

due 30 days after receipt of the opposing party's initial expert reports; reply expert reports due 30 days after receipt of the opposing party's rebuttal expert report; and, the expert discovery cut-off should be 45 days after receipt of the opposing party's reply expert reports.

      e.    *Case-specific deadlines and dates, such as the deadline to file a motion for class certification, the deadline to file a motion for dismissal or summary judgment based on qualified immunity, a date on which the parties are available for a Markman hearing, if applicable, and a deadline to file dispositive motions*

The Parties' respective positions are set forth below.

**Plaintiff's Proposal re: Class Certification and Dispositive Motions**:

- Lead Plaintiff's Motion for Class Certification: **December 3, 2021**

- Defendants' Opposition to Class Certification: **January 21, 2022**

- Lead Plaintiff's Reply in Further Support of Class Certification: **February 25, 2022**

- Initial Briefs in Support of Dispositive Motions: **November 28, 2022**

- Oppositions to Dispositive Motions: **December 28, 2022**

- Replies in Support of Dispositive Motions: **January 13, 2023**

**Defendants' Proposal re: Class Certification and Dispositive Motions**

- Lead Plaintiff's Motion for Class Certification: **October 11, 2021**

- Defendants' Motion for Partial Summary Judgment: **October 11, 2021**

- Opposition Briefs: **December 13, 2021**

- Reply Briefs: **February 14, 2022**

- Other Dispositive Motions: **After substantial completion of merits discovery**

- Opposition Briefs: **60 days after opposing party's initial briefs**

- Reply Briefs: **30 days after opposing party's opposition briefs**

      f.    *A date by which the parties shall have engaged in good faith settlement talks and a description of settlement communications to date*:

JOINT PROPOSED CASE MANAGEMENT REPORT      -28-

During the meet and confer held on August 18, 2021, the Parties discussed potential settlement of class claims and agreed that they are too early in the litigation to engage in meaningful settlement discussions. The Parties have agreed to revisit the potential for settlement later in the case.

**16.    WHETHER A JURY TRIAL HAS BEEN REQUESTED AND WHETHER REQUEST FOR A JURY TRIAL IS CONTESTED.  IF THE REQUEST IS CONTESTED, SET FORTH THE REASONS WHY TRIAL BY JURY IS IN DISPUTE:**

Lead Plaintiff has requested a jury trial (Dkt. 52 at 47). The request is not contested.

**17.    ESTIMATED LENGTH OF TRIAL AND ANY SUGGESTIONS FOR SHORTENING TRIAL:**

The Parties agree that an estimated length of trial is not determinable at this time. However, the Parties have agreed to revisit during the course of litigation and will supplement as needed.

**18.    ANY OTHER MATTERS THAT WILL AID THE COURT AND PARTIES IN RESOLVING THIS CASE IN A JUST, SPEEDY, AND INEXPENSIVE MANNER AS REQUIRED BY FEDERAL RULE OF CIVIL PROCEDURE 1:**

The Parties do not identify any other matters at this time that will aid the Court and the Parties in resolving the case in just, speedy, and inexpensive manner.  However, the Parties have agreed to revisit during the course of litigation and will supplement as needed.

Dated:  August 30, 2021                    Respectfully submitted,

                                           */s/ Laurie B. Smilan*
                                           Laurie B. Smilan

                                           **WILSON SONSINI GOODRICH & ROSATI**
                                           **Professional Corporation**
                                           Nina F. Locker (*pro hac vice*)
                                           Laurie B. Smilan (*pro hac vice*)
                                           Douglas W. McManaway (*pro hac vice*)
                                           650 Page Mill Rd
                                           Palo Alto, CA 94304

                                           **SACKS, RICKETTS & CASE LLP**
                                           Cynthia A. Ricketts (Arizona Bar No. 012668)
                                           Andrew C. Stanley (Arizona Bar No. 029789)

JOINT PROPOSED CASE MANAGEMENT REPORT                    -29-

2800 N. Central Avenue, Suite 1910
Phoenix, AZ 85004

*Attorneys for Mesa Defendants*


*/s/ Agnès Dunogué*
Agnès Dunogué


**SHEARMAN AND STERLING LLP**
Agnès Dunogué (*pro hac vice*)
Adam S. Hakki (*pro hac vice*)
599 Lexington Avenue
New York, NY 10022-6069

**LEWIS ROCA ROTHGERBER CHRISTIE LLP**
Edwin A. Barkel (Arizona Bar No. 021666)
John C. Gray (Arizona Bar No. 028454)
Michael C. Brown (Arizona Bar No. 030524)
201 East Washington Street, Suite 1200
Phoenix, AZ 85004

*Attorneys for Underwriter Defendants*

*/s/ James M. Wilson, Jr.*
James M. Wilson, Jr.


**FARUQI & FARUQI, LLP**
Lubna Faruqi (*pro hac vice*)
Robert W. Killorin (*pro hac vice*)
James M. Wilson, Jr. (*pro hac vice*)
685 Third Avenue, 26th Floor
New York, NY 10017

*Attorneys for Lead Plaintiff and Lead Counsel for the Class*

*/s/ Gary F. Urman*
Gary F. Urman


**DECONCINI MCDONALD YETWIN & LACY, P.C.**
Gary Frank Urman (Arizona Bar No. 11748)
2525 East Broadway, Suite 500
Tucson, Arizona, 85716

*Attorneys for Lead Plaintiff and Liaison Counsel for the Class*

JOINT PROPOSED CASE MANAGEMENT REPORT          -30-

Case 2:20-cv-00648-MTL    Document 109-1    Filed 01/05/22    Page 301 of 335

# EXHIBIT 9

NINA F. LOCKER (*pro hac vice*)
LAURIE B. SMILAN (*pro hac vice*)
DOUGLAS M. MCMANAWAY (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:   (650) 565-5100
Email:  nlocker@wsgr.com

CYNTHIA A. RICKETTS, SBN 012668
cricketts@srclaw.com
ANDREW C. STANLEY, SBN 029789
astanley@srclaw.com
SACKS, RICKETTS & CASE LLP
2800 North Central Avenue, Suite 1910
Phoenix, AZ 85004
Telephone: (602) 385-3370
Facsimile: (602) 385-3371

Attorneys for Defendants
*Mesa Air Group, Inc.,*
*Jonathan G. Ornstein, Michael J. Lotz, Daniel J. Altobello,*
*Ellen N. Artist, Mitchell Gordon, Dana J. Lockhart,*
*G. Grant Lyon, Giacomo Picco, Harvey Schiller, and Don Skiados*

(Additional counsel on signature page)

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| David G. Lowthrorp, Individually and On Behalf of All Other Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Mesa Air Group, Inc., *et al.*,<br><br>Defendants. | CASE NO.:  2:20-cv-00648<br><br>**SUPPLEMENTAL RULE 26(F) REPORT** |

Lead Plaintiff, DeKalb County Pension Fund ("DeKalb" or "Lead Plaintiff"), by and through its counsel and Defendants Mesa Air Group, Inc. ("Mesa"), Jonathan G. Ornstein, Michael J. Lotz, Daniel J. Altobello, Ellen N. Artist, Mitchell Gordon, Dana J. Lockhart, G. Grant Lyon, Giacomo Picco, Harvey Schiller, and Don Skiados (collectively, the "Individual Defendants" and together with Mesa, the "Mesa Defendants") and Raymond James & Associates, Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Cowen and Company, LLC; Stifel, Nicolaus & Company, Incorporated; and Imperial Capital, LLC (collectively, the "Underwriter Defendants"), by and through their counsel, hereby submit this Joint Proposed Case Management Plan.

**1.    COUNSEL WHO ATTENDED THE RULE 26(F) MEETING AND ASSISTED IN DEVELOPING THIS JOINT PROPOSED CASE MANAGEMENT REPORT:**

For Lead Plaintiff: Robert Killorin and James Wilson of Faruqi & Faruqi, LLP (Lead Counsel); Gary Urman of Deconcini McDonald Yetwin & Lacey, P.C. (liaison counsel for Lead Plaintiff).

For Defendants: Nina Locker and Laurie B. Smilan of Wilson Sonsini Goodrich & Rosati, P.C. (for the Mesa Defendants); Cynthia A. Ricketts of Ricketts & Case, LLP (local counsel for the Mesa Defendants); Agnès Dunogué and Robert Lewis of Shearman & Sterling LLP (for the Underwriter Defendants); John C. Gray of Lewis Roca Rothgerber Christie LLP (local counsel for the Underwriter Defendants).

**2.    LIST OF ALL PARTIES IN THE CASE, INCLUDING ANY PARENT CORPORATIONS OR ENTITIES:**

a.    Lead Plaintiff – DeKalb County Pension Fund

b.    Named Plaintiff – David G. Lowthorp

c.    Defendant – Mesa Air Group Incorporated

d.    Defendant – Jonathan G. Ornstein

e.    Defendant – Michael J. Lotz

f.    Defendant – Daniel J. Altobello

g.    Defendant – Ellen N. Artist

h.    Defendant – Mitchell Gordon

i.    Defendant – Dana J. Lockhart

j.    Defendant – G. Grant Lyon

k.    Defendant – Giacomo Picco

l.    Defendant – Harvey Schiller

m.    Defendant – Don Skiados

n.    Defendant – Raymond James & Associates, Inc.

o.    Defendant – Merrill Lynch, Pierce, Fenner & Smith, Incorporated

p.    Defendant – Cowen and Company, LLC

q.    Defendant – Stifel Nicolaus & Company, Incorporated

r.    Defendant – Imperial Capital, LLC

3.    **SHORT STATEMENT OF THE NATURE OF THE CASE, INCLUDING A DESCRIPTION OF EACH CLAIM, DEFENSE, AND AFFIRMATIVE DEFENSE:**

Lead Plaintiff's Statement of the Case:

Lead Plaintiff asserts **claims** under Sections 11, 12(a)(2), and 15 of the Securities Act, and violations of Items 303 and 503 of SEC Regulation S-K on behalf of persons who acquired Mesa Air Group's securities pursuant and/or traceable to Defendant Mesa Air Group's ("Mesa" or the "Company") initial public offering ("IPO") commenced on or around August 9, 2018. Amended Class Action Complaint For Violations Of The Federal Securities Law ("Complaint"), Doc. 52, ¶ 1. Lead Plaintiff asserts securities claims against Mesa, the Individual Defendants (Complaint ¶¶ 20-31) and the Underwriter Defendants. Complaint ¶¶ 33-37.

Lead Plaintiff's claims are based on its allegations that Mesa's registration statement contained material misstatements and omissions that violate Sections 11, 12(a)(2), and 15 of the Securities Act and Items 303 and 503 of Regulation S-K. The Court found in its Motion to Dismiss Order ("Order") that ***two of the three claims were adequately pleaded (and that Lead Plaintiff also had adequately stated claims under Items 303 and 503 of Regulation S-K, which separately are sufficient to state a Section 11 claim).***[1] The only claim that was dismissed by the Court was Lead Plaintiff's claim for a violation of Section 12(a)(2), and the Court noted that any motion to amend must be filed within the deadline set at the upcoming scheduling conference. *See* Order 21-22 (emphasis added). Doc. 81.

The Court sustained Lead Plaintiff's claims based on its allegations that the Company's registration statement and prospectus issued for the IPO (Complaint ¶¶ 57-58) contained materially false and misleading statements in violation of Sections 11 and 15 of the Securities Act of 1933, Items 303 (17 C.F.R. § 229.303(b)(2)(ii)) and 503 (17 C.F.R. § 229.503(c))) of SEC Regulation S-K regarding Mesa's Aircraft Maintenance. Complaint ¶¶ 68, 71, 74.); *see also* Order 19-24 (granting in part and denying in part Defendants' motion to dismiss). Doc. 81. These materially false or misleading statements include the following:

(1) Low-Cost Operator. We believe that we are among the lowest cost operators of regional jet service in the United States. There are several key elements that contribute to our cost efficiencies: Efficient Fleet Composition. . . . Larger regional aircraft require less fuel and crew resources per passenger carried, and may

---

[1] The Court noted that the Lead Plaintiff did not bring separate claims under Items 303 and 503 in the Complaint, but that allegations which state a claim under Item 303 and 503 sufficiently state a claim under Section 11. Order 22-23.

also have maintenance cost efficiencies. . . . Competitive Procurement of Certain Operating Functions. We have long-term maintenance agreements . . . to provide parts procurement, inventory and engine, airframe and component overhaul services. We expect that our long-term agreements with these and other strategic vendors will provide predictable high-quality and cost effective solutions for most maintenance categories over the next several years. In prior periods, we also invested in long-term engine overhauls on certain aircraft, which we believe will reduce related maintenance obligations in future periods:

(2) Maintain Low-Cost Structure. . . . We intend to continue our disciplined cost control approach through responsible outsourcing of certain operating functions, by flying large regional aircraft with associated lower maintenance costs . . . These efficiencies, coupled with the low average seniority of our pilots, has enabled us to compete aggressively on price in our capacity purchase agreement negotiations: and

(3) As of March 312, 2018, we employed approximately . . . 411 mechanics … Our continued success is partly dependent on our ability to continue to attract and retain qualified personnel. *See* Order 19-20.

There are no reasonable grounds to dispute that the scope of discovery should include documents and testimony that are relevant to Lead Plaintiff's claim that these three statements were false. Lead Plaintiff disagrees that there is a legitimate reason for disputes regarding the scope of discovery in this case.

Lead Plaintiff alleges that these statements were false and misleading and that soon after the IPO, Mesa disclosed materially adverse and previously existing but undisclosed conditions, trends, uncertainties, and risks at the Company, including a shortage of qualified mechanics and maintenance personnel to properly and timely service its aircraft. Complaint ¶¶ 6-7, 11; *see also* Order 19-24. Due to

the undisclosed shortage of qualified mechanics and maintenance personnel, adverse conditions, risks, trends, and uncertainties leading to increased maintenance expenses, decreased revenues, and weak earnings, risks which the Company's common stock price plummeted and lost 75% of its value from its Offering price, closing at $3.03 per share on April 1, 2020.

Lead Plaintiff purchased substantial amounts of Mesa stock in the IPO, including a single purchase of 30,047 at the offering price of $12.00 on August 10, 2018, the initial day of the offering. Lead Plaintiff held all but 138 of its shares until March 30, 2020.  Under the statutory formula for damages under Section 11, Lead Plaintiff's damages are in the hundreds of thousands of dollars and it is an adequate lead plaintiff. Doc. 52-1.

In its Order on Defendants' Motion to Dismiss, this Court ruled that as support for the Complaint's allegations that statements concerning Mesa's maintenance issues were false and misleading, the Lead Plaintiff proffered a portion of an earnings call from May 2019, during which Defendant Jonathan G. Orenstein ("Orenstein") acknowledged that the Company had been hamstrung because it needed more pilots, it was hung up on pilot training, and maintenance became more difficult in terms of qualified maintenance people.  Order 21. However, stock price drops that occurred on other dates when the Company reported negative earnings results due to higher maintenance costs would also be attributable to the registration statement's false and misleading maintenance statements even without a *mea culpa* similar to the one made by Orenstein on May 10, 2019. *See, e.g., In re Enron Corp. Sec. Derivative & ERISA Litig.*, No. CIV A. H013624, 2005 WL 3504860, at *18 (S.D. Tex. Dec. 22, 2005) ("Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event

that causes the loss"). Courts uniformly agree that a corrective disclosure need only reveal some aspect of the fraud and that the market does not always learn of a fraudulent scheme in one complete *mea culpa. See, e.g., United States v. Hatfield*, No. 06-CR-0550 JS AKT, 2014 WL 7271616, at *8 (E.D.N.Y. Dec. 18, 2014). Importantly, a corrective disclosure may occur even where the defendant continues to deny the existence of a fraud. *In re Elec. Data Sys. Sec. & ERISA Litig.*, 298 F. Supp. 2d 544, 560–61 (E.D. Tex. 2004).

Lead Plaintiff strongly disagrees with Defendants' contention that "this case has been limited to the alleged omission concerning the adequacy of Mesa's in-house mechanics."

This Court clearly and plainly addressed three statements regarding "Aircraft Maintenance" from the Registration Statement that Lead Plaintiff alleges were false and misleading. *See* Order 19 ("As to aircraft maintenance, the Amended Complaint alleges that **three** statements are materially false and misleading:") (emphasis added). The specific three statements are identified above. The Court then discusses Defendants' arguments that these **statements** are non-actionable opinions and immunized from liability under the bespeaks cautions doctrine. *Id.* at 20. In discussing, and rejecting, the arguments that these **statements** were opinion statements or covered by the bespeaks caution doctrine, the Court continued to refer to these **statements**. *Id.* at 21 ("Here, the Mesa Defendants contend that the challenged statements "are quintessential opinions" because they begin with "we believe" or "we expect."4 (Doc. 56 at 18.) The Pension Fund disagrees, arguing the statements are actionable because they contain an embedded statement of untrue fact and were misleading in context. (Doc. 60 at 16.) Thus, in the Pension Fund's view, the statements are actionable under *Omnicare*. (*Id.*)").

Defendants appear to conflate the Court's discussion of statements made by the Individual Defendants Ornstein during a May 2019 conference call, in rejecting Defendants' argument that the **statements** about aircraft maintenance in the Registration Statement were "quintessential opinions" (Order 21).  In rejecting Defendants' argument that the three statements in the Registration Statement were opinions, the Court considered Mr. Ornstein's May 2019 statement during a conference call that: "We knew that in the last year, 18 months, I mean, we were hamstrung by the fact that we had expanded a lot, we needed more pilots, we got hung up a little bit in pilot training, maintenance became more difficult in terms of qualified maintenance people." *Id.*

The Court accepted Lead Plaintiff's characterization of Ornstein's statement to mean that from May 2018 to May 2019, Mesa faced a shortage of qualified mechanics, and that shortage was one of four factors that "hamstrung" the company, rendered Mesa's statements that its success depended on its ability to continue to attract and retain qualified personnel misleading.  *Id.* at 22. The Court then concluded by rejecting Defendants' argument that the **statements** were non-actionable opinions. *Id.*

To further demonstrate Defendants' misinterpretation and conflating of the Order, the Court then went on to discuss the application of the "bespeaks caution" doctrine to the "maintenance-related **statements**" (emphasis added), and concluded by ruling that:

> **Therefore, the Court will deny the Mesa Defendants' motion to dismiss insofar as it related to the statements concerning Mesa Air's maintenance solutions.**

Order 22-23 (emphasis added).

Defendants' effort to cabin Lead Plaintiff's allegations to a single statement in the Registration Statement regarding qualified in-house maintenance personnel, and thereby seeking to severely limit the scope of discovery, conflicts with the clear and plain language from this Court's Order and should be rejected.

Finally, Plaintiff opposes Defendants' proposal that "Plaintiff should be required to seek leave to amend to add parties or claims prior to the commencement of discovery."

**Defendants' Statement of the Case:**

On July 22, 2021, the Court dismissed much of Lead Plaintiff's amended complaint, dismissing the Section 12 claim outright and dismissing the Section 11 and 15 claims related to statements other than those related to Mesa's maintenance solutions at the time of the IPO. (the "Maintenance Claim").  The Maintenance Claim was sustained based on a single alleged omission: the failure to disclose an alleged shortage of qualified mechanics at the time of the IPO that "hamstrung" the Company.  (Dkt. 81 (the "MTD Order") at 21-22.[2]  There are no other alleged omissions concerning any aspect of Mesa' maintenance solutions at the time of the IPO identified in the Complaint or in the Order.

The fact that this case has been limited to the alleged omission concerning the adequacy of Mesa's in-house mechanics is confirmed in the Court's discussion

---

[2] The Court dismissed Lead Plaintiff's claims based on  misstatements in the Registration Statement concerning: (i) Mesa's capacity purchase agreement ("CPA") with American Airlines (the "American CPA Claims"); (ii) Mesa's operational performance (the "Operational Performance Claims"); and (iii) Mesa's spare aircrafts (the "Operational Spares Claims") as well as all claims under Section 12 of the Securities Act (collectively, the "Dismissed Claims").  *See* MTD Order (Dkt. 81) at 13, 16, 19, 24-25.

sustaining Plaintiff's Item 303 and 503 claims.   The Court stated: [T]he Pension Fund alleges "a shortage of qualified mechanics" would lead to "increased maintenance expenses, decreased revenues, and weak earnings." (*Id.* ¶ 87.) Accordingly, the Pension Fund's alleged Item 303 violation survives." MTD Order (Dkt. 81) at 23.

In its Order, the Court held that, drawing all inferences in Lead Plaintiff's favor, the Complaint plausibly alleged the challenged statements regarding maintenance were misleading because of a single purportedly curative disclosure on May 10, 2019 (the "May 10, 2019 Alleged Corrective Disclosure"), which the Court held could be interpreted as disclosing a shortage of qualified mechanics at the time of the IPO.  *Id.*   Lead Plaintiff alleged—and the Court noted in its Order—that the May 10, 2019 Alleged Corrective Disclosure was the *only* curative information regarding the Maintenance Claim. [3]   (Dkt. 52 at ¶¶ 97-99; Dkt. 81 at 21).   Plaintiff now ignores its own Complaint and this Court's Order in an apparent attempt to broaden the scope of its lone surviving maintenance claim which was sustained solely on the basis of an alleged shortage of mechanics at the time of the IPO.

Defendants deny and will ultimately show that the challenged maintenance statements were not false or misleading at the time of the IPO. However, even if Lead Plaintiff could demonstrate that any maintenance statements were misleading (which it cannot), neither Lead Plaintiff nor any member of the putative class

---

[3] As the Court specifically identified, the other purported corrective disclosures alleged in the Complaint related to Dismissed Claims and not to the remaining Maintenance Claim. The alleged corrective disclosures in January, February, August and December 2019, related to the now-dismissed American CPA, Operational Performance and/or Operational Spares Claims. (Dkt. 52 at ¶¶ 75, 78, 85, 105-111; Dkt. 81 at 12-13, 15-18.),

suffered any cognizable loss attributable to that statement.  That is because (1) Lead Plaintiff's cognizable losses under Sections 11 and 15 are limited to any decline in Mesa's stock price attributable to the May 10, 2019 Alleged Corrective Disclosure, the *only* allegedly curative disclosure identified in the Order and the Complaint as relevant to any statement about Mesa's maintenance at the time of the IPO and (2) the May 10, 2019 Alleged Corrective Disclosure did not result in a statistically significant decline in Mesa's stock price, as expert testimony utilizing well-established methodologies will conclusively demonstrate. *In re Barclays Bank PLC Sec. Litig.*, 2017 U.S. Dist. LEXIS 148695, at *75-76 (S.D.N.Y. Sept. 13, 2017) (granting summary judgment on Section 11 claims where experts established the lack of a statistically significant price decline), *aff'd*  756 F. App'x 41, 47-50 (2d Cir. 2018).

In tacit recognition of this fact, Plaintiff now attempts to argue that *all* of the maintenance related statements, including those related to in-house mechanics as well as  outsourced third party maintenance were shown to be false when made because of "stock price drops that occurred on other dates [i.e., not just May 10, 2019 as alleged] when the Company reported negative earnings results due to higher maintenance costs." Plaintiff's "shift" in position concerning the relevant, albeit unidentified curative disclosures, is unavailing.  Defendants' experts will show that, as Plaintiff alleges, the May 10, 2019 Alleged Corrective Disclosure was fully corrective with respect to any alleged insufficiency of in-house mechanics at the time of the IPO and made no corrective disclosure concerning the state of other maintenance solutions *at the time of the IPO*.  Defendants experts will also show that any disclosures prior to and subsequent to the May 10, 2019 Alleged Corrective Disclosure are not relevant because they have no causal nexus to the state of Mesa's maintenance solutions *at the time of the IPO* but instead reflect maintenance-related

issues resulting from events well *after the IPO,* e.g., unanticipated labor shortages at an outsourced maintenance provider and the increased utilization of Mesa's aircraft under the post-IPO amendment to the American CPA. *See Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 342 ("the price decline before [the curative] disclosure may not be charged to defendants); *Barclays,* 2017 U.S. Dist. LEXIS 148695, at *71-75 ("Plaintiff cannot recover for [subsequent] declines resulting from materialization of risk 'somehow connected with the misstatement'" where "the potentially corrective additional disclosures . . . do not reveal 'some then-undisclosed fact' "reflect[ing] information that was misstated or concealed *before the [O]ffering*" but, rather, relate to changed circumstances *after* the Offering). Defendants therefore believe they will sustain their complete affirmative defense of negative loss causation by showing that (1) the May 10, 2019 Alleged Corrective Disclosure did not result in a statistically significant stock price decline (which also demonstrates a lack of materiality), and (2) *none* of the earlier or later stock price declines were attributable to any misrepresentation about the sufficiency of Mesa's maintenance at the time of the IPO. Therefore, Defendants intend to seek leave to file an early motion for partial summary judgment on their negative loss causation defense. In a Section 11 case where "Defendants . . . set forth compelling evidence to establish that, even if the Registration Statement contained material omissions, those omissions were 'not the cause of the actual loss suffered'" by [Plaintiff] they are entitled to summary judgment." Alpha Capital Anstalt v. Intellipharmaceutics *Int'l Inc.,* 2021 U.S. Dist. LEXIS 128773, at *12 (S.D.N.Y. July 9, 2021).

**4.        THE PRINCIPAL FACTUAL AND LEGAL DISPUTES IN THIS CASE:**

The parties expect that the following legal and factual issues[4] will be the subject of discovery in this litigation and will be addressed in this case:

a.    Whether any of the Defendants violated § 11 of the Securities Act;

b.    Whether any of the Individual Defendants violated § 15 of the Securities Act;

c.    Whether any of the alleged statements at issue omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading or which were required to be disclosed pursuant to Items 303 or 503 of Regulation S-K;

d.    Whether any of the statements alleged to be false and/or misleading were material;

e.    Whether the alleged false and misleading statements caused damages;

f.    The extent of alleged damages allegedly sustained by class members and the appropriate measure of such alleged damages;

g.    The extent to which Defendants can demonstrate the affirmative defense of "negative causation" under § 11(e);

h.    Whether the Individual Defendants had, after reasonable investigation, reasonable ground to believe and did believe that the statements in the Registration Statement were true and not misleading;

i.    Whether the Underwriter Defendants had, after reasonable investigation, reasonable ground to believe and did believe that the statements in the Registration Statement were true and not misleading;

_____

[4] The Parties' statements of issues reflect their current assessment of the primary issues to be litigated and are not intended to be an exhaustive list of issues, defenses or arguments that may be asserted or arise.

j.      Whether a class may be certified in this case pursuant to FED. R. CIV. P. 23; and

k.      Whether Plaintiff has standing.

**5.      JURISDICTIONAL BASIS FOR THE CASE:**

This action arises under and pursuant to §§ 11 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77o).  The parties agree that Mesa is headquartered in this District and a significant portion of the Mesa Defendants' alleged actions occurred within this District, but Defendants contend that no wrongful actions occurred in this District or elsewhere.

Lead Plaintiff's Position: Lead Plaintiff contends that this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act (15 U.S.C. § 77v). Lead Plaintiff contends that venue is proper in this District pursuant to 28 U.S.C. § 1391 and § 22(a) of the Securities Act (15 U.S.C. § 77v(a)). Lead Plaintiff further contends that it and the putative class suffered injury in fact as a result of the multiple misrepresentations and omissions alleged in the Complaint that were sustained by the Court in its Motion to Dismiss Order. (Dkt. 81).

Defendants' Position: Defendants concur that the Court has jurisdiction over the subject matter but intend to demonstrate that Lead Plaintiff and the putative class did not suffer any injury in fact as a result of  any misrepresentation or omission remaining in the case after the Court's Order on Defendants' Motion to Dismiss. (Dkt. 81).

**6.      ANY PARTIES THAT HAVE NOT BEEN SERVED:**

All Defendants through their counsel have accepted service of the summons and complaint in this Action (Dkt. 31).

**7.    STATEMENT WHETHER ANY PARTY EXPECTS TO ADD ADDITIONAL PARTIES TO THE CASE OR OTHERWISE TO AMEND THE PLEADINGS**

**Lead Plaintiff's Position:** At this point, Lead Plaintiff does not expect to add additional parties. It is Lead Plaintiff's position that the deadline to amend the pleadings should be the last day of fact discovery.

**Defendants' Position:**

As the Parties are now preparing to proceed with discovery, and all Defendants have now answered, Plaintiff should be required to seek leave to amend to add parties or claims prior to the commencement of discovery, although the deadline to seek leave to amend the pleadings solely to conform to the evidence should be the last day of fact discovery.

**8.    LISTING OF CONTEMPLATED MOTIONS:**

a.    <u>Motion for Class Certification</u>

**Lead Plaintiff's Position Regarding Timing of Class Certification Motion:**

Lead Plaintiff's proposed deadline of January 5, 2022 to file its motion for class certification complies with Rule 23 for a Section 11 case.

**Defendants' Position:**

Defendants agree to January 5, 2022 as the deadline for Lead Plaintiff's motion for class certification.

b.    <u>Dispositive Motions</u>

The Parties contemplate that motions for summary judgment will be filed.

Defendants intend to seek leave to file an early motion for partial summary judgment on negative loss causation prior to completion of discovery.

c.    Discovery Motions

The Parties also contemplate that discovery motion(s) may be necessary.

**Lead Plaintiff's Position:** Lead Plaintiff's position is that routine discovery motions may be filed pursuant to the Federal Rules of Civil Procedure.

**Defendants' Position:**    The Parties' respective statements of the case above as well as Plaintiff's Initial Disclosures served on September 8, 2021 suggest that there may be  significant disagreements among the Parties concerning the proper scope of discovery, which Defendants believe must appropriately reflect the Court's Order dismissing many of the statements that were alleged to be misleading. Defendants contend that discovery should be limited to issues that are shown to be reasonably related to the single remaining alleged omission, i.e., the adequacy of Mesa's in-house maintenance at the time of the IPO.  Order at 20-21. To the extent Plaintiff contends that it is entitled to discovery on now-dismissed issues and claims, significant discovery disputes and motion practice are likely and will cause the discovery period to be unnecessarily and significantly protracted.

9.    **PROSPECT FOR SETTLEMENT AND POTENTIAL METHODS FOR CONDUCTING SETTLEMENT, INCLUDING (A) WHETHER THE CASE IS SUITABLE FOR REFERENCE TO A MAGISTRATE JUDGE FOR SETTLEMENT CONFERENCE AND (B) ANY OTHER REQUEST OF THE COURT FOR ASSISTANCE IN SETTLEMENT EFFORTS:**

The Parties discussed settlement during the Meet and Confer held on August 18, 2021. The Parties believe it is premature to have meaningful settlement negotiations, but do not foreclose the possibility of settlement at a later date.

**10.    WHETHER ANY ASPECT OF THE CASE IS SUITABLE FOR REFERENCE TO A SPECIAL MASTER OR TO A UNITED STATES MAGISTRATE JUDGE:**

The Parties do not object to the appointment of a Magistrate Judge to resolve any potential discovery disputes, should the need arise at a later date.

**11.    THE STATUS OF ANY RELATED CASES PENDING BEFORE THIS OR OTHER COURTS:**

There are no related pending cases in this Court. There is a case pending in Superior Court of the State of Arizona in and for the County of Maricopa captioned, *City of Pittsburgh Comprehensive Municipal Pension Trust Fund, et al. v. Mesa Air Group, Inc., et al.*, Civ. No. CV2020-003927 (filed Mar. 24, 2020) (the "State Action") that asserts the same and/or similar claims and allegations against the same Defendants as those in this Action. On October 6, 2020, the Superior Court issued an order that stayed proceedings in the State Action in light of the pendency of this action until further order of that court.

**12.    DISCUSSION OF ANY ISSUES RELATING TO PRESERVATION, DISCLOSURE OR DISCOVERY OF ELECTRONICALLY STORED INFORMATION ("ESI"), INCLUDING THE PARTIES' PRESERVATION OF ESI AND THE FORM IN WHICH IT WILL BE PRODUCED:**

The Parties are in the process of meeting and conferring regarding an ESI protocol that will cover topics related to ESI, including but not limited to, the format in which the Parties agree to produce ESI.

**13.    A DISCUSSION OF ANY ISSUES RELATING TO CLAIMS OF PRIVILEGE OR WORK PRODUCT:**

The Parties are in the process of meeting and conferring regarding a protective order and ESI protocol, both of which will address privilege issues, which the parties will submit to the Court for approval.

**14.    A DISCUSSION OF NECESSARY DISCOVERY WITHIN THE SCOPE OF RULE 26(B)(1):**

**PLAINTIFF'S PROPOSAL:**

The Parties discussed discovery within the scope of Rule 26(b)(1), including the following: (a) the extent, nature, scope, and location of discovery anticipated by the parties and why it is proportional to the needs of the case; (b) suggested changes, if any, to the discovery limitations imposed by the Federal Rules of Civil Procedure; and (c) the number of hours permitted for each deposition, unless extended by agreement of the parties. The Parties have agreed to engage in good faith negotiations regarding the extent, nature, scope and location of discovery, including the impact of the Court's Order of July 22, 2021 (Dkt. 81) on the scope of discovery.

Lead Plaintiff does not have any suggested changes to discovery limitations imposed by the Federal Rule of Civil Procedure.  The recommended hour limitation for depositions is seven hours total, and not to exceed two business days.

**Defendants' Proposal:**

As noted, the Parties' respective statements of the case above as well as Plaintiff's Initial Disclosures served on September 8, 2021 suggest that there may be  significant disagreements between the Parties concerning the proper scope of discovery, which Defendants believe must appropriately reflect the Court's Order holding that many of the statements that were alleged to be misleading cannot serve as bases for Plaintiff's claims.  Defendants contend that discovery should be limited to issues that are shown to be reasonably related to the single remaining alleged omission, i.e., the adequacy of Mesa's in-house maintenance at the time of the IPO.

Order at 20-21.  To the extent Plaintiff contends that it is entitled to discovery on now-dismissed issues and claims, significant discovery disputes and motion practice are likely.

To the extent there are disagreements about the remaining statements and claims and, thus, the proper scope of discovery, Defendants believe such matters should be resolved at the outset of discovery to avoid significant discovery disputes and motion practice.

**15.      PROPOSED DEADLINES FOR EACH OF THE FOLLOWING EVENTS:**

a.      *A deadline for amending the pleadings*

**Lead Plaintiff's Proposal:** Last day of fact discovery

**Defendants' Proposal:** Defendants propose that, as the Parties are now preparing to proceed with discovery, and all Defendants have now answered, Plaintiff should be required to seek leave to amend to add parties or claims prior to the commencement of discovery.  Defendants agree that the deadline for leave to amend solely to conform to the evidence shall be the last day of fact discovery.

b.      *A deadline for lodging a proposed Joint Stipulated Protective Order with the Court, if desired*

The Parties jointly propose the following deadline: **November 15, 2021**

c.      *A deadline for completing fact discovery.  This will also be the deadline for pretrial disclosures pursuant to Rule 26(a)(3). Discovery requests must be served and depositions noticed sufficiently in advance of this date to ensure reasonable completion by the deadline, including time to resolve discovery dispute.  Absent extraordinary circumstances, the Court will not entertain discovery disputes after this deadline*

The Parties have agreed that documents shall be produced on a rolling basis. The Parties also jointly propose that pretrial disclosures pursuant to Rule 26(a)(3)

be completed by February 10, 2023.  The Parties disagree regarding a proposed date for the substantial completion of document discovery.  The Parties' respective positions are set forth below.

**Plaintiff's Proposal re Substantial Completion Date.**        Plaintiff proposes that production of documents responsive to document requests relating to the merits served on or before October 9, 2021, shall be substantially completed by January 31, 2021 and completed by August 15, 2022.

**Defendants' Proposal re Substantial Completion Date.**

Defendants believe that Plaintiff's proposed "substantial completion" date is unrealistic and not achievable in any circumstance.  Plaintiff has not even served any document requests as of the date of the filing of this Report.   Plaintiff's proposal fails to take into account the length of time required to negotiate the relevant custodians, to identify, collect, and upload significant amounts of data, test search parameters, review documents for responsiveness and privilege and then produce such documents.[5]  Defendants propose that production of documents responsive to document requests relating to the merits shall be substantially completed by August 15, 2022, and completed by October 31, 2022. Defendants' proposed discovery schedule takes into account concerns that there may be fundamental disagreements about the scope of the remaining claims and, thus, the

---

[5] Because "securities class actions typically are document-intensive cases, and often involve allegations concerning a company's top executives, discovery can be a grueling and expensive process" with "defendants [often having] to review and produce millions of pages of documents." https://www.sullcrom.com/files/upload/ThomsonReutersJournal_Litigation_PSLRA_OctNov17.pdf

proper scope of discovery, which could result in significant discovery disputes and motion practice.  If the Parties' disputes concerning the remaining claims in the case are resolved at the outset and discovery is appropriately limited to information concerning the sufficiency of Mesa's in-house mechanics at the time of the IPO, Defendants believe that discovery could be substantially completed by May 31, 2022 and completed by July 31, 2022. Defendants would be in favor of this shorter timeline if the Parties could avoid the significant discovery disputes that will result from Plaintiff seeking to broaden the scope of the case beyond the scope of this Court's Order dismissing many of Plaintiff's claims.

      d.    *Dates for full and complete expert disclosures and rebuttal expert disclosures, if any, and a date for expert discovery cut-off*

The Parties disagree regarding proposed dates for expert disclosure deadlines.  The Parties' respective positions are set forth below.

**Plaintiff's Proposal:**

- Initial expert reports, if any, from either Party: **September 13, 2022**
- Rebuttal expert reports, if any, from either Party: **October 25, 2022**
- Reply expert reports, if any, from either Party: **November 15, 2022**
- Expert discovery (including expert witness depositions) completed: **November 11, 2022**

**Defendants' Proposal:**

As noted, Defendants intend to seek leave of court to file an early motion for partial summary judgment on negative loss causation which will necessitate expert reports and testimony.   With that exception, Defendants propose the following dates for expert reports and discovery:

- Initial expert reports: **November 30, 2022**
- Rebuttal expert reports: **January 14, 2023**

- Reply expert reports: **February 13, 2023**

- Expert discovery (including expert witness depositions) completed: **March 10, 2023**

    e.   *Case-specific deadlines and dates, such as the deadline to file a motion for class certification, the deadline to file a motion for dismissal or summary judgment based on qualified immunity, a date on which the parties are available for a Markman hearing, if applicable, and a deadline to file dispositive motions*

The Parties' respective positions are set forth below.

**<u>Plaintiff's Proposal re: Class Certification and Dispositive Motions</u>**:

- Lead Plaintiff's Motion for Class Certification: **January 4, 2022**

- Defendants' Opposition to Class Certification: **February 22, 2022**

- Lead Plaintiff's Reply in Further Support of Class Certification: **March 25, 2022**

- Initial Briefs in Support of Dispositive Motions: **December 22, 2022**

- Oppositions to Dispositive Motions: **January 24, 2022**

- Replies in Support of Dispositive Motions: **February 10, 2022**

**<u>Defendants' Proposal re: Class Certification and Dispositive Motions</u>**

Defendants do not object to Lead Plaintiff's proposed dates for briefing on Class Certification.

- Defendants' Motion for Partial Summary Judgment on Negative Causation: TBD if Leave to File is Granted

- Opposition Briefs: TBD if Leave to File is Granted

- Reply Briefs: TBD if Leave to File is Granted

- Other Dispositive Motions: **March 13, 2023**

- Opposition Briefs: **May 12, 2023**

- Reply Briefs: **June 12, 2023**.

    f.    *A date by which the parties shall have engaged in good faith settlement talks and a description of settlement communications to date*:

During the meet and confer held on August 18, 2021, the Parties discussed potential settlement of class claims and agreed that they are too early in the litigation to engage in meaningful settlement discussions. The Parties have agreed to revisit the potential for settlement later in the case.

16.    **WHETHER A JURY TRIAL HAS BEEN REQUESTED AND WHETHER REQUEST FOR A JURY TRIAL IS CONTESTED. IF THE REQUEST IS CONTESTED, SET FORTH THE REASONS WHY TRIAL BY JURY IS IN DISPUTE:**

Lead Plaintiff and the Mesa Defendants have requested a jury trial (Dkt. 52 at 47; Dkt. 91 at 42).

17.    **ESTIMATED LENGTH OF TRIAL AND ANY SUGGESTIONS FOR SHORTENING TRIAL:**

The Parties agree that an estimated length of trial is not determinable at this time. However, the Parties have agreed to revisit during the course of litigation and will supplement as needed.

18.    **ANY OTHER MATTERS THAT WILL AID THE COURT AND PARTIES IN RESOLVING THIS CASE IN A JUST, SPEEDY, AND INEXPENSIVE MANNER AS REQUIRED BY FEDERAL RULE OF CIVIL PROCEDURE 1:**

The Parties do not identify any other matters at this time that will aid the Court and the Parties in resolving the case in just, speedy, and inexpensive manner.

However, the Parties have agreed to revisit during the course of litigation and will supplement as needed.

Dated:  September 24, 2021

Respectfully submitted,

*/s/ Laurie B. Smilan*

Laurie B. Smilan

**WILSON SONSINI GOODRICH & ROSATI**
**Professional Corporation**
Nina F. Locker (*pro hac vice*)
Laurie B. Smilan (*pro hac vice*)
Douglas W. McManaway (*pro hac vice*)
650 Page Mill Road
Palo Alto, CA 94304

**SACKS, RICKETTS & CASE LLP**
Cynthia A. Ricketts (Arizona Bar No. 012668)
Andrew C. Stanley (Arizona Bar No. 029789)
2800 N. Central Avenue, Suite 1910
Phoenix, AZ 85004

*Attorneys for Mesa Defendants*

*/s/ Agnès Dunogué*

Agnès Dunogué

**SHEARMAN AND STERLING LLP**
Agnès Dunogué (*pro hac vice*)
Adam S. Hakki (*pro hac vice*)
599 Lexington Avenue
New York, NY 10022-6069

**LEWIS ROCA ROTHGERBER CHRISTIE LLP**
Edwin A. Barkel (Arizona Bar No. 021666)
John C. Gray (Arizona Bar No. 028454)
Michael C. Brown (Arizona Bar No. 030524)
201 East Washington Street, Suite 1200
Phoenix, AZ 85004

*Attorneys for Underwriter Defendants*

*/s/ James M. Wilson, Jr.*

James M. Wilson, Jr.

**FARUQI & FARUQI, LLP**
Lubna Faruqi (*pro hac vice*)
Robert W. Killorin (*pro hac vice*)
James M. Wilson, Jr. (*pro hac vice*)
685 Third Avenue, 26th Floor
New York, NY 10017

*Attorneys for Lead Plaintiff and Lead Counsel for the Class*

/s/ Gary F. Urman

Gary F. Urman

**DECONCINI MCDONALD YETWIN & LACY, P.C.**
Gary Frank Urman (Arizona Bar No. 11748)
2525 East Broadway, Suite 500
Tucson, Arizona, 85716

*Attorneys for Lead Plaintiff and Liaison Counsel for the Class*

# EXHIBIT 10



# Types of Aviation Maintenance Checks

Jul 10, 2020



## What is a Maintenance Check?

 The aviation industry is highly regulated, meaning that airlines and other commercial airline companies must practice continuous inspection programs established by aviation authorities. In the United States, aircraft maintenance programs are overseen by the Federal Aviation Administration (FAA). The FAA requires each airline/operator to establish a Continuous Airworthiness Maintenance Program (CAMP). The CAMP outlines routine and detailed inspections or "checks" of aircraft they have in their fleet. Checks are important to

Case 2:20-cv-00648-MTL     Document 109-1     Filed 01/05/22     Page 329 of 335

continually perform as they keep aircraft safe and airworthy. Having such a rigorous maintenance program ensures that passengers will get to their destinations safely on an aircraft that has been fully vetted for any issues prior to leaving the airport gate!

While the FAA oversees the regulations and programs, it is up to the actual airline or operator to ensure that maintenance gets done and up to CAMP specifications. Aircraft have set checks at various intervals, often known as flight line maintenance checks and also four different types of higher-level maintenance: A, B, C, and the heaviest (D) checks.

The objective of these checks is to conduct both routine and non-routine maintenance of the aircraft. The maintenance includes scheduling the repair of known problems; replacing items after a certain air time, the number of cycles or calendar time; repairing defects discovered previously, and performing scheduled repairs.

All aircraft are different and may require maintenance checks at different times than others. This is a general overview of the types of work aviation maintenance technicians can expect on a day-to-day basis!

## Line Maintenance Checks

This type of maintenance is the most routine. Sometimes called post-flight, maintenance pre-flight, service check, and overnight checks, this is the most typical maintenance service performed on aircraft. Line checks require minimal tools and are usually done at the airport gate under the "open sky."

Line checks happen the most frequently, as they cover basic inspection checks. Commonly, aviation maintenance technicians will inspect things like wheels, brakes, and fluid levels (oil, hydraulics) during line checks.

Performing a line maintenance check ensures an aircraft is airworthy and safe to continue service. Aircraft need line maintenance every 24 to 60 hours of accumulated flight time, but it depends on the operator of the aircraft!

## A Checks

The next level of checks is known as A checks. The A check is performed approximately every 400-600 flight hours, or every 200–300 flights, depending on aircraft type. A check maintenance is typically done at a hangar and can take a minimum of 10 working hours depending on the services needed. Sometimes, this maintenance is done overnight as to not interrupt the schedule that airlines keep. The frequency of this check varies by aircraft type, the flight cycle count, or the number of hours flown since the last check.

The maintenance work during A checks often covers general inspections of the interior and the aircraft hull for evidence of damage, deformation, corrosion, missing parts. Additionally, it also includes service, engine, and function checks.

Other work performed could entail things such as:

- checking emergency lights
- lubricating nose gear retract actuator
- checking parking brake accumulator pressure

# B Checks

Next, B checks are often completed during the A check phase, as airlines and operators have phased out B checks. For airlines and operators to efficiently maintain, repair, and overhaul an aircraft, some B check tasks have been absorbed into A check phases. This helps by reducing aircraft downtime, reducing time maintenance technicians work on the aircraft, improving maintenance scheduling, and implementing better usage of resources such as hangars and test equipment.

Aviation maintenance professionals perform B maintenance checks approximately every 6-8 months. It takes about 160-180 labor hours, depending on the aircraft, and can be completed within 1–3 days at an airport hangar.

Typical work completed during B checks are tasks such as checking alignment and torquing of the nose landing gear spotlight or inspecting the wheel well hydraulic tubing for condition, corrosion, and fluid leakage.

# C Checks

C and D checks typically fall under "heavy maintenance," and are much more extensive than the B check. The C check requires an aviation maintenance technician to perform a deep inspection of a majority of the aircraft's parts.  Also, the C maintenance check can often take the aircraft out of service for 1–2 weeks.

This type of check often requires an aircraft to stay at a maintenance facility for the necessary space/tools/maintenance technician working hours/materials. Up to 6,000 maintenance hours are typically needed for C checks.

Aviation maintenance technicians will perform certain tasks during C checks, such as:

- examination of structures (load-bearing components on the fuselage and wings) and functions for corrosion and damage
- checking the operation of the DC bus tie control unit
- in-depth lubrication of all fittings and cables

There are different levels of C checks depending on the type of aircraft, much like how A checks incorporate B check tasks! For example, a schedule might have aviation

maintenance technicians performing C1 check tasks on a certain day and then the next day continuing with C2 and so on.

## D Checks

Lastly, the so-called "heavy maintenance visit" occurs every 6-10 years depending on the aircraft. D checks are comprehensive inspections and repairs of the entire aircraft and can mean taking apart the aircraft to inspect for damage and corrosion. The process can take upwards of 30,000 to 50,000 labor hours over a period of four to six weeks.

With the entire aircraft stripped down and equipment removed, airlines often decide to refurbish aircrafts' interiors and upgrade them altogether during D checks.

Because of the nature and the cost of a D check, most airlines plan D checks years in advance. Oh, and the cost of the entire process can cost upwards of a few million dollars!

There comes a certain point where airlines realize that the cost of repair is more than the actual cost of the aircraft. This usually happens after two or three D checks.

## Routine Maintenance Checks and You

There is a strict system for aircraft to be properly maintained, repaired, overhauled, and inspected as time goes on. The Federal Aviation Administration sets this system in place, and it is up to airlines and other aviation operators to implement the system and ensure it is being followed. Above all, preventing damage to aircraft and working to keep that aircraft flying safely is what it's all about to be an aviation maintenance technician!

Additionally, it is important to view this list as a general and brief overview of the type of maintenance checks performed by technicians. Each airline/operator is different, as is each aircraft.

It's time to dream bigger. Train to become an aviation maintenance technician in as little as 14 months at National Aviation Academy! Fill out the form below to get started!

Case 2:20-cv-00648-MTL    Document 109-1    Filed 01/05/22    Page 332 of 335

# THE DEMAND IS REAL...

# 626,000

Aviation Maintenance Technicians Needed Worldwide According to Boeing

Source – Boeing

# 33%

Workforce That Is At Or Near Retirement Age According To ATEC

Source – ATEC

# 188,901

Average Daily Worldwide Flights in 2019 According to Flight Radar 24

Source – FlightRadar24

## REQUEST INFORMATION

Ready to start your career as an Aviation Maintenance Professional? Fill out the form below for more information!

**First Name** *

**Last Name** *

**Phone Number** *

000-000-0000

**Email** *

example@example.com

**Zip Code** *

00000

**Where are you located?** *

Submit

By submitting this form, I authorize National Aviation Academy (NAA) and its representatives to contact me using the contact information I provided by phone, text message, or email, including using automated dialing technology for marketing purposes, regarding NAA programs, offers and general information. To opt-out at any time, call 727-531-2080 or email info@naa.edu.

# EMPLOYERS WHO HAVE HIRED OUR GRADS:





         

## CAMPUS LOCATIONS

### New England Campus

130 Baker Ave Ext. Concord, MA 01742

Ph: 781-274-8448

### Tampa Bay Campus

6225 Ulmerton Rd. Clearwater, FL 33760

Ph: 727-531-2080

## QUICK LINKS

Programs

Admissions

Resources

About

Contact Us

Case 2:20-cv-00648-MTL   Document 109-1   Filed 01/05/22   Page 335 of 335

The Different Types of Aviation Maintenance Checks

© 2021 National Aviation Academy

Consumer Information

Privacy Policy