# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------x

In re WORLDSPACE, INC. SECURITIES
LITIGATION

          :   No. 07 Civ. 02252 (RMB)

          :   <u>CLASS ACTION</u>

This Document Relates To:

          :   <u>ECF Case</u>

    ALL ACTIONS.

----------------------------------x

**DECLARATION OF LAWRENCE D. LEVIT IN SUPPORT OF LEAD PLAINTIFF'S
MOTION FOR: (1) FINAL APPROVAL OF SETTLEMENT AND PLAN OF
ALLOCATION OF SETTLEMENT PROCEEDS; AND (2) AWARD OF ATTORNEYS'
FEES AND EXPENSES**

# TABLE OF CONTENTS

Page(s)

I.    PRELIMINARY STATEMENT ................................................................1

II.    SUMMARY OF LEAD PLAINTIFF'S ALLEGATIONS.....................................5

III.    LEAD PLAINTIFF'S PROSECUTION OF THE CASE.......................................8

      A.    The Commencement of the Litigation, Appointment of Lead Plaintiff and Filing of the AC.......................................................8

      B.    Defendants' Motion to Dismiss ........................................................9

      C.    The Court's Opinion Denying the Motions to Dismiss .............................9

      D.    Initial Discovery And An Early Attempt At Mediation.........................10

      E.    WorldSpace Files For Bankruptcy Protection ...................................11

      F.    Defendants Seek To File A Summary Judgment Motion .........................12

      G.    Lead Plaintiff Seeks to Modify the Bankruptcy Court Stay ....................12

      H.    Discovery Resumes....................................................................13

      I.    The Parties Agree on a Schedule and Engage in Mediation .....................15

IV.    PRELIMINARY APPROVAL OF THE SETTLEMENT AND MAILING AND PUBLICATION OF NOTICE OF SETTLEMENT ...........................................17

V.    FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT ...................18

      A.    The Settlement Was Fairly and Aggressively Negotiated by Counsel ..................18

      B.    Serious Questions of Law and Fact Placed the Outcome of the Class Action in Significant Doubt...................................................................20

            1.    Defendants Would Argue that Plaintiffs Could Not Prevail on Their Claims ..................................................................21

2. Defendants Would Argue that Lead Plaintiff Could Not Establish Loss Causation or Significant Damages .................................................................22

C. The Judgment of the Parties that the Settlement Is Fair and Reasonable Provides Additional Support for Approval of the Settlement .................................................23

VI. THE PLAN OF ALLOCATION ...............................................................................24

VII. FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD .................................................................................25

A. Extent of Litigation .................................................................................27

B. Standing and Expertise of Plaintiffs' Counsel .............................................28

C. Standing and Caliber of Opposition Counsel ..............................................28

D. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Securities Cases ...........................................28

E. Lead Counsel's Request for Payment of Expenses Incurred Is Reasonable and Should Be Approved ..................................................................................32

VIII. CONCLUSION .......................................................................................................32

Lawrence D. Levit, declares as follows:

1.     I am a member of the New York Bar, admitted to practice before this Court and an attorney with the firm of Abraham, Fruchter & Twersky, LLP ("Abraham Fruchter"), the Court-appointed Lead Counsel for Lead Plaintiff and the Class (defined below) in the above-captioned consolidated action (the "Action"). I submit this Declaration in Support of Lead Plaintiff's Motion for Final Approval of the Settlement and Plan of Allocation of Settlement Proceeds, and the Application for an Award of Attorneys' Fees and Expenses ("Levit Declaration"). I have personal knowledge of the matters set forth herein based on my active participation in all material aspects of the prosecution and settlement of this litigation. If called upon, I could and would competently testify that the following facts are true and correct.

2.     Lead Plaintiff Midtown Partners III, Inc. ("Midtown Partners") has entered into a settlement on behalf of itself and the other members of the Class with Defendants, which provides a recovery of $2,375,000 in cash to resolve this securities class action against all Defendants (the "Settlement"). The Settlement is contained in a Stipulation and Agreement entered into by all parties dated October 11, 2012 (the "Stipulation") and previously filed with the Court.

3.     This Declaration sets forth the nature of claims asserted, the principal proceedings in this Action, the legal services provided by Lead Counsel and the settlement negotiations, and also demonstrates why the Settlement and Plan of Allocation are fair and in the best interests of the Class, and why the Application for Attorneys' Fees and Expenses is reasonable and why they should be approved by this Court.

## I.     PRELIMINARY STATEMENT

4.     This case was carefully investigated and has been vigorously litigated since its commencement. Lead Counsel thoroughly reviewed and analyzed all publicly available information regarding WorldSpace, Inc. ("WorldSpace" or the "Company"), including, but not limited to, its

Securities and Exchange Commission ("SEC") filings, financial reports and press releases, as well as media reports about WorldSpace and analysts' reports rendered by securities firms.

5. The factual investigation and discovery undertaken by Lead Counsel during the course of the litigation was extensive. Following this Court's denial of Defendants' motion to dismiss, the Parties made an initial attempt to resolve the Action, which was not successful. Plaintiffs[1] were then subjected to a stay of the Action after WorldSpace filed for Bankruptcy Court protection. While its bankruptcy case was proceeding, Lead Counsel made attempts to commence discovery and then had to fend off repeated attempts by Defendants to file for summary judgment before discovery was even allowed to begin again. Subsequently, Lead Counsel successfully moved in the Bankruptcy Court for a limited modification of the automatic stay. The parties then engaged in numerous meet-and-confer sessions where the parameters of Defendants' document production were debated. These sessions, which at times were quite acrimonious, included many that were lengthy and resulted in the Parties exchanging many detailed letters setting forth their positions. The Parties' negotiations concerning discovery, which included an appearance before Magistrate Judge Cott to resolve some of the disputes, resulted in the production of more than 365,000 pages of non-public documents by Defendants, many of which were one or two page e-mails, which were reviewed by Lead Counsel. In addition, Lead Counsel consulted with experts in loss causation and damages, and thoroughly researched the law pertinent to the claims and defenses asserted.

6. While the document review was being completed and Lead Counsel was preparing a motion for class certification and preparing for depositions, the Parties engaged in a third mediation session before the late Honorable Nicholas Politan, a former United States District Judge for the

---

[1] Although there is only one Lead Plaintiff, several plaintiffs brought these consolidated actions and they were brought on behalf of a class. Thus, at times, the plural of plaintiff is used herein.

District of New Jersey, where they made comprehensive presentations regarding the claims and defenses thereto, including damages, and negotiated possible settlement terms. During the full day session before Judge Politan, the Parties, although they did not reach a final agreement, made significant progress in attempting to resolve the Action. At the end of the mediation session, Judge Politan made a mediator's proposal to resolve the Action, and during the next couple of weeks, negotiations continued with Judge Politan serving as an intermediary. Ultimately, the Parties reached agreement, which resulted in the Settlement before the Court for final approval.

7. The proposed $2,375,000 Settlement is a notable achievement derived from the substantial efforts of Lead Counsel who zealously litigated this case. The proposed Settlement is a substantial result for the Class, particularly under the circumstances of this litigation, and is eminently fair, reasonable and adequate based on the impediments to recovery, the legal hurdles and risks involved in proving liability and damages as well as the further risk, delay and expense had this case continued to summary judgment and/or trial against the Defendants. Lead Plaintiff and Defendants do not agree on the average amount of damages per share that would be recoverable if Plaintiffs were to have prevailed on the claims asserted, nor that Plaintiffs would have prevailed at all. Indeed, Defendants continue to assert that the Class suffered little or no damages as a result of the securities law claims alleged in the Action. In light of such adamant opposition, a recovery of $2,375,000, derived solely from Lead Counsel's efforts, represents a highly successful result.

8. The Settlement was negotiated on all sides by experienced counsel with a firm understanding of the strengths and weaknesses of their clients' respective claims and defenses. The Settlement confers substantial and immediate benefits to the Class while eliminating the risk of little or no recovery from the Defendants. Even if Plaintiffs had successfully opposed Defendants' expected summary judgment motion and had prevailed at trial, any recovery would still be years

away as Defendants would likely appeal. Moreover, even at that point, given WorldSpace's bankruptcy, recovery from it was uncertain. While judgment might also have been obtained against the other Defendants, they asserted additional defenses that were not available to WorldSpace as the issuer of the securities. Although insurance did exist, those proceeds likely would have been exhausted either completely or in large part by the time a trial and/or appeals would be resolved. A judgment against the Underwriter Defendants (defined below) would have been more difficult to obtain because of their due diligence defense. Lead Counsel respectfully submit that, under these circumstances, the Settlement is in the best interests of the Class and should be approved as fair, reasonable and adequate. The Court should also approve the Plan of Allocation of Settlement proceeds and award attorneys' fees in the amount of 25% of the Settlement Fund, plus expenses in the amount of $143,474.06 which have been incurred or advanced by Lead Counsel in connection with this litigation, plus interest thereon, as a result of Lead Counsel's considerable efforts in creating this substantial benefit on behalf of the Class, and as recognition for the risks faced and overcome.

9. The Class appears to overwhelmingly approve the Settlement. Pursuant to the Court's Order Preliminarily Approving Settlement and Providing for Notice dated January 25, 2013, 2011 (the "Notice Order"), a Notice of Settlement of Class Action Lawsuit (the "Notice") was mailed to more than 10,023 potential Class members. Additionally, a Summary Notice was published in the *Investor's Business Daily* on February 5, 2013 (the "Summary Notice"). The Notice apprised Class members of their right to object to the Settlement, the Plan of Allocation or to Lead Counsel's application for attorneys' fees of 25% of the total Settlement Fund plus expenses of up to $175,000. The time to file objections to these proposals expires on May 8, 2013. To date, there have been no objections to the Settlement, Plan of Allocation or counsel's request for an award of

attorneys' fees and expenses from any Class member. In this era of heightened shareholder activism, the complete lack of objection is noteworthy.

10.     Lead Counsel have litigated this case for more than six years on a wholly-contingent basis. The fee application for 25% of the total recovery is fair, reasonable and adequate and warrants Court approval. This fee request is well within the range of fees typically awarded in actions of this type and is wholly justified in light of the benefits obtained, the substantial risks undertaken, and the quality, nature and extent of the services rendered, as more fully set forth in Lead Counsel's Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Expenses, submitted herewith.

11.     In sum, the Settlement is the product of hard-fought litigation and protracted arm's-length negotiation and takes into consideration the risks specific to this case. Lead Counsel respectfully submit that under these circumstances the Settlement is in the best interests of the Class and should be approved as fair, reasonable and adequate.

12.     The following sets forth the principal proceedings in this matter and the major legal services provided by Lead Counsel, the negotiation of the Settlement, the terms of the Settlement, why the Settlement and the Plan of Allocation are fair and in the best interests of the Class, and the reasonableness of Lead Counsel's fee and expense request.

## II.     SUMMARY OF LEAD PLAINTIFF'S ALLEGATIONS

13.     This litigation arises from alleged misrepresentations in and omissions from the Registration Statement and Prospectus (the "Offering Documents") issued by Defendant WorldSpace in connection with its initial public offering (the "IPO") of approximately 11.8 million shares of common stock at $21.00 per share on or about August 4, 2005. The Action is brought on behalf of a class of all persons who purchased shares pursuant to or traceable to the IPO on August 4, 2005 through March 16, 2006 (the "Class"). The Action asserts claims against WorldSpace, Noah

- 5 -

Samara ("Samara"), WorldSpace's Chairman and Chief Executive Officer, Sridhar Ganesan ("Ganesan"), WorldSpace's Executive Vice President and Chief Financial Officer (Samara and Ganesan are collectively referred to herein as the "Individual Defendants"), and the Underwriters for the Company's IPO, UBS Securities LLC ("UBS") and Cowen & Co., LLC ("Cowen") (UBS and Cowen are collectively referred to herein as the "Underwriter Defendants").

14.     Lead Plaintiff contends, among other things, that the Registration Statement failed to disclose WorldSpace's correct subscriber numbers and did not disclose that WorldSpace could not accurately determine such numbers.

15.     WorldSpace was attempting to establish a satellite radio business, primarily in India and China, and would then subsequently expand to Africa. It offered satellite radio services to customers by signing them to subscription agreements. The Company generated revenues mainly by selling subscriptions for its services. It needed to increase its number of customers as well as maintain its existing subscribers in order to grow and be successful.

16.     Unbeknownst to investors, however, Plaintiffs alleged that WorldSpace did not have the ability to calculate its subscriber numbers accurately and did not provide the correct number of subscribers in its Offering Documents. Moreover, Plaintiffs contend that the Offering Documents failed to disclose that WorldSpace was facing a material threat to its business because of a trend that showed it was having a difficult time retaining existing customers.

17.     WorldSpace provided its subscribers with a device that could be used to access its various radio channels. In order to be able to have access to WorldSpace's services, the Company provided each paying subscriber with a passcode, which WorldSpace would change periodically to prevent non-subscribers from having access to its stations. If customers elected to end their WorldSpace service and/or stopped paying for the service, WorldSpace would not provide them with

a new passcode and the customer would no longer be able to access the satellite radio channels. WorldSpace also provided customers with a grace period before they would end the customers' service if payment had not been received. Because the passcode was typically changed approximately every three months, and because WorldSpace provided grace periods of up to sixty days, it was possible for non-paying former subscribers to be able to access WorldSpace's satellite radio service for several months after they had stopped paying for the services. Plaintiffs alleged that because of the passcode change and the grace period provided by WorldSpace, the Company was unable to count its paying subscribers accurately at any given time.

18. Moreover, Plaintiffs contended that a trend had developed about the time of the IPO, which indicated that WorldSpace was having difficulty in retaining existing customers. While churn figures were not specifically provided in the Offering Documents, Plaintiffs contend that such information was so material to WorldSpace's subscriber-based business, this trend needed to be included in the Offering Documents.

19. On November 7, 2005, WorldSpace announced its financial results for the third quarter of 2005, ended September 30, 2005. During a conference call held that day, WorldSpace, through Defendant Ganesan, refused to provide information concerning the Company's churn rate— how many subscribers cancel service in a given period of time, stating instead that they would provide net subscriber additions.

20. Following this announcement, the price of WorldSpace's common stock fell from $12.30 per share to $10.93 per share on November 8, 2005, on trading volume heavier than usual.

21. On March 16, 2006, during a conference call with analysts, WorldSpace revealed that service to subscribers was not promptly discontinued when a customer failed to renew its subscription. Ganesan stated during that call that the Company could only get a true estimate of

renewals when it disconnected subscribers and changed passwords. He further stated that they could not provide exact numbers or the general numbers. In the days following this call, WorldSpace's stock price dropped from a closing price of $11.52 per share on March 16, 2006 to a closing price on March 21, 2006 of $5.95 per share.

22.     On March 24, 2006, an analyst reporting on WorldSpace described how the Company's passcode change operated and allowed, when combined with the grace period provided, non-paying subscribers to continue to receive WorldSpace's radio services for many months after they no longer paid for the services. Plaintiffs alleged that such policies resulted in WorldSpace being unable to determine its correct number of subscribers at any particular time, which was not revealed to the market until March 16, 2006.

## III.    LEAD PLAINTIFF'S PROSECUTION OF THE CASE

### A.    The Commencement of the Litigation, Appointment of Lead Plaintiff and Filing of the AC

23.     On March 15, 2007, an initial complaint was filed against WorldSpace, UBS and Cowen in the United States District Court for the Southern District of New York (the "Court"), alleging violations of the federal securities laws. Four additional complaints were subsequently filed, alleging similar claims. By Order dated June 21, 2007, the Court consolidated those cases and appointed Midtown Partners as Lead Plaintiff and approved its selection of Abraham Fruchter as Lead Counsel.

24.     Thereafter, pursuant to the Court's Scheduling Order, Plaintiffs' Amended Complaint (the "AC") was filed on August 9, 2007, alleging violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§77k, 77l(a)(2) and 77o, in connection with the IPO. The AC alleged that the Offering Documents contained untrue statements of material fact, omitted facts

necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

**B. Defendants' Motion to Dismiss**

25. On October 9, 2007, Defendants filed a joint motion to dismiss the AC for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Defendants argued that, *inter alia*, Plaintiffs' primary claims sounded in fraud and Plaintiffs failed to satisfy the applicable heightened pleading requirements, the Offering Documents did not contain any material misstatements or omissions because the allegations regarding its subscriber numbers related to the Company's October 2005 promotion, which occurred after the IPO, and that Plaintiffs were on inquiry notice at least by December 30, 2005 when an analyst reported on WorldSpace's refusal to prove any churn calculations, and therefore Plaintiffs' claims were barred by the statute of limitations.

26. On November 15, 2007, Lead Plaintiff filed a memorandum of law in opposition to the motion to dismiss, arguing, inter alia, that the AC was predicated solely on negligence and that none of the claims were based on fraud, that the Offering Documents materially overstated the actual number of subscribers and that the Company's inability to determine the number of paying customers accurately was known to it and having a negative impact on the Company's operations, and that prior to March 16, 2006, Plaintiffs were unaware that WorldSpace could not accurately determine the number of its subscribers or its churn rate.

27. On December 14, 2007, Defendants filed a joint reply memorandum in further support of their motion to dismiss.

**C. The Court's Opinion Denying the Motions to Dismiss**

28. On July 21, 2007, after oral argument was held on Defendants' motion to dismiss, the Court issued its Opinion denying the motion to dismiss. *See In re WorldSpace Sec. Litig.*, No. 07-2252 (RMB), 2008 U.S. Dist. LEXIS 96224 (S.D.N.Y. 2008).

- 9 -

29.     The Court held that Plaintiffs were not required to satisfy the heightened standards applicable to fraud claims because their claims alleged negligence, not fraud. *Id*. at \* 15. The Court further held that Plaintiffs' allegations about the problems with WorldSpace's subscriber count system were "sufficient to raise a right to relief above the speculative level" and "could very well have affected investment decisions." *Id*. at \*18-20. In addition, the Court found that Defendants had "not satisfied the 'heavy burden' to establish that Plaintiffs were 'on inquiry notice as a matter of law' of Defendants' alleged securities law violations." *Id*. at \*12. Thus, Defendants' statute of limitations defense did not bar the claims.

30.     The WorldSpace Defendants and the Underwriter Defendants each served an Answer to the AC on August 25, 2008.

**D.      Initial Discovery And An Early Attempt At Mediation**

31.     Lead Plaintiff actively pursued discovery and conducted extensive document review. On July 31, 2008, Plaintiffs served their First Request for Production of Documents Addressed to Defendants (the "Document Demand") on Defendants. The Underwriter Defendants and the WorldSpace Defendants each responded and objected to the Document Demand on September 2, 2008.

32.     Defendants objected to many of the documents sought by Lead Plaintiff, and to the definitions and instructions set forth in the Document Demand. Among other things, Defendants objected to the definition of subscribers and other relevant terms, and to producing documents from the time period of January 1, 2005 through August 31, 2006.

33.     Defendants served documents requests on Lead Plaintiff during this time period and Lead Plaintiff served objections and responses to such requests and produced documents in response. Plaintiffs and Defendants served Initial Disclosures pursuant to Fed. R. Civ. P. 26(a)(1) on

September 9, 2008 and September 22, 2008, respectively. The parties also entered into a Stipulated Protective Order, which was So Ordered by the Court on November 20, 2008.

34. While the Parties were having initial discussions about the scope of Defendants' documents production, they also discussed the possibility of trying to resolve the Action at its initial stages through mediation. The Parties thus made an attempt to resolve the Action in September 2008 when they participated in a mediation session before the late Honorable Nicholas Politan, a retired United States District Court Judge from the District of New Jersey, on September 15, 2008. In connection with that session, the WorldSpace Defendants made a partial, limited production of certain documents in response to the Document Demand. After attending a full-day session with Judge Politan and conducting subsequent separate discussions after that session with Judge Politan, the Parties were unable to reach an agreement on resolving the Action.

35. Thereafter, Lead Counsel and counsel for the WorldSpace Defendants held the first of numerous meet and confer sessions to discuss WorldSpace's document production.

**E.      WorldSpace Files For Bankruptcy Protection**

36. On October 17, 2008, WorldSpace filed a voluntary petition under Chapter 11 of Title 11 of the Bankruptcy Code of the United States in the United States District Court for the District of Delaware (the "Bankruptcy Court"). WorldSpace gave notice of the filing and suggestion of an automatic stay to the Court on October 22, 2008. The Court then stayed the action at a status conference on November 3, 2008, but at Lead Plaintiff's request, ordered the Underwriter Defendants to produce their due diligence files to Lead Plaintiff.

37. Although the Action was stayed, the Parties made another attempt to resolve the Action early in 2009 when they held another formal mediation session before Judge Politan on February 26, 2009. However, no significant progress was made during that mediation session and the parties did not pursue any further settlement discussions at that time.

### F.    Defendants Seek To File A Summary Judgment Motion

38.    During the ensuing months, WorldSpace's Bankruptcy Court proceedings continued and the Parties to the Action attended periodic status conferences before the Court.  At one such conference on or about March 2, 2010, despite the continuation of the stay of the Action, and the very limited discovery that thus far occurred, Defendants requested permission to file a motion for summary judgment, which Plaintiffs opposed.  The Court ordered the Parties to submit three-page letters setting forth their positions on Defendants' request.  On March 10, 2010, Defendants submitted their letter requesting that they be permitted to file such a motion.  Lead Plaintiff opposed this request in a letter dated March 24, 2010, and Defendants submitted a letter in reply dated March 25, 2010.

39.    The Court determined that Defendants' request to file a summary judgment motion at that time was premature, especially because it appeared that WorldSpace had agreed to sell its assets to a third party and that its Bankruptcy Court proceeding might be ending in the relatively near future.  Defendants, however, indicated that they would continue to seek to file a summary judgment motion at the first available opportunity.

### G.    Lead Plaintiff Seeks to Modify the Bankruptcy Court Stay

40.    Also at a conference with the Court on or about May 17, 2010, Lead Counsel requested permission from the Court to attempt to modify the automatic stay as to WorldSpace before the Bankruptcy Court, which the Court granted.  Therefore, on or about June 18, 2010, Lead Plaintiff made a motion in the Bankruptcy Court to modify the automatic stay as to WorldSpace to serve a document subpoena.  On July 2, 2010, the Debtor filed an objection to the request to modify the stay and Lead Plaintiff submitted a reply on July 7, 2010.

41.    On July 16, 2010, the Bankruptcy Court held a hearing on Lead Plaintiff's motion to modify the automatic stay as to WorldSpace and to serve a document subpoena.  On August 16,

2010, the Bankruptcy Court issued an order modifying the automatic stay to allow Lead Plaintiff to serve a subpoena duces tecum on WorldSpace, and also provided that the order to modify the stay would not be effective until October 14, 2010. The stay otherwise remained in effect, as did this Court's stay.

### H. Discovery Resumes

42. On October 15, 2010, Lead Plaintiff served a subpoena for the production of documents on WorldSpace. Thereafter, Lead Counsel and counsel for WorldSpace conducted a series of meet-and-confer discussions regarding WorldSpace's production, including discussions concerning electronically stored information and the ability to search such databases efficiently and effectively. In addition, Lead Counsel began conducting separate meet-and-confer sessions with the Underwriters Defendants' Counsel concerning the Underwriters' production of documents, particularly emails and other electronically stored information that had been requested but not produced. In addition, Lead Plaintiff served a subpoena on PriceWaterhouseCoopers LLP ("PwC"), WorldSpace's consultants as to its internal controls, for production of documents and a possible deposition, and began negotiating documents to be produced by it. Lead Plaintiff also reviewed and analyzed the privilege log produced by WorldSpace, and consulted with its experts in loss causation and damages.

43. In addition, Lead Plaintiff conducted factual research about articles, news stories and other publications to determine whether Defendants' claim about WorldSpace's stock price decline had any merit. Specifically, Lead Plaintiff investigated WorldSpace's claim about its promotional campaign and whether WorldSpace's stock price drop was connected to the information about that campaign or whether other explanations existed for the decline.

44. The Parties had continuous disputes about the scope of document production. While Plaintiffs had instructed the WorldSpace Defendants to preserve all documents early in the Action,

and particularly in light of WorldSpace's bankruptcy filing, when the automatic stay was modified and document production by WorldSpace was to resume, Plaintiffs were informed that all of WorldSpace's documents were on a disk, and that it would be an overly burdensome, lengthy and costly endeavor to retrieve and extract the particular documents Plaintiffs sought. This dispute took months to resolve and required Lead Plaintiff to retain a database expert, which assisted in accessing the relevant files for the WorldSpace Defendants' Counsel to review and then produce to Plaintiffs.

45. In addition to the dispute about the database itself, the Parties conducted numerous meet-and-confer discussions over a period of months in an attempt to agree on the scope of document production. The Parties disputed the custodians from whom documents should be produced, the time period for production and, especially, the search terms necessary for the relevant documents to be retrieved and provided. The Parties disputed these discovery issues during lengthy conference calls and exchanged numerous detailed letters in an attempt to resolve these disputes.

46. Without reaching a final agreement on all discovery issues, the Defendants collectively produced more than 368,000 pages of documents, which were reviewed and analyzed by Lead Counsel. While the Parties were able to resolve some of their disagreements and narrow other issues during their meet and confer sessions, they continued to have discovery disputes even as document production continued, and a series of such disputes led to a conference before Magistrate Judge Cott on May 11, 2011, as Plaintiffs sought judicial intervention to assist with the resolution of some of the discovery issues. In advance of the conference, the Parties each submitted letters to Magistrate Judge Cott concerning several scheduling issues and discovery disputes. At the conference, the Parties discussed outstanding issues, including those raised in the letters submitted. Although Magistrate Judge Cott did not issue a formal order, he provided guidance at the conference as to how the Parties might resolve their disputes.

- 14 -

I.  The Parties Agree on a Schedule and Engage in Mediation

47.  During a conference with the Court on April 26, 2011, the Defendants again sought to file a summary judgment motion even though discovery had just resumed. The Court ordered the Parties to submit a schedule for the Action by June 29, 2011, including a briefing schedule for Defendants' summary judgment motion.

48.  As discovery was proceeding, the Parties set a briefing schedule for the filing of Defendants' summary judgment motion, which was to be filed on December 2, 2011. Separately, Plaintiffs began to draft a motion for class certification and also began compiling a list of deponents and preparing for taking the expected depositions. On August 3, 2011, Lead Plaintiff sent the WorldSpace Defendants' Counsel an initial list of ten people Lead Plaintiff wanted to schedule for depositions beginning September 12, 2011.

49.  As these activities were occurring, the Parties again began discussing the possible resolution of the Action. The negotiations that produced this Settlement were substantial. After Lead Plaintiff had reviewed most of the documents produced by Defendants, during a period of several weeks, beginning in June, 2011, Lead Counsel and the WorldSpace Defendants' Counsel had a series of back-and-forth telephone calls during which each side presented the points supporting their respective positions, and settlement demands and offers were exchanged. No agreement was reached and the Parties agreed to return to Judge Politan for another mediation session.

50.  On August 16, 2011, the Parties conducted a full-day mediation session with Judge Politan. In advance of the mediation, Lead Plaintiff prepared a detailed analysis of the documents produced during discovery and set forth the strengths and weaknesses of their case, referring to numerous documents that supported the claims. During the mediation, Lead Plaintiff debated the various issues in the litigation, including liability, loss causation and damages, as well as Defendants' summary judgment motion. The negotiations went back-and-forth for the entire day,

with the Parties advocating their positions and thoroughly debating the strengths and weaknesses of their respective cases. After conducting arm's-length negotiations throughout the day, no agreement could be reached. At that point, Judge Politan proposed that he make a Mediator's Proposal to each side which would have to be accepted by all sides in the upcoming days. After further negotiations and discussions with Judge Politan during the following week, the Parties reached agreement on or about August 24, 2011. As a result of the extensive negotiations over several weeks and the mediation session with the assistance of Judge Politan, there can be no question that the Settlement was the result of hard fought arm's-length negotiations

51. Following the agreement-in-principle to settle the Action, the Parties engaged in further extensive negotiations concerning the terms of the Stipulation. During the course of these negotiations, it became apparent that the Bankruptcy Court would also need to approve any settlement. During the pendency of the Parties' negotiations regarding the terms of the Stipulation, WorldSpace's bankruptcy proceeding was converted from Chapter 11 to Chapter 7. A Trustee was subsequently appointed for the debtors' estate, and after the Parties reached agreement on the Stipulation, the Parties sought the Trustees' approval, which was obtained and the Stipulation was approved as of October 11, 2012. Lead Plaintiff sought to have the Trustee obtain Bankruptcy Court approval for the Settlement, which was granted by that court on November 13, 2012.

52. Consistent with the Parties' hard-fought litigation of this Action, once the Parties reached their agreement-in-principal, it took several additional months to agree upon all the details of the Settlement as reflected in the Stipulation. Lead Counsel and counsel for Defendants debated numerous issues back-and-forth as to what was needed by each side in the various settlement documents. Drafts of each of the documents were exchanged repeatedly during those months, and

disputed issues arose constantly that needed to be resolved. Only through the persistence of Lead Counsel and counsel for Defendants was an agreement produced that all sides could sign.

53. Lead Counsel firmly believe that the compromise embodied in the Settlement represents a substantial recovery for the Class. The proposed $2,375,000 Settlement will provide Class members a benefit now and without risking the possibility of no recovery if the litigation continued or a judgment many years from now, which might be difficult to collect.

## IV. PRELIMINARY APPROVAL OF THE SETTLEMENT AND MAILING AND PUBLICATION OF NOTICE OF SETTLEMENT

54. On November 21, 2012, Lead Plaintiff filed their motion for preliminary approval of the Settlement. In connection therewith, Lead Plaintiff requested that the Court approve the forms of notice, which, among other things, described the terms of the Settlement, advised Class members of their rights in connection with the Settlement, set forth the proposed Plan of Allocation of the Settlement proceeds, informed Class members of the maximum amount of attorneys' fees and expenses that Lead Counsel would request, and explained the procedure for filing a Proof of Claim and Release form ("Proof of Claim") in order to be eligible to receive a payment from the Net Settlement Fund.

55. In addition, Lead Plaintiff requested that the Court certify the Class for settlement purposes.

56. By order dated January 25, 2013, the Court preliminarily approved the terms of the Settlement and directed that Lead Counsel cause the mailing of the Notice and the Proof of Claim to all potential Class members identifiable with reasonable effort.

57. The Court's Notice Order also directed Lead Counsel to cause the Summary Notice to be published once in *Investor's Business Daily*.

58. Submitted herewith is the Declaration of Jennifer M. Keough of Garden City Group, Inc., the Claims Administrator for the Settlement, which attests that Notices have been mailed to over 10,023 potential Class members and that the Summary Notice was published on February 5, 2013, as directed by the Court.

59. The Notice informed Class members of, among other things, the terms of the Settlement, the Plan of Allocation of the Settlement proceeds, and that Lead Counsel would apply for an award of attorneys' fees not to exceed 25% of the Settlement Fund, and expenses not to exceed $175,000.00, plus interest on each amount at the same rate earned on the Settlement Fund.

60. The Notice states that objections to any aspect of the Settlement, the Plan of Allocation or the application for attorneys' fees and reimbursement of expenses or Plaintiff awards must be filed by May 8, 2013. To date, no objections have been filed by any member of the Class to the Settlement, the Plan of Allocation or to the request for attorneys' fees and expenses or Plaintiff awards. This fact supports Lead Counsel's conclusion that they obtained an outstanding result for the Class.

## V. FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT

### A. The Settlement Was Fairly and Aggressively Negotiated by Counsel

61. As set forth above, the terms of the Settlement were negotiated by the Parties at arm's-length through adversarial but good faith negotiations. The Settlement was reached only after extensive settlement negotiations with the substantial assistance of Judge Politan. Consistent with the Parties' hard-fought and aggressive litigation of this Action, Lead Counsel spent many hours investigating the allegations of wrongdoing and the merit of the defenses raised by Defendants, and litigating Plaintiffs' claims, while at the same time pursuing settlement discussions. Once settlement discussions commenced, it took months for Lead Counsel to reach agreement, document and present the final terms of the Settlement to the Court for approval.

62. The volume and substance of Lead Counsel's knowledge of the merits and potential weaknesses of Plaintiffs' claims are unquestionably adequate to support the Settlement. This knowledge is based, first and foremost, on Lead Counsel's extensive investigation and discovery during the prosecution of this Action, including, *inter alia*: (i) review of WorldSpace's public statements, SEC filings, regulatory filings and reports, and securities analysts' reports and advisories about the Company; (ii) review of media reports about the Company; (iii) research of the applicable law with respect to the claims asserted in the Action and the potential defenses thereto; (iv) review of over 365,000 pages of documents produced by WorldSpace and the Underwriter Defendants; and (v) negotiating the Settlement with Defendants, including participating in three separate mediation sessions during the course of the Action, submitting a comprehensive mediation statement and documentary support, and where the Parties thoroughly presented the evidence supporting their claims and defenses. The accumulation of the information found in the above sources permitted Lead Plaintiff and Lead Counsel to be well-informed about the strengths and weaknesses of Plaintiffs' case and to engage in effective settlement discussions with Defendants.

63. The Settlement avoids the hurdles Plaintiffs would have to overcome if the Action continued, not only with respect to proving loss causation and the full amount of the Class' damages, but liability as well, and avoids the significant costs associated with further litigation of this complex securities action, particularly the completion of discovery, including possible overseas depositions, Defendants' summary judgment motion, and a trial. It further avoids having to try to obtain any payment from a company that had been in bankruptcy proceedings. In view of the significant risks and additional time and expense involved in taking this Action further in litigation, we respectfully submit that the Settlement is fair, reasonable and adequate.

64. In view of the litigation efforts of Lead Counsel and the discussions that occurred during the Parties' settlement negotiations, Lead Counsel were able to identify the issues that are critical to the outcome of this case. Lead Counsel have considered the risks of continued litigation, the likelihood of getting past summary judgment after expensive fact and expert discovery and, if successful, the risk, expense, and length of time to prosecute the litigation through trial and the inevitable subsequent appeals, and the possible need to litigate even further in Bankruptcy Court. Lead Counsel have also considered the substantial monetary benefit provided by the Settlement in light of the risk of taking the case to trial. Lead Plaintiff was a participant in this assessment and was consulted with, and kept apprised of the Settlement negotiations.

65. Lead Counsel is actively engaged in complex federal civil litigation, particularly the litigation of securities class actions. We believe that our reputation as attorneys who are unafraid to zealously carry a meritorious case through the trial and appellate levels gave us a strong position in engaging in settlement negotiations with Defendants.

66. Lead Counsel respectfully submit that, under the circumstances, the Settlement represents an excellent result for the Class. The Settlement will provide Class members with a benefit without the risk of zero recovery if the litigation were to continue and be unsuccessful.

**B. Serious Questions of Law and Fact Placed the Outcome of the Class Action in Significant Doubt**

67. Another factor considered in assessing the merits of class action settlements – whether serious questions of law and fact exist – supports the conclusion that the Settlement is fair, reasonable and adequate to the Class.

68. Throughout the course of the litigation, Defendants asserted that they possessed absolute defenses to Plaintiffs' claims, including, but not limited to, Lead Plaintiffs' failure to plead material misstatements and omissions, and that Plaintiffs' damages were dramatically lower than

Plaintiffs suggested, if they existed at all. Defendants consistently claimed that if the case continued, they would move for summary judgment and would succeed on such motion. Defendants further claimed that even if Plaintiffs somehow were successful in opposing summary judgment, Defendants would prevail at trial. Thus, the Settlement is unquestionably better than another distinct possibility – no recovery for the Class.

> **1. Defendants Would Argue that Plaintiffs Could Not Prevail on Their Claims**

69. While the Court sustained Plaintiffs' claims against Defendants at the motion to dismiss stage, Lead Plaintiff, nevertheless, recognized that it faced substantial risks if the Action continued. Lead Plaintiff and Lead Counsel heavily considered and analyzed potential risks to continued litigation of the Action in determining the Settlement's fairness, and, in light of such risks, believe the Settlement is in the best interests of the Class.

70. Without this Settlement, Defendants would have continued to argue that Plaintiffs could not prevail on their claims. Defendants would have claimed that they did not make any false or misleading statements in the Offering Documents, and that the Offering Documents adequately described the Company's business and the risks that were posed. Moreover, they would have contended that the Offering Documents accurately reported WorldSpace's subscriber numbers and would have argued that even if those numbers were not exact, any difference was not material given that WorldSpace needed a vastly higher number of subscribers in order to succeed.

71. Defendants would have also argued that WorldSpace knew how to determine its subscriber numbers and that if any question about such ability arose, it was only after the IPO in connection with a promotional campaign. In addition, Defendants would have argued that Plaintiffs did not raise the issue of churn in the Complaint, but even if it was part of the Action, churn was not

discussed in the Offering Documents and WorldSpace specifically stated that it was too early for the Company to provide meaningful churn numbers.

72.     Although Lead Plaintiff believes it could counter Defendants' likely defenses, any summary judgment motion would have been hard-fought and extensive, and Lead Plaintiff would have no guarantee of success.  Even if Defendants' summary judgment motion was denied, Lead Counsel recognizes that a finding of liability by a jury is never assured, and that Defendants would renew these arguments at trial.

73.     The risks of establishing liability posed by conflicting testimony and evidence would be exacerbated by risks inherent in all shareholder litigation, including the unpredictability of a lengthy and complex jury trial, the risk that the jury would react to evidence in unforeseen ways, the risk that a jury would find that some or all of the alleged misrepresentations were not material and the risk that the jury would find that the Defendants disclosed all information that they were required to disclose in the Offering Documents and that no damages were caused by their actions. Thus, Lead Plaintiff faced the risk that Defendants' arguments would find favor with a jury and result in the Class losing at trial.

### 2.     Defendants Would Argue that Lead Plaintiff Could Not Establish Loss Causation or Significant Damages

74.     Lead Plaintiff also faced the risk that it would not be able to prove damages even if liability was established.  Defendants would argue that the decline in WorldSpace's stock price and the resulting losses incurred by shareholders were due to factors unrelated to its IPO, including the information about its promotional campaign, which commenced months after the IPO.  Moreover, Defendants would contend that if negative causation did not eliminate damages, it severely limited them.

75.     The determination of damages, like the determination of liability, is a complicated and uncertain process, typically involving conflicting expert opinions. Moreover, the reaction of a jury to such complex expert testimony is highly unpredictable. Expert testimony about damages could rest on many subjective assumptions, any one of which could be rejected by a jury as speculative or unreliable. Conceivably, a jury could find that there were no damages or that damages were only a fraction of the amount that Lead Plaintiff sought.

76.     Although Lead Counsel believe that it would be able to provide convincing expert testimony as to damages, and establish damages, it is also realized that in the "battle of the experts," a jury might disagree with Lead Plaintiff's experts. Accordingly, the risk of proving damages could not be eliminated until after a successful trial and the exhaustion of all appeals. Thus, even if Lead Plaintiff prevailed in establishing liability, additional risks would remain in establishing both loss causation and the existence or amount of damages.

C.     **The Judgment of the Parties that the Settlement Is Fair and Reasonable Provides Additional Support for Approval of the Settlement**

77.     Another factor in considering whether to approve class action settlements is the judgment of the parties that the settlement is fair and reasonable. As outlined above, the Settlement is the product of arm's-length negotiations lasting over many months between adversaries with significant experience in securities class action litigation.

78.     Lead Counsel strongly believe that the Settlement represents an excellent resolution for the Class under the circumstances. As outlined above, the Settlement is fair, reasonable and adequate in all respects and should be approved by the Court.

79.     Furthermore, copies of the Settlement Notice have been mailed to over 10,023 potential Class members. The date for objection is May 8, 2013, but at present, Lead Counsel is not aware of any objections to the Settlement or the Plan of Allocation that have been submitted by a

Class member. Should any objections be timely filed between the date of this Declaration and the final approval hearing, they will be addressed in a supplemental memorandum to be filed with the Court on or before May 15, 2013.

## VI.    THE PLAN OF ALLOCATION

80.    Pursuant to the Notice Order and as set forth in the Notice, all Class members who wish to participate in the distribution of the Settlement Fund must submit a proper Proof of Claim form. As provided in the Stipulation, after deducting all appropriate taxes, administrative costs, attorneys' fees and expenses, the remainder of the Settlement Fund (the "Net Settlement Fund") shall be distributed among Class members who submit valid Proof of Claim forms according to the Plan of Allocation.

81.    If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed. The proposed Plan of Allocation provides that, to qualify for payment, a claimant must be, among other things, an eligible member of the Class and must submit a valid Proof of Claim form that provides all of the requested information.

82.    The Plan of Allocation is set forth in the Notice.

83.    The proposed Plan of Allocation was formulated after consultation with Lead Plaintiff's materiality and damages consultant in order to calculate a fair method to divide the Net Settlement Fund for distribution among the Class members. The proposed Plan of Allocation attempts to eliminate the effects of market forces unrelated to the alleged misrepresentations and omissions as well as simplify claims administration with attendant reduced cost to the Class. Thus, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of this Settlement among the Class.

## VII. FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD

84.     Despite working on this matter for more than six years, Lead Counsel have not received any payment for their services in prosecuting this litigation, nor have they been reimbursed for their out-of-pocket expenses incurred in the prosecution of the litigation. The Notice provides that Lead Counsel may apply for an award of attorneys' fees not to exceed 25% of the proceeds of the Settlement, plus expenses of up to $175,000, which were incurred in the litigation, plus interest earned on each amount at the same rate earned on the Settlement Fund.

85.     As set forth in Lead Counsel's Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Expenses, Lead Counsel is requesting attorneys' fees in that amount and expenses of $143,474.06. The requested fee award of 25% is well within the range of fees awarded by Courts in this District and in courts throughout the country.

86.     Lead Counsel achieved this result for the Class at great risk and substantial expense to itself. We were unwavering in our dedication to the interests of the Class and our investment of the time and resources necessary to bring this litigation to a successful conclusion as against the Defendants. Lead Counsel's compensation for the services rendered has always been wholly contingent. The requested fee is reasonable based on the quality of Lead Counsel's work and the substantial benefit obtained for the Class.

87.     The prosecution of this Action required Lead Counsel and their paraprofessionals to perform 2,561.40 hours of work and incur $143,474.06 in expenses.

88.     The resulting lodestar totals $1,194,720.00. Lead Counsel's 25% fee represents a negative multiplier of approximately 0.5 to their aggregate loadstar, which is below the range of multipliers awarded in similar cases.

- 25 -

89.     Indeed, the result obtained by Lead Counsel for the Class is truly extraordinary given the obstacles that existed to obtaining any recovery.  Defendants have maintained throughout this litigation that they had no liability.  They insisted they made no material misstatements or omissions in the Offering Documents and that they did nothing wrong.  Moreover, they claimed they intended to move for summary judgment and insisted they would prevail.  If Plaintiffs sought to go to trial, even if successful, it is unlikely they would have been able to obtain any payment from WorldSpace, and a judgment against the other Defendants would have been much more difficult to obtain.  In any event, it would be years before any recovery was obtained for the Class.

90.     In addition, Defendants maintained that loss causation did not exist.  They claimed that any decline in the Company's stock price was not related to any misstatements or omissions that they made, but was caused by other factors having nothing to do with the Offering Documents.  As such, Defendants contended that Lead Plaintiff would not be able to prove loss causation and would not be able to obtain a recovery.  Defendants further claimed that even if some amount of the decline in the Company's stock price could be attributable to their actions, those damages would be small and any recovery by Plaintiffs would be much lower than the amounts being sought.

91.     For our extensive efforts on behalf of the Class, we are applying for compensation from the Settlement Fund on a percentage basis, and seek the Court's approval of this fee percentage.  The percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum recovery in the shortest amount of time required under the circumstances.

92.     Lead Counsel's compensation for the services rendered was wholly contingent on their success.  Demonstrating Lead Counsel's tremendous commitment to this litigation, we have devoted more than 2,561.40 hours to litigating this Action.  The expenses incurred in the prosecution

of the litigation are set forth in the accompanying separate declaration. Those expenses are reflected in the books and records maintained by Abraham Fruchter, and are an accurate recordation of the expenses incurred. In total, Lead Counsel have incurred reimbursable expenses in the amount of $143,474.06. We respectfully submit that all of these costs and expenses have been reasonably incurred and should be approved by the Court.

### A. Extent of Litigation

93. As described above, this case was aggressively litigated and settled only after extensive settlement negotiations, including three formal mediation sessions before Judge Politan. Lead Counsel thoroughly researched the law applicable to the Class' claims and Defendants' defenses, prepared and filed a fact-specific amended complaint specifying Defendants' alleged violations of the federal securities laws, successfully opposed Defendants' motions to dimiss the case, reviewed and analyzed more than 365,000 pages of documents, aggressively pursued discovery, including holding numerous meet-and-confer sessions with Defendants regarding discovery disputes, successfully made a motion to modify the automatic stay in Bankruptcy Court, participated in mediation sessions with Defendants, overseen by Judge Politan, and engaged in extensive settlement negotiations over several months with the Defendants, even after an agreement-in-principle was agreed upon. In total, the 2,561.40 hours thus far devoted by Lead Counsel in the prosecution of this case represents a total lodestar of $1,194,720.00. Lead Counsel's work in this case will not cease after final approval of the Settlement, however. We anticipate spending significant time assisting Class members with claims administration issues and in working with the Claims Administrator to ensure a prompt distribution of the Net Settlement Fund to the Class. Thus, the lodestar, which is even higher than the amount of fees requested, represents a fair and reasonable amount to be awarded to Lead Plaintiff's Counsel and the amount requested should be approved.

### B.    Standing and Expertise of Plaintiffs' Counsel

94.    The expertise and experience of Lead Counsel is described in the separate declaration submitted herewith.  Lead Counsel is among the most experienced and skilled practitioners in the securities litigation field.  The attorneys at Lead Counsel's firm have years of experience litigating securities class actions, and have been involved in cases that have recovered hundreds of millions of dollars for shareholders.

### C.    Standing and Caliber of Opposition Counsel

95.    Defendants are represented by outstanding law firms, and they spared no effort in the defense of their clients.  Defendants' law firms vigorously defended their clients, insisted they had no liability and gave every indication they were ready to proceed with the litigation to trial, if necessary, if a settlement was not reached.  In the face of this opposition, Lead Counsel developed their case so as to persuade Defendants to settle the case on a basis favorable to the Class under the circumstances.

### D.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Securities Cases

96.    This litigation was undertaken by Lead Counsel on a wholly-contingent basis. From the outset, Lead Counsel understood that they were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel were obligated to assure that sufficient attorney and paraprofessional resources were dedicated to the prosecution of this litigation and that funds were available to compensate staff and the out-of-pocket costs which a case such as this entails.

97.    Because of the nature of a contingent practice in the area of securities litigation, where cases are predominantly "big cases" lasting several years, not only do contingent litigation

- 28 -

firms have to pay regular overhead, but they also have to advance the expenses of the litigation. With an average lag time of three to four years for these cases to conclude, the financial burden on contingent fee counsel is far greater than on a firm that is paid on an ongoing basis.

98. The foregoing does not even take into consideration the possibility of no recovery. As discussed above, from the outset, this litigation presented a number of unique risks and uncertainties which could have prevented any recovery whatsoever. It is wrong to assume that a law firm handling complex contingent litigation such as this always wins. Tens of thousands of hours have been expended in losing efforts. The factor labeled by the courts as "the risks of litigation" is not an empty phrase.

99. There are numerous cases where plaintiffs' counsel in contingent cases, after the expenditure of thousands of hours, have received no compensation. It is only the knowledge by defendants and their counsel that the leading members of the plaintiffs' securities bar are actually prepared to, and will, force a resolution on the merits and go to trial, that permits meaningful settlements in actions such as this.

100. There have been many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, changes in the law during the pendency of the case, or a decision of a judge following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel. Indeed, many relatively recent federal appellate reports are filled with opinions affirming dismissals with prejudice in securities cases. *See, e.g., ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009); *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009); *Stark Trading v. Falconbridge Limited*, 552 F.3d 568 (7th Cir. 2009); *Public Employees' Retirement Association of Colorado v. Deloitte & Touche LLP*, 551 F.3d 305 (4th Cir. 2009); *Zucco Partners, LLC v. Digimarc Corp.*, 552

F.3d 981 (9th Cir. 2009); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2008); *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125 (9th Cir. 2004); *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843 (9th Cir. 2003); *Wilkes v. Versant Object Tech. Corp.*, 56 Fed. Appx. 322 (9th Cir. 2003); *Zishka v. Am. Pad & Paper Co.*, 72 Fed. Appx. 130 (5th Cir. 2003); *Romine v. Acxiom Corp.*, 296 F.3d 701 (8th Cir. 2002); *Seinfeld v. Bartz*, 322 F.3d 693 (9th Cir. 2003); *Schiller v. Physicians Res. Group, Inc.*, 342 F.3d 563 (5th Cir. 2003); *Gompper v. VISX, Inc.*, 296 F.3d 893 (9th Cir. 2002); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424 (5th Cir. 2002); *ABC Arbitrage v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002); *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002); *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002); *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001); *Phila v. Fleming Cos.*, 264 F.3d 1245 (10th Cir. 2001); *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001); *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000); *Yourish v. Cal. Amplifier*, 191 F.3d 983 (9th Cir. 1999); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999); *Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997); *Chill v. GE*, 101 F.3d 263 (2nd Cir. 1996); *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922 (9th Cir. 1996); *Gross v. Summa Four*, 93 F.3d 987 (1st Cir. 1996); *Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399 (9th Cir. 1996); *Epstein v. Wash. Energy Co.*, 83 F.3d 1136 (9th Cir. 1996); *Lovelace v. Software Spectrum*, 78 F.3d 1015 (5th Cir. 1996); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996); *Acito v. IMCERA Group*, 47 F.3d 47 (2d Cir. 1995).

101.    The many appellate decisions affirming summary judgments and directed verdicts for defendants show that even surviving a motion to dismiss is no guarantee of recovery. *See In re*

- 30 -

*Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009); *Shuster v. Symmetricom, Inc.*, 35 Fed. Appx. 705 (9th Cir. 2002); *Gross v. Nuveen Advisory Corp.*, 295 F.3d 738 (7th Cir. 2002); *In re Digi Int'l, Inc. Sec Litig.*, 14 Fed. Appx. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001); *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000); *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999); *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir. 1998); *Silver v. H&R Block*, 105 F.3d 394 (8th Cir. 1997). Moreover, even plaintiffs who succeed at trial may find their judgment overturned on appeal. *See, e.g., Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (*en banc*) (reversing plaintiffs' verdict for securities fraud and ordering entry of judgment for defendants); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1988) (reversing plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (same).

102. The foregoing refutes the argument that the commencement of a class action is a guarantee of a settlement and payment of a fee. Indeed, the course of this litigation demonstrates the fact that the mere filing of an action does not ensure that there will be any settlement or fee. Thus, there was a demonstrable risk that the Class and its counsel would receive nothing. It took hard and diligent work by skilled counsel, to develop facts and theories which persuaded the Defendants to enter into serious settlement negotiations. If defendants believe they will prevail, experience shows that they will litigate to the end. The risk factor is real.

103. Losses such as those cited above are exceedingly expensive. The fees that are awarded are used to cover enormous overhead expenses incurred during the course of the litigation

and are taxed by federal, state and local authorities. Moreover, changes in the law through legislation or judicial decree can be catastrophic, frequently affecting contingent counsel's entire inventory of pending cases. These are real threats.

104. Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. Vigorous private enforcement of the federal securities and state corporation laws can only occur if the private plaintiffs can obtain parity in representation with that available to large corporate interests. If this important public policy is to be carried out, the courts must award fees which will adequately compensate private plaintiffs' counsel, taking into account the risks undertaken with a clear view of the economies of a securities class action.

105. When we undertook to act for the Lead Plaintiff and the Class in this matter, it was with the knowledge that we would spend many hours of hard work against some of the best defense lawyers in the United States with no assurance of ever obtaining any compensation for our efforts. The benefits conferred on the Class by this Settlement are particularly noteworthy in that a Settlement Fund worth $2,375,000 (plus accrued interest) was obtained for the Class despite the existence of substantial risks of no recovery in light of the vigorous defense mounted by Defendants.

**E. Lead Counsel's Request for Payment of Expenses Incurred Is Reasonable and Should Be Approved**

106. Lead Counsel has submitted a declaration setting forth the amounts of the expenses incurred over the course of the litigation. This declaration is filed herewith. These expenses were necessarily incurred for the successful prosecution of this litigation and are reasonable in amount.

## VIII. CONCLUSION

107. For the reasons set forth above and in the accompanying Lead Plaintiff's Memorandum of Law in Support of Motion for Final Approval of Settlement and Plan of Allocation

of Settlement Proceeds, and Lead Counsel's Memorandum of Law in Support of Motion For an Award of Attorneys' Fees and Expenses, it is respectfully submitted that: (a) the Settlement is fair, reasonable and adequate and should be finally approved; (b) the Plan of Allocation represents a fair method for the distribution of the Net Settlement Fund among Class members and should also be approved; and (c) the application for attorneys' fees of 25% of the proceeds of the Settlement, expenses in the amount of $143,474.06 plus interest earned on each amount, should be granted in its entirety.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on May 1, 2013.

_____
s/ Lawrence D. Levit
LAWRENCE D. LEVIT