UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| **David G. Lowthorp,** ) | |
| ) | No. 2:20-cv-00648-MTL |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Phoenix, Arizona |
| **Mesa Air Group, Incorporated,** ) | April 6, 2023 |
| **et al.,** ) | 9:01 a.m. |
| ) | |
| Defendants. ) | |
| _____ ) | |

**BEFORE:   THE HONORABLE MICHAEL T. LIBURDI, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**SETTLEMENT/FAIRNESS HEARING**

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiff:
      FARUQI & FARUQI, LLP
      By:  **Mr. Robert W. Killorin, Esq.**
      3565 Piedmont Road NE, Building 4
      Atlanta, Georgia  30305
      - and -
      FARUQI & FARUQI, LLP
      By:  **Mr. James W. Wilson, Esq.**
      685 Third Avenue
      26th Floor
      New York, New York  10017
      - and -
      DECONCINI McDONALD YETWIN & LACY, PC
      By:  **Mr. Gary F. Urman, Esq.**
      2525 East Broadway Blvd
      Suite 200
      Tucson, Arizona  85716

For the Mesa Defendants:
      COPPERSMITH BROCKELMAN, PLC
      By:  **Mr. Nathan J. Kunz, Esq.**
      2800 North Central Avenue, Suite 1900
      Phoenix, Arizona  85004
      - and -
      WILSON SONSINI GOODRICH & ROSATI, LLP
      By:  **Ms. Nina Fran Locker, Esq.  (Telephonic)**
           **Mr. Charles A. Talpos (Telephonic)**
      650 Page Mill Road
      Palo Alto, California  94304-1050

For the Underwriter Defendants:
      LEWIS ROCA
      By:  **John Christopher Gray, Esq.**
      201 East Washington Street, Suite 1200
      Phoenix, Arizona  85004
      -and-
      Shearman & Stering, LLP
      By:  **Ms. Agnes Dunogue (Telephonic)**
      599 Lexington Avenue
      New York, New York  10022

UNITED STATES DISTRICT COURT

**P R O C E E D I N G S**

(Court was called to order by the courtroom deputy.)

(Proceedings commence at 9:01 a.m.)

THE COURTROOM DEPUTY:  Civil Case 20-648, David J. Lowthorp vs. Mesa Air Group, Incorporated, and others.  This is the time set for fairness hearing.

Please announce your presence for the record starting with the plaintiff.

MR. KILLORIN:  Robert Killorin of Faruqi & Faruqi, along with my partner, James Wilson, for the plaintiff.

THE COURT:  Good morning.

Who's behind you?

MR. URMAN:  That's fine.

THE COURT:  Sir?

MR. URMAN:  I'm Gary Urman, local counsel for the plaintiff.

THE COURT:  Okay.  Good morning.

MR. KUNZ:  Good morning, Your Honor.  Nathan Kunz with Coppersmith Brockelman on behalf of the Mesa defendants as local counsel.  And we're joined by lead counsel on the phone, Nina Locker and Charles Talpas, with Wilson, Sonsini, Goodrich & Rosati.

THE COURT:  Okay.  Thank you.

MR. GRAY:  Good morning, Your Honor.  John Gray with Lewis Roca on behalf of the underwriter defendants.  And with

me on the phone I have Agnes Dunogue with Shearman & Sterling and also for the underwriter defendants.

THE COURT: Okay. Thank you. Good to see you all.

I have the motion for final approval of the class action settlement and the motion for attorneys' fees. I haven't seen any objections. I haven't seen any opt-outs.

Mr. Killorin, can you confirm that for me.

MR. KILLORIN: Yes, Your Honor, that -- that is -- that is correct. And we have just recently learned from defense counsel that in the -- there's a -- another pending state case, but what's our understanding, that their plan is to dismiss that case with prejudice once the final order is entered in this case and participate in the settlement.

THE COURT: Is that in Arizona state court?

MR. KILLORIN: Yes, Your Honor.

THE COURT: All right. Okay.

Ms. Locker, any -- anything to add? Have you maybe seen any objections or opt-outs or something of that nature that -- that everybody else might have missed?

MS. LOCKER: I have not seen anything, Your Honor. Thank you.

THE COURT: All right. Thank you, Ms. Locker.

Mr. Gray, tell me the name of the underwriter defendants' lead counsel again.

MR. GRAY: Mr. Dunogue.

THE COURT:  Dunogue?

MR. GRAY:  Yes.

THE COURT:  Okay.  Mr. Dunogue, have you seen anything that I should be aware of.

MS. DUNOGUE:  We have not, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.

Are there any changes, Mr. Killorin, that have occurred since you filed your motion?

MR. KILLORIN:  Nothing that hasn't been reflected in our most recent filings, Your Honor.  We filed a reply brief recently, and there have been a couple of updates filed by the claims administrator with -- with new numbers coming in, all of which look very good.

THE COURT:  Okay.  All right.  Thanks.

Any other lawyers want to add anything, there being any -- any changes to the situation that may not be reflected in what's been filed?  All right.  I don't see anybody.

Okay.  Well, Mr. Killorin, would you like to make a record of -- of anything at this point that you feel supports the settlement?

And if you could stand and do that, please.

MR. KILLORIN:  Yes, Your Honor.

Your Honor, we think this is a -- an excellent, clean settlement.  It's been administered expeditiously, properly, according to the Court's order on preliminary approval.  For

two years, both sides fought zealously to represent their parties' interest and professionally, in my opinion, for all counsel involved.  We had a full-day mediation in front of a experienced mediator, Jed Melnick, who after a full day of arm wrestling and consulting experts and their damage -- potential damage calculations, we arrived at an arm's-length settlement of $5 million for the case that we all believe is a fair, good-faith settlement, Your Honor.

I can -- I'd be happy to go into more detail.

We -- during this two years of litigation, my client, DeKalb County, made full discovery.  We served interrogatories and requests for production of documents.  Our IT person at DeKalb County, Barry Puckett, spent --

THE COURT:  Mr. Killorin, I just realized something. Your folder is blocking the microphone.

MR. KILLORIN:  I apologize.

THE COURT:  Although I could hear you, I just -- I have a concern that the folks on the phone might not be able to hear you.

MR. KILLORIN:  Sure, Your Honor.

Our IT person at DeKalb County spent 23 hours just going through computer records and gathering documents to comply with defendants' record request, which just gives you an indication of -- of the full discovery process that we went through in this case.

At the end of this discovery process, defendants saw fit to go ahead and stipulate to class certification because DeKalb County is an experienced lead plaintiff and class representative.  They have had good success in these kind of cases in the past.  And we, as a law firm, have had the privilege of representing DeKalb County for a number of years.

During -- during the pendency of the case -- bear with me one moment.

I'm going to just give you a quick laundry list of things that -- that were done in the litigation.  Our firm engaged in a full investigation of the claims, public records and private information gathered by private investigators.  We were involved in three contested hearings here before this Court.  Defendants zealously advocated their position on damages and their desire for an early summary judgment motion.  And because of that, we had a lot of discussions and talking to do about an appropriate scheduling order and the issue of bifurcation.  Ultimately -- and that necessitated two trips to Phoenix for hearings on proposed scheduling orders.

We finally were able to -- the Court issued a scheduling order, and then ultimately the Court issued a ruling that the case would go forward like a normal Section 11 case with discovery.  And then that set the stage for mediation, which is where we settled the case.

Along with that, we -- we -- after the case -- because

it settled before full discovery was had from defendants, we made arrangement to do two months of confirmatory discovery. Defendants were fairly forthcoming.  We reviewed approximately 72,000 pages of internal private documents confirming the settlement -- the fairness of the case, and, indeed, the -- the limits of feasible claims that the stock drop on August 9th was maintenance related.

So we think it's a good settlement, Your Honor, under all metrics.  This case -- the settlement would be 5.3 percent of the abstract theoretical possible limit of damages under Section 11 and Section 12.  Both of those damage provisions are similar, and parties that had stock -- purchased stock that would qualify for Section 12 would also have the option of filing a suit under Section 11 but not both.  You can't get double -- you can't double dip.  And, therefore, the plan of allocation is appropriate.  And, indeed, there've been no -- no objections, even though we have received, gosh, over 3,000 claim forms.  And over $9 million in claims have been submitted for this $5 million settlement.  And the abstract damage amount would be about $94 million.  That's under Section 11.  But that -- the way Section 11 works, it counts all stock drops from the date of the IPO to the date the complaint is filed.

I have here, if the Court wants, or for its convenience, a copy of paragraph 14 from our complaint.  In fact, I would feel better.  Could I hand you this --

THE COURT: Of course.

MR. KILLORIN: -- chart?

THE COURT: Come on up and hand that to the courtroom deputy.

MR. KILLORIN: It just makes it crystal clear.

THE COURT: And do defendants' counsel --

MR. KILLORIN: Yeah, they have a copy of this, Your Honor. And all it is is a reproduction of a part of the page from the complaint that contains the chart.

THE COURT: Okay.

MR. KILLORIN: And so, Your Honor, the theoretical damages in this case would be the entire stock drop shown on this chart from $12 down to $3.

THE COURT: Right. You know, I don't think I've ever made money when I've bought an IPO, although -- although I've never -- I've never been one of the fortunate few to get in before it's offered. But this is -- I'm sorry. This is just triggering some -- some bad decisions -- some memories of bad financial decisions that I have made.

But, anyway, go ahead, sir.

MR. KILLORIN: So --

THE COURT: That's just a -- that's an anecdote.

MR. KILLORIN: Thank you, Your Honor. I appreciate that.

So Section 11, it's just a statutory formulaic damage

calculation that starts with the IPO at $12 and under its statutory formula would award damages of the drop all the way down to $3, or 75 percent of value roughly.  However, the statute also provides defendants with the opportunity to challenge and make defendants share loss causation, which I think due process would require.

And based on that concept, all parties and all experts agree, I think, that the big drop at the very end of this chart was due to the onset of COVID.  That drop was pretty much in lockstep with all the other airlines.  So we do not think -- the risk of not recovering that part of Section 11 statutory damages we believe was extremely high, as -- as was -- was the risk.  Because of the loss causation defense, that we think defendants would have had an extremely high risk of not recovering anything other than the August 9th, 2019, steep drop shown in the middle of the page.

That drop both -- experts on both sides, I think it's fair to say, would consider that mathematically statistically significant.  And it would be -- an approximation would be $3.08 of that drop would be statistically significant.  And if it could be tied to our -- the surviving claims of misrepresented -- misrepresentation regarding maintenance and maintenance personnel, then it would be recoverable.

That is what the plan of allocation formula is based on.  It is -- to me, it's in a certain sense not as complicated

as I used to think it would be.  All it is is the bare bones statutory Section 11 formula that excludes losses from any purchases made above $12.  So if you purchased it, you know, at almost $16, you are not going to get the losses that you suffered while it was going from 16 back down to the original 12 IPO.  So that part of any losses are taken out of the formula, as are any losses more than $3.08 per share, because that's the -- the amount of the drop on the date in question that the experts agree was statistically significant and may be tied to the loss causation from the maintenance statements.  And -- excuse me.  And beyond that, any losses -- any sales before that date get zero recovery because they were not impaired by -- by that -- by that drop caused by misrepresentation in the -- in the prospectus.

So we think it's a fair plan of allocation.  We've talked to a number of experts and experienced claims administrators, spent a lot of time trying to get it right.  We think we did.  And we think the fact that we got it right is supported by the fact that we had over 3,000 claims submitted.  No objections and no opt-outs.

THE COURT:  Okay.

MR. KILLORIN:  So, Your Honor, we think it was an excellent result achieved for our client through years of zealous advocacy.  We think the expenses and attorneys' fees are reasonable.

The lodestar we're asking for is actually --

THE COURT:  Do you need some water?

MR. KILLORIN:  Yeah, I do.  Thank you.

THE COURT:  Okay.

MR. KILLORIN:  Thank you, Your Honor.

THE COURT:  Let's get you some water here.  Lisa.

MR. KILLORIN:  Oh, I've got some.  Thank you.

THE COURT:  Oh, okay.

MR. KILLORIN:  The lodestar we're asking for is actually less.  The multiplier is actually less than 1.  People in the office say, well, it's a negative multiplier.  No, it's not negative.  It's just less than 1.

In other words, we're not asking for any enhancement on any of the lodestar calculation of our attorneys' fees.  We're actually asking for a very slight reduction.  It's going to be something like .97 per- -- or 97 percent of our lodestar.  And that is to bring this case into compliance with long-standing precedent in the Ninth Circuit that 25 percent is considered the norm or a very acceptable standard for these kind of cases.  We have a contract with DeKalb we won't seek more than 28 percent in these cases.  But because we're in the Ninth Circuit and there's such strong precedent for 25 percent, we decided to limit our request for attorneys' fees to 25 percent.

Your Honor, that's the -- those are the highlights.

And I'm happy to delve into any type of questions the Court may have.

THE COURT:  All right.  I don't believe so at this point.  Thank you, Mr. Killorin.

Do any of the defendants' counsel wish to say anything on your client's behalf?  Any -- any reason why you support this settlement?

Ms. Locker, I'll ask you first.  Anything else to say?

MR. LOCKER:  No.  We have nothing to add, Your Honor.  Thank you very much.

THE COURT:  All right.  Good.

And, Mr. Dunogue, anything that you wish to add?

MS. DONOGUE:  No, nothing to add.  Thank you, Your Honor.

THE COURT:  All right.  Counsel in the courtroom, would you like to say anything?

Mr. Gray?

MR. GRAY:  Nothing here, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.

Mr. Kunz?

MR. KUNZ:  Nothing, Your Honor.  Thank you.

THE COURT:  All right.  And there haven't been any objections or any -- anybody state any concern with your attorneys' fees request, Mr. Killorin?

MR. KILLORIN:  Zero, Your Honor.

THE COURT:  Okay.

MR. KILLORIN:  Absolutely no -- no objections.

THE COURT:  All right.  Okay.  Well, I will take the matter under advisement.  I -- I anticipate approving the settlement and granting the motion for attorneys' fees.  Hopefully that will be done today.  Maybe tomorrow.  You know, the latest Monday.  But I'm pretty confident we'll get it done this week.

Mr. Killorin, I'm going to need you or somebody to email me a Word document of your proposed final order and judgment.  Somebody might have done that already.  And if that's the case, thank you, but I can't find it.

MR. KILLORIN:  Okay.

THE COURT:  And I just need it sent to the chamber's email address.  Do you have that?

MR. KILLORIN:  I believe we do, Your Honor.

MR. WILSON:  Yes, Your Honor.  We've -- we've submitted -- I believe you're correct.  We filed the Word version of the proposed order earlier.  We've also submitted the -- some of the backup data to the Court's email address that we have.  And I'll have the office email the final -- final order as soon as --

THE COURT:  That would be great, Mr Wilson.

MR. WILSON:  Okay.

THE COURT:  And if you wouldn't mind, make sure all

the lawyers are copied on that --

MR. WILSON:  Yes, sir.

THE COURT:  -- so that they can see.  And if somebody wants to check it, they can.

MR. WILSON:  Absolutely, Your Honor.

MR. KILLORIN:  And, Your Honor, we will send the Word document as it is in the filings.  I will just point out there is one bracketed insert in the order that simply says something like no objections have been filed.  And that just simply is -- still is a correct statement, so the brackets can be re- -- with -- removed.

THE COURT:  Okay.  Mr Wilson, can your office just remove those brackets?

MR. WILSON:  Yes, Your Honor.  We'll take -- I'll take care of that.

THE COURT:  Okay.  Does anybody have a concern with that proposed order being modified in that regard?

MR. GRAY:  No, Your Honor.

MR. KUNZ:  No, Your Honor.

THE COURT:  Okay.  Thanks.  All right.  Mr Wilson, I appreciate that.  And the sooner your office can do that, the better it will be for me in acting on your proposed order.

MR. WILSON:  Yes, Your Honor.  I'll take care of it right away.

THE COURT:  Thank you, sir.

I think the only thing that I wish to say -- well, there are many things that I wish to say.  The first is, is you all did a wonderful job on this case.  You know, I enjoyed it. I enjoyed having you in the courtroom.  I enjoyed reading your filings.

And I know Ms. Locker and the defense had -- you had some -- some very strong arguments that -- that didn't go your way, but I appreciate you all working together to settle the case and in a way that I do think is fair and reasonable for the class members.  So you should all be very proud of your work.  I want to make sure that I convey that to you.

The only -- the one area that I might want to just let you know that I don't think I necessarily agree with something that was said in the motion -- you don't have to write this down.  This is just editorializing.

I think plaintiff's counsel said something about -- you cited a -- I think a Northern District of California decision, and you said that Courts should kind of just stand back and let the private parties, you know, settle this as a way to, like, engage in private contract.

I don't necessarily agree with that.  I -- I think that as a district judge I need to exercise a -- a fiduciary-type role over the settlement -- over approving settlements for class action.  So I don't view it necessarily as a private contract between two parties.  I don't think it --

it could be compared to that.  I view me as -- as looking at this settlement and ensuring that the persons who are not necessarily in the courtroom, the class members, they're getting a fair deal.  And I -- and I do find that the class members have received a fair deal in this case, and I do find that the attorneys for the plaintiff did excellent work and that the fee is reasonable.

And so that's what I wish to say.

MR. KILLORIN:  Thank you, Your Honor.

THE COURT:  You're welcome to respond to that, if you want, but you don't have to if you don't want to.

MR. KILLORIN:  Your Honor, I agree with what you just said wholeheartedly.  I think we all do.

MR. WILSON:  Yes.

MR. KILLORIN:  If I -- if our words were inartful in that motion, we will not let that mistake happen again.

THE COURT:  Well, it's -- you shouldn't take that anything -- as anything other than a comment.  Okay?

All right.  Anything else?

MR. LOCKER:  Your Honor, this is Nina Locker.  Thank you for your comments.  And not everything went our way.  We are very grateful and -- for the Court's engagement throughout this matter, and we found that to be -- we are very grateful for that.

So, yes, it didn't always go the way we had hoped, but

we are very grateful and appreciative of the Court's engagement throughout.

THE COURT:  Well, I appreciate that, Ms. Locker.

And -- and, again, I'll say it once again, you all should be very proud with all of your work and the quality of lawyering that you provided to your clients.

MR. KILLORIN:  And we would echo Ms. Locker's comments.  We agree.  Thank you, Your Honor.

THE COURT:  Well, thank you, Mr. Killorin.

Why aren't you at The Master's?

MR. KILLORIN:  That's -- well, I've been to practice rounds before, Your Honor.  It's a beautiful place.  I would like to be there.

THE COURT:  Okay.  Well, maybe you could hop a plane and get there.

Thank you, everybody.

Court is adjourned.

MR. KILLORIN:  Thank you, Your Honor.

MR. WILSON:  Thank you, Your Honor.

(Proceedings conclude at 9:22 a.m.)

---oOo---

UNITED STATES DISTRICT COURT

# C E R T I F I C A T E

I, CATHY J. TAYLOR, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 7th day of April, 2023.

s/Cathy J. Taylor
Cathy J. Taylor, RMR, CRR, CRC